# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

MICHAEL JOSHUA HENDERSON,

                                 Plaintiff,

      v.                                9:22-CV-0242
                                        (AMN/MJK)

BRYAN POPP, *et al.*,

                                 Defendants.

---

MICHAEL JOSHUA HENDERSON, Plaintiff, *Pro Se*
NICHOLAS DORANDO, ESQ., Assistant Attorney General, for Defendants

MITCHELL J. KATZ, United States Magistrate Judge

TO THE HONORABLE ANNE M. NARDACCI, DISTRICT JUDGE:

## ORDER and REPORT AND RECOMMENDATION

This matter has been referred to me for Report and Recommendation by United States District Judge Anne M. Nardacci, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c).

Plaintiff commenced this action seeking remedies under 42 U.S.C. §1983 by filing a complaint on March 14, 2022. (Dkt. No. 1). In accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Senior United States District Judge Lawrence E. Kahn reviewed the sufficiency of the claims therein and entered a Memorandum-Decision and Order on May 12, 2022. (Dkt. No. 4).

Plaintiff filed an amended complaint on August 23, 2022. (Dkt. No. 20). In accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), Judge Kahn reviewed the sufficiency of the claims therein and entered a Decision and Order on August 23, 2022. (Dkt. No. 19). The Court determined that the following claims survived *sua sponte* review and required a response:

(1) Plaintiff's First Amendment retaliation claims against Defendants McLenithan, Guyette, Popp, Hamel, Fraser, Reynolds, and Jones; (2) Plaintiff's Fourteenth Amendment substantive due process claims against Defendants McLenithan, Guyette, Popp, Hamel, Fraser, Reynolds, Jones, and Scarlotta; (3) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Reynolds; (4) Plaintiff's Eighth Amendment failure-to-protect and excessive force claims against Defendant Popp; (5) Plaintiff's Section 1983 conspiracy claims against Defendants Guyette, Popp, Hamel, Fraser, and Reynolds; and (6) Plaintiff's intentional infliction of emotional distress claims against Defendants McLenithan, Guyette, Popp, Hamel, Fraser, and Jones. (Dkt. No. 19, pgs. 4-5).

Except for Defendant Reynolds, all Defendants filed their answer on November 7, 2022. (Dkt. No. 29). An answer on behalf of Defendant Reynolds was filed on December 22, 2023. (Dkt. No. 53). Among their defenses, Defendants assert that Plaintiff failed to exhaust his administrative remedies.

2

(Dkt. Nos. 29 and 53, ¶14).

Discovery has been completed and Defendants move pursuant to Fed. R. Civ. P. 56(a) for an order granting summary judgment, dismissing Plaintiff's amended complaint in its entirety with prejudice. (Dkt. Nos. 59 through 59-14). Defendants each submitted a declaration in support of the motion, a "joint" Statement of Material Facts ("SOMF"), the declarations of non-party witnesses Alexandria Cutler, Rachel Sequin and Lisa Stickney, a memorandum of law, and a reply memorandum of law in support of their motion for summary judgment. Plaintiff filed a response to the motion. (Dkt. Nos. 67 through 67-4). Consistent with applicable case law and Local Rule 56.2, Defendants and the Clerk each provided Plaintiff with notice of the consequences of failing to respond to the motion.  (Dkt. Nos. 59, 60). [1]

## I. Summary Judgment

### A. Legal Standard

"Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *ING Bank N.V. v. M/V TEMARA, IMO*, 892 F.3d 511, 518 (2d Cir. 2018). In ruling on a summary judgment motion, the district court must first "determine

---

[1] The Notice of Due Date to Respond to Motion for Summary Judgment which includes the consequences of the *pro se* litigant's failure to comply with the requirements of Fed. R. Civ. P. 56 was served upon the Plaintiff by regular mail. (Dkt. Nos. 60).

whether there is a genuine dispute as to a material fact, raising an issue for trial."
*McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 202 (2d Cir. 2007) (internal
quotations and citations omitted).

In reviewing the record to determine whether there is a genuine issue for
trial, the court must "construe the evidence in the light most favorable to the non-
moving party," *Costello v. City of Burlington,* 632 F. 3d 41, 45 (2d. Cir. 2011), and
"resolve all ambiguities, and credit all factual inferences that could rationally be
drawn, in favor of the party opposing summary judgment" *Kessler v. Westchester
County Dep't of Social Services,* 461 F.3d 199, 206 (2d Cir. 2006). "Where the
record taken as a whole could not lead a rational trier of fact to find for the
nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party bears the initial burden of 'showing that there is no
genuine dispute as to a material fact.'" *CILP Assocs., L.P. v. Price Waterhouse
Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quoting *Vivenzio v. City of
Syracuse,* 611 F.3d 98, 108 (2d Cir. 2010)).  "When the moving party has carried
its burden under Rule 56(c), its opponent must do more than simply show that
there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475
U.S. at 586. "The nonmoving party may not rely on mere conclusory allegations
nor speculation, but instead must offer some hard evidence showing that its version

of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145,149 (2d Cir. 1998).

"If the defendant in a run-of-the-mill civil case moves for summary judgment …, the judge must ask [themselves] not whether [they] think[] the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook,* 691 F.3d 226, 230 (2d Cir. 2012).

When a party moves for summary judgment against a *pro se* litigant, the Second Circuit requires that "*pro se* litigants have actual notice, provided in an accessible manner, of the consequence of the *pro se* litigant's failure to comply with the requirements of Rule 56." *Irby v. New York City Transit Auth.,* 262 F.3d 412, 414 (2d Cir. 2001). When such notice is given, courts in this district have routinely held that if a *pro se* plaintiff fails to respond to a motion for summary judgment, the court may accept defendant's factual assertions in the statement of material facts as true to the extent they are supported by the evidence in the record. *See Jackson v. Moore,* No. 9:21-CV-1001 (GTS/ATB), 2023 WL 4710869, at *2

(N.D.N.Y. Apr. 14, 2023), *report and recommendation adopted*, 2023 WL 4711091 (N.D.N.Y. Jul. 24, 2023); *see also Price v. Oropallo,* No. 9:13-CV-563 (GTS/TWD), 2014 WL 4146276, at *5 (N.D.N.Y. 2014); *Ahmed v. Frazer & Jones, Co*., No. 5:13-CV-573 (GTS/TWD), 2015 WL 470648 at *2 (N.D.N.Y. Feb. 4, 2015);  Local Rule 56.1(b).

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Salaam v. Stock*, No. 9:19-CV-00689 (AMN/TWD), 2023 WL 3853811, at *2 (N.D.N.Y.  Feb.  27, 2023), *report and recommendation adopted,* 2023 WL 3579770 (N.D.N.Y. May 22, 2023) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)); *see also Meagher v. State Univ. Constr. Fund*, No. 1:17-CV-0903 (GTS/CFH), 2020 WL 5504011, at *16 (N.D.N.Y. Sept. 11, 2020) ("where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*"). "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.'" *Id.* (citing *Cao-Bossa v. New York State Dep't of Lab.,* No. 1:18-CV-0509 (GTS/TWD), 2021 WL

3674745, at *1 (N.D.N.Y. Aug. 19, 2021)). The Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Id.* (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001)) (citation and internal quotation marks omitted).

Local Rule 56.1(b) requires that the non-movant file a response to the movant's statement of material facts ("SOMF") which admits or denies each of the movant's factual assertions in matching number paragraphs and supports any denials with a specific citation to the record where the factual issue arises. Where a party fails to respond to the movant's statement of material facts as required by Local Rule 56.1(b), the court may deem facts set forth in a movant's therein to be admitted, "where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement." *Coulter v. Barbeque Integrated, Inc.,* No. 5:20-CV-533 (GTS/ATB), 2022 WL 3444953, at *5 (N.D.N.Y. Aug. 17, 2022), *appeal withdrawn*, No. 22-2034, 2022 WL 19005660 (2d Cir. 2022); *see also*, N.D.N.Y. Local Rule 56.1(b); *Const. Pipeline Co., LLC v. Permanent Easement for 1.06 Acres*, No. 1:14-CV-2112 (NAM/DJS), 2022 WL 61316, at *1, n.1 (N.D.N.Y. Jan. 6, 2022) ("Because Defendant has not

responded to Plaintiff's Statement of Material Facts, the facts herein are deemed admitted to the extent they are supported by the record.").

### B.    Plaintiffs Response to Defendant's Statement of Material Facts

The facts set forth below were detailed in Defendants' SOMF pursuant to Rule 56.1(a). (Dkt. No. 59-1). Plaintiff's response to the SOMF (Dkt. No. 67) ("Response") does not conform to Local Rule 56.1(b) in any respect. Specifically, Plaintiff denies each factual statement and provides a rambling affidavit ("Plaintiff's Affidavit," "Affidavit," or Plaintiff's Aff.") which is largely a restatement of the allegations in, and citations to, his amended complaint.[2] "The responding Statement of Material Facts is not a mere formality." *Cross v. State Farm Ins. Co.,* 926 F. Supp. 2d 436, 441 (N.D.N.Y. Feb. 22, 2013). "To the contrary, this and other local rules governing summary judgment are "essential tools" intended to relieve the district court "of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'" *Carter v. Broome County*, 394 F. Supp. 3d 228, 238 (N.D.N.Y. 2019) (quoting *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005)); *see also Frantti v. New York*, 414 F. Supp. 3d 257, 284 (N.D.N.Y. Oct. 29, 2019), *affirmed*, 850 F. App'x 17 (2d Cir. 2021).

---

[2] Plaintiff's Affidavit is also used as a vehicle to present documents. However, while the documents are cited at the end of various paragraphs, the import of the documents is not discussed.

Here, Plaintiff's claims rely upon many of the facts set forth in the SOMF and he refers to his extensive Affidavit and references to his complaint which proves some of the facts to be true. Similarly, Plaintiff denies some of the facts notwithstanding admitting them in his deposition testimony. Significantly, when Plaintiff denies the facts, there is no specific basis for him doing so. This approach provides grounds to simply ignore the document or deem the unsubstantiated denials as admitted.

Nevertheless, in consideration of the Plaintiff's *pro se* status, the Court did examine his Response to determine whether his Affidavit, complaint, or deposition testimony provided a basis to deem the facts admitted, or a basis for him to deny or otherwise controvert any of the facts. The Court's findings are set out below after each statement of fact.

1)     Plaintiff was housed at Great Meadow Correctional Facility ("Great Meadow") from March 16, 2018, until July 3, 2020, which includes the time period at issue. (Cutler Decl., ¶ 19, Dkt. No. 59-3).  *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 4-14, ¶¶ 3-12, Dkt. No. 67).

2)     During the relevant period, Great Meadow's incarcerated grievance process was fully functioning and available to incarcerated individuals. Incarcerated individuals at Great Meadow had, and continue to have, full access to CORC to appeal facility-level grievance determinations. (Seguin Decl., ¶ 11,

Dkt. No. 59-12).  *Plaintiff denies this fact*. (Dkt. No. 67-2, pg. 13, Affidavit of non-party Richard Herne).

    3)    On March 23, 2019, Defendant McLenithan was working at Great Meadow in the B-Block housing unit. (McLenithan Decl., ¶ 5, Dkt. No. 59-9). *Plaintiff admits this fact.* (Plaintiff's Aff., pg. 4, ¶ 3, Dkt. No. 67).

    4)    At approximately 12:40 P.M., Defendant McLenithan was at the console outside of B-6 Block. (McLenithan Decl., ¶ 5, Dkt. No. 59-9). *Plaintiff admits this fact.* (Plaintiff's Aff., pg. 4, ¶ 3, Dkt. No. 67).

    5)    Plaintiff approached the window of the console, where Defendant McLenithan was located, and complained about not being let out of his cell, asking for Defendant McLenithan's name. (McLenithan Decl., ¶ 5, Dkt. No. 59-9; Dorando Decl., Exhibit "A", pg. 22[3]).  *Plaintiff admits this fact.* (Plaintiff's Aff., pg. 4, ¶ 3, Dkt. No. 67).

    6)    Defendant McLenithan observed Plaintiff become increasingly agitated, and ordered him to continue up the stairs and return to his cell by telling him to "Lock In." (McLenithan Decl., ¶ 7, Dkt. No. 59-9). *Plaintiff admits that he "ordered him to continue up the stairs and return to his cell by telling him to "Lock In."* (Plaintiff's Aff., pgs. 4-5, ¶ 3, Dkt. No. 67) (emphasis added).

---

[3] All page citations referenced in the Dorando Declaration are to the actual deposition page numbers and not to the pages numbers assigned by the CM/ECF system.

7)     Defendant McLenithan observed Plaintiff yelling belligerently as he went up the stairs to B-5 Block. (McLenithan Decl., ¶ 8, Dkt. No. 59-9). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 4-5, ¶ 3, Dkt. No. 67).

8)     Defendant McLenithan ordered Plaintiff to stop, but Plaintiff continued yelling. (McLenithan Decl., ¶ 8, Dkt. No. 59-9; Plaintiff's Aff., pgs. 4-5, ¶ 3, Dkt. No. 67). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 4-5, ¶ 3, Dkt. No. 67).

9)     Plaintiff then told Defendant McLenithan that he would "take care of" his issue the next time Defendant McLenithan was out of console, which Defendant McLenithan believed was a threat against him. (McLenithan Decl., ¶ 8, Dkt. 59-9). *Plaintiff did not deny stating to Defendant McLenithan that he will "take care of it," but rather asserts the phrase is "vague and does not constitute a threat."* (Dkt. 67-1, pg. 7, at ¶2).

10)     Failing to obey an order, harassing an officer, and threatening other people in the prison is prohibited conduct and against DOCCS rules. (McLenithan Decl., ¶ 9, Dkt. 59-9). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 4-5, ¶ 3, Dkt. No. 67).

11)     As a result of Plaintiff's conduct, Defendant McLenithan drafted a Misbehavior Report ("MBR"), accusing Plaintiff of Threats (Rule 102.10), Harassment (Rule 107.11), and Failure to Obey a Direct Order (Rule 106.10).

(McLenithan Decl., ¶ 9, Exhibit "A," pg. 5, Dkt.5 9-9; Dorando Decl., Exhibit "A," pg. 23, Dkt. No. 59-4). *Plaintiff admits that a MBR was prepared.* (Plaintiff's Aff., pgs. 4-5, ¶ 3, Dkt. No. 67; Dkt. No. 67-1, pg. 2).

12)     Plaintiff did not file a grievance regarding the March 23, 2019 incident, nor did he appeal any such grievance to the Central Office Review Committee ("CORC"). (Seguin Decl., ¶¶ 9, 13, Dkt. No. 59-12; Cutler Decl., ¶¶ 14-19, Dkt. No. 59-3). *Plaintiff denies this fact.* (Plaintiff's Aff., pg. 14, ¶ 14, Dkt. No. 67).

13)     This MBR was the subject of a hearing conducted by Defendant Scarlotta. (Dorando Decl., Exhibit "A," pg. 24, Dkt. No. 59-4; Scarlotta Decl., ¶ 10, Exhibit "A," Dkt. No. 59-11). *Plaintiff admits this fact.* (Plaintiff's Aff., pg. 5, ¶ 4, Dkt. No. 67).

14)     Following a hearing, where Plaintiff was permitted to be heard, Plaintiff was found guilty of the charges in the MBR and sentenced to 30 days keeplock confinement. (Dorando Decl., Exhibit "A," pgs. 25-26, Dkt. No. 59-4; Scarlotta Decl., ¶ 16, Exhibit "A," pg. 6, Dkt. No. 59-11). *Plaintiff admits this fact.* (Plaintiff's Aff., pg. 5, ¶ 4, Dkt. No. 67).

15)     Plaintiff filed grievances unrelated to this hearing at Great Meadow before and after the hearing occurred. (Seguin Dkt. Decl., ¶ 13, Exhibit "A," pgs. 7-9; Scarlotta Decl., ¶ 19, Dkt. No. 59-11). *Plaintiff admits this fact.* (Plaintiff's

Aff., pg. 14, ¶ 14, Dkt. No. 67).

16)    Plaintiff appealed the hearing determination within the facility, and
the decision was affirmed. (Cutler Decl., pg. 22, Dkt. No. 59-3[4]; Dorando Decl.,
Exhibit "A," pg. 25, Dkt. No. 59-4). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs.
5-6, ¶ 4, Dkt No. 67; Dkt. No. 67-1, pgs. 6-9).

17)    Several months later, on December 31, 2019, Defendant Guyette
wrote another misbehavior report regarding Plaintiff. (Guyette Decl., ¶ 10, Exhibit
"A," pg. 5, Dkt. No. 59-6). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5,
Dkt. No. 67).

18)    At that time, Defendant Guyette was working in the C-2 Block at Great
Meadow. (Guyette Decl., ¶ 6, Dkt. No. 59-6). *Plaintiff admits this fact.* (Plaintiff's
Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

19)    On December 31, 2019, Plaintiff requested to use the phone or the
tablet at the kiosk. (Guyette Decl., ¶ 7, Dkt. No. 59-6). *Plaintiff admits this fact.*
(Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

20)    At approximately 6:52 P.M., Defendant Guyette allowed Plaintiff out
of his cell to use the telephone. (Guyette Decl., ¶ 7, Dkt. No. 59-6).  *Plaintiff
admits this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

---

[4] Defendants' citation generally to Exhibit "A" in support of this fact is not specific and not helpful.
Exhibit "A" to the Cutler Declaration is thirty pages of computer printouts. The documentary
evidence to support this fact is found at Dkt. No. 59-3, pg. 22.

21)    Plaintiff chose to use the tablet at the kiosk. (Guyette Decl., ¶ 7, Dkt. No. 59-6; Dorando Decl., Exhibit "A," pg. 27, Dkt. No. 59-4). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

22)    When Plaintiff went to the kiosk, Defendant Guyette left Plaintiff to use the tablet, and went to the entry of the C-2 Block to let staff and a nurse onto the company to administer medications. (Guyette Decl., ¶ 8, Dkt. No. 59-6). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

23)    When Defendant Guyette returned approximately 10 minutes later, he saw Plaintiff on the phone. (Guyette Decl., ¶ 8). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

24)    As a result of this conduct, which violated Rule 121.12 – Phone Violation Use of Phone or Kiosk, Defendant Guyette drafted an MBR, accusing Plaintiff of that charge which was countersigned by C.O. Worth. (Guyette Decl., ¶ 10, Exhibit "A," pg. 5, Dkt. No. 59-6). *Plaintiff admits the preparation of the MBR.* (Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67; Dkt. No. 67-1, pg. 21).

25)    After a hearing where the phone record was reviewed, Plaintiff was found guilty of the charge in the MBR. (Guyette Decl., ¶ 14, Dkt. No. 59-6). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5, Dkt. No. 67).

26)    This hearing was affirmed on appeal. (Dorando Decl., Exhibit "A," pg. 31, Dkt. No. 59-4). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 6-7, ¶ 5,

Dkt. No. 67; Dkt. No. 67-1, pgs. 25-28).

27)     Plaintiff did not file a grievance regarding the December 31, 2019, incident, nor did he appeal any such grievance to CORC. (Seguin Decl., ¶ 9, Dkt. No. 59-12; Cutler Decl., ¶¶ 14-19, Dkt. No. 59-3). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 14-15, ¶ 14, Dkt. No. 67).

28)     Several days later, on or about January 8, 2020, Defendant Popp issued Plaintiff an MBR for conduct that occurred in the law library of Great Meadow at approximately 6:30 P.M. (Popp Decl., ¶ 7, Dkt. No. 59-10). *Plaintiff admits that Defendant Popp issued him a MBR for conduct that occurred in the Great Meadow law library, but denies the date was January 8, 2020.* (Plaintiff's Aff., pgs. 9-10, ¶ 9, Dkt. No. 67).

29)     Defendant Popp observed Plaintiff using library computers and equipment to write grievances against a specific officer to circulate to other incarcerated individuals for filing, in a process referred to as "shot gunning" grievances, which is a Facility Correspondence Violation (Rule 180.11). (Popp Decl., ¶ 14, Dkt. No. 59-10). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 9-10, ¶ 9, Dkt. No. 67).

30)     Defendant Popp issued Plaintiff an MBR, charging him with Refusing a Direct Order (Rule 104.10), and Facility Correspondence Violation (Rule 180.11). (Popp Decl., Exhibit "A," pg. 8). *Plaintiff admits this fact.*

(Plaintiff's Aff., pgs. 9-10, ¶ 9, Dkt. No. 67; Dkt. No. 67-1, pg. 32).

31)    As the area Sergeant, Defendant Hamel reviewed the MBR and approved it. (Hamel Decl., ¶ 8, Dkt. No. 59-7). *Plaintiff denies this fact.* (Plaintiff's Aff., pg. 8, ¶ 6, Dkt. No. 67).

32)    Plaintiff did not file a grievance regarding the January 8, 2020 MBR, nor did he appeal any such grievance to the central office. (Seguin Decl., ¶ 9. Dkt. No. 59-12; Cutler Decl., ¶¶ 14-19, Dkt. No. 59-3). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 14-15, ¶ 14, Dkt. No. 67).

33)    The January 8, 2020, MBR was the subject of a Tier 2 hearing where Plaintiff was found guilty of the Facility Correspondence Violation charge and sentenced to a suspended sentence of 15 days in keeplock confinement, which would not be served if Plaintiff refrained from committing additional offenses. (Popp Decl., ¶ 13, Dkt. No. 59-10; Reynolds Decl., ¶ 18, Exhibit "A," pg. 8, Dkt. No. 72[5]). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 9-10, ¶ 9, Dkt. No. 67).

34)    Additionally, Defendant Reynolds recommended that Plaintiff be removed from the Law Library Program. (Reynolds Decl., ¶ 21, Exhibit "A," pg. 8, Dkt. No. 72). *Plaintiff denies this fact.* (Plaintiff's Aff., pg. 8, ¶ 6, Dkt. No. 67).

35)    Defendant Reynolds' recommendation for removal from the Law Library Program had no force and effect unless endorsed by the Programming

---

[5] In the SOMF, defendants cite generally to Reynolds at "Exh. A" which is seven (7) pages of internal DOCCS documents, some of which is difficult to understand without guidance from defendants, which was lacking here.

Committee, which is headed by the Deputy Superintendent of Programs ("DSP"). (Reynolds Decl., ¶¶ 20, 22, Dkt. No. 72; Stickney Decl., ¶¶ 10-11, Dkt. 59-13). *Plaintiff denies this fact.* (Plaintiff's Aff., pg. 8, ¶ 6, Dkt. No. 67).

36)    Then-DSP Stickney made the ultimate determination to remove Plaintiff from his program. (Stickney Decl., ¶¶ 10, 11, Dkt. No. 59-13). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 8, 9,10, 15, ¶ 6, 9. 15, Dkt. No. 67).

37)    On January 24, 2020, Plaintiff was involved in an altercation with another incarcerated individual. (Dorando Decl., Exhibit "A," pgs. 41-42, Dkt. No. 59-4). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 12-13, ¶ 11, Dkt. No. 67; Dkt. No. 67-1, pg. 43).

38)    Plaintiff did not file a grievance regarding the January 24, 2020 incident, nor did he appeal any such grievance to CORC. (Seguin Decl., ¶ 9, Dkt. No. 59-12; Cutler Decl., ¶¶ 14-19, Dkt. No. 59-3). *Plaintiff denies this fact.* (Plaintiff's Aff., pgs. 14-15, ¶ 14, Dkt. No. 67).

39)    Several months later, in June 2020, Plaintiff was housed in the C-1-30 Company of Great Meadow. (Jones Decl., ¶ 7, Dkt. No. 59-8; Cutler Decl., ¶ 30, Dkt. No. 59-3). *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 13-14, ¶ 12, Dkt. No. 67; Dkt. No. 67-1, pg. 3).

40)    On June 7, 2020, C.O. Laura Jones issued Plaintiff an MBR because she observed him passing an unidentified object to another incarcerated individual

at approximately 11:45 A.M. (Jones Decl. ¶¶ 7-8, 10, Dkt. No. 59-8). *Plaintiff*

*admits this fact.* (Plaintiff's Aff., pgs. 13-14, ¶ 12, Dkt. No. 67).

41)    Plaintiff was charged with violating Rule 106.10 – Direct Order, and

Rule 113.15 Unauthorized Exchange. (Jones Decl., ¶ 10, Exhibit "A," pg. 5).

*Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 13-14, ¶ 12, Dkt. No. 67).

42)     Following a disciplinary hearing, Lt. Murphy found Plaintiff guilty of

the charges and imposed 30 days in keep-lock confinement (two of which were

served pre-hearing), and a loss of packages and commissary for 30 days. (Jones

Decl. ¶ 13, Dkt. No. 59-8).  *Plaintiff admits this fact.* (Plaintiff's Aff., pgs. 13-14, ¶

12, Dkt. No. 67; Dkt. No. 67-2, pgs. 8-11).

43)    Plaintiff did not file a grievance regarding the June 7, 2020 MBR, nor

did he appeal any such grievance to CORC. (Seguin Decl., ¶ 9, Dkt. No. 59-12;

Cutler Decl., ¶¶ 14-19, Dkt. No. 59-3).  *Plaintiff denies this fact*. (Plaintiff's Aff.,

pgs. 14-15, ¶ 14, Dkt. No. 67).

## II.    Exhaustion of Remedies

The Prison Litigation Reform Act ("PLRA") governs federal civil rights

litigation by inmates. Under the PLRA, "[n]o action shall be brought with respect to

prison conditions under § 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's

exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (citations omitted).

To exhaust administrative remedies, an incarcerated individual must complete all the administrative review procedures according to the rules applicable to the institution in which he or she is confined. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). Therefore, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

## A.    Plaintiff's Position Concerning the Grievance Process

Plaintiff does not argue that Great Meadow lacked an established grievance process. To the contrary, Plaintiff's evidence, and the documentary evidence produced by Defendants, establish that Plaintiff was familiar with the grievance process. In addition to summarily stating that he filed grievances regarding every claim in his complaint (Plaintiff's Aff., pg. 14, ¶14), Plaintiff's argument regarding exhaustion is that "Great Meadow Correctional Facility's grievance committee is always throwing grievances away, not filing them or making them disappear." (*Id.*). Plaintiff continues, "[f]or example, if you compare the number of grievances filed at

Great Meadow by Plaintiff, to those that CORC has, you'll see that CORC has more grievances on record than they have filed at Great Meadow." (*Id.*).

Plaintiff also offers the affidavit of Mr. Herne (an incarcerated individual as of June 8, 2020), who states, "I would like to add that filing a grievance complaint here in Great Meadow Correctional Facility is futile and pointless. I've tried to file a grievance in the past, here, and it was never filed and I was never called for a grievance hearing or given a grievance number." (Herne Affidavit, Dkt. No. 67-2, pg. 14). Mr. Herne offers, without specifics, that there are other inmates who have had the same experience, and he confirms that he heard this complaint from Plaintiff. (*Id.*).

**B.    Plaintiff's Position Concerning the Filing of Specific Grievances**

Plaintiff summarily states that he "filed grievances with respects (sic) to all the claims alleged in the complaint." (Plaintiff's Aff., pg. 14, ¶14; Dkt. No. 67). However, Plaintiff does not specifically identify copies of these grievances.[6] Plaintiff filed a collection of documents as Exhibit "H" to his affidavit. (Dkt. No. 67-2, pgs. 15-33). Again, Plaintiff does not describe what these documents are, and how they relate to his claims. They are simply attached.

One of the documents included in Exhibit "H" purports to be a letter dated

---

[6] In the complaint (Dkt. No. 1) and amended complaint (Dkt. No. 20), Plaintiff alleges that the retaliatory acts were taken because of grievances, but he does not ever clearly state that he filed any grievances.

January 8, 2020, from Plaintiff to the IGRC, with a reference line "Grievance Complaint." (*Id.*, pgs. 16-17). Plaintiff provides no explanation or argument about this document and Defendants do not address it. The content of the letter describes some of the allegations that Plaintiff has made in his complaint.

The next document Plaintiff filed is a Great Meadow's form, which seems to have been completed by Donita McIntosh, First Deputy Superintendent, and refers to an "inmate note dated 1/11/20," which states "your complaint has been referred to the Inmate Grievance Program." (*Id.*, pg. 18). Again, Plaintiff provides no details concerning this document, and Defendants have again not addressed it. Plaintiff has not provided an "inmate note" dated January 11, 2020, so the Court is left to guess whether the January 8, 2020 letter is the "inmate note." Finally, if this is a "grievance," it does not seem to have been captured by Director Seguin in the search report. (Seguin Decl., ¶ 8, Dkt. No. 59-12).

Exhibit "H" also includes a letter from Plaintiff to the IGRC dated January 28, 2020, which refers to a grievance filed on January 11, 2020, regarding "harassment and false misbehavior reports." (Dkt. No. 67-2, pg. 19). The content of the January 11, 2020 letter does not match the content of the January 28, 2020 letter. Plaintiff does not clarify the purpose of the letters, and Defendants are likewise silent regarding the same. There is also a letter to the IGRC that refers to the January 11, 2020 grievance and purports to concern an appeal to the CORC. (Dkt. No. 67-2, pg.

20).

     There are also letters included in Exhibit "H" that refer to "grievance appeals." (Dkt. No. 67-2, pgs. 22, 23, 24, 26, 27, 28, 31). There is no indication that these letters were filed or delivered by Plaintiff in accordance with grievance procedures, and Plaintiff provides no explanation.[7] Again, Defendants have also not provided any information in their reply papers concerning these documents. The documents at Dkt. Nos. 67-2, pages at 21 and 29 have blanks, and Plaintiff provides no explanation about them. The letter at Dkt. No. 67-2, page 25, concerns a "grievance complaint" and the content relates to Plaintiff's claims, but again, Plaintiff provides no details concerning the document, and again, Defendants offer nothing in reply.

     The last of the documents attached as Exhibit "H" to Plaintiff's affidavit is a form prepared by the IGRC office dated June 18, 2020, with the subject line "Your Grievance Number" that refers to a grievance pertaining to "Tier 2." (Dkt. No. 67-2, pg. 32). The grievance document was not identified or provided by Plaintiff. Whatever the content of the grievance, it was considered by the IGRC, which dismissed and closed the grievance. (Dkt. No. 67-2, pg. 33). Plaintiff indicated his desire to appeal that decision on the IGRC form. (*Id.*). Neither party has provided any information about these documents.

---

[7] While the letters have a similar appearance, below the signature line appears the cell block information for the plaintiff presumably at the time he signed and or sent the letters.

### C.    Defendants' Position Concerning the Grievance Process

Alexandria Cutler (not a party in this action) is employed at Great Meadow as the Incarcerated Grievance Program ("IGP") Supervisor, a position she has held since 2018. (Cutler Decl., ¶ 1, Dkt. No. 59-3). Ms. Cutler attests to the details of the IGP at Great Meadow, that the IGP was fully functioning at Great Meadow during the relevant period, and the incarcerated individual orientation program that includes a presentation by a representative from the Incarcerated Grievance Resolution Committee ("IGRC") about the grievance process. (Cutler Decl., ¶ 5, 17, Dkt. No. 59-3).  She further avers that Plaintiff completed the "Facility Orientation" at Great Meadow on June 17, 2018. (Cutler Decl., ¶ 5, Dkt. No. 59-3).  Ms. Cutler also attests to the procedures associated with the grievance process. Ms. Cutler states that the allegations against Defendants, except for Plaintiff's Fourteenth Amendment substantive due process claims against Defendant Scarlotta and Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Reynolds, are the proper subject for a grievance under 7 N.Y.C.R.R. §701.2(a). (Cutler Decl., ¶¶ 14, 15, Dkt. No. 59-3).

Ms. Cutler states that she conducted a review of Great Meadow's grievance activity for the period between January 2019 and February 2020 and found four grievances filed by Plaintiff at Great Meadow. (Cutler Decl., ¶ 16, Dkt. No. 59-3). She authenticated a record of that search, attaching it to her declaration. (*Id.*). The

grievance filed on July 8, 2019, is titled "Alleged Threats" and the grievance filed on October 17, 2019, is titled "Retaliation for Grievances." *Id.*

Rachel Seguin (not a party in this action), is Director of the Incarcerated Grievance Program ("IGP") for DOCCS. (Seguin Decl., ¶ 1, Dkt. No. 59-12). Director Seguin's declaration explains the DOCCS IGP and the appeal process, which culminates with the Central Office Review Committee ("CORC"). (Seguin Decl., ¶¶ 4-8, Dkt. No. 59-12). As the IGP's custodian of records, Director Seguin searched for and produced a record titled "Inmate Grievance – Active Cases" and one titled "Inmate Grievance – Closed Cases." (Seguin Decl., Exhibit "A," pgs. 7-9, Dkt. No. 59-12). She identified only two appeals to CORC by Plaintiff while he was at Great Meadow, neither of which concern the allegations against the Defendants. (Seguin Decl., ¶ 13, Dkt. No. 59-12).

Records such as those provided by Rachel Seguin and Alexandria Cutler, both of whom who have personal knowledge of the inmate grievance and appeal processes at correctional facilities, have been found sufficient to support summary judgment based on an incarcerated individual's failure to exhaust administrative remedies. *See Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at *3 (W.D.N.Y. May 14, 2020) (finding CORC appeal log report accompanied by certification of DOCCS official certifying the log report was made in the regular course of business and employees engaged in creating the report had a duty to truthfully record the events

maintained therein). Here, however, and for the reasons more fully articulated below,

the declarations of Alexandria Cutler and Rachel Seguin are an insufficient basis on

which to grant Defendants' summary judgment motion regarding exhaustion.

### D.    Analysis of Exhaustion Defense

#### i.    Claims Were Subject to Grievance Process

Based upon the various documents attached as Exhibit "H" to Plaintiff's

affidavit, it appears that the parties agree that except for the claims against

Defendants Reynolds and Scarlotta, Plaintiff's claims, if accepted as true, are the

proper subject for a grievance under DOCCS's grievance procedures outlined in 7

N.Y.C.R.R. § 701.1 *et seq*. Plaintiff was housed at Great Meadow from March 16,

2018, until July 3, 2020. (Cutler Decl., ¶ 17, Dkt. No. 59-3). During that time, Great

Meadow had a fully functioning IGP that was available to incarcerated individuals.

(*Id.*)  Further, incarcerated individuals at Great Meadow had and continue to have

full access to CORC in which to appeal facility-level grievance determinations. (*Id.*).

#### ii.    Administrative Remedies Were "Available" to Plaintiff

The PLRA provides that no action shall be brought "until such administrative

remedies *as are available* are exhausted." 42 U.S.C. §1997e(a) (emphasis added).

Plaintiff essentially argues that the exhaustion of remedies requirement of the PLRA

is not applicable in this case because the grievance process was not available to him

at Great Meadow, as the grievance procedures were not "capable of use" to obtain

"some relief for the action complained of." *Booth v. Churner,* 532 U.S., at 731, 738 (2001); *see also Ross,* 578 U.S. 632, 642 (2016).

"First, as *Booth* made clear, an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S. at 643 (citing *Booth,* 532 U.S. at 736, 738). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Ross*, 578 U.S. at 643–44 "And finally, the same is true when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross,* 578 U.S. at 644.

Here, Plaintiff argues that Great Meadow failed to record and/or lost grievances, and that the difference between the number of appeals to the CORC and the number of filed grievances proves that Great Meadow did not have a fair or functioning grievance system. (Plaintiff's Aff., pg. 14, ¶ 14, Dkt. No, 67). That another incarcerated individual attested to the same unsubstantiated conclusions does not manifest a triable issue of fact.  As of March 29, 2024, Plaintiff had recorded 49 appeals to CORC. (Seguin Decl., Exhibit "A," pgs. 6-9, Dkt. No. 59-12). Six of those appeals were made from grievances filed by Plaintiff at Great Meadow. Plaintiff did

not challenge this evidence.

Plaintiff's reliance on the fact that the grievance process was "unavailable" to him, is belied by the documentary evidence. No trier of fact could look at the record and conclude anything else. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. The uncontroverted documentary evidence shows that Great Meadow had a functioning grievance system, including appeals, and that Plaintiff availed himself of the same when it suited him. The uncontroverted evidence also shows that the grievance system was able to, and did in fact, provide remedies to aggrieved inmates. In addition, the record of Plaintiff's use of the grievance process proves that the system could be readily navigated by him. And finally, there is no specific evidence to suggest that either Plaintiff's or Mr. Herne's efforts to use the grievance system were thwarted "through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644.

### iii.    Whether Plaintiff Exhausted his Administrative Remedies Cannot be Determined on this Motion

Only after an incarcerated individual confined in a DOCCS facility has properly exhausted all three levels of review afforded by the IGP may he or she seek relief pursuant to Section 1983 in federal court. *See McCants v. Cannon*, No. 9:08-CV-616 (LEK/DEP), 2008 WL 4936821, at *3, (N.D.N.Y. Nov. 18, 2008) (Plaintiff must complete the exhaustion process prior to commencing the action) (citations omitted).

Defendants assert that Plaintiff did not file a grievance with respect to any of his claims in this action (Cutler Decl., ¶ 19, Dkt. No. 59-3), nor did Plaintiff appeal the denial of any grievance related to his claims in this action to CORC (Seguin Decl., ¶¶ 13-14, Dkt. No, 59-12).  Further, with respect to Plaintiff's Fourteenth Amendment substantive due process claim against Defendant Scarlotta, Defendants assert that Plaintiff did not appeal the relevant hearing determination to the Central Office, as is required to exhaust administrative remedies with respect to that claim. (Cutler Decl., ¶ 22, Dkt. No. 59-3); *see also Beauvoir v. Smith,* No. 9:14-cv-1495 (MAD/DEP)*,* 2017 WL 4271636, at *2 (N.D.N.Y. Sept. 26, 2017) (When a Plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal.") (citations omitted).

Ms. Cutler averred that an incarcerated individual may appeal to the CORC, but of course the decision to appeal is left with the individual. (Cutler Decl., ¶10, Dkt. No. 59-3).  The documentary evidence presented by Ms. Cutler shows that Plaintiff only filed four grievances while at Great Meadow between January 2019 and February 2020. (Cutler Decl., ¶ 16, Exh. "A," pgs. 34-36, Dkt. No. 59-3). Plaintiff appealed two of them. (Seguin Decl., ¶ 8, Dkt. No. 59-12) (There were

however a total of six appeals from grievances filed at Great Meadows, including four filed in 2018).  Ms. Cutler also stated that the document retention procedure requires retention of grievance documents for the current year and the previous four calendar years and as of April 1, 2024, the "office ha[d] on file all grievances filed in Great Meadow from January 1, 2020 to the present." (Cutler Decl., ¶ 12).[8]

Interestingly, the grievance record submitted by Director Seguin shows that since 2012, Plaintiff filed fifty grievances at several facilities, including six at Great Meadow. Two of the grievances filed at Great Meadow are titled "Missing Grievances" and "Grievance Process." (Seguin Decl., Exhibit "A," pgs. 8-9, Dkt. No., 59-12). Neither Plaintiff nor Defendants provide any details concerning these grievances. In addition, while providing Plaintiff's entire grievance history, Director Seguin only calls out the period of January 2019 to February 2020 (Seguin Decl., ¶ 13, Dkt. No., 59-12), which does not include the time when Defendant Jones filed an MBR which is the subject of Plaintiff's claim against her (Jones Decl., ¶ 7, Dkt. No. 59-8), and it also does not include the dates when the grievances titled "Missing Grievances," and "Grievance Process" were filed. Regarding the two grievances Director Seguin discussed, she indicated that "neither of these grievances address the

---

[8] Neither the complaint (Dkt. No. 1) nor the amended complaint (Dkt. No. 20) provided notice of any issue concerning the grievance process. If however, a litigation hold notice had been issued to the facility by DOCCS, documents prior to January 2020 would have been preserved, including those concerning the grievances filed by plaintiff titled "Grievance Process" and "Missing Grievance." (Seguin Del., pg. 8, Dkt. No. 59).

above-referenced allegations against the named Defendants." (Seguin Decl., ¶ 13, Dkt. No., 59-12).

As discussed below, the alleged grievance against Defendant Guyette is the "protected activity" that forms the basis of Plaintiff's retaliation claims, and the date of this alleged grievance is unstated but if it was filed, it must have been filed before the first retaliatory event alleged in the complaint, January 2019. It is possible that the 2018 grievances address the alleged Defendant Guyette grievance. While "possible" is not an evidentiary principle, lacking any discussion, argument or additional evidence from Defendants to put the issue to rest, it is sufficient, in addition to the some of the other documents filed by Plaintiff, to recommend an exhaustion hearing.

The documents attached to Exhibit "H" to Plaintiff's affidavit include a facility document completed by Donita McIntosh, First Deputy Superintendent, dated January 16, 2020. (Plaintiff's Aff., Exhibit "H," pg. 18, Dkt. No. 67-2). Without any explanation from the parties, the Court cannot determine whether this is evidence of the filing of a relevant grievance, and whether the unsigned typed letter from Plaintiff to the IGRC dated January 8, 2020 (Plaintiff's Aff., Exhibit "H," pgs. 16-17, Dkt. No. 67-2), is the document to which the form refers, or whether there is another document.

Also attached as Exhibit "H" is a facility document from the IGRC office

dated June 18, 2020. (Plaintiff's Decl., Exhibit "H," pg. 32, Dkt. No. 67-2).  The

subject is "Your *Grievance* Number," and it confirms receipt of "your *grievance* that

you wrote pertaining TIER 2." (*Id.*) (emphasis added). Defendant Jones filed a MBR

on June 7, 2020. The hearing[9] concerning Defendant Jones's MBR was concluded on

June 10, 2020, and Plaintiff was found guilty. (Plaintiff's Aff., Exhibit "H," pg. 4,

Dkt. No. 67-2). Plaintiff filed a written appeal (Plaintiff's Aff., Exhibit "H," pgs. 8-9,

Dkt. No. 67-2), the appeal was acknowledged by the Superintendent (Plaintiff's

Decl., Exhibit "H," pg. 10, Dkt. No. 67-2), and the hearing decision was affirmed

(Plaintiff's Aff., Exhibit "H," pg. 11, Dkt. No. 67-2). None of these documents

explain the facility document referring to a *grievance* around the time of Defendant

Jones's MBR and administrative hearing. Plaintiff provides no explanation, and

importantly, neither do the Defendants.

Defendants' reply memorandum of law (Dkt. No. 69) does not specifically

address any of the documents in Plaintiff's Exhibit "H," relying generally on the

Seguin Declaration and Cutler Declaration to prove that Plaintiff did not file

whatever documents he asserts he did file. (Dkt. No. 69, pg.  4). This does not,

however, explain the facility documents noted above, nor does Defendants' failure to

address the documents filed by Plaintiff and perhaps to preserve, help the Court

accurately address the exhaustion issues. While these documents may ultimately be

---

[9] The hearing officer was Lt. Murphy who is not a defendant.

proven to be irrelevant, and it may be determined that Plaintiff has failed to exhaust his administrative remedies concerning each of his claims, the Court is unable to make that determination on these papers.

For these reasons, the Court recommends that an exhaustion hearing be convened.[10]

## IV.    Plaintiff's Retaliation Claims

### A. Legal Standard

To state a First Amendment claim for retaliation, an incarcerated person must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *See Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (citations omitted). Regardless of the presence of retaliatory motive, … a defendant may be entitled to summary judgment if he can show … that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

"Although not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that verbal or oral complaints

---

[10] Defendants reply memorandum of law suggests an evidentiary hearing on the issue of exhaustion if the court declines to grant summary judgment. (Dkt. No. 69, pg. 5).

about the conduct of prison officials or conditions of confinement may constitute

protected speech in the context of a First Amendment retaliation claim." *Id.; see also,*

*Mazyck v. Keller*, No. 6:20-CV-06055, 2021 WL 1201224, at \*8 (W.D.N.Y. Mar. 31,

2021) (finding that  plaintiff "plausibly alleged that he engaged in protected activity

for purposes of his First Amendment claim" where the plaintiff alleged to have

verbally reported an assault by a correctional officer to a supervisor, and as a result,

faced retaliation); *Smith v. Woods*, No. 03-CV-480 (DNH), 2006 WL 1133247, at

\*10 (N.D.N.Y. Apr. 24, 2006) (noting that "the First Amendment protects, not only

the filing of written grievances and complaints, but under some circumstances, the

making of oral complaints to correction officers."), *affirmed*, 219 F. App'x 110 (2d

Cir. 2007) (summary order) (citation omitted).

    With respect to adverse action, the filing of a false misbehavior report that

results in some form of punishment that cannot be labeled as *de minimis* has been

found sufficient to constitute adverse action.  *See Reed v. Doe No. 1*, No. 9:11-CV-

250 (TJM/DEP), 2012 WL 4486086, at \*5 (N.D.N.Y. July 26, 2012) (finding that the

"filing of a false misbehavior report can qualify as an adverse action for the purposes

of a First Amendment retaliation" where the report resulted in a fourteen-day term in

keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085

(N.D.N.Y. Sept. 27, 2012); *see also Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373

(N.D.N.Y. May 24, 2010) (finding that a misbehavior report that resulted in SHU

confinement constituted an adverse action). A penalty that "would deter a similarly situated individual of ordinary firmness from exercising … constitutional rights" is an adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)). In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care." *Rivera v. Goord*, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds, Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)). Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

To establish a causal connection between the protected activity and adverse action, a plaintiff must show that "the protected conduct was a substantial or motivating factor" in a defendant's decision to act against him. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The court may consider several factors in

determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions. *See Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (*citing Colon*, 58 F.3d at 872-73. Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id*.

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Webster v. Fischer*, 694 F. Supp. 2d 163, 183 (N.D.N.Y. Feb. 22, 2010) (citing *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y. Mar. 19, 2007)).

### B.    Defendant McLenithan

#### 1.    Facts

Plaintiff alleges that Defendant McLenithan issued him a MBR because Plaintiff threatened to file a grievance against him. (Dorando Decl., pgs. 24-25, Dkt. No. 59-4; Amended Compl., ¶ 20, Dkt. No. 20).  Plaintiff asserts that he asked Defendant McLenithan for his name and threatened him with the filing of a grievance because Defendant McLenithan allegedly failed to open Plaintiff's cell at the same time he opened the other cells so Plaintiff could go to the mess hall.

(Plaintiff's Aff., pg. 1, ¶ 3, Dkt. No. 67). Yet, Plaintiff admits that his cell was opened and that he did go to lunch. (*Id.*).

Defendant McLenithan confirms that Plaintiff asked for his name on his way back from lunch. He states that Plaintiff was yelling at him about not having been let out of his cell. Defendant McLenithan states that he was wearing his name badge and advised Plaintiff of his name. (McLenithan Decl., ¶¶ 5-6, Dkt. No. 59-9). Defendant McLenithan also states that Plaintiff was agitated and yelling despite being told to stop and made a verbal threat (Plaintiff will "take care of it" next time McLenithan was out of the console). (*Id.*). Defendant McLenithan issued the MBR on March 23, 2019. No other witnesses are noted in the MBR. (McLenithan Decl., ¶5, Dkt. No. 59-9).

A hearing on the MBR was conducted by Defendant Scarlotta. Plaintiff was found guilty of each charge. (Dkt. No. 67-1, pg.3). On appeal, Plaintiff asserted that Defendant McLenithan "attempted to starve me by not opening my cell for lunch." (Dkt. No, 67-1, pg. 6, ¶1). Yet, Plaintiff admits in his affidavit that his *cell was opened and that he did go to the mess hall for lunch*. (Plaintiff's Aff., pg. 4, ¶3, Dkt. No. 67) (emphasis added). Plaintiff did not deny stating to Defendant McLenithan that he will "take care of it," but rather argues the phrase is "vague and does not constitute a threat." (Dkt. No. 67-1, pgs. 1-2, ¶ 3).

Defendant McLenithan established that Plaintiff was issued an MBR because

Plaintiff was engaging in prohibited conduct, including harassing and threatening Defendant McLenithan. (McLenithan Decl., ¶¶ 5 – 9, Dkt. No. 59-9). Plaintiff was subsequently found guilty of the charges in this MBR. (Scarlotta Decl., ¶16, Dkt. No. 59-11). Plaintiff received a penalty of 30 days keeplock confinement, as well as loss of package, phone, and commissary (*Id.*)

## 2.    Analysis

Defendant McLenithan admits that Plaintiff asked for his name. (McLenithan Decl., ¶6, Dkt. No. 59-9).  Defendant McLenithan states that he does not have a recollection of Plaintiff telling him he planned to file a grievance. (*Id.*). As Defendant McLenithan does not argue that Plaintiff did not engage in protected activity, on this record, there is a basis to conclude that Plaintiff's statement constituted protected activity. *See Smith*, 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006).

Plaintiff has failed, as a matter of law, to show that the protected activity was a substantial or motivating factor in Defendant McLenithan issuing the MBR. The undisputed evidence proves no causal connection between the protected interest and the adverse action, as (1) Plaintiff did not have a good disciplinary record since he had been disciplined on numerous occasions, including for harassment and threats (Cutler Decl., pgs. 22-34, Dkt. No. 59-3), and (2) Plaintiff was found guilty (not vindicated) at the disciplinary hearing concerning the subject of the charge made by Defendant McLenithan. (Scarlotta Decl., ¶16, Dkt. No. 59-11). Plaintiff does not

challenge his disciplinary record history, and he also admits that he was found guilty of the charge. (Plaintiff's Aff., pgs. 5-6, ¶4, Dkt. No. 67). In addition, Plaintiff's admission that he told the officer he "would take care of it" provides additional support for the charges contained in the MBR. *See Chavis v. Struebel,* 317 F.Supp.2d 232, 235 (W.D.N.Y. Mar. 29, 2004) (misbehavior report issued against incarcerated individual for threats made to officer). Since plaintiff is unable to satisfy all three prongs enunciated in *Holland* for a retaliation claim, the Court recommends that, notwithstanding the findings in the exhaustion hearing, summary judgment be granted, and that the retaliation claim against Defendant McLenithan be dismissed with prejudice.

### C.    Defendant Guyette

#### 1.    Facts

Plaintiff alleges that Defendant Guyette issued him a MBR because Plaintiff filed a grievance against him. (Dorando Decl., Exhibit "A," pgs. 30-31, Dkt. No. 59-4; Amended Compl., ¶ 4, Dkt. No. 20). Plaintiff testified that the prior grievance concerned activity in the law library and that plaintiff "ended up writing him [Guyette] up because he was in there watching a T.V. that he wasn't supposed to have." (Dorando Decl., Exhibit "A", pg. 30, Dkt. No. 59-4).

The MBR refers to Plaintiff's improper use of a telephone. (Guyette Decl., ¶ 10, Dkt. No. 59-6). The MBR was endorsed by C.O. Worth as an "other employee

witness." Plaintiff states he was "never on the phone," that he requested *his phone records, and they showed that he was not on the phone*, that Hearing Officer Reynolds agreed with Plaintiff that he was never on the phone, that Hearing Officer Reynolds stated he was not going to go against his officers and so he agreed to direct only counseling and a reprimand as a penalty. (Plaintiff's Aff., pg. 6, ¶ 5) (emphasis added). Defendant Guyette states that the phone record was reviewed at the hearing. (Guyette Decl., ¶14, Dkt. No. 59-6). The written hearing findings states, "the evidence relied upon was Guyette's misbehavior report" and there is no mention of phone records. (Dkt. No. 67-1, pg. 23). Defendant Reynolds' declaration says nothing about this hearing. (Reynolds Decl., Dkt. No. 72-1).

On administrative appeal, and contrary to his sworn statement that *the phone records showed he was not on the phone*, Plaintiff wrote that the hearing officer "did not produce my phone records." (Dkt. No., 67-1, pg. 27, ¶4) (emphasis added). Also on appeal, Plaintiff asserted that "Inmate Thomas testified that I was never on the phone the entire time I was out of my cell." (Dkt. 67-1, pg. 26, ¶2). The hearing record does not show that Inmate Thomas gave testimony at this hearing. (Dkt. No. 67-1, pg. 23).

Plaintiff supports his allegation of retaliation with his sworn statement that Defendant Guyette admitted to him and to another incarcerated individual (Joel Almonte) that the MBR was issued solely as retaliation. (Plaintiff's Aff., pg. 7, ¶ 5,

Dkt. No. 67). Mr. Almonte's January 20, 2020 sworn statement describes a conversation that he allegedly had with Defendant Guyette that same day.  (Dkt. No. 67-1, pg. 30).  Mr. Almonte avers that Defendant Guyette stated to him "since you and Henderson want to write bullshit grievances against me, I'm going to write you a bullshit misbehavior report just like I did to Henderson for his grievances." (*Id.*). Mr. Almonte also states that Defendant Guyette turned to Plaintiff and said, "since you and Almonte want to write bullshit grievances against me, I'm going to write Almonte a bullshit misbehavior report like I did to you for your grievances." (*Id.*).

Defendant Guyette denies making the statements alleged by Plaintiff about "bullshit grievances" (Guyette Decl., ¶12, Dkt. No. 59-6), and he denies telling any incarcerated individual the substance of the statements attributed to him by Mr. Almonte (Guyette Decl., ¶¶ 11, 12, Dkt. No. 59-6).  Defendant Guyette does not address Plaintiff's deposition testimony about the underlying grievance, that is, about watching T.V.  Defendant Guyette avers that he does not have any personal interest in whether Plaintiff, or any incarcerated individual filed a grievance against him. (Guyette Decl., ¶ 15, Dkt. No. 59-6). Defendants do not offer any documentary evidence to show whether Mr. Almonte had written any grievances against Defendant Guyette or whether Defendant Guyette had written any MBRs against Mr. Almonte.

### 2.    Analysis

Again, Defendant does not argue that Plaintiff did not engage in protected activity, presumably because if Plaintiff did file a grievance (which is denied by Defendants), that act would constitute protected activity.

Defendant Guyette also does not argue that there was no adverse action. With respect to adverse action, the filing of a false misbehavior report that results in some form of punishment that cannot be labeled *de minimis* has been found sufficient to constitute adverse action. *See Reed v. Doe No. 1*, No. 9:11-CV-250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012). Here, the hearing officer's imposition of counseling and a reprimand as punishment for the phone program violation is *de minimis*. (Dkt. 59-6 at ¶14). *See McFadden v. Friedman*, No. 9:12–CV–0685 (GTS/CFH), 2015 WL 5603433, at *11 (N.D.N.Y. Aug. 13, 2015) (Tier I hearing punishment that plaintiff be "counseled and reprimanded," without more, was held to be *de minimis,* and, therefore, did not constitute an "adverse action") *report recommendation adopted*, 2015 WL 5603433 (N.D.N.Y. Sept. 23, 2015); *see also Monko v. Cusack,* No. 9:11–CV–1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept.27, 2013) (finding that the penalty of "counseling and reprimand" was insufficient to establish adverse action).

Because Plaintiff has failed to prove that he suffered an adverse action from Defendant Guyette's MBR, the Court need not determine whether there is a causal

connection between Plaintiff's protected conduct and defendant Guyette's actions. *See McFadden,* 2015 WL 5603433, at *12. Accordingly, there is no genuine issue of material fact as to Defendant Guyette's actions, and it is recommended that Defendants' motion for summary judgment be granted regardless of the outcome of the exhaustion hearing.

### D.    Defendants Popp, Hamel, Fraser, Reynolds

### 1.    Facts

Plaintiff alleges the following regarding the loss of his library job or "program":

1.    On January 1, 2020, Defendant Hamel interviewed Plaintiff about the grievance that he filed against Defendant Guyette. (Plaintiff's Aff., pg. 8, ¶ 6, Dkt. No. 67).

2.    Defendant Hamel threatened Plaintiff saying, "I'm going to take your program in the law library away from you for these grievances. (*Id.*).

3.    On January 8, 2020, at the law library, Defendant Popp said, "I don't want to do this but you're fired. It's over my head and coming all the way up the chain of command from Captain Fraser. Fraser wants me and Sgt. Hamel to put something in writing to fire you for your grievances. He wants me and Sgt. Hamel to write a ticket but you won't be keeplock." (Plaintiff's Aff., pg. 8, ¶ 7, Dkt. No. 67).

4.     On January 9, 2020, Defendant Popp stated to Plaintiff, "right now you have this morning and afternoon to get all of your stuff out of the law library. If Sgt. Hamel tells me to write you up, then I'll have to write you a ticket, but as he explained it to me, you won't be keeplock." (Plaintiff's Aff., pgs. 8-9, ¶ 8, Dkt. No. 67)

5.     Later that morning, Defendant Hamel went to Plaintiff's cell and demanded his program card, complaining about "three more grievances the next day," and stating, among other things, "it only gets worse for you, like I told you." (*Id.*).

6.     Later that day, Defendant Popp came to the law library and stated, among other things, to Plaintiff, "Sgt. Hamel and Fraser told me to write you a ticket but, as I said, you're not keeplock as of now," noting that the ticket related to writing a grievance on the computer and handing it out to a bunch of inmates (referred as "shot gunning grievances"), "I guess against Guyette." (*Id.*).

7.     On January 14, 2020, Plaintiff was served with Defendant Popp's MBR, "back dated" to January 8, 2020. (Plaintiff's Aff., pg. 9, ¶ 9, Dkt. No. 67).

8.     Defendant Reynolds presided over the disciplinary hearing on January 15 and 18, 2020, admitting to Plaintiff, "they just want me to take

your program." (*Id.*).

9.     "While Plaintiff denys (sic) the allegations in the misbehavior report, *even if he was "shot gunning" grievances for himself or others, he has a right to do so*." "As a law library clerk I have a right to help others with grievances." (Dkt. No. 74, pgs. 2-3) (emphasis added).

In summary, Plaintiff alleges that Defendant Popp issued him a false MBR at the direction of Defendants Hamel and Fraser in retaliation for a grievance Plaintiff says he filed against Defendant Guyette (presumably the alleged grievance concerning watching T.V.). Plaintiff also alleges that Defendant Reynolds found him guilty of the charges in the MBR in retaliation for filing a grievance against Defendant Guyette. Defendants specifically deny the statements attributed to them.

## 2.     Analysis

The protected activity alleged by Plaintiff is the grievance he allegedly filed against Defendant Guyette. Defendants do not argue the absence of protected activity. The same analysis of the alleged Defendant Guyette grievance is applicable.  *See* Section IV(C)(2), *supra.*

Considering whether a causal connection exists between the protected activity and adverse action, first, with respect to temporal proximity, as discussed above, Plaintiff has failed to indicate when he filed the grievance against Defendant Guyette, which precludes the inference of a causal relationship. *See Dawes,* 239

F.3d at 492.  Second, Plaintiff had 10 disciplinary convictions prior to this MBR being issued. (Cutler Decl., pgs. 22-24, Dkt. No. 59-3). Third, Plaintiff was found guilty of one of the charges made against him in the MBR.

Regarding the fourth factor, Defendants Popp, Hamel, Fraser, and Reynolds deny making the statements alleged by Plaintiff detailed above, and they state that they do not have any personal interest in whether Plaintiff, or any incarcerated individual, filed a grievance against Defendant Guyette. (Popp Decl., ¶ 12, Dkt. No. 59-10; Hammel Decl., ¶ 19, Dkt. No. 59-7; Fraser Decl., ¶ 18, Dkt. No. 59-5; Reynolds Decl., ¶¶ 24-25, Dkt. No. 72-1). The Court is skeptical of Plaintiff's version of the various discussions with these Defendants, even though they are specific as to date, time, and place.  *See Dawes,* 239 F.3d at 491; *see also Davis,* 320 F.3d at 352 (The court is cautioned to approach claims of retaliation with "skepticism and particular care"). It is, of course, not the court's prerogative to resolve material issues of fact and credibility on a summary judgment motion, but the court may grant judgment when the defendant satisfies his burden of establishing that the adverse action would have been taken in the absence of improper motive. *See Graham*, 89 F.3d at 79; *see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994).

The specific evidence submitted by Defendants (and generally denied by Plaintiff) establishes that Plaintiff was using the library computers and equipment to

write a grievance against another correction officer to circulate to other incarcerated individuals for filing. (Popp Decl., at ¶¶ 7, 18, Dkt. No. 59-10). This was a violation of facility rules. (Popp Decl., at ¶¶ 9-11, Dkt. No. 59-10). According to Defendant Popp, the misbehavior report was based upon his direct observations made at approximately 6:30 p.m. on January 8, 2020.  (Popp Decl., ¶¶ 7-11, 18, Dkt. No. 59-10).  Plaintiff was found guilty of one of the charges at a disciplinary hearing conducted by Defendant Reynolds which was completed on January 18, 2020 (Reynolds Decl., ¶ 18, Dkt. No. 72-1). Plaintiff was sentenced to 15 days in keeplock confinement, and loss of commissary and package privileges (*Id.*).[11] Thus, regardless of any alleged retaliatory motive, a trier of fact could reasonably conclude, notwithstanding Plaintiff's general denial, and considering his written assertion that *even if he* was shot gunning grievances, he "had a right to so," that Plaintiff committed the offenses charged in the MBR and therefore the MBR was not filed against him for a retaliatory purpose. *See Graham*, 89 F.3d at 79. On this record, a trier of fact could not reasonably conclude that the Plaintiff did not commit the subject offense for which he was found guilty. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

Accordingly, as Plaintiff is unable to satisfy all three prongs enunciated in

---

[11] The hearing determination was affirmed on appeal on February 6, 2020. Dkt. 72-1, Exhibit "A", pg. 7).

*Holland* for a retaliation claim, and regardless of the outcome of the exhaustion

hearing, the Court recommends that the motion for summary judgment dismissing

the retaliation claims against Defendants Popp, Hamel, Fraser, and Reynolds be

granted.

### E.    Second Claim against Defendant Popp

#### 1.    Facts

Plaintiff's second retaliation claim against Defendant Popp alleges that

Defendant Popp provoked an unidentified incarcerated individual to attack Plaintiff

on January 24, 2020, "in retaliation for [p]laintiff's grievances." (Dorando Decl.,

Exhibit "A," pgs. 41-43, Dkt. No. 59-4; Plaintiff's Aff., pg., 11, ¶ 10, Dkt. No. 67).

Plaintiff claims that a third unidentified incarcerated individual told him that

Defendant Popp provoked the attack. (Plaintiff's Aff., pg. 11, ¶ 10, Dkt. No. 67;

Amended Coml., pg. 7, Dkt. No. 20; Dorando Decl., Exhibit "A," pgs. 41-43, Dkt.

No. 59-4).

#### 2.    Analysis

While not argued by Defendant Popp, there is no proven protected activity.

Plaintiff simply states that Defendant Popp's alleged provocatory statements were

made in "retaliation for [p]laintiff's grievances." Plaintiff has offered no evidence to

establish that Defendant Popp was aware of these undefined grievances. There is

therefore insufficient evidence to invoke consideration of the temporal proximity

element. *Dawes,* 239 F.3d at 493. Second, Defendant Popp concedes the adverse action element (the attack and injury) and defends this claim by relying upon the failure of Plaintiff's evidence concerning the events he describes.

Plaintiff does not identify who attacked him, or the name of the incarcerated individual that informed him of the reasons why Plaintiff was attacked. There is no admissible evidence that Defendant Popp procured this attack, as Plaintiff's claim rests entirely on hearsay from unnamed declarants and an alleged statement by Defendant Popp saying, "that's what happens when you write grievances" (Plaintiff's Aff., pg. 13, ¶ 11, Dkt. No. 67; Amended Compl., pg. 8, Dkt. No. 20), which Defendant Popp denies (Popp Decl., ¶ 25, Dkt. No. 59-10). *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (party cannot rely on inadmissible hearsay in opposing a motion for summary judgment); *see also Selvam v. Experian Info. Sols., Inc.*, 651 F. App'x 29, 31-32 (2d Cir. 2016) (quoting *Burlington,* 769 F.2d at 924) (the party opposing summary judgment "cannot rely on inadmissible hearsay in opposing a motion for summary judgment[] *absent a showing that admissible evidence will be available at trial."*) (emphasis in original). Plaintiff has failed to show that admissible evidence will be available at trial. Further, even if Defendant Popp made the statement attributed to him (Popp Decl., ¶¶ 23-25, Dkt. No. 59-10), there is no indication from the alleged statement itself that implicates that he procured the attack.

Defendant Popp has met his burden establishing his entitlement to summary judgment, and Plaintiff has failed in his burden to come forward with evidence in admissible form that there are triable material issues of fact regarding this claim. *See Yuyan Lin v. Amazon.Com Servs., LLC,* No. 21-CV-6203, 2024 WL 4266008, at *4 (E.D.N.Y. Sept. 23, 2024). The Court therefore recommends that, regardless of the outcome of the exhaustion hearing, summary judgment be granted dismissing this claim with prejudice against Defendant Popp.

### F.    Defendant Jones

#### 1.    Facts

Plaintiff alleges that Defendant Jones issued him a MBR on June 7, 2020,[12] charging him with unauthorized exchange, because Plaintiff's filed unspecified grievances against unspecified officers. (Dorando Decl., Exhibit "A," pgs. 44-45, Dkt. No. 59-4; Plaintiff's Aff., pg. 14, ¶ 12, Dkt. No. 67; Amended Compl., pg. 8, Dkt. No. 20).

Defendant Jones established that Plaintiff was engaging in the prohibited conduct of unauthorized exchange. (Jones Decl., ¶¶ 8-10, Dkt. No. 59-8). These charges were eventually determined to be founded, and a penalty was imposed by hearing officer Lt. Murphy. (Jones Decl., ¶ 13, Dkt. No. 59-8; Dkt. No. 59-3, pg. 22;

---

[12] Plaintiff testified at his deposition that the incident with C.O. Jones occurred in April of 2020. (Dorando Decl., Exhibit "A," pgs. 43-44). However, the record evidence establishes that the MBR was issued on June 7, 2020.

Dkt. No. 67-2, pg. 4) The hearing decision was affirmed on appeal. (Dkt. No. 67-2, pg. 11).

Regarding statements made by Defendant Jones, Plaintiff filed an affidavit signed by Richard Herne on June 8, 2020, describing a conversation he alleges to have had with Defendant Jones on June 7, 2020, during which he asked her "why did you falsify a misbehavior report against my neighbor Henderson saying he passed something when I know he did not, as I was standing on my gate the whole time chow was running?" Mr. Herne continues, "She responded, 'because Henderson likes to write grievances against my officers.'" (Dkt. No. 67-2, pg. 13). Defendants' reply does not specifically address this affirmation, but Defendant Jones did specifically deny this exchange.  (Jones Decl., ¶11, Dkt. No. 59-8).

## 2.    Analysis

Plaintiff again fails to provide any details concerning the protected activity that was the alleged predicate for the alleged retaliatory action. As discussed above, this failure precludes Plaintiff's claim. Defendant Jones, however, does not argue a lack of protected activity, relying instead on the position that Plaintiff cannot establish a causal connection between the assumed protected activity and the issuance of the MBR.

Considering the causal connection factors, first, the temporal proximity element of the causal connection standard is lacking, as Plaintiff fails to offer any

details about these unspecified grievances or when they were filed. Second, Plaintiff

was disciplined on 10 occasions prior to Defendant Jones issuing Plaintiff this MBR.

(Cutler Decl., pgs. 22-24, Dkt. No. 59-3). Third, Plaintiff was not vindicated at a

hearing concerning these charges. (Jones Decl., ¶ 13, Dkt. No. 59-8; Cutler Decl., pg.

22, Dkt. No. 59-3).

The fourth factor concerning Defendant Jones's statements, Mr. Herne's

affidavit and Plaintiff's sworn statement create issues of credibility concerning

Defendant Jones's motive. If the Court finds that Plaintiff exhausted his

administrative remedies regarding his claim against Defendant Jones, the Court

recommends that summary judgment be denied.

## V.    Plaintiff's Excessive Force and Failure to Protect Claims Against Defendant Popp

### A. Legal Standard

#### i.    Excessive Force

Incarcerated individuals enjoy Eighth Amendment protection against the use

of excessive force and may recover damages under 42 U.S.C. § 1983 for a violation

of those rights. *See Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). To sustain a claim

of excessive force, a plaintiff must establish both the objective and subjective

elements of an Eighth Amendment claim. *See Blyden v. Mancusi*, 186 F.3d 252, 262

(2d Cir. 1999); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be "inconsistent with the contemporary standards of decency." *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *see also Hudson*, 503 U.S. at 9. The malicious use of force to cause harm constitutes a *per se* Eighth Amendment violation, regardless of the seriousness of the injuries. *See Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' … or 'significant' injury, … provided that the amount of force used is more than '*de minimis*,' or involves force that is 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 7-10.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.*, at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause

harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants

acted in a malicious or wanton manner, the Second Circuit has identified five factors

to consider:

> the extent of the injury and the mental state of the defendant;
> the need for the application of force; the correlation between
> that need and the amount of force used; the threat reasonably
> perceived by the defendants; and any efforts made by the
> defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

### ii.    Failure to Intervene

To prevail on a claim of failure to intervene under Section 1983, a plaintiff

must show that the defendant saw and had reason to know that: (1) excessive force

was being used, or a person was being wrongfully arrested, or a constitutional

violation was being committed; and (2) the officer had a realistic opportunity to

intervene and prevent the harm from occurring. *See Universal Calvary Church v.

City of N.Y.*, No. 96-CV-4606, 2000 WL 1538019, at *9 (S.D.N.Y. Oct. 17, 2000)

(citing *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994)); *see also O'Neill v.

Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988) (affirming grant of summary judgment

with respect to a claim based on excessive force an officer "had no realistic

opportunity to attempt to prevent").

### B.    Analysis

Plaintiff's claims for excessive force and failure to intervene arise out of his

allegations that: (1) Defendant Popp falsely told another law library clerk that

Plaintiff was the cause of the clerk losing his position in the library, (2) Defendant

Popp used this false information to provoke the clerk to attack Plaintiff, (3) the clerk

approached Plaintiff and told him what Defendant Popp had said, and (4) sometime

thereafter, an unidentified incarcerated individual told Plaintiff that the clerk had

offered money for someone to attack Plaintiff. (Amended Compl., pg. 7, Dkt. No. 20;

Plaintiff's Aff., pg. 11, ¶ 10, Dkt. No. 67). As a result, Plaintiff alleges that he was

attacked and injured in a fight, which resulted in a MBR being issued against him in

January 2020. (Amended Compl., pg. 8, Dkt. No. 20; Plaintiff's Aff., pgs. 12-13, ¶

11, Dkt. No. 67).

Plaintiff also alleges that when he confronted Defendant Popp and accused

him of provoking the clerk to attack him, Defendant Popp responded, "well, that's

what happens when you write grievances" and walked away. (Plaintiff's Aff., pgs.

12-13, ¶ 11, Dkt. No. 67). Defendant Popp denies each of Plaintiff's allegations.

(Popp Decl., ¶¶ 20-25, Dkt. No. 59-10).

Plaintiff provides no evidence in admissible form, nor does he offer the names

of the unidentified individuals and a proffer that he could offer this evidence in

admissible form at trial. *See* Fed. R. Civ. P. at 56(c). The multiple levels of hearsay

statements are insufficient to meet his burden in responding to the motion for

summary judgment. *See Burlington Coat Factory Warehouse Corp.,* 769 F.2d at 924.

Furthermore, Plaintiff's assertions about what Defendant Popp said, even if

true, do not show that Defendant Popp knew of, and disregarded, a significant risk of injury to Plaintiff. What Plaintiff describes is a collection of rumors and, even if Defendant Popp started the rumors, "the spreading of rumors alone does not amount to a constitutional violation." *Williams v. Muller,* No. 98-CV-2001, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001). Plaintiff fails to present admissible evidence that Defendant Popp intended to incite another individual to harm Plaintiff, or that he was deliberately indifferent to a substantial risk to Plaintiff's safety. *See Bouknight v. Shaw,* No. 8-CV-5187, 2009 WL 969932, at *4 (S.D.N.Y. Apr. 6, 2009). There is simply no competent evidentiary record upon which a rational juror could find a triable issue of material fact regarding these alleged statements. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

Accordingly, the Court recommends that regardless of the outcome of the exhaustion hearing, summary judgment be granted dismissing Plaintiff's claim for excessive force/failure to intervene against Defendant Popp.

## VI.    Plaintiff's Procedural Due Process Claims Against Defendant Reynolds Regarding Removal From Law Library Program

### A.    Liberty Interest Regarding Removal Procedure

Plaintiff asserts[13] that he was denied due process when he was terminated from

---

[13] When Defendants filed their summary judgment motion, they neglected to file the Reynolds Declaration (Dkt. No. 72-1) which was filed with the court's permission on January 3, 2025. Plaintiff filed a timely written response to the same. (Dkt. No. 74)

his law clerk position in the law library because the hearing officer did not have the authority to do so, citing 7 NYCRR 253.7. (Dkt. No. 74, pg. 2).[14] Plaintiff was temporarily suspended from the position by Defendant Hamel on January 8, 2020, when the MBR was issued. (Hamel Decl., ¶ 15, Dkt. No. 59-7; Popp Decl., ¶ 12, Dkt. No. 59-10).[15] Plaintiff was removed from his position in the law library on January 26, 2020 (Cutler Decl., pg. 14, Dkt. No. 59-3).

Plaintiff argues that only a Tier III Superintendent's Hearing Officer can make a recommendation for removal from a program. (Dkt. No. 74, pg. 2). Characterizing his claim under applicable law, the DOCCS regulations confer upon Plaintiff a liberty interest in not having a hearing officer remove him from his law library program. The regulations cited by Plaintiff (7 N.Y.C.R.R. Parts 253 and 254) do not support the conclusion that the recommendation for removal can only come from a Tier III Superintendent's Hearing Officer, but Part 253 does note that the hearing officer is not empowered to impose loss of program as a penalty.

Defendant Reynolds agrees with Plaintiff that he was without authority to remove him from his position in the law library and that only the Deputy Superintendent of Programs ("DSP") could do so. (Reynolds Decl., ¶20, Dkt. No. 72-

---

[14] In the initial review under 28 USC § 1915, Judge Kahn held that the cited regulation does not provide the hearing officer with the authority to remove the defendant from a program job as a remedy following a disciplinary hearing. (Dkt. No., pgs. 33-34).

[15] Defendant Hamel attests that "I temporarily suspended Plaintiff from his position at the Law Library, which I was empowered to do, because Plaintiff was found guilty of conduct demonstrating his misuse of his position." (Hamel Decl., ¶15, Dkt. No. 59-7).

1). Defendant Reynolds states that he could only recommend removal and mistakenly included "remove from program" in the penalty section when it should have been added on the next page in the "special instruction and recommendations" section. (Reynolds Decl., ¶¶ 20-22, Dkt. No. 72-1). Defendant Reynolds also avers that Plaintiff would not have been removed from the law library program if the DSP did not approve. (Reynolds Decl., ¶ 22, Dkt. No. 72-1).

Lisa Stickney, the DSP at the relevant time, states under oath that none of the Defendants had the authority to remove Plaintiff from the law library position and that only she had the authority to do so in accordance with Directive 4803. (Stickney Decl., ¶¶ 4, 6, 10, 11, Dkt. No. 59-13).[16] She states under oath that her decision regarding Plaintiff was "motivated solely by the mandates of [her] position and that the other Defendants were not involved in the "decision to remove [p]laintiff from his program." (Stickney Decl., ¶ 11, Dkt. No. 59-13). Thus, the procedural protections provided by DOCCS regarding the remedy were afforded by Defendants, as Plaintiff's liberty interest in not having a hearing officer remove him from his law

---

[16] Directive 4803, Section X provides that the "DSP, or equivalent, shall be responsible for fall facility programs. The facility DSP may designate a staff person at SG-22 or equivalent, such as a Supervising Offender Rehabilitation Coordinator or Education Supervisor or above, as the Program Committee Chairperson …" Directive 4803, Section XI(B) provides that the "Program Committee Chairperson shall be responsible for all program assignments and removals (with the exception of Incarcerated Grievance Resolution Committee representatives who are covered by Directive #4040, "Incarcerated Grievance Program"). Directive 4803 lacks clarity as to whether Lisa Stickney, the Deputy Superintendent of Program Services at the time, or the Chair of the IGRC had the authority to remove Plaintiff his law library program. However, Plaintiff does not seem to contest Lisa Stickney's authority.

library program were protected.[17]

**B. Due Process Claim Against Defendant Reynolds Regarding Disciplinary Hearing**

Plaintiff admits being served with a copy of the MBR on January 14, 2020. (Plaintiff's Aff., pg. 9, ¶ 9, Dkt. No. 67; Reynolds Decl., ¶ 11, Exhibit "A"). Plaintiff admits that a hearing was held on January 15 and 18, 2020, that he "pled not guilty to all rule violations and placed several procedural due process violations on the record." (Plaintiff's Aff., pg. 9, ¶ 9, Dkt. No. 67; Reynolds Decl., pg. 8, Dkt. No. 72-1; Amended Compl., pg. 6, Dkt. No. 20). Other than his complaint that the hearing officer lacked the authority to remove him from his program, Plaintiff does not elaborate regarding these "several procedural due process violations." Plaintiff does, however, assert that Defendant Reynolds admitted to him "they just want me to take your program[.]" (Plaintiff's Aff., pg. 10, ¶ 9) Defendant Reynolds specifically denies making this statement. (Reynolds Decl., ¶ 25, Dkt. No. 72-1).

Defendant Reynolds avers that "Plaintiff was permitted to ask for witnesses and present any evidence on his behalf, that he did not deny any relevant witnesses or evidence, and if Plaintiff had made any objections, he would have noted them on the record." (Reynolds Decl., ¶ 17, Dkt. No. 72-1). Plaintiff provides no details about his due process objections and does not specifically controvert the statement made by

---

[17] Plaintiff has no liberty interest beyond this "procedural" liberty interest, as an incarcerated individual has no protected liberty or property interest in a prison job. *See Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987).

Defendant Reynolds regarding the process that was afforded at the hearing. Plaintiff acknowledged receipt of the written hearing disposition document by affixing his signature. (Reynolds Decl., pg. 10, Dkt. No. 72-1).

Plaintiff filed an administrative appeal which was denied. (*Id*). Plaintiff also asserts that he "filed an Article 78 petition in state court, and the Superintendent, on his own, without explanation, expunged the report." (Plaintiff's Aff., pg. 10, ¶ 9). Plaintiff provides a copy of the decision and order dismissing the Article 78 petition dated December 11, 2020. (Dkt. No. 67-1, pg. 41).

The state court decision and order states: "The Attorney General has informed the Court that on May 29, 2015 (sic), the decision in petitioner's Tier II Discipline Hearing of January 22, 2020[,] at the Great Meadow Correctional Facility was reversed and expunged." (Dkt. No. 67-1, pg. 41). The disciplinary hearing at issue was conducted by Defendant Reynolds on January 15, and 18, 2020. The relevance of the Article 78 decision and order is not apparent given the date discrepancy. Plaintiff seems to believe that Defendant Reynolds' hearing decision was expunged. Defendants provide no comment.

Finally, while Plaintiff asserts that Defendant Reynolds was biased against him, Plaintiff offers no evidence in admissible form that would allow a reasonable trier of fact to find in his favor.

Plaintiff has failed to show that he was deprived of his liberty interest without

being afforded sufficient process. *See Tellier v. Fields*, 280 F. 3d 69, 79-80 (2d Cir.

2000). The evidentiary record shows that Plaintiff was afforded the constitutionally

mandated due process requirements set out by the Supreme Court in *Wolff v.*

*McDonnell*, 418 US 539, 564-69 (1974).[18] For the foregoing reasons and regardless

of the outcome of the exhaustion hearing, the Court therefore recommends that

Plaintiff's procedural due process claim against Defendant Reynolds be dismissed

with prejudice.

**VII.   Substantive Due Process Claims**

    **A.   Plaintiff's Substantive Due Process Claims are Duplicative of His Retaliation Claims Against Defendants McLenithan, Guyette, Fraser, Hamel, Popp, Reynolds and Jones**

Plaintiff's claims against Defendants McLenithan, Guyette, Fraser, Hamel,

Popp, Reynolds and Jones are based on his assertion that they took adverse action

against him because he filed grievances against them; that is, they retaliated against

him. "Claims of retaliation find their roots in the First Amendment." *Mallard v.*

*Redner*, No. 9:21-CV-1080 (LEK/TWD), 2023 WL 8828866, at *2 (citing *Gill v.*

*Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004)).

---

[18] Collectively, the cited cases require that the incarcerated individual be provided with written notice of the charges, be permitted an opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence, the hearing officer (who must be impartial) must prepare a written statement explaining their decision and the reasons for the action being taken, and in some circumstances not present here (i.e., defendant needs special accommodations), the right to assistance in preparing a defense.

Where a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Graham*, 490 U.S. at 386; *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Lewis v. City of Albany Police Dep't*, No. 1:04-CV-0152 (DNH/RFT), 2005 WL 8169570, at *7 (N.D.N.Y. Feb. 14, 2005) ("Since plaintiff has alleged a more specific claim for unreasonable search and seizure under the Fourth Amendment, plaintiff's Fourteenth Amendment claim arising from the same search is duplicative and is therefore barred by the rule set forth in *Albright.*"); *Roman v. Velleca*, No. 3:11-CV-1867, 2012 WL 4445475, at *10 (D. Conn. Sept. 25, 2012) (Under *Albright*, "substantive due process claims must be dismissed where they are merely duplicative of claims explicitly protected under other constitutional sources"); *Rother v. NYS Dept. of Corr. and Cmty. Supervision,* 12–CV–0397 (LEK/CFH), 2013 WL 4774484, at * 14 (N.D.N.Y. Sept.4, 2013) ("Plaintiff's substantive-due-process claim overlaps entirely with her procedural-due-process claim-they both seek to remedy the same harm and challenge the same conduct … Moreover, the harm and conduct challenged by the substantive-due-process, First Amendment, and equal-protection claims significantly overlap. Because the claim for substantive due process is subsumed by Plaintiff's other constitutional claims, it must be dismissed.").

In this case, Plaintiff's Fourteenth Amendment substantive due process claims against Defendants McLenithan, Guyette, Fraser, Hamel, Popp, Reynolds and Jones are entirely duplicative of his First Amendment retaliation claims, and therefore the Court recommends that the substantive due process claims be dismissed as against these Defendants. *See Monko v. Cusack*, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *3 (N.D.N.Y. Sept. 27, 2013).

**B.    Plaintiff's Substantive Due Process Claims Against Defendants Reynolds and Scarlotta Arising from the Disciplinary Hearings are Duplicative of His Fourteenth Amendment Procedural Due Process Claims**

Similarly, Plaintiff's substantive due process claims arising out of the disciplinary hearings conducted by Defendants Reynolds and Scarlotta are duplicative of his procedural due process claim against them. While the procedural due process claim against Defendant Scarlotta was dismissed on initial review (Dkt. No., pg. 35), the factual basis for both claims are duplicative, and under *Albright*, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright*, 510 U.S. at 272-73 Therefore, the Court recommends dismissal, with prejudice, of Plaintiff's substantive due process claims against Defendants Reynolds and Scarlotta.

## VIII. <u>Conspiracy Claims</u>

Plaintiff asserts that Defendants Guyette, Popp, Hamel, Fraser and Reynolds conspired to violate his constitutional rights, which is actionable under §1983. *See Pangburn v. Culbertson*, 200 F. 3d 65, 72 (2d Cir. 1999). "In order to survive a motion to dismiss, §1983 … conspiracy claims must 'provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy.'" *Blue v. City of New York*, No. 16-CV-9990, 2018 WL 2561023, at *9 (S.D.N.Y. June 4, 2018) (quoting *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F.Supp.2d 197, 208 (S.D.N.Y. 2013)). These Defendants assert a that Plaintiff's conspiracy claims are barred by the intra-agency conspiracy doctrine.

"'Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together[ ]'" while acting within the scope of their employment. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (quotations and other citations omitted); *see also Crudele v. City of N.Y. Police Dep't,* No. 97- CV-6687, 2004 WL 1161174, *5 (S.D.N.Y. May 24, 2004) (citations omitted). Although courts first applied this doctrine to cases involving public corporations, they have subsequently held that the doctrine is applicable to municipal entities and their

officers, agents, and employees. *See County of Nassau,* 345 F.Supp.2d at 304

(citation omitted); *see also Cameron v. Church,* 253 F.Supp.2d 611, 623

(S.D.N.Y.2003) (quotation omitted). "However, '[a]n exception to the intracorporate

conspiracy doctrine applies to individuals within a single entity when they are

pursuing personal interests wholly separate and apart from the entity.'" *County of*

*Nassau,* 345 F.Supp.2d at 304-05 (quotation omitted); *see also Stoner v. N.Y. City*

*Ballet Co.,* No. 99-CV-0196, 2002 WL 523270, *9 (S.D.N.Y. Apr. 8, 2002)

(quotation and other citation omitted); *Griffin-Nolan v. Providence Wash. Ins. Co.*,

No. 5:04-CV-1453 (FJS/GJD), 2005 WL 1460424, at *10 (N.D.N.Y. June 20, 2005).

"Although the Second Circuit has recognized that the doctrine applies in the Section

1985 context (citing *Hartline* v. *Gallo*, 546 F.3d 95, 99, n.3 (2d Cir. 2008)), it has not

passed directly on the doctrine's applicability in the Section 1983 context. However,

district courts within the Circuit have applied the doctrine to such claims." *Livingston*

*v. Hoofagle*, No. 9:19-CV-0353 (GLS/CFH), 2019 WL 7500501, at *16 (N.D.N.Y.

Nov. 8, 2019) (collecting cases).

    As there are no allegations, let alone any competent evidence to prove

otherwise, the exception to the intracorporate conspiracy doctrine is not applicable

here. Accordingly, the Court recommends that summary judgment on this issue be

granted regardless of the outcome of the exhaustion hearing, and that Plaintiff's

conspiracy claim against Defendants Guyette, Popp, Hamel, Fraser and Reynolds be dismissed with prejudice.

## IX.    <u>Intentional Infliction of Emotional Distress</u>

Defendants assert that Plaintiff's claim for intentional infliction of emotional distress is barred by New York Correction Law §24 and the applicable statute of limitations[19]. (Dkt. 59-2, pg. 22).

Corrections Law §24 prohibits a civil action "against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of employment and in the discharge of the duties by such officer or employee." *Boyd v. Selmer*, 842 F. Supp. 52, 57 (N.D.N.Y. Jan. 5, 1994). An employee's actions are deemed to be within the scope of their employment when "the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997). When the federal court applies supplemental jurisdiction, it applies state substantive law to the state claim. *See Baker v. Coughlin*, 77 F. 3d 12, 15 (2d Cir. 1996).

Plaintiff does not respond to this argument.[20] As there are no allegations that Defendants were acting outside of the scope of their employment and in the

---

[19] Defendants' answers (Dkt. Nos. 29, 53) to Plaintiff's amended complaint (Dkt. No. 20) do not assert statute of limitations as a defense, and therefore this defense has been waived.

[20] "In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that

discharge of their duties, the statutory bar imposed by Corrections Law §24 is

applicable, and the Court therefore recommends that summary judgment be granted

regardless of the outcome of the exhaustion hearing and that Plaintiff's claim for

intentional infliction of emotional distress be dismissed with prejudice.

## X.    **Qualified Immunity**

As Defendants correctly note, the issue of qualified immunity cannot be

resolved if there is an issue of fact regarding whether there is a lack of retaliatory

causation, that is, whether there was a constitutional violation.  *See Moreno v. Ricks*,

No. 9:02-CV-1435 (PAM/GJD), 2006 WL 2333961, at *2 (N.D.N.Y. Aug. 9, 2006).

Insofar as the Court is recommending that summary judgment be granted as to

Defendants Guyette, McLenithan, Popp, Fraser, and Hamel, the issue as to whether

they are shielded from liability by the qualified immunity doctrine is moot.

Conversely, since the Court is recommending that summary judgment be denied as to

Defendant Jones, he cannot rely on qualified immunity to evade potential liability.

---

argument, the movant need only show that the argument possess facial merit, which has
appropriately been characterized as a 'modest' burden." *Ryder v. Czajka*, No. 1:23-CV-1002
(GTS/MJK), 2025 WL 391179 (N.D.N.Y. Feb. 4, 2025) (citing N.D.N.Y. L.R. 7.1(a)(3) ("Where a
properly filed motion is unopposed and the Court determines that the moving party has met to
demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or
serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the
motion, as the case may be, unless good cause is shown."); *see also Rusyniak v. Gensini*, No. 07-
CV-0279 (GTS/GHL), 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (collecting cases);
*Este-Green v. Astrue*, No. 09-CV-0722 (GTS/GHL), 2009 WL 2473509, at *2, nn.2, 3 (N.D.N.Y.
Aug. 7, 2009) (collecting cases).

## XI.    Claim for Compensatory Damages Under PLRA[21]

The Prison Litigation Reform Act ("PLRA") provides in relevant part, that

"[n]o Federal civil action may be brought by a prisoner … for mental or emotional

injury suffered while in custody without a prior showing of physical injury …" 42

USC §1997(e)(e).  The PLRA "is generally interpreted to preclude a prisoner

complaining of mental and emotional injury during imprisonment, without a showing

of physical injury, from receiving an award of compensatory damages." *Walker v.

Schult*, 45 F.4th 598, 612 (2d Cir. 2022). The physical injury must be more than *de

minimis.  See Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999).

Here, Plaintiff alleges that he suffered physical injury on January 24, 2020,

when he was attacked from behind by another incarcerated individual. Plaintiff avers

that he received a 1 ½" laceration that required eight stitches and left a permanent

scar. (Plaintiff's Aff., pgs. 12 -13, ¶11, Dkt. No. 67). Plaintiff asserts that this attack

was provoked by Defendant Popp because of grievances he filed. (Plaintiff's Aff.,

pgs. 12 -13, ¶¶ 11-12, Dkt. No. 67). Defendants do not dispute Plaintiff's statements

concerning his injury. Plaintiff also asserts many emotional injuries, which he alleges

were caused by Defendants' actions against him. (Plaintiff's Aff., pg. 14, ¶12).

However, Plaintiff also states that prior to the January 24, 2020 fight, he had a

prior history of mental health issues (Plaintiff Aff., pgs. 12-13, ¶11, Dkt. No. 67),

---

[21] While defendants do not make it clear, the court assumes that this argument is made on the
assumption that Plaintiff's claims have otherwise withstood legal scrutiny.

which resulted in a level one mental health status (Dkt. No. 67-1, pg. 26, ¶ 3).

Plaintiff also states that Lt. Wilson, the officer who reviewed Defendant Guyette's

December 31, 2019 MBR (and is not a party to this action), retaliated against him by

failing to classify the MBR as a Tier I violation and failed to consider his level one

mental health status, which MBR put Plaintiff in a "homicidal/suicidal state of mind

that cause me to make a noose and attempt to hang myself as is explained in one of

my grievances and formal complaints." (*Id.*).

As it relates to Plaintiff's retaliation, substantive due process, conspiracy, and

intentional infliction of emotional distress claims against Defendants McLenithan,

Guyette, Hamel, Fraser, Reynolds, Scarlotta and Jones, Plaintiff has failed to meet

his burden to show a physical injury upon which compensatory damages claim under

the PLRA might be predicated. Therefore, the Court recommends that summary

judgment dismissing Plaintiff's claim for compensatory damages against

McLenithan, Guyette, Hamel, Fraser, Reynolds, Scarlotta and Jones, be granted.

Regarding the excessive force and failure to protect claim against Defendant

Popp, Plaintiff alleges that he suffered a facial laceration and scarring because of the

attack he claims was orchestrated by Popp, and suffered "mental, emotional

damages." (Plaintiff Aff., pgs. 12-13, ¶11, Dkt. No. 67)  While this is a physical

injury which supports compensatory damages under the PLRA based on Plaintiff's

allegations, *see Corley v. City of New York,* No. 1:14-CV-3202, 2015 U.S. Dist.

LEXIS 135362, at *43 (S.D.N.Y. Sept. 2015) (physical injury found not to be "*de minimis*" where medical attention was required), if the Court accepts the recommendation to grant the motion to dismiss the excessive force and failure to protect claim against Defendant Popp, then of course, the claim for compensatory damages should likewise be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that an exhaustion hearing be scheduled to determine whether Plaintiff exhausted his administrative remedies pursuant to 42 U.S.C. § 1997e(a) prior to having commenced this action; and it is further

**RECOMMENDED,** that notwithstanding the findings of an exhaustion hearing, Defendants' motion for summary judgment (Dkt. No. 59) as to Defendants Guyette, McLenithan, Popp, Fraser, and Hamel should nevertheless be **GRANTED IN ITS ENTIRETY** and the amended complaint should be **DISMISSED WITH PREJUDICE** against them, and it is further

**RECOMMENDED**, that notwithstanding the findings of an exhaustion hearing, Defendants' motion for summary judgment (Dkt. No. 59) as to Defendant Jones should be **DENIED**, and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated:  March 4, 2025

_____

Hon. Mitchell J. Katz
U.S. Magistrate Judge

2023 WL 4710869

2023 WL 4710869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,
v.
N. MOORE, Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed April 14, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, Plaintiff, pro se.

RACHAEL S. OUIMET, Assistant Attorney General, for
Defendant.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** In this pro se civil rights action, plaintiff alleges
that the defendant violated his Eighth Amendment rights
when he failed to protect plaintiff from another inmate.
Presently before the court is defendant Correctional Officer
("C.O.") Moore's motion for summary judgment. (Dkt. No.
16). This matter has been referred to me for Report and
Recommendation by United States District Judge Glenn T.
Suddaby, pursuant to 28 U.S.C. § 636(b) and Local Rule
N.D.N.Y. 72.3(c). For the reasons set forth below, this court
will recommend granting defendant's motion and dismissing
the complaint in its entirety.

### I. Background

#### A. Procedural History

In this civil rights action, plaintiff alleges a constitutional
violation occurred while he was incarcerated at Clinton
Correctional Facility ("Clinton C.F."), in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS"). Plaintiff filed the
original complaint on September 10, 2021. (Dkt. No. 1). On
October 25, 2021, the court issued a Decision and Order
granting plaintiff's application to proceed in the action in
forma pauperis ("IFP"), and conditionally dismissing the
original complaint because it failed to state a claim upon

which relief may be granted pursuant to 28 U.S.C. § 1915 and
28 U.S.C. § 1915A. (Dkt. No. 4). The court granted plaintiff
leave to amend his complaint to "correct[ ] the pleading
defects" identified with his original complaint. (Id. at 10).
Plaintiff availed himself of the opportunity to amend, and
the court received plaintiff's amended pleading on or about
November 18, 2021. (Dkt. No. 6, "Am. Compl.").

On February 9, 2022, I determined, pursuant to my initial
review of the complaint, that plaintiff's amended complaint
was accepted for filing and that the only active defendant was
C.O. Moore. (Dkt. No. 7 at 3). C.O. Moore filed an answer
to the amended complaint on April 14, 2022. (Dkt. No. 12).
On December 15, 2022, defendant filed this instant motion
for summary judgment (Dkt. No. 16), to which plaintiff
responded on February 16, 2023 (Dkt. No. 20).

#### B. Summary of Complaint

The complaint alleges that on September 6, 2018, while
plaintiff was confined in Clinton C.F., he was attacked by
another inmate when they were released from their keep-
lock cells at the same time. (Am. Comp. at 4). Although
facility policies and procedures prohibited C.O. Moore from
releasing the other inmate "until [plaintiff] was ... back in
general population," C.O. Moore nevertheless released both
inmates simultaneously, knowing that plaintiff did not have
an escort at the time. Id. C.O. Moore also "knew there was a
race war going on in [Clinton C.F.] with the bloods and the
Spanish gangs and let [plaintiff] out of [his] cell with a known
gang member posed [sic] a substantial risk of serious harm
to [him]." Id. Although C.O. Moore observed the inmate run
into plaintiff's cell and attack him, C.O. Moore "did nothing
to prevent it from happening." Plaintiff was returned to keep-
lock after the incident and remained there for an additional 70
days, until November 15, 2018. (Dkt. No. 16-3, Pl.'s Dep. at
18, 27, 79, 88, 95; Internal Movement History, Dkt. No. 20-1
at 31).

### II. Summary Judgment

**\*2** Summary judgment is appropriate where there exists no
genuine issue of material fact and, based on the undisputed
facts, the moving party is entitled to judgment as a matter of
law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,
272-73 (2d Cir. 2006). Rule 56(b) provides that a party may
file a motion for summary judgment "at any time until 30
days after the close of all discovery." Fed. R. Civ. P. 56(b).
Thus, a party may move for summary judgment in lieu of
an answer. *See, e.g., Anderson v. Rochester-Genesee Reg'l*

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

*Transp. Auth.*, 337 F.3d 201, 202 (2d Cir. 2003); *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010); *Riehl v. Martin*, No. 9:13-CV-439 (GLS/TWD), 2014 WL 1289601, at *1-2 (N.D.N.Y. Mar. 31, 2014).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272. "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the non-movant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Although plaintiff received proper notice of his obligation to respond to defendant's summary judgment motion in accordance with Local Rules, the plaintiff did not file a Statement of Material Facts that addressed many of the factual allegations in defendant's Statement, as required by Local Rule 7.1(a)(3). [1] Consequently, the court may accept the properly supported facts contained in the defendants' Rule 7.1 statement (Dkt. No. 16-2) as true for purposes of this

motion. *See Govan v. Campbell*, 289 F. Supp. 2d 289, 295-96 (N.D.N.Y. 2003).

[1]    Defense counsel specifically advised plaintiff of the consequences of failing to respond to the summary judgment motion. (Dkt. No. 16). Counsel forwarded, to plaintiff, a copy of the court's form Notification of the Consequences of Failing to Respond to a Summary Judgment Motion, which provided in pertinent part:

If you do not file a proper response to this motion, the Court may grant the motion and dismiss some or all of your claims. Under Local Rules 7.1(b) and 56.1(b), to file a proper response to this motion, you must submit the following papers:

(1) A response to the defendants' statement of material facts that admits and/or denies each of the defendants' assertions in matching numbered paragraphs, 1 and that supports each denial with citations to record evidence.

* * *

WARNING: If you do not submit a proper response to the defendants' statement of material facts, the Court may deem you to have admitted the defendants' factual statements.

(Dkt. No. 16 at 4).

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

**\*3**    The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004), (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds, Ross v. Blake*, 578 U.S. 632 (2016). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

In order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the court

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 73 of 531

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Incarcerated [2] Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Incarcerated [3] Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) and (I), 701.5.

[2]    This committee was formerly known as the "Inmate Grievance Resolution Committee," but has recently been renamed.

[3]    The program was formerly known as the "Inmate Grievance Program," but has recently been renamed.

Prior to *Ross v. Blake*, *supra*, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

In *Ross*, the Supreme Court made it clear that courts may not excuse a prisoner's failure to exhaust because of

"special circumstances." *Ross v. Blake*, 578 U.S. 632, 640 (2016). "[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 578 U.S. at 639). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, 578 U.S. at 642. Courts evaluating whether an inmate has exhausted his or her administrative remedies must also consider whether those remedies were "available" to the inmate. *Id.*; *see also Riles*, 2016 WL 4572321 at *2.

**B. Analysis**

**\*4** Defendant C.O. Moore argues that plaintiff's failure-to-protect claim is subject to dismissal, for failure to exhaust administrative remedies, because plaintiff did not file an initial grievance prior to bringing suit, nor did he appeal the denial of any grievance concerning this claim to CORC. (Dkt. No. 16-1, Defendant's Memorandum of Law at 14). In support of his position, defendant has attached to his motion papers the sworn declarations of Rachael Seguin ("Seguin Decl.") (Dkt. No. 16-7), the Director of the IGP for DOCCS, and Christine Gregory, the IGP Supervisor at Clinton C.F. ("Gregory Decl.") (Dkt. No. 16-6). These declarations, and the evidence attached as exhibits thereto, indicate that plaintiff neither filed an initial grievance related to his claim that C.O. Moore failed to protect him from another inmate on September 6, 2018, nor did plaintiff submit an appeal to CORC. (*See* Gregory Decl. ¶¶ 16-20; Seguin Decl. ¶¶ 12-14, Ex. A).

In opposition to defendant's motion, plaintiff alleges that, while confined in his keep-lock cell, he attempted to file a grievance relating to the incident with C.O. Moore by putting a sealed letter on the gate for mail pickup. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89). Plaintiff testified that he remembered the grievance being picked up by an unnamed officer, but does not remember the exact day he mailed the grievance. [4] (Dkt. No. 16-3, Pl.'s Dep. at 87-89, 93). Plaintiff speculates that an unnamed officer on duty threw his grievance away. (Dkt. No. 20 at 2-3; Pl.'s Dep. at 87-89)

Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

4       Plaintiff testified that he filed the grievance "it was
        in like the same – I want to say around like the 22 nd
        or so." (Pl.'s Dep. at 87-88).

Plaintiff acknowledged that he never followed up with respect
to his grievance for the 70 days after the incident when he was
confined on keeplock; but he alleges that he asked sergeants,
officers, and counselors about the status of his grievance and
they told plaintiff "they'll get back to you." (Pl.'s Dep. at
93-94). Plaintiff admitted that he did not retain any copies
of the purported grievances relative to his complaints against
C.O. Moore. (*Id.* at 88). 5

5       Plaintiff alleges that he was told "it was a code
        49 and that it had to go to the superintendent
        office." (Dkt. No. 20 at 3).

Plaintiff further testified that he not only understood the
grievance process, but also that he participated in an
orientation program at Clinton C.F. about how the grievance
process works at the facility. (*Id.* at 85-86). He admitted that
he filed "a couple" of grievances after the incident concerning
other matters, while still residing at Clinton C.F. (*Id.* at 90).

The record before this court clearly established that the
defendant did not exhaust administrative remedies with
respect to the failure-to-protect claim against C.O. Moore.
Given that an initial grievance was never filed, nor was the
claim ever appealed to CORC, the question becomes whether
plaintiff's failure to exhaust should be excused.

The defendant has satisfied his initial burden of
"establishing ... that a grievance process exist[ed] and
applie[d] to the underlying dispute." *Hubbs v. Suffolk
County Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir. 2015)
(citation omitted). 6 Thus, plaintiff assumes the burden
of producing evidence that one of the exceptions to the
administrative exhaustion requirement applies, excusing his
failure to exhaust and permitting his claim to survive
summary judgment. *Id.* ("If the defendants meet their
initial burden, administrative remedies may nonetheless be
deemed unavailable if the plaintiff can demonstrate that
other factors ... rendered a nominally available procedure
unavailable as a matter of fact.") 7

6       IGP Supervisors Gregory and Seguin stated
        Clinton C.F. had a fully functioning IGP program at
        all times relevant to the complaint. (Gregory Decl.

¶ 16; Seguin Decl. ¶ 11). Plaintiff also testified that
he filed a grievance for an unrelated matter after the
incident and received an unfavorable decision and
appealed that decision. (Pl.'s Dep. 90-91).

7       I agree with Magistrate Judge Peebles' cogent
        analysis that, while the burden of production may
        shift to a plaintiff with respect to certain aspects
        of the exhaustion issue, "the ultimate burden
        of proof with respect to the exhaustion defense
        remains, at all times, with the defendant." *See,
        e.g., Bailey v. Fortier,* No. 9:09-CV-0742 (GLS/
        DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4,
        2012), *report and recommendation adopted,* 2013
        WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v.
        Plumley,* No. 9:12-CV-422 (TJM/DEP), 2015 WL
        4326762, at *7-8 (N.D.N.Y. July 14, 2015), *report
        and recommendation adopted,* 2013 WL 1305338
        (N.D.N.Y. Mar. 18, 2013).

**\*5** Liberally construed, plaintiff appears to argue that
administrative remedies were unavailable to him as a result of
C.O. Moore trying "to cover his mistakes up". (Dkt. No. 20
at 2-3). Plaintiff does not offer any support for his claim other
than his statement "officers talk like inmates talk. So knowing
the incident, knowing I put in a grievance, they wanted to be
nosey [sic], and they opened it and never let it get to where
it was supposed to go once it was read." (Pl.'s Dep. at 89).
During his deposition, plaintiff specifically stated that C.O.
Moore was not the person who picked up the grievance. (Pl.'s
Dep. at 88-89). Furthermore, plaintiff testified the alleged
grievance was sealed, so the unnamed C.O. would have no
way of knowing what conduct the grievance was referring to
unless (s)he opened the envelope. (Pl.'s Dep. at 92).

As noted above, plaintiff was on keep-lock status when he
allegedly attempted to submit a grievance relating to the
claim in this action by leaving a sealed envelope for C.O.s
to deliver. "Keeplock is a form of disciplinary confinement
segregating an inmate from other inmates and depriving him
of participation in normal prison activities." *Green v. Bauvi,*
46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R.
& Regs. tit. 7, § 301.6. While "[k]eep-lock is similar to
serving time in a Special Housing Unit ... [with the inmate]
remain[ing] in their assigned cell" (Dkt. No. 16-5, Terry Allen
Declaration ¶ 7), plaintiff acknowledged that keep-lock status
is "not like if you were in the SHU" (Pl.'s Dep. at 35).

In *Williams v. Priatno,* 829 F.3d 118, 123-27 (2d Cir.
2016), the Second Circuit considered whether administrative

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 75 of 531
Jackson v. Moore, Not Reported in Fed. Supp. (2023)
2023 WL 4710869

remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in a SHU, he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.[8] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[8]    My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

Some district court cases in the Second Circuit suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU.[9] *See, e.g., Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y.

July 19, 2016) (finding that the Second Circuit's decision in *Williams* "hinged on the 'extraordinary circumstances' specific to the case before it")); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *6 (N.D.N.Y. Oct. 4, 2019) ("Courts have taken an inmate's housing and level of segregation from the general population into account when determining the availability of grievance procedures.") (citing *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (holding that a plaintiff in keeplock was not entitled to an exhaustion exception when he alleged that his grievance had not been filed due to mail tampering, and subsequently never inquired about it), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).

[9]    In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

**\*6** In any event, unsupported assertions that a plaintiff "filed a grievance but that it was somehow lost or destroyed" have generally been found "insufficient to establish a genuine issue of fact." *Blake v. Porlier*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, 2017 WL 2791063, at *5); *Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report and recommendation adopted*, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2017); *Engles v. Jones*, No. 6:13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

Moreover, courts in this Circuit have granted summary judgment for failure to exhaust administrative remedies, even for a prisoner confined to a SHU whose ability to directly file a grievance or make a copy may be limited, when the plaintiff

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 76 of 531

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

provided no documentation or minimal corroborative details. *See, e.g.*, *Sankara v. Montgomery*, No. 9:16-CV-00885 (FJS/ TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) ("Plaintiff's conclusory allegations that the DOCCS IGP was unavailable to him [while confined to the SHU] were insufficient to withstand summary judgment," where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]"), *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018); *Simpson v. Price*, No. 9:19-CV-1413 (MAD/CFH), 2021 WL 7367083, at *9 (N.D.N.Y. Dec. 29, 2021) (in the absence of any documentary evidence to corroborate plaintiff's alleged attempt to file a grievance from the SHU, the court concludes that plaintiff's completely unsupported, unclear, and vague implication that the grievance was not properly processed does not suffice to avoid summary judgment), *report and recommendation adopted*, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022); *Ozzborn v. Cornell*, No. 9:17-CV-1039 (MAD/ ATB), 2021 WL 2227829, at *5 (N.D.N.Y. June 2, 2021) (Plaintiff claimed that he filed a grievance from the SHU by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect; but, because he never received a response, he presumed that the grievance was never submitted. Because plaintiff never followed up on his grievance and successfully filed numerous other grievances in the recent past, he has failed to demonstrate that his administrative remedies were unavailable to him).[10]

[10]     District Judge D'Agostino distinguished *Williams v. Priatno* by noting the various ways in which the plaintiff in *Williams* specified how he followed up with respect to the grievance that he left for delivery from the SHU, which was never filed with the IGP. *Id.* at *4.

Here, the court does not merely rely on plaintiff's lack of direct evidence, such as copies of the relevant grievances, in finding that he has failed to establish a genuine issue of material fact as to unavailability. Plaintiff in this case has done nothing more than allege in conclusory fashion that he attempted to file a grievance concerning a September 6, 2018 incident. Plaintiff's testimony about when he attempted to submit the grievance was vague and he did not identify the officer who allegedly collected it. Likewise, he has not supported his claim that unnamed sergeants, officers, and counselors told

him "not to worry" with any documentary evidence. *See, e.g.*, *Belile v. Griffin*, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the IGP [process]"), *report and recommendation adopted*, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013).

**\*7** For the above reasons, the court concludes that plaintiff's completely unsupported and vague claim that a grievance he attempted to file against C.O. Moore relative to the September 6, 2018 incident was not properly processed does not suffice to avoid summary judgment. Accordingly, the court recommends that C.O. Moore be granted summary judgment and the second amended complaint be dismissed against him, on the ground that plaintiff failed to exhaust his administrative remedies.

Dismissal with prejudice is appropriate where the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust. *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004). Here, plaintiff's time to file the relevant grievance to CORC in accordance with the rules and regulations has already passed,[11] rendering his failure to exhaust his administrative remedies incurable at this time. As a result, I recommend that plaintiff's complaint be dismissed with prejudice as to these claims. *See Livingston v. Hoffnagle*, No. 17-CV-1158 (MAD/DEP), 2019 WL 409366, at *7 (N.D.N.Y. Feb. 1, 2019) (dismissing without leave to amend, where the exhaustion error would not be cured by permitting the plaintiff leave to amend).

[11]     "Ordinarily, an inmate must first submit 'a complaint,' or grievance, to the facility's IGP clerk within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a). Relief from the twenty-one day time limit may be granted by the IGP supervisor based upon mitigating circumstances, provided, however, that '[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence.' " *Nelson v. Plumley*, 2015 WL 4326762, at *2 (citing N.Y.C.R.R. § 701.6(g)(1)(i) (a)).

## IV. Eighth Amendment Failure to Protect Claim

Jackson v. Moore, Not Reported in Fed. Supp. (2023)

2023 WL 4710869

Defendant also seeks summary judgment on the merits of plaintiff's failure to protect claim, arguing, among other things, that plaintiff has failed to establish C.O. Moore was acting with deliberate indifference to conditions that posed a substantial risk of serious harm to plaintiff. For the following reasons, the court agrees that summary judgment is warranted, in the alternative, on the merits of plaintiff's Eighth Amendment claim.

### A. Legal Standards

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970 (1994). The plaintiff must show that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. *Id.* at 837, 114 S. Ct. 1970. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

The failure of corrections officers to employ reasonable measures to protect an inmate from violence by other inmates may rise to the level of an Eighth Amendment violation. *See Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) (citing *United States v. Bailey*, 444 U.S. 394, 423 (1980)). "Reckless disregard" of plaintiff's right to be free from attacks by other inmates may be shown by the existence of a "pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.*, 904 F. Supp. 217, 221-22 (S.D.N.Y. 1995) (citing *Rucco v. Howard*, No. 91 Civ. 6762, 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993); *Martin v. White*, 742 F.2d 469, 474 (8th Cir. 1984)).

**\*8** An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (citing *Ayers v. Coughlin*, 780 F.2d at 209). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43).

### B. Analysis

With due regard for plaintiff's status as a pro se litigant, plaintiff has failed to establish that C.O. Moore knew of a particular risk to plaintiff's safety or that C.O. Moore was deliberately indifferent for failing to protect plaintiff. Plaintiff merely offers conclusory, general allegations that C.O. Moore knew about an alleged gang and/or race war happening at Clinton C.F. (Dkt. No. 20 at 2). However, C.O. Moore has, in his sworn declaration, denied having any knowledge about a race war at Clinton C.F. or having any access to information regarding an inmate's gang status. (Moore Decl. ¶¶ 21, 23). Even if C.O. Moore did have access to such records, plaintiff testified that he is not a member of a gang. (Jackson Dep. at 19). Thus, there is nothing in the record other than plaintiff's conclusory allegations establishing that C.O. Moore knew plaintiff was at a substantial risk of harm because of an alleged gang war.

Plaintiff's claim is further undermined by his sworn testimony admitting that he had not had any prior interactions with the inmate who attacked him before the underlying incident. (Jackson Dep. at 19-20); *Gillard v. Jarvis*, No. 9:11-CV-1021 (LEK/ATB), 2012 WL 7037734, at *7 (N.D.N.Y. Nov. 6, 2012), *report and recommendation adopted*, 2013 WL 474384 (N.D.N.Y. Feb. 7, 2013) ("If plaintiff did not know the inmate who assaulted him, he cannot claim that defendants "knew" and disregarded the serious risk that plaintiff would be assaulted at Clinton by this unknown individual."). Plaintiff has not alleged that he was threatened by the other inmate, or any member of the other inmate's race or gang, prior to this incident. Additionally, neither inmate was in protective custody when they were released from their cells. (Moore Decl. ¶ 14). Plaintiff also testified he never asked for protective custody before or after the incident. (Jackson Dep. at 73).

"Courts routinely deny deliberate indifference claims based upon surprise attacks." *Zimmerman v. Macomber*, No. 95 Civ. 0882, 2001 WL 946383, at *5 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of the defendants where the plaintiff failed to carry his burden to establish that the defendant had knowledge of a substantial risk to plaintiff's health or safety from an inmate attacker). Here, plaintiff has failed to allege defendants knew of a prior altercation between the plaintiff and his attacker, or of any threats that had been made against the plaintiff. *Fernandez v. N.Y.C. Dep't of Corr.*, No. 08 Civ. 4294, 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); *Clark v. Gardner*, 256 F. Supp.3d

2023 WL 4710869

154, 168 (N.D.N.Y. 2017). Because plaintiff has alleged no facts suggesting that C.O. Moore knew of a particular risk to the plaintiff's safety, he has failed to raise a material question of fact as to whether C.O. Moore was deliberately indifferent, and summary judgment is warranted. *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp.2d 354, 363 (S.D.N.Y. 2013).

**\*9  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 16) be **GRANTED,** and the complaint be **DISMISSED WITH PREJUDICE**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Hum. Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2023 WL 4710869

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:21-CV-01001**<br>Jackson v. New York State Department of Corrections et al | — | N.D.N.Y. | Sep. 10, 2021 | Docket |

**History (3)**

**Direct History (2)**

1.  Jackson v. Moore
2023 WL 4710869 , N.D.N.Y. , Apr. 14, 2023

*Report and Recommendation Adopted by*

2.  Jackson v. Moore
2023 WL 4711091 , N.D.N.Y. , July 24, 2023

**Related References (1)**

3.  Jackson v. Moore
2022 WL 22888891 , N.D.N.Y. , Feb. 09, 2022

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4711091

2023 WL 4711091
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dumar JACKSON, Plaintiff,

v.

Officer MOORE, Corr. Fac. Ofcr.,
Clinton Corr. Fac., Defendant.

9:21-CV-1001 (GTS/ATB)
|
Signed July 24, 2023

**Attorneys and Law Firms**

DUMAR JACKSON, 18-A-2746, Plaintiff, Pro Se, Five
Points Correctional Facility, Caller Box 19, Romulus, New
York 14541.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, RACHEL OUIMET, ESQ., Assistant U.S.
Attorney, Counsel for Defendant, The Capitol, Albany, New
York 12224.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Dumar Jackson ("Plaintiff")
against Correctional Officer Moore ("Defendant"), are (1)
Defendant's motion for summary judgment, (2) United
States Magistrate Judge Andrew T. Baxter's Report-
Recommendation recommending that Defendant's motion
be granted and Plaintiff's Complaint be dismissed, and (3)
Plaintiff's Objection to the Report-Recommendation. (Dkt.
Nos. 16, 21, 22.) Because Plaintiff's one-page (four-sentence)
Objection fails to specifically challenge any portion of the
Report-Recommendation, the Court need review that Report-
Recommendation for only clear error. [1] After carefully
reviewing the relevant filings in this action, the Court can find

no clear error in the Report-Recommendation: Magistrate
Judge Baxter employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. As a result, the Court accepts and adopts the Report-
Recommendation for the reasons stated therein, and Plaintiff's
Complaint is dismissed with prejudice.

[1]    When only a *general* objection is made to a portion
       of a magistrate judge's report-recommendation,
       the Court subjects that portion of the report-
       recommendation to only a *clear error* review.
       Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P.
       72(b), Advisory Committee Notes: 1983 Addition;
       *see also Brown v. Peters*, 95-CV-1641, 1997
       WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997)
       (Pooler, J.) [collecting cases], *aff'd without opinion*,
       175 F.3d 1007 (2d Cir. 1999). Similarly, when
       *no* objection is made to a portion of a report-
       recommendation, the Court subjects that portion of
       the report-recommendation to only a *clear error*
       review. Fed. R. Civ. P. 72(b), Advisory Committee
       Notes: 1983 Addition. When performing such a
       "clear error" review, "the court need only satisfy
       itself that there is no clear error on the face of the
       record in order to accept the recommendation." *Id.*

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Baxter's Report-
Recommendation (Dkt. No. 21) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion for summary judgment
(Dkt. No. 16) is **GRANTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**DISMISSED** with prejudice.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4711091

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| 1. **Docket 9:21-CV-01001**<br>Jackson v. New York State Department of Corrections et al | — | N.D.N.Y. | Sep. 10, 2021 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (3)**

**Direct History (2)**

1. Jackson v. Moore
2023 WL 4710869 , N.D.N.Y. , Apr. 14, 2023

*Report and Recommendation Adopted by*

2. Jackson v. Moore
2023 WL 4711091 , N.D.N.Y. , July 24, 2023

**Related References (1)**

3. Jackson v. Moore
2022 WL 22888891 , N.D.N.Y. , Feb. 09, 2022

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Sheffer v. Fleury,  N.D.N.Y.,  September 18, 2019

2014 WL 4146276
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Chris PRICE, Plaintiff,

v.

J. OROPALLO, Sergeant, Upstate Corr. Facility;
Norman H. Bezio, Dir. of Shu, Inmate Disciplinary
Program, Nys Docs; and Phillip Battiste, Dir.
of Security Staff, Nys Docs, Defendants.

No. 9:13–CV–0563 (GTS/TWD).
|
Signed Aug. 19, 2014.

**Attorneys and Law Firms**

Chris Price, Auburn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Keith J. Starlin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court, in this *pro se* prisoner civil
rights action filed by Chris Price ("Plaintiff") against the three
above-captioned New York State correctional employees
("Defendants"), are Defendants' motion for summary
judgment, and United States Magistrate Judge Therese
Wiley Dancks' Report–Recommendation recommending that
Defendants' motion be granted. (Dkt.Nos.25, 28.) Plaintiff has
not filed an Objection to the ReportRecommendation, and
the deadline by which to do so has expired. (*See generally*
Docket Sheet.) After carefully reviewing the relevant filings
in this action, the Court can find no clear error in the Report–
Recommendation: Magistrate Judge Dancks employed the
proper standards, accurately recited the facts, and reasonably
applied the law to those facts. (Dkt. No. 28.) To that analysis,
the Court would add only two points.

First, with regard to Plaintiff's claims against Defendants
Battiste and Bezio, the Court notes that the verified Complaint
does not allege facts plausibly suggesting, or adduce
admissible evidence establishing, that Plaintiff sent letters to
Battiste or Bezio at an appropriate address *and* by appropriate
means. (Dkt. No. 1, at ¶ 6.) In any event, even if he had
done so, the Complaint alleges facts plausibly suggesting, or
adduces admissible evidence establishing, that a response by
officials at his correctional facility followed the sending of
the letters. (*Id.*)

Second, as an alternative ground for the dismissal of the
Complaint, the Court accepts Defendants' failure-to-exhaust
argument because, even assuming Plaintiff was in fact told
that his complaint was not grievable, he filed the grievance
and knew he was "suppose[d] to ... receive[ ]" a response to it.
(Dkt. No. 1, at 4.) More important, he could have, and should
have, filed an appeal from his non-response (which he did not
do). 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within
the time limits may be appealed to the next step."); *see also*
*Smith v. Kelly,* 985 F.Supp.2d 275, 281–82 (N.D.N.Y.2013)
(collecting cases). Such an appeal could have proved fruitful,
given that the issue was indeed grievable. (Dkt. No. 25,
Attach. 5. at ¶ 3 [Hale Decl.].)

For all of these reasons, Defendants' motion is granted, and
Plaintiff's Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–
Recommendation (Dkt. No. 28) is **_ACCEPTED_** and
**_ADOPTED_** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 25) is **_GRANTED;_** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is
**_DISMISSED_** in its entirety.

### ORDER and REPORT–RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

*Pro se* Plaintiff Chris Price, an inmate currently confined
in the Auburn Correctional Facility, has commenced this
action pursuant to 42 U.S.C. § 1983 alleging Defendants

failed to protect him in violation of his Eighth Amendment rights by placing a member of a rival gang in his cell. (Dkt. No. 1.) Plaintiff has sued Corrections Sergeant Jon Oropallo ("Oropallo"); Phillip Battiste ("Battiste"), New York State Department of Corrections and Community Supervision ("DOCCS") Director of Security Staff; and Norman R. Bezio ("Bezio"), DOCCS Director of Special Housing/Inmate Disciplinary Program *Id.* at 1.

**\*2** Defendants filed an Answer to Plaintiff's Complaint (Dkt. No. 12) and have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 25.) Plaintiff has not opposed the motion or sought additional time within which to do so. For the reasons set forth below, the Court recommends that Defendants' motion for summary judgment be granted.

## I. BACKGROUND

While Plaintiff was confined at the Upstate Correctional Facility ("Upstate"), his membership in the Crips gang was known to prison officials. (Dkt. No. 1 at ¶ 7.) Plaintiff expressed concerns for his safety to officials at Upstate, at least in part because according to Plaintiff, Defendant Oropallo had previously forced him to fight with members of the Bloods, a rival gang. *Id.* at 6. In a Declaration submitted in support of Defendants' motion for summary judgment, Oropallo denies ever having forced Plaintiff to fight with another inmate. (Dkt. No. 25–4 at ¶ 4.)

The evidence shows that Oropallo did issue a misbehavior report on Plaintiff on December 8, 2011, after observing Plaintiff and his cell mate Williams fighting. (Dkt. No. 25–4 at ¶ 8 and p. 23.) [1] The fight investigation form reveals that Plaintiff did not want protection and neither he nor Williams wanted to press charges in connection with the fight. *Id.* at p. 24. Donald Uhler ("Uhler"), Deputy Superintendent of Security at Upstate, reviewed Plaintiff's security file and found no request by him for protective custody. (Dkt. No. 25–3 at ¶ 10.)

[1]    Page numbers cited herein are those assigned by the Case Management/Electronic Case File (CM/ECF) system.

Plaintiff claims that as a result of being forced to fight members of the Bloods gang, he filed a grievance and began speaking with officials at Upstate regarding his safety in the fall of 2011. (Dkt. No. 1 at ¶ 6.) Plaintiff's file from Upstate contains a December 12, 2011, "To Whom It May Concern"

letter in which Plaintiff disclosed that he had been forced to fight on December 8, 2011, and had been threatened with a scalpel by members of the Bloods. (Dkt. No. 25–3 at ¶ 4 and p. 6.) In his December 12, 2011, letter Plaintiff indicated that he was writing to create a paper trail regarding safety issues he had raised with corrections officers and sergeants. (Dkt. No. 25–3 at p. 6.) Plaintiff wrote:

> I used to be a well known crip gang member. The bloods still label me as being a crip gang member. So to back myself up, I'm [writing] to all people that I think should be notified of my situation of safety. On the 8th of this month for this particular reasons I stated above, I was [threatened] and forced to fight. I fear for my life while I'm here [incarcerated]. I just wanna do the time that I have and hopeful[ly] get a reversal on my appeals. Are there any ways that, I can be bunked up with someone who isn't labeled a bloods gang member, because I was threatened with a scalpel. I notified the proper personnel and I wasn't taken serious [ly] until I started kicking the cell door I was in, I was taken out to be forced to fight in another cell. I fear I'm a get hurt or I'm a hurt someone. Can you help me? Thank you for your time and [patience].

**\*3** *Id.*

According to Uhler, Lt. Lumbard ("Lumbard") investigated the letter on December 21, 2011. *Id.* at ¶ 5. Lumbard reported that Plaintiff told him that he was a member of the Crips gang and had been having trouble with members of the Bloods gang. *Id.* at p. 5. When asked about being threatened with a scalpel, Plaintiff refused to provide any information. *Id.* Plaintiff did tell Lumbard that he was getting along well with his current cell mate, and that they had no issues. *Id.* Lumbard indicated that the cell block staff had been notified about the situation and advised to leave Plaintiff with his cell mate and, if possible, to move the cell mate with him when he was moved upstairs. *Id.*

2014 WL 4146276

Plaintiff was dissatisfied with the resolution of his grievance and claims to have written to Defendants Battiste and Bezio about his safety concerns. *Id.* Plaintiff was subsequently told by Upstate officials that the safety issues of which he had complained would be handled, and he would not have to worry about being placed in the same cell with known members of the Bloods. *Id.* Nonetheless, on August 9, 2012, inmate Adams, a member of the Bloods, was brought in to bunk with Plaintiff. (Dkt. No. 1 at ¶ 6 .) Plaintiff and Adams got into what both described as a gang related fight in the cell within minutes after the officer placing Adams in the cell left, and Plaintiff sustained a non-displaced fracture of his nose and a laceration on his nose which required stitches. *Id .;* Dkt. Nos. 25–3 at 12; 25–4 at 8–9; 26 at 8–12.

Prior to Adams being placed in the cell with Plaintiff, Oropallo had no personal knowledge or information that would have led him to believe that Adams was gang related or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had never told Oropallo he was in a gang, and nothing about the December 8, 2011, fight between Plaintiff and Williams led Oropallo to believe Adams would be a threat to Plaintiff. *Id.* at ¶ 10. Furthermore, the assignment of inmates for double cell housing was not within the scope of Oropallo's authority. *Id.* at ¶ 9.

DOCCS maintains an "enemies" list for inmates based upon information provided by the inmate and from his disciplinary record. *Id.* at ¶ 6. Uhler has explained in his Declaration that DOCCS does not recognize street gangs, and inmates frequently do not disclose gang affiliations to prison officials, although if there is information of gang affiliation, a notation might appear on the inmate's personal characteristics screen, his security file, or be made by a counselor during intake. *Id.* at ¶ 7. Uhler reviewed the DOCCS files on Adams and found no notations indicating that he was gang affiliated. *Id.* at ¶ 8; *see also* Adams' Personal Characteristics Form and Inmate Security Classification Form, neither of which identifies him as a member of the Bloods gang. *Id.* at pp. 9–10.

A misbehavior report was filed against Plaintiff as a result of the August 9, 2012, fight. (Dkt. No. 25–4 at 8.) Plaintiff was found guilty of violent conduct and assault and was given four months in the Special Housing Unit, loss of packages, commissary, ear phones, recreation, and good time, with two months suspended as an incentive for Plaintiff to improve his behavior. *Id.* at 5–6.

## II. APPLICABLE LEGAL STANDARDS

### A. General Legal Standards for Summary Judgment Motions

**\*4** Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [2] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

[2]    Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable

2014 WL 4146276

inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U .S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). [3]

[3]    Copies of unpublished decisions cited herein will be provided to Plaintiff in accordance with *Lebron v. Sanders,* 557 F.3d 76, 79 (2009) ( *per curiam* ). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### B. Summary Judgment When a *Pro Se* Plaintiff Fails to Oppose the Motion

Plaintiff has not opposed Defendants' summary judgment motion. N .D.N.Y. L.R. 56.2 requires the moving party to notify a *pro se* litigant of the consequences of failing to respond to the summary judgment motion. [4] Where a party has been given satisfactory notice of the consequences of failing to respond to a motion for summary judgment, the nonmovant's failure to respond to the movant's statement of material facts will result in the facts set forth in the statement being accepted as true to the extent they are supported by the evidence in the record. [5] *See* L.R. 7.1(a) (3) ( *"The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* ) (emphasis in original).

[4]    A Notice of the Consequences of Failing to Respond to a Summary Judgment Motion was served with Defendants' motion papers in this case. (Dkt. No. 25 at 3.)

[5]    *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to

evidence in the record supports the assertion.") (citation omitted).

**\*5** A *pro se* plaintiff's failure to oppose a summary judgment motion does not mean that the defendant's motion is to be granted automatically. An unopposed summary judgment motion may properly be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (internal quotes and citations omitted).

A district court has no duty to perform an independent review of the record to find proof of a factual dispute where the nonmovant fails to respond to a summary judgment motion. *See Amnesty America. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2000). This is so even where a plaintiff is appearing *pro se* because even *pro se* plaintiffs must obey the Court's procedural rules. *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). Although not obligated to do so, the Court has elected to conduct a review of the entire record in this case. *See Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 292 (2d Cir.2000) (a court may, in its discretion, "choose to conduct an assiduous review of the record" even when a party has failed to file a statement of material facts). Because Plaintiff's Complaint is verified, the Court will treat it as an affidavit in opposition to Defendants' motion. *See Colon,* 58 F.3d at 872.

### III. ANALYSIS

#### A. Administrative Exhaustion

Defendants argue that they are entitled to summary judgment based upon Plaintiff's failure to exhaust his administrative remedies with regard to Defendants' alleged failure to protect him from a Bloods gang member in violation of his Eighth Amendment rights. (Dkt. No. 25–6 at 5–6.)

1. *Exhaustion Under The Prison Litigation Reform Act*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997(e). The PLRA requires "proper exhaustion" of prison administrative remedies, which includes compliance with agency deadlines and procedural rules. *See Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378,

165 L.Ed.2d 368 (2006). "[P]roper exhaustion ... means using all steps that the agency holds out and doing so properly (so that the agency addresses the issues on the merits)." *Id.* Exhaustion is mandatory, and an inmate cannot satisfy the PLRA's exhaustion requirement by filing an untimely or administratively defective grievance or appeal. *Id.* at 84–85.

The DOCCS Inmate Grievance Procedure ("IGP") has three stages which prison inmates must complete. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5; *see also Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). First a grievance complaint must be submitted to the Inmate Grievance Resolution Committee ("IGRC") for an initial determination within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a). Next, if the IGRC decision is adverse to the inmate, he has seven calendar days to appeal to the prison superintendent. *Id.* at § 701.5(c). If dissatisfied with the superintendent's decision, the inmate has another seven calendar days to appeal the superintendent's decision to the Central Office Review Committee ("CORC"). *Id.* at § 701 .5(d).

**\*6** An inmate must follow through on all three steps to complete the exhaustion process. *See Morrison v. Stefaniak,* 523 F. App'x 51 (2d Cir.2013) (summary order) (upholding dismissal of complaint because plaintiff failed to appeal IGRC's decision); *Belile v. Griffin,* No. 9:11–CV0092 (TJM/DEP), 2013 WL 1776086, at \*3–4, 7, 2013 U.S. Dist. LEXIS 47137, at \*10, 22–23 (N.D.N.Y. Feb.12, 2013) (plaintiff failed to exhaust his administrative remedies because he had not followed through on all of the steps, *i.e.,* he did not appeal to the superintendent of the facility or appeal any unfavorable decision of the superintendent to CORC).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at \*4, 2010 U.S. Dist. LEXIS 32014, at \* 16 (N.D.N.Y. Mar.31, 2010). If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at \*4. *Hemphill* sets forth a three-part

inquiry for district courts. [6] First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill,* the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F.3d at 688.

[6]    Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense) (internal quotation marks omitted).

Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by conduct such as " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at \*5 & n. 26 (collecting cases); *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at \* 12, 2008 U.S. Dist. LEXIS 124388, at \*44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly

suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question."). Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a nonexhaustion defense, the inmate's failure to exhaust may be justified. *Hemphill,* 380 F.3d at 686.

2. *Exhaustion Analysis*
**\*7** In his Complaint, Plaintiff has alleged that he asked to file a grievance with regard to the placement of a known Bloods gang member in his cell. (Dkt. No. 1 at ¶ 4.) According to Plaintiff, he was told by the grievance officer that the issue was not grievable and, as a result, never received a response to his grievance. *Id.* Jeffrey Hale ("Hale"), Assistant Director for the DOCCS IGP, has stated in his Declaration that the IGP is the appropriate vehicle for inmates to use to address issues regarding the person with whom they are housed and complaints against staff. (Dkt. No. 25–5 at ¶ 3.) Defendants have not, however, submitted evidence disputing Plaintiff's claim that he was told his complaint was not grievable.

Instead, Defendants have focused on a grievance filed by Plaintiff with regard to the medical care he received for the injuries he sustained in the fight with Adams and have relied upon Plaintiff's failure to appeal from the denial of that grievance as evidence of failure to exhaust the claim asserted in this lawsuit. (Dkt. Nos. 25–3 at ¶ 9 and pp. 11–13; 25–6 at 6.) In Grievance No. UST–50552, Plaintiff referenced the fight in his cell but only in the context of the fight as the cause of his broken nose. *Id.* at p. 11. Plaintiff's complaint was that it took five days for the medical staff at Upstate to send him out for x-rays. *Id.* The investigative report on the grievance references only the medical care given Plaintiff, and the grievance was denied solely on the grounds that there was no urgent need for an x-ray. *Id.* at p. 13. In short, the grievance has no direct relevance to Plaintiff's exhaustion of the failure to protect claim asserted in this lawsuit.

The relevant exhaustion issue on this motion is whether the allegation in Plaintiff's Complaint regarding his unsuccessful attempt to grieve the failure to protect issue is sufficient by itself to raise an issue of fact under any of the *Hemphill* considerations. A number of district courts in the Second Circuit have found either that the IGP is unavailable to an inmate who has been told by a prison official that his complaint was not grievable, or that the misinformation constitutes a special circumstance excusing exhaustion under

*Hemphill.* [7] *See, e.g., Partee v. Goord,,* No. 06–15528, 2007 WL 2164529(SAS), at *4, 2007 U.S. Dist. LEXIS, at *14 (S.D.N.Y. July 25, 2007) (excusing exhaustion requirement because plaintiff was told in reply to his grievance that his claim was outside the purview of the IGRC, and he reasonably understood this to mean his dispute was not grievable); *Lewis v. Cunningham,* No. 05–9243(GBD), 2007 WL 2412258, at *2, 2007 U.S. Dist. LEXIS 62346, at *5 (S.D.N.Y. Aug.23, 2007) (finding special circumstances justifying failure to exhaust remedies because a supervisor told plaintiff that filing a grievance was not the proper way to address a complaint, and to instead write a letter to the Chief Medical Officer at the Department of Health, which he did); *Jeffers v. Goord,* No. 9:99–CV–0335 (FJS/GHL), 2005 WL 928628, at *6, 2005 U.S. Dist. LEXIS 39309, at *16–17 (N.D.N.Y. Apr.4, 2005) ("[p]rison official may prevent a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only through another avenue.").

[7]     Courts have noted that there is significant overlap in the three *Hemphill* considerations. *See, e.g., Barksdale v. Frenya,* No. 9:10–CV–00831 (MAD/DEP), 2012 WL 4107805, at *6 n. 11, 2012 U.S. Dist. LEXIS 134738, at *21 n. 11 (N.D.N.Y. Sept.19, 2012) ("In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap."). A failure to exhaust as a result of being given false information on whether a complaint was grievable by a non-defendant could arguably fit within either the first or third consideration.

**\*8** Defendants' failure to submit evidence refuting or explaining Plaintiff's claim that he was told his complaint was not grievable leaves material issues of fact regarding the applicability of one or more of the *Hemphill* considerations. Therefore, the Court recommends that Defendants' request for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies be denied without prejudice.

**B. Battiste and Bezio**
The Eighth Amendment to the United States Constitution "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate

indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983."); *see also Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991) ("[A]n inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect [the inmate] from the violent actions of other inmates may state a viable § 1983 cause of action."); *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment"); *Wassmann v. County of Ulster,* 528 F. App'x 105, 106 (2d Cir.2013) ("Officers at correctional facilities have a duty to protect inmates from violence at the hands of other inmates.") (citing *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

To prevail on a failure to protect claim, an inmate must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm; and (2) prison officials exhibited deliberate indifference. *Farmer,* 511 U.S. at 837. In order to establish deliberate indifference where a prison official has failed to protect an inmate from violence by another inmate, a plaintiff must prove that the defendant official actually knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Hayes,* 84 F.3d at 620. Even assuming that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact on the issue of substantial risk of harm, the summary judgment record is devoid of evidence that Battiste and Bezio exhibited deliberate indifference to Plaintiff's safety in placing Adams in his cell.

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919,

at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (citing *Ayers,* 780 F.2d at 210). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873. [8]

[8]
> The Supreme Court's decision in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

Plaintiff claims that he wrote to Defendants Battiste and Bezio with respect to his safety concerns with regard to sharing a cell with a Bloods gang member after he was dissatisfied with the response of Upstate officials to his complaints in the fall or winter of 2011. (Dkt. No. 1 at ¶ 6.) According to Plaintiff after he sent the letters to Battiste and Bezio he was told by Upstate officials that his safety issue had been addressed. *Id.*

Battiste and Bezio did not submit evidence regarding whether they received letters from Plaintiff and, if so, took any action in response. Instead, they rely upon an attorney's declaration stating upon information and belief that a search was made of records in the DOCCS Central Office and no correspondence to or from Plaintiff was found. (Dkt. No. 25–2 at ¶ 3.) The

source of counsel's information and belief appears to be the July 25, 2013, unsworn letter from a DOCCS senior attorney annexed as an exhibit. *Id.* at p. 4.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997); *see also Salahuddin,* 467 F.3d at 272–73 (movant bears the initial burden of showing through the production of admissible evidence that he is entitled to judgment as a matter of law). An attorney's affidavit that is not based upon personal knowledge and relies upon an attached letter not sworn as required by Rule 56(e) is not admissible evidence and not properly considered on a summary judgment motion. [9] *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986); *see also Sepanski v. Jani–King, Inc.,* No. 10–CV–518S, 2013 WL 4455412, at *2–3, *8, 2013 U.S. Dist. LEXIS 116437, at *8 (W.D.N.Y. Aug.16, 2013) (holding that three unsworn letters submitted by plaintiff could not be considered in connection with a motion for summary judgment).

[9]    Statements in Defendants' Statement Pursuant to Rule 7.1(a)(3) are deemed admitted on an unopposed summary judgment motion only to the extent they are supported by admissible evidence. *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001) ("court may not rely solely upon statement of undisputed facts in determining whether movant has met this burden of showing the absence of a genuine issue for trial; court must be satisfied that the citation to evidence in the record supports the assertion). Paragraph 13 of Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 25–1), stating that "[t]here is no evidence to demonstrate that Defendants Bezio or Battiste received correspondence from Plaintiff," relies upon an attorney's declaration that is not based upon personal knowledge and an unsworn letter, neither of which constitutes admissible evidence. *See Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986).

A movant's burden of demonstrating the absence of a question of material fact remains the same where the motion is unopposed. *See Vt. Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is

presented.") (citation and internal quotation marks omitted). Defendants have not satisfied their burden of production with respect to Plaintiff's claim that he wrote to Battiste and Bezio regarding his concerns about Bloods.

**\*10** Nonetheless, because Plaintiff has not alleged facts in his Complaint showing that Battiste or Bezio had knowledge of, or personal involvement in, Adams being placed in a cell with him, or that they were aware of Adams' Bloods affiliation, he has failed to state an Eighth Amendment claim against the two supervisory officials for failure to protect him from the injuries he sustained in the fight with Adams. *See McKinnon,* 568 F.2d at 934 (personal involvement in constitutional deprivation is a prerequisite to an award of damages under § 1983); *Hayes,* 84 F.3d at 620 (defendant official must actually have known of and disregarded an excessive risk of harm to the plaintiff's safety to establish deliberate indifference).

Therefore, the Court recommends that Battiste and Bezio be granted summary judgment dismissing the Complaint as against them.

### C. Oropallo

Even assuming, *arguendo,* that the allegations in Plaintiff's Complaint are sufficient to satisfy, or at least raise a question of fact, on the issue of substantial risk of harm, the evidence in the summary judgment record establishes that Defendant Oropallo did not know of and disregard an excessive risk of harm to Plaintiff's safety in connection with Adams being placed in Plaintiff's cell. *See Hayes,* 84 F.3d at 620. The prison files on inmate Adams contained no notations indicating that he was gang related. (Dkt. No. 25–3 at ¶ 8.) The DOCCS "enemies" list did not identify Plaintiff and Adams as enemies. *Id.* at ¶ 6. Moreover, Plaintiff's security file contained no requirements for protective custody. *Id.* at ¶ 10.

According to Oropallo, prior to the altercation between Plaintiff and Adams, he had no personal knowledge or information that would have led him to believe that Adams was gang affiliated or would pose a threat to Plaintiff. (Dkt. No. 25–4 at ¶ 7.) Adams had not told Oropallo he was in a gang before being placed in Plaintiff's cell. *Id.* at ¶ 10. Moreover, the assignment of inmates in double cell housing was not within Oropallo's authority. *Id.* at ¶ 9.

Since Plaintiff has failed to submit opposition to Defendants' motion, the Court can look only to his verified Complaint for evidence demonstrating that a genuine issue of material

2014 WL 4146276

fact exists as to whether Oropallo knew of and disregarded an excessive risk of harm to the plaintiff's safety. *Id.* Mere allegations in Plaintiff's Complaint, especially conclusory allegations or conjecture and speculation, are insufficient to create a genuine issue of fact. *See Matsushita,* 475 U.S. at 585–86; *Kerzer,* 156 F.3d at 400.

None of the allegations in Plaintiff's verified Complaint contradicts Defendants' evidence that prison records did not identify Adams as a member of the Bloods gang, that Oropallo had no knowledge that Adams was a member of the Bloods gang at the time he was placed in Plaintiff's cell, and that Oropallo had no authority with regard to the assignment of inmates in double cells. Therefore, Plaintiff has failed to raise a question of fact as to whether Oropallo was deliberately indifferent to his safety, a necessary element of proof on an Eighth Amendment claim for cruel and inhuman punishment based upon a failure to protect. *See Farmer,* 511 U.S. at 837. Therefore, the Court recommends that Oropallo's motion for summary judgment be granted.

**\*11** **ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED;** and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892F.2d 15 (2d Cir.1989) (per curiam); 28 U.S.C. § 636(b) (1); Federal Rules of Civil Procedure 72, 6(a).

Filed June 18, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4146276

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Docket 9:13cv00563**<br>PRICE v. OROPALLO ET AL | — | N.D.N.Y. | May 15, 2013 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

2015 WL 470648
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Yousif AHMED, Plaintiff,

v.

FRAZER & JONES COMPANY, Defendant.

No. 5:13–CV–0573 (GTS/TWD).
|
Signed Feb. 4, 2015.

**Attorneys and Law Firms**

Yousif Ahmed, Syracuse, NY, pro se.

Bond, Schoeneck & King, PLLC, Thomas G. Eron, Esq., Kerry W. Langan, Esq., of Counsel, Syracuse, NY, for Defendant.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this employment discrimination action filed *pro se* by Yousif Ahmed ("Plaintiff") against Frazer & Jones Company ("Defendant") pursuant to Title VII of the Civil Rights Act of 1964, is Defendant's unopposed motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 18.) For the reasons set forth below, Defendant's motion is granted.

**I. RELEVANT BACKGROUND**

 **A. Summary of Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint claims that, in September of 2011, Defendant discriminatorily suspended then terminated his employment based on his race/ color and national origin in violation of Title VII of the Civil Rights Act of 1964. (Dkt. No. 1.) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties. (*Id.*)

 **B. Undisputed Material Facts**

The following material facts were asserted and supported by Defendant in its Local Rule 7.1 Statement and not controverted by Plaintiff in any Local Rule 7.1 Response, despite the fact that he was twice given specific notice of the consequences of failing to so respond (and the fact that he previously received a courtesy copy of both the Court's Local Rules of Practice and *Pro Se* Handbook). (Dkt. No. 18, Attach. 3 [Def.'s Rule 7.1 Statement]; Dkt. No. 18, Attach. 4 [First Notification of Consequences]; Dkt. No. 21 [Second Notification of Consequences]; Dkt. No. 3 [Notice of *Pro Se* Handbook and Local Rules].)

1. Defendant is a high-quality ductile and malleable iron foundry that has been in business for over 150 years in Syracuse, New York.

2. Plaintiff was hired on November 11, 2006, to work as a Hard Iron Sorter at Defendant's manufacturing facility in Syracuse, New York.

3. Plaintiff was a member of the Communication Workers of America, Local 81300 ("Union").

4. On September 2, 2011, Defendant suspended Plaintiff, pending investigation, for pushing and threatening a co-worker.

5. On September 6, 2011, Defendant terminated Plaintiff for his conduct on September 2, 2011.

6. Pursuant to the collective bargaining agreement between Defendant and the Union, the Union was promptly notified of Plaintiff's termination and represented him throughout the termination process.

7. On October 4, 2012, Plaintiff filed a complaint with the New York State Division of Human Rights ("Division") claiming that he was discriminated against because of an alleged disability.

8. On October 10, 2012, the Division dismissed Plaintiff's complaint for untimeliness because it was not filed within one year of the alleged discrimination.

9. Plaintiff's Division complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC").

10. On February 26, 2013, the EEOC issued a Dismissal and Notice of Rights.

11. The EEOC Dismissal and Notice of Rights stated that Plaintiff's charge was dismissed for lack of jurisdiction because the charge was not timely filed.

**\*2** 12. On April 28, 2014, Defendant was served with a Summons and Complaint, later filed by Plaintiff with this Court on May 17, 2013, alleging that Defendant discriminated against him based on his race/color and national origin.

### C. Briefing on Defendant's Motion

Generally, in support of its motion for summary judgment, Defendant argues that Plaintiff's Complaint must be dismissed as untimely for the following reasons: (1) an individual may not maintain a cause of action pursuant to Title VII unless he has first filed a claim with the EEOC or an equivalent state agency within 300 days of the alleged discriminatory act; (2) a discriminatory termination is considered a "discrete act"; (3) here, Plaintiff was terminated on September 6, 2011, 300 days after which was July 2, 2012; and (4) however, he did not file with the Division until October 4, 2012. (Dkt. No. 18, Attach. 1 [Def.'s Memo. of Law].)

Plaintiff did not file an opposition memorandum of law (or any opposition paper), despite having been twice given specific notice of the consequences of failing to do so (Dkt. No. 18, Attach. 4 [First Notification of Consequences]; Dkt. No. 21 [Second Notification of Consequences] ); and the deadline by which to do so expired more than seven-and-a-half months ago (*see generally* Docket Sheet).

### II. RELEVANT LEGAL STANDARD

Because Defendant, in its memorandum of law, accurately summarizes the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard. (Dkt. No. 18, Attach. 1, at Part I [Def.'s Memo. of Law].) To that summary, the Court would add only two brief points.

First, implied in the burden-shifting standard referenced by Defendant is the fact that, where a nonmoving party fails to adequately respond to a properly supported Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se*.[1] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond

to the motion for summary judgment.)[2] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[3] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's properly supported Statement of Material Facts to have been admitted where the nonmoving party has failed to properly respond to that statement[4]—even where the nonmoving party is proceeding *pro se* in a civil rights case.[5]

1    *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

2    *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

3    *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

4    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

5    *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

Second, in this District, when a non-movant fails to oppose a legal argument asserted by a movant in a properly filed memorandum of law (submitted in support of a motion for summary judgment), the movant's burden with regard to that argument is lightened such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v.. Gensini,* 07–CV–0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL2473509, at *2 & nn. 2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). Again, this rule applies even to *pro se* litigants, especially ones who have received notice of the consequence of that failure to respond.[6]

2015 WL 470648

6    Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Federal Exp.,* No. 12–1475, 2014 WL 4412333, at *6 (2d Cir.2014) ("Where a partial response to a motion is made—i.e., referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

## III. ANALYSIS

**\*3** After carefully considering the matter, the Court finds, for the reasons stated in Defendant's memorandum of law, that Defendant has met its modest burden of showing the facial merit of its argument that Plaintiff's Complaint must be dismissed as untimely. (*See, supra,* Part I.C. of this Decision and Order.)

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 18) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

*The Clerk is directed to enter judgment for Defendant and close this action.*

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 470648

---

End of Document         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 101 of 531

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3853811

2023 WL 3853811
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rashad SALAAM, Plaintiff,
v.
Gordon STOCK and Travis M. Zehr, Defendants.

9:19-cv-00689-AMN-TWD
|
Signed February 27, 2023

**Attorneys and Law Firms**

RASHAD SALAAM, Plaintiff, pro se, 14-A-3363, Clinton
Correctional Facility, P.O. Box 2001, Dannemora, NY 12929.

LETITIA JAMES, Attorney General of the State of New
York, STEVE NGUYEN, ESQ., Assistant Attorney General,
Attorney for Defendants, The Capitol, Albany, NY 12224.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

**\*1** This matter has been referred for a report and
recommendation by the Hon. Anne M Nardacci, United States
District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule
72.3(c). On May 30, 2019, *pro se* Plaintiff Rashad Salaam
("Plaintiff"), an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C.
§ 1983 ("Section 1983"). (Dkt. No. 1.) Plaintiff's fourth
amended complaint was accepted for filing on August 11,
2021, and alleged Fourteenth Amendment equal protection
and Eighth Amendment failure to protect claims against
Correction Officer ("CO") Gordon Stock and CO Travis M.
Zehr. (Dkt. No. 83.)

Currently before the Court is Defendants' motion for
summary judgment. (Dkt. No. 108.) For the reasons set forth
below, the Court recommends Defendants' motion be granted
in part and denied in part.

**II. LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is warranted if "there is no genuine
dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).
The moving party bears the initial burden of demonstrating
"the absence of a genuine issue of material fact." *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v.
Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006). A fact is
"material" if it "might affect the outcome of the suit under the
governing law," and is genuinely in dispute "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." *Anderson*, 477 U.S. at 248; *see Jeffreys
v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). The
movant may meet this burden by showing that the nonmoving
party has "fail[ed] to make a showing sufficient to establish
the existence of an element essential to that party's case, and
on which that party will bear the burden of proof at trial."
*Celotex*, 477 U.S. at 322.

If the moving party satisfies its burden, the nonmoving party
must move forward with specific facts showing there is a
genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that
context, the nonmoving party must do more than "simply
show that there is some metaphysical doubt as to the material
facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio
Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations,
conjecture and speculation ... are insufficient to create a
genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396,
400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment
motions, "[t]he mere existence of a scintilla of evidence in
support of the plaintiff's position will be insufficient; there
must be evidence on which the jury could *reasonably* find
for the plaintiff." *Jeffreys*, 426 F.3d at 554 (emphasis in
original). In other words, "a nonmoving party must offer
some hard evidence showing that [his] version of the events
is not wholly fanciful." *Id.* (citation and internal quotation
marks omitted). Accordingly, statements "that are devoid of
any specifics, but replete with conclusions, are insufficient to
defeat a properly supported motion for summary judgment."
*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

**\*2** In determining whether a genuine issue of material
fact exists, the court must resolve all ambiguities and draw
all reasonable inferences against the moving party. *Major
League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290,
309 (2d Cir. 2008). Where a party is proceeding *pro se*, the

2023 WL 3853811

court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/ Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment").

## III. DEFICIENCIES IN PLAINTIFF'S OPPOSITION SUBMISSION

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*, 351 F.3d at 50. In opposing Defendants' motion for summary judgment, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under Local Rule 56.1(b). [1] (*See* Dkt. No. 110.) "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.' " *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021).

[1]  Local Rule 56.1(b) requires the opposing party to file a Response to the movant's Statement of Material Facts. Under the rule, the Response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 56.1(b).

Nevertheless, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record. *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.2 (S.D.N.Y. 2019) (noting that special solicitude afforded to *pro se* litigants suggests that courts should review the record when *pro se* plaintiff fails to appropriately respond to defendants' properly supported statement of material facts).

## IV. BACKGROUND

Plaintiff's claims stem from two specific incidents: the first on July 22, 2017, and the second on July 25, 2017. Plaintiff alleges on July 22, 2017, CO Stock was overlooking the gallery as he opened the cells for breakfast around 7:30AM and during that time, another inmate, Jason Williams ("Williams"), was able to enter Plaintiff's cell and sexually assault him. (Dkt. No. 83 at 3; Dkt. No. 108-4 at 22-23, 25; Dkt. No. 110 at 2-3.) The incident lasted around 3 minutes. (Dkt. No. 108-4 at 25.) Williams threatened to kill Plaintiff if he told anyone about the attack. (Dkt. No. 108-4 at 25-27.) Plaintiff alleges he would not have been assaulted if CO Stock would have made his rounds on time or pulled a pin during the attack. (Dkt. No. 83 at 1.)

**\*3**  Plaintiff alleges CO Stock knew he was at serious risk of harm due to his background. Plaintiff was sexually assaulted at other facilities and previously identified as transgender. (Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48.) This information had supposedly spread throughout his block and the prison. (Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48.) As a result, other inmates loudly taunted him, but the COs did nothing about it. *Id.* Plaintiff claims CO Stock would overhear the inmates in other tiers harassing him and would then walk past Plaintiff's cell grinning at him "in a childlike manner" while he continued his rounds. (Dkt. No. 83 at 2-3.)

On July 25, 2017, CO Zehr was opening cells for the inmates after recreation at or around 10PM. (Dkt. No. 83 at 3-4; Dkt. No. 108-4 at 36.) The same inmate who assaulted Plaintiff three days prior, Williams, came up behind Plaintiff and cut his face with a razor. (Dkt. No. 108-4 at 35.) Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's right arm before returning to his own cell. (Dkt. No. 108-4 at 35, 39-40.) The incident lasted about a minute and a half. (Dkt. No. 108-4 at 38.) CO Zehr allegedly stood at the end of the gallery watching as this occurred. (Dkt. No.

Salaam v. Stock, Not Reported in Fed. Supp. (2023)
2023 WL 3853811

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 103 of 531

83 at 3-4.) According to Plaintiff, CO Zehr did not pull a pin or give attention to the situation. *Id.* Plaintiff also claims CO Zehr walked by his cell "smiling in a childish way" four to five minutes after the incident while Plaintiff was bleeding from his arm and face. (Dkt. No. 108-4 at 35-36, 40.) Plaintiff alleges he had to call CO Zehr back and ask him to go to the infirmary. (Dkt. No. 108-4 at 35-36.) CO Zehr allegedly told Plaintiff to wait, did his rounds, and then sent Plaintiff to the infirmary. (Dkt. No. 108-4 at 36.) Plaintiff still has scars on his face and arm from the incident. (Dkt. No. 108-4 at 46.)

Plaintiff claims as a result of the attacks on July 22 and July 25, 2017, other inmates have "tried"[2] him in the shower and while using the phone; spit in his food at every meal; took his commissary and packages; and extorted his mother for money —resulting in the police being called. (Dkt. No. 83 at 4.)

[2]     The Court interprets "tried" to mean other inmates
        attempted to assault or start an altercation with
        Plaintiff.

## V. DISCUSSION

Plaintiff claims COs Stock and Zehr failed to protect him from the July 22, 2017, and July 25, 2017, incidents, violating his Eighth Amendment rights. (Dkt. No. 83 at 1-4.) Plaintiff also claims COs Stock and Zehr treated him differently because he previously identified as transgender and because he murdered someone related to a CO, violating his Fourteenth Amendment equal protection rights. (Dkt. No. 83 at 3.) Defendants assert Plaintiff's claims fail as a matter of law because (1) COs Stock and Zehr were unaware of Plaintiff's risk of harm at the time of the two incidents; (2) Plaintiff was not a member of a protected class or treated differently from others similarly situated; and (3) Defendants' actions were not discriminatory. (Dkt. 108-5 at 7-14.) In the alternative, Defendants claim they are entitled to qualified immunity. (Dkt. 108-5 at 15.)

### A. Fourteenth Amendment Equal Protection Claim

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

**\*4** When a suspect classification is not at issue, the Equal Protection Clause still requires that individuals be treated the same as "similarly situated" individuals. *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012). Thus, a plaintiff may bring a "class of one" equal protection claim "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564. In the Second Circuit, class of one plaintiffs "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). A high level of similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose— whether personal or otherwise—is all but certain." *See Witt v. Vill. of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at \*5 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 639 F. App'x 44 (2d Cir. 2016).

To summarize, to state a class of one claim, a plaintiff must allege (1) that he was intentionally treated differently from other similarly situated individuals; and (2) that the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus. *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 (S.D.N.Y. 2008).

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 104 of 531

2023 WL 3853811

### 1. Suspect Class

Plaintiff claims COs Stock and Zehr "neglected" to protect or "ignored" Plaintiff because he had previously identified as transgender and because he murdered someone related to a CO. (Dkt. No. 83 at 3.) To start, Plaintiff has not demonstrated he was a member of a suspect class due to his gender identity. This Circuit has previously grappled with what level of scrutiny to apply to transgender individuals and whether transgender individuals are a suspect class for equal protection purposes. *See Adkins v. City of New York*, 143 F. Supp. 3d 134 (S.D.N.Y. 2015); *White v. City of New York*, 206 F. Supp. 3d 920 (S.D.N.Y. 2016). However, Plaintiff no longer identified as transgender by the time the incidents occurred. (Dkt. No. 108-4 at 19-20.) Plaintiff testified he identified as transgender from 2009 to 2011. *Id.* In 2011, he began to identify as a cisgender [3] man again. *Id.* Because Plaintiff no longer identified as transgender at the time the incidents occurred in 2017, the Court need not determine which level of scrutiny applies to transgender individuals or whether transgender individuals are a suspect class. *See generally Adkins*, 143 F. Supp. 3d at 134; *White*, 206 F. Supp. 3d at 920. Alternatively, Plaintiff has not demonstrated any of the criteria needed to qualify "individuals who previously identified as transgender" as a suspect class. [4]

[3]     Cisgender means "of, relating to, or being a person whose gender identity corresponds with the sex the person had or was identified as having at birth." Cisgender, Merriam-Webster, https://www.merriam-webster.com/dictionary/cisgender (last accessed Feb. 27, 2023.)

[4]     In *Adkins*, the court used the four factors outlined in *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012) in its determination that transgender individuals are a quasi-suspect class: (1) the group has suffered a history of persecution and discrimination; (2) the group has sufficiently discernable characteristic(s); (3) the group's characteristic(s) have no relation to ability to contribute to society; (4) the group is politically weakened or powerless. *Adkins*, 143 F. Supp. 3d at 139-40.

Moreover, Plaintiff was not a member of a suspect class as someone convicted of murder. *Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("prisoners either in the aggregate or specified by offense are not a suspect class"); *Mathie v. Dennison*, No. 06 CIV. 3184(GEL), 2007 WL 2351072, at *8 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 381 F. App'x 26 (2d Cir. 2010) ("Prisoners are not a suspect class.... Nor are violent prisoners a suspect class." A history of violent crime is the very opposite of a morally irrelevant, immutable trait: it reflects a voluntary choice by the offender to commit a dangerous and harmful criminal act when he could have complied with the law); *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ("neither violent felons nor non-violent felons are a 'suspect class' under the United States Constitution.") Therefore, Plaintiff has not demonstrated he was a member of a suspect class at the time the incidents occurred.

### 2. Class of One

**\*5** Plaintiff has also not sufficiently demonstrated he is a class of one for equal protection purposes. Plaintiff must demonstrate both (1) he was intentionally treated differently from other similarly situated individuals; and (2) the disparate treatment was either (a) "irrational and wholly arbitrary" or (b) motivated by animus. *Assoko*, 539 F. Supp. 2d at 735. Plaintiff has provided no examples of similarly situated individuals for use of comparison. *Ruggiero v. Fischer*, 807 F. App'x 70, 74 (2d Cir. 2020) (finding the district court properly granted summary judgment on an equal protection claim when Plaintiff "made no showing at all that he was treated differently from SHU inmates at other institutions" and "did not attempt to identify a specific comparator at [his facility] or another facility with whom he had a high degree of similarity."); *Rasheed v. Adner*, 356 F. Supp. 3d 222, 242 (N.D.N.Y. 2019) (dismissing complaint when Plaintiff failed "to allege any facts suggesting how he was treated differently than any similarly situated inmate" and "Plaintiff's vague and conclusory allegations [were] insufficient to plausibly suggest an equal protection violation."); *Ippolito v. Goord*, No. 05-CV-6683 MAT, 2012 WL 4210125, at *19 (W.D.N.Y. Sept. 19, 2012) ("Plaintiff has offered no evidence that he was treated differently from other, similarly situated inmates. Accordingly, his 'class of one' equal protection claim fails as a matter of law and is dismissed."). As a result, the Court cannot determine if disparate treatment existed, and Plaintiff has not demonstrated he was a class of one for equal protection purposes. Therefore, the Court recommends granting Defendants' motion as to Plaintiff's Fourteenth Amendment equal protection claim. (Dkt. No. 108-5 at 10-16.)

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3853811

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 105 of 531

## B. Eighth Amendment Failure to Protect Claims

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and requires prison officials to take "reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)). In particular, prison officials "have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). Prison officials are liable under the Eighth Amendment for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety. *Morales v. New York State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) ("[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under [Section] 1983.").

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one objective and one subjective. To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. That is, the deprivation "must be, in objective terms, 'sufficiently serious.' " *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The standard "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Id.* (quoting *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990)). Under this standard, the plaintiff "must demonstrate that this grave harm was 'actual or imminent.' " *Dublin v. New York City Law Dep't*, No. 10 Civ. 2971 (LAP), 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (quoting *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003)).

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.' " *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836) (alterations in original). Indeed, "[t]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis in original). Mere negligence by a prison official will not suffice.

*Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

In this case, Defendants do not deny the lacerations Plaintiff received constitute a serious harm for purposes of the objective prong. (Dkt. No. 108-5 at 7.) However, they do argue Plaintiff offered no evidence to satisfy the subjective prong of the test as to CO Stock or CO Zehr. *Id.*

### 1. CO Stock

**\*6** There is no indication CO Stock was aware of facts from which an inference could be drawn that Plaintiff was at a substantial risk of serious harm during the July 22, 2017, attack. CO Stock stated in his declaration on July 22, 2017, at 7:30AM, the First Officer went around to each company in A-Block and let the residents out for breakfast. (Dkt. No. 108-2 at 2). CO Stock served as Second Officer and followed behind the First Officer to inspect every A-Block cell to confirm it was vacant. *Id.* This is known as the "chow run." *Id.* CO Stock started from the fifth floor and made his way down to the second floor, where Plaintiff was housed in A-9. *Id.* CO Stock states he did not observe, encounter, or interact with Plaintiff on chow run that day. (Dkt. No. 108-2 at 3.) He further states he did not witness Williams enter Plaintiff's cell or assault him at any point on July 22, 2017. *Id.*

Plaintiff alleges the July 22, 2017, attack occurred sometime between 7 and 7:30AM. (Dkt. No. 108-4 at 23.) Plaintiff testified CO Stock was not nearby during the attack but was above him on "[the] second or third floor." (Dkt. No. 108-4 at 28.) Additionally, the summary judgment record does not demonstrate CO Stock was present in A-9 between 7 and 7:30AM on July 22, 2017. (Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 28.) If CO Stock was not in A-9 during the attack, it does not appear it would have been possible for him to see or hear the attack, as companies on the same floor face away from each other and companies on separate floors are separated by concrete floors and walls. (Dkt. No. 108-2 at 2-3.) Therefore, it appears CO Stock was not and could not have been aware of a substantial risk of serious harm to Plaintiff during the attack.

Nor is there any evidence suggesting CO Stock was aware of a substantial risk of serious harm to Plaintiff prior to the attack. Plaintiff alleges CO Stock was aware of Plaintiff's risk of harm prior to the incident on July 22, 2017, due

2023 WL 3853811

to the other inmates' loud taunting of Plaintiff about his gender identity and the sexual assaults at other prisons. (Dkt. No. 83 at 2-3; Dkt. No 108-4 at 47-48.) Plaintiff further claims CO Stock and other COs neglected him because he previously identified as transgender and because he murdered a CO's relative. (Dkt. No. 83 at 3.) However, the record evidence does not demonstrate CO Stock had any prior altercations with Plaintiff or had any prior knowledge of Plaintiff's gender identity or prior crimes; the sexual assaults at other prisons; or the other inmates' taunting of Plaintiff. (Dkt. No. 108-2 at 2; Dkt. No. 108-4 at 34.) Plaintiff offers no proof to the contrary beyond the conclusory allegation that CO Stock knew this information. (Dkt. No. 83 at 2-3.) "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Therefore, the Court recommends granting Defendants' motion on Plaintiff's Eighth Amendment failure to protect claim against CO Stock. (Dkt. No. 108-5 at 7-9.)

### 2. CO Zehr

The Court comes to a different recommendation with regard to the Eighth Amendment claim against CO Zehr. According to Plaintiff, on July 25, 2017, CO Zehr was opening cells for the inmates after recreation at or around 10PM. (Dkt. No. 83 at 3-4; Dkt. No. 108-4 at 36.) During that time, Williams came up behind Plaintiff and cut his face with a razor. (Dkt. No. 108-4 at 35-36.) Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's right arm before returning to his own cell. (Dkt. No. 108-4 at 35, 39-41.) The incident lasted about a minute and a half. (Dkt. No. 108-4 at 38.) CO Zehr allegedly stood at the end of the gallery watching as this occurred. (Dkt. No. 83 at 4.) According to Plaintiff, CO Zehr did not pull a pin or give attention to the situation. *Id.* As with CO Stock, Plaintiff claimed CO Zehr ignored or neglected him due to his prior gender identity and because he murdered someone related to a CO. (Dkt. No. 83 at 3.)

**\*7** CO Zehr states in his declaration that on the evening of July 25, 2017, he was assigned to A-9. (Dkt. No 108-3 at 2.) At approximately 10:05PM, the A-9 residents returned to their cells from recreation by walking up a stairwell. *Id.* CO Zehr was stationed between the stairwell and the front of the company, which is closest to Cell 1, directing residents to their respective cells. *Id.* He further states because he was the only officer in A-9 he could not leave his post. *Id.* At one point he observed Williams' "outstretched arm through [Plaintiff's]

cell bars" but "could not determine whose cell it belonged to" at the time. *Id.* He could not "observe who was inside or what Williams was doing with his extended hand." *Id.* However, he claims at the time he "believed Williams was trying to pass a pack of cigarettes or something similar." (Dkt. No. 108-3 at 3.) He confirmed Plaintiff's "cell bars were already closed" but "[s]hortly afterward" he "observed another incarcerated individual obstruct[ing] [his] view of the company." *Id.* CO Zehr then instructed Williams and the other inmate "to return to their cells, and they complied." *Id.* When all of the A-9 residents were locked in their cells, CO Zehr conducted the count at 10:10PM. *Id.* When he approached Plaintiff's cell, he observed Plaintiff "was bleeding from his face and arm," "immediately" notified his sergeant of the incident, and escorted Plaintiff to medical. *Id.* CO Zehr issued an Inmate Misbehavior Report to Williams as a result of the incident and testified at his August 8, 2017, disciplinary hearing. *Id.*

CO Zehr claims he had no prior altercations with Plaintiff or prior knowledge of his gender identity or previous crimes. (Dkt. No. 108-3 at 2.) He further claims he was not deliberately indifferent because "at no point on July 25, 2017, did [he] witness Williams cut [Plaintiff];" he did not have reason to suspect Plaintiff was at risk of being harmed; and he was unaware Plaintiff had been assaulted until he approached his cell. (Dkt. No. 108-3 at 3-4.)

However, CO Zehr's testimony at Williams' August 8, 2017, disciplinary hearing calls into question what he actually saw and inferred at the time of the July 25, 2017, incident. [5] (Dkt. No. 108-3 at 16, 17.) At the hearing, CO Zehr testified he saw Williams walking toward 21 cell and watched as Williams "stop[ped], talk[ed], reach[ed] his hand in [Plaintiff's cell] and *start[ed] making violent swinging motions inside the cell.*" (Dkt. No. 108-3 at 20 (emphasis added).) While he testified he could see down the company, he claimed he could not see a weapon from where he was positioned. (Dkt. No. 108-3 at 19-20.) While this was occurring, another inmate was acting as a "look out" and was watching CO Zehr "to see if [he] was paying attention to ... what was going on." (Dkt. No. 108-3 at 20.) Interestingly, at this point of the hearing, the hearing officer seemingly misstates CO Zehr's prior testimony by replying "now you couldn't see what was happening inside the cell, you saw his arm kind of moving" to which CO Zehr replied "[y]up." CO Zehr then went on to testify he did not know what was happening in the cell at the time; he did not see a weapon; and he "thought maybe [Williams] was trying to pass a pack of cigarettes or something." (Dkt. No. 108-3 at 24-25.) When asked what he normally does if he sees an

2023 WL 3853811

inmate being assaulted or someone attempting to assault an inmate, CO Zehr testified "[u]sually I will call a response on my radio or if I have to yell to another officer. And then I wait for additional staff to arrive to properly deal with the situation. Then, as soon as that happens, we notify the supervisor and he also responds." (Dkt. No. 108-3 at 23.)

5       Defendants provide the August 8, 2017 disciplinary hearing transcript as Exhibit D of their Motion for Summary Judgment. (Dkt. No. 108-3 at 15.)

Plaintiff asserts CO Zehr watched as he was attacked by Williams the night of July 25, 2017, and did nothing. (Dkt. No. 83 at 3-4.) CO Zehr testified both that he believed Williams was handing Plaintiff cigarettes or something similar *and* that he saw Williams "making violent swinging motions inside [Plaintiff's] cell." (Dkt. No. 108-3 at 20, 24-25.) Crediting Plaintiff's claims and CO Zehr's hearing testimony, a reasonable jury could find CO Zehr knew of and disregarded an excessive risk to inmate health and safety upon observing Williams' and the other inmate's actions —rendering CO Zehr deliberately indifferent. *See Mills v. Fenger,* 216 F. App'x 7, 10 (2d Cir. 2006) ("[T]he state of the defendant's knowledge is normally a question of fact to be determined after trial.") (internal quotation marks omitted); *see also Heisler v. Kralik,* 981 F. Supp. 830, 837 (S.D.N.Y. 1997), *aff'd sub nom. Heisler v. Rockland Cnty.,* 164 F.3d 618 (2d Cir. 1998) (denying defendant's motion for summary judgment where the plaintiff alleged that another inmate, whom plaintiff had no alleged previous altercations with, attacked him while he was being held as a pretrial detainee, and officers witnessed the assault but failed to intercede to stop it); *Stewart v. Schiro,* No. 13-CV-3613 (NGG)(VMS), 2015 WL 1854198, at *8 (E.D.N.Y. Apr. 22, 2015) ("[U]nder certain circumstances, the commencement of an inmate-to-inmate altercation could put a prison official on sufficient notice to render the prison official deliberately indifferent if he or she then fails to intervene in an appropriate manner"); *Candelaria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *9 (S.D.N.Y. Mar. 1, 1996) (inaction by a correction officer to intercede and halt an attack by a fellow prisoner is sufficient basis for deliberate indifference).

 *8  In short, the record evidence provides differing accounts of what transpired on the night of the July 25, 2017, incident and resolving what happened is a question for the jury. "While the weight of the evidence may favor [Defendants], the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions." *Lewis v. Hanson,* No. 18-CV-0012 (LEK/DJS), 2022 WL 991729, at *9 (N.D.N.Y.

Mar. 31, 2022) (citing *Franklin v. Oneida Corr. Facility,* No. 03-CV-1452 (LEK), 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial, defendants' invitation to make a credibility determination and reject plaintiff's version of the events on motion for summary judgment is plainly unwarranted.")); *see, e.g., Cicio v. Lamora,* No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), *report-recommendation adopted by* 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he was beaten by [Defendant] stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact.").

Relatedly, the Court finds CO Zehr is not entitled to qualified immunity at this stage of the proceeding. *See Villante v. Vandyke,* No. 9:04CV759 FJS DRH, 2008 WL 163596, at *3 (N.D.N.Y. Jan. 15, 2008) ("Since [p]laintiff has raised an issue of fact about whether [d]efendants stood by and allowed other inmates to attack him ... [d]efendants are not entitled to qualified immunity"); *Decayette v. Goord,* No. 9:06-CV-783, 2009 WL 1606753, at *12 (N.D.N.Y. June 8, 2009) (finding defendant should not be entitled to summary judgment on qualified immunity claim because triable issues of fact existed as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she was liable for failing to intervene during the alleged beating of Plaintiff); *Rosen v. City of New York,* 667 F. Supp. 2d 355, 362 (S.D.N.Y. 2009) (denying summary judgment on defendants' qualified immunity claim where genuine issue of material fact existed as to whether it was reasonable for city corrections officer to believe that shouting at inmates to stop beating pretrial detainee fulfilled his duty to protect detainee).

In sum, as to the July 25, 2017, incident, Defendants have not met their burden of showing there is no genuine issue of material fact as to Plaintiff's Eighth Amendment failure to protect claim against CO Zehr. Accordingly, the Court recommends denying Defendants' motion for summary judgment as to this claim.

## VI. CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

Salaam v. Stock, Not Reported in Fed. Supp. (2023)

2023 WL 3853811

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 108) be **GRANTED** in part and **DENIED** in part as follows: (1) the Fourteenth Amendment equal protection claim against both Defendants be dismissed; (2) the Eighth Amendment failure to protect claim against Defendant CO Stock be dismissed; and (3) the Eighth Amendment failure to protect claim against Defendant CO Zehr proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [6] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[6]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**\*9  SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3853811

---

     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:19-CV-00689**<br>Salaam v. Williams et al | — | N.D.N.Y. | June 10, 2019 | Docket |

**History (8)**

**Direct History (2)**

1. Salaam v. Stock
   2023 WL 3853811 , N.D.N.Y. , Feb. 27, 2023

   *Report and Recommendation Adopted by*

2. Salaam v. Stock
   2023 WL 3579770 , N.D.N.Y. , May 22, 2023

**Related References (6)**

3. Salaam v. Department of Corrections and Community Supervision
   2019 WL 4415624 , N.D.N.Y. , Sep. 16, 2019

4. Salaam v. Doe
   2019 WL 5552131 , N.D.N.Y. , Oct. 28, 2019

5. Salaam v. Stock
   2021 WL 2367123 , N.D.N.Y. , May 12, 2021

   *Report and Recommendation Adopted by*

6. Salaam v. Stock
   2021 WL 2102242 , N.D.N.Y. , May 24, 2021

7. Salaam v. Zehr
   2024 WL 3298958 , N.D.N.Y. , Apr. 19, 2024

   *Report and Recommendation Adopted by*

8. Salaam v. Zehr
   2024 WL 2873550 , N.D.N.Y. , June 07, 2024

2023 WL 3579770

2023 WL 3579770
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rashad SALAAM, Plaintiff,

v.

Gordon STOCK and Travis M. Zehr, Defendants.

9:19-cv-00689 (AMN/TWD)
|
Signed May 22, 2023

**Attorneys and Law Firms**

RASHAD SALAAM, 14-A-3363, Clinton Correctional Facility, P.O. Box 2001, Dannemora, NY 12929, Plaintiff, pro se.

LETITICA JAMES, Attorney General of the State of New York, STEVE NGUYEN, ESQ., The Capitol, Albany, NY 12224, Attorney for Defendant, Assistant Attorney General.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

**\*1** On May 30, 2019, plaintiff *pro se* Rashad Salaam ("Plaintiff"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. Plaintiff sought and was granted leave to proceed *in forma pauperis.* Dkt. Nos. 11 & 15. Plaintiff's fourth amended complaint ("FAC") was accepted for filing on August 11, 2021, in which Plaintiff alleged Fourteenth Amendment equal protection and Eighth Amendment failure to protect claims against Corrections Officer ("CO") Gordon Stock and CO Travis Zehr (collectively, "Defendants"). *See* Dkt. No. 83. On July 20, 2022, Defendants filed a motion for summary judgment seeking dismissal of the FAC. *See* Dkt. No. 108. This matter was referred to United States Magistrate Judge Thérèse Wiley Dancks, who, on February 27, 2023, issued a Report-Recommendation and Order ("Report-Recommendation"), recommending that Defendants' motion for summary judgment, Dkt. No. 108, be granted in part and denied in part. *See* Dkt. No. 115 at 19. Magistrate Judge Dancks advised that under 28 U.S.C. § 636(b)(1), the parties had fourteen days within

which to file written objections and that failure to object to the Report-Recommendation within fourteen days would preclude appellate review. *Id.* Plaintiff timely filed a response to the Report-Recommendation. Dkt. No. 116.

For the reasons stated herein, the Court adopts the recommendations in the Report-Recommendation.

**II. BACKGROUND** [1]

[1] Plaintiff's factual allegations are detailed in the Report-Recommendation. *See* Dkt. No. 115 at 5-6.

Plaintiff alleges that he [2] was sexually assaulted on July 22, 2017, and physically assaulted on July 25, 2017, by another inmate, Jason Williams ("Williams"), while he was incarcerated at Auburn Correctional Facility ("Auburn C.F."). *See* Dkt. No. 83. According to Plaintiff, at approximately 7:30 a.m. on July 22, 2017, Williams entered Plaintiff's cell and sexually assaulted him for approximately three minutes while CO Stock was overlooking the gallery and opening the cells for breakfast in Plaintiff's cell block. Dkt. No. 83 at 3; Dkt. No. 108-4 at 22-23, 25. [3] Plaintiff did not report the attack at the time because Williams threatened to kill him if he told anyone about the attack. Dkt. No. 108-4 at 25-27. Plaintiff contends that he would not have been assaulted if CO Stock had made his rounds on time or pulled a pin during the attack. Dkt. No. 83 at 1.

[2] Because Plaintiff has alleged and testified that he no longer identifies as transgender, the Court will refer to Plaintiff as "he" or "him" herein.

[3] Citations to Court documents utilize the pagination generated by CM/ECF docketing system and not the documents' internal pagination.

Plaintiff alleges that he was physically assaulted on July 25, 2017, by Williams, when CO Zehr was opening cells for inmates after recreation at or around 10 p.m. Dkt. No. 83 at 3-4; Dkt. No. 108-4 at 36. According to Plaintiff, Williams came up behind him and cut his face with a razor. Dkt. No. 108-4 at 35. Plaintiff went back into his cell, but Williams followed him and cut Plaintiff's right arm before returning to his own cell. Dkt. No. 108-4 at 35, 39-40. Plaintiff contends that CO Zehr stood at the end of the gallery watching as Williams assaulted him. Dkt. No. 83 at 3-4. Plaintiff alleges that CO Zehr did not pull a pin or otherwise give attention to the situation. *Id.* Plaintiff also claims CO Zehr walked by his cell "smiling in a childish way" four to five minutes after the

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 112 of 531

incident while Plaintiff was bleeding from his face and arm. Dkt. No. 108-4 at 35-36, 40. Plaintiff further alleges he had to call CO Zehr back and ask him to go to the infirmary. Dkt. No. 108-4 at 35-36. CO Zehr allegedly told Plaintiff to wait, completed his rounds, and then sent Plaintiff to the infirmary. Dkt. No. 108-4 at 36. Plaintiff still has scars on his face and arm from the incident. Dkt. No. 108-4 at 46.

**\*2** Plaintiff contends that he was "neglected" or "ignored" by CO Stock and CO Zehr because he previously identified as transgender and because he was convicted of murdering someone who was related to a CO. Dkt. No. 83 at 3. Plaintiff further contends that the fact that he previously identified as transgender and had a history of being sexually assaulted in other DOCCS facilities had spread throughout his block and the prison. Dkt. No. 83 at 2-3; Dkt. No. 108-4 at 48. As a result, other inmates loudly taunted him, and thus the Auburn C.F. COs had knowledge of Plaintiff's background. *See* Dkt. No. 83 at 2-3.

### III. STANDARD OF REVIEW

#### A. Summary Judgment

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (emphasis in original). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Moreover, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *See Chambers*, F.3d at 36-37 (quotation and other citation omitted). Any assessments of credibility and all choices between available inferences are matters to be left for a jury, not matters to be decided by the Court on summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (citing Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing, *inter alia*, *Anderson*, 477 U.S. at 255).[4] Where a party is proceeding *pro se*, like here, the court must "read his supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

4    Where, as here, the non-movant fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n. 5 (2d Cir. 2003) (holding that not verifying in the record the assertions in a motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

#### B. Review of Report-Recommendation

A district court reviews *de novo* those portions of a magistrate judge's report-recommendations that have been properly preserved with a specific objection. 28 U.S.C. § 636(b)(1)(C). "To be 'specific,' the objection must, with particularity, 'identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection.' " *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012) (alteration in original) (quoting N.D.N.Y. Local Rule 72.1(c)). When a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [previously] presented to the magistrate judge," the district court reviews a magistrate judge's report-recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322 (TJM) (DRH), 2011 WL 933846, at \*1 (N.D.N.Y. Mar. 16, 2011) (citations omitted); *accord Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (a "statement, devoid of any reference to specific findings or recommendations to which [the plaintiff] objected and why, and unsupported by legal authority, was not sufficient to preserve" a claim).

**\*3** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289

2023 WL 3579770

F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal ...." *Machicote v. Ercole*, No. 06 Civ. 13320 (DAB)(JCF), 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 1:22-cv-567 (BKS/CFH), 2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1)(C).

## IV. DISCUSSION

Defendants did not file objections to the Report-Recommendation. In response to the Report-Recommendation, Plaintiff submitted a document docketed as an objection. Dkt. No. 116. However, Plaintiff's submission restates certain of the allegations in the FAC, *compare* Dkt. No. 116, *with* Dkt. No. 83, and does not reference the Report-Recommendation or identify any objection to the analysis in the Report-Recommendation.[5] Plaintiff has thus failed to preserve an objection. Therefore, the Court reviews the Report-Recommendation for clear error.

[5]    Although it is titled "Written Objection," Plaintiff's document presents as more akin to a settlement demand than as an objection to the Report-Recommendation. *See* Dkt. No. 116. Instead of the $100,000 in monetary damages initially sought, Plaintiff states that he now seeks $5,000 in monetary damages to resolve his Eighth Amendment failure to protect claim against CO Zehr. *See id.*

### A. Plaintiff's Equal Protection Claim

Magistrate Judge Dancks recommended that Plaintiff's Fourteenth Amendment equal protection claim against Defendants be dismissed. Dkt. No. 115 at 19. For the reasons stated below, the Court adopts Magistrate Judge Dancks' recommendation.

#### i. Legal Standard

"The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted). Where there are no allegations of membership in a suspect or protected class, the plaintiff may still prevail on an equal protection claim under either a selective enforcement or a class of one theory.[6] *See Cobb v. Pozzi*, 363 F.3d 89, 109-11 (2d Cir. 2004); *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013); *see also Emblen v. Port Authority of New York/New Jersey*, No. 00 Civ. 8877 (AGS), 2002 WL 498634, at *7 (S.D.N.Y. Mar. 29, 2002) (allowing plaintiff's equal protection claim under the class of one theory to proceed where the plaintiff was not homosexual but alleged that he was perceived and discriminated against as such) (citing *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).

[6]    The Second Circuit treats claims under the selective enforcement theory and the class of one theory as separate claims. *See Casciani v. Nesbitt*, 392 F. App'x. 887, 888 (2d Cir. 2010) (summary order); *Gentile v. Nulty*, 769 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (noting that courts in the Second Circuit "have generally treated selective enforcement and class of one theories as distinct theories with distinct elements of proof." (citations and internal quotation marks omitted)).

**\*4** To state a claim under the selective enforcement theory, "a plaintiff must allege facts supporting a conclusion that 1) he was 'treated differently from other similarly situated' comparators, and 2) 'that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Missere v. Gross*, 826 F. Supp. 2d 542, 560 (S.D.N.Y. 2011) (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (internal quotation marks omitted)). Finally, a plaintiff can state an equal protection claim under the "class of one" theory by alleging that he has been intentionally and "irrationally singled out." *Engquist v. Or. Dep't of Agric.*, 553

2023 WL 3579770

U.S. 591, 601 (2008). A plausible class of one claim requires the plaintiff to demonstrate an "extremely high degree of similarity" with the person to whom he is comparing himself to. *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (citation and internal quotation marks omitted).

### ii. Application

Plaintiff contends that his Fourteenth Amendment rights were violated on two separate occasions by two different DOCCS corrections officers. [7] *See* Dkt. No. 83. Plaintiff alleges that CO Stock violated his Fourteenth Amendment rights when he failed to protect him from being sexually assaulted by Williams on July 22, 2017. *Id.* at 1. Plaintiff also alleges that CO Zehr failed to protect him from being physically assaulted by Williams on July 25, 2017. *Id.* at 3-4. Plaintiff contends that Defendants failed to protect him from being assaulted for two reasons: (1) because he was convicted of murdering someone related to a CO; and (2) because he previously identified as transgender. *Id.* at 3.

[7]     Plaintiff uses the words "neglected" and "ignored" to describe the basis for his equal protection claim against Defendants. Dkt. No. 83 at 3. Construing Plaintiff's submissions and arguments liberally, the Court understands Plaintiff to be alleging that Defendants failed to protect him from being sexually and physically assaulted by Williams.

### 1. CO Stock

As an initial matter, Plaintiff has no legally cognizable claim under the Fourteenth Amendment against CO Stock. It is undisputed that CO Stock was not physically present for, involved in, or a witness to Plaintiff's alleged sexual assault by Williams on July 22, 2017. *See* Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 27-28. The summary judgment record, including Plaintiff's testimony, demonstrates that CO Stock was not present at the time the sexual assault occurred. [8] *Id.* Therefore, the evidence before the Court fails to establish that CO Stock treated Plaintiff differently than those similarly situated—he simply was not present in Plaintiff's cell block at the time of the alleged assault and thus could not have engaged in any treatment of Plaintiff whatsoever with respect to the alleged assault. *Id.* Therefore, the Court adopts

Magistrate Judge Dancks' recommendation that Plaintiff's equal protection claim against CO Stock be dismissed.

[8]     Plaintiff alleges that he was sexually assaulted by Williams because CO Stock failed to pull a pin and/or failed to timely complete his rounds. Dkt. No. 83 at 1. Plaintiff's allegations are refuted by the summary judgment record. First, CO Stock could not have pulled a pin because he was not present—and was not supposed to be present—on Plaintiff's cell block at the time the alleged assault occurred, and second, CO Stock performed his duties consistent with his established schedule. *See* Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 27-28.

### 2. CO Zehr

The Court also adopts Magistrate Judge Dancks' recommendation that Plaintiff's equal protection claim against CO Zehr be dismissed. Magistrate Judge Dancks correctly found that Plaintiff's equal protection claim against CO Zehr fails as a matter of law. *See* Dkt. No. 115 at 7-10.

**\*5**  The Court will first address whether Plaintiff is a member of an identifiable or suspect class. Plaintiff alleges two different bases for his equal protection claim, which the Court will analyze separately. Beginning with Plaintiff's contention that CO Zehr failed to protect him because he was convicted of murdering someone related to a corrections officer—Plaintiff is not a member of a suspect class because he was convicted of murdering someone related to a corrections officer. *See Lee v. Governor of State of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("prisoners either in the aggregate or specified by offense are not a suspect class"); *Mathie v. Dennison*, No. 06 CIV. 3184 (GEL), 2007 WL 2351072, at \*8 (S.D.N.Y. Aug. 16, 2007), *aff'd*, 381 F. App'x 26 (2d Cir. 2010) ("Prisoners are not a suspect class .... Nor are violent prisoners a suspect class. A history of violent crime is the very opposite of a morally irrelevant, immutable trait: it reflects a voluntary choice by the offender to commit a dangerous and harmful criminal act when he could have complied with the law."); *Scott v. Dennison*, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) ("neither violent felons nor non-violent felons are a 'suspect class' under the United States Constitution").

The Court next addresses Plaintiff's contention that CO Zehr failed to protect him because he previously identified as transgender. Defendants argue that Plaintiff is not a member

2023 WL 3579770

of a suspect class because Plaintiff did not identify as transgender at the time the alleged assaults occurred. *See* Dkt. No. 108-5 at 12-13. Defendants also argue that even if Plaintiff was transgender at the time the alleged assaults occurred, Plaintiff would not be entitled to heightened scrutiny because there is no Supreme Court or Second Circuit case addressing whether transgender individuals are members of a protected or suspect class. *See id.* at 12.

First, Defendants are correct that Plaintiff is not a member of a protected or suspect class because he previously identified as transgender. Plaintiff testified that he was born a male and currently identifies as male. Dkt. No. 108-4 at 18. Plaintiff also testified that he identified as transgender from 2009 to 2011 but ceased to do so when he was incarcerated in 2011. *Id.* at 19. Thus, for purposes of resolving CO Zehr's motion for summary judgment as to Plaintiff's equal protection claim, the Court need not determine whether transgender persons are members of a protected or suspect class because Plaintiff in this action does not currently identify as transgender. [9]

[9]     The Court notes that Plaintiff need not be a member of a protected or suspect class to proceed with an equal protection claim under a selective enforcement or class of one theory. The Court assesses the sufficiency of such claims *infra*.

However, the Court notes that Defendants are correct in that neither the Supreme Court nor the Second Circuit has provided guidance on this point. Moreover, there is a lack of uniformity among the district courts in this Circuit that have addressed the question of whether transgender plaintiffs are members of a protected class whose equal protection claims are entitled to heightened scrutiny. *Compare Adkins v. City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2016) (concluding that transgender persons are a quasi-suspect class and are thus entitled to intermediate scrutiny) *with White v. City of New York*, 206 F. Supp. 3d 920, 933 (S.D.N.Y. 2016) (concluding that neither the Supreme Court nor the Second Circuit has held that transgender persons are members of a protected class whose claims are entitled to heightened scrutiny). The *Adkins* court relied on the four-factor test set forth in *Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), in which the Second Circuit held that homosexual persons are a quasi-suspect class and are entitled to intermediate scrutiny. 143 F. Supp. at 139-140. The *Adkins* court acknowledged that although transgender individuals and homosexual individuals are not identical, they are "similarly situated with respect to each of *Windsor's* four

factors[,]" because transgender individuals have "suffered a history of persecution and discrimination," "transgender status bears no relation to the ability to contribute to society," "transgender status is a sufficiently discernable characteristic to define a discrete minority class," and "transgender people are a politically powerless minority." [10] *Id.* at 139. Thus, the *Adkins* court held that *Windsor* clearly established equal protection rights for not only homosexual individuals, but also transgender individuals. *Id.* at 139-140; *see also Johnson v. Padin*, No. 3:20-CV-637 (CSH), 2020 WL 4818363, at *3 (D. Conn. Aug. 16, 2020). By contrast, in *White*, which was decided approximately a month later than *Adkins*, the court declined to extend the holding in *Windsor* to transgender plaintiffs. *White*, 206 F. Supp. 3d at 933 ("While there is certainly an argument to be made that the *Windsor* holding should be expanded to transgender persons ... it [is] not the clearly established law of this Circuit ..."); *see Shtilman v. Makram*, No. 14-CV-6589 (NSR), 2018 WL 3745670, at *7 (S.D.N.Y. Aug. 6, 2018) (stating that neither the Supreme Court nor the Second Circuit has held that transgender individuals are members of a protected class).

[10]    Although *Adkins* found that the plaintiff established a violation of the Fourteenth Amendment, the court granted the individual defendants' motion to dismiss because qualified immunity applied. *Adkins*, 143 F. Supp. 3d at 140. The court held that qualified immunity applied because plaintiff's rights were not clearly established at the time of his arrest, which occurred a year prior to the decision in *Windsor v. United States*. *Id.*

**\*6** Even assuming *arguendo* that Plaintiff still identified as transgender at the time of the alleged assaults and adequately alleged intentional or purposeful discrimination on the part of CO Zehr, Plaintiff's equal protection claim against CO Zehr would be dismissed because CO Zehr is entitled to qualified immunity. Qualified immunity shields government officials from liability for money damages for violation of a right under federal law if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It allows government officials to make reasonable judgments and is said to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Qualified immunity bars a plaintiff's claim unless (1) the official violated a statutory or constitutional right, and (2) that right was clearly established at the time of the challenged

Salaam v. Stock, Not Reported in Fed. Supp. (2023)
2023 WL 3579770

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 116 of 531

conduct." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (citing *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019)). A right is clearly established when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011). "To determine whether a law is clearly established, this Court considers 'the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law.' " *Matzell*, 64 F.4th at 434 (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)). Because it was not (and still is not) the clearly established law of this Circuit that transgender plaintiffs are members of a protected or suspect class whose equal protection claims are entitled to heightened scrutiny, CO Zehr "could not be expected to anticipate that [his] actions would be subject to any standard more stringent than rational basis review," *see White*, 206 F. Supp. 3d at 933, and is therefore entitled to qualified immunity on Plaintiff's equal protection claim. *See id.* (holding that qualified immunity applied to the individual defendants because plaintiff's rights were not clearly established at the time of the alleged discrimination occurred); *Adkins*, 143 F. Supp. 3d at 140 (same).

The Court next considers whether Plaintiff has alleged a cognizable equal protection claim under either a selective enforcement or a class of one theory. The Court finds that Plaintiff has failed to do so. Plaintiff's claim under these theories fails because he does not allege any facts from which the Court can discern that he was treated differently from similarly situated inmates. *See Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011) ("There are two types of equal protection claims that require similarly situated comparators ... selective enforcement or selective treatment claims ... [and] 'class of one' claims ..."); *see also Ruggiero v. Fischer*, 807 F. App'x 70, 74 (2d Cir. 2020) ("[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and persons to whom they compare themselves.") (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). Plaintiff only alleges that he was "ignored" and "neglected" by CO Zehr because he previously identified as transgender and/or because he was convicted of murdering someone related to a CO. Dkt. No. 83 at 3. He identifies no comparators. *See generally* Dkt. No. 83. These factual allegations are insufficient to demonstrate disparate treatment from those similarly situated, even with recognition of

Plaintiff's *pro se* status. Accordingly, the Court adopts Magistrate Judge Dancks' recommendation that Defendants' motion for summary judgment be granted as to Plaintiff's Fourteenth Amendment equal protection claim against CO Zehr.

**B. Plaintiff's Failure to Protect Claim**

Magistrate Judge Dancks recommended that Plaintiff's Eighth Amendment failure to protect claim against CO Stock be dismissed, but that Plaintiff's Eighth Amendment failure to protect claim against CO Zehr proceed to trial. Dkt. No. 115 at 19. For the reasons stated below, the Court adopts these recommendations.

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one that is subjective, and one that is objective. *See Farmer v. Brennan*, 511 U.S. 825, 828-34 (1994). To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. To satisfy the subjective prong, the plaintiff must prove deliberate indifference on the part of the official. *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 833). That is, "the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.' " *Celestin v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014) (quoting *Farmer*, 511 U.S. at 836) (alterations in original). Moreover, the "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis in original). Mere negligence by a prison official will be insufficient to establish deliberate indifference. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

**\*7** Magistrate Judge Dancks correctly concluded that Plaintiff cannot satisfy the elements of a failure to protect claim against CO Stock. *See* Dkt. No. 115 at 12-14. As a threshold matter, Plaintiff's failure to protect claim against CO Stock fails for the same reason his equal protection claim against CO Stock fails. As discussed in Section IV.A.ii.1 *supra*, there is simply no evidence that CO Stock was on Plaintiff's cell block at the time Plaintiff alleges the sexual assault occurred. *See* Dkt. No. 108-2 at 2-3; Dkt. No. 108-4 at 28. As such, CO Stock could not have prevented Williams from allegedly sexually assaulting Plaintiff on July 22, 2017.

2023 WL 3579770

Moreover, Plaintiff has not adequately alleged that CO Stock was aware prior to (or at the time of) the sexual assault that Plaintiff previously identified as transgender and that he had been sexually assaulted at previous DOCCS facilities, such that there was a substantial risk of serious harm to Plaintiff to which CO Stock was deliberately indifferent. [11] In sum, Plaintiff has failed to allege facts sufficient to establish a failure to protect claim against CO Stock. Accordingly, the Court adopts Magistrate Judge Dancks' recommendation that Defendants' motion for summary judgment as to Plaintiff's Eighth Amendment failure to protect claim against CO Stock be granted.

[11]    In the FAC, Plaintiff simply refers to "he" in the sentences in which he describes his bases for why he believes that the COs "allowed" him to be assaulted by Williams. *See* Dkt. No. 83 at 2 ("*He* overheard inmates from the other tiers harassing me about my sexuality and everything else. *He* knew this were (sic) an ongoing issue of mine, where I have been raped on several occasions at other facilities." (emphasis added)). Even with recognition of Plaintiff's *pro se* status and the solicitude afforded therewith, the Court cannot speculate as to who "he" is—"he" could be CO Stock, CO Zehr, or some unnamed CO. *See also* Dkt. 115 at 13-14.

In addition, Magistrate Judge Dancks correctly concluded that Plaintiff's Eighth Amendment failure to protect claim against CO Zehr should proceed to trial because a reasonable jury could find that CO Zehr was deliberately indifferent to an excessive risk to inmate health and safety when he failed to intervene at the time that he saw Williams "making violent swinging motions" inside Plaintiff's cell during the alleged assault on July 25, 2017. Dkt. No. 115 at 15 (citing Dkt. No. 108-3 at 20). The Court adopts Magistrate Judge Dancks' recommendation that Defendants' motion for summary judgment be denied as to Plaintiff's Eighth Amendment failure to protect claim against CO Zehr. *See, e.g., Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997), *aff'd sub nom. Heisler v. Rockland Cnty.*, 164 F.3d 618 (2d Cir. 1998) (denying defendant's motion for summary judgment where plaintiff alleged that another inmate, whom plaintiff had no alleged previous altercations with, attacked him while he was being held as a pretrial detainee, and officers witnessed the assault but failed to intercede to stop it); *Stewart v. Schiro*, No. 13-CV-3613 (NGG)(VMS), 2015 WL 1854198, at *8 (E.D.N.Y. Apr. 22, 2015) ("under certain circumstances, the

commencement of an inmate-to-inmate altercation could put a prison official on sufficient notice to render the prison official deliberately indifferent if he or she then fails to intervene in an appropriate manner"); *Candelaria v. Coughlin*, No. 91 Civ. 2978, 1996 WL 88555, at *9 (S.D.N.Y. Mar. 1, 1996) (inaction by a correction officer to intercede and halt an attack by a fellow prisoner is sufficient basis for deliberate indifference). Additionally, the Court agrees with Magistrate Judge Dancks' finding that CO Zehr is not entitled to qualified immunity, *see* Dkt. No. 115 at 18, because Plaintiff has raised a question of fact with respect to this claim. *See, e.g., Decayette v. Goord*, No. 9:06-CV-783, 2009 WL 1606753, at *12 (N.D.N.Y. June 8, 2009) (finding defendant was not entitled to summary judgment on qualified immunity grounds because triable issues of fact existed as to whether she was deliberately indifferent to a serious medical need of Plaintiff's and as to whether she was liable for failing to intervene during the alleged beating of Plaintiff).

Having reviewed the Report-Recommendation for clear error, and found none, the Court adopts the recommendations in the Report-Recommendation.

## V. CONCLUSION

**\*8**    Accordingly, the Court hereby

**ORDERS** that the recommendations in the Report-Recommendation, Dkt. No. 115, are **ADOPTED** for the reasons stated herein; and the Court further

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 108, is **GRANTED** in part and **DENIED** in part. The motion is granted in that the following claims are **DISMISSED**: the Fourteenth Amendment equal protection claim against both Defendants and the Eighth Amendment failure to protect claim against Defendant CO Stock. The motion is **DENIED** as to the Eighth Amendment failure to protect claim against Defendant CO Zehr; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**Salaam v. Stock, Not Reported in Fed. Supp. (2023)**

2023 WL 3579770

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3579770

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
| --- | --- | --- | --- | --- |
| **1.  Docket 9:19-CV-00689**<br>Salaam v. Williams et al | — | N.D.N.Y. | June 10, 2019 | Docket |

**History (8)**

**Direct History (2)**

1.  Salaam v. Stock
2023 WL 3853811 , N.D.N.Y. , Feb. 27, 2023

*Report and Recommendation Adopted by*

2.  Salaam v. Stock
2023 WL 3579770 , N.D.N.Y. , May 22, 2023

**Related References (6)**

3.  Salaam v. Department of Corrections and Community Supervision
2019 WL 4415624 , N.D.N.Y. , Sep. 16, 2019

4.  Salaam v. Doe
2019 WL 5552131 , N.D.N.Y. , Oct. 28, 2019

5.  Salaam v. Stock
2021 WL 2367123 , N.D.N.Y. , May 12, 2021

*Report and Recommendation Adopted by*

6.  Salaam v. Stock
2021 WL 2102242 , N.D.N.Y. , May 24, 2021

7.  Salaam v. Zehr
2024 WL 3298958 , N.D.N.Y. , Apr. 19, 2024

*Report and Recommendation Adopted by*

8.  Salaam v. Zehr
2024 WL 2873550 , N.D.N.Y. , June 07, 2024

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

2020 WL 5504011
United States District Court, N.D. New York.

Terese MEAGHER, Plaintiff,
v.
STATE UNIVERSITY CONSTRUCTION
FUND; Robert Haelen, in his official and
individual capacity; and Joanne Di Stefano, in
her official and individual capacity, Defendants.

1:17-CV-0903 (GTS/CFH)
|
Signed 09/11/2020

**Attorneys and Law Firms**

TABNER, RYAN & KENIRY, LLP, Counsel for Plaintiff,
18 Corporate Woods Boulevard, Albany, NY 12211, OF
COUNSEL: THOMAS R. FALLATI, ESQ.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendants, The Capitol, Albany,
NY 12224, OF COUNSEL: BRIAN W. MATULA, ESQ.,
Assistant Attorney General

GIRVIN & FERLAZZO, P.C., Co-Counsel for Defendants,
20 Corporate Woods Boulevard, Albany, NY 12211, OF
COUNSEL: PATRICK J. FITZGERALD III, ESQ.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this employment
discrimination action filed by Terese Meagher ("Plaintiff")
against the State University Construction Fund ("Fund"),
Robert Haelen, and Joanne Di Stefano ("Defendants"), is
Defendants' motion for summary judgment. (Dkt. No. 59.)
For the reasons set forth below, Defendants' motion is
granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Second Amended Complaint**
Generally, in her Second Amended Complaint, Plaintiff
asserts the following seven claims against all Defendants
(unless otherwise indicated): (1) a claim for gender
discrimination in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"); (2) a claim for retaliation in violation
of Title VII; (3) a claim that Defendants Haelen and Di
Stefano violated her right to equal protection pursuant to
the Fourteenth Amendment of the United States Constitution
and 28 U.S.C. § 1983; (4) a claim that Defendants Haelen
and Di Stefano retaliated against her in violation of the First
Amendment of the United States Constitution and 28 U.S.C.
§ 1983; (5) a claim that Defendants Haelen and Di Stefano
violated her substantive due process rights pursuant to the
Fourteenth Amendment of the United States Constitution and
28 U.S.C. § 1983; (6) a claim for gender and familial status
discrimination in violation of the New York State Human
Rights Law ("NYSHRL"); and (7) a claim for retaliation in
violation of the NYSHRL. [1] (Dkt. No. 42 [Pl.'s Compl.].)

[1]    As Plaintiff acknowledges in her Second Amended
       Complaint, the first, third, fourth, fifth, and sixth
       of these claims were dismissed by the Court in its
       Decision and Order of June 21, 2018.

As a result of the Court's Decision and Order of June 21, 2018,
only the following claims survive at the time of this motion
for summary judgment: (1) Plaintiff's claim for retaliation
pursuant to Title VII; (2) Plaintiff's claim for discrimination/
hostile work environment pursuant to the NYSHRL based
on her familial status; and (3) Plaintiff's claim for retaliation
pursuant to the NYSHRL. (Dkt. No. 17 [Decision and Order
filed June 21, 2018].)

**B. Undisputed Material Facts on Defendants' Motion
for Summary Judgment**
The following facts were asserted and supported with
accurate record citations by Defendants in their Statement of
Material Facts and either expressly admitted by Plaintiff or
denied without appropriate record citations in her response
thereto. (*Compare* Dkt. No. 59, Attach. 1 [Defs.' Rule 7.1
Statement] *with* Dkt. No. 66 [Pl.'s Rule 7.1 Resp.].)

1. The Fund is a New York public benefit corporation which
oversees the construction of projects for the State University
of New York system.

2. Plaintiff was hired in June 2009 as an Associate Counsel in
the Fund's legal department.

3. Plaintiff's primary job responsibilities were advising the
Fund regarding legal issues, particularly those involving
construction contracts and insurance, and handling pending

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

and threatened litigation involving the Fund, which included assisting the New York State Attorney General's office.

**\*2** 4. Bill Barczak, the Fund Counsel at the time Plaintiff was hired, was Plaintiff's direct supervisor and was the only other attorney in the Fund's legal department from the time Plaintiff was hired until his retirement in March 2015.

5. Shortly after becoming employed by the Fund, Plaintiff went on maternity leave from July to November 2009 for the birth of her first child.

6. After her maternity leave, Plaintiff returned to the Fund part-time, working an 80% schedule until November 2011.

7. In November 2011, Mr. Barczak told Plaintiff that she would need to work full-time to be considered for advancement, and Plaintiff accordingly began working full-time.

8. With Mr. Barczak's retirement in March 2015, Plaintiff became the only attorney in the Fund's legal department, but retained the title of Associate Counsel.

9. After Mr. Barczak retired, Plaintiff was appointed to his former role as Secretary of the Fund's Board of Trustees.

10. When Mr. Barczak retired, he told Defendant Haelen that Plaintiff should not be promoted to his position as Fund Counsel because she was not ready for that role.[2]

[2]
Plaintiff argues that this statement is inadmissible hearsay and thus should not be admitted. (Dkt. No. 66, at ¶ 10 [Pl.'s Rule 7.1 Resp.].) However, because it is not apparent that this evidence could not be presented in a form admissible at trial, the Court declines to exclude this evidence for the purposed of Defendants' motion for summary judgment. *See Smith v. City of New York,* 697 F. App'x 88, 89 (2d Cir. 2017) (finding that the Court did not need to review whether the relevant evidence met one of the hearsay exceptions because "material relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question 'will be presented in admissible form at trial,' it may be considered on summary judgment' ") (quoting *Santos v. Murdock,* 243 F.3d 681, 683 [2d Cir. 2001]). For example, setting aside whether

the statement is offered for the truth of the matter asserted for the purposes of Fed. R. Evid. 801(c)(2) or merely the effect on the listener, the Court has no reason to believe that Mr. Barczak would not be available to testify at trial.

11. After Mr. Barczak retired, Plaintiff struggled to keep up with the workload.

12. After Mr. Barczak retired, the legal department fell behind on its work, and Defendant Haelen received complaints from the legal department's constituents about the legal department taking too long to complete tasks.[3]

[3]
Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) As an initial matter, the Court is not convinced that this statement would be inadmissible hearsay if it is presented to establish merely that Defendant Haelen received such complaints, rather than to establish that the legal department was indeed taking too long to complete tasks. *See* Fed. R. Evid. 801(c) (" 'Hearsay' means a statement that: [1] the declarant does not make while testifying at the current trial or hearing; and [2] a party offers in evidence to prove the truth of the matter asserted in the statement."). Additionally, as discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith,* 697 F. App'x at 89. For example, the Court has no reason to believe that none of the legal department's constituents would be available to testify at trial, or that none of these complaints survive in written form.

**\*3** 13. In the summer of 2015, Plaintiff initiated a conversation with Defendant Haelen to discuss her difficulties with her workload.

14. In this conversation, Plaintiff stated that she wanted to spend more time with her children and that her workload was interfering with this goal.

15. In this conversation, Defendant Haelen told Plaintiff that he would confer with the human resources department regarding providing the legal department with staffing to help reduce Plaintiff's workload.

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

16. Mary Jo Lais, the Fund's Director of Human Resources, also had conversations with Plaintiff during the summer of 2015 regarding the legal department's workload.

17. On August 7, 2015, Defendant Haelen informed Plaintiff that he had selected Defendant Di Stefano (the Fund's Corporate Integrity and Ethics Officer) to join the legal department as Deputy Counsel, and that Plaintiff would not be promoted.

18. Defendant Haelen also advised Plaintiff that Defendant Di Stefano would be taking over the role of Secretary for the Board of Trustees.

19. Plaintiff responded that, due to the hiring of Defendant Di Stefano, she wished to return to an 80% schedule.

20. Defendant Haelen explained to Plaintiff that he would have to consult with Defendant Di Stefano about her request for a part-time schedule.

21. Plaintiff reiterated that her current workload was too burdensome.

22. Defendant Haelen acknowledged Plaintiff's concern and reassured her that he did not want her to "burn out."

23. Defendant Haelen explained that adding Defendant Di Stefano to the legal department would serve to reduce Plaintiff's workload and enable Plaintiff to focus more exclusively on litigation.

24. In her new role as Deputy Counsel of the legal department, Defendant Di Stefano was tasked by Defendant Haelen with addressing the department's backlog of work.

25. At various times, different employees at the Fund have had different authorizations to sign documents on behalf of the Fund. Between Mr. Barczak's retirement in March 2015 and Defendant Di Stefano's appointment to the role of Deputy Counsel in August 2015, Plaintiff was the only attorney in the Fund's legal department and thus was given greater signatory authority after Mr. Barczak's retirement. That signatory authority was later reduced after Defendant Di Stefano became Deputy Counsel. [4]

[4]    The Court finds that portions of Defendants' asserted fact are properly disputed by Plaintiff's denial. (Compare Dkt. No. 59, Attach. 1, at ¶

26 [Defs.' Rule 7.1 Statement] with Dkt. No. 66, at ¶ 26 [Pl.'s Rule 7.1 Resp.].) The Court has reformulated the asserted fact to reflect the undisputed facts that could be gleaned from the evidence cited by Defendants and Plaintiff.

26. In her role as Deputy Counsel in the legal department, Defendant Di Stefano became Plaintiff's direct supervisor.

27. In her role as Deputy Counsel in the legal department, Defendant Di Stefano was given the authority to assign and review Plaintiff's work.

28. In her role as Deputy Counsel in the legal department, Defendant Di Stefano had no ownership interest in the Fund and lacked any authority to hire or fire Fund employees. [5]

[5]    Plaintiff objects to this asserted fact, arguing that it sets forth a legal conclusion rather than a factual assertion. (Dkt. No. 66, at ¶ 29 [Pl.'s Rule 7.1 Resp.].) However, whether Defendant Di Stefano had an ownership interest or the authority to hire and fire employees are clearly factual issues that can be proven or disproven by evidence. Defendants have cited evidence supporting the asserted fact, while Plaintiff has not adduced evidence to establish a genuine dispute of material fact regarding Defendant Di Stefano's ownership interest or authority to hire and fire employees. As a result, this asserted fact is deemed admitted.

*4 29. Plaintiff had conversations with Defendant Di Stefano shortly after Defendant Di Stefano became Deputy Counsel regarding Plaintiff's ongoing struggles with her current workload.

30. In these conversations, Plaintiff noted that she had frequently been working on nights and weekends and expressed her desire for a decreased workload that would enable her to spend more time with her family.

31. In one of these conversations, Plaintiff complained about a recent instance in which she had done work at home on a weekend after her children had gone to bed.

32. In these conversations, Defendant Di Stefano assured Plaintiff that she would help alleviate Plaintiff's workload by taking on some of the responsibilities that Plaintiff had been handling.

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

33. Defendant Di Stefano personally took on much of the legal department's day-to-day transactional work.

34. Defendant Di Stefano frequently spent in excess of 70 hours per week (including nights and weekends) on her responsibilities to the Fund.

35. In another meeting with Defendant Di Stefano in November 2015, Plaintiff again expressed her desire to work fewer hours.

36. Plaintiff also reiterated a request she had made to Defendant Haelen in July 2015 for compensatory time off for "excess" work hours.

37. Following the meeting on November 10, 2015, Defendant Di Stefano conferred with the Fund's human resources department and determined that Plaintiff was not entitled to compensatory time under the Fund's then-current policies.

38. On December 7, 2015, Defendant Di Stefano and Ms. Lais met with Plaintiff to confirm that she was not entitled to receive compensatory time.

39. Plaintiff approached Defendant Di Stefano on December 23, 2015, with a new proposal for reducing her work hours.

40. On December 23, 2015, Plaintiff asked Defendant Di Stefano for approval of a part-time work schedule consisting of two hours off every other Tuesday plus a full day off every other Thursday, and noted that she wanted to spend this time with her children.

41. On January 7, 2016, Defendant Di Stefano asked Plaintiff for a workload analysis to enable her to evaluate Plaintiff's request for a part-time schedule.

42. On January 11, 2016, Plaintiff gave Defendant Di Stefano a handwritten page containing notations related to tasks for various matters being handled by the legal department.

43. This page did not include any details such as deadlines or estimates of the amount of time Plaintiff would need to complete the listed tasks.

44. Upon receiving this page, Defendant Di Stefano was greatly frustrated because it lacked the critical details that she felt were necessary for her to gain a meaningful understanding of Plaintiff's current workload.

45. Defendant Di Stefano also felt that the page showed very little effort on Plaintiff's part to provide the information Defendant Di Stefano had requested.

46. Defendant Di Stefano emailed Plaintiff that same day, requesting a more thorough analysis, including more detailed project descriptions, timeframes for completion of projects, and deadlines.

47. Defendant Di Stefano believed at that time that Plaintiff's submission of January 11, 2016, reflected Plaintiff's disinterest in collaborating with her to find a solution for the workload problem.

*5 48. In a meeting on January 28, 2016, after Plaintiff had returned from a vacation, Defendant Di Stefano remarked that she was "personally and professionally offended" by Plaintiff's submission.

49. Plaintiff protested that she had spent a lot of time trying to prepare the workload analysis.

50. Plaintiff offered to provide Defendant Di Stefano with copies of her timesheets and a litigation log of pending lawsuits, but Defendant Di Stefano stated that these items were not helpful to gain a full understanding of Plaintiff's current workload.[6]

[6]  Plaintiff denies this asserted fact, but the evidence that she cites in opposition does not dispute the fact that Defendant Di Stefano told Plaintiff that the proffered documents would not be helpful. (Dkt. No. 66, at ¶ 54 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

51. On February 3, 2016, during a meeting with Plaintiff, Defendant Di Stefano reiterated that she still wanted a thorough written workload analysis.

52. Plaintiff requested a template to guide her in preparing an analysis of her workload.

53. Defendant Di Stefano responded that she did not have a template for Plaintiff to use, but she reiterated what information she wanted included in the analysis.[7]

[7]  Plaintiff denies this asserted fact, but the evidence she cites in opposition does not dispute the fact

that Defendant Di Stefano did not have a format to give Plaintiff. (Dkt. No. 66, at ¶ 54 [Pl.'s Rule 7.1 Resp.].) In her affidavit, Plaintiff states that Defendant Di Stefano specifically said, "I won't even comment on that," in response to her request for a format (to which she refers in the cited paragraph of her affidavit) indeed state that "JD said she does not have a format." (Dkt. No. 59, Attach. 31, at 3.) The Court finds nothing in Plaintiff's purported denial that actually denies the asserted fact and thus the asserted fact is deemed admitted.

54. As of early 2016, the legal department's constituents, including the Attorney General's office and other Fund personnel who relied on the legal department for advice and support, were continuing to express dissatisfaction with Plaintiff. [8]

[8]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) As discussed in note 3 of this Decision and Order, these statements would not be hearsay if they were offered to establish that complaints were made about Plaintiff's performance, rather than to establish the truth of the substance of those complaints. Alternatively, the Court has no reason to believe that the complainants would be unavailable to testify at trial. As a result, the Court finds that it may consider this evidence on this motion for summary judgment.

55. At some point around January 2016, Defendant Di Stefano (without Plaintiff) met with Bruce Feldman, an attorney from the Attorney General's office, to discuss issues relating to their offices' joint handling of litigation. [9]

[9]    Plaintiff denies this asserted fact, but she fails to cite admissible evidence to support her denial. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) In Plaintiff's own deposition, she testified that her "understanding of the meeting was to discuss with the Office of Attorney General the handling of Fund litigation by the AG's Office." (Dkt. No. 59, Attach. 4, at 95 [Pl.'s Dep.].) The Court also rejects Plaintiff's assertion that this asserted fact contains hearsay. This asserted fact is therefore deemed admitted.

**\*6** 56. Mr. Feldman raised serious concerns about Plaintiff's involvement in lawsuits in which the Attorney General's office was representing the Fund. [10]

[10]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order.

57. Mr. Feldman complained that, among other things, Plaintiff was requesting excessive extensions, was uncooperative with the Attorney General's office in handling cases, and was not timely in responding to issues. [11]

[11]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order.

58. Due to these concerns, Mr. Feldman conveyed that the Attorney General's office no longer wanted to work with Plaintiff. [12]

[12]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) As discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89.

59. Pursuant to her meeting with Mr. Feldman, as well as other previous and subsequent requests by the Attorney General's office for her personal assistance with litigation matters, Defendant Di Stefano began taking a more active role in the department's litigation work. [13]

[13]    Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order. Additionally, as discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89.

60. Defendant Di Stefano became involved with a lawsuit entitled *Sano-Rubin* at the specific request of the Attorney

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 126 of 531

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

General's office after Mr. Feldman expressed displeasure with Plaintiff's unwillingness to prioritize a time-sensitive task. [14]

[14]     Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order. Additionally, as discussed above in note 2 of this Decision and Order, it is not apparent that this evidence could not be presented in a form admissible at trial. *Smith*, 697 F. App'x at 89.

61. During a meeting with Plaintiff on February 9, 2016, Defendant Di Stefano remarked on the legal department's ongoing backlog of time-sensitive work and reiterated her continuing need for a workload analysis so that she could consider Plaintiff's request for a part-time schedule. [15]

[15]     Plaintiff denies the asserted fact, arguing that the "backlog" was not of her own litigation work. (Dkt. No. 66, at ¶ 67 [Pl.'s Rule 7.1 Resp.].) However, the asserted fact specifically refers to "the department's" backlog, not merely Plaintiff's litigation work, and Plaintiff cites no evidence to establish that the department as a whole did not have a backlog. (Dkt. No. 59, Attach. 1, at ¶ 67 [Defs.' Rule 7.1 Statement].) This fact is therefore deemed admitted.

 *7  62. As of February 9, 2016, Plaintiff had still not prepared a workload analysis that was satisfactory to Defendant Di Stefano.

63. In response to Defendant Di Stefano's statement that she was still determining whether Plaintiff could be switched to a part-time schedule that permitted Plaintiff to take time off on Tuesdays and Thursdays as she had requested, Plaintiff indicated that she wanted to spend more time with her children in the immediate future because her younger daughter was starting school that fall.

64. Defendant Di Stefano responded by observing that she was herself working extremely long hours to the detriment of her personal and family time due to the department's very heavy workload.

65. At other times during conversations with Plaintiff, Defendant Di Stefano discussed the difficulties of balancing work demands and parenthood, and mentioned that at one

time she had taken a less demanding, lower-paying job to be able to spend more time with her daughter. In making these statements, Defendant Di Stefano felt that she was being empathetic to Plaintiff based on her own personal experiences in her career. [16]

[16]     Plaintiff denies this asserted fact. (Dkt. No. 66, at ¶ 71 [Pl.'s Rule 7.1 Resp.].) However, Plaintiff does not cite any evidence to support her denial of the portion of the fact related to Defendant Di Stefano's feelings or motivations, and the Court does not feel that Defendants' characterization of Defendant Di Stefano's words is inaccurate or misleading. This asserted fact is therefore deemed admitted.

66. As a result of the meeting of February 9, 2016, Defendant Di Stefano repeated her request for a detailed workload analysis, which she now asked Plaintiff to complete by February 19, 2016.

67. On February 12, 2016, Defendant Di Stefano (without Plaintiff) attended a meeting on a lawsuit entitled *Christa v. Fund*.

68. When Plaintiff and Defendant Di Stefano met again on February 16, 2016, Plaintiff presented a log of her workload.

69. Defendant Di Stefano noted that the log (although appreciably more detailed than Plaintiff's previous submission) still did not include the time estimates she had requested; she asked Plaintiff to add this information.

70. In mid-February 2016, Defendant Di Stefano directed Plaintiff to complete a litigation analysis for Defendant Haelen so that he could evaluate several important lawsuits involving the Fund, and she set a deadline of February 26, 2016, for Plaintiff to complete that analysis.

71. Defendant Di Stefano and Plaintiff both attended a meeting with other Fund staff regarding the *Christa* case on February 29, 2016.

72. Defendant Di Stefano felt that Plaintiff had been grossly unprepared for the meeting, and subsequently expressed concern about Plaintiff's lack of preparation. [17]

[17]     Plaintiff denies this asserted fact, but provides no evidence that would create a genuine dispute of material fact as to whether this was indeed what

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

Defendant Di Stefano felt. (Dkt. No. 66, at ¶ 78 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

73. Meanwhile, also on February 29, 2016, Plaintiff received an email from a SUNY attorney complaining about a default judgment that had been entered in a lawsuit entitled *Green Depot v. SUNY* after the Fund's failure to answer the complaint in that case. [18]

[18]  Plaintiff denies this asserted fact, but her denial is based entirely on a denial of the implied fact that the Fund was responsible for answering the complaint in that matter. (Dkt. No. 66, at ¶ 78 [Pl.'s Rule 7.1 Resp.].) *See also Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts). However, Plaintiff has not denied the actual asserted fact, and thus that fact is deemed admitted.

**\*8**  74. Plaintiff told Defendant Di Stefano that, due to other work, she could not address *Green Depot* immediately, so Defendant Di Stefano took the *Green Depot* file to handle the issue herself.

75. On March 7, 2016, Defendant Haelen extended a written apology to SUNY for "how poorly the Green Depot matter was handled by the Fund."

76. As of February 29, 2016, Plaintiff had not completed the litigation analysis which had been due on February 26, 2016.

77. During a meeting on March 1, 2016, Defendant Di Stefano further commented on Plaintiff's performance at the February 29 meeting, stating that she felt that Plaintiff was not efficient in how she approached her workload and assignments.

78. Defendant Di Stafano asked Plaintiff to make an effort to complete more tasks more efficiently.

79. Defendant Di Stefano advised that, in light of the legal department's demanding workload, Plaintiff might have to work long hours, including nights and weekends on an as-needed basis, just as Defendant Di Stefano had been doing.

80. Plaintiff protested that Defendant Di Stefano had already approved her request for a part-time schedule.

81. Defendant Di Stefano stated that she had not approved a part-time schedule as requested by Plaintiff because she did not have the information she felt that she needed to determine if a part-time schedule was compatible with the legal department's obligations.

82. At this point in the meeting, Plaintiff began crying and looked away.

83. Defendant Di Stefano responded by leaning towards Plaintiff from the opposite side of the conference room table and asking Plaintiff to look at her so that she could confirm that Plaintiff had heard her. [19]

[19]  Plaintiff disputes that the purpose of Defendant Di Stefano's actions was to confirm that Plaintiff understood her, but Plaintiff cites no evidence to support that denial. (Dkt. No. 66, at ¶ 78 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

84. Defendant Di Stefano followed up on this strained meeting by sending emails to all of the legal department's employees on March 2 and March 5, 2016, indicating that those employees were required to make advance written requests for time off for the purposes of accountability and to ensure that Fund staff could be reached if needed.

85. Defendant Di Stefano granted Plaintiff's request to take a day off on Thursday, March 3, 2016, but asked Plaintiff to cover a meeting on Tuesday, March 8, 2016.

86. When Plaintiff indicated that she did not have childcare arranged for March 8 because she had planned to take time off that morning, Defendant Di Stefano approved Plaintiff's request for time off on that date.

87. On March 5, 2016, Defendant Di Stefano assigned Plaintiff an insurance procedure drafting project and set a deadline of March 14, 2016, for its completion.

88. On March 7, 2016, Defendant Di Stefano asked Plaintiff to complete the litigation analysis assignment for Defendant Haelen by March 14, 2016; that analysis had initially been due by February 26, 2016, but had not been completed.

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

89. On March 8, 2016, Plaintiff informed Defendant Di Stefano that she "[did] not expect to meet" the March 14 deadline for the insurance project assignment.

**\*9** 90. On the evening of Friday, March 11, Plaintiff then requested an extension of the March 14 deadline for the litigation analysis assignment, stating that she could not work on it that weekend because her daughter had a birthday celebration that would span the entire weekend.

91. Defendant Di Stefano replied that they should meet on the morning of Monday, March 14 to discuss the deadline extension.

92. Defendant Di Stefano was unable to make that meeting on time, but thereafter asked Plaintiff to give her what Plaintiff had so far on the litigation assignment and her workload log. [20]

> [20] The Court notes that Defendants' assertion that Defendant Di Stefano "advised Plaintiff to keep working on the project" does not appear to be supported by the evidence cited by Defendants. (Dkt. No. 59, Attach. 1, at ¶ 98 [Defs.' Rule 7.1 Statement].)

93. On March 14, 2016, Plaintiff sent a series of emails from her work email address to her personal email address containing successive drafts of a journal which chronicled her experience at the Fund.

94. On the morning of March 14, 2016, Defendant Di Stefano commented that Plaintiff had not proposed an alternative deadline by which she would have the litigation assignment completed, informed Plaintiff that she would be reviewing the assignment before giving the materials to Defendant Haelen, expressed concern whether there would be adequate time to review the assignment before a Thursday meeting, and asked Plaintiff to print an update "of where you are with the litigation analysis assignment as soon as possible."

95. Plaintiff emailed Defendant Di Stefano a draft of only one of the three case analyses that had been assigned to her.

96. Later that day, Defendant Di Stefano asked Plaintiff to attend a quarterly meeting with other State agencies that Defendant Di Stefano was unable to attend. Plaintiff did not attend and instead asked Defendant Di Stefano by email whether she could "take this off my calendar due to workload"

because another Fund employee (who was not part of the legal department) was attending the meeting; Defendant Di Stefano did not see this email until after the meeting had already taken place. [21]

> [21] Plaintiff disputes the asserted fact, but her denial is merely an attempt to state additional disputed facts, which more properly belong in a Statement of Additional Material Facts that she contends are in dispute pursuant to Local Rule 7.1(a)(3). (Dkt. No. 66, at ¶ 102 [Pl.'s Rule 7.1 Resp.].) This asserted fact is therefore deemed admitted.

97. In January, February, and March 2016, Defendant Di Stefano continued to receive complaints from constituents about Plaintiff's failures to complete tasks in a timely manner. [22]

> [22] Plaintiff again argues that this statement involves inadmissible hearsay. (Dkt. No. 66, at ¶ 12 [Pl.'s Rule 7.1 Resp.].) The Court rejects this argument for the reasons discussed in note 8 of this Decision and Order.

98. As of early March 2016, Defendant Di Stefano and Ms. Lais were having discussions regarding their options for addressing the alleged issues with Plaintiff's performance, including the preparation of a performance improvement plan ("PIP").

99. It was decided that a PIP would be prepared for Plaintiff.

100. Ms. Lais emailed Defendant Di Stefano a rough draft of the PIP on March 8, 2016, that reflected their previous discussions.

**\*10** 101. Defendant Di Stefano added more detailed descriptions to the PIP throughout the month of March.

102. Defendant Di Stefano's March 29, 2016, version of the draft PIP set forth numerous issues with Plaintiff's performance.

103. Plaintiff and Defendant Di Stefano met again on March 16, 2016.

104. Defendant Di Stefano expressed her frustration with Plaintiff's tardiness as to the completion of work assignments

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 129 of 531

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

and the substance of Plaintiff's work product on the litigation analysis project.

105. Defendant Di Stefano also advised Plaintiff at that meeting that she could not grant Plaintiff's request for a part-time schedule in the face of the legal department's workload and its need to meet its obligations.

106. When Plaintiff asked whether she was expected to work nights and weekends, Defendant Di Stefano responded that Plaintiff's responsibilities could sometimes require that, and stressed that Plaintiff needed to find a way to get her work done.

107. Plaintiff met with Defendant Haelen on March 17, 2016, and discussed her difficulties working with Defendant Di Stefano.

108. Defendant Haelen advised Plaintiff that he agreed with Defendant Di Stefano that Plaintiff's responsiveness and handling of her workload were not up to par and that Plaintiff needed to become more efficient.

109. Defendant Haelen noted that struggles with balancing work and family time were part of the nature of fast-paced jobs, and he shared that he, as a parent himself, had sometimes had to sacrifice parenting time for work.

110. On March 18, 2016, Plaintiff left a voicemail for Ms. Lais in which she stated that she felt "the need to make a complaint on the anti-bullying policy."

111. Plaintiff confirmed at her deposition that she had referenced the Fund's "Bullying in the Workplace" policy when she made her complaint to Ms. Lais.

112. Plaintiff also testified that she was specifically aware of the "Bullying in the Workplace" policy due to an update sent out by the human resources department around December 2015 when the policy was added to the Fund's Employee Handbook.

113. The Employee Handbook also includes an anti-discrimination policy that is separate from the "Bullying in the Workplace" policy.

114. Ms. Lais responded to Plaintiff's voicemail by sending an email to Plaintiff on March 18, 2016.

115. Ms. Lais' email confirmed receipt of Plaintiff's voicemail and invited Plaintiff to schedule a time for them to discuss the complaint.

116. Ms. Lais' email also notified Plaintiff that Ms. Lais, Defendant Di Stefano, and Defendant Haelen had been developing a PIP "for the past several weeks" based on "on-going discussions for the past several months regarding [her] performance."

117. Ms. Lais assured Plaintiff that there would be a separate meeting to discuss the PIP and the issues raised therein.

118. On March 21, 2016, after a senior staff meeting during which Defendant Di Stefano had been unaware of certain communications between Plaintiff and another Fund employee related to contract changes, Defendant Di Stefano directed Plaintiff that "[p]er previous discussions, please send me an email or copy/forward to me emails regarding your dealings with staff on various matters or when approached for new work/questions so that we keep on the same page and don't work at cross purposes in providing advice to the Fund."

*11 119. Plaintiff and Ms. Lais met on March 30, 2016, to discuss Plaintiff's bullying complaint.

120. Ms. Lais advised Plaintiff that the PIP would not be implemented until Plaintiff's complaint had been addressed.

121. Ultimately, the PIP was never implemented because Plaintiff went on medical leave before Ms. Lais finished investigating her complaint.

122. During their meeting on March 30, 2016, Plaintiff presented Ms. Lais with an eight-page document that chronicled various interactions between herself, Defendant Di Stefano, and Defendant Haelen.

123. During their meeting on March 30, 2016, Plaintiff explained to Ms. Lais that the document set forth the basis for her bullying complaint against Defendant Di Stefano.

124. Pursuant to a Board resolution drafted by Defendant Haelen's staff on or prior to March 17, 2016, Defendant Di Stefano was appointed as the Secretary of the Fund's Board of Trustees in April 2016 at its first meeting following Defendant Di Stefano's appointment as Deputy Counsel.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 130 of 531

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

125. In her deposition, Plaintiff admitted that she was excluded from some meetings before she made her complaint.

126. After she made her complaint, Plaintiff continued to be included in some meetings, but not others.

127. In her deposition, Plaintiff admitted that some of her responsibilities were taken before she made her bullying complaint to Ms. Lais.

128. Throughout the spring of 2016, Plaintiff remained involved in a variety of litigation and non-litigation matters, and Defendant Di Stefano continued to solicit input and participation from Plaintiff.

129. As of June 2016, Plaintiff had enough work remaining that she was still struggling to juggle competing projects.

130. In her deposition, Plaintiff could not identify any requests for time off (other than her longstanding request for a part-time schedule) that Defendant Di Stefano had denied.

131. In mid-June 2016, Defendant Di Stefano approved a request from Plaintiff to take a week off for a family vacation.

132. Ms. Lais completed her investigation of Plaintiff's complaint on June 20, 2016.

133. Ms. Lais' investigation report found insufficient evidence to establish bullying by Defendant Di Stefano, but acknowledged the existence of a "dysfunctional work environment" and a "lack of communication and cooperation" between Plaintiff and Defendant Di Stefano.

134. The last day on which Plaintiff reported to work at the Fund was June 17, 2016.

135. On June 17, 2016, Plaintiff left work early and later notified Ms. Lais that she was taking medical leave.

136. Plaintiff never returned to work, and she remained on medical leave for more than two years.

137. Plaintiff received sick leave benefits during her medical leave.

138. Plaintiff provided the Fund with successive doctor's notes indicating that she was unable to work.

139. The Fund eventually terminated Plaintiff in October 2018 (after she had been out on medical leave for more than two years with no anticipated date for her to return to work) so that it could hire another candidate to fill her position.

140. Every member of the legal department throughout the time period relevant to this litigation was a parent, including Plaintiff, Defendant Di Stefano, and the department's two non-attorney administrative staff employees.

**C. Parties' Briefing on Defendants' Motion for Summary Judgment**

**1. Defendants' Memorandum of Law**

**\*12** Generally, in their motion for summary judgment, Defendants makes seven arguments. (Dkt. No. 59, Attach. 2 [Defs.' Mem. of Law].) First, Defendants argue that Plaintiff did not engage in any protected activity for the purposes of her Title VII retaliation claim. (*Id.* at 20-22.) More specifically, Defendants argue that Plaintiff could not have had an objectively reasonable belief that she was reporting gender discrimination because there is no admissible evidence of any comments suggestive of gender-based discrimination, and because Plaintiff specifically brought her complaint pursuant to the Fund's anti-bullying policy (rather than the Fund's anti-discrimination policy) and did not reference anything about that bullying conduct being motivated by her gender. (*Id.*)

Second, Defendants argue that Plaintiff did not put Defendants on notice that she was making a discrimination complaint. (*Id.* at 22-23.) More specifically, Defendants argue that Plaintiff never identified any relationship between Defendant Di Stefano's conduct towards her and her gender, and thus there was no basis for Defendants to construe her complaint as raising an issue of discrimination. (*Id.*)

Third, Defendants argue that Plaintiff has not shown that she was retaliated against for her complaint. (*Id.* at 23-27.) More specifically, Defendants argue that Plaintiff has not shown that she suffered any adverse action because the actions she complains of are either not supported by the evidence or are not sufficiently serious to qualify as an adverse action. (*Id.* at 23-24.) Defendants also argue that Plaintiff has not shown that her complaint was the but-for cause of any of the actions taken against her because some of these actions had also occurred before she made her complaint or were a mere continuation of policies or decisions made before she made her complaint

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

(such as excluding her from certain meetings, taking work from her, declining to grant her an ongoing part-time work schedule, having her keep them apprised of her workload, and preparing the PIP). (*Id*. at 24-27.)

Fourth, Defendants argue that, if the Court grants summary judgment and dismisses Plaintiff's Title VII claim, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims because those claims involve state-law matters. (*Id*. at 27.)

Fifth, Defendants argue that Plaintiff's retaliation claims under the NYSHRL should be dismissed for substantially the same reasons as her Title VII claim should be dismissed because she has not adduced evidence to support her claim that she complained about discrimination based on either gender or familial status, much less that a retaliatory action was taken against her based on such discrimination. (*Id*. at 27-28.)

Sixth, Defendants argue that, as to her discrimination claim pursuant to the NYSHRL, Plaintiff has failed to establish that she was discriminated against based on her familial status. (*Id*. at 28-37.) More specifically, Defendants argue as follows: (a) any actions taken by Defendants before January 19, 2016, cannot be considered because that is the date on which the amendment of the NYSHRL adding "familial status" as a protected class became effective; (b) the NYSHRL explicitly does not require an employer to provide accommodations based on familial status including those related to "an individual's particular needs relative to childrearing," but merely must not discriminate against a parent specifically based on their status as a parent, and thus Plaintiff's argument that Defendants denied her a part-time shift to spend more time with her children cannot establish a claim for familial status discrimination; (c) it is not clear that the NYSHRL amendments related to familial status allow for hostile work environment claims; (d) even if a hostile work environment claim can be brought, the conduct Plaintiff has shown does not rise to level of a hostile work environment; (e) Plaintiff has also not shown that the alleged hostile conduct was causally related to her status as a parent, particularly because there is ample evidence that Plaintiff had demonstrated problems managing her workload and dealing with her work efficiently and effectively; and (f) there is no evidence that Defendants raised the issue of Plaintiff's familial status, but rather it was Plaintiff who brought up her children and her desires as a parent, and there is no evidence that Defendants treated

childless employees different than employees with children. (*Id*.)

**\*13** Seventh, Defendants argue that Defendant Di Stefano cannot be held liable under the NYSHRL because (a) she has no ownership in the Fund, (b) she lacks the ability to hire and fire employees, and (c) given that Plaintiff's accusations related to conduct taken by Defendant Di Stefano, she cannot be held liable as an "aider or abettor" because she is not facilitating the discriminatory acts of another individual. (*Id*. at 37.)

## 2. Plaintiff's Opposition Memorandum of Law

Generally, in her opposition memorandum of law, Plaintiff makes seven arguments. (Dkt. No. 67 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that she has sufficiently shown that she had a belief that she was reporting conduct that is outlawed by Title VII to survive a motion for summary judgment. (*Id*. at 21.) More specifically, Plaintiff argues that the evidence adduced sufficiently shows that Defendants made comments about her being a mother with young children and that she felt that she needed to choose between being a mother and working at the Fund, both of which establish a basis for believing Defendants' actions violated VII despite her reliance on the bullying policy. (*Id*. at 22-23.)

Second, Plaintiff argues that Defendants had notice that she was reporting protected activity based both on her reports to Ms. Lais in the bullying complaint itself and on the knowledge of Defendants Di Stefano and Haelen from their participation in the relevant events. (*Id*. at 23-24.)

Third, Plaintiff argues that there is a genuine dispute of material fact remaining as to whether Defendants retaliated against her for her complaint. (*Id*. at 24-31.) More specifically, Plaintiff argues as follows: (a) the threat of a PIP and slights about her job performance constitute an adverse action because (i) PIPs were rarely issued, (ii) the poor performance noted in the PIP is inconsistent with the previously positive reports Plaintiff had been receiving about her work, and (iii) having the PIP "hanging over her head" during the pendency of the investigation of her complaint negatively impacted Plaintiff's ability to act; (b) the increased supervision by Defendant Di Stefano (i.e., Defendant Di Stefano's request that she be copied on all of Plaintiff's correspondences with Fund staff) was a deviation from previous practice and constituted an adverse action; (c) the reduction of Plaintiff's

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

responsibilities constituted an adverse action; (d) Defendant Di Stefano's exclusion of Plaintiff from meetings and actions in isolating Plaintiff from others in the Fund (for example, by telling her she could no longer use a conference room to do her litigation work) constituted adverse actions; and (e) Defendants' various reactions to her filing of a complaint (including Defendant Haelen telling her that it would be "painful" if she filed a complaint, the warning about the PIP, the fact that Defendants and Ms. Lais all met the day following Plaintiff's indication that she would file a complaint, and the failure to conduct the investigation into her complaint in a timely manner) also serve as evidence of retaliation. (*Id.* at 24-28.)

Plaintiff also argues that she has sufficiently shown causation based on the timing of various conduct relative to the filing of her complaint, as well as based on direct evidence. (*Id.* at 28-29.) Plaintiff additionally argues that Defendants' proffered reason is pretextual based on (a) the long history of positive performance reviews of Plaintiff's work, (b) the fact that Defendant Di Stefano was involved in the conduct and "was obviously laboring in February and March 2016 to create a paper trail," and (c) the lack of evidence corroborating Defendants' version of events. (*Id.* at 29-30.) Further, Plaintiff argues that her termination of employment clearly constitutes an adverse action that occurred after she filed her complaint and after she filed an EEOC complaint in December 2016. (*Id.* at 30-31.)

**\*14** Fourth, Plaintiff argues that, even if her Title VII claim is dismissed, the Court should exercise supplemental jurisdiction over her NYSHRL claims because they do not raise any novel issues of state law. (*Id.* at 32.)

Fifth, Plaintiff argues that there is no basis to dismiss her retaliation claim based on the NYSHRL for the same reasons as argued related to her Title VII retaliation claim. (*Id.* at 32-33.)

Sixth, Plaintiff argues that she has established a hostile work environment claim based on familial status under the NYSHRL. (*Id.* at 33-35.) More specifically, Plaintiff argues as follows: (a) she is not raising a failure to accommodate claim; (b) because other protected classes listed in the NYSHRL allow hostile work environment claims and the amendment does not include anything to suggest such claims would be excluded for a claim based on familial status, Defendants' argument on this point is unsupported; (c) Plaintiff has provided sufficient evidence to establish a hostile work environment on the basis of her familial status; and (d) there is no requirement for Plaintiff to show that other employees with a similar familial status were also treated in a hostile manner to establish her claim. (*Id.*)

Seventh, Plaintiff argues that there is no basis for dismissing the NYSHRL claims against Defendant Di Stefano because Defendant Di Stefano was an "employer" based on the fact that she was a supervisor who actually participated in the conduct giving rise to the alleged discrimination, and thus she can be held liable under the NYSHRL as a principal actor. (*Id.* at 36.) In the alternative, Plaintiff argues, Defendant Haelen is undisputedly an "employer" for the purposes of the NYSHRL and was alleged to have participated in the discriminatory actions, and therefore Defendant Di Stefano can, at the very least, be held liable as an aider and abettor. (*Id.* at 36-37.)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make six arguments. (Dkt. No. 72 [Defs.' Reply Mem. of Law].) First, Defendants argue that Plaintiff did not engage in protected activity because she has failed to show that she held an objectively reasonable belief that the "bullying" conduct she was reporting was in violation of Title VII or the NYSHRL, and has failed to adduce any evidence to support her assertions that she believed she was targeted based on her gender. (*Id.* at 4-6.)

Second, Defendants argue that they were not on notice that Plaintiff was reporting conduct proscribed by Title VII because Plaintiff's complaint and reports to Ms. Lais and Defendants Di Stefano and Haelen merely indicate that Plaintiff was expressing that she desired more time off to spend with her children, but did not reasonably indicate that Plaintiff was asserting that her requests were denied specifically because she was a woman or a parent. (*Id.* at 6-7.)

Third, Defendants argue that the admissible evidence fails to show retaliation against Plaintiff. (*Id.* at 8-13.) More specifically, Defendants argue as follows: (a) the overwhelming evidence shows that, in context, the actions taken against Plaintiff were not related to her bullying complaint; (b) the request to copy Defendant Di Stefano on emails was based on conversations that occurred before Plaintiff made her complaint and on a meeting regarding which Defendant Di Stefano was "out of the loop"; (c) her eventual phase-out from the Board of Trustees began before

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

her complaint and she continued to be involved for some time after her complaint; (d) Plaintiff has offered no evidence as to how her signatory authority changed and admits that the signatory authority is updated only annually, and thus the timing of the alleged change in her signatory authority does not provide an inference of retaliation; (e) she has offered no evidence to establish that she was excluded from more meetings after her complaint and acknowledges that she did not attend every meeting even before her complaint; (f) the PIP was being prepared before Plaintiff made her complaint and thus it cannot constitute evidence of retaliation for that complaint, and withholding any negative feedback from Plaintiff during the pendency of the investigation does not constitute an adverse action, particularly because Plaintiff was already aware of most of the instances included in the PIP; (g) any delay by Ms. Lais in investigating Plaintiff's complaint cannot constitute an adverse action because it did not change the circumstances of Plaintiff's employment in any way; and (h) Plaintiff's termination in October 2018 was not an adverse action because it occurred more than two years after she made her complaint and only after she had been out on medical leave for two years with no expectation of returning. (*Id.*)

 **\*15** Fourth, Defendants argue that the Court should decline to exercise supplemental jurisdiction if it dismisses her Title VII claim because family status was so recently added to the NYSHRL that claims based on that new protected class present a matter of first impression that should be decided by the state court. (*Id.* at 14.)

Fifth, Defendants argue that Plaintiff was not subjected to a hostile work environment based on her familial status, but rather was lawfully denied accommodations to care for her children in the way she desired to, and that the mere fact that she made those requests for reasons that implicate her familial status does not transform Defendants' actions into a negative bias against employees who are parents. (*Id.* at 14-16.) Additionally, Defendants argue that Plaintiff's own admissions that the workload of the legal department had increased during the relevant time shows that Defendants' reason that there was simply too much work to grant Plaintiff's request for a part-time schedule was not pretextual. (*Id.* at 15-16.)

Sixth, Defendants argue that Defendant Di Stefano cannot be held liable under the NYSHRL because (a) she did not have the power to make personnel decisions, and (b) Plaintiff has not shown that Defendant Haelen was a principle actor such

that Defendant Di Stefano's actions could be considered to aid and abet his conduct. (*Id.* at 16.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [23] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[23]    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [24]

[24]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

**\*16** Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. [25] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.) [26] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [27]

[25]   *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[26]   *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[27]   *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [28] – even where the non-movant was proceeding *pro se*. [29]

[28]   Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any

denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[29]   *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [30] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at \*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[30]   *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, 1999 WL 325378, at \*27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at \*3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Retaliation Claim Pursuant to Title VII Must Be Dismissed

**\*17** After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 59, Attach. 2, at 20-22, 23-27 [Defs.' Mem. of Law].); Dkt. No. 72, at 4-6,

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 135 of 531

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)
2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

8-13 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment ... to discriminate against any individual ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show the following four things: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Russell v. Aid to Developmentally Disabled, Inc.,* 753 F. App'x 9, 14 (2d Cir. 2018) (quoting *Summa v. Hofstra Univ.,* 708 F.3d 115, 125 [2d Cir. 2013]). "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa,* 708 F.3d at 125. "If the employer demonstrates such a reason, the burden shifts back to the plaintiff to adduce evidence from which a rational finder of fact could infer 'that the desire to retaliate was the but-for cause of the challenged employment action.' " *Russell,* 753 F. App'x at 14 (quoting *Ya-Chen Chen v. City Univ. of New York,* 805 F.3d 59, 70 [2d Cir. 2015]).

As to whether Plaintiff participated in protected activity, [31] Plaintiff has provided evidence that she raised her concerns about Defendant Di Stefano's treatment of her to Defendant Haelen on March 17, 2016, and it is undisputed that Plaintiff called Ms. Lais on March 18, 2016, to make a complaint about conduct that she had been subjected to in the workplace. Defendants argue that this complaint does not constitute protected activity because Plaintiff made it under the auspices of Defendant Fund's "anti-bullying policy" rather than its anti-discrimination policy, and thus she could not have reasonably believed that she was reporting conduct that was unlawful under Title VII; they also argue that Plaintiff has not adduced evidence to support that she had an objectively reasonable belief that Defendants' alleged conduct towards her was based on a class protected by Title VII (in this case, her sex). *See Summa,* 708 F.3d at 126 ("To establish that she engaged in protected activity, Summa need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under

that statute."); *Sharpe v. Utica Mut. Ins. Co.,* 756 F. Supp. 2d 230, 240 (N.D.N.Y. 2010) (Hurd, J.) (noting that, in order to meet the protected activity prong, the plaintiff need only show that she had a "good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII"). Whether a belief is reasonable is an objective standard that is "to be evaluated from the perspective of a reasonable similarly situated person." *Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.,* 716 F.3d 10, 16-17 (2d Cir. 2013).

[31]    To the extent that Plaintiff argues that Defendants retaliated against her for making requests for time off and for schedule changes, such requests do not constitute a protected activity that can be the basis for a retaliation claim. Protected activities under Title VII include opposition to a discriminatory employment practice or participation in an investigation, hearing, or proceeding under Title VII. *Hubbard v. Total Communications, Inc.,* 347F. App'x 679, 680-81 (2d Cir. 2009) (citing 42 U.S.C. § 2000e-3[a]). There is no evidence establishing that Plaintiff's requests for time off were in any way related to opposing a discriminatory practice. Rather, the evidence shows that they were rooted in her desire to spend more time with her children and to return to the part-time schedule she had before she voluntarily went to a full-time schedule in 2011. A request for a change of schedule or other accommodation for purely personal reasons like a desire to spend more time at home with children does not constitute protected activity. *See Taylor v. Family Residences and Essential Enterprises, Inc.,* 03-CV-6122, 2008 WL 268801, at *13 (E.D.N.Y. Jan. 30, 2008) (finding that refusing to accept a certain shift because it would interfere with the plaintiff's ability to get to his second job on time did not constitute protected activity). As a result, any retaliatory actions in response to her requests for time off are not actionable under Title VII.

**\*18** The Court is not convinced that the fact that Plaintiff explicitly referenced the anti-bullying policy when making her complaint to Ms. Lais is *by itself* sufficient to merit a finding that she did not have a good faith, reasonable belief that the conduct that she was reporting was a violation of Title VII. A plaintiff is not required to cite to Title VII (or any specific statute) in order to make a complaint that constitutes protected activity. Title VII also applies to harassment and

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 136 of 531

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

thus Title VII can apply to conduct that would be covered by the anti-bullying policy. The Court will therefore focus on the substance of what Plaintiff reported as part of that complaint rather than any bare statement of what policy it might fall under.

In her deposition, Plaintiff testified that, at the time she was speaking with Ms. Lais regarding her complaint, she "felt that [she] was being now asked to make a choice between being a mother spending time with her child and having a job at the Fund." (Dkt. No. 59, Attach. 4, at 151 [Pl.'s Dep.].) She also testified that she felt that Defendant Di Stefano had become hostile towards her after she made her request to spend time with her daughter (i.e., to move to the equivalent of an 80% work schedule). (*Id.* at 152.) The notes that Plaintiff submitted to Ms. Lais as part of her complaint reflect instances in which her status as a parent was the subject of work tensions, but do not contain any indication from which a reasonable factfinder could conclude that Plaintiff believed that this treatment was based specifically on her sex. (Dkt. No. 59, Attach. 31.) In her affidavit submitted in opposition to Defendants' motion, Plaintiff raises many of the same parental-related concerns, specifically stating that, by February 2016, "Di Stefano had become increasingly hostile and belittling towards me," and "[i]t was evident to me that she was using my desire to spend time with my daughters as the rationale for this hostile behavior." (Dkt. No. 64, at ¶ 63 [Pl.'s Aff.].) Notably, of all the specific statements that Plaintiff asserts Defendants Di Stefano and Haelen made to her about work-life balance and being parents (e.g., that working long hours impacted their personal lives and required sacrifice, that they made choices about their careers in order to spend more time with their children, that Plaintiff had longstanding problems with work-parenting balance, and "wouldn't it be nice if we could go home and eat dinner with our families"), none of them directly implicate anything about Plaintiff's sex. (Dkt. No. 64, at ¶¶ 56, 76, 82 [Pl.'s Aff.].) In her deposition, Plaintiff testified that she did not know whether Defendant Di Stefano's conduct would have been different if she had been a father asking to spend more time with his children, but that she thought that Defendant Di Stefano "probably" would have treated a father in the same situation the same way that she treated Plaintiff, stating specifically that she thought "this [would] have happened if a parent-child issue was in front of [Di Stefano], whether it was a mom or dad." (Dkt. No. 59, Attach. 4, at 39-40, 202 [Pl.'s Dep.] [attaching errata sheet changing "wouldn't" to "would" in the above quote].) When asked whether she had any evidence to support a belief that a father would have been treated differently, she further stated, "No, I

am talking about being a parent, whether it is a mom or dad, this is parent-child." (*Id.* at 40.)

It is well established that parental status is not a protected characteristic for the purposes of Title VII. *Rotondo v. Best Buy Stores LLC*, 17-CV-0522, 2019 WL 4805374, at *8 n.8 (N.D.N.Y. Oct. 1, 2019) (Hurd, J.). As noted above, the evidence (including Plaintiff's own notes about the situation) indicates that she was reporting discrimination and/or harassment based on her status as a "mother." However, even if Plaintiff believed that she was being discriminated against or harassed because she is a mother, she has not adduced any admissible evidence from which a reasonable factfinder could conclude either that (a) she believed that the treatment was based specifically on her status as a mother (as opposed to a father) and thus on her status as a woman, or (b) any belief that she was targeted as a mother/woman specifically was an objectively reasonable belief. [32]

[32]   On June 18, 2020, Plaintiff filed a letter, citing to the Supreme Court's recent decision in *Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731 (June 15, 2020), as supplemental authority supporting her argument that she has sufficiently shown that Defendants' conduct was based on her sex. However, *Bostock* is inapposite. In particular, the Court has no doubt that an individual's reporting that she is being discriminated against because she is a mother can, under the right circumstances, be sufficient to show a reasonable belief that she is being discriminated against based on her sex. However, those are not the circumstances here. As discussed above, Plaintiff has not provided any evidence that Defendants' treatment of her was related to her sex in any way, but rather her gender-neutral status as a parent. Notably, unlike being gay or transgender (which, as the Supreme Court found, cannot be defined or considered without reference to sex), being a parent does not have inherent gender implications. Although Plaintiff reported that she felt like she was being forced to choose between being a mother and her job, her specific use of the term "mother" does not automatically mean that she believed her sex was implicated in Defendants' conduct because Plaintiff herself testified that it was her status of being a parent that was at issue and she thought that Defendant Di Stefano would probably have treated a father the same way under the same circumstances. (Dkt.

Meagher v. State University Construction Fund, Not Reported in Fed. Supp. (2020)

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

No. 59, Attach. 4, at 39-40 [Pl.'s Dep.].) Thus, unlike in a situation involving an individual's status as a gay or transgender person, Plaintiff's own evidence indicates that the conduct here was, even in Plaintiff's subjective mind, truly gender-neutral. There is simply no evidence to support Plaintiff's argument that she reasonably believed that she was reporting discrimination based on her sex merely because she referred to herself as a mother.

**\*19** Plaintiff argues that she has sufficiently shown that she reasonably believed that her conduct was covered by a "gender-plus" theory (with the "plus" being her parental status), whether or not she can sustain a claim on that basis. (Dkt. No. 67, at 21-22 [Pl.'s Opp'n Mem. of Law].) However, Plaintiff's argument ignores the fact that, even in a "gender-plus" case, she must still show that her gender played some role. As already discussed, although Plaintiff frames it as her feeling that she was required to choose between being a mother and her job, there is no admissible evidence to establish that she believed that it was the fact that she was a *mother specifically* (and thus a woman) as opposed to that she was a parent that caused Defendants to act in the ways that they did. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004) ("The relevant issue is not whether a claim is characterized as 'sex plus' or 'gender plus,' but rather, whether the plaintiff provides evidence of *purposefully sex-discriminatory* acts.") (emphasis added). In particular, none of the evidence (including the statements by Defendants Di Stefano and Haelen) reasonably indicate that their treatment of Plaintiff was based on the fact that Plaintiff was a woman or on any kind of stereotype about working mothers, or that they would have treated a male father in a different manner. The fact that Plaintiff subjectively felt that the long hours she was being asked to work were interfering with her ability to spend more time with her children (and thus to be a parent) does not turn Defendants' treatment of her into gender-based discrimination, nor does it show that she reasonably believed that Defendants' conduct was motivated by the fact that she is a woman specifically. The Court therefore rejects Plaintiff's argument that she has sufficiently shown that she reasonably believed she was reporting "gender-plus" discrimination or harassment. [33]

[33]   The cases Plaintiff cites in support of her gender-plus theory are inapposite, because there is no admissible evidence to show that Plaintiff was subjected to any of the stereotypes about the incompatibility of motherhood and full-time

work that were found to constitute gender-plus discrimination in those cases. *Back*, 365 F.3d at 118-21. Rather, in this case, Defendants wanted Plaintiff to work a full-time schedule, and it was Plaintiff who was consistently seeking to work less due to her parental obligations.

In the alternative, the Court finds that, even if it were to find that Plaintiff's complaint constituted protected activity, no reasonable fact finder could conclude, based on the admissible evidence, that any adverse action she suffered was causally connected to her complaint. As an initial matter, the Court notes that it is axiomatic that an action taken against an individual before he or she engaged in protected activity cannot constitute an adverse action for the purposes of a retaliation claim. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding that an inference of retaliation could not arise where the plaintiff's termination was the end result of "an extensive period of progressive discipline" that began five months before he engaged in protected activity); *Doroz v. Columbia Place Assocs., LLC*, 13-CV-1135, 2014 WL 5475289, at \*7 (N.D.N.Y. Oct. 29, 2014) (Hurd, J.) (finding that the plaintiff's termination a year before his protected activity could not show retaliation); *Grant v. New York State Office for People with Developmental Disabilities*, 12-CV-4729, 2013 WL 3973168, at \*9 (E.D.N.Y. July 30, 2013) (finding that the plaintiff could not establish a causal connection between any protected activity and the adverse action where all of the alleged adverse actions occurred before the plaintiff ever engaged in the protected activity). As a result, Plaintiff cannot rely on any actions that were taken against her before her March 17, 2016, meeting with Defendant Haelen, which, as discussed above, was the first apparent instance when Plaintiff reported feeling like Defendant Di Stefano was forcing her to "choose between being employed at the Fund and being a mother." (Dkt. No. 64, at ¶ 81 [Pl.'s Decl.].)

As Defendants argue, many of the specific types of conduct that Plaintiff asserts as adverse actions began before she made her complaint. Specifically, it is undisputed that (a) the resolution to name Defendant Di Stafano as Secretary of the Fund's Board of Trustees was made before Plaintiff made her complaint, even if she was not appointed until after; [34]  (b) Defendant Di Stefano and Ms. Lais began preparing the PIP before Plaintiff made her complaint; (c) Defendant Di Stefano expressed dissatisfaction with Plaintiff's work completion and work product before she made her complaint; (d) Defendants Haelen and Di Stafano engaged in delays in responding to and approving her requests for time off, including her request

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

for a return to an 80% schedule or a schedule with time off on various Tuesdays and Thursdays before she made her complaint; (e) Defendant Di Stefano cancelled meetings with Plaintiff frequently both before and after she made her complaint; (f) Defendant Di Stefano worked with members of the other Departments without consulting Plaintiff both before and after she made her complaint, including an instance in or before February 2016 when Plaintiff asserts Defendant Di Stefano unilaterally drafted language for a contract that "undermined" Plaintiff's relationship with that Department; and (g) Defendant Di Stefano sent an email indicating that requests for time off needed to copy all Counsel's Office staff before Plaintiff made her complaint. (*See, supra*, Part II of this Decision and Order, at ¶124; Dkt. No. 59, Attach. 6, at 5-6, 10-12; Dkt. No. 64, at ¶¶ 38-39, 41-42, 45-55, 59, 61, 65, 68, 72.) Because all of this conduct was occurring before her complaint, the fact that some of it merely continued to occur after she made her complaint does not reasonably suggest that Defendants retaliated against her.

34    Notably, in her deposition, Plaintiff testified that, although Defendant Di Stefano became Secretary officially in April 2016, Defendant Haelen had told Plaintiff "that he didn't expect [Plaintiff] to continue in that role as [S]ecretary" as early as the summer of 2015. (Dkt. No. 59, Attach. 4, at 22-23 [Pl.'s Dep.].)

**\*20**  The Court also agrees with Defendants that it is logically inconsistent for Plaintiff to argue that Defendants retaliated against her by taking work away from her and diminishing her responsibilities and also argue that Defendant Di Stefano had acted in an inappropriate manner by "loading up her workload" with more work than she could handle around the beginning of March. (Dkt. No. 64, at ¶¶ 70.) Specifically, there is no evidence to suggest that her responsibilities were diminished so much that a reasonable factfinder could conclude that the lessening of her work load rose to the level of an adverse action.

The remaining asserted retaliatory actions include the following: (a) an email on March 21, 2016, in which Defendant Di Stefano requested that Plaintiff copy her on or forward to her emails between Plaintiff and staff on work matters or work questions so that she was aware of what was going on and they would not be working at "cross-purposes"; (b) the fact that Defendant Di Stefano took over various responsibilities that used to be Plaintiff's without telling her, including cancelling or not inviting her to meetings or not including her on emails, independently drafting contract language behind Plaintiff's back or changing Plaintiff's work product without telling her, and taking over various litigation matters; (c) the fact that Defendant Di Stefano excluded her from any involvement with the Board of Trustees, even though the previous Fund Counsel had her assist him with Board matters when he was the Secretary; (d) the fact that she was excluded from a Counsel's Office Staff meeting around June 10, 2016; (e) the fact that she was told she could not work in the Counsel's Office conference room and was told to instead do that work in the file room; (f) the fact that, on June 8, 2016, she was notified that her signatory authority had been reduced to vendor responsibility forms; [35] and (g) the fact that Defendants disputed her right for a waiver related to her health benefits in September 2017 and terminated her employment in October 2018. (Dkt. No. 64, at ¶¶ 109-10, 112-24, 126-32, 140, 142, 144, 163-64.)

35    Plaintiff admitted in her deposition that, although she did not receive notice in the change of signatory authority until June 2016, she does not know when that authority was actually changed. (Dkt. No. 59, Attach. 4, at 124-25 [Pl.'s Dep.].)

The Court is not convinced that a reasonable factfinder could conclude, based on the admissible evidence, that these alleged actions rose to the level of adverse actions. [36] Rather, they are more in line with "petty slights or minor annoyances" than materially adverse actions, whether or not Plaintiff subjectively felt humiliated and excluded. *See Ziyan Shi v. New York Dep't of State, Division of Licensing Servs.*, 393 F. Supp. 3d 329, 337-39 (S.D.N.Y. 2019) (finding that assigning the plaintiff a challenging workload, giving the plaintiff a counseling memorandum without adverse consequences, yelling and screaming at the plaintiff, and failing to include the plaintiff on an email to all the other investigators did not rise to the level of an adverse employment action); *Lyman v. New York State OASAS*, 928 F. Supp. 2d 509, 523 (N.D.N.Y. 2013) (D'Agostino, J.) (finding that actions including requiring the plaintiff to call into the office and inform them of his whereabouts when he was working outside the office, communicating with the plaintiff's estranged ex-wife, harassing the plaintiff at work, reassigning certain assignments from the plaintiff without decreasing his pay or position, informing plaintiff that he was being laid off for budgetary reasons, and placing a memorandum in the plaintiff's file did not constitute adverse actions to show retaliation).

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

36    The exception to this finding is Defendants' alleged actions related to Plaintiff's health benefits and her termination, both of which would arguably dissuade a reasonable worker from making a charge against her employer. However, these actions occurred more than a year after she made her complaint and there were numerous intervening circumstances (most notably, Plaintiff's being on leave for a significant portion of time without any indication of when she would return to work) that would break any causal connection between her complaint and these actions. *See Placide-Eugene v. Visiting Nurse Service of New York*, 86 F. Supp. 3d 132, 150 (E.D.N.Y. 2015) (noting that an "intervening event dispels an inference of a causal relationship between the protected activity and Plaintiff's termination, thus defeating Plaintiff's prima facie case of unlawful retaliation").

**\*21** Additionally, even if these actions did constitute adverse actions when considered together, Plaintiff cannot show that those actions are causally connected to her complaint of March 18, 2016. Although the above actions are somewhat different conduct than what Plaintiff dealt with before she made her complaint, they represent a variation on the same theme: there is nothing in the admissible evidence to show that Defendant Di Stefano or Defendant Haelen treated Plaintiff worse than they had before she made her complaint. Without any such worsening, Plaintiff cannot show that Defendants' post-complaint actions were retaliation for her complaint, as opposed to a mere continuation of Defendants' previous pattern of conduct towards her. *See Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (noting that, "where, as here, timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff ever engaged in any protected activity, an inference of retaliation does not arise," and finding that, because the facts "document a pattern of attempts to undermine and exclude him that began well before the filing of the first EEOC complaint and that continued after the complaint was filed," no causal connection was shown between those acts and the protected activity); *Hardy v. Rochester Genesee Regional Transp. Auth.*, 906 F. Supp. 2d 178, 185 (W.D.N.Y. 2012) (noting that "temporal proximity alone does not create an inference of retaliation when the adverse action is part of, or the culmination of, a disciplinary process that was already underway prior to the protected activity").

For all of the above reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's Title VII retaliation claim. The Court also finds that Plaintiff's claim for retaliation under the NYSHRL must be dismissed because the standards for liability under Title VII and NYSHRL are the same. Specifically, even if Plaintiff's complaint about discrimination or a hostile work environment based on her parental status would constitute protected activity under NYSHRL (because parental status is a protected classification under that statute and thus she had a good faith reasonable belief that she was reporting conduct that violated the statute), the same deficiencies in her ability to prove an adverse action or a causal connection between any adverse action and her protected activity apply to her NYSHRL claim. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 413 (S.D.N.Y. Mar. 10, 2014) (finding it appropriate to exercise supplemental jurisdiction over NYSHRL claim despite having dismissed the Title VII claims because "the standards of liability under the two statutes are coterminous," and thus it was in the interests of judicial economy, convenience, fairness, and comity to dismiss those claims together).

**B. Whether the Court Should Exercise Supplemental Jurisdiction Over Plaintiff's Remaining NYSHRL Claim**

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 59, Attach. 2, at 27 [Defs.' Mem. of Law]; Dkt. No. 72, at 11-12 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

A district court "may decline to exercise supplemental jurisdiction over a claim" if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, the court should balance "values of judicial economy, convenience, fairness, and comity." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). However, as a general rule, "when the federal claims are dismissed, the state claims should be dismissed as well," and the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998).

The Court notes that Plaintiff's NYSHRL claim for discrimination and/or hostile work environment based on her familial status remains to be decided. As discussed above in Part I of this Decision and Order, Plaintiff's

2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

discrimination/hostile work environment claim under Title VII was dismissed on a previous motion due to her failure to state a claim, in particular based on her failure to allege facts plausibly suggesting that she was discriminated against based on her sex. However, because Title VII does not include familial status as a protected class, the Court has not had the opportunity to reach the merits of Plaintiff's claim for discrimination based on her familial status. Additionally, because familial status is protected under New York law only (and not also federal law), any decision on that claim would involve a deeper assessment of New York state law, even if the general analytical framework is the same as that used under federal law.

**\*22** Because the Court has already dismissed the remaining federal law claim in this action and was not required to make a determination on the merits of any Title VII discrimination and/or hostile work environment claim on this motion for summary judgment, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claim for familial status discrimination. In particular, the Court finds that this is the typical case in which the relevant factors point towards that conclusion, as any decision will require an assessment of primarily state law given that Title VII has no equivalent protection based on familial status.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 59) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's retaliation claims under Title VII and the NYSHRL are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's discrimination claim based on familial status under the NYSHRL is **DISMISSED without prejudice** to refiling in state court within the applicable time limits; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

### All Citations

Not Reported in Fed. Supp., 2020 WL 5504011, 2020 Fair Empl.Prac.Cas. (BNA) 347,387

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (3)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Reply Memorandum of Law in Support of Defendants State University Construction Fund, Robert Haelen, and Jo Anne Di Stefano's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56** Terese MEAGHER, Plaintiff, v. STATE UNIVERSITY CONSTRUCTION FUND, Robert Haelen, in his official and individual capacity, and Joanne Di Stefano, in her official and individual capacity, Defendants. 2019 WL 11637365 | — | N.D.N.Y. | Dec. 16, 2019 | Motion |
| **2. Docket 20-3536** Meagher v. State University Construction | — | C.A.2 | Oct. 13, 2020 | Docket |
| **3. Docket 1:17-CV-00903** Meagher v. State University Construction Fund et al | — | N.D.N.Y. | Aug. 16, 2017 | Docket |

**History (3)**

**Direct History (2)**

1. Meagher v. State University Construction Fund
2020 WL 5504011 , N.D.N.Y. , Sep. 11, 2020

*Appeal Withdrawn by*

2. Meagher v. State University Construction Fund
2021 WL 1526391 , 2nd Cir. , Apr. 06, 2021

**Related References (1)**

3. Meagher v. State University Construction Fund
2018 WL 3069192 , N.D.N.Y. , June 21, 2018

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

KeyCite Yellow Flag - Negative Treatment

Supplemented by  Cao-Bossa v. New York State Dep't of Labor,  N.D.N.Y., November 16, 2021

2021 WL 3674745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Weili CAO-BOSSA, Plaintiff,
v.
NEW YORK STATE DEPARTMENT
OF LABOR, Defendant.

1:18-CV-0509 (GTS/TWD)
|
Signed 08/19/2021

**Attorneys and Law Firms**

WEILI CAO-BOSSA, Plaintiff, Pro Se, 1912 East Country Club Drive, Schenectady, NY 12309.

HON. LETITIA JAMES, Attorney General for the State of New York, Counsel for Defendant, 300 South State Street, Suite 300, Syracuse, NY 13202, OF COUNSEL: AIMEE COWAN, ESQ., Assistant Attorney General.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

 *1  Currently before the Court, in this employment discrimination action filed by Weili Cao-Bossa ("Plaintiff") against the New York State Department of Labor ("Defendant"), are the following two motions: (1) Defendant's motion for summary judgment; and (2) Defendant's letter-motion to strike Plaintiff's sur-reply. (Dkt. Nos. 58, 70.) For the reasons set forth below, Defendant's motion for summary judgment is granted, and its motion to strike Plaintiff's sur-reply is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Second Amended Complaint

Generally, in her Second Amended Complaint, Plaintiff claims that Defendant discriminated against her based on her national origin and age in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"). (Dkt. No. 25 [Pl.'s Second Am. Compl.].) In support of her claims, Plaintiff alleges that Defendant discriminated against her by (a) refusing to hire her for a position for which she interviewed in March 2016, and (b) terminating her employment in another position after six months. (*Id.*) More specifically, Plaintiff, who is Chinese and was 45 years old at the time of her termination, alleges that she received unfairly poor performance reviews based on a few sporadic mistakes that resulted in her termination, but that other American and/or younger employees did not receive similar negative performance reviews and were not terminated. (*Id.*)

### B. Undisputed Material Facts on Defendant's Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1 (formerly Local Rule 7.1[a][3]), a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. Local R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.' " *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. Local R. 56.1(b).

In this case, Plaintiff entirely failed to provide any response to Defendant's Statement of Material Facts, much less one that complies with Local Rule 56.1. Where a party has failed to respond to the movant's statement of material facts in the manner required under Local Rule 56.1, the facts in the movant's statement will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2)

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).[1] Here, Defendant served on Plaintiff the standard form for this District entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which includes a specific notification of the requirement to respond to the defendant's statement of material facts in matching numbered paragraphs with citation to supporting evidence as well as a warning that failure to do so could result in the Court deeming facts to be true that are not properly disputed. (Dkt. No. 58, Attach. 2.) Moreover, four days later, the Court served Plaintiff with a duplicate copy of that Notification. (Dkt. No. 59.) Eight days later, Plaintiff requested an extension of the response deadline. (Dkt. No. 60.) Plaintiff has therefore received sufficient notice of the possible consequences of her failure to respond to Defendant's Statement of Material Facts.

1    Notably, although "courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' " *Salaam v. Stock*, 19-CV-0689, 2021 WL 2367123, at *2 (N.D.N.Y. May 12, 2021) (Dancks, M.J.) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 [2d Cir. 2003]), report-recommendation adopted by 2021 WL 2102242 (N.D.N.Y. May 24, 2021) (Sannes, J.).

**\*2** Although the Court has ensured that Defendant's asserted facts are supported by the cited record evidence, it does not have the duty to scour the record for any and all evidence that may contradict those asserted facts. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted). As a result, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and deemed admitted by Plaintiff due to her failure to respond and failure to provide any evidence

to dispute the asserted facts. (Dkt. No. 66 [Def.'s Rule 56.1 Statement].)

1. Plaintiff was born on September 21, 1972.

2. Plaintiff is of Chinese national origin.

3. Plaintiff obtained a bachelor's degree in Agriculture in 1996 from Ocean University of China.

4. Plaintiff also received a certificate from Austin Community College in Austin, Texas, in 2012 for "professional accountant with high technology."

5. Plaintiff did not have her Certified Public Accountant ("CPA") license at the time of her deposition.

6. In 2016, Plaintiff did not have the requisite one year of accounting experience, supervised by a CPA, required for CPA licensing.

7. Plaintiff testified that she passed her CPA examinations in 2014.

8. Plaintiff did not have any formal accounting experience before she immigrated from China to the United States in 2008.

9. The first accounting position Plaintiff held after arriving in the United States in 2008 was her position with Defendant in 2016.

10. Defendant is an executive agency of the State of New York, established pursuant to Article 2 of the New York State Labor Law.

11. Defendant's Administrative Finance Bureau ("AFB") is responsible for the budgeting, fiscal management, accounting, and expenditure of all department funds.

12. The AFB also maintains and ensures the accuracy of Defendant's payroll system, provides support operations services, including all procurement and payment activities, and provides property management services covering leasing, space planning, project oversight, and building maintenance.

13. Additionally, the AFB is responsible for the management of Defendant's federal grant funding and ensuring compliance with state and federal reporting requirements.

2021 WL 3674745

14. The AFB is divided into multiple sub-units, each with managers who reported to Kathleen Elfeldt when she was the Director of Finance from 2014 until January 2018.

15. The Financial Management Unit ("FMU") is one of the sub-units of the AFB.

16. In March 2016, Defendant posted a job vacancy announcement for an Accountant Trainee 1 & 2 (Grades 14 and 16) and Senior Accountant (Grade 18) position within the AFB's FMU.

17. In order to be eligible for the Accountant Trainee position, a candidate must pass a Civil Service examination and possess a bachelor's degree in accounting, auditing or taxation, or a bachelor's degree or higher degree with 24 semester credit hours of accounting, auditing or taxation courses.

18. A list of candidates who meet these requirements is provided to Defendant by the New York State Department of Civil Service.

19. Plaintiff was the fourth candidate on the Accountant Trainee list, with a score of 90, and thus she was eligible for an interview.

20. On July 12, 2016, Plaintiff was interviewed for the open Accountant Trainee position, and then was interviewed by Director Elfeldt the following day.

21. During the second interview, Director Elfeldt explained that the position for which Plaintiff was interviewing was within the AFB's FMU, which manages Defendant's finances related to federal grants and federal programs.

*3 22. Director Elfeldt informed Plaintiff that federal requirements made the FMU position unique, but that in the future she expected that there would be open positions in the Accounting Office that could be a better fit for Plaintiff's skills and experience.

23. At the time of her interview, Plaintiff did not have any experience reviewing federal guidance or regulations and was not familiar with federal grant funding and guidance requirements.

24. Plaintiff emailed Director Elfeldt after the interview, asking "[W]hy you set such an interview if government working experience is a necessity to this job?"

25. Director Elfeldt responded that government work experience was not a job requirement for the position, but that the federal grant funding and reporting requirements made the Department of Labor different than a typical state agency, and the position Plaintiff interviewed for was not in the accounting office and would not be entering data into an accounting system.

26. Director Elfeldt indicated that Plaintiff's work experience did not make her a good fit for the position.

27. Plaintiff alleges that she did not receive this position because she was discriminated against based on her age and national origin.

28. Plaintiff does not know the basis for her belief that Director Elfeldt discriminatorily denied her the position based on her age and national origin, other than that "there is no other explanation."

29. Plaintiff admitted at her deposition that she did not have the right experience for this position.

30. On July 15, 2016, Defendant posted another job vacancy for an Accountant Trainee 1 & 2 and Senior Accountant, this one in the Accounting Unit.

31. Plaintiff was again reachable for this position on the Civil Service list.

32. Plaintiff claims that Director Elfeldt had her assistant call Plaintiff to let her know that there was another position open.

33. On July 19, 2016, Plaintiff interviewed for the position in the Accounting Unit.

34. On September 13, 2016, Margaret "Peg" Farrell, the Project Director for the State Financial System ("SFS") Project in the Accounting Unit at the time, requested that Plaintiff be hired for a Senior Accountant Trainee position.

35. Plaintiff's hiring was approved by Michelle Daly, the Director of the Accounting Office, and Director Elfeldt.

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

36. Plaintiff accepted the offer, and her employment began on October 6, 2016.

37. Plaintiff was hired as a trainee on a probationary basis and her salary grade was equivalent to a Grade 14.

38. Plaintiff's probationary period was to run concurrently with her two-year traineeship.

39. After she was hired, Plaintiff was assigned to the Accounting Office's SFS Project Team.

40. Plaintiff's direct supervisor was Project Assistant Lindsay Pulcher and the team manager was Ms. Farrell.

41. Ms. Farrell was Ms. Pulcher's direct supervisor.

42. Ms. Pulcher was the Project Assistant for the SFS Project Team from April 2014 to April 2017.

43. Supervisors for probationary trainees such as Plaintiff are required to present trainees with an Individual Development Plan and quarterly probationary evaluations, as well as traineeship evaluations at six-month intervals during the traineeship.

44. On October 26, 2016, Plaintiff met with Ms. Pulcher and was provided an Individual Development Plan that listed the activities, tasks, and performance standards that were expected of her in her position.

 *4  45. However, during the month of November 2016, Plaintiff had many issues completing basic tasks and assignments that were required in her position.

46. On or about December 5, 2016, Ms. Pulcher and Ms. Farrell met with Plaintiff to review her Individual Development Plan to ensure that Plaintiff understood the requirements of her position and what was expected of her.

47. During the meeting, Plaintiff was reminded about the tasks she needed to complete as part of her position and she was reminded as to how she should be completing her assignments.

48. Plaintiff was also reminded during this meeting that her position was a two-year traineeship during which she was on probation and could be terminated for poor performance.

49. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed during this meeting that she needed to choose her wording carefully in emails and on the telephone.

50. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she is not entitled to "flex time" and was not allowed to leave early if she arrived to work early.

51. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she needed to complete her assignments in the format that her supervisor had requested.

52. At no point during the meeting did either Ms. Pulcher or Ms. Farrell discuss Plaintiff's age or national origin.

53. At no point during the meeting did Plaintiff raise any concerns about discrimination.

54. However, following the meeting of December 5, 2016, Plaintiff continued to have issues with her job performance.

55. On January 6, 2017, Plaintiff received a three-month performance evaluation which indicated that she needed to improve in almost all aspects of her job performance.

56. The three-month evaluation was completed by Ms. Pulcher and reviewed by Ms. Farrell.

57. A meeting was held with Plaintiff on January 6, 2017, in which Ms. Pulcher and Ms. Farrell gave the three-month evaluation to Plaintiff.

58. Ms. Pulcher took notes of the meeting, indicating what was reviewed with Plaintiff and Plaintiff's responses.

59. Plaintiff admits that she made mistakes during the first three months of her probationary term.

60. During the meeting, Ms. Pulcher showed Plaintiff an example of an email in which Plaintiff used a harsh, inappropriate tone.

61. Plaintiff testified at her deposition that she disagrees with Ms. Pulcher's assessment of her performance.

62. Following receipt of her three-month evaluation, Plaintiff met with Lin Arbab, a Human Resources Specialist for Defendant.

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

63. During this meeting, Ms. Arbab explained to Plaintiff that managers and supervisors may appropriately issue evaluations that accurately reflect the quality of an employee's performance.

64. Ms. Arbab explained that sometimes an employee's performance will be rated as "needs improvement" in certain areas, and that it is not unusual for an employee to receive an evaluation that indicates performance areas that need improvement.

65. Ms. Arbab explained that Plaintiff's three-month evaluation reflected her supervisor's assessment of her performance and included examples of the noted performance deficiencies.

 *5  66. At the time, Plaintiff did not express to Ms. Arbab any belief that the three-month evaluation was the result of discrimination.

67. On January 12, 2017, Plaintiff wrote an email to Ms. Pulcher and Ms. Farrell, in which she stated that she "appreciate[d] you letting me know your concerns about my performance in the first quarter evaluation," and that she "enjoys very much working" with Ms. Pulcher and Ms. Farrell and "can learn something new every day with [their] help."

68. In the email of January 12, 2017, Plaintiff also listed her plans to improve her performance, including promising to review her emails before sending them to other people, pay attention to formatting details for biweekly downloading and monthly queries, submit a summary of the work she performed that day before she left work every day, take notes so she can stop "asking the same stupid questions," and charge personal time whenever she has to use work time.

69. Plaintiff also asked Ms. Pulcher to remind her if she asks the "same stupid questions" and stated, "Please help me improve my management skills of work assignments. I will improve my quality of work and other virtues required for my work."

70. In the email of January 12, 2017, Plaintiff did not complain about feeling like she was being discriminated against, and did not express disagreement with the three-month performance evaluation.

71. Following the three-month performance evaluation, Plaintiff continued to have job performance issues.

72. Ms. Farrell kept a log of some of the performance issues that Plaintiff exhibited for approximately nine weeks after her three-month evaluation:

> a. On January 23, 2017, Ms. Pulcher noted that Plaintiff downloaded the wrong NHRP files.

> b. On February 1, 2017, Plaintiff's Monthly Mod Accrual and Stat Ledger queries were for December 2015 rather than December 2016.

> c. On February 6, 2017, Ms. Farrell notified Plaintiff that she had made mistakes on the monthly query, to which Plaintiff responded, "[S]orry for the negligence. Will be more careful in the future."

> d. Also on February 6, 2017, Ms. Pulcher was forced to remind Plaintiff to download the NHRP522 and NHRP530 files despite the fact that this had been a recurring task for several pay periods.

> e. On February 22, 2017, Ms. Pulcher spoke with Plaintiff about her failure to prioritize assignments correctly.

> f. On February 27, 2017, Ms. Pulcher emailed Plaintiff to inform her that she

> was enrolled in mandatory training courses, but that those courses were not a priority since they did not need to be completed for eight months, and to identify which assignments were a priority. However, Plaintiff completed these training courses before the priority assignments despite Ms. Pulcher's directions.

> g. On Mar h 1, 2017, Ms. Farrell asked Plaintiff to complete an assignment immediately, but Plaintiff submitted the assignment the following day, incorrectly. The assignment was still incorrect the second time Plaintiff submitted it.

> h. On March 3, 2017, Ms. Farrell asked Plaintiff to create a tab with a pivot table for each ledger on an Excel spreadsheet. Plaintiff submitted the assignment incorrectly and Ms. Farrell was forced to follow up.

> *6  i. Also on March 3, 2017, Ms. Pulcher contacted Plaintiff regarding an assignment that she submitted incorrectly the previous day. Plaintiff responded, "You

Case 9:22-cv-00242-AMN-MJK     Document 75     Filed 03/04/25     Page 148 of 531

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

are right ... I guess I was kind of in a hurry. Sorry for the abbreviation."

j. On March 8, 2017, Ms. Pulcher requested that Plaintiff provide a summary of an accounting training class Plaintiff had attended; however, Plaintiff did not provide that summary and Ms. Pulcher was forced to follow up on March 21, 2017, at which time Plaintiff still had not completed the assignment.

73. Ms. Farrell recorded at least 13 separate instances between January 11, 2017, and March 20, 2017, on which Plaintiff submitted an incorrect or incomplete assignment or needed to be reminded to complete an assignment.

74. On April 3, 2017, Plaintiff received a six-month evaluation from Ms. Pulcher.

75. Ms. Pulcher recommended that Plaintiff be terminated based on her unsatisfactory performance.

76. Ms. Farrell approved Ms. Pulcher's recommendation for Plaintiff's termination.

77. Director Elfeldt also agreed with the recommendation for termination.

78. Ultimately, termination decisions are made by the Personnel Department.

79. The recommendation was forwarded to Lisa Burrell, Associate Director of Human Resources for Defendant, who made the final determination approving Plaintiff's termination.

80. Plaintiff was presented with the six-month evaluation at a meeting, during which Ms. Pulcher indicated the main reasons why her employment was being terminated, including the fact that her assignments were often not completed per instructions and follow-up was often required, the fact that she needed to be reminded of the same issues repeatedly, and the fact that she did not make the best use of her time or exert a consistent effort.

81. Plaintiff signed the evaluation that recommended her termination.

82. When she received her six-month evaluation, Plaintiff did not complain that her evaluation was the result of discrimination.

83. On April 13, 2017, Plaintiff emailed Director Elfeldt, stating "[T]here were errors in my work because of careless [sic] and inexperience, but they had nothing to do with working abilities."

84. At her deposition, Plaintiff acknowledged that she admitted she was careless and inexperienced during her six months working for Defendant.

85. Plaintiff did not allege in her email of April 13, 2017, that she felt discriminated against.

86. She did, however, thank Director Elfeldt for giving her a chance "to see how unique and complicated the DOL accounting could be."

87. The first time Plaintiff ever expressed that she felt discriminated against while working for Defendant was in an email to Ms. Arbab on April 10, 2017.

88. At no point during her employment with Defendant did anyone make any remarks about Plaintiff's national origin or age.

89. There were "many" employees in Plaintiff's specific unit who were Plaintiff's age or older.

90. On July 17, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR").

91. Her complaint was amended on or about August 2, 2017, and in it she alleged that she was subjected to discrimination based on her age and national origin in violation of the New York State Human Rights Law, Title VII, and the ADEA.

**\*7** 92. On December 20, 2017, the NYSDHR issued a Determination and Order After Investigation, in which it determined that there was no probable cause to believe that Defendant engaged in or was engaging in the unlawful discriminatory practices Plaintiff alleged.

93. On January 26, 2018, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR.

94. Plaintiff alleges in her Second Amended Complaint that two or three other employees were treated more favorably than her because of their national origin.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 149 of 531
Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)
2021 WL 3674745

95. Specifically, Plaintiff alleges that Richard Deitz was treated more favorably than her because of his national origin. However, Plaintiff does not know what position Mr. Dietz held or who he is, and she admits that his job responsibilities were different than her job responsibilities. She also "guesses" that he is "American."

96. According to Mr. Deitz's evaluation in the record, his supervisor was Michelle Daly, not Ms. Pulcher, and Ms. Pulcher has never supervised or evaluated Mr. Deitz.

97. The basis for Plaintiff's belief that Mr. Deitz was treated differently than her is that he was praised for "taking initiative" while she was not.

98. Plaintiff also alleges that Frank Shavel was treated more favorably than her because of his national origin. However, Plaintiff is unaware of where Mr. Shavel worked within Defendant's organization, she did not know what position he held, she did not know who supervised him, she has never worked with him and has never seen him in person, she does not know what his salary grade is, and she does not know whether he was a permanent or probationary employee. Plaintiff also does not know his ethnic background.

99. The only basis for Plaintiff's belief that Mr. Shavel was treated more favorably than her is that he was given a counseling memorandum about failing to complete a mandatory training rather than being terminated, while she did not receive any memoranda before her termination.

100. However, Plaintiff does not know whether Mr. Shavel failed to complete other tasks or training beyond the one related to the counseling memorandum.

101. Plaintiff also alleges that Kayla O'Hara was treated more favorably than her because of her national origin. However, Plaintiff admitted that she does not know Ms. O'Hara's national origin (but she guesses that it is American), she has never worked with Ms. O'Hara or observed her work performance, she has never spoken with anyone who worked with or supervised Ms. O'Hara, she does not know whether Ms. O'Hara made similar mistakes to the ones that are detailed in Plaintiff's own evaluations, and she does not know whether Ms. O'Hara was ever counseled about her time or attendance. Additionally, unlike Plaintiff, who was hired as a Grade 14 Accountant Trainee, Ms. O'Hara was hired as a Grade 18 Senior Budget Analyst effective September 21, 2017.

102. The only basis for Plaintiff's belief that Ms. O'Hara was treated differently than her is because there is no mention of "one-time incident[s]" or "learning process" on Ms. O'Hara's evaluation. Ms. O'Hara's performance evaluation shows that she met performance expectations for her position.

103. Plaintiff also alleges that these employees were treated more favorably than her based on her age.

*8 104. However, Plaintiff admits that Mr. Shavel and Mr. Deitz are both as old or older than her: Mr. Deitz was 45 years old in 2017, and Plaintiff testified that Mr. Shavel is "older than sixty, in his sixties or something .... He's older than me." Mr. Shavel was in fact 61 years old in 2017.

105. Ms. O'Hara was 27 years old in 2017.

106. Ms. Pulcher was not aware of either Ms. O'Hara's or Plaintiff's ages in 2017.

107. The basis for Plaintiff's belief that she was treated differently because of her age was "some clues from [Ms. Pulcher]," such as when Ms. Pulcher "mentioned something about older people. She just didn't believe older people could do good job."

108. Specifically, Plaintiff alleges that Ms. Pulcher commented that a receptionist, Donna, who is around retirement age, "didn't know what she was doing."

109. Plaintiff also alleges that Ms. Pulcher made a comment about a "guy who's doing payroll" and how he needs to retire.

110. Ms. Pulcher denies ever making any comments about "Donna" or "a guy who's doing payroll" with respect to their age or ability to perform their job, and denies making any comments to Plaintiff during her employment about any employees' ages or how their ages impact their ability to perform their jobs.

111. Director Elfeldt was 57 years old at the time of Plaintiff's termination.

112. Assistant Director Cathryn Piccirillo was 51 years old at the time of Plaintiff's termination.

113. Ms. Farrell was 50 years old at the time of Plaintiff's termination.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 150 of 531
Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)
2021 WL 3674745

114. Associate Director of Human Resources Ms. Burrell was 48 years old at the time of Plaintiff's termination.

115. Plaintiff was not the only employee of Asian descent in the AFB at the time Plaintiff was employed there, and there are currently employees of Asian descent employed in Defendant's Finance Bureau.

116. On April 7, 2017, Ms. Burrell sent a letter to Plaintiff indicating that she concurred with the termination recommendation effective close of business April 14, 2017.

117. On April 10, 2017, Plaintiff emailed Ms. Burrell and stated that she felt Ms. Pulcher was an "inexperienced and inapt [sic] supervisor" who was not qualified and who did not provide her with proper training and help, as well as that she felt that Ms. Pulcher was mean to her and that she had been discriminated against.

118. Nowhere in the email of April 10, 2017, does Plaintiff mention that she felt discriminated against specifically based on her age or national origin.

119. At no point during her employment with Defendant did Plaintiff ever complain to Director Elfeldt that she believed she was being discriminated against in any way.

### C. Parties' Briefing on Defendant's Motion for Summary Judgment

#### 1. Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant makes three arguments. (Dkt. No. 58, Attach. 1, at 12-43 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's discrimination claims should be dismissed as untimely to the extent they are based on Defendant's failure to hire her for a position with the FMU in July 2016. (Id. at 12-15.) Specifically, Defendant argues that this alleged act of discrimination occurred more than 300 days before Plaintiff filed her complaint with the NYSDHR on July 17, 2017, and thus any portion of her claims based on that alleged act of discrimination must be dismissed. (Id.) Defendant additionally argues that, timeliness notwithstanding, Defendant's actions in not hiring her for that position in July 2016 were not based on discrimination, but rather because she lacked experience with federal grants and

other regulatory considerations that were a feature of that specific position. (Id.)

*9 Second, Defendant argues that Plaintiff's national origin discrimination claim pursuant to Title VII should be dismissed. (Id. at 15-33.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she was not qualified for her position in that she did not meet legitimate employer expectations of job performance as evidenced by the job evaluations showing unsatisfactory performance, and (ii) the circumstances of her termination do not give rise to an inference of discriminatory intent given that there was evidence that Plaintiff did many things wrong and there have been no comments alleged to have been made about her ethnic group, and, in particular, the other employees identified by Plaintiff are not sufficiently similarly situated to her to raise such an inference; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment, namely her repeated poor performance despite having meetings and reviews in which she was informed of the ways in which she was not meeting expectations; and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because she has no evidence that her national origin was even a factor in that decision, and her own subjective belief that it was is not sufficient to sustain her claim. (Id.)

Third, Defendant argues that Plaintiff's age discrimination claim pursuant to the ADEA should be dismissed. (Id. at 33-43.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she cannot show that she was performing her job satisfactorily (as already discussed), and (ii) she cannot show that her termination occurred under circumstance giving rise to an inference of discrimination based on her age given that the only alleged co-employee who was younger than her is not sufficiently comparable, and any comments that may have been made by Ms. Pulcher about the ages of other employees were merely stray remarks and Ms. Pulcher was nonetheless not the ultimate decisionmaker as to Plaintiff's termination; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment (as discussed above); and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because her subjective belief that she was discriminated against and a few stray remarks about employees other than Plaintiff do not

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 151 of 531

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

show that her age was the but-for cause of her termination. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

In her response to Defendant's motion, Plaintiff requests that the Court deny that motion, noting the reasons she had needed to request an extension in the past to file her response, and noting that, "[w]hile preparing Plaintiff's Memorandum of Law, I found out Defendant's Memorandum of Law did not follow L.R. 7.1. It was 36 pages in length, and it was 45 pages in total with Table of Contents and the cover page." (Dkt. No. 67, at 1-2 [Pl.'s Opp'n Mem. of Law].) Plaintiff does not address any of the substantive arguments made by Defendant, nor does she submit any response to Defendant's Statement of Material Facts, as already discussed above in Part I.B. of this Decision and Order.

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant makes three arguments. (Dkt. No. 68 [Def.'s Reply].) First, Defendant argues that it did not violate the Local Rules of Practice for this Court by filing an overlong brief because the pages for the cover page, the table of contents, and the signature block do not count toward the overall page count, and Defendant's substantive brief was 35 pages as allowed by this Court's Text Order of December 21, 2020. (*Id.* at 4.)

Second, Defendant argues that the Court should accept its asserted facts as true due to Plaintiff's failure to respond to its Statement of Material Facts as required by Local Rule 56.1 because, even though Plaintiff is *pro se*, she was twice provided notice of the consequences of failing to do so. (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff's claims should be deemed to have been abandoned because Plaintiff failed to address or oppose any of Defendant's legal arguments. (*Id.* at 6-7.)

### 4. Plaintiff's Sur-Reply

**\*10** Plaintiff also submitted a sur-reply without the permission of the Court. (Dkt. No. 69 [Pl.'s Sur-Reply].) In this sur-reply, Plaintiff asserts that she was not informed

that Defendant had requested or been granted permission to file an overlong brief with 10 additional pages, and that, because she was not aware of this, she "filed the motion of rejection and was waiting for the Judge's further directions about the allowable length." (*Id.* at 1.) She argues that Defendant's brief exceeds the extended page limit because the Conclusion section was on page 36 of that brief and that Conclusion section is "substantive enough to be counted." (*Id.* at 2.) Plaintiff again requests that the Court deny Defendant's motion for being improperly overlong, noting that she "completed [her] response to Defendant's Material Facts Not in Dispute before [she] filed [her] rejection" and indicating that "I will submit my response in whole when Defendant submit [sic] proper memorandum of law or as further directed by the court if otherwise." (*Id.*)

### 5. Defendant's Letter-Motion to Strike Plaintiff's Sur-Reply

Defendant filed a motion to strike Plaintiff's sur-reply because such responses are not permitted without permission under the Local Rules of this Court, but that, even if the Court considers the sur-reply, Plaintiff was provided with a copy of Defendant's request for additional pages for its memorandum and the Court's order granting that request was served on Plaintiff by regular mail, and thus she has no basis for claiming she was not reasonably made aware of Defendant's increased page limit. (Dkt. No. 70.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[2]   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].

2021 WL 3674745

As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e). [3]

[3]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*. 255 (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.). [4] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules. [5]

[4]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Sudbaby, J.) (citing cases).

[5]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

**\*11** Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*,

76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [6] – even where the non-movant was proceeding *pro se*. [7]

[6]     Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports its denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[7]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [8] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Sudbaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Sudbaby, J.) (collecting cases).

[8]     *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 153 of 531
Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)
2021 WL 3674745

failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Sur-Reply Should Be Stricken

Although Defendant is correct that sur-replies are not permitted under Local Rule 56.1 without permission from the Court, the Court finds that whether or not it considers Plaintiff's sur-reply is immaterial to the ultimate outcome of Defendant's motion because the arguments Plaintiff makes within that sur-reply are not meritorious.

 **\*12** Plaintiff's argument that she never received the Court's Text Order of December 21, 2020, is unpersuasive. As Defendant argues, there is sufficient evidence that Plaintiff was reasonably apprised of the Court's Text Order granting Defendant's request for 10 additional pages for its memorandum. (Dkt. No. 48 [noting specifically that a copy of the Text Order was served upon Plaintiff via regular mail].) There is no indication that Plaintiff had changed mailing addresses, that the Text Order had been returned as undeliverable, or that there has been any difficulty with her receiving mail throughout the course of this litigation. (*See* Dkt. No. 1 [Pl.'s Comp.] [listing her address at the time of filing in April 2018 as the same address on file with the Court as her current address].) As a result, there is no reason that Plaintiff should not have reasonably known about the request for (and grant of) the additional pages.

Similarly, Plaintiff's argument that Defendant's motion should be denied because the non-substantive portions of Defendant's memorandum were in excess of 35 pages is unavailing. Non-substantive matter such as cover page, table of contents, and signature block do not count toward the substantive page limit. *See Moore v. Syracuse City Sch. Dist.*, 05-CV-0005, 2009 WL 890576, at *2 n.8 (N.D.N.Y. Mar. 31, 2009) (Scullin, J.) (noting that it repaginated plaintiff's memorandum by starting page one following the Table of

Contents and Authorities); *In re Marina Dev., Inc.*, 05-CV-1349, 2007 WL 9752855, at *1-2 (N.D.N.Y. Jan. 11, 2007) (Hurd, J.) (noting that the Local Rules applied to brief format in bankruptcy cases, and concluding that the appellees' briefs should therefore not exceed 25 pages, "exclusive of pages containing the table of contents, table of citations or similar material"). Additionally, although Plaintiff argues that Defendant's one-sentence conclusion is "substantive enough to be counted," the Court disagrees because that conclusion is merely a brief restatement of Defendant's request that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint that contains no additional substantive argument. (Dkt. No. 58, Attach. 1, at 44 [Def.'s Mem. of Law].) Even if the conclusion were considered to be substantive, the proper course of action in this case would be to merely not consider any pages beyond the allowed amount, not to strike the entire motion as Plaintiff requests. *See Helen Cross v. Colvin*, 16-CV-0111, 2016 WL 7011477, at *4 n.3 (N.D.N.Y. Dec. 1, 2016) (Suddaby, C.J.) (noting that, "[b]ecause Plaintiff has exceeded the page limit, the Court will not consider the arguments contained in pages eleven through fifteen of her counsel's reply affidavit"). The Court therefore finds that there is no basis for Plaintiff's arguments that Defendant's motion should be denied based on the length of its memorandum of law.

Also unpersuasive is Plaintiff's argument that she has prepared a more detailed substantive response to Defendant's motion (including a response to Defendant's Statement of Material Facts), but has not yet filed her "response in whole" because she has been waiting for this Court's "further directions about the allowable length" of Defendant's memorandum of law. (Dkt. No. 69 [Pl.'s Sur-Reply].) Even considering Plaintiff's *pro se* status, there is no justification for Plaintiff's blatant failure to comply with the Local Rules by essentially ignoring the Court's imposed deadlines and manufacturing her own procedure that she now expects the Court to follow. Plaintiff was provided with notice that her response to Defendant's motion for summary judgment was due by February 19, 2021, a notice that she received because she subsequently requested (and was granted) two separate 60-day extensions of time on that deadline, such that her response was not ultimately due until June 21, 2021. (Dkt. Nos. 59, 60, 61, 62, 64.) The Notification of the Consequences of Failing to Respond to a Summary Judgment form that was filed along with Defendant's motion clearly states that a failure to file a proper response to the motion including a response to the Statement of Material Facts, copies of all pertinent record evidence, and a response memorandum

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 154 of 531

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

containing legal arguments could result in dismissal of some or all of the claims. (Dkt. No. 58, Attach. 2.)

**\*13** Despite being made aware of the need to respond fully and despite being granted multiple lengthy extensions to do so, Plaintiff, without any permission or direction from the Court, chose to instead file a brief "motion" to dismiss Defendant's memorandum due to an alleged failure to comply with the page limits in the Local Rules and seemingly expected (again, without any permission or direction from the Court) that such counter-motion held the deadline for submitting a substantive response to Defendant's motion in abeyance. However, Plaintiff's misunderstanding of the rules of procedure based on her *pro se* status do not excuse her failure to comply with those rules of procedure. *See Alzawahra v. Albany Medical Ctr.*, 546 F. App'x 53, 54 (2d Cir. 2013) (noting that, "[a]lthough a *pro se* litigant is entitled to a liberal construction of his filings, ... his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules"). This is particularly so given that Plaintiff was informed of what she was required to submit in response to Defendant's motion, and the consequences for failing to do so.

Finally, the Court finds that it would not serve the interests of judicial efficiency to allow Plaintiff to submit any further substantive filings in response to Defendant's motion for summary judgment at this point. As already noted, Plaintiff was granted an additional 120 days in which to file her response. In granting her second request to extend that deadline, the Court stated that no more extensions would be granted without documentary evidence that extension was warranted due to medical issues, and noted that this case has been pending for more than three years. (Dkt. No. 64 [Text Order filed Apr. 19, 2021].) Because Plaintiff's response and sur-reply indicate that her failure to file a full response by the deadline was due to her decision to wait to see what the Court ruled as to the propriety of the length of Defendant's memorandum rather than due to any medical or other issue, there is no basis for allowing Plaintiff additional time to submit a full and proper response. Notably, allowing Plaintiff to do so would require Defendant to expend additional time and effort to prepare yet another reply memorandum despite having already filed a reply and a motion to strike in response to Plaintiff's sur-reply. Lastly, the Court notes that, having reviewed the record on this motion, it is unlikely that providing Plaintiff with additional opportunity to respond to Defendant's motion would result in a different outcome on that motion.

As a result, the Court denies Defendant's motion to strike the sur-reply because the sur-reply offers Plaintiff no relief even if considered.

**B. Whether Plaintiff's Discrimination Claim Based on the July 2016 Failure to Hire Must Be Dismissed as Untimely**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

"To sustain Title VII or ADEA claims, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged act of discrimination." *Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 [2d Cir. 1996]; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 [2d Cir. 1999]). Thus, any conduct that occurred more than 300 days before the charge is filed is barred in a federal lawsuit unless an exception applies. *Betterson*, 661 F. App'x at 89.

Here, Plaintiff filed her complaint with the NYSDHR on July 14, 2017. (Dkt. No. 58, Attach. 12, at 1, 23.) As a result, only alleged acts of discrimination that occurred on or after September 17, 2016, are covered under that complaint. Because the failure to hire that Plaintiff alleges occurred in July 2016, any claim related to that alleged action is barred unless Plaintiff meets one of the defined exceptions to the 300-day requirement.

**\*14** Recognized exceptions to the 300-day requirement include waiver, estoppel, equitable tolling, or the existence of a continuing violation. *Barr v. Bass Pro Outdoor World, LLC*, 17-CV-0378, 2019 WL 6828987, at \*9 (N.D.N.Y. Dec. 13, 2019) (Sannes, J.). None of these exceptions are applicable here. There is no apparent basis for applying waiver or estoppel.

As to equitable tolling, a plaintiff must show that (1) she has been pursuing her rights diligently, but (2) some extraordinary circumstance stood in the way and prevented timely filing. *Barr*, 2019 WL 6828987, at \*9 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 [2d Cir. 2010]). There is no indication of any circumstances between July 2016 and September 2016 that would have prevented her from filing a charge as to the

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 155 of 531
Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)
2021 WL 3674745

allegedly discriminatory failure to hire in July 2016, much less an extraordinary one.

There is also no basis for applying the continuing violation doctrine here. "Under the continuing violation exception to the ... limitations period, if a ... plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under the policy would be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012). However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A discrete act is one that "necessarily 'constitutes a separate actionable unlawful employment practice' " that would be individually actionable, such as "termination, failure to promote, denial of transfer, or refusal to hire." *Chin*, 685 F.3d at 157 (citing *Morgan*, 536 U.S. at 114). It is well recognized that discrete acts that fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157). Because the alleged failure to hire is a discrete act that was actionable in its own right, the continuing violation doctrine cannot be used to make it timely.

For all of the above stated reasons, the Court finds that the portions of Plaintiff's discrimination claims that are based on the failure to hire her in July 2016 are barred due to her failure to file a timely charge as to that act and must be dismissed.

### C. Whether Defendant's Motion Should Be Granted as to Plaintiff's Title VII Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Claims for discrimination under Title VII are subject to the *McDonnell Douglas* burden-shifting standard. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). As an initial matter, the plaintiff must proffer sufficient evidence to state a prima facie case of discrimination. *Kirkland*, 760 F.3d at 225. If the plaintiff can make a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant does so, the burden shift back to the plaintiff

to show that the defendant's explanation is a pretext for discrimination. *Id.* As to this last step, "once the [defendant] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [plaintiff's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [defendant's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 [2d Cir. 2003]).

**\*15** "To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate [the following four elements]: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App.'x 54, 56 (2d Cir. 2016). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that (a) she had satisfactory job performance, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

As to the second element, "[i]n determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors," because "job performance cannot be assessed in a vacuum" and "the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *see Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance"). Whether performance is satisfactory "depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, ... they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' " *Meiri*, 759 F.2d at 995.

Here, it is undisputed that Plaintiff was a probationary trainee employee during the relevant time period, and thus subject to termination if she did not meet employer expectations. (Dkt. No. 58, Attach. 3, at ¶ 5 [Arbab Decl.]; Dkt. No. 58, Attach. 9.) Under the terms of this probationary trainee employment, her supervisors were

Case 9:22-cv-00242-AMN-MJK Document 75 Filed 03/04/25 Page 156 of 531

Cao-Bossa v. New York State Department of Labor, Not Reported in Fed. Supp. (2021)

2021 WL 3674745

required to provide an Individual Development Plan and quarterly probationary evaluations as well as traineeship evaluations at six-month intervals during the traineeship period. (Dkt. No. 58, Attach. 3, at ¶ 6 [Arbab Decl.].) Plaintiff was provided with her Individual Development Plan (which she acknowledged with a signature) on October 25, 2016; this document outlined activities and performance standards for her Grade 14 position. (Dkt. No. 58, Attach. 5.) On January 6, 2017, Plaintiff was provided with a three-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which Plaintiff was rated as "needs improvement" in all listed areas except "relationships," with details related to those areas written in the comments section that highlight the specific tasks and ways in which Plaintiff was noted to not be performing up to expected standards. (Dkt. No. 58, Attach. 6.) On April 3, 2017, Plaintiff was provided with a six-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which it was noted that Plaintiff was rated as "unsatisfactory" in the areas of management of work assignments, quality of work, productivity, personal work characteristics, and problem solving/decision-making, "needs improvement" in the areas of attendance and communications, and "meets expectations" in the area of relationships; again, the evaluation includes written comments regarding the specific tasks and ways in which Plaintiff was not performing up to specific expectations. (Dkt. No. 58, Attach. 7.) Plaintiff was also provided with a six-month performance evaluation, in which concerns about her performance as to the activities and tasks outlined in the Individual Development Plan were noted. (Dkt. No. 58, Attach. 8.)

**\*16** Based on the evidence, it is clear both what the standards of Plaintiff's position were and the reasons that Plaintiff's performance did not meet those standards. As discussed above in Part I.B. of this Decision and Order, Plaintiff herself acknowledged that she made some mistakes in the course of her performance of her duties, and additional evidence from Ms. Pulcher and Ms. Farrell substantiates multiple specific mistakes. (Dkt. No. 58, Attachs. 28-33, 44, 47-54.) Additionally, there is nothing in the record to show that these expectations were in any way illegitimate or arbitrary. Plaintiff has offered no evidence to support her claim but her own subjective belief that her performance was not as bad as her supervisors stated. In an email to Ms. Arbab on April 10, 2017, Plaintiff stated that she believed Ms. Pulcher provided inadequate training or communication to her; however, there is no evidence to substantiate this subjective belief and the undisputed record reflects that both Ms. Pulcher and Ms.

Farrell provided fairly significant feedback and reminders to Plaintiff about her tasks and duties. (Dkt. No. 58, Attachs. 28-33, 39-41, 43, 45-54.) Based on the record before the Court, no reasonable factfinder could conclude that Plaintiff performed her job satisfactorily.

In the alternative, the Court finds that Plaintiff also has not shown that the circumstances surrounding her termination give rise to an inference of discrimination. Notably, the record is devoid of any indication that any of Defendant's employees ever referenced Plaintiff's national origin during her employment or made any kind of disparaging remarks about her national origin. Additionally, the three employees that Plaintiff holds out as comparators who received better treatment because they were not terminated are not sufficiently similar to her to give rise to an inference of discrimination based on national origin for two reasons. First, Plaintiff's deposition makes clear that she is not even certain what the national origins of these individuals are, but she merely assumes that they are "American." (Dkt. No. 58, Attach. 15, at 102-03, 105-06, 109 [Pl.'s Dep.].) Second, there is no evidence to show that these individuals were in comparable positions with comparable responsibilities and that they made comparable mistakes to those made by Plaintiff. To raise an inference of discrimination from more favorable treatment towards similarly situated individuals outside of the protected group, "a plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *De Jesus-Hall v. New York Unified Court Sys.*, 2021 WL 1259581, at \*1 (2d Cir. 2021) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

As to Ms. O'Hara, although her job tasks and objectives are similar to Plaintiff's, the evidence shows that Ms. O'Hara was hired as Grade 18 Senior Budget Analyst/Senior Accountant (while Plaintiff was a Grade 14 Senior Accountant Trainee) and her performance reviews show that she overwhelmingly performed tasks up to expectations, with the exception of "needs improvement" on her three-month probation evaluation in the areas of managing work assignments and problem solving/decision-making, where it was noted that she needed to improve on working more efficiently to complete her assignments in a timely manner and in completing analyses and problem solving more independently, and "needs improvement" on her six-month probation evaluation in the area of problem solving/decision-making, where it was noted she needed to improve on completing analyses and problem solving more independently; it was noted that she

2021 WL 3674745

had improved in these areas and was meeting expectations by the time of her nine-month probation evaluation. (Dkt. No. 58, Attach. 58.) The evidence therefore shows that, even if Plaintiff and Ms. O'Hara performed the same or similar jobs, Ms. O'Hara did so with fewer mistakes and she gradually improved her performance over the course of the documented time, whereas Plaintiff's evaluations showed that she made far more extensive mistakes and did not show improvement. As a result, the Court finds that Ms. O'Hara is not sufficiently similar and thus the disparate treatment between her and Plaintiff would not allow a reasonable fact finder to infer discrimination.

**\*17** As to Mr. Deitz, he was a Grade 18 Senior Accountant in a different section or unit than Plaintiff, and his listed tasks and objectives are not similar to those listed in Plaintiff's Individual Development Plan. (*Compare* Dkt. No. 25, at 21-24 *with* Dkt. No. 58, Attach. 5, at 1-2; *see* Dkt. No. 58, Attach. 15, at 111-12 [Pl.'s Dep.] [testifying that she did not do many of the tasks listed on Mr. Deitz's tasks and objectives list and admitting that his responsibilities were "different" than hers].) Additionally, Mr. Deitz was supervised by Melinda Hansen and Michelle Daly, not Ms. Pulcher and Ms. Farrell, and a summary of his performance completed by Ms. Daly indicates that Mr. Deitz performed his job satisfactorily in all noted respects. (Dkt. No. 25, at 24, 26-27.) Because there is no evidence that Mr. Deitz was a trainee, the evidence shows that he had different job responsibilities and different supervisors than Plaintiff, and there is no evidence of ongoing job performance issues, the Court finds that no reasonable fact finder could conclude that the treatment Mr. Deitz received raises an inference of discrimination.

As to Mr. Shavel, there is little evidence about the details of his employment. Plaintiff's only allegation regarding Mr. Shavel is that he was given a counseling memorandum for failing to complete mandatory training, but did not have his employment terminated. (Dkt. No. 25, at 31.) However, there is no evidence to suggest that Mr. Shavel had engaged in any other actions that made his job performance unsatisfactory, much less that he committed mistakes similar to those documented related to Plaintiff's job performance. Additionally, there is no evidence to suggest that Mr. Shavel was a trainee employee or that he worked in a similar position or with similar tasks and objectives as Plaintiff's position, and the counseling memorandum suggests that Mr. Shavel was supervised in some way by Ms. Hansen, not Ms. Pulcher or Ms. Farrell. (Dkt. No. 25, at 31.) Based on the evidence, the Court finds that no reasonable fact finder could conclude

that the treatment Mr. Shavel received raises an inference of discrimination.

Because Plaintiff has not provided evidence which can prove a prima facie case of national origin discrimination under Title VII and because there is no outstanding issue of material fact evident from the parties' submissions, the Court grants Defendant's motion for summary judgment on this claim.

### D. Whether Defendant's Motion Should Be Granted as to Plaintiff's ADEA Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

" 'In order to establish a prima facie case of age discrimination,' the plaintiff 'must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.' " *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 [2d Cir. 2010]). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that she (a) was qualified for the position, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

Regarding whether Plaintiff was qualified, under the law of this Circuit, "a plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 [2d Cir 1991]). Notably, although misconduct is not a basis for finding an employee lacks the basic qualifications for a position, evidence of performance based on evaluations of an employee's work is appropriate evidence for making that determination. *Owens*, 934 F.2d at 409 (clarifying that it is the ability to perform job duties that is important, not whether the conduct is inappropriate or offensive); *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding summary judgment appropriate on the issue of whether the plaintiff was qualified for the position because there was no "competing evidence" against the unsatisfactory performance evaluations to create an issue of fact about the plaintiff's performance,

2021 WL 3674745

and no evidence that the negative evaluations were unfair or incorrect). Here, Plaintiff has offered no evidence that the performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance. Because her unsubstantiated assertions and beliefs cannot outweigh the other evidence, the Court finds that Plaintiff has not sufficiently shown that there is a genuine dispute of material fact about whether she was qualified for her position as that term is defined by the law.

**\*18** Regarding whether Plaintiff has raised an inference of discrimination, as already discussed above in Part III.C. of this Decision and Order, Plaintiff's attempt to show that she was treated less favorably than younger similarly situated individuals is unavailing. Notably, it is undisputed that Ms. O'Hara was the only individual of the three named that was not as old or older than Plaintiff. However, as discussed previously, Ms. O'Hara is nonetheless not sufficiently similarly situated to Plaintiff because there is no evidence that Ms. O'Hara made the same or similar mistakes as Plaintiff did at the level and frequency at which Plaintiff made those mistakes. Rather, the evidence shows that Ms. O'Hara was reported to have made fewer overall mistakes and that she improved with each probation evaluation that was conducted. It is undisputed that Plaintiff is not personally familiar with Ms. O'Hara or her work abilities, and that Plaintiff has no knowledge as to how well or not Ms. O'Hara performed her job on a day-to-day basis. As a result, disparate treatment here does not give rise to an inference of discrimination based on Plaintiff's age any more than it does related to her national origin.

The Court also acknowledges Defendant's correct argument that many courts recognize that "an allegation that a decision is motivated by age animus is weakened when the decisionmakers are of the protected class," and also where "Plaintiff was well within the protected age group when she was hired." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (collecting cases). However, these factors are not dispositive. *Ehrbar*, 131 F. Supp. 3d at 26. Here, Plaintiff was within the protected age group when she was hired, and Ms. Farrell, who was 50 at the relevant time, approved her termination, as did Ms. Burrell, who was 48 at the relevant time. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.]; Dkt. No. 58, Attach. 25, at ¶¶ 5, 29 [Farrell Decl.].) Ms. Pulcher, however, was not in the protected age group. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.].) Additionally, "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 [2d Cir. 1997]); *see also Downey v. Adloox, Inc.*, 789 F. App'x 903, 907 (2d Cir. 2019) (affirming district court's dismissal of age discrimination claim based in part on the fact that plaintiffs were hired and fired by the same executives within a short period of time). Here, Plaintiff's hiring was prompted by a request from Ms. Farrell, and Ms. Farrell also was one of the persons who approved her termination approximately six months later. (Dkt. No. 58, Attach. 25, at ¶¶ 5, 27 [Farrell Decl.].) Although it is unclear who precisely had the last authoritative say about Plaintiff's termination, Ms. Farrell's involvement in both Plaintiff's hiring and firing is a factor to consider in determining whether the evidence can be reasonably interpreted as raising an inference of discrimination based on age.

Unlike the national origin claim, which is unsupported by any evidence of statements made by Plaintiff's supervisors about her or other employee's national origins, there is a genuine dispute of material fact as to whether Ms. Pulcher made comments to Plaintiff about certain other employees being too old to do their jobs effectively. Plaintiff asserts that Ms. Pulcher made such comments, while Ms. Pulcher denies making such comments. It is undisputed that the two employees about whom Ms. Pulcher allegedly made the comments were at, near, or beyond retirement age, while Plaintiff was 45 at the time she was employed by Defendant. (Dkt. No. 58, Attach. 15, at 114-18 [Pl.'s Dep.] [testifying that Ms. Pulcher said that the employees in question did not know what they were doing and should have retired].) However, even if a fact finder were to accept Plaintiff's testimony that Ms. Pulcher made these comments, it would be insufficient to raise an inference of discrimination in light of all of the other evidence, including the fact that Ms. Farrell (who was not alleged to have made any comments about age) was personally aware of Plaintiff's work performance through working directly with her, and also signed Plaintiff's probationary evaluations and recommended her termination. Put another way, even if Ms. Pulcher had made comments suggesting possible age bias, those comments and any inference of discrimination on her part cannot be imputed to Ms. Farrell in the absence of evidence she was aware of any bias Ms. Pulcher may have held, particularly given that Ms. Farrell was directly and independently familiar with Plaintiff's performance issues. As a result, the Court finds that Plaintiff has not established that a reasonable fact finder could

2021 WL 3674745

conclude there was an inference of discrimination even if they resolved the issue about Ms. Pulcher's comments in Plaintiff's favor.

**\*19** In the alternative, even if a reasonable fact finder could conclude that Plaintiff was qualified and Ms. Pulcher's statements raised an inference of discrimination, denial of summary judgment is inappropriate here because Plaintiff cannot meet her ultimate burden to show that Defendant's proffered non-discriminatory explanation (i.e., that Plaintiff's performance was poor) was a pretext for discrimination. To establish a claim for discrimination under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Green*, 952 F.3d at 403 (citing *Gorzynski*, 596 F.3d at 106). In other words, Plaintiff's age does not need to have been the only consideration, but rather she still must show that she would not have been terminated without her age being considered. *Perez v. Cnty of Rensselaer, New York*, 14-CV-0950, 2018 WL 3420014, at \*4 (N.D.N.Y. July 13, 2018) (Sharpe, J.) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 [2d Cir. 2014]). A few isolated comments that were not even directed at Plaintiff are insufficient to allow a reasonable fact finder to conclude that Plaintiff's age was the but-for cause of her termination in light of all of the evidence discussed above related to Plaintiff's failure to show an inference of discrimination. No reasonable fact finder could conclude that Plaintiff would not have been terminated despite her performance reviews if not for her age.

Because Plaintiff cannot establish a prima facie case and cannot show that her age was the but-for cause of her termination, the Court grants Defendant's motion for summary judgment on this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims for national origin and age discrimination pursuant to Title VII and the ADEA are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 25) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3674745

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (4)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Brief for Defendant-Appellee**<br>Weili CAO-BOSSA, Plaintiff-Appellant, v. NEW YORK STATE DEPARTMENT OF LABOR, Defendant-Appellee, Lindsay Pulcher, Project Assistant, Associate Accountant; Kathleen A. Elfeldt, Director of Finance, Defendants.<br>2022 WL 4605871 |  | C.A.2 | Sep. 26, 2022 | Brief |
| **2.  Docket 23-7336**<br>WEILI CAO-BOSSA v. NEW YORK STATE DEPARTMENT OF LABOR | — | U.S. | Apr. 29, 2024 | Docket |
| **3.  Docket 21-2593**<br>Cao-Bossa v. New York State Department of L | — | C.A.2 | Oct. 13, 2021 | Docket |
| **4.  Docket 1:18-CV-00509**<br>Cao-Bossa v. New York State Department of Labor | — | N.D.N.Y. | Apr. 27, 2018 | Docket |

**History (9)**

**Direct History (5)**

🚩 1. Cao-Bossa v. New York State Department of Labor
2021 WL 3674745 , N.D.N.Y. , Aug. 19, 2021

*Supplemented by*

2. Cao-Bossa v. New York State Dep't of Labor
2021 WL 5321946 , N.D.N.Y. , Nov. 16, 2021

*AND Affirmed by*

3. Cao-Bossa v. New York State Department of Labor
2023 WL 2376071 , 2nd Cir.(N.Y.) , Mar. 07, 2023

*Certiorari Denied by*

4. Cao-Bossa v. New York State Department of Labor
144 S.Ct. 2593 , U.S. , May 28, 2024

*Rehearing Denied by*

5. Cao-Bossa v. New York State Department of Labor
144 S.Ct. 2724 , U.S. , July 22, 2024

**Related References (4)**
6. Cao-Bossa v. Pulcher
2018 WL 5262469 , N.D.N.Y. , May 03, 2018

*Report and Recommendation Adopted by*

7. Cao-Bossa v. Pulcher
2018 WL 3062583 , N.D.N.Y. , June 21, 2018

8. Cao-Bossa v. New York State Department of Labor
2019 WL 13115844 , N.D.N.Y. , May 14, 2019

9. Cao-Bossa v. New York State Dep't of Labor
2019 WL 2743505 , N.D.N.Y. , July 01, 2019

2022 WL 3444953

2022 WL 3444953
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Cheryl A. COULTER, Plaintiff,
v.
BARBEQUE INTEGRATED, INC., doing
business as Smokey Bones, Defendant.

5:20-CV-0533 (GTS/ATB)
|
Signed August 17, 2022

**Attorneys and Law Firms**

ANTHONY J. DiMARTINO, JR., ESQ., DiMARTINO LAW
OFFICE, Counsel for Plaintiff, Canal Commons, 28 West
Bridge Street, Oswego, NY 13126.

THOMAS B. CRONMILLER, ESQ., BARCLAY DAMON
LLP, Counsel for Defendant, 2000 Five Star Bank Plaza, 100
Chestnut Street, Rochester, NY 14604-2072.

#### DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

 **\*1**  Currently before the Court, in this personal injury
action filed by Cheryl A. Coulter ("Plaintiff") against
Barbeque Integrated, Inc., doing business as Smokey Bones
("Defendant"), is Defendant's motion for summary judgment.
(Dkt. No. 22.) For the reasons set forth below, Defendant's
motion is granted.

## I. RELEVANT BACKGROUND

### A. Summary of Complaint and Removal Thereof
Generally, Plaintiff's Complaint claims that Defendant was
negligent when it caused her to trip and fall over a "bunched
up" or "folded up" rug in the entrance to its restaurant
in Syracuse, New York, on the evening of April 1, 2017,
breaking her patella. (Dkt. No. 2.) Following the filing of
Plaintiff's Complaint in New York State Supreme Court
(Oswego County) on March 17, 2020, and service of that
Complaint on Defendant on April 10, 2020, Defendant
removed the Complaint to this Court based on diversity
jurisdiction on May 11, 2020. (Dkt. No. 1.) [1]

[1]

The Court finds that it has subject-matter
jurisdiction over this action because the parties are
diverse and the amount-in-controversy requirement
has been satisfied. The Complaint alleges that,
although Defendant "regularly conducts business
in New York State as a food and beverage
operation," Defendant is a "corporation organized
and existing pursuant to the laws of the State
of Delaware." (Dkt. No. 1, Attach. 3, at ¶ 2.)
Moreover, the Notice of Removal states that
"Barbeque Integrated is–and has been at all
times relevant to this action–a foreign corporation,
incorporated in the state of Delaware, with its
principal place of business located at 2999 NE 191
Street, Suite 500 Aventura, Florida 33180." (Dkt.
No. 1, at ¶ 8.) Finally, the Complaint alleges
that Plaintiff suffered a "broke[n] ... patella,"
"pain," and "emotional anguish," for which she
has incurred and continues to incur "medical
expenses." (Dkt. No. 1, Attach. 3, at ¶¶ 6-7.) *Cf.*
*Kurtz v. Uber Tech., Inc.*, 21-CV-6188, 2021 WL
4777973, at \*3 (S.D.N.Y. Oct. 13, 2021) (finding
amount-in-controversy satisfied where, although
the complaint did not specify the precise damages
sought, it alleged "a left knee patella fracture, a
forehead concussion, contusions of the arms and
leg, and right knee pain," and sought "damages to
compensate her for past, present, and future doctor
and hospital bills and for pain and suffering with
her injuries").

Granted, Defendant's Notice of Removal appears to have been
filed one day late. *See* 28 U.S.C. § 1446(b) ("The notice of
removal of a civil action or proceeding shall be filed within
30 days after the receipt by the defendant, through service
or otherwise, of a copy of the initial pleading setting forth
the claim for relief upon which such action or proceeding
is based, or within 30 days after the service of summons
upon the defendant if such initial pleading has then been filed
in court and is not required to be served on the defendant,
whichever period is shorter."). However, Plaintiff has not
sought remand. (*See generally* Docket Sheet.) Moreover,
more than thirty days have passed since the filing of the
Notice of Removal. *See Mitskovski v. Buffalo & Fort Erie
Pub. Bridge Auth.*, 435 F.3d 127, 131 (2d Cir. 2006) ("[A]
district court may not act to remand on its own motion more
than 30 days after removal in the absence of a party's timely
remand motion, and if it does so, a court of appeals may
review and correct the improper remand."); *Jimenez-Castro
v. Greenwich Ins. Co.*, 20-CV-9210, 2020 WL 7352505, at

2022 WL 3444953

*2 (S.D.N.Y. Dec. 15, 2020) ("A district court can remand *sua sponte* on procedural grounds within thirty (30) days of the filing of the notice of removal."). As a result, the Court will not *sua sponte* remand this action because of untimely removal.

## B. Summary of Parties' Arguments

**\*2** Generally, in support of its motion for summary judgment, Defendant asserts two arguments: (1) Plaintiff is unable to establish that the cause of her fall was the result of a defective or dangerous condition, because (a) Plaintiff testified she did not see the rug before her fall, (b) she has adduced no admissible record evidence that the rug was "folded up" or otherwise defective in some way before her fall, and (c) it is just as likely that some other factor, such as a misstep or a loss of balance, caused Plaintiff's trip-and-fall accident; and (2) even if Plaintiff's fall was caused by a defective or dangerous condition, Plaintiff is unable to establish that Defendant created or had actual or constructive notice of a defective or dangerous condition, because (a) she has adduced no admissible record evidence that Defendant's employees had been informed by patrons (before the incident) of people having tripped on the rug, and (b) in any event, she has adduced no admissible record evidence that any defective or dangerous condition existed for a sufficient length of time before the accident to enable Defendant to correct it. (Dkt. No. 22, Attach. 5.)

Generally, in opposition to Defendant's motion, Plaintiff asserts three arguments: (1) she has adduced admissible record evidence from which a rational fact finder could conclude that her fall was the result of a defective or dangerous condition, because (a) she testified in her deposition that immediately before her fall she felt her right foot "catch the rug" in question, and (b) Ms. Vosseller testified in an affidavit that immediately after the fall she noticed the "folded up carpet" beneath Plaintiff; (2) Plaintiff has adduced admissible record evidence from which a rational fact finder could conclude that Defendant had constructive notice of the defective or dangerous condition, because (a) the aforementioned evidence establishes that the folded-up rug was in the entrance way of Defendant's restaurant, and (b) both Plaintiff and Ms. Vosseller have testified that two other patrons stated that they had witnessed other people trip over the "bunched up" rug before Plaintiff's fall; and (3) Defendant has failed to establish that Plaintiff "cannot produce admissible evidence to support the fact [in question]" under Fed. R. Civ. P. 56(c)(1)(B), because the statements in question are admissible under Fed. R. Evid.

803(1) (providing a hearsay exception for "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it") and/or Fed. R. Evid. 803(2) (providing a hearsay exception for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"). (Dkt. No. 25, Attach. 1.)

Generally, in its reply memorandum of law, Defendant asserts two arguments: (1) Plaintiff has failed to provide any evidence as to the cause of her fall, because (a) her purported "Response to Defendant's Statement of Material Fact" is defective in that it fails to specifically respond to Defendant's factual assertions, and (b) in any event, Plaintiff's reliance on the testimony of Ms. Vosseller is misplaced in that she did not notice the rug being "folded up" until *after* the fall; and (2) Plaintiff submits inadmissible hearsay that is unable to defeat a motion for summary judgment, because (a) she has made no showing that the unidentified man and woman upon whom she relies will be made available to testify at trial, and (b) in any event, even if the statements of the man and woman were admissible at trial, those statements do not establish how long before Plaintiff's fall the defective or dangerous condition existed (or even if the condition was the same as the condition that caused Plaintiff's fall). (Dkt. No. 26.)

## C. Statement of Undisputed Material Facts

Except otherwise noted,[2] the following factual assertions have been asserted (and supported by specific citations to the record) by Defendant in its Statement of Material Facts, and not expressly denied by Plaintiff in matching numbered paragraphs (followed by specific citations to the record) in a Response to the Statement of Material Facts, as required by Local Rule 56.1 of the District's Local Rules of Practice.

[2]    The Court qualifies its recitation of undisputed material facts with the prefatory phrase "except otherwise noted," because it has added to Defendant's Statement of Material Facts a few factual assertions that it has deemed to be undisputed by the parties based on the Court's ordinary review of the record to determine whether Defendant's factual assertions have indeed been supported by the record. Although the Court has no duty to *sua sponte* scour the record for material evidence, it will not turn a blind eye to such evidence that it comes across. *See, e.g., Toscano v.*

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 165 of 531

Coulter v. Barbeque Integrated, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3444953

*Petsmart, Inc.*, 16-CV-0587, 2018 WL 813633, at *1 (N.D.N.Y. Feb. 9, 2018) (Suddaby, C.J.).

**\*3** Instead, Plaintiff has filed a purported "Response to Defendant's Statement of Material Facts" that is defective in three ways: (1) it contains only twelve paragraphs (not the twenty-five paragraphs contained in Defendant's Statement of Material Facts); (2) it does not *match* Defendant's paragraphs; (3) it does not expressly "admit" or "deny" any of Defendant's factual assertions. (*Compare* Dkt. No. 22, Attach. 6 [Def.'s Statement of Material Facts] *with* Dkt. No. 25, Attach. 2 [Plf.'s Response Thereto].)[3] Under these circumstances, the Court may, and does, disregard Plaintiff's purported "Response to Defendant's Statement of Material Facts."

[3]     Compounding Plaintiff's error, Defendant has filed (along with its reply memorandum of law) a "Response to Plaintiff's Statement of Material Facts," as if Plaintiff had filed a cross-motion for summary judgment, which she clearly had not. (*Compare* Dkt. No. 26, Attach. 1 [Def.'s "Response to Plaintiff's Statement of Material Facts"] *with* Dkt. No. 25 [Plf.'s Opposition to Def.'s Motion for Summary Judgment].) Both counsel are respectfully reminded to not simply read but carefully comply with Local Rule 56.1 in the future.

1. Plaintiff is an individual who resides at 231 Kingdom Road, Oswego, New York 13126.

2. Defendant is a food service company that owns and operates a chain of restaurants at several locations, including the restaurant located at 4036 State Route 31, Liverpool, New York 13090 ("the Restaurant").

3. Plaintiff seeks damages for personal injuries she allegedly sustained as a result of a trip-and-fall accident when she walked through the foyer of Defendant's Restaurant on Saturday, April 1, 2017.

4. The Restaurant has a single entrance accessible to the general public.

5. Inside the single entrance to the Restaurant is a foyer that leads to a second door, which leads to a greeter stationed to address reservations and coordinate seating within the Restaurant.

6. On Saturday, April 1, 2017, at about 7:00 p.m., Plaintiff and her daughter, Jessica Vosseller, arrived at the Restaurant for dinner.

7. Upon approaching the entryway from the parking lot, Ms. Vosseller pulled open the door and held it for Plaintiff, who then entered; as she did so, she noticed that there were at least twenty people sitting and standing on the sides of the foyer, waiting for their tables.

8. Because of the crowd, Plaintiff estimated there was about a four-foot wide path to towards the greeter station.

9. With Ms. Vosseller following behind her, Plaintiff walked about three to four feet into the foyer and then fell.

10. Plaintiff fell within about ten feet of the greeter at the greeter station.[4]

[4]     (Dkt. No. 25, Attach. 3, at ¶ 10 [Affid. of Jessica Vosseller].)

11. Before she fell, Plaintiff felt the toes of her right foot "catch the rug."

12. As she fell, Plaintiff's right knee hit the ground, and she came to rest on her hands and knees.

13. At the time, Plaintiff's hands were on tile or stone (not a rug or carpet), and her knees were (she believes) also on tile or stone.

14. After landing on her hands and knees, Plaintiff did not look back to observe a rug or carpet.

15. However, *immediately after Plaintiff fell*, Ms. Vosseller observed a folded-up rug or carpet beneath Plaintiff.[5]

[5]     (Dkt. No. 25, Attach. 3, at ¶ 5 [Affid. of Jessica Vosseller].)

16. Ms. Vosseller yelled to Defendant's manager to move the rug.[6]

[6]     (Dkt. No. 22, Attach. 3, at 11 [attaching page "36" of Examination Before Trial of Plaintiff]; Dkt. No. 25, Attach. 5, at 8 [attaching page "11" of Examination Before Trial of Dolores Fullerton].)

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 166 of 531
Coulter v. Barbeque Integrated, Inc., Not Reported in Fed. Supp. (2022)
2022 WL 3444953

17. Plaintiff was on her hands and knees for about four minutes before someone (who she believes was her daughter) helped her up.

 **\*4** 18. By the time Plaintiff was helped up, Defendant's manager on duty that evening, Dolores "Dee" Fullerton, had come over (having been informed of the incident by a greeter). [7] Ms. Fullerton asked Plaintiff whether she was okay and whether she needed Ms. Fullerton to do anything for her. Ms. Vosseller answered for Plaintiff and requested that Ms. Fullerton remove the rug.

[7]    (Dkt. No. 25, Attach. 5, at 8 [attaching page "11" of Examination Before Trial of Dolores Fullerton].)

19. Plaintiff then sat down on a bench in the foyer and was provided a pack or bag of ice by Ms. Fullerton.

20. Approximately fifteen to twenty minutes later, Plaintiff and Ms. Vosseller were seated at a table.

21. As Plaintiff sat on the bench, Ms. Vosseller heard a gentleman who witnessed the fall state that "the carpet was bunched up prior to [the] fall." [8]

[8]    (Dkt. No. 25, Attach. 3, at ¶ 8 [Affid. of Jessica Vosseller]; Dkt. No. 25, Attach. 4, at 11 [attaching page "37" of Examination Before Trial of Plaintiff].) Although Defendant challenges the admissibility of this statement, the Court rejects that challenge for the reasons stated below in Part III of this Decision and Order. However, the Court is persuaded by Defendant's challenge to the admissibility of the following other hearsay statements: (1) Plaintiff's deposition testimony that, after her accident (e.g., as she was sitting on the bench), "[t]wo different people" (a man and a woman) told her that they had "watched many people trip over that rug"; and (2) Ms. Vosseller's affidavit testimony that, immediately after the fall, "a woman stated that other people tripped over the same rug prior to [the] fall." (Dkt. No. 25, Attach. 4, at 11 [attaching page "37" of Examination Before Trial of Plaintiff]; Dkt. No. 22, Attach. 3, at 12 [attaching page "38" of Examination Before Trial of Plaintiff]; Dkt. No. 25, Attach. 3, at ¶ 9 [Affid. of Jessica Vosseller].)

22. Plaintiff did not observe the condition of the rug or carpet before her fall.

23. According to Plaintiff, even after her fall, she "did not realize there was a rug."

24. At the time, Plaintiff surmised that she tripped over a rug because, in her own words, "it felt like a rug when [she] went down" and it "felt like [she] tripped over a rug."

25. Plaintiff has no knowledge of Defendant's employees having been informed by patrons (before the incident) of people having tripped on the rug.

26. Ms. Fullerton has worked continuously (except for one year) at the Restaurant since February of 2005 and has served as its General Manager for seven or eight years, including on April 1, 2017.

27. Ms. Fullerton was present at the restaurant on April 1, 2017, from approximately 8:00 a.m. through 8:30 p.m. or 9:00 p.m., including at the time that Plaintiff fell.

28. Ms. Fullerton never observed, or was told of, any falls on the rug or carpet in the foyer that Plaintiff claimed to have tripped over, before Plaintiff's fall on April 1, 2017.

29. Ms. Fullerton never observed or was told of any defective or dangerous conditions associated with the carpet or rug prior to Plaintiff's fall on April 1, 2017, including, but not limited to, that the rug was curled up, creased, or folded over, or was known to slide or move.

30. Ms. Fullerton never received or was told of any complaints from the Restaurant's patrons regarding the condition of the rug or carpet before Plaintiff's fall on April 1, 2017.

## II. GOVERNING LEGAL STANDARDS

### A. Procedural Legal Standard
 **\*5**  Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [9] As for the materiality requirement, a

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 167 of 531

Coulter v. Barbeque Integrated, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3444953

dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

9        As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [10]

10        *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Sullivan, J.) (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [11]

11        Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [12] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

12        *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 168 of 531

Coulter v. Barbeque Integrated, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3444953

to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

### B. Substantive Legal Standard

**\*6** To "establish a prima facie case of negligence under New York law, three elements must be demonstrated: (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998). As a result, an owner or occupant of a commercial establishment has "a general duty to maintain [the establishment] in a reasonably safe condition so as to prevent the occurrence of foreseeable injuries." *Maravalli v. Home Depot, U.S.A., Inc.*, 266 A.D.2d 437, 698 N.Y.S.2d 708, 708-09 (N.Y. App. Div., 2d Dep't 1999). [13] More specifically, to impose this duty on a defendant the plaintiff must show two things: (1) that the alleged dangerous condition existed; [14] and (2) either (a) that the defendant created the dangerous condition, [15] or (b) that both (i) the owner or occupant had actual or constructive notice of the dangerous condition, [16] and (ii) the dangerous condition existed for a sufficient period of time so as to charge the owner or occupant with the responsibility to take corrective action. [17]

[13]    The Court notes that foreseeability is often the essence of such a duty. *See, e.g., Lisi v. MRP Holdings, Inc.*, 238 A.D.2d 316, 317, 656 N.Y.S.2d 293 (N.Y. App. Div., 2d Dep't 1997) (finding that store had no duty to customer who was injured when she was knocked to the floor by a dog that was running loose in the store); *Miller v. City of Syracuse*, 258 A.D.2d 947, 685 N.Y.S.2d 531, 532 (N.Y. App. Div., 4th Dep't 1999) (finding the presence of nonticketed individuals in an airport baggage claim area carrying balloon strings in which plaintiff's crutches became entangled did not constitute a foreseeable danger).

[14]    *See, e.g., Ribadi v. Atl. & Pac. Tea Co., Inc.*, 268 A.D.2d 418, 702 N.Y.S.2d 316, 317 (N.Y. App. Div., 2d Dep't 2000) (requiring the existence of a "dangerous condition" in a slip-and-fall case, and finding such a condition existed in the form of a

"rolled up" carpet in the produce aisle of a grocery store).

[15]    *See, e.g., Ribadi v*, 702 N.Y.S.2d at 317 (granting defendant's motion for summary judgment because plaintiff failed to prove that defendant created the alleged dangerous condition, which was a "rolled up" carpet in the produce aisle).

[16]    *See, e.g., Ribadi v.* 702 N.Y.S.2d at 317 ("A plaintiff in a slip-and-fall case must establish that the defendant either created the condition that caused the accident or had actual or constructive notice of the condition....") (internal citations omitted).

[17]    *See Gordon v. Am. Museum of Nat. History*, 67 N.Y.2d 836, 837-38, 501 N.Y.S.2d 646, 492 N.E.2d 774 (N.Y. 1986) ("[A] defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it....") (internal citations omitted), *accord, Ribadi v.* 702 N.Y.S.2d at 317.

## III. ANALYSIS

As indicated above in Part II.B. of this Decision and Order, the Court's analysis begins with the question of whether a dangerous condition existed at the time of Plaintiff's fall. After carefully considering the matter, the Court finds that admissible record evidence exists that, before Plaintiff's fall, a dangerous condition did indeed exist in the form of a "bunched up" or "folded up" carpet or rug in the entrance to Defendant's restaurant. [18]

[18]    Not surprisingly, a "bunched up" rug has been treated as a dangerous condition by New York State courts. *See, e.g., Richardson-Dorn v. Golub Corp.*, 252 A.D.2d 790, 676 N.Y.S.2d 260, 261-62 (N.Y. App. Div., 3d Dep't 1998) (treating a "bunched up" rug as a dangerous condition); *cf. Denker v. Century 21 Dep't Stores, LLC*, 55 A.D.3d 527, 866 N.Y.S.2d 681, 682 (N.Y. App. Div., 2d Dep't 2008) (treating "curled" edge of carpet mat as a dangerous condition); *Ribadi*, 702 N.Y.S.2d at 317 (treating a "rolled up" carpet as a dangerous condition).

Granted, the Court agrees with Defendant that Plaintiff's testimony that she felt the toes of her right foot "catch the rug," and Ms. Vosseller's testimony that she observed the "folded up" rug or carpet immediately after Plaintiff's fall, do

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 169 of 531

Coulter v. Barbeque Integrated, Inc., Not Reported in Fed. Supp. (2022)

2022 WL 3444953

not make it more likely than not that a dangerous condition exited before the fall: absent other evidence, this testimony could just as likely lead to the conclusion that Plaintiff's manner of walking caused her foot to catch the rug, and that her catching of the rug caused it to "fold[ ] up." *See* Fed. R. Evid. 401 ("Evidence is relevant if ... it has any tendency to make a fact more or less probable than it would be without the evidence...."). However, there is such other evidence: Ms. Vosseller's affidavit testimony that, minutes after the fall, a gentleman who witnessed the fall stated that "the carpet was bunched up prior to [the] fall." (Dkt. No. 25, Attach. 3, at ¶ 8 [Affid. of Jessica Vosseller].) [19]

[19]    The Court notes that Ms. Vosseller's affidavit testimony that, immediately after the fall, "a woman stated that other people tripped over the same rug prior to [the] fall" does not constitute such evidence because the woman did not indicate that the dangerous condition had been the same: for example, she did not state that the "other people" had tripped over the rug "the same way" or "for the same reason" as Plaintiff, or "because it had been bunched up." (Dkt. No. 25, Attach. 3, at ¶¶ 8-9 [Affid. of Jessica Vosseller].) Similarly, Plaintiff's deposition testimony that, after her fall (e.g., as she was sitting on the bench), "[t]wo different people" (a man and a woman) told her that they had "watched many people trip over that rug" does not constitute such evidence for the same reason. (Dkt. No. 25, Attach. 4, at 11 [attaching page "37" of Examination Before Trial of Plaintiff]; Dkt. No. 22, Attach. 3, at 12 [attaching page "38" of Examination Before Trial of Plaintiff].) For example, the others could have tripped because the rug was frayed or torn. *See, e.g., Rekemeyer v. Knickerbocker Furniture Co., Inc.*, 222 A.D.2d 873, 635 N.Y.S.2d 320, 320-21 (N.Y. App. Div., 3d Dep't 1995) (treating "a rip in the carpet" as a dangerous condition).

**\*7**  Although Defendant is correct that this statement is hearsay under Fed. R. Evid. 801, Defendant has not persuaded the Court that it is inadmissible hearsay. To the contrary, the testimony is admissible as a statement by the gentleman describing the bunched-up condition of the rug during the instant before Plaintiff's fall, made immediately after the gentleman perceived that condition. *See* Fed. R. Evid. 803(1) (providing a hearsay exception for "[a] statement describing or explaining an event or condition, made while

or immediately after the declarant perceived it"). [20]  The immediacy requirement has been satisfied because admissible evidence exists that the gentleman made the statement as he and Plaintiff sat on a bench about four minutes after he perceived the condition (and Plaintiff's fall). *See, e.g., U.S. v. Lovato*, 950 F.3d 1337, 1345 (10th Cir. 2020) ("[T]he three to four-minute delay between the shooting and first descriptive statements did not destroy the necessary contemporaneity.").

[20]    The Court notes that the statement would *not* be admissible as an excited utterance under Fed. R. Evid. 803(2) (providing a hearsay exception for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"), given the lack of any suggestion that the gentleman was excited. For example, no curse word preceded, or exclamation point followed, his factual assertion, which could as easily have come in the form of a meditative whisper as a declaration of outrage.

Moreover, the Court is not persuaded that, under the circumstances, the gentleman need be identified and available at trial for this present sense impression to be admissible. Granted, generally, courts are hesitant to admit the present sense impression of an unidentified bystander. [21]  However, here, based on the evidence, it is reasonable to infer that the gentleman was one of the at least twenty people sitting or standing on the sides of the foyer at the time of Plaintiff's fall, and that he observed both the fall and rug only a few feet away from him as he waited for his table. Furthermore, Defendant has not challenged the gentleman's capacity to observe. Finally, the Court is not persuaded that the gentleman need be available at trial for this present sense impression to be admissible. *See, e.g., Lovato*, 950 F.3d at 1345 ("Under Rule 803(1), a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it is admissible as an exception to the rule against hearsay, *regardless of whether the declarant is available as a witness*.") (internal quotation marks omitted, and emphasis added).

[21]    *Cf.* Fed. R. Evid. 803(1), Advisory Committee's Note ("However, when declarant is an unidentified bystander, the cases indicate hesitancy in upholding the statement alone as sufficient [to demonstrate that the declarant actually perceived the incident].").

The next questions that arise, then, are whether Defendant *created* the dangerous condition, and (if it did not) whether Defendant had *actual* notice of the dangerous condition. The Court need not linger on these questions. No evidence (or even argument) has been adduced that Defendant created the dangerous condition. (*See generally* Dkt. Nos. 22, 25.) Nor has any evidence (or even argument) been adduced that Defendant had actual notice of the dangerous condition. (*Id.*)

The question then becomes whether any evidence was adduced that Defendant had *constructive* notice of the dangerous condition. After carefully considering the matter, the Court finds that the only possible evidence of such constructive notice is the fact that, at the time of the accident, the greeter was present at the greeter station only ten feet away from the accident. [22] However, it does not appear that the mere proximity of the greeter to the offending rug would suffice to give rise to constructive notice to Defendant under the circumstances. [23] For example, the fact that there were at least 20 people sitting and standing on the sides of the foyer, waiting for their tables, leaving only about a four-foot wide path between them, suggests the greeter may have been busy attending to other patrons or had his or her view of the rug obstructed.

[22]    The Court notes that Ms. Vosseller's affidavit testimony that, immediately after the fall, "a woman stated that other people tripped over the same rug prior to [the] fall" does not suffice for each of two alternative reasons: (1) the woman did not state that the "other people" had tripped over the rug the "same way" or "for the same reason" as Plaintiff, or because the rug had been "bunched up"; and (2) in any event, the woman did not state *when* the "other people" had tripped over the "bunched up" rug (e.g., fifteen minutes before Plaintiff's fall or years before Plaintiff's fall). (Dkt. No. 25, Attach. 3, at ¶¶ 8-9 [Affid. of Jessica Vosseller].) Similarly, Plaintiff's deposition testimony that, after her fall (e.g., as she was sitting on the bench), "[t]wo different people" (a man and a woman) told her that they had "watched many people trip over that rug" does not suffice for the same two alternative reasons. (Dkt. No. 25, Attach. 4, at 11 [attaching page "37" of Examination Before Trial of Plaintiff]; Dkt. No. 22, Attach. 3, at 12 [attaching page "38" of Examination Before Trial of Plaintiff].) In any event, "a general

awareness that ... floor mats occasionally bunch is insufficient by itself to constitute notice of a dangerous condition...." *Hughes v. Carrols Corp.*, 248 A.D.2d 923, 670 N.Y.S.2d 610, 611 (N.Y. App. Div., 3d Dep't 1998) (citations omitted).

[23]    *See, e.g., Ortiz v. Wal-Mart Stores East, LP*, 17-CV-0945, 2019 WL 1171566, at *7 (S.D.N.Y. March 13, 2019) ("While Plaintiff is correct that there is evidence that there were three of Defendant's employees in the area of the dangerous condition prior to the accident ..., this alone is not enough to show that Defendant had constructive notice."); *Gonzalez v. Kmart Inc.*, 13-CV-5910, 2016 WL 3198275, at *5 (E.D.N.Y. June 8, 2016) ("The mere fact that a Kmart employee may have been close to the spill at the time Plaintiff fell is insufficient to create an inference that the employee saw the spill before the accident...."); *Hammond-Warner v. United States*, 797 F. Supp. 207, 212 (E.D.N.Y. 1992) ("[T]he mere proximity of employees is insufficient grounds on which to establish constructive notice."); *Beware v. Big V Supermarkets, Inc.*, 177 A.D.2d 846, 576 N.Y.S.2d 461, 463 (N.Y. App. Div., 3d Dep't 1991) ("[T]he fact that certain of defendant's employees were stationed near the site of the accident does not suffice to establish constructive notice....") (citation omitted).

**\*8**  In any event, and most importantly, even if this evidence were to suffice, no admissible evidence exists that the dangerous condition existed long enough for any employee of Defendant (whether that be the greeter, Ms. Fullerton, or someone else) to *remedy* the dangerous condition (e.g., through smoothing out the rug and installing non-skid material under it, or removing the rug and hanging up a warning sign, etc.). For example, if the "bunch[ing] up" occurred mere minutes or seconds before Plaintiff's fall (and it is mere speculation that it did not), a reasonable amount of time would not have existed for Defendant to remedy the dangerous condition. [24] It bears emphasizing that, despite how much sympathy the Court may have for Plaintiff, under the law Defendant is not strictly liable for her injuries.

[24]    *See, e.g., Gordon v. Am. Museum of Nat. Hist.*, 67 N.Y.2d 836, 838, 501 N.Y.S.2d 646, 492 N.E.2d 774 (N.Y. 1986) (granting museum's motion for summary judgment because, "on the evidence presented, the piece of paper that caused plaintiff's

2022 WL 3444953

fall could have been deposited there only minutes or seconds before the accident and any other conclusion would be pure speculation"); *accord, Soto v. Michael's New York, Inc.*, 282 A.D.2d 300, 723 N.Y.S.2d 454, 455 (N.Y. App. Div., 1st Dep't 2001) (granting landlord's motion for summary judgment because "the wetness that allegedly caused plaintiff's [slip and fall] accident could have been left on the stairs only minutes or seconds before the accident and any other conclusion would be pure speculation") (internal quotation marks and citation omitted).

For all of these reasons, the Court must, and does, grant Defendant's motion.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 22) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 2) is **DISMISSED**; and it is further

**ORDERED** that the Clerk of Court shall enter a Judgment for Defendant and close this action.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3444953

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings (2)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 22-2034**<br>Coulter v. Barbeque Integrated, Inc. | — | C.A.2 | Sep. 15, 2022 | Docket |
| **2.  Docket 5:20-CV-00533**<br>Coulter v. Barbeque Integrated, Inc. | — | N.D.N.Y. | May 11, 2020 | Docket |

**History (2)**

**Direct History (2)**

1. Coulter v. Barbeque Integrated, Inc.
   2022 WL 3444953 , N.D.N.Y. , Aug. 17, 2022

*Appeal Withdrawn by*

2. Coulter v. Barbeque Integrated, Inc. 🖙
   2022 WL 19005660 , 2nd Cir. , Dec. 19, 2022

Constitution Pipeline Company, LLC v. Permanent..., Not Reported in Fed....

2022 WL 61316

2022 WL 61316
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

CONSTITUTION PIPELINE
COMPANY, LLC, Plaintiff,

v.

A PERMANENT EASEMENT FOR 1.06 ACRES
and a Temporary Easement for 0.99 Acres in Afton,
Chenango County, New York, Tax Parcel Number
290.-1-11.1, and Stephen J. Gabaly, et al., Defendants.

Case No. 1:14-CV-2112 (NAM/DJS)
|
Signed 01/05/2022
|
Filed 01/06/2022

**Attorneys and Law Firms**

Elizabeth U. Witmer, Esq., Sean T. O'Neill, Esq., Saul Ewing
Arnstein & Lehr LLP, 1200 Liberty Ridge Drive, Suite 200,
Wayne, PA 19087, Attorneys for Plaintiff.

Stephen J. Gabaly, 128 McFall Road, Apalachin, NY 13732,
Defendant.

**MEMORANDUM-DECISION & ORDER**

Norman A. Mordue, Senior United States District Judge:

**I. INTRODUCTION**

 **\*1** Now before the Court is Plaintiff Constitution Pipeline
Company, LLC's Motion for Summary Judgment on the issue
of just compensation owed to Defendant Stephen J. Gabaly.
(Dkt. No. 28). Defendant was personally served with the
motion, but he has not responded. (Dkt. No. 29). Indeed,
Defendant has not appeared in this action at all.

**II. BACKGROUND**

**A. Procedural History**

Plaintiff commenced this action in 2014 by seeking
condemnation of numerous properties owned by landowner
Defendants in this case and others, for the purpose of
constructing a natural gas pipeline (the "Pipeline Project").

(Dkt. No. 1). On February 21, 2015, the Court granted
Plaintiff's motions for partial summary judgment and a
preliminary injunction, thereby giving Plaintiff a permanent
right of way and easement on Defendants' properties for
the pipeline, as well as temporary easements for pipeline
construction and maintenance. (Dkt. Nos. 16, 17, 20). Plaintiff
also posted bonds as security for the payment of just
compensation to Defendants. (*Id.*). However, the Pipeline
Project was later abandoned, and it is now permanently
cancelled. (*See* Dkt. No. 24). Therefore, on September 17,
2020, the Court dissolved the injunction for the pipeline,
vacated the related orders, and ordered that all cases proceed
to trial on the issue of compensation due to the landowners
for the taking that occurred. (Dkt. No. 33).

**B. Undisputed Facts** [1]

[1]    Because Defendant has not responded to Plaintiff's
       Statement of Material Facts, the facts herein are
       deemed admitted to the extent they are supported
       by the record. *See* N.D.N.Y. L.R. 7.1(a)(3).

Plaintiff had a possessory interest for Rights of Way on 2.05
acres of Defendant's 53.81-acre property from March 3, 2015
until the dissolution of the injunction for the Pipeline Project
on September 17, 2020 (the "Temporary Taking"). (Dkt. No.
28-2, ¶¶ 10, 16). Thereafter, Plaintiff obtained an appraisal
of the property from CNY Pomeroy Appraisers, Inc. which
determined that: 1) the Temporary Taking had no impact on
the market value of the property, which remained at $97,000
for the entire 53.81 acres; and 2) the fair rental value of the
2.05-acre portion of land subject to the Temporary Taking was
$2,200 at its highest and best use. (*Id.*, ¶¶ 17–18) (citing Dkt.
No. 28-8). The fair rental value was calculated as 10% of the
market value of the property ($1,800 per acre) per year. (*Id.*,
¶ 17). The professional appraisal was provided to Defendant,
who did not respond or counter with any other figure. (*Id.*,
¶¶ 17–18). Defendant also failed to respond to Requests for
Admission on the issue of compensation, thereby admitting
the above facts, and further, that the Temporary Taking did not
cause any other harm, loss, or damages to him or his property.
(*Id.*) (citing Dkt. Nos. 28-9, 28-10).

**III. STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), summary
judgment may be granted only if all the submissions, taken
together, "show that there is no genuine issue as to any

2022 WL 61316

material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**\*2** If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

## IV. DISCUSSION

Plaintiff argues that it is entitled to summary judgment on the issue of just compensation because there is no genuine issue of material fact as to the measure and amount of just compensation owed to Defendant. (Dkt. No. 28-3). Specifically, Plaintiff contends that Defendant is only owed compensation for the fair rental value of the property subject to the Temporary Taking, a sum of $2,200. (*Id.*, pp. 11–15).

Typically, the measure of just compensation in a partial taking case is "the difference between the value of the land before the taking and its value after the taking." *U.S. v. 25.202 Acres of Land and building affixed to land located in Town of Champlain, Clinton County, N.Y.*, 860 F. Supp. 2d 165, 179 (N.D.N.Y. 2010). But in the case of a *temporary* taking, the usual measure of just compensation is "the fair rental value of the property for the period of the taking." *Yuba Nat. Resources, Inc. v. U.S.*, 904 F.2d 1577, 1581 (Fed. Cir. 1990) (citing cases).

Here, the undisputed facts show that 2.05 acres of Defendant's property was subject to a Temporary Taking from March 3, 2015 until September 17, 2020—when the Pipeline Project was abandoned and the related injunction dissolved. The undisputed facts further show that the fair rental value of this property for the period of the Temporary Taking was $2,200, and that the Temporary Taking had no impact on the market value of the property as a whole. Defendant has not submitted any evidence of harm, loss, or damages caused by the Temporary Taking.

Accordingly, the Court finds that Plaintiff is entitled to judgement as a matter of law as to the measure and amount of just compensation owed to Defendant—that being $2,200 as the appraised fair rental value of the 2.05-acre portion of Defendant's property subject to Plaintiff's Temporary Taking for the Pipeline Project.

## V. CONCLUSION

Wherefore, it is hereby

**ORDERED** Plaintiff's Motion for Summary Judgment (Dkt. No. 28) is **GRANTED**; and it is further

**ORDERED** that Judgment is entered against Plaintiff Constitution Pipeline Company, LLC and in favor of Defendant Stephen J. Gabaly in the amount of $2,200, as just compensation for the taking that occurred in connection with the condemnation in this action; and it is further

**ORDERED** that Plaintiff shall provide confirmation that payment has been tendered to Defendant, at which time the Judgment shall be marked as satisfied, the bond that was posted shall be released, and the case closed; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision & Order on the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2022 WL 61316

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:14-CV-02112**<br>Constitution Pipeline Company, LLC v. A Permanent Easement for 1.06 Acres and Temporary Easement for 0.99 Acres in Afton, Chenango County, New York, Tax Parcel Number 290.-1-11.1 et al | — | N.D.N.Y. | Dec. 24, 2014 | Docket |

**History**

There are no History results for this citation.

2008 WL 4936821
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mandrell McCANTS, Plaintiff,
v.
L. CANNON, Correction Officer, Great Meadow
Correctional Facility; Murray, Sergeant, Great Meadow
Correctional Facility; Prevost, Correction Officer,
Great Meadow Correctional Facility, Defendants.

No. 9:08-CV-616 (LEK/DEP).
|
Nov. 18, 2008.

West KeySummary

1    Civil Rights  🔑  Criminal Law Enforcement;
     Prisons

     State inmate's claim alleging deprivation of
     his civil rights could be dismissed for
     failure to exhaust remedies under the Prison
     Litigation Reform Act. While inmate did
     file a grievance addressing his claims now
     raised, he did not pursue all steps required to
     exhaust the internal grievance process before
     commencing this action. Therefore, this suit was
     premature. 42 U.S.C.A. § 1983; Civil Rights
     of Institutionalized Persons Act, § 7(a), 42
     U.S.C.A. § 1997e(a).

**Attorneys and Law Firms**

Mandrell McCants, Alden, NY, pro se.

HON. Andrew Cuomo, Office of the Attorney General, State
of New York, Michael G. Mccartin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on October 22, 2008, by the
Honorable David E. Peebles, United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the
Northern District of New York. Report-Rec. (Dkt. No. 25).

Within ten days, excluding weekends and holidays, after a
party has been served with a copy of a Magistrate Judge's
Report-Recommendation, the party "may serve and file
specific, written objections to the proposed findings and
recommendations," FED. R. CIV. P. 72(b), in compliance with
L.R. 72.1. No objections have been raised in the allotted time
with respect to Judge Peebles's Report-Recommendation.
Furthermore, after examining the record, the Court has
determined that the Report-Recommendation is not subject to
attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 25)
is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it
is further

**ORDERED,** that the Defendants' Motion to Dismiss for
failure to state a cause of action (Dkt. No. 20) is **GRANTED;**
and it is further

**ORDERED,** that the Plaintiff's Amended Complaint
(Dkt. No. 16) is **DISMISSED without prejudice** to
renewal following complete exhaustion of available internal
administrative remedies; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all
parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Mandrell McCants, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983,
alleging deprivation of his civil rights. In his complaint,
McCants contends that he was beaten by the three corrections
workers named as defendants in his action, in violation
of the Eighth Amendment's protection against cruel and

2008 WL 4936821

unusual punishment, and seeks recovery of compensatory and punitive damages as a result of the incident.

Currently pending before the court is a motion filed on behalf of the defendants requesting dismissal of plaintiff's complaint based upon his failure to fully exhaust available, internal administrative remedies prior to commencing the action. Because it appears clear from plaintiff's complaint that this action was commenced prior to his pursuit to completion of a grievance regarding the matter, and thus he has not met the exhaustion requirement of 42 U.S.C. § 1997e(a), I respectfully recommend that defendants' motion be granted.

## I. *BACKGROUND* [1]

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964).

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services (the "DOCS"); at the times relevant to his claims, McCants was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 16). Plaintiff alleges that on March 28, 2008, while in line for lunch at the prison, he was the subject of a random pat frisk conducted by defendant Cannon, a corrections officer, resulting in the discovery of a "black tape". *Id.* § 6. During the course of an ensuing investigation regarding his possession of the tape, plaintiff was slapped, punched, and kicked by defendant Cannon as well as his two co-defendants, Corrections Sergeant Murray and a third individual originally named as John Doe, but later identified as Corrections Officer Prevost, without provocation, resulting in his suffering of injuries requiring medical treatment, including seven stitches. *Id.* §§ 3, 6, 7.

## II. *PROCEDURAL HISTORY*

 *2   Plaintiff commenced this action on June 9, 2008 and, following the entry of an order conferring *in forma pauperis* status and the filing of a dismissal motion on behalf of the defendants, submitted an amended complaint as a matter

of right on September 4, 2008. *See* Dkt. Nos. 1, 4, 14, 16. In lieu of answering plaintiff's amended complaint, defendants instead have sought dismissal of plaintiff's claims by motion filed on October 7, 2008, based upon his failure to fully exhaust available administrative remedies before commencing suit. Dkt. No. 20. Despite passage of the deadline for doing so, plaintiff has failed to respond to defendants' motion, which is therefore now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Standard of Review* [2]

[2]    Defendants' motion is also brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, suggesting their belief that the court lacks jurisdiction over plaintiff's claims. *See* Dkt. No. 20. It is clear that failure to satisfy the exhaustion of remedies requirement of 42 U.S.C. § 1997(e)(a) represents an affirmative defense which is subject to waiver, and that the provision is neither jurisdictional, nor does it impose a threshold pleading requirement which must be met by an inmate plaintiff. *Jones v. Bock,* 549 U.S. 199, ----, 127 S.Ct. 910, 921, 166 L.Ed.2d 798 (2007). I have therefore not considered this portion of defendants' motion, and instead will determine whether the court is currently positioned to find that plaintiff's complaint, on its face, fails to state a claim upon which relief may be granted, given that the defendants have invoked failure to exhaust as a defense.

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson,* 127 S.Ct.

at 2200 (quoting *Twombly,* 127 S.Ct. at 1964) (quotations and citations omitted); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is ultimately likely to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (quotations and citations omitted) Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' "). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

**\*3** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable

cause of action. *Erickson,* 127 S.Ct. at 2200 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976)) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (internal quotations omitted); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.) (citation omitted). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave [to amend] when justice so requires.").

### B. *Exhaustion of Remedies*

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382-83, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan.31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones,* 127 S.Ct. at 914-15 (citations omitted); *see also Woodford,* 548 U.S. at 89, 126 S.Ct. at 2385-86; *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted). The occurrence which forms the basis of plaintiff's claims in this action, involving the alleged use of excessive force, plainly falls within the scope of the PLRA's exhaustion mandate. *See id.*

**\*4** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[3] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(a), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d).

[3]    The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

In his complaint plaintiff asserts that he filed a grievance regarding events forming the basis for his claims, but had not received an answer to that grievance at the time his complaint was prepared. *See* Amended Complaint (Dkt. No. 16) § 4(b). It is well established that in order to be deemed to have fully exhausted his or her remedies, an inmate must complete all three levels of the established New York IGP. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at \*3 (S.D.N.Y. Dec.11, 2000)); *see also Ryan v. Lyder,* No. 01 Civ. 10057, 2002 WL 1990780, at \*2 (S.D.N.Y. Aug.28, 2002). Moreover, complete exhaustion must have occurred prior to the time the action was commenced. *Chalif v. Spitzer,* No. 9:05-CV-1355, 2008 WL 1848650, at \*13 (N.D.N.Y. April 23, 2008) (Kahn, J.); *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 348 (S.D.N.Y.2002). Since by his own account plaintiff did not prosecute his internal grievance to completion before commencing this action, he has failed to satisfy the PLRA's exhaustion requirement.

Under some circumstances, I would be reluctant to dispose of a case based upon the failure of an inmate plaintiff to meet the PLRA's exhaustion on motion to dismiss. Such a disposition, however, is entirely appropriate in an instance such as this where a plaintiff's failure to exhaust is " 'readily apparent' " or " 'unambiguously established in the record.' " *Torrence v. Pesanti,* 239 F.Supp.2d 230, 231-32 (D.Conn.2003) (quoting *Snider,* 199 F.3d at 112, 113). Since plaintiff has not established that he pursued his grievance through to the CORC, prior to commencement of suit, this action is subject to dismissal, though without prejudice. *Neal v. Goord,* 267 F.3d 116, 117 (2d Cir.2001); *Rodriguez,* 209 F.Supp.2d at 348; *Mendez v. Artuz,* No. 01 CIV 4157, 2002 WL 313796, at \*2 (S.D.N.Y. Feb.27, 2002).

## IV. *SUMMARY AND RECOMMENDATION*

**\*5** Plaintiff's complaint, in which he asserts excessive force claims which are subject to the PLRA's exhaustion requirement, on its face discloses that while he did file a grievance addressing claims now raised, he did not pursue all steps required to exhaust the internal grievance process before commencing this action. Under the circumstances, plaintiff's suit is premature and subject to dismissal, without prejudice. Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion to dismiss plaintiff's complaint for failure to state a cognizable cause of action (Dkt. No. 20) be GRANTED, and that plaintiff's complaint in this action be dismissed, without prejudice to renewal following complete exhaustion of available internal administrative remedies.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4936821

**McCants v. Cannon, Not Reported in F.Supp.2d (2008)**

2008 WL 4936821

---

**End of Document**                                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 9:08cv00616**<br>MCCANTS v. CANNON ET AL | — | N.D.N.Y. | June 18, 2008 | Docket |

**History**

There are no History results for this citation.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 187 of 531

Beauvoir v. Smith, Not Reported in Fed. Supp. (2017)
2017 WL 4271636

2017 WL 4271636
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jimmy BEAUVOIR, Plaintiff,

v.

SMITH, Correctional Officer; Bare Hill Correctional
Facility; Conto, Correctional Officer; Bare Hill
Correctional Facility; Bashaw, Correctional Officer;
Bare Hill Correctional Facility; Lagray, Correctional
Lieutenant; Bare Hill Correctional Facility, Defendants.

9:14-cv-1495 (MAD/DEP)
|
Signed 09/26/2017

**Attorneys and Law Firms**

JIMMY BEAUVOIR, 14-A-0367, Fishkill Correctional
Facility, P.O. Box 1245, Beacon, New York 12508, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY
GENERAL, OF COUNSEL: LOUIS JIM, AAG, The Capitol,
Albany, New York 12224.

**ORDER**

Mae A. D'Agostino, U.S. District Judge

**\*1** Plaintiff *pro se* Jimmy Beauvoir, an inmate in the
custody of the New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced this civil
rights action brought pursuant to 42 U.S.C. § 1983 asserting
claims arising from an incident that allegedly occurred on
September 13, 2014, when he was incarcerated at the Bare
Hill Correctional Facility ("Bare Hill"). *See generally* Dkt.
No. 16.

On December 29, 2016, Defendants filed a motion for
summary judgment seeking dismissal of Plaintiff Beauvoir's
Eighth Amendment excessive force claim against Defendants
Kevin Smith, Daniel Conto, and Carl Bashaw, and Fourteenth
Amendment false imprisonment claim against Defendant Jeff
LaGray. *See* Dkt. No. 75. Defendants argue that not only
does the record completely contradict Plaintiff's allegations
that Defendants violated the Eighth Amendment by using
excessive force and that Plaintiff did not receive the process
that he was due under the Fourteenth Amendment, but

that Plaintiff failed to exhaust all administrative remedies
available to him under the Prison Litigation Reform Act
("PLRA"). *See* Dkt. No. 75-27 at 11. Plaintiff failed to
respond to the motion for summary judgment. *See* Dkt. No.
82 at 6. In an August 30, 2017 Report and Recommendation,
Magistrate Judge Peebles recommended granting Defendants'
motion for summary judgment. *See id.* at 2.

In reviewing a report and recommendation, a district court
"may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b)(1)(C). When a party makes specific
objections to a magistrate judge's report, the district court
engages in *de novo* review of the issues raised in the
objections. *See id.*; *Farid v. Bouey*, 554 F.Supp.2d 301,
307 (N.D.N.Y. 2008). When a party fails to make specific
objections, the court reviews the magistrate judge's report
for clear error. *See Farid*, 554 F.Supp.2d at 307; *see also
Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, *1
(S.D.N.Y. Nov. 29, 2004). Since Plaintiff has not objected to
Magistrate Judge Peebles' Report and Recommendation, the
Court reviews the report for clear error.

A court may grant a motion for summary judgment only if
"the court determines that there is no genuine issue of material
fact to be tried and that the facts as to which there is no such
issue warrant judgment for the moving party as a matter of
law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d
Cir. 1994) (citations omitted). When analyzing a summary
judgment motion, the court " 'cannot try issues of fact; it can
only determine whether there are issues to be tried.' " *Id.* at
36-37 (quotation and other citation omitted).

In assessing the record to determine whether any such issues
of material fact exist, the court is required to resolve all
ambiguities and draw all reasonable factual inferences in
favor of the nonmoving party. *See id.* at 36 (citing *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505,
2513-14, 91 L.Ed. 2d 202 (1986)) (other citations omitted).
Where the non-movant either does not respond to the motion
or fails to dispute the movant's statement of material facts,
the court may not rely solely on the moving party's statement
of material facts; rather, the court must be satisfied that
the citations to evidence in the record support the movant's
assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143
n.5 (2d Cir. 2003).

**\*2** Moreover, "in a *pro se* case, the court must view the
submissions by a more lenient standard than that accorded to

2017 WL 4271636

'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Id.* at 295 (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, at *1 (S.D.N.Y. May 16, 2001)).

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as

a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90-103, 126 S.Ct. 2378.

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to Central Office Review Committee ("CORC"), which makes the final determination within the administrative review process. *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F.Supp.2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524, 122 S.Ct. 983); *Singh v. Goord*, 520 F.Supp.2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F.Supp.2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009).

**\*3** To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by CORC, must be completed before an action asserting that claim may be initially filed. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds*, *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, at *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 189 of 531

Beauvoir v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 4271636

WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross v. Blake*, — U.S. ——, 136 S.Ct. 1850, 1855, 195 L.Ed.2d 117 (2016). "First, an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S.Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S.Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S.Ct. at 1860). [1]

[1]    In *Ross*, the Court rejected the Second Circuit's "extra-textual" exception to the PLRA's exhaustion requirement which allowed the taking into account of "special circumstances" to justify a prisoner's failure to comply with administrative procedural requirements. *See Ross*, 136 S.Ct. at 1856-57. Rather, it held that the only limit to the PLRA's exhaustion requirement "is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.' " *Id.* at 1862; *see also Williams*, 829 F.3d at 123 (recognizing that the framework set forth in *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) and *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), setting forth a "special circumstances" exception to the PLRA's exhaustion requirement has been abrogated in part by *Ross*). As such, the Supreme Court specifically found that an inmate's mistaken belief that he has exhausted his administrative remedies, even where that belief seems reasonable, does not make the administrative remedy unavailable. *See id.* at 1858.

In the present matter, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' motion for summary judgment should be granted. Plaintiff failed to controvert Defendants' well-supported assertion that Plaintiff failed to appeal any claims to the CORC, thus failing to exhaust all administrative remedies available to him prior to filing a suit with the Court. *See* Dkt. No. 75-27 at 13.

Furthermore, since Plaintiff was able to discern and navigate the first two steps of the grievance process, there is nothing to suggest that the third step, the appeal to CORC, was opaque to such a point that it became incapable of use. *See* Dkt. No. 75-27 at 13. A print-out from the CORC database of grievances filed over the previous year show that Plaintiff did not appeal any grievances to the CORC, and, therefore cannot file a valid civil rights claim in court until he does so. *See* Dkt. No. 75-11. Although the courts review *pro se* plaintiffs' submissions under a more lenient standard, these plaintiffs are not excused from "following the procedural requirements of summary judgment," which plaintiff failed to do by opting not to contest, or in any way answer, Defendants' properly filed motion for summary judgment, thus effectively consenting to the granting of the relief sought by Defendants pursuant to Local Rule 7.1(b)(3). *See* Dkt. No. 78.

 **\*4**   Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Peebles' Report and Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 75) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4271636

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   3

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Docket 9:14-CV-01495**<br>Beauvoir v. Doe et al | — | N.D.N.Y. | Dec. 11, 2014 | Docket |

**History (2)**

**Direct History (2)**

1.  Beauvoir v. Smith
2017 WL 9511157 , N.D.N.Y. , Aug. 30, 2017


*Report and Recommendation Adopted by*

2.  Beauvoir v. Smith ☞
2017 WL 4271636 , N.D.N.Y. , Sep. 26, 2017

531 F.Supp.3d 630
United States District Court, W.D. New York.

Corey MAZYCK, Plaintiff,

v.

Deputy Superintendent of Security Gregory
KELLER, Sergeant Matthew W. Scull, Sergeant
Berghorn, and Officer Hendrickson, Defendants.

6:20-CV-06055 EAW
|
Signed 03/31/2021

**Synopsis**

**Background:** Inmate brought § 1983 action against prison's deputy superintendent, correctional officer, and officer's supervisors for failure to protect and excessive force under the Eighth Amendment, First Amendment retaliation, conspiracy to obstruct justice, supervisory liability, and deprivation of due process under the Fourteenth Amendment. Defendants filed motion to dismiss for failure to state a claim.

**Holdings:** The District Court, Elizabeth A. Wolford, J., held that:

[1] inmate stated a claim against correctional officer for excessive use of force;

[2] inmate stated a claim against deputy superintendent for failure to protect;

[3] inmate plausibly alleged that he was retaliated against for reporting assault by correctional officer;

[4] inmate stated a claim for conspiracy to obstruct justice;

[5] inmate stated a claim for deprivation of due process;

[6] inmate stated claims against supervisors and deputy superintendent for failure to protect, retaliation, and deprivation of due process pursuant to theory of supervisory liability; but

[7] inmate failed to state claim against supervisors and deputy superintendent for excessive use of force pursuant to theory of supervisory liability.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (44)

**[1]    Federal Civil Procedure** 🔑 **Insufficiency in general**

In order to withstand a motion to dismiss for failure to state a claim, a party must set forth enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[2]    Federal Civil Procedure** 🔑 **Insufficiency in general**

A claim has facial plausibility, and will withstand a motion to dismiss for failure to state a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

**[3]    Federal Civil Procedure** 🔑 **Insufficiency in general**

Although a complaint attacked by a motion to dismiss for failure to state a claim does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do. Fed. R. Civ. P. 12(b)(6).

**[4]    Federal Civil Procedure** 🔑 **Insufficiency in general**

In order to state a plausible claim, a complaint's factual allegations must be enough to raise a right to relief above the speculative level. Fed. R. Civ. P. 12(b)(6).

[5]    **Sentencing and Punishment**    Conditions of Confinement

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. U.S. Const. Amend. 8.

[6]    **Sentencing and Punishment**    Use of force

In order to state an Eighth Amendment claim against prison officials for excessive use of force, a prisoner must allege two elements: first, the prisoner must allege that the defendant acted with a subjectively sufficiently culpable state of mind, and second, he must allege that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions. U.S. Const. Amend. 8.

[7]    **Sentencing and Punishment**    Use of force

In order to state an Eighth Amendment claim against prison officials for excessive use of force, a prisoner must show that the defendant acted with a sufficiently culpable state of mind, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct. U.S. Const. Amend. 8.

[8]    **Sentencing and Punishment**    Use of force

For purposes of a prisoner's excessive force claim against prison officials under the Eighth Amendment, the test for wantonness is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. U.S. Const. Amend. 8.

[9]    **Sentencing and Punishment**    Use of force

In a prisoner's action against a prison official for excessive force under the Eighth Amendment, the determination of whether the official's conduct toward the prisoner was objectively harmful enough or sufficiently serious to reach constitutional dimensions is context specific, turning upon contemporary standards of decency. U.S. Const. Amend. 8.

[10]    **Sentencing and Punishment**    Use of force

The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force against prisoners by prison officials, provided that the use of force is not of a sort repugnant to the conscience of mankind. U.S. Const. Amend. 8.

[11]    **Sentencing and Punishment**    Use of force

Certain actions by prison officials against prisoners, including the malicious use of force to cause harm, constitute Eighth Amendment violations per se; this result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. U.S. Const. Amend. 8.

[12]    **Prisons**    Use of force

**Sentencing and Punishment**    Use of force

Inmate alleged a malicious and sadistic use of force by correctional officer, and thus inmate stated a § 1983 claim for excessive use of force under the Eighth Amendment; inmate alleged that officer suddenly and for no apparent penological reason projected him into a wall while he was wearing handcuffs, and that, when inmate asked why he was thrown into the wall, officer responded that inmate was stupid and had gotten blood on him. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

[13]    **Sentencing and Punishment**    Conditions of Confinement

The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates. U.S. Const. Amend. 8.

**[14]    Sentencing and Punishment** 🔑 **Protection from violence**

Not every assault against an inmate translates into constitutional liability under the Eighth Amendment for prison officials responsible for the victim's safety. U.S. Const. Amend. 8.

**[15]    Sentencing and Punishment** 🔑 **Hazardous and unhealthful conditions**

In order for an inmate to state a claim against a prison official under the Eighth Amendment on the basis that the official has failed to prevent harm, the inmate must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the official acted with deliberate indifference. U.S. Const. Amend. 8.

1 Case that cites this headnote

**[16]    Sentencing and Punishment** 🔑 **Deliberate indifference in general**

Deliberate indifference under the Eighth Amendment means that a prison official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S. Const. Amend. 8.

2 Cases that cite this headnote

**[17]    Prisons** 🔑 **Protection from violence, assault, or abuse**

**Sentencing and Punishment** 🔑 **Protection from violence**

Inmate stated a § 1983 claim against prison's deputy superintendent for failure to protect under the Eighth Amendment; inmate alleged that he wrote a letter to officer notifying him of heightened substantial risk of harm to his health and safety due to a hit being ordered on him by another inmate who had been a co-defendant and possessed a gang affiliation, that deputy

superintendent never replied to such letter and failed to take any precautions to prevent harm to inmate, that inmate was attacked by other inmates three days later, and that he learned at a disciplinary hearing that deputy superintendent had received the letter but chose not to place inmate into protective custody. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[18]    Prisons** 🔑 **Protection from violence, assault, or abuse**

**Sentencing and Punishment** 🔑 **Protection from violence**

It was irrelevant for purposes of inmate's § 1983 claim against prison's deputy superintendent for failure to protect under the Eighth Amendment whether injuries sustained by inmate in attack by other inmates rose to the level of a constitutional violation; such a claim relied upon the existence of a substantial risk of serious harm rather than the extent of physical injuries sustained. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

**[19]    Sentencing and Punishment** 🔑 **Protection from violence**

Conditions of confinement can be deemed to objectively pose an unreasonable risk of serious harm to an inmate's current or future health, as element of a failure to protect claim against a prison official under the Eighth Amendment, even where no serious physical injury results. U.S. Const. Amend. 8.

3 Cases that cite this headnote

**[20]    Sentencing and Punishment** 🔑 **Protection from violence**

In assessing whether the risk of an inmate's violence against other inmates is sufficiently serious to trigger constitutional protection under the Eighth Amendment, as required for an inmate to establish a failure to protect claim against prison officials, the focus of inquiry must be the existence of a substantial risk of serious harm

rather than the extent of the physical injuries sustained in an attack. U.S. Const. Amend. 8.

5 Cases that cite this headnote

[21]    **Prisons** 🔑 Protection from violence, assault, or abuse

**Sentencing and Punishment** 🔑 Protection from violence

Injuries sustained by inmate in an attack by other inmates were sufficiently serious to support a § 1983 claim against prison's deputy superintendent for failure to protect under the Eighth Amendment, where inmate's injuries included a broken tooth and several severe lacerations which required emergency treatment at an outside hospital and several staples and sutures. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

[22]    **Civil Rights** 🔑 Criminal law enforcement; prisons

Inmate adequately alleged that prison's deputy superintendent was personally involved in failure by prison officials to protect inmate from attack other inmates, supporting § 1983 claim against deputy superintendent for failure to protect under the Eighth Amendment; inmate alleged that he wrote a letter informing deputy superintendent that other inmate, who had been a co-defendant, had placed a hit on him and possessed a gang affiliation, and that it was confirmed at a disciplinary hearing that deputy superintendent received inmate's letter but failed to take any protective action. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[23]    **Civil Rights** 🔑 Persons Liable in General

A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority; the defendant's personal involvement in alleged constitutional deprivations is a prerequisite to an award of damages. 42 U.S.C.A. § 1983.

[24]    **Constitutional Law** 🔑 Retaliation

In order to state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. U.S. Const. Amend. 1.

2 Cases that cite this headnote

[25]    **Constitutional Law** 🔑 Prisoners

**Prisons** 🔑 Particular violations, punishments, deprivations, and conditions

Inmate plausibly alleged that he was retaliated against for reporting an assault by correctional officer, supporting § 1983 claim against correctional officer and supervisors for First Amendment retaliation; inmate alleged that he verbally reported the assault to officer's supervisor, that supervisor then deterred inmate from speaking further about the assault by informing multiple other inmates that inmate was a snitch, that inmate was denied medical treatment for damage to his tooth resulting from the assault, that he was denied protective custody housing and instead placed in a cell block where supervisor had previously announced that inmate was a snitch, and that the threats and cover up were meant to chill his speech about said assault. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[26]    **Civil Rights** 🔑 Prisons and jails; probation and parole

**Constitutional Law** 🔑 Prisoners

**Prisons** 🔑 Particular violations, punishments, deprivations, and conditions

Inmate plausibly alleged that he engaged in protected activity under the First Amendment when he reported an assault by correctional officer, supporting § 1983 claim against officer and supervisors for First Amendment retaliation,

even though it was not clear from the complaint when inmate made such reports or the nature of those reports; inmate alleged that he verbally reported the assault to officer's supervisor and prison's medical clinic, and this reporting did not constitute mere confrontation or disagreement with a lawful order given by a corrections officer. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[27]    **Constitutional Law** 🔑 Prisons

**Constitutional Law** 🔑 Prisoners

Not every statement an inmate makes in prison is afforded First Amendment protection, but certain verbal complaints by prisoners about the conduct of prison officials may be considered protected action for purposes of a First Amendment retaliation claim. U.S. Const. Amend. 1.

3 Cases that cite this headnote

[28]    **Constitutional Law** 🔑 Prisoners

**Prisons** 🔑 Particular violations, punishments, deprivations, and conditions

Inmate plausibly alleged that he sustained an injury and experienced adverse action by prison officials after reporting an assault by correctional officer, supporting § 1983 claim against officer and supervisors for First Amendment retaliation; inmate alleged that, in retaliation for reporting the assault, he was denied medical care for tooth damage sustained during the assault, that he was denied placement in protective custody even though he faced risk of serious harm from a fellow inmate who had been a co-defendant, and that officer and supervisors put inmate at an increased risk of harm by informing other inmates that he was a snitch. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[29]    **Constitutional Law** 🔑 Retaliation in general

In the context of a First Amendment retaliation claim, an adverse action is defined as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; the test is

objective, and the plaintiff is not required to show that he was actually deterred. U.S. Const. Amend. 1.

1 Case that cites this headnote

[30]    **Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

A plaintiff has standing to bring a First Amendment retaliation claim if he can show either that his speech has been adversely affected by the alleged government retaliation or that he has suffered some other concrete harm. U.S. Const. Amend. 1.

[31]    **Constitutional Law** 🔑 Prisoners

**Prisons** 🔑 Particular violations, punishments, deprivations, and conditions

Inmate plainly alleged a causal connection between his protected activity of reporting an assault by correctional officer and resulting adverse actions, supporting § 1983 claim against officer and supervisors for First Amendment retaliation; inmate alleged that, immediately after he made his report, officer and supervisors disclosed to other inmates that he was a snitch, that he was denied medical care for damage to his tooth resulting from assault, and that he was denied protective custody despite the threat posed by fellow inmate who had been a co-defendant. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[32]    **Conspiracy** 🔑 Obstructing justice or judicial proceedings

A conspiracy to obstruct justice need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct. 42 U.S.C. § 1985(2).

[33]    **Conspiracy** 🔑 Civil rights conspiracies

Conclusory, vague, and general allegations of a conspiratorial agreement are insufficient to

allege conspiracy to obstruct justice. 42 U.S.C. §
1985(2).

**[34]** **Conspiracy** 🔑 Civil rights conspiracies

Inmate plausibly alleged an agreement between
correctional officer and supervisors to obstruct
justice regarding allegedly excessive use of force
by officer in violation of the Eighth Amendment;
inmate alleged that while he was receiving
treatment in prison medical clinic, he overheard
supervisor instruct other supervisor to have an
officer retrieve inmate's tooth from scene of the
alleged assault and place it inside orientation
room to create impression that tooth had actually
been chipped during a separate assault of inmate
which had occurred there, and that supervisor
instructed other supervisor to not allow anyone
into orientation room until pictures had been
taken to show that this was where inmate's tooth
was found. U.S. Const. Amend. 8; 42 U.S.C.A.
§ 1985(2).

**[35]** **Conspiracy** 🔑 Civil rights conspiracies

Inmate's allegations against correctional officer
and supervisors regarding conspiracy to obstruct
justice as to excessive use of force by officer
in violation of the Eighth Amendment were
sufficient to invoke personal stake exception to
the intracorporate conspiracy doctrine; inmate
alleged that supervisors fabricated evidence to
cover up officer's assault of inmate and alleged
that this conduct was not related in any way to
a corporate policy or management decision. U.S.
Const. Amend. 8; 42 U.S.C.A. § 1985(2).

1 8 Cases that cite this headnote

**[36]** **Conspiracy** 🔑 Intracorporate conspiracy
doctrine in general

Pursuant to the intracorporate conspiracy
doctrine, employees or agents of a single
corporate entity, acting within the scope of their
employment, are legally incapable of conspiring
together.

1 4 Cases that cite this headnote

**[37]** **Conspiracy** 🔑 Personal stake or interest

Under the personal stake exception, the
intracorporate conspiracy doctrine does not
apply to bar conspiracy claims against
individuals within a single entity when they are
pursuing personal interests wholly separate and
apart from the entity.

1 7 Cases that cite this headnote

**[38]** **Constitutional Law** 🔑 Access to courts

**Prisons** 🔑 Access to Courts and Public
Officials

Inmate stated a claim that his due process rights
under the Fourteenth Amendment were violated
when correctional officer and supervisors
fabricated evidence to cover up officer's alleged
assault of inmate by trying to make it appear
that injuries from said assault actually resulted
from a separate assault by other inmates, and to
retaliate against inmate for telling the truth about
the other assault; inmate's claim was based on
allegation that the cover up had tainted material
evidence and made it almost impossible for him
to litigate his underlying claim of conspiracy to
obstruct justice, based on violations of the Eighth
and First Amendments. U.S. Const. Amends. 1,
14; 42 U.S.C.A. §§ 1983, 1985(2).

1 1 Case that cites this headnote

**[39]** **Civil Rights** 🔑 Failure to act or protect or to
enforce law

**Constitutional Law** 🔑 Constitutional Rights
in General

There is no right under the United States
Constitution to an investigation by government
officials; however, courts do recognize an
inadequate investigation as sufficient to state a §
1983 claim when there was another recognized
constitutional right involved. 42 U.S.C.A. §
1983.

**[40]** **Constitutional Law** 🔑 Retaliation in general

A § 1983 claim for First Amendment retaliation
may proceed when the plaintiff alleges that an

investigation was falsified for the purpose of retaliating against him for the exercise of his legal rights. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

[41]    **Civil Rights**    Criminal law enforcement; prisons

Inmate stated a claim against prison's deputy superintendent pursuant to theory of supervisory liability for failure to protect under the Eighth Amendment, based on failure to properly supervise officer who allegedly assaulted inmate, failure to implement a proper inmate classification system, and failure to remedy wrongs committed by officer; inmate alleged that deputy superintendent was personally involved in said conduct. U.S. Const. Amend. 8.

[42]    **Civil Rights**    Criminal law enforcement; prisons

**Conspiracy**    Prisons, jails, and convicts

Inmate stated a claim against correctional officer's supervisors pursuant to theory of supervisory liability for failure to protect under the Eighth Amendment, First Amendment retaliation, deprivation of due process under the Fourteenth Amendment, and conspiracy to obstruct justice, based on failure to properly supervise officer who allegedly assaulted inmate, failure to implement a proper inmate classification system, and failure to remedy the wrongs committed by officer; inmate alleged that supervisors personally participated in said conduct. U.S. Const. Amend. 8; 42 U.S.C.A. § 1985(2).

[43]    **Labor and Employment**    Negligent training and supervision

Simply because a defendant serves in supervisory capacity does not automatically make every claim a plaintiff has against that defendant one for supervisory liability.

1 Case that cites this headnote

[44]    **Civil Rights**    Prisons and jails; probation and parole

Inmate failed to state a claim pursuant to theory of supervisory liability against correctional officer's supervisors and prison's deputy superintendent for use of excessive force under the Eighth Amendment, based on officer's alleged assault of inmate and creation of a policy or custom under which inmates were abused by corrections officers, even though inmate alleged that prison had a longstanding culture of brutality; inmate's second amended complaint lacked specific allegations describing prior instances of abuse by officer, or specific allegations that supervisors or deputy superintendent were aware of or encouraged those actions. U.S. Const. Amend. 8.

1 Case that cites this headnote

**Attorneys and Law Firms**

*635 Poupa Jenny Marashi, Marashi Legal, Bronx, NY, for Plaintiff.

Matthew D. Brown, New York State Office of the Attorney General, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

*636 **INTRODUCTION**

**1** Plaintiff Corey Mazyck ("Plaintiff") commenced this action on January 24, 2020, against defendants Deputy Superintendent of Security Gregory Keller, Sergeant Matthew W. Scull, Sergeant Berghorn, and Officer Hendrickson (hereinafter "Defendants") in their individual capacities, alleging claims for failure to protect, excessive force, First Amendment retaliation, conspiracy, supervisory liability, and violation of due process of law, pursuant to 42 U.S.C. § 1983. (Dkt. 1; Dkt. 9).

Presently before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)

2021 WL 1201224

(6). (Dkt. 10). For the following reasons, Defendants' motion is granted as to the fifth cause of action for "supervisory liability," but it is otherwise denied.

## BACKGROUND

The following facts are taken from Plaintiff's second amended complaint (Dkt. 9) and are assumed true for purposes of this motion. During the events in question, Plaintiff was an inmate at Elmira Correctional Facility ("Elmira"). (*Id.* at ¶ 4). Plaintiff arrived at Elmira on August 10, 2018. (*Id.* at ¶ 11). Plaintiff has "a very serious case of the chronic auto-immune disease Myasthenia gravis, and as a result of such is very weak and does not have strong muscles," which "makes [him] very vulnerable to any acts of violence as he does not have the physical capacity to fight back or to defend himself." (*Id.* at ¶ 12).

On August 11, 2018, an arrival interview was conducted by Sergeant Issac, [1] during which Plaintiff was asked if he "had enemies." (*Id.* at ¶ 13). Plaintiff informed Sergeant Issac that he suffered two prior attacks at other facilities, and also made Sergeant Issac aware of an "ongoing feud/beef/dispute he had with his criminal codefendant J. Padilla, as a result of a written statement where Plaintiff had, in the mind of [his] co-defendant, cooperated with law enforcement, during their criminal case." (*Id.*). Sergeant Issac verified that J. Padilla was present at Elmira, and that he was undergoing a pending disciplinary Tier 3 hearing and was housed in the Special Housing Unit. (*Id.* at ¶ 14). Despite Plaintiff's pleas that he be placed in protective custody and his concerns about the past two attacks he suffered and J. Padilla, Sergeant Issac told Plaintiff that protective custody was not necessary, even though the prison had a general policy of segregating co-defendants in a "known conflict situation." (*Id.* at ¶ 15). Sergeant Issac instructed Plaintiff to sign a "Protective Custody Waiver" despite Plaintiff's objections. (*Id.* at ¶ 16). Following his arrival interview, Plaintiff was released **\*637** from his 72-hour quarantine keep-lock status. (*Id.* at ¶ 17).

[1]    Defendants argue that Sergeant Issac should be dismissed from the case because the second amended complaint makes no allegations against him. (Dkt. 10-2 at 13). Sergeant Issac was named as a defendant in the complaint and first amended complaint, but not in the second amended complaint. In his response, Plaintiff explains that

Sergeant Issac was voluntarily withdrawn as a defendant in the second amended complaint, but also that he reserves the right to add him if discovery reveals his further involvement. (Dkt. 17 at 13 n.2). Because Plaintiff has voluntarily withdrawn Sergeant Issac from the case and he is not named in the second amended complaint, which is the operative pleading in the case, the Clerk of Court is directed to terminate Sergeant Issac as a party on the docket. Thus, the motion to dismiss Sergeant Issac is denied as moot.

**\*2**    Between August 12, 2018 and August 19, 2018, Plaintiff had "several documented encounters" with other inmates which further solidified his belief that he was at substantial risk of serious harm. (*Id.* at ¶ 18). During these encounters, Plaintiff was approached and notified of J. Padilla's affiliation with the Bloods; informed that the two prior attacks he suffered at other facilities were orchestrated by J. Padilla; and was warned and notified of a pending attack ordered by J. Padilla in the event Plaintiff was transferred to Elmira. (*Id.* at ¶¶ 19-21). As a result of these encounters, on August 20, 2018, Plaintiff wrote a letter to defendant Keller, notifying him of the heightened substantial risk of harm to his health and safety, as well as of J. Padilla's gang affiliation and how it "would turn the feud between himself and [his] co-defendant into something much larger[.]" (*Id.* at ¶ 22). Plaintiff mailed the letter to defendant Keller via Elmira's internal mail system. (*Id.*). Although defendant Keller was "the final authority, and decision maker regarding all mat[t]ers at Elmira regarding the policy of and the placement decisions for security of prisoners," Plaintiff never received any direct correspondence from him following his letter, nor did defendant Keller take any precautions to prevent the heightened risk of harm. (*Id.* at ¶¶ 23-24).

After several days of not receiving a response from defendant Keller, on August 22, 2018, Plaintiff wrote a letter to his assigned counselor, E. Klosterman, requesting protective custody housing based on his co-defendant status and the additional information he had received, and mailed it to him via the internal mail system. (*Id.* at ¶ 25). During this time, defendant Keller still failed to act to prevent an impending attack on Plaintiff, despite being aware of the incidents reported to him by Plaintiff. (*Id.* at ¶ 26).

On August 23, 2018, at approximately 9:25 AM, Plaintiff was attacked in the unsupervised orientation room on the second floor of Shop 5. (*Id.* at ¶ 27). Specifically, "[t]wo inmates, Roman and Rubin, assaulted Plaintiff with sharp

foreign objects, causing Plaintiff to sustain multiple serious lacerations to the face and head." (*Id.*). The officers assigned to Shop 5 failed to timely respond to stop the attack, and only responded when an uninvolved inmate notified them of the incident, but many minutes had already passed, and Plaintiff had already sustained injuries. (*Id.* at ¶ 28). When the officers responded, Plaintiff was attempting to protect himself, while the other inmates were assaulting him in the face and head with sharp objects. (*Id.* at ¶ 29). Plaintiff complied with the officers' orders to stop fighting and backed away from the other inmates. (*Id.* at ¶ 30). Defendant Hendrickson told Plaintiff to "face the fucking wall" and put his hands behind his back. (*Id.*). Plaintiff complied with this order, and while defendant Hendrickson was placing restraints on him, he whispered in Plaintiff's ear, "I don't want your fucking blood on me, and it is in your best interest to make sure that doesn't happen." (*Id.* at ¶ 31).

Defendant Hendrickson told Plaintiff he was taking him to the clinic due to his injuries. (*Id.* at ¶ 33). Plaintiff and defendant Hendrickson exited the orientation room and Plaintiff was guided to turn right. (*Id.*). Suddenly, and while Plaintiff was still in restraints, defendant Hendrickson "maliciously, and with no lawful objective, projected Plaintiff with great force, into a wall on the left side of the hallway of the second floor, seriously injuring Plaintiff," which "considerably added to his bodily bruises and lacerations," and also caused severe injury to Plaintiff's mouth, **\*638** including a chipped front top right tooth and an injured lip, and a tear in his shin. (*Id.* at ¶ 34). Plaintiff asked defendant Hendrickson why he had thrown him against the wall, to which defendant Hendrickson responded that Plaintiff was stupid and got blood on him. (*Id.* at ¶ 36).

When Plaintiff and defendant Hendrickson reached the bottom of the emergency fire steps, Plaintiff noticed that defendant Scull was also present and escorting him to the clinic. (*Id.* at ¶ 37). Plaintiff notified defendant Scull, who supervised defendant Hendrickson, that defendant Hendrickson had projected him into a wall and of his injuries. (*Id.*). Defendant Scull stated "in sum and substance that nobody will ever know Defendant Hendrickson did it, then called Plaintiff 'a dumb stupid black n****r that everyone will know is a snitch' because he would personally make sure of it." (*Id.* at ¶ 38). In an effort to ensure that Plaintiff did not inform anyone of defendant Hendrickson's actions, defendant Scull "took conscious shocking action against Plaintiff" and, while they were walking the path between the gym, G Block and the clinic, "loudly berated Plaintiff to multiple inmates

attending protective custody recreation in the gym yard, calling Plaintiff a snitch while pointing at Plaintiff's multiple bleeding lacerations." (*Id.* at ¶¶ 39-41). Defendant Scull also asked if anyone knew Plaintiff, and without waiting for a response from the inmates, stated "[w]ell, now you know he's a snitch; let everybody know." (*Id.* at ¶ 42). Before entering the clinic, defendant Scull told Plaintiff that he would "never make it home now because he will be killed in jail for being a snitch." (*Id.* at ¶ 43). Plaintiff alleges that the berating by defendant Scull "was in direct retaliation for [Plaintiff]'s putting into the verbal statement of the report of the incident that Defendant Hendrickson had caused Plaintiff serious injury." (*Id.* at ¶ 44).

**\*\*3** Plaintiff was examined by medical personnel at the clinic, during which Plaintiff informed them what had occurred and who had injured him, including the injuries inflicted by defendant Hendrickson. (*Id.* at ¶ 45). Plaintiff suffered the following injuries:

> multiple lacerations and bruises, some of which were caused by Defendant Officers, in addition to the chipped tooth, swollen lip and shin abrasion. Plaintiff was notified by medical personnel that he had a 7" laceration extending from the right side forehead to the right ear, a ... 5" laceration on his scalp, and a 1 ¼" laceration on his left cheek, and finally a 1" laceration in and on the right ear.

(*Id.* at ¶ 46).

Plaintiff was asked by defendant Scull if he wanted protective custody, and Plaintiff again requested protective custody housing, but he was not provided such housing. (*Id.* at ¶ 47). Following the medical examination, defendant Berghorn, who was also a sergeant and supervisor, took photographs of Plaintiff's injuries. (*Id.* at ¶ 48). Plaintiff was administered an HIV/AIDS screening test due to blood getting on defendant Hendrickson. (*Id.* at ¶ 49). Plaintiff was then notified that he was being sent to an outside hospital due to the severity of his injuries. (*Id.* at ¶ 50).

Plaintiff then observed and overheard defendants Scull and Berghorn in the doorway of the emergency room of the clinic

discussing the misconduct by defendant Hendrickson. (*Id.* at ¶ 51). Defendant Berghorn instructed defendant Scull to solicit an officer to retrieve Plaintiff's tooth from the second floor hallway of Shop 5 and place it inside the Orientation room, to create the impression that his tooth had been chipped during the assault by the prisoners, rather than by defendant Hendrickson in the hallway. (*Id.*). Defendant Berghorn also instructed defendant Scull **\*639** that no person was to enter the orientation room until pictures had been taken placing the tooth there. (*Id.* at ¶ 52). Plaintiff alleges that these actions and fabrication of evidence were taken to "cover up the action of their subordinate Defendant Hendrickson, knowing that their photos and their placement of the tooth would create the false illusion that ... only inmates had injured Plaintiff, and that Defendant Hendrickson had not." (*Id.* at ¶ 53).

Plaintiff received treatment at Arnot Ogden Medical Center for his lacerations, but not his chipped tooth. (*Id.* at ¶ 54). He received 11 staples and 24 sutures, as well as other treatment. (*Id.* at ¶ 55). When he returned to Elmira, Plaintiff was escorted back to the clinic and met by defendant Scull, who asked Plaintiff to sign paperwork following his request for protective custody. (*Id.* at ¶ 56). However, defendant Scull intentionally placed Plaintiff in G block—which is a general population housing area and where defendant Scull had earlier berated Plaintiff—to continue to retaliate against him for stating on incident reports, medical reports, and other documents that defendant Hendrickson had injured him. (*Id.* at ¶ 57). Plaintiff remained in G Block, at a heightened risk of harm, for six days following the incident and his request for protective custody housing. (*Id.* at ¶ 59).

On August 29, 2018, during a disciplinary hearing, Plaintiff expressed his concerns regarding his current housing area. (*Id.* at ¶ 60). Mrs. Lyndaker, the civilian hearing officer, assured Plaintiff that she would make sure he was placed in more appropriate housing. (*Id.*). During the disciplinary hearing, either on or off the record, Plaintiff was informed that defendant Keller had received Plaintiff's letter, which had detailed and warned of the immediate risk of harm to Plaintiff, but he chose not to place Plaintiff in protective custody. (*Id.* at ¶ 61). Following the hearing, Plaintiff was transferred to H block, the protective custody housing area. (*Id.* at ¶ 63).

## PROCEDURAL HISTORY

**\*\*4** Plaintiff filed his complaint on January 24, 2020. (Dkt. 1). On February 14, 2020, Defendants filed a motion to dismiss. (Dkt. 6). Thereafter, on March 6, 2020, Plaintiff filed an amended complaint (Dkt. 8), and the Court denied Defendants' motion to dismiss as moot (Dkt. 11). Plaintiff filed a second amended complaint on March 19, 2020, removing the previously-named "Issac" defendant. (Dkt. 9). Plaintiff's second amended complaint alleges six causes of action: (1) an excessive force claim against defendant Hendrickson, in violation of the Eighth Amendment; (2) a failure to protect claim against defendant Keller, in violation of the Eighth Amendment; (3) a retaliation claim against defendants Berghorn, Scull, and Hendrickson, in violation of the First Amendment; (4) a claim for conspiracy to obstruct justice against defendants Scull, Berghorn, and Hendrickson, pursuant to 42 U.S.C. § 1985(2); (5) a claim for supervisory liability against defendants Scull, Berghorn, and Keller; and (6) a claim for violation of due process of law against defendants Scull, Berghorn, and Hendrickson, in violation of the Fourteenth Amendment. (*Id.* at 16-23). On April 7, 2020, Defendants filed a motion to dismiss the second amended complaint. (Dkt. 10). Plaintiff filed a response in opposition to the motion on May 15, 2020. (Dkt. 16; Dkt. 17).

## DISCUSSION

### I. Legal Standard

**[1]** **[2]** "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by **\*640** reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a party must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

**[3]** **[4]** "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

## II. Plaintiff's Eighth Amendment Claims

Plaintiff's first and second claims are for violations of his Eighth Amendment rights—an excessive use of force claim against defendant Hendrickson, and a failure to protect claim against defendant Keller. (Dkt. 9 at 15-18). Defendants contend that Plaintiff's Eighth Amendment claims must be dismissed because (1) Plaintiff has failed to allege that he suffered a serious injury, as he suffered only a "chipped tooth and facial lacerations" (Dkt. 10-2 at 8), and (2) the claims against defendant Keller must be dismissed because Plaintiff has failed to allege that he was personally involved in the constitutional violations, as his receipt of Plaintiff's letter, by itself, does not amount to personal involvement (*id.* at 10-11).

### A. Excessive Use of Force Claim Against Defendant Hendrickson

[5] [6] [7] [8] "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. To state an Eighth Amendment claim, a prisoner must allege two elements, one subjective and one objective. First, the prisoner must allege that the defendant acted with a subjectively sufficiently culpable state of mind. Second, he must allege that the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (internal quotations and citations omitted). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quotations and citations omitted). For an excessive force claim, "the test for wantonness 'is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)).

**\*5** [9] [10] [11] "The objective component of the Eighth Amendment test is also context specific, turning upon 'contemporary standards **\*641** of decency.' " *Id.* at 64 (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quotations and citation omitted). However, "certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se*. This result follows because when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Harris*, 818 F.3d at 64 (citation omitted).

[12] Plaintiff's allegations against defendant Hendrickson easily satisfy both the subjective and objective elements of an excessive use of force claim, and Defendants' argument that Plaintiff has failed to allege that he sustained a "serious injury" is misplaced. Plaintiff alleges that defendant Hendrickson, suddenly and for no apparent penological reason, projected Plaintiff—who was wearing handcuffs—into a wall. When Plaintiff asked defendant Hendrickson why he threw him into the wall, defendant Hendrickson replied that Plaintiff was stupid and got blood on him. In other words, Plaintiff has alleged the malicious and sadistic use of force by defendant Hendrickson, which amounts to a *per se* violation of the Eighth Amendment. Accordingly, Defendants' motion to dismiss Plaintiff's excessive use of force claim against defendant Hendrickson is denied.

### B. Failure to Protect Claim Against Defendant Keller

[13] [14] [15] [16] The Constitution imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations and citation omitted). However, not every assault "translates into constitutional liability for prison officials responsible for the victim's safety." *House v. City of N.Y.*, No. 18 Civ. 6693 (PAE)(KNF), 2020 WL 6891830, at \*11 (S.D.N.Y. Nov. 24, 2020) (citation omitted). "To state a claim under the Eighth Amendment on the basis that a defendant has failed to prevent harm, a plaintiff must plead both (a) conditions of confinement that objectively pose an unreasonable risk of serious harm to their current or future health, and (b) that the defendant acted with 'deliberate indifference.' " *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020). "Deliberate indifference under the Eighth Amendment standard means

the official must know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (alterations and quotations omitted).

**[17]** Plaintiff has plausibly alleged a failure-to-protect claim against defendant Keller. Specifically, Plaintiff alleges:

> On August 20th, 2018, as a result of the information he had received in the above enumerated encounters with previously unknown inmates, Plaintiff wrote a letter to Defendant Keller notifying him of the heightened substantial risk of harm to his health and safety resulting from the hit on him ordered by his co-defendant Padilla, and also notified Defendant Keller of the co-defendant's gang affiliation and how it would turn the feud between himself and [his] co-defendant into something much larger, and involve not only Padilla, but also unknown to Plaintiff associates, or affiliates of Padilla's. Plaintiff the[n] mailed the letter to Defendant Keller via Elmira Correctional Facility's internal mail system.

**\*\*6  \*642** (Dkt. 9 at ¶ 22). Plaintiff never received a response to his letter and defendant Keller did not take any precautions to prevent harm to Plaintiff (*id.* at ¶¶ 22-25), and Plaintiff ultimately was attacked three days after he wrote the letter to defendant Keller (*id.* at ¶ 27). Plaintiff further alleges that he learned at a disciplinary hearing on August 29, 2018, that defendant Keller had received his letter, but chose not to place Plaintiff in protective custody, which was unreasonable due to the information in the letter, detailing the serious risk of harm to Plaintiff. (*Id.* at ¶ 61). In other words, Plaintiff has alleged that he communicated specific information relating to a risk of serious harm—including information relating to an impending attack—and that defendant Keller had knowledge of this information but chose to disregard the risk of harm to Plaintiff by failing to place him in protective custody. *Stewart v. Fisher*, No. 11 Civ. 2184(HB), 2011 WL 6153084, at \*6 (S.D.N.Y. Dec. 12, 2011) (finding that plaintiff adequately

alleged failure to protect claim, where defendants "knew of a substantial risk prior to the February 28, 2011 attack and failed to take reasonable measures to abate the harm"); *see also Douglas v. Annuci*, No. 14-CV-6018 CJS, 2017 WL 5159194, at \*6 (W.D.N.Y. Nov. 7, 2017) (finding that plaintiff plausibly pleaded a substantial risk of serious harm where the complaint alleged that there was "an active 'contract' on his life by the Bloods gang, and that he has already been slashed by Bloods gang members on five occasions").

**[18]  [19]  [20]  [21]** To the extent Defendants also contend that the injuries Plaintiff sustained due to defendant Keller's failure to prevent an attack are not "sufficiently serious" to rise to the level of a constitutional violation, the Court rejects this argument. Most of the cases cited by Defendants for this proposition do not involve failure to protect claims, as alleged by Plaintiff. (*See* Dkt. 10-2 at 9-10). Rather, these cases involve deliberate indifference to serious medical needs claims, which require that a plaintiff allege a "serious medical need." *See Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). In the context of a failure to protect claim, "the objective prong can be satisfied even where no serious physical injury results," and "[a]t bottom, [i]n assessing whether the risk of an inmate's violence against other inmates is 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.' " *Randle v. Alexander*, 960 F. Supp. 2d 457, 473-74 (S.D.N.Y. 2013) (quotations and citation omitted). Here, Plaintiff has plainly alleged that he informed defendant Keller of a substantial risk of serious harm that existed due to the threat from J. Padilla and his associates, but that defendant Keller failed to take any action to protect him.[2]

[2]
> Even if the focus of the failure to protect inquiry was the injuries resulting from an attack, Plaintiff's alleged injuries—which included a broken tooth and several severe lacerations which required emergency treatment at an outside hospital and several staples and sutures—are sufficiency serious. *See Dabney v. Sawyer*, No. 9:11-CV-0273(LEK/RFT), 2013 WL 5494074, at \*10 (N.D.N.Y. Sept. 30, 2013) ("a broken tooth may be considered sufficiently serious for purposes of stating a medical deliberate indifference claim"); *Goldston v. Albany Cnty. Sheriff Dept.*, No. 9:02-CV-1004, 2006 WL 2595194, at \*7 (N.D.N.Y. Sept. 11, 2006) (finding that plaintiff's injuries,

including "a two-centimeter deep laceration on his forehead that required six stitches to close" was sufficiently serious for constitutional purposes).

**[22]** **[23]** Defendants also argue that Plaintiff has failed to allege defendant Keller's personal involvement. "A defendant in **\*643** a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority. Rather, the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal alterations, quotations, and citations omitted). Although in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), the Second Circuit identified five categories of evidence that may establish the liability of a supervisory official, more recently, in *Tangreti v. Bachmann*, the Second Circuit held that, post-*Iqbal*, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d 609, 618 (2d Cir. 2020). The Second Circuit explained that "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly." *Id.* (second alteration in original) (quotations and citations omitted).

**\*\*7** At this stage of the case, Plaintiff has alleged defendant Keller's personal involvement in the failure to protect claim. Plaintiff alleges that he wrote to defendant Keller directly to inform him of the specific risk of harm he faced due to J. Padilla and that defendant Keller was aware of the risk of harm to Plaintiff, but he failed to take any action to protect Plaintiff from that harm. Plaintiff further alleges that at a disciplinary hearing he received confirmation that defendant Keller had received Plaintiff's letter and was therefore aware of the risk of harm. In other words, contrary to Defendants' implication in their motion to dismiss (Dkt. 10-2 at 10-11), Plaintiff's claims against defendant Keller are not based solely on his position as deputy superintendent of security at Elmira, but rather on his personal involvement in the alleged constitutional deprivations.

The Second Circuit's recent decision in *Morgan v. Dzurenda*, 956 F.3d 84 (2d Cir. 2020), although involving a failure to protect claim at the summary judgment stage, is instructive on this point. In *Morgan*, the district court granted summary judgment to two prison officials on the plaintiff's failure to

protect claim, based on the doctrine of supervisory liability. *Id.* at 89. The Second Circuit reversed, explaining:

[W]hile Chapdelaine and Godding both held supervisory roles at Osborn, Morgan seeks to hold them liable only for acts that they themselves committed. The crux of Morgan's allegations against Chapdelaine and Godding is that they violated the Eighth Amendment by ignoring his pleas for help. Morgan nowhere suggests that Chapdelaine, Godding, or any other defendant improperly allowed a subordinate prison official to commit a constitutional violation. The doctrine of supervisory liability is therefore not implicated.

We hold that the district court erred in dismissing Morgan's claims against Chapdelaine and Godding on the ground that neither was "on notice that ... Morgan faced an unreasonable risk to his safety." The Inmate Request Forms Chapdelaine and Godding acknowledged receiving were detailed and explicit regarding the threat Morgan believed Rodriguez posed.... In response, Godding made dismissive remarks to Morgan, which Morgan relayed to Chapdelaine in his Inmate Request Form. Chapdelaine ignored these requests for help. These actions reflect Chapdelaine and Godding's subjective awareness of, and deliberate indifference to, Morgan's **\*644** specific, repeated, and urgent expressions of fear for his safety.

*Id.* at 89-90 (internal citations omitted). Because Plaintiff has alleged defendant Keller's personal involvement, Defendants' motion to dismiss the failure to protect claim against defendant Keller is denied.

### III. Plaintiff's First Amendment Retaliation Claims Against Defendants Berghorn, Scull, and Hendrickson

**[24]** Plaintiff's third claim is for First Amendment retaliation. (Dkt. 9 at 18). "To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

**[25]** Plaintiff has alleged facts plausibly suggesting that Plaintiff was retaliated against for reporting the assault by defendant Hendrickson. Specifically, Plaintiff alleges that he verbally reported the incident involving defendant

Hendrickson to his supervisor defendant Scull, after which defendant Scull, to deter Plaintiff from further speaking about the alleged assault by defendant Hendrickson, informed multiple inmates that Plaintiff was a snitch. (Dkt. 9 at ¶¶ 37, 39-44). Plaintiff also reported defendant Hendrickson's attack to the medical clinic and was denied treatment for his tooth. (*Id.* at ¶¶ 45, 54). Plaintiff further alleges that following the attack, he was denied protective custody housing and was instead placed in G block where defendant Scull had previously announced that Plaintiff was a snitch, and this placement was in retaliation for Plaintiff reporting the incident involving defendant Scull. (*Id.* at ¶¶ 57-58). Plaintiff remained in G block for six days at an increased risk of harm. (*Id.* at ¶ 59). Finally, Plaintiff alleges that the threats by defendant Scull, as well as the cover up instigated by defendants Scull and Berghorn, were meant to chill Plaintiff's speech about the incident involving defendant Hendrickson. (*Id.* at ¶ 107).

**\*\*8** **[26]** **[27]** Defendants argue that Plaintiff has not alleged a First Amendment retaliation claim because he has failed to identify the exercise of a protected right. (Dkt. 10-2 at 14-15). In response, Plaintiff contends that his statements to prison officials immediately after the attack and before he filed a grievance were protected speech because "[a] prisoner's statement that he ... intends to file a grievance is constitutionally protected speech." (Dkt. 17 at 27). "An inmate's informal complaints or requests as well as formal grievances constitute protected activity under the First Amendment. With regard to oral or verbal complaints, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Smith v. Barone*, No. 3:20cv794(VLB), 2021 WL 917118, at \*4 (D. Conn. Mar. 10, 2021) (internal quotations and citations omitted). "[A]lthough not every statement an inmate makes in prison is afforded First Amendment protection, certain verbal complaints by prisoners about the conduct of prison officials may be considered protected action for purposes of a First Amendment retaliation claim." *Washington v. Fitzpatrick*, No. 20 CV 911 (VB), 2021 WL 966085, at \*6 (S.D.N.Y. Mar. 15, 2021) (quotations and citation omitted); *but see McIntosh v. United States*, No. 14-CV-7889(KMK), 2016 WL 1274585, at \*26 (S.D.N.Y. Mar. 31, 2016) ("courts in the Second Circuit and others have distinguished between unambiguously protected activity and situations where an inmate verbally confronts a prison official"); **\*645** *Rossi v. Goord*, No. 9:00-CV-1521(LEK/DEP), 2006 WL 2811505, at \*10 n.16 (N.D.N.Y. Sept. 28, 2006) ("The questioning by an inmate of a lawful order given by a corrections officer,

however, does not constitute protected speech deserving of First Amendment protection.").

The Court finds that Plaintiff has plausibly alleged that he engaged in protected activity for purposes of his First Amendment retaliation claim. Plaintiff alleges that he initially verbally reported the assault by defendant Hendrickson to defendant Scull, and also that he reported the assault to the medical clinic. (*See, e.g.*, Dkt. 9 at ¶ 37 ("Plaintiff notified and informed Defendant Scull, a supervisor of Defendant Hendrickson, and the rank of Sergeant, of Defendant Hendrickson's projecting him to the wall, and the serious injury and excessive bleeding to his mouth, around his teeth, lip and shins tears directly caused by Defendant Hendrickson."); *id.* at ¶ 45 ("During the examination, Plaintiff informed the medical personnel what had happened and who had injured him, including the very serious injuries inflicted on him by Defendant Hendrickson.")). Plaintiff further alleges that he stated on incident and medical reports that defendant Hendrickson had injured him (*id.* at ¶ 57 ("Regardless of Plaintiff's signature for placement into Protective Custody housing, Defendant Scull intentionally housed Plaintiff into G Block in order to continue to retaliate against Plaintiff for stating on incident reports, medical reports, and other documents that Defendant Hendrickson had inflicted severe injury on Plaintiff.")), although it is not clear from the complaint when Plaintiff made those specific reports or the nature of the reports. Although Plaintiff's initial report of the actions taken by defendant Hendrickson to defendant Scull was verbal, it was not a mere confrontation or a disagreement with a lawful order given by a corrections officer. Rather, Plaintiff made a verbal report of an assault by defendant Hendrickson to his supervisor.

**[28]** Defendants next argue that Plaintiff has failed to allege that he sustained an injury or experienced any adverse action due to his engaging in protected speech. (Dkt. 10-2 at 14-16). Specifically, Defendants contend that Plaintiff's speech was not chilled because he filed grievances regarding his claim, and he filed the instant lawsuit. (*Id.* at 15). Defendants further contend that the six days Plaintiff spent in general population before he was placed in protective custody is not an injury, because "fear of being assaulted is not a sufficiently serious injury." (*Id.* at 15-16).

**[29]** **[30]** The Court has considered these arguments and finds them to be without merit. In the context of a First Amendment retaliation claim, "[a]n adverse action is defined as retaliatory conduct that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quotations and citation omitted). While "[i]t might seem that, because [an inmate] continued to file grievances even after the alleged retaliation, the defendants' actions were not sufficiently adverse ... such a view misperceives what constitutes adverse action. The test is objective, and the plaintiff is not required to show that he was actually deterred." *Id.* In other words, "[c]hilled speech is not the *sine qua non* of a First Amendment claim. A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

**\*\*9** Here, Plaintiff alleges that he sustained injuries, beyond just the chilling of his speech, in retaliation for his reporting the assault by defendant Hendrickson. For example, **\*646** Plaintiff alleges that he was denied medical care for his tooth, that he was denied placement in protective custody despite the fact that he faced a risk of serious harm, and that Defendants informed other inmates that he was a snitch, putting him at an increased risk of harm. *See Thurmond v. Thomas-Walsh*, No. 18-CV-409(KMK), 2019 WL 1429559, at \*10 (S.D.N.Y. Mar. 29, 2019) (denial of medical evaluation or treatment could constitute adverse action for purposes of First Amendment retaliation claim); *see also Livingston v. Hoffnagle*, No. 9:19-CV-0353(GLS/CFH), 2019 WL 7500501, at \*13 (N.D.N.Y. Nov. 8, 2019) ("Courts in this Circuit have found that a prison official defendant's refusal of protective custody can be an adverse action for the purposes of a First Amendment retaliation claim because it could cause a prisoner to fear for his safety." (alterations, quotations, and citation omitted)), *adopted*, 2020 WL 95431 (N.D.N.Y. Jan. 8, 2020).

**[31]** Finally, the Court notes that Plaintiff plainly alleges a causal connection between the protected activity and the adverse actions. Defendants disclosing to other inmates that Plaintiff was a snitch, the denial of medical care for his tooth, and the denial of protective custody all occurred immediately after Plaintiff initially reported the incident involving defendant Hendrickson. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action"). Accordingly, Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim is denied.

## IV. Plaintiff's Conspiracy to Obstruct Justice Claim Against Defendants Berghorn, Scull, and Hendrickson

**[32]** **[33]** Plaintiff's fourth claim is for conspiracy to obstruct justice, in violation of 42 U.S.C. § 1985(2). (Dkt. 9 at 19). A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.' " *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999) (citation omitted). However, "[c]onclusory, vague, and general allegations of a conspiratorial agreement is insufficient to allege conspiracy under section 1985." *Berry v. Fed. Bureau of Investigations*, No. 3:20-cv-1116-VLB, 2021 WL 260255, at \*6 (D. Conn. Jan. 26, 2021); *see also Rolkiewicz v. City of N.Y.*, 442 F. Supp. 3d 627, 649 (S.D.N.Y. 2020) ("A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct. A plaintiff must, however, provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." (quoting *Sanders v. Long Island Newsday*, No. CV 09-2393(JFB)(SIL), 2015 WL 5475694, at \*14 (E.D.N.Y. July 14, 2015))).

**[34]** Defendants contend that this claim must be dismissed because (1) "Plaintiff offers only conclusory, vague, and general allegations of a conspiracy," and (2) the individuals involved in the conspiracy were all employees of the New York Department of Corrections and are therefore precluded by the intracorporate conspiracy doctrine. (Dkt. 10-2 at 17). In response, Plaintiff contends that there are exceptions to the intracorporate conspiracy doctrine, including where the defendants have engaged in criminal conduct, and where the involved individuals are pursuing personal interests wholly separate from the entity. (Dkt. 17 at 24).

Contrary to Defendants' argument, Plaintiff's allegations relating to the alleged **\*647** conspiracy are not conclusory. Plaintiff alleges that while he was in the clinic receiving treatment for his injuries, he observed and heard defendants Scull and Berghorn discussing the misconduct of defendant Hendrickson. (Dkt. 9 at ¶ 51). Specifically, defendant Berghorn instructed defendant Scull to solicit an officer to retrieve Plaintiff's tooth from the second floor hallway of Shop 5 and place it inside the orientation room, to create the impression that his tooth had been chipped during the assault by the prisoners, rather than by defendant Hendrickson in the hallway. (*Id.*). Defendant Berghorn also instructed defendant Scull that no one be permitted to enter the orientation room

until pictures had been taken placing the tooth there, knowing that the photos and placement of the tooth would create the false illusion that only the inmates had injured Plaintiff, and that defendant Hendrickson had not. (*Id.* at ¶¶ 52-53). These allegations plausibly allege an agreement by the parties to carry out prohibited conduct.

**\*\*10**  [35]  [36]  [37] Nor does the intracorporate conspiracy doctrine operate to bar Plaintiff's conspiracy claim. Pursuant to the intracorporate conspiracy doctrine, "employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together." *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015). However, "[a]ccording to the personal stake exception, the intracorporate conspiracy doctrine does not apply to bar conspiracy claims against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Id.* (quotations and citation omitted). "Courts have applied this exception in cases where officers were alleged to have exercised excessive force and then conspired to cover-up this alleged use of force." *Rolkiewicz*, 442 F. Supp. 3d at 648.

At this stage of the proceedings, the Court finds that Plaintiffs' allegations are sufficient to invoke the personal stake exception to the intracorporate conspiracy doctrine. Plaintiff has alleged that defendants Scull and Berghorn fabricated evidence to cover up the action of defendant Hendrickson (Dkt. 9 at ¶ 53), and that "[n]one of these acts were in any way related to corporate policy or management decision" (*id.* at ¶ 111). Taking these allegations as true, Plaintiff has plausibly alleged that Defendants "acted other than in the normal course of their corporate duties," by "using excessive force and then agreeing to cover up the alleged assault by manipulating or destroying evidence." *Brown v. Annucci*, No. 19 CV 9048(VB), 2021 WL 860189, at \*10-11 (S.D.N.Y. Mar. 8, 2021) (internal quotations and citation omitted); *see also Edwards v. Annucci*, No. 17 CV 5018(VB), 2019 WL 1284295, at \*9 (S.D.N.Y. Mar. 20, 2019) (explaining that "[e]mploying excessive force and falsifying documents are not core functions performed in the normal course of a correction officer's duties," and "accepting plaintiff's allegations as true for purposes of deciding this motion, plaintiff adequately pleads defendants acted outside the scope of their employment and in their own personal interest when they allegedly tried to cover up the beating, rendering the intracorporate conspiracy doctrine inapplicable"). Accordingly, Defendants' motion to dismiss Plaintiff's conspiracy claim is denied.

## V. Plaintiff's Due Process of Law/"Cover Up Claim" Against Defendants Scull, Berghorn, and Hendrickson

[38] Plaintiff's sixth claim is that his due process rights were violated when Defendants failed to properly investigate his claim against defendant Hendrickson and engaged in a "cover up" to protect defendant **\*648** Hendrickson. (Dkt. 9 at 22). In connection with this claim, Plaintiff alleges that there was ample evidence showing he had been attacked by defendant Hendrickson, but that defendants Scull and Berghorn fabricated evidence and manufactured the cover up of evidence, and therefore made it impossible for Plaintiff to litigate his underlying claim (*id.* at ¶¶ 132-34), and Plaintiff was not permitted to produce evidence of his position at the disciplinary hearings brought by the prison (*id.* at ¶ 140). Defendants argue that this claim must be dismissed because "Plaintiff does not have a constitutional right to an investigation." (Dkt. 10-2 at 16). In response, Plaintiff contends that he is not bringing a failure to investigate claim, but rather a substantive due process violation "grounded in the Fourteenth Amendment, for the cover up and tainting of key evidence which has now been hidden for use in subsequent proceedings." (Dkt. 17 at 31).

[39]  [40] "Although there is ... no constitutional right to an investigation by government officials, courts do recognize an inadequate investigation as sufficient to state a civil rights claim [when] there was another recognized constitutional right involved." *Melendez v. Falls*, No. 06-CV-6198P, 2009 WL 529259, at \*1 (W.D.N.Y. Mar. 2, 2009) (alteration, quotations, and citations omitted). For example, "where, as here, the plaintiff alleges that the investigation was falsified for the purpose of retaliating against him for the exercise of his legal rights, such a claim may proceed." *Id. See also Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) ("An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper." (alterations and citation omitted). Here, Plaintiff plausibly alleges that Defendants fabricated evidence both to protect defendant Hendrickson, but also in retaliation for Plaintiff's exercising his First Amendment rights. (*See, e.g.,* Dkt. 9 at ¶ 106 ("The cover up of the force used by Defendant Hendrickson ... w[as] all inflicted as retaliation for [Plaintiff]'s assertion of his right to tell the truth about the inmate attack incident that was being investigated, and also [Plaintiff]'s due process rights and rights in accessing the courts."); *id.* at ¶ 134 ("This cover up was performed by Defendants Scull, Berghorn, and Hendrickson in order to cover up Defendant

Hendrickson's unlawful actions, and has now made it almost impossible for Plaintiff to litigate this underlying claim, because material evidence was destroyed that showed the tooth in the hallway, and no treatment was provided for the tooth to cover up actions of Defendants.")). Accordingly, Defendants' motion to dismiss Plaintiff's due process claim on the basis that Plaintiff does not have a constitutional right to an investigation is denied.

## VI. Plaintiff's Supervisory Liability Claim Against Defendants Scull, Berghorn, and Keller

**\*11** **[41]** **[42]** Plaintiff's fifth cause of action is for "eighth amendment—supervisory liability" against defendants Scull, Berghorn, and Keller, based on their failure to properly supervise defendant Hendrickson, failure to implement a proper inmate classification system, and by failing to remedy the wrongs committed by defendant Hendrickson and other Department of Corrections employees. (Dkt. 9 at 20-21). Defendants contend that this claim must be dismissed because Plaintiff does not allege that they created a policy or custom under which unconstitutional practices occurred. (Dkt. 10-2 at 11-13).

In response to the motion to dismiss, Plaintiff argues that he has properly pleaded a supervisory liability claim against defendants Berghorn and Scull. **\*649** (Dkt. 17 at 21). Citing to the five categories delineated by the Second Circuit in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), he points to the following allegations in the second amended complaint which he argues support his supervisory liability claim:

> [t]he SAC plausibly alleges that Berghorn and Scull directly participated in the excessive force violation through *all five* means iterated above. They (1) covered up evidence (SAC ¶¶ 51-53). They (2) did not remedy the wrong after being informed of it by Mr. Mazyck (SAC ¶¶ 37-53), and (3) in covering up the violation, allowed it to continue (SAC ¶¶ 37-53). Berghorn and Scull (4) were grossly negligent regarding Hendrickson, who committed the violation (SAC ¶¶ 37-53), and (5) did not act (in a lawful manner) on information indicating the unlawful

use of force had taken place (SAC ¶¶ 37-59)[.]

(Dkt. 17 at 22 (citations omitted)). Plaintiff further clarifies that he only alleges "supervisory liability claims, not any *Monell* claims." (*Id.* at 21 n.9).

The Court first notes that the theories of supervisory liability delineated in *Colon* are no longer controlling following the Second Circuit's decision in *Tangreti v. Bachmann*, where the Second Circuit held that "there is no special rule for supervisory liability," and that "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 983 F.3d at 618 (quotations and citations omitted). Accordingly, *Colon* is no longer controlling on this issue.

**[43]** The parties' arguments addressing Plaintiff's claim for "supervisory liability" appear to be based on their misapprehension of such a claim. Simply because a defendant serves in supervisory capacity does not automatically make every claim a plaintiff has against that defendant one for "supervisory liability." *See Morgan*, 956 F.3d at 90 (doctrine of supervisory liability implicated where plaintiff contends that supervisory defendant improperly allowed subordinate prison official to commit a constitutional violation). As explained above, Plaintiff has plausibly alleged the personal involvement of defendants Keller, Berghorn, and Scull—all of whom hold supervisory positions—in several of the specific constitutional deprivations alleged by Plaintiff. Specifically, Plaintiff alleges that defendant Keller was personally involved in the failure to protect claim, and defendants Berghorn and Scull personally participated in the alleged retaliation, due process, and conspiracy claims.

**[44]** However, to the extent Plaintiff attempts to hold defendants Keller, Berghorn, and Scull liable for actions taken by defendant Hendrickson only, or for creating a policy or custom under which inmates were abused by corrections officers at Elmira, the Court agrees with Defendants that he has failed to state such a claim. While the second amended complaint contains allegations that there is "a longstanding culture of brutality at Elmira" (Dkt. 9 at ¶ 78), that defendants "Keller, Scull, and Berghorn failed to instruct, train, supervise, control, and discipline personnel in documenting uses of force and preserving evidence, contributing to the culture of lawlessness at Elmira

and allowing abusive officers to continue their pattern of excessive force against inmates in their custody" (*id.* at ¶ 80), as well as that they were aware that "Defendants had been involved in multiple incidents of abuse of inmates prior to their abuse of Plaintiff but did nothing to prevent that abuse" (*id.* at ¶ 72), those allegations are conclusory and vague, and lack the required specificity to hold supervisory defendants responsible for the actions of their subordinates. For example, the second **\*650** amended complaint lacks specific allegations describing prior instances of abuse by defendant Hendrickson, or that defendants Keller, Scull, and Berghorn were aware of or encouraged those actions. Because Plaintiff has failed to allege facts plausibly suggesting that defendants Keller, Scull, and Berghorn may be held liable for the actions of their subordinates, Plaintiff's claim for "supervisory liability" is dismissed.

## CONCLUSION

**\*\*12**  For the foregoing reasons, Defendants' motion to dismiss the second amended complaint (Dkt. 10) is granted in part and denied in part. Defendants' motion is denied in all respects, except as to Plaintiff's fifth cause of action for "supervisory liability," which is dismissed. In addition, the Clerk of Court is directed to terminate Sergeant Issac from the docket.

SO ORDERED.

**All Citations**

531 F.Supp.3d 630, 2021 WL 1201224

---

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (4)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Second Amended Complaint**<br>Corey MAZYCK, Plaintiff, v. DEPUTY SUPERINTENDENT OF SECURITY GREGORY KELLER, Sergeant Matthew W. Scull, Sergeant Berghorn, and Officer Hendrickson, in their individual capacities, Defendants.<br>2020 WL 13512818 | — | W.D.N.Y. | Mar. 19, 2020 | Pleading |
| **2. Memorandum of Law in Opposition to the Motion to Dismiss By Defendants Keller, Scull, Berghorn, and Hendrickson**<br>Corey MAZYCK, Plaintiff, v. DEPUTY SUPERINTENDENT OF SECURITY GREGORY KELLER, Sergeant Matthew W. Scull, Sergeant Berghorn, and Officer Hendrickson, in their individual capacities, Defendants.<br>2020 WL 13512817 | — | W.D.N.Y. | May 15, 2020 | Motion |
| **3. Defendants' Memorandum of Law to Support Their Fed. R. Civ. Pro. 12(b)(6) Motion to Dismiss**<br>Corey MAZYCK, Plaintiff, v. SUPERINTENDENT GREGORY KELLER, Sergeant Matthew W. Scull, Sergeant Berghorn, and Officer Hendrickson, in their individual capacities, Defendants.<br>2020 WL 13512816 | — | W.D.N.Y. | Apr. 07, 2020 | Motion |
| **4. Docket 6:20-CV-06055**<br>Mazyck v. Keller et al | — | W.D.N.Y. | Jan. 23, 2020 | Docket |

**History (2)**

**Direct History (1)**

1. Mazyck v. Keller
   531 F.Supp.3d 630 , W.D.N.Y. , Mar. 31, 2021

**Related References (1)**

2. Mazyck v. Doe 1-10
   2024 WL 922790 , W.D.N.Y. , Mar. 04, 2024

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Smith v. Collins, S.D.N.Y., October 1, 2015

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of New York, Kelly L. Munkwitz, Esq., Asst. Attorney General, of Counsel, Department of Law, Albany, NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated March 17, 2006, the Honorable George H. Lowe, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted, and that plaintiff's motion for partial summary judgment be denied. (Docket No. 51). The plaintiff has filed objections to the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of the report and recommendations to which the plaintiff has objected, the Report-Recommendation is accepted and adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly, it is ORDERED that
1. Defendants' motion for summary judgment is GRANTED;

Plaintiff's motion for partial summary judgment is DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of Practice for this Court. In this *pro se* civil rights action brought under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges that five employees of Upstate Correctional Facility-Deputy Superintendent Robert K. Woods, Captain Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service Administrator Richard Antonelli, and Correction Officer Wayne Holt ("Defendants")-violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments by (1) retaliating against him for having previously filed a complaint, (2) subjecting him to an unreasonable search and seizure, (3) subjecting him to a damaged bunk bed while he was housed in the Upstate Correctional Facility Special Housing Unit, and (4) taking away his "good time" credits without affording him due process. (Dkt. No. 5 [Plf.'s Am. Compl.].) [1]

[1]    Given my duty to liberally construe a *pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ]

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in how pro se pleadings are construed." Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 467 (S.D.N.Y.1998); see Haines v. Kerner, 404 U.S. 519, 520-21

*(1972) (per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at \*4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]   *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]   *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*).

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and*

that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at \*4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at \*2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [8]

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

6      *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

7      Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806 (1995).

8      *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649,

664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. 9 Of course, an affidavit may be conclusory because its assertions are too general. 10 However, even where an affidavit's assertions are specific (e.g., with respect to time, place, persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." 11 Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

9      *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

10     *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging

2006 WL 1133247

remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by

admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a] [2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other

two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"]*; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint"* in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]    (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]    (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]    (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]    (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]    (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37

2006 WL 1133247

[Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]    (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

[21]    (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. [22]

[22]    (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. [23] In pertinent part, the letter stated,

[23]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. [24]

[24]    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. [25]

[25]    (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. [26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." [27] In addition, the last page of the letter states:

2006 WL 1133247

[26]   (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

[27]   (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original*.
It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[28]

[28]   (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]   (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request."[31]

[30]   (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]   (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention."[33]

[32]   (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]   (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic."[34]

[34]   (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

2006 WL 1133247

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[35] The note stated, in pertinent part:

[35]   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *DEAD* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself.[36]

[36]   (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

*7 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff.[37] That memorandum stated, in pertinent part:

[37]   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately.[38]

[38]   (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum.[39]

[39]   (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents.[40] Plaintiff denied having such documents.[41]

[40]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note.[42]

[42]   (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers).[43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters).[44]

[43]   (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement];

2006 WL 1133247

Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

44     (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping

an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

45     (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

46     (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

Plaintiff's Misbehavior Report,
Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3)

soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20. [48]

47    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

48    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee; [49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization; [50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee. [51]

49    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

50    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14][v].

51    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or

services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

52    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 224 of 531
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

55 (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56 (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

57 (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58 *(Id.)*

59 *(Id.)*

Meetings Between Defendants
Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

60 (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1,

¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

61 (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

62 (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

63 (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged

unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002.[64]

[64]   (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU.[65]

[65]   (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned.[66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood.[67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU.[68]

[66]   (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial

of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[67]   (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

[68]   (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9**  In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits (which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d.Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have

been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]   *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such

2006 WL 1133247

complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

70      (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

71      (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

72      (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73      (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74      (See, supra, Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. [75]

75      (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though that cause of action cites the Fourth

Smith v. Woods, Not Reported in F.Supp.2d (2006)

2006 WL 1133247

Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am".] *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h) (3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint.[76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim.[77] In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...."[78]

[76]   *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

[77]   (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am"

even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am".)

[78]   (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11**   The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984).[79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube."[80] Indeed, Plaintiff appears to recognize this point of law.[81]

[79]   *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

[80]   *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

[81]   (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and

2006 WL 1133247

seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

[82]    (Dkt. No. 5, ¶ 12 [Am. Compl.].)

[83]    I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

[84]    *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not

established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference' exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of

sleeping on a defective bed. [86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need. [87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint, [88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need. [89]

[85] "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

[86] (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

[87] *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

[88] (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard

conditions there, which included his allegedly defective bunk].)

[89] (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90] (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91] *(See, supra,* Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92] (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93] *(Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different

2006 WL 1133247

SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]  (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds.[95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]  *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

### 2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3, 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it.[96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times.[97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]  (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]  (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[98] Any assertion by Plaintiff that Defendants

2006 WL 1133247

Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October

24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101]    Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    *(See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §

2006 WL 1133247

1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations

omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed. [102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]   (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]   *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding

2006 WL 1133247

that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104]    *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]    (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school. [106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F. [107] Indeed, he had filed grievances immediately before and during this very time period. [108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

2006 WL 1133247

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their threshold burden with regard to this issue. [109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated. [110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated. [111]

[109] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ...

upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110] *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111] *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group

2006 WL 1133247

of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have

personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant

official would have understood that his or
her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations
omitted), cert. denied, 503 U.S. 962 (1992). [112] Regarding the
issue of whether *a reasonable person would have known* he
was violating such a clearly established right, this "objective
reasonableness" [113] test is met if "officers of reasonable
competence could disagree on [the legality of defendant's
actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see
also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757,
764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921
F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court
explained,

[112]    *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d
647, 654 (2d Cir.1993); *Prue v. City of Syracuse,*
26 F.3d 14, 17-18 (2d Cir.1994).

[113]    *See Anderson v. Creighton,* 107 S.Ct. 3034,
3038 (1987) ( "[W]hether an official protected
by qualified immunity may be held personally
liable for an allegedly unlawful official action
generally turns on the 'objective reasonableness
of the action.' ") (quoting *Harlow,* 457 U.S. at
819; *Benitez v. Wolff,* 985 F.2d 662, 666 (2d
Cir.1993) (qualified immunity protects defendants
"even where the rights were clearly established,
if it was objectively reasonable for defendants to
believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample
protection to all but the plainly incompetent or those who
knowingly violate the law.... Defendants will not be immune
if, on an objective basis, it is obvious that no reasonably
competent officer would have concluded that a warrant should
issue; but if officers of reasonable competence could disagree
on this issue, immunity should be recognized.
*Malley,* 475 U.S. at 341. Furthermore, courts in the
Second Circuit recognize that "the use of an 'objective
reasonableness' standard permits qualified immunity claims
to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764
(citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992]
[citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's
motion papers and response papers, I will assume, for the

sake of argument, that Plaintiff is claiming he had, among
others, the following rights: (1) a right to have Defendant Holt
take control of Inmate Alcivar's legal materials when Plaintiff
offered those materials to Defendant Holt, and to later
acknowledge his failure to take control of those materials;
(2) a right to have Defendant Woods personally visit Plaintiff
in his "cube," and not launch a disciplinary investigation
against him, following Plaintiff's notes to Defendant Woods;
(3) a right to have Defendants Belarge and O'Donnell
not open or read Plaintiff's correspondence to and from
Inmate Alcivar's two daughters, following Plaintiff's notes to
Defendant Woods; (4) a right to have Defendant Antonelli
recuse himself based on the (alleged) fact that Plaintiff
and Defendant Antonelli, one week before the disciplinary
hearing, had an "encounter" regarding the conditions of
the equipment in the prison mess hall; and (5) a right to be
either transferred to a new cell in SHU, or provided with
a new bunk bed in SHU, *immediately* upon making an oral
complaint about his bunk bed to Defendants Woods, Belarge,
O'Donnell, Antonelli and/or Holt (or upon the observations of
that bunk bed by those Defendants).

*20   As an initial matter, it is unclear to me that any of
these rights were "clearly established" in the summer and fall
of 2002 (or are clearly established now). In any event, even
if these rights were clearly established, it appears entirely
reasonable to me for Defendants to have concluded that their
treatment of Plaintiff did not violate these rights (or any
rights). Simply stated, I can find no *evidence* in the record that
Defendants Holt, Woods, Belarge, O'Donnell or Antonelli
did anything wrong. At the very least, officers of reasonable
competence could have disagreed as to the lawfulness of
Defendants' actions..

As a result, even if the Court does not dismiss all of
Plaintiff's claims for the reasons stated earlier in this Report-
Recommendation, I recommend that the Court dismiss all of
Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for
partial summary judgment–which (at best) contains arguments
regarding the issues discussed above–is without merit. I reach
this conclusion for the independent reason that Plaintiff's
Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2)
generally does not contain any citations to the record; and, to
the extent that Rule 7.1 Statement does contain citations to
the record, the record generally does not actually support the
facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the*

2006 WL 1133247

*moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*") [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (5)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Brief for Defendants-Appellees**<br>Jeff SMITH, Plaintiff-Appellant, v. Robert K. WOODS, Defendants-Appellees.<br>2006 WL 5101312 | PDF | C.A.2 | Oct. 23, 2006 | Brief |
| **2. Notice of Motion**<br>Jeff SMITH, Plaintiff, v. Robert K. WOODS, DepUty Superintendent; Joseph R. Belarge, Captain; G. J. O'Donnell, Sergeant; F.S.A. Antonelli; Wayne Holt, Officer, Defendants.<br>2004 WL 5538138 | PDF | N.D.N.Y. | June 30, 2004 | Motion |
| **3. Counter-Statement Pursuant to Rule 7.1(a)(3)**<br>Jeff SMITH, Plaintiff, v. Robert K. WOODS, Deputy Superintendent; Joseph R. Belarge, Captain; G.J. O'Donnell, Sergeant; F.S.A. Antonelli; Wayne Holt, Correction Officer, Defendants.<br>2005 WL 6063077 | PDF | N.D.N.Y. | Apr. 01, 2005 | Filing |
| **4. Docket 07-8792**<br>JEFF SMITH v. ROBERT K. WOODS | — | U.S. | Jan. 17, 2008 | Docket |
| **5. Docket 06-2370**<br>SMITH v. WOODS | — | C.A.2 | May 16, 2006 | Docket |

**History (3)**

**Direct History (3)**

🚩  1.  Smith v. Woods
2006 WL 1133247 , N.D.N.Y. , Apr. 24, 2006

*Judgment Affirmed by*

2.  Smith v. Woods
219 Fed.Appx. 110 , 2nd Cir.(N.Y.) , Mar. 12, 2007

*Certiorari Denied by*

3.  Smith v. Woods
552 U.S. 1248 , U.S. , Mar. 03, 2008

2012 WL 4486086

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Benji D. REED, Plaintiff,

v.

John DOE No. 1; John Doe No

2; and M. Soto, Defendants.

Civil Action No. 9:11–CV–0250 (TJM/DEP).

|

July 26, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se. [1]

[1] The court's records list the plaintiff as being confined in the Southport Correctional Facility "Southport", based upon a change of address notice filed by Reed on February 22, 2012. *See* Dkt. No. 20. According to publically available information, however, Reed is now being held in the Elmira Correctional Facility. *See* http//nysdoccslookup.doccs.ny.gov. GCA00P00/ WINQ130 (screenshot attached. Plaintiff is reminded of his obligation under the court's rules to notify the court and defendants' counsel of any further address changes in order to facilitate communications with him. *See* N.Y.N.D.L.R. 10.1(c)(2).

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendant Soto.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Benji D. Reed, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against various prison officials, alleging deprivation of his civil rights. While the scope of his complaint has been winnowed, and it now raises only claims of cruel and unusual punishment and unlawful retaliation against one named and two unidentified "Doe" defendants, as originally filed that pleading asserted an array of claims stemming from incidents occurring at two separate correctional facilities.

In response to plaintiff's complaint the sole remaining named defendant has moved for dismissal of all claims against him for failure to state a plausible cause of action upon which relief may be granted. The plaintiff, in turn, has applied for leave to amend his complaint, and for appointment of counsel to represent him *pro bono.* For the reasons set forth below, I recommend that defendant's motion to dismiss be granted, and will deny plaintiff's application for leave to amend, on the basis of futility in light of my recommendation regarding the legal sufficiency of his existing claims, as well as his request for assignment of counsel.

I. *BACKGROUND* [2]

[2] The following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). In light of the severance and transfer of plaintiff's claims arising out of his confinement at the Southport Correctional Facility to the Western District of New York, I have included only the facts relevant to his remaining claims, all of which involve events at the Eastern Correctional Facility ("Eastern").

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to the claims remaining in the action, he was designated to Eastern, located in Napanoch, New York. *Id.* at ¶ 3.

The events giving rise to plaintiff's claims were set in motion on September 14, 2010, when Reed developed an illness he attributed to food consumed in the mess hall at Eastern. Complaint (Dkt. No. 1) ¶¶ 32–37. Plaintiff maintains that the food causing his intestinal issues was known by defendant John Doe No. 1 to have been contaminated, and should have been inspected by defendant John Doe No. 2 prior to being served to the inmates. Complaint (Dkt. No. 1) ¶¶ 41–42.

Plaintiff was initially treated on the following day at the facility's medical clinic, along with several other affected inmates, and given "dymotabs" to address the condition. Complaint (Dkt. No. 1) ¶ 38. The medication was subsequently discontinued on that same day, however, and plaintiff was confined to his cell and placed on a water diet for one day. *Id.* at ¶¶ 39–40.

While at Eastern, plaintiff was designated to undergo alcohol and substance abuse treatment in a program ("ASAT") overseen by defendant M. Soto, a counselor at the facility. *See* Complaint (Dkt. No. 1) ¶¶ 6, 31. Based apparently upon his absence from ASAT treatment while confined to his cell due to illness, plaintiff received a misbehavior report authored by defendant M. Soto accusing him of lying regarding his location on September 15, 2010, after being asked why he did not appear for ASAT treatment, and for failing to follow facility rules regarding attendance in the program. Complaint (Dkt. No. 1) ¶¶ 46–47. At a subsequent disciplinary hearing conducted to address the accusations set forth in the misbehavior report, however, the charges were dismissed. *Id.* at ¶ 49.

**\*2** Following plaintiff's return to the ASAT program he was called into defendant Soto's office and, after a conversation during which Reed refused to discuss the conviction that led to his incarceration, he was forced by Soto to sign a refusal to participate in ASAT training. *Id.* at ¶¶ 50–56. Plaintiff was then removed from the ASAT program and escorted to his cell, where he remained in keeplock pending a hearing stemming from the issuance of a new misbehavior report alleging his refusal to participate in the ASAT program.[3] *Id.* at ¶¶ 57–61. At a subsequent hearing, conducted on October 12, 2010, Reed was exonerated of all charges and was permitted to return to the ASAT program. *Id. at* ¶¶ 64–65. As a result of issuance of the two misbehavior reports, while at Eastern plaintiff was keeplock-confined for a total of fourteen days.[4] *See* Plaintiff's Memorandum (Dkt. No. 18) p. 6 of 18.

[3]    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving the inmate of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997)

(Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)) (Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.). Inmate conditions while keeplocked are substantially the same as in the general population, the primary exception being that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

[4]    Plaintiff's opposition memorandum also intimates that he lost good time credits as a result of the relevant events. *See* Plaintiff's Memorandum (Dkt. No. 18) at p. 6 of 18. There is no factual support for this statement, however, in either plaintiff's complaint or the attached exhibits.

Plaintiff was subsequently transferred out of Eastern and into the Southport Correctional Facility, located in Pine City, New York, in December 2010. Complaint (Dkt. No. 1) ¶ 71.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 8, 2011. Complaint (Dkt. No. 1). Plaintiff's complaint named the two Doe defendants, M. Soto, and seven corrections employees assigned to Southport as defendants, and asserted claims under the Eighth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. § 12,101 *et seq.,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, additionally setting forth a pendent claim of negligence. By order issued on August 2, 2011, based upon an initial review of plaintiff's complaint and accompanying *in forma pauperis* application, Senior District Judge McAvoy ordered all claims arising from events occurring at Southport severed, and directed that those claims be transferred to the Western District of New York. Dkt. No. 4.

In lieu of answering plaintiff's complaint defendant Soto, the sole remaining named defendant in this action, moved on October 17, 2011 for dismissal of plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In his motion defendant argues that plaintiff's complaint fails to allege a plausible claim upon which relief may be granted, and that in any event he is entitled to

qualified immunity from suit. *Id.* Plaintiff has since submitted a response in opposition to defendant's motion. Dkt. No. 18.

Following the filing of defendant's dismissal motion, plaintiff moved on December 7, 2011 for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Dkt. No. 14. In his motion Reed asserts that amendment is sought to permit elimination of the claims and references to the defendants affected by the transfer to the Western District of New York, and to clarify and expand upon facts set forth in his original complaint relating to events at Eastern. *See* Motion for Leave to Amend (Dkt. No. 14) ¶¶ 1–2. Plaintiff has also requested appointment of counsel to represent him in the action, *pro bono.* Dkt. No. 15. Defendant Soto has since responded in opposition to those motions, by letter dated January 6, 2011 from his counsel, Megan A. Brown, Esq., arguing that the motion for leave to amend should be denied as futile for the same reasons as set forth in his dismissal motion, and taking no position with regard to plaintiff's request for appointment of counsel. Dkt. No. 17.

**\*3** Defendant's dismissal motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Rule 72.3(c). *See* Fed.R.Civ.P. 72(b). The remaining two motions brought by the plaintiff fall within my non-consensual jurisdiction, and therefore will be addressed in the form of an order from this court.

## III. *DISCUSSION*

### A. *Standard of Review*

Defendant's motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a

complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims." *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations and quotations omitted)).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

### B. *Plaintiff's Retaliation Claim*

Plaintiff alleges that defendant Soto, motivated by Reed's use of the medical facilities at Eastern, issued two false misbehavior reports to him in September 2010. In response,

2012 WL 4486086

Soto argues that plaintiff's vague and conclusory allegations offered in support of this retaliation claim are insufficient to survive a motion to dismiss.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the provisions of the Eighth Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.2008). Claims by inmates that adverse actions taken by prison workers are, of course, easily incanted, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis,* 320 F.3d at 352 (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff succeeds in carrying this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*5** Affording plaintiff the deference which he is due as a *pro se* litigant and broadly construing his complaint, it appears that plaintiff is claiming the September misbehavior reports were issued in retaliation for his having sought medical treatment due to a sudden illness.[5] As defendant correctly argues, the mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to level of constitutional significance. *Boddie v. Schnieder,* 105

F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). The further assertion that the false misbehavior report was prompted by the accused inmate having engaged in protected activity, however, can suffice to support a cognizable claim of unlawful retaliation. *Franco,* 854 F.2d at 589.

5        In his motion defendant Soto has assumed, for the sake of argument, that plaintiff's resort to seeking medical treatment within the facility constituted protected activity sufficient to trigger the First Amendment's protection against retaliation, and I will do likewise.

Having assumed plaintiff's ability to establish that he engaged in protected activity, the court's focus turns next to the question of whether he has sufficiently alleged that he experienced adverse action at the hands of the defendant. In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493; *see also Davis,* 320 F.3d at 353. The adverse action inquiry is a contextual one. *Davis,* 320 F.3d at 353. Courts should bear in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

The adverse action alleged by the plaintiff in support of his retaliation claim consists of the issuance of two false misbehavior reports. The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). The false misbehavior reports at issue led to plaintiff's keeplock cell confinement for a period of fourteen days. At this early procedural juncture, I am unable to conclude that this allegation is insufficient to support a plausible finding of adverse action. *See Edwards v. Horn,* No.2012 WL 76012, at * 16 (S.D.N.Y. Mar. 8, 2012) (citing *Gill,* 389 F.3d at 384) (false misbehavior report and placement in keeplock constitutes adverse action)).

The third requirement for pleading a cognizable retaliation claim involves linking the protected activity and adverse action alleged. It is in connection with this element that plaintiff's retaliation claim fails. In cases involving claims of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558

(N.D.N.Y.2007). When evaluating whether a misbehavior report is the product of retaliatory animus, an analysis most typically undertaken on a motion for summary judgment, courts generally look to several factors as bearing upon any potential nexus between the protected conduct and the misbehavior report, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

**\*6** In this instance, plaintiff's complaint is lacking in any factual allegations that would establish the requisite nexus between his visit to the prison infirmary and defendant Soto's issuance of misbehavior reports. Indeed, in his complaint Reed hypothesizes that Soto disbelieved his explanation concerning his whereabouts at the time of his absence from the ASAT program, prompting him to issue the misbehavior reports. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 54, 65. This allegation by the plaintiff suggests a non-retaliatory motivation for defendant's issuance of the misbehavior reports at issue.

In light of the plaintiff's failure to state facts sufficient to satisfy this critical element of a retaliation claim, I recommend that the defendant's motion be granted, and that plaintiff's retaliation cause of action under the First Amendment be dismissed.

### C. *Verbal Harassment/False Misbehavior Report Claims*

Liberally construed, plaintiff's complaint could be interpreted as also asserting a claim, independent of retaliation, under the Eighth Amendment for harassment and for issuance of false misbehavior reports.

As was previously observed, the mere issuance of a false misbehavior report, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise on behalf of a prison inmate; a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). As such, plaintiff's claim related to the filing of a false misbehavior report, independent of his First Amendment retaliation cause of action, is subject to dismissal.

Defendant also interprets plaintiff's complaint as alleging that he was generally harassed by Soto, and that Soto stated to other inmates that Reed was a monster with whom they should not associate. These allegations appear to be calculated to state a violation of his Eighth Amendment's right to be free from cruel and unusual punishment. Reed's complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection. As a general matter, mere verbal harassment, including that accompanied by the use of profanity, without any corresponding physical injury does not support a cognizable claim under section 1983, however boorish and unprofessional the alleged conduct may be. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Because plaintiff's complaint lacks allegations that would plausibly support an Eighth Amendment violation claim, I recommend dismissal of that cause of action, to the extent that his complaint may properly be construed as raising such a claim.

### D. *Leave to Amend*

**\*7** Following the filing of plaintiff's dismissal motion, plaintiff sought leave to amend his complaint to flesh out certain factual allegations in support of his claims. *See* Dkt. No. 14. At this juncture the court must determine whether to permit the amendment now sought, and additionally whether the plaintiff should be granted leave to amend in any event in an effort to cure the deficiencies perceived with regard to his existing claims against defendant Soto.

### 1. *Leave to Amend Generally*

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted—under circumstances not applicable here—a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98–CIV–662, 2000 WL 297197, at \*3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

2012 WL 4486086

Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances that may entitle the pleader to relief, then futility is not a proper basis on which to deny the right to amend. *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

The court has reviewed plaintiff's proposed amended complaint, and finds that it suffers from the same deficiencies as are noted above with respect to his initial complaint. Accordingly, plaintiff's motion for leave to file the proposed amended complaint accompanying his motion will be denied on basis of futility.[6] *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *accord Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sep.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted).

[6]    In his proposed amended complaint plaintiff seeks to add a claim for denial of equal protection, alleging that because he was issued a misbehavior report for exercising his right to seek medical care while another inmate was permitted to attend the medical clinic, his right to equal protection was denied. *See* Proposed Amended Complaint (Dkt. No. 14–1) ¶ 60.

        The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)

(citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (internal quotation marks omitted)).

        While plaintiff's complaint alleges that he was treated differently than another inmate, conspicuously absent from his proposed amended complaint is the allegation of any fact plausibly suggesting that the difference in treatment was the result of an intentional or purposeful discrimination directed at an identifiable or suspect class. For this reason, I find that the proposed amended complaint does not state a plausible equal protection claim.

*2. Leave to Amend to Cure Perceived Deficiencies*

**\*8** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon,* 875 F.Supp. at 1003 (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

I am unable to conclude that if given the opportunity plaintiff nonetheless would be unable to set forth allegations sufficient to avoid dismissal of his claims at this early stage in the litigation. If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995)

2012 WL 4486086

(Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

E. *Appointment of Counsel*

In addition to seeking leave to amend, plaintiff has applied to the court for appointment of counsel. As a threshold matter, prior to requesting appointment of *pro bono* counsel, a party must first demonstrate that he or she has been unable to obtain counsel through the private sector or public interest firms. *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 173–74 (2d Cir.1989) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). Given that plaintiff has not provided the court with information regarding any efforts by him to obtain counsel, his request is subject to denial on this basis alone.

Turning to the merits of his application, I find that Reed has not demonstrated entitlement to appointment of counsel under the applicable statute. 28 U.S.C. § 1915(e)(1) affords district courts broad—though not limitless—discretion in determining whether to appoint counsel to represent indigent civil litigants. *Hodge,* 802 F.2d at 60. In *Hodge,* the Second Circuit noted that when exercising that discretion the court

**\*9** should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for crossexamination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and

any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61–62; *see also Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (citing Hodge). As can be seen, of the criteria enunciated by the Second Circuit to be considered when determining whether assignment of pro bono counsel is appropriate, the most important is the merits —that is, "whether the indigent's position [is] likely to be of substance." *Cooper,* 877 F.2d at 172 (citations and internal quotations omitted). Where a plaintiff does not provide a court with evidence, as opposed to mere allegations, relating to his or her claims, that party does not meet this threshold requirement. *See Herman v. Runyon,* No. 96 CIV. 6080, 1997 WL 118379, at \*1 (S.D.N.Y. Mar. 17, 1997).

Each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, J.) (citing *Hodge,* 802 F.2d at 61). Although the Constitution guarantees indigent litigants "meaningful access" to the courts, it does not entitle all such parties to receive the benefit of *pro bono* representation. *Hodge,* 802 F.2d at 60. While, as was previously indicated, the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised the court is required to call upon attorneys to donate their time *pro bono* to the benefit of indigent litigants and the court. Accordingly, in deference to the limited resources available to the court to serve the interests of the many indigent litigants who pursue claims before it, and recognizing the "thankless burden" associated with such assignments, *Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir.1961), *cert. denied,* 370 U.S. 964, 82 S.Ct. 1592, 8 L.Ed.2d 830 (1962), courts should not grant such applications indiscriminately, but instead must exercise good judgment and restraint in doing so. *Cooper,* 877 F.2d at172.

In this instance, plaintiff has failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation. Plaintiff's application for appointment of counsel will therefore be denied, without prejudice to renewal. [7]

[7]    In accordance with the customary practice of this court, once a case passes through the discovery and motion phases and becomes trial ready, *pro bono* counsel is usually appointed for an indigent *pro*

*se* inmate litigant to assist in preparation for and during the trial, either as attorney of record or as standby counsel.

## IV. *SUMMARY AND RECOMMENDATION*

The claims now remaining before this court, following severance and transfer of a portion of plaintiff's original complaint to the Western District of New York, include causes of action against two John Doe defendants arising from plaintiff's alleged investigation of contaminated food, as well as claims of retaliation, harassment, and cruel and unusual punishment against defendant M. Soto. Because the Doe defendants in this case have not yet been identified and thus have not yet appeared in the action, the court has not been called on to gauge the sufficiency of plaintiff's claims against those defendants.[8] Turning to plaintiff's claims against defendant Soto, based upon a review of the allegations set forth in plaintiff's complaint, I recommend that all claims against defendant Soto be dismissed, with leave to replead, and find it unnecessary to address his alternative argument, to the effect that he is entitled to qualified immunity from suit.

[8]    Because only "persons" may act under color of state law, a complaint seeking money damages pursuant to § 1983 must name one or more individuals as defendants. *See Walker v. State of Connecticut,* No. 3:06CV165, 2006 WL 1981783, *2 (D.Conn.2006); *Connor v. Hurley,* No. 00Civ.8354LTSAJP, 2004 WL 885828, at * 3 (S.D.N.Y.2004). It is not uncommon for a *pro se* plaintiff to include a "John Doe" or other unknown defendants, together with named defendants in a complaint. Generally, in such cases the complaint is served upon the named defendants, and the plaintiff is directed to pursue discovery to identify the John Doe(s) and to thereafter seek leave to amend the complaint to name them as defendants. In the event the plaintiff chooses to abandon his claims against defendant Soto, leaving only the two "Doe" defendants in the case, I recommend the court allow plaintiff to name the superintendent of Eastern as a defendant—even though there is no suggestion of his or her personal involvement in the alleged constitutional violations—solely for the purpose of effecting service and so that issue may be joined. In that event, once issue is joined, plaintiff may seek through discovery the identity of the John Doe defendant(s). *See Peralta v. Doe,* No. 04–CV–6559P, 2005 WL

357358, at * 2 (W.D.N.Y. Jan.24, 2005) (citing *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997)) (district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *Harvey v. Corrections Officer,* 9:09–CV–0517 (N.D.N.Y.) (LEK/GHL) (order filed 6/1/09 permitting plaintiff to name superintendent as a defendant for purposes of service and discovery).

*10    Turning to plaintiff's pending motions, I conclude that his motion for leave to amend should be denied, based upon futility, but that he nonetheless should be afforded an opportunity to further amend his complaint in an effort to cure the deficiencies cited in this report and recommendation in connection with his allegations against defendant Soto. I further find, however, that he has failed to establish a basis for appointment of counsel to represent him, *pro bono,* at this early procedural juncture in this litigation.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed above within thirty days from the date of the filing a decision and order acting upon my recommendation of dismissal; and it is further

ORDERED, that plaintiff's motions for leave to amend (Dkt. No. 14) and for appointment of counsel (Dkt. No. 15) be DENIED in all respects, without prejudice to renewal.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

2012 WL 4486086

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486086

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:11cv00250**<br>REED v. DOE ET AL | — | N.D.N.Y. | Mar. 08, 2011 | Docket |

**History (4)**

**Direct History (2)**

1.  Reed v. Doe No. 1 🐾
    2012 WL 4486086 , N.D.N.Y. , July 26, 2012

*Report and Recommendation Adopted by*

2.  Reed v. Doe No. 1
    2012 WL 4486085 , N.D.N.Y. , Sep. 27, 2012

**Related References (2)**

3.  Reed v. Doe No. 1
    2013 WL 5441503 , N.D.N.Y. , Sep. 27, 2013

4.  Reed v. Doe
    2015 WL 902795 , N.D.N.Y. , Mar. 03, 2015

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4486085
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE NO. 1; John Doe No
2; and M. Soto, Defendants.

No. 9:11–CV–0250 (TJM/DEP).
|
Sept. 27, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se.

James Seaman, New York State Attorney General, Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This pro se action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his July 26, 2012 Report–Recommendation and Order, Magistrate Judge Peebles recommended that "the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed [in the ReportRecommendation and Order] within thirty days from the date of the filing of a decision and order acting upon my recommendation of dismissal." Rep. Rec., p. 28 [dkt. # 22].

In the Report–Recommendation and Order, Magistrate Judge Peebles also addressed Plaintiff's motions (1) for leave to file an amended complaint [Dkt. No. 14], and (2) to appoint counsel [Dkt. No. 15]. Magistrate Judge Peebles denied Plaintiff's motion for leave to amend because the proposed amended complaint submitted with the motion did not contain allegations setting forth plausible claims. See July 26, 2012

Report–Recommendation and Order, pp. 18–20. Magistrate Judge Peebles denied Plaintiff's motion for appointment of counsel [Dkt. No. 15], without prejudice to renewal, because Plaintiff "failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation." Id. p. 25; see also id. pp. 22–25.

Defendant Soto objects to the recommendation to the extent that it recommends that Plaintiff be granted leave to file an amended complaint, arguing that Plaintiff already had ample opportunity to do so but failed to state a claim upon which relief can be granted. Def. Obj. [dkt. # 24]. Plaintiff objects by asserting that the complaint does contain sufficient factual allegations to set forth a plausible claim of retaliation, or, in the alternative, he should be granted leave to file an amended complaint to assert a retaliation claim. Pl. Obj. [dkt. # 26]. He also argues that he should be appointed counsel "for the sole purpose of ascertaining the names of the two John Doe defendants." Id.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1)(C); see also United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir.1997) (The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings.). "[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." Machicote v. Ercole, 2011 WL 3809920, at \* 2 (S.D.N.Y., Aug.25, 2011) (citations and interior quotation marks omitted); DiPilato v. 7–Eleven, Inc., 662 F.Supp.2d 333, 340 (S.D.N.Y.2009) (same). By the same reasoning, a party may not advance new theories that were not presented to the magistrate judge in an attempt to obtain this second bite at the apple. See Calderon v. Wheeler, 2009 WL 2252241, at \*1, n. 1 (N.D.N.Y. July 28, 2009); Green v. City of New York, 2010 WL 148128, at \* 4 (E.D.N.Y. Jan.14, 2010) ("[N]ew claims ... presented in the form of, or along with, 'objections ...' should be d ism issed.") (citations omitted).

**\*2** General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. Farid v. Bouey, 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); see Frankel v.

*N.Y.C.,* 2009 WL 465645 at *2 (S.D.N.Y. Feb.25, 2009). After reviewing the report and recommendation, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

With this standard in mind, and after having reviewed Defendant's and Plaintiff's objections, the Court determines to adopt the recommendation for the reasons stated in Magistrate Judge Peebles's thorough report.

Plaintiff's attempts to reargue the positions he took before Magistrate Judge Peebles are insufficient. The Court finds no error in Magistrate Judge Peebles's analysis or determinations. Moreover, Plaintiff is granted leave to re-plead his claims, so he suffers no prejudice by dismissal. Should he elect to do so, Plaintiff should take care to re-plead his retaliation claim with more particularity as to (1) what he asserts was the retaliatory conduct, and (2) what he believes was the motivation for this conduct. *See* Rep. Rec. p. 21.[1]

---

[1]    As Magistrate Judge Peebles stated:

    If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25, 1995 WL 316935 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128

(2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint [must] also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Inasmuch as the re-pled claims must be accordance with the parameters set forth contained in the Report–Recommendation and Order, *see* fn. 1, *supra,* the Court rejects Defendant's objection to this portion of the recommendation. *See Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ( "It is the usual practice upon granting a motion to dismiss to allow leave to replead.") (citations omitted), *cert den.,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Hughes v. Anderson,* 2011 WL 5829658, at *1 (2d Cir. Nov.21, 2011) ("As a general matter (excepting clearly frivolous cases), it is improper for a district court to dismiss a complaint with prejudice for failure to state a claim without giving the plaintiff notice and an opportunity to be heard and to offer an amended pleading.") (summary order) (citing *Perez v. Ortiz,* 849 F.2d 793, 797 (2d Cir.1988)).

To the extent that Plaintiff's objections challenge Magistrate Judge Peebles's determinations to deny (1) leave to file the previously proposed amended complaint, and (2) appointment of counsel, the objections are in the nature of an appeal. A district court judge reviewing a magistrate judge's non-dispositive pretrial order may not modify or set aside any part of that order unless it is clearly erroneous or contrary to law. *Labarge v. Chase Manhattan Bank, N.A.,* 1997 WL 583122, at *1 (N.D.N.Y. Sept.3, 1997) (Pooler, D.J.) (citing 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); N.D.N.Y. LOCAL RULE 72.1(b)); *Mathias v. Jacobs,* 167 F.Supp.2d 606, 621–23 (S.D.N.Y.2001). Findings are clearly erroneous when the reviewing court is firmly convinced the lower court decided an issue in error. *Lanzo v. City of New York,* 1999 WL 1007346, *2–3 (E.D.N.Y. Sept.21, 1999). This standard imposes a heavy burden on the objecting party, and only permits reversal where the district court determines that the magistrate judge "abused his broad discretion over resolution of discovery matters." *Labarge,* 1997 WL 583122, at *1; *see Mathias,* 167 F.Supp.2d at 621–23; *Lanzo,* 1999 WL 1007346, *3.

**\*3** The Court finds no error or abuse of discretion by Magistrate Judge Peebles and, therefore, affirms Magistrate

Judge Peebles's decisions in these regards for the reason set forth in the Report–Recommendation and Order at pages 18–20 and 22–25.

## IV. CONCLUSION

For the reasons discussed above, the Court adopts Magistrate Judge Peebles's July 26, 2012 Report–Recommendation and Order in its entirety. Therefore, Defendant M. Soto's motion to dismiss Plaintiff's claims against him in this action (Dkt. No. 11) is GRANTED, and all claims against Defendant Soto are DISMISSED. Plaintiff is granted leave to file an amended complaint. An amended complaint, if one is filed, must be in accordance with the directions contained in the Report–Recommendation and Order, and must be filed within thirty (30) days from the date of the filing of this Decision and Order.

To the extent that Plaintiff's objections can be construed as appeals from Magistrate Judge Peebles's determinations to deny Plaintiff's motions to amend the complaint [Dkt. No. 14], and to appoint counsel [Dkt. No. 15], Magistrate Judge Peebles's determinations are AFFIRMED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486085

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Docket 9:11cv00250**<br>REED v. DOE ET AL | — | N.D.N.Y. | Mar. 08, 2011 | Docket |

**History (4)**

**Direct History (2)**

1.  Reed v. Doe No. 1 🐾
2012 WL 4486086 , N.D.N.Y. , July 26, 2012

*Report and Recommendation Adopted by*

2.  Reed v. Doe No. 1
2012 WL 4486085 , N.D.N.Y. , Sep. 27, 2012

**Related References (2)**

3.  Reed v. Doe No. 1
2013 WL 5441503 , N.D.N.Y. , Sep. 27, 2013

4.  Reed v. Doe
2015 WL 902795 , N.D.N.Y. , Mar. 03, 2015

2015 WL 5603433
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Reggie McFADDEN, Plaintiff,
v.
J. FRIEDMAN, Corr. Officer; Eastern Corr. Facility;
B. Leifeld, Sergeant, Eastern Corr. Facility; Geisler,
Corr. Officer, Eastern Corr. Facility; Filkins,
Corr. Officer, Eastern Corr. Facility; William
Brown, Superintendent, Eastern Corr. Facility;
and Brian Fischer, Comm'r, Doccs, Defendants.

No. 9:12–CV–0685 (GTS/CFH).
|
Signed Sept. 23, 2015.

**Attorneys and Law Firms**

Reggie Mcfadden, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Ryan W. Hickey, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Reggie McFadden ("Plaintiff")
against the six above-captioned New York State correctional
employees ("Defendants") pursuant to 42 U.S.C. § 1983,
are Defendant's motion for summary judgment and United
States Magistrate Judge Christian F. Hummel's Report–
Recommendation recommending that the motion for
summary judgment be granted. (Dkt.Nos.66, 100.) For the
reasons set forth below, the Report–Recommendation is
accepted and adopted in its entirety, and Defendant's motion
for summary judgment is granted.

**I. RELEVANT BACKGROUND**

Because this Decision and Order is intended primarily for
the review of the parties, the Court will not summarize the
claims and factual allegations asserted in Plaintiff's
Amended Complaint, which are accurately recited in the

Report–Recommendation. (Dkt. No. 100.) Nor will the Court
summarize the findings and conclusions rendered in the
Report–Recommendation, for the same reason; rather, the
Court will respectfully refer the reader to the Report–
Recommendation. (Dkt. No. 66.)

**II. STANDARD OF REVIEW**

When a *specific* objection is made to a portion of a
magistrate judge's report-recommendation, the Court subjects
that portion of the report-recommendation to a *de novo*
review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To
be "specific," the objection must, with particularity, "identify
[1] the portions of the proposed findings, recommendations,
or report to which it has an objection and [2] the basis for
the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing
such a *de novo* review, "[t]he judge may ... receive further
evidence...." 28 U.S.C. § 636(b)(1). However, a district court
will ordinarily refuse to consider evidentiary material that
could have been, but was not, presented to the magistrate
judge in the first instance. [2] Similarly, a district court will
ordinarily refuse to consider argument that could have been,
but was not, presented to the magistrate judge in the first
instance. *See Zhao v. State Univ. of N.Y.,* 04–CV–0210,
2011 WL 3610717, at \*1 (E.D.N.Y. Aug.15, 2011) ("[I]t is
established law that a district judge will not consider new
arguments raised in objections to a magistrate judge's report
and recommendation that could have been raised before the
magistrate but were not.") (internal quotation marks and
citation omitted); *Hubbard v. Kelley,* 752 F.Supp.2d 311, 312–
13 (W.D.N.Y.2009) ("In this circuit, it is established law that
a district judge will not consider new arguments raised in
objections to a magistrate judge's report and recommendation
that could have been raised before the magistrate but were
not.") (internal quotation marks omitted).

[1]      *See also Mario v. P & C Food Markets, Inc.,*
313 F.3d 758, 766 (2d Cir.2002) ("Although Mario
filed objections to the magistrate's report and
recommendation, the statement with respect to his
Title VII claim was not specific enough to preserve
this claim for review. The only reference made to
the Title VII claim was one sentence on the last
page of his objections, where he stated that it was
error to deny his motion on the Title VII claim '[f]or
the reasons set forth in Plaintiff's Memorandum of
Law in Support of Motion for Partial Summary
Judgment.' This bare statement, devoid of any
reference to specific findings or recommendations

2015 WL 5603433

to which he objected *and why,* and unsupported by legal authority, was not sufficient to preserve the Title VII claim.") (emphasis added).

2    *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

3    *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

4    *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*2** After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

## III. ANALYSIS

In his lengthy Objection to the Report–Recommendation, Plaintiff objects to virtually every finding and conclusion rendered by Magistrate Judge Hummel. (Dkt. No. 101.) The problem is that Plaintiff never states the *basis* for his objections. (*Id.*) As explained above in Part II of this Decision and Order, to lodge a specific objection (sufficient to trigger a *de novo* review), a litigant must not only identify the portion of the Report–Recommendation to which he or she has an objection but the *basis* for that objection. [5] As a result, only a clear-error review of the Report–Recommendation is required under the circumstances.

5    The Court notes that, on file in the correctional facility in which Plaintiff was incarcerated when he drafted his Objection are copies of the District's

Local Rules of Practice and *Pro Se* Handbook, both of which explain this requirement. Furthermore, even if Plaintiff had a valid excuse for not reading those documents, a litigant's *pro se* status does not excuse him having to comply with a court's procedural rules. *Cusamano v. Sobek,* 604 F. Supp .2d 416, 42627 & n. 4 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).

After carefully reviewing the relevant filings in this action, the Court can find no clear error in the thorough Report–Recommendation: Magistrate Judge Hummel employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (Dkt. No. 100.) To those reasons, the Court adds only three brief points.

First, regarding the findings rendered by Magistrate Judge Hummel on pages 16 and 17 of his Report–Recommendation, the Court notes that it rejects Plaintiff's personal-photographs argument on the alternative ground that any declaration testimony that Plaintiff offers to support his allegation that he possessed personal photographs (that were taken by Defendant Friedman) is at odds with both Defendant Friedman's testimony on the subject and the entirety of the record evidence, thus putting the Court in the inescapable position of having to make a credibility determination, which it does, against Plaintiff based on the evidence. [6]

[6]    *See Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether ... there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.... In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, ... we hold that the District Court did not err by awarding summary judgment. Because no reasonable person would undertake the suspension of disbelief necessary

to give credit to the allegations made in the complaint, ... conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42–46 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line [1] was "unsupported by documentary or other concrete evidence," and indeed was contradicted by the other record evidence, and [2] was "conclusory" and "inconsistent" with plaintiffs' present representations); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612–15 (S.D.N.Y.2004) (finding that plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony [1] recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign," and [2] were inconsistent with plaintiff's other statements and claims), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

Second, regarding the findings rendered by Magistrate Judge Hummel on pages 19 through 22 of his Report–Recommendation, the Court concludes that the three injuries Plaintiff allegedly suffered are not substantial enough to constitute an adverse action for purposes of a First Amendment retaliation claim, regardless of whether the Court considers those injuries separately *or together,* which is the standard. [7]

[7]    *See, e.g., Manon v. Pons,* 12–CV–7360, 2015 WL 5507759, at *8 (S.D.N.Y. Sept.18, 2015) ("Even if every incident allegedly ascribable to Pons is not enough, in itself, to constitute an 'adverse action,' taken together the troubling harassment that Manon alleges would dissuade a person of reasonable firmness from voicing her complaints."); *Dabnet v. Maddock,* 10–CV–0519, 2011 WL 7429164, at *4 (N.D.N.Y. Nov. 29, 2011) (Peebles, M.J.) ("[W]hile in isolation potentially none of those allegations rises to a level sufficient to support a finding of adverse action, collectively they could suffice to constitute adverse action.").

Third, regarding the findings rendered by Magistrate Judge Hummel on page 20 of his Report–Recommendation, the Court acknowledges that, while it may make eminent sense to consider as a factor that Plaintiff indeed filed a grievance immediately after he allegedly suffered adverse action in deciding whether the adverse action would have chilled similarly situated inmates of ordinary firmness (the class of which presumably includes Plaintiff), it is not permissible to do so under Second Circuit precedent. *See, e.g., Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) ("[T]he objective test [that governs a First Amendment retaliation claim] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."). However, the Court finds, for the other reasons stated by Magistrate Judge Hummel, that Plaintiff has failed to show that Defendant Friedman's alleged taking of his personal fan constituted adverse action for purposes of the First Amendment.

**\*3  ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Hummel's Report–Recommendation (Dkt. No. 100) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 66) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 38) is ***DISMISSED*** in its entirety; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment for Defendants and close this action.

## REPORT–RECOMMENDATION AND ORDER [1]

[1]     This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Reggie McFadden, an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that: (1) defendant Jill Friedman denied him access to the commissary, issued him false misbehavior reports, conducted unauthorized

cell searches, and took or destroyed his property, in violation of the First Amendment (Dkt. No. 38 ("Amended Compl.") at 8–11); (2) defendant Berndt Leifeld issued false misbehavior reports in retaliation for plaintiff filing grievances, in violation of the First Amendment (*id.* at 12–13); (3) defendant Daniel Geisler issued a false misbehavior report in retaliation for plaintiff's filing grievances, in violation of the First Amendment (*id.* at 14); (4) defendant Keith Filkins harassed and threatened plaintiff by issuing a false misbehavior report to plaintiff in retaliation for plaintiff filing a grievance against defendant Leifeld and other correctional staff, in violation of the First Amendment (*id.* at 14–15); and (5) defendants William Brown and Brian Fischer are liable as supervisors for the misconduct of defendants Friedman, Leifeld, Geisler, and Filkins (*id.* at 19–31, 32–34, 42–53, 55–57).

At all relevant times, plaintiff was an inmate at Eastern Correctional Facility ("Eastern"). Plaintiff commenced this action on April 25, 2012, seeking $2.7 million dollars in compensatory and punitive damages, together with attorneys' fees and costs. Dkt. No. 1 at 20. Plaintiff filed a motion to amend his complaint on August 30, 2013. Dkt. No. 32. The Court granted plaintiff's motion as to some claims, denied the motion as to others, and directed that the amended complaint supersede and replace the previously-filed complaint. Dkt. No. 37 at 16–17. Plaintiff filed an amended complaint on January 17, 2014. Dkt. No. 38. Presently pending is defendants' first motion for summary judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ .P.") 56(a). Dkt. No. 66. Plaintiff opposed the motion. Dkt. Nos. 78, 85.

### I. Background

#### A. July 1, 2009 Commissary Buy

On July 1, 2009, plaintiff was placed on a one-day medical confinement due to a minor medical condition. Amended Compl. at 8. Plaintiff's medical confinement status allowed him to receive meals in his cell and also excused him from attending recreation activities and his assigned program. *Id.* Plaintiff's July 1, 2009 medical excuse permit for did not specify any additional changes or restrictions. *Id.*

**\*4**  Defendant Friedman conducted final rounds at the conclusion of her shift on July 1, 2009 at approximately 2:30 p.m. Declaration of Jill Friedman ("Friedman Decl.") ¶ 6. At that time, plaintiff demanded to be taken to the commissary. *Id.* ¶ 7. Friedman states that plaintiff asked if "keep-lock"

inmates were allowed to go to the commissary. *Id.* ¶ 9. She informed plaintiff that inmates placed on a disciplinary keep-lock lose their commissary privileges. *Id.* She was not aware at the time that plaintiff was keep-locked on the orders of medical staff. *Id.* Plaintiff alleges that Friedman told him that she was not allowing him to go to the commissary because he had written a grievance complaint on her "home girl," Officer Jamil.[2] Amended Compl. at 9.

<div style="margin-left:2em">

[2]    This Court denied plaintiff's motion to amend his complaint to add claims against Officer Jamil, by Decision and Order dated January 17, 2014. Dkt. No. 37. Accordingly, Officer Jamil is not a defendant in this action.

</div>

An inmate on a medical keep-lock may not leave his cell to go to the commissary, but may request a "make-up" commissary buy for another time. Friedman Decl. ¶¶ 10–11. Plaintiff never requested a "make-up" commissary buy day. *Id.* ¶ 12. Plaintiff filed a grievance complaint against Friedman on July 3, 2009. Amended Compl. at 9. A hearing on the July 3, 2009 grievance complaint took place on July 14, 2009. *Id.* Plaintiff alleges that he appealed the matter to defendant Brown on July 17, 2009 and July 20, 2009. *Id.* at 19–20. Brown responded to plaintiff's appeal on August 25, 2009. *Id.* Plaintiff also claims that he appealed the matter to defendant Fischer on August 20, 2009, and Fischer responded on or about September 23, 2009. *Id.* at 42.

### B. July 14, 2009 Misbehavior
### Report and Contraband Receipt

On July 14, 2009, defendant Friedman was conducting regular rounds when she heard a radio playing loudly from plaintiff's cell. Friedman Decl. ¶¶ 15–16. Upon inspection, Friedman saw that plaintiff was not in his cell. *Id.* ¶ 16. Eastern's facility policy dictates that inmates must turn off and unplug their radios while they are not present in their cells. *Id.* ¶ 17. Previously, Friedman had counseled plaintiff regarding this policy and had instructed him to turn off his radio when he left his cell. *Id.* ¶ 18. Friedman issued plaintiff a misbehavior report for violation of Standards of Inmate Behavior 104.13 (Creating a Disturbance) and 106.10 (Refusing a Direct Order). *Id.* ¶ 19, Exh. A. Friedman also confiscated plaintiff's radio, issued him a contraband receipt, and placed the radio in the West Wing Court Office. *Id.* ¶¶ 19–20, Exh. B.

Plaintiff claims that Friedman's July 14, 2009 misbehavior report is false because he did not leave his radio playing loudly that day. Amended Compl. at 9–10. He also claims that Friedman stole two of his family photographs from his cell and did not note the photographs on the contraband receipt issued to him. *Id.* at 10. Plaintiff alleges that Friedman issued the false misbehavior report, and confiscated plaintiff's photographs, in retaliation for the grievance complaint that plaintiff filed against her on July 3, 2009. *Id.* at 910. Friedman denies that she confiscated any photographs from plaintiff's cell. Friedman Decl. ¶ 23.

**\*5** Plaintiff was found guilty of violating Standard of Inmate Behavior 104.13 (Creating a Disturbance) at his Tier I Disciplinary Hearing regarding the July 14, 2009 misbehavior report. Friedman Decl. ¶ 22; Declaration of Berndt Leifeld ("Leifeld Decl.") ¶ 32. Leifeld, who served as a hearing officer at plaintiff's disciplinary hearing, counseled and reprimanded plaintiff on Eastern's policy on radio use. Friedman Decl. ¶ 22; Leifeld Decl. ¶ 33, Exh. C. Plaintiff alleges that he appealed this matter to defendant Brown on both July 17, 2009 and July 20, 2009, and Brown responded to the appeals on August 25, 2009. Amended Compl. at 20–21. Plaintiff also alleges that Brown responded to his appeal on July 20, 2009. *Id.* at 23. Plaintiff sent a letter regarding the incident to defendant Fischer on August 20, 2009, and Fischer responded on September 23, 2009. *Id.* at 44.

### C. October 8, 2009 Contraband Receipt

On October 8, 2009, plaintiff alleges that Friedman conducted an "unauthorized search" of plaintiff's cell and "stole" his personal fan. Amended Compl. at 10–11. He also alleges that Friedman vandalized his cell, pouring "soap powder, coffee, sugar, water, and ... mayonnaise all over everything" in his cell. *Id.* at 10. Plaintiff alleges that Friedman acted in retaliation for the grievance complaints he had previously filed against her. *Id.*

Friedman states that she was conducting regular rounds at 1:50 p.m. on October 8, 2009 when she observed a lamp and linens hanging from a clothesline in plaintiff's cell. Friedman Decl. ¶ 26. According to Eastern's facility policy, inmates may not hang their clotheslines until after 4:00 p.m. and may not hang lamps from their clotheslines. *Id.* ¶ 27. Therefore, Friedman confiscated the clotheslines and the linens and issued a contraband receipt to plaintiff. *Id.* ¶ 28. Friedman states that her actions were performed based on "facility

2015 WL 5603433

policy and protocol[,]" and that she "did not threaten, harass, or retaliate against Plaintiff in any way at any time." *Id.* ¶ 29. Plaintiff alleges that the contraband receipt is false because he never owned a clothesline during his time at Eastern. Amended Compl. at 11.

Plaintiff alleges that he sent a "grievance letter" to defendant Brown on October 8, 2009, complaining about Friedman's conduct. Amended Compl. at 21. After plaintiff sent the letter to Brown, an investigation took place on October 19, 2009. *Id.* at 22. Plaintiff also alleges that he sent a letter regarding the incident to defendant Fischer on October 8, 2009, and Fischer responded on February 17, 2010. *Id.* at 46. Brown received plaintiff's letter and forwarded it to subordinate staff for investigation. Declaration of William Brown ("Brown Decl.") ¶ 15. On December 31, 2009, Brown's office sent plaintiff a copy of defendant Leifeld's response to the grievance regarding the October 8, 2009 incident. *Id.*

### D. October 20, 2009 Misbehavior Report

 **\*6** On October 20, 2009, plaintiff alleges that defendant Leifeld issued a false misbehavior report against him, claiming that Leifeld had searched plaintiff's cell and confiscated a pair of stolen headphones. Amended Compl. at 12. Plaintiff alleges that the misbehavior report is false because Leifeld did not conduct a search and, further, plaintiff did not own any headphones at the time of the alleged search. *Id.*

Leifeld states that, on October 20, 2009, plaintiff gave him a pair of broken headphones and accused another officer of cutting one of the wire leads on the headphones. Leifeld Decl. ¶ 5. Leifeld inspected the headphones, along with facility records, and found that (1) the headphones were the "Unitone digital" brand; (2) the headphones were identical to the type of headphones sold in Eastern's commissary; (3) there was no identification number on the headphones; (4) plaintiff did not have a permit for the headphones; and (5) there were no records of plaintiff's purchase of the headphones from Eastern's commissary. *Id.* ¶¶ 8–11. Inmates must have a property permit for headphones pursuant to Directive 2733. *Id.* ¶ 6. Accordingly, Leifeld determined that plaintiff possessed the headphones illegally and issued him a misbehavior report for violating Standards of Inmate Behavior 116.13 (Possession of Stolen Property). *Id.* ¶ 12. Leifeld also determined that plaintiff's claim that an officer had damaged the headphones was meritless and placed the

headphones in the West Wing Court Contraband Locker. *Id.* ¶¶ 13–14. Leifeld states that his actions were based on "facility policy and protocol." *Id.* ¶ 15.

Plaintiff states that he filed a grievance complaint regarding the headphones incident on October 23, 2009, and sent the grievance complaint to defendants Brown and Fischer. Amended Compl. at 24. Brown assigned Captain L. Pingotti to investigate the incident, and Captain Pingotti issued a memorandum regarding his investigation on December 5, 2009 *Id.* at 24–25. Plaintiff alleges that Brown never responded to plaintiff's October 23, 2009 grievance. *Id.* at 24. Plaintiff also alleges that he appealed the incident to Fischer on December 17, 2009. *Id.* at 48.

Defendant Fischer received a letter regarding this incident on November 3, 2009. Declaration of Brian Fischer ("Fischer Decl.") ¶ 8. The letter was addressed to defendant Brown, with a copy addressed to Fischer. *Id.* ¶ 8, Exh. B. Deputy Commissioner Leclaire responded to the letter on November 12, 2009, referring plaintiff to the grievance office at Eastern to resolve his complaint. *Id.*

### E. December 5, 2009 Misbehavior Report

On December 5, 2009, plaintiff alleges that he dropped "his electrical trimmers[,]" causing the battery from the trimmers to roll outside of his cell. Amended Compl. at 55. He then placed a mirror outside of his cell bars in order to locate the battery. *Id.* Plaintiff alleges that defendant Filkins walked by, "snatch[ed]" the mirror from his hand, called plaintiff a racial slur, threatened him for filing grievances against other officers, and stated, "we skin heads are not going to stand for it." *Id.* at 55–56.

 **\*7** Officer Filkins states that, on December 5, 2009, he observed a mirror propped up against a book outside of plaintiff's cell door. Declaration of Keith Filkins ("Filkins Decl.") ¶ 6. According to Standards of Inmate Behavior Rule 116.11, inmates are not allowed to alter their personal property to extend outside of their cell doors. *Id.* ¶ 7. As Filkins approached plaintiff's cell, plaintiff disassembled the mirror and book set-up and moved the mirror inside his cell. *Id.* ¶ 8. Filkins ordered plaintiff to give him the mirror four times, and plaintiff refused. *Id.* ¶¶ 9–10. After the fourth refusal, Filkins told plaintiff that he was keep-locked and gave plaintiff a fifth order directing him to hand over the mirror. *Id.* ¶ 10. Plaintiff refused again, at which point Filkins

2015 WL 5603433

told plaintiff that he would continue making his rounds and would return after to confiscate the mirror. *Id.* ¶ 11. As Filkins walked away from plaintiff's cell, plaintiff placed the mirror outside of his cell, and Filkins confiscated it and placed it in the West Wing Court Office. *Id.* ¶ 12.

Filkins notified the Area Sergeant of the incident, and issued plaintiff a misbehavior report for violating Standards of Inmate Behavior Rules 106.10 (Refusal to obey a direct order), 107.10 (Interference with an employee), and 116.11 (Tampering with personal property). Filkins Decl. ¶ 13. Filkins states that he issued the misbehavior report based on "policy and protocol[,]" and denies that he retaliated against plaintiff for grievances filed against other DOCCS staff. *Id.* ¶¶ 14, 16. He also denies threatening or harassing plaintiff. *Id.* At a Tier II disciplinary hearing, plaintiff pleaded guilty to violating Standards of Inmate Behavior Rule 116.11 (Tampering with personal property). *Id.* ¶ 15.

Plaintiff sent a grievance regarding this incident to defendant Brown on or about December 6, 2009. Amended Compl. at 33. Plaintiff also alleges that he appealed the matter to defendant Fischer on January 13, 2010, and Fischer responded on March 3, 2010. *Id.* at 56.

### F. December 27, 2009 Misbehavior Report

On December 27, 2009, plaintiff alleges that defendant Leifeld told him to move to a different area at Eastern without providing him with an institutional pass or an escort officer. Amended Compl. at 12. Plaintiff contends that Leifeld's order violated Eastern's movement regulations and effectively forced plaintiff to disobey the regulations. *Id.* at 12–13. Officer Geisler found plaintiff in the bathroom and issued him a misbehavior report. *Id.* at 14. Plaintiff alleges that Leifeld and Geisler's misbehavior report is false because it states that plaintiff refused to return to his housing unit at Geisler's direction. *Id.* He claims that Leifeld ordered him to a different area of the prison for the purpose of issuing him a false misbehavior report for his movement outside of Eastern's regulations, and that he did not immediately obey Geisler because he was using the bathroom. *Id.* at 13–14. He further claims that Leifeld acted in retaliation for past grievances filed against him and other staff members. *Id.* at 13.

**\*8** Leifeld claims that, on December 27, 2009, he asked Geisler to instruct plaintiff to meet Leifeld in the West Wing

Court. Leifeld Decl. ¶ 17. Leifeld states that he asked plaintiff to report to the West Wing Court during an "open movement" period, during which inmates are allowed to move about the facility without passes or escorts. *Id.* ¶¶ 18, 20. On December 27, 2009, there was an open movement period immediately after breakfast, lasting from approximately 8:20 a.m. to 8:35 a.m. *Id.* ¶¶ 19, 22. Plaintiff failed to report to the West Wing Court during the open movement period despite the fact that Mess Hall # 1, where plaintiff ate breakfast, and the West Wing Court "are about a two-minute walk apart." *Id.* ¶¶ 21, 23. After searching other areas of Eastern for plaintiff, Leifeld instructed Geisler to search for plaintiff. *Id.* ¶¶ 23–24. Geisler located plaintiff in the shower area at approximately 8:45 a.m and reported to Leifeld that plaintiff refused to be escorted back to his housing unit, and only complied after Geisler signaled other officers for assistance. *Id* . ¶¶ 24–25. Plaintiff was escorted back to his housing unit and placed on keep-lock status. *Id.* ¶ 26. Leifeld issued plaintiff a misbehavior report for violations of Standards of Inmate Behavior 106.10 (Refusal to obey a direct order); 109.10 (Out of place); 107.10 (Interference); and 109.12 (Staff direction to movement). *Id.* ¶ 27.

Plaintiff alleges that he sent a letter to defendants Brown and Fischer regarding the allegedly false misbehavior report on December 29, 2009. Amended Compl. at 26. Plaintiff claims that neither Brown nor Fischer have responded to that letter. *Id.* Plaintiff also filed a grievance on December 31, 2009. *Id.* at 28. Brown replied to the grievance on January 14, 2010. *Id.*

Following a Tier II disciplinary hearing held on January 14, 2010, plaintiff was found guilty of violating Standard of Inmate Behavior 106.10 (Refusal to obey a direct order). Leifeld Decl. ¶ 28. Brown states that he received both the original grievance and the appeal of the disciplinary hearing determination and forwarded both to the Deputy Superintendent of Security. Brown Decl. ¶¶ 11–14. The Deputy Superintendent of Security affirmed the hearing officer's finding on January 15, 2010. Leifeld Decl. ¶ 29.

### II. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a), (c). The moving party has the burden to show the absence of disputed material facts by providing the court

with portions of pleadings, depositions, and affidavits which support the motion. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*9** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. First Amendment Retaliation Claims

Plaintiff argues that: (1) defendant Friedman denied plaintiff access to the commissary, issued plaintiff false misbehavior reports, conducted unauthorized cell searches, verbally threatened plaintiff, and took or destroyed plaintiff's property in retaliation for plaintiff filing grievances in violation

of the First Amendment; (2) defendant Leifeld issued plaintiff false misbehavior reports in retaliation for plaintiff's filing grievances, in violation of the First Amendment; (3) defendant Geisler issued plaintiff a false misbehavior report in retaliation for plaintiff's filing grievances, in violation of the First Amendment; and (4) defendant Filkins harassed and threatened plaintiff, and issued a false misbehavior report to plaintiff in retaliation for plaintiff's filing grievances, in violation of the First Amendment. Amended Compl. at 9–15.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " *See,* e.g., *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir .2004), *overruled on other grounds by Swierkiewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). In order to prove an adverse action, a plaintiff must show that the defendant's " 'retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection.' " *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 366 (S.D.N.Y.2011) (quoting *Dawes,* 239 F.3d at 292–93).

### 1. Friedman

#### a. July 1, 2009 Commissary Buy

**\*10** Plaintiff claims that, on July 1, 2009, Friedman prevented him from traveling to the commissary on his scheduled day and stated to plaintiff: "this is only the beinning [sic] of your sorrows, because you wrote a grievance complaint on my home girl[.]" Amended Compl. at 9. Where plaintiff refers to Friedman's "home girl," he means corrections officer Jamil. *Id.*

Plaintiff has shown that he engaged in constitutionally protected conduct insofar as he claims to have filed a grievance against Jamil. *See Graham v. Henderson,* 89 F.3d 75, 80 (1996). However, he has failed to show that he suffered an adverse action, and he has also failed to show a causal connection between his protected speech and the alleged adverse action.

At the outset, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden,* No. 09 Civ. 3135(RWS), 2011 WL 1453789, at \*4 (S.D.N.Y. Apr.14, 2011) (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009)). Plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham,* 89 F.3d at 81. Here, plaintiff does not allege that he filed any grievances or complaints against Friedman. Although he claims that Friedman did not allow him to go to the commissary because he had previously filed a grievance against Officer Jamil, Friedman states in her affidavit that July 1, 2009 was the first day she encountered plaintiff, and that she had no knowledge of any previous grievances filed by him against Officer Jamil. Friedman Decl. ¶ 14. As plaintiff has provided no evidence establishing why Friedman would file a false misbehavior report against him on Jamil's behalf beyond a conclusory belief that the two officers are friends, he has failed to present a genuine issue of material fact as to a causal connection between his protected speech and being denied his commissary buy day. *See Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at \*9 (N.D.N.Y. Dec.22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); *see also Alicea v. Maly,* No. 9:12–cv–203 (MAD/TWD), 2015 WL 4326114, at \*14 (N.D.N.Y.

July 14, 2015); *Guillory v. Ellis,* No. 9:11–CV–600 (MAD/ATB), 2014 WL 4365274, at \*18 (N.D.N.Y. Aug.29, 2014). Even if the Court were to find that a causal connection did exist, plaintiff's claim would still fail because the loss of one visit to the commissary is *de minimis* and does not amount to an adverse action. *See Gantt v. Lape,* No. 9:10–CV–0083 (GTS/TWD), 2012 WL 4033729 (N.D.N.Y. July 31, 2012) (finding no adverse action where the plaintiff lost commissary privileges for thirty days).

Accordingly, there is no genuine issue of material fact as to Friedman's actions on July 1, 2009, and it is recommended that defendants' motion on this ground be granted.

#### b. July 14, 2009 Misbehavior Report and Contraband Receipt

**\*11** Plaintiff alleges that he filed a grievance against Friedman on July 3, 2009, in response to her actions on July 1, 2009. Amended Compl. at 10. He claims that Friedman performed an unauthorized search of his cell, stole two photographs, and issued a false misbehavior report and contraband receipt. *Id.*

Plaintiff's grievance against Friedman is constitutionally-protected conduct. *See Graham,* 89 F.3d at 80. As to the second prong, whether the conduct complained of amounts to an adverse action, routine cell searches are "an integral part of prison life[.]" *Jones v. Harris,* 665 F.Supp.2d 384, 394 (S.D.N.Y.2009) (citing *Hudson v. Palmer,* 468 U.S. 517, 527–28, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). As such, "neither the United States Suprem e Court nor the Second Circuit has ever held that a cell search can be the basis of a First Amendment retaliation claim." *Id.* at 398. Further, any property seized during cell searches or disarray caused by the search must be "unusually punitive" or "out of the ordinary" in order to show that a plaintiff has suffered more than a *de minimis* injury. *Id.* at 398. A plaintiff must show that a prison official " 'intentionally' " or " 'deliberately' lost or destroyed his property[.]" *Key v. Toussaint,* 660 F.Supp.2d 518, 525 (S.D.N.Y.2009) (quoting *Gill v. Frawley,* No.9:02–CV–1380, 2006 WL 1742738, at \*5 & nn. 25–26 (N.D.N.Y. June 22, 2006)).

Friedman states that she took a radio from plaintiff's cell because she had discovered the radio playing while plaintiff was not present in his cell, which is a violation of Eastern's policy. Friedman Decl. ¶¶ 17, 19. She denies

2015 WL 5603433

taking any personal photographs from plaintiff's cell, *id.* ¶ 23, and plaintiff has not set forth any proof to show that she confiscated the photographs. Plaintiff attaches to his supplemental response to defendants' motion a form listing an inventory of his personal belongings he had upon his arrival at Eastern. Dkt. No. 83 at 28. Although plaintiff claims that the form lists his personal photographs, it does not. *See id.* at 9, 28. As plaintiff failed to show that Friedman intentionally lost or destroyed his photographs, he has failed to show that he suffered an adverse action.

Plaintiff has also failed to allege facts tending to establish a First Amendment retaliation claim based on Friedman's issuance of a misbehavior report based on plaintiff's improper use of his radio. Although plaintiff's filing of a grievance against Friedman is constitutionally-protected speech, plaintiff has failed to show that he suffered an adverse action insofar as he accuses Friedman of issuing a retaliatory false misbehavior.[3] " ' "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes adverse action for a claim fo retaliation.' " *Davis,* 320 F.3d at 353. At his Tier I hearing, plaintiff was "counseled and reprimanded" by the hearing officer. Leifeld Decl. ¶ 33. Plaintiff received no other penalty. *Id.* The penalty received by plaintiff is *de minimis,* and, therefore, is not an "adverse action." *See Monko v. Cusack,* No. 9:11–CV–1218 GTS/TWD, 2013 WL 5441724, at *11 (N.D.N.Y. Sept.27, 2013) (finding that the penalty of "counseling and reprimand" was insufficient to establish adverse action).

[3]     Plaintiff also requests that the Court preclude any evidence that Friedman had issued a prior direct order to plaintiff regarding the use of his radio when not in his cell. Dkt. Nos. 83 at 12, 83–1 at 19. He bases this request on the fact that the charge against him for violating Standard of Inmate Behavior 106.10 (Direct Order) was dismissed, yet Friedman states in her declaration that she had previously counseled plaintiff several times regarding proper radio use. *See* Dkt. No. 83–1 at 19; Friedman Decl. ¶ 18. Whether the charges were dismissed following a disciplinary hearing is not dispositive of whether or not Friedman's act of issuing the misbehavior report was retaliatory in nature. Moreover, the Court understands Friedman's reference to prior counseling to refer to previous instances, other than the events of July 14, 2009. Thus, the

dismissal of the failure to obey a direct order charge from the July 14, 2009 misbehavior report, and the charge contained within that report, was not based upon earlier instances of radio misuse and resultant counseling. Accordingly, plaintiff's request is denied.

**\*12** Because plaintiff has failed to show that he suffered an adverse action on July 14, 2009, the undersigned need not determine whether there is a causal connection between plaintiff's protected conduct and Friedman's actions. Accordingly, there is no genuine issue of material fact as to Friedman's actions on July 14, 2009, and it is recommended that defendants' motion on this ground be granted.

#### c. October 8, 2009 Contraband Receipt

Plaintiff alleges that, on October 8, 2009, in retaliation for "a number of grievances" filed against Friedman, Friedman performed an unauthorized search of plaintiff's cell, confiscated plaintiff's personal fan without issuing a contraband receipt, and issued a false contraband receipt claiming that plaintiff had a lamp hanging from a clothesline in his cell. Amended Compl. at 10–11. Plaintiff denies having a clothesline in his cell, and also alleges that, during Friedman's search of his cell, she "poured soap powder, coffee, sugar, water, and ... mayonnaise all over everything in [his] cell." *Id.* at 10–11. Friedman states that, on October 8, 2009 at approximately 1:50 p.m., while conducting regular rounds, she observed a clothesline in plaintiff's cell with linens and a lamp hanging from it. Friedman Decl. ¶ 26. Pursuant to Eastern's policies, inmates may not hang lamps from clotheslines in their cells and, also, may not hang their clothesline until after 4:00 p.m. *Id.* ¶ 27. Thus, Friedman confiscated the clothesline and the linens and issued plaintiff a contraband receipt for those items. *Id.* ¶ 28.

As to the first prong of plaintiff's retaliation claim, plaintiff engaged in constitutionally protected activity insofar as he alleges that he had previously filed grievances against Friedman. *See Graham,* 89 F.3d at 80. As to the second prong, plaintiff claims that he suffered adverse actions by Friedman insofar as she confiscated his personal fan, vandalized his cell, and issued a false contraband receipt. None of the injuries alleged are substantial enough to amount to an adverse action for purposes of a First Amendment retaliation claim. Each alleged injury is considered in turn below.

2015 WL 5603433

As to the alleged confiscation of plaintiff's fan, this injury is not "substantial enough to deter legitimate grievances against prison officers." [4] *Salahuddin v. Mead,* No. 95 Civ. 8581(MBM), 2002 WL 1968329, at *4 (S.D.N.Y. Aug.26, 2002); *c.f. Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995) (finding adverse action where the plaintiff alleged that prison officials had planted contraband in his cell); *Johnson v. Schiff,* No. 9:11–CV–0531 (MAD/TWD), 2013 WL 5466218, at *13 (N.D.N.Y. Sept.13, 2013) (Dancks, M.J.) (finding adverse action where defendants assaulted the plaintiff, denied him medical care and a legal phone call, and falsely accused him of making a verbal threat against an officer); *Smith v. City of New York,* No. 03 Civ. 7576(NRB), 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) (finding adverse action where prison officials destroyed multiple legal papers and nine hundred dollars worth of the plaintiff's personal property). Moreover, the confiscation of a fan would not "[deter] 'a similarly situated individual of ordinary firmness from exercising his constitutional rights.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493). Further, plaintiff's inventory form listing all of the personal items he had upon his arrival to Eastern fails to show that he owned a fan. *See* Dkt. No. 83–1 at 28. Upon investigation of plaintiff's claim that Friedman had issued a contraband receipt without listing the fan allegedly seized, defendant Leifeld responded that, after a full investigation, he found plaintiff's letter contained "unsupported statements and embellishments. Brown Decl. Exh. E. Leifeld also cited plaintiff's "continue[d] disregard for [Eastern's] simple rules and regulations[.]" *Id.* Superintendent Brown responded to plaintiff's complaint letter stating that there was "no tangible evidence to support [plaintiff's] allegations or employee misconduct ." *Id.* Failure to issue a contraband receipt does not amount to a *per se* constitutional violation, as long as the disciplinary hearing that follows complies with due process. *See generally Cook v. Terwillegar,* No. 89 Civ. 0036(KTD), 1990 WL 303592, at *3–4 (S.D.N.Y. Jan.3, 1990) (finding that the plaintiff "was given adequate opportunity" to state the reasons why he thought a contraband receipt was falsified). Plaintiff's claim that Friedman confiscated his personal fan without issuing a contraband receipt was fully investigated within the facility and that claim was found to lack merit. Further, Friedman's alleged confiscation of plaintiff's fan did not chill plaintiff's First Amendment rights, as he filed a grievance against Friedman that same day. As such, he has failed to show that he suffered an adverse action sufficient to amount to a constitutional violation insofar as he claims that Friedman took his personal fan in retaliation for grievances filed against her.

[4]  Insofar as plaintiff's amended complaint may be read as raising a claim for the confiscated property, in violation of his due process rights, the Fourteenth Amendment does not afford the prisoner a remedy. *Daniels v. Williams,* 474 U.S. 327, 335 (1986). Further, it is well-settled that even where deprivation is intentional, there is no remedy available in federal court if there exists an adequate state court remedy. *See Hudson,* 468 U.S. at 533. As "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action pursuant to N.Y. Comp.Codes R. & Regs. tit. 7, § 1700.3(b)(4) [,]" there is no remedy in federal court for plaintiff's property damage. *Davis v. New York,* 311 F. App'x 397, 400 (2d Cir.2009) (citation omitted).

**\*13** As to Friedman's vandalizing of plaintiff's cell, prisoners are to understand that, as part of a cell search, there may be "trashing" of their cells and seizure of their property. *See Jones,* 665 F.Supp.2d at 398 (finding no adverse action where the plaintiff failed to show that a random cell search, subsequent seizure of personal items, and "trashing" of the plaintiff's cell was not out of the ordinary). Still, the retaliatory destruction of a prisoner's personal property can be sufficient to establish an adverse action, *Smith,* 2005 WL 1026551, at *3, however, a plaintiff must show that the search was "unusually punitive" and "out of the ordinary." *Jones,* 665 F.Supp.2d at 398.

Plaintiff has shown that he had filed past grievances against Friedman. Amended Compl. at 4. He also claims that, approximately three months prior to the alleged destruction of his property, Friedman stated: "I am going to make you wish you never wrote a grievance on me." *Id.* at 9. He also presents a sworn affidavit from an inmate stating that plaintiff's cell looked as though a "hurricane" has come through and there were "food and clothes ... every where [sic], with stuff poured all over them." Dkt. No. 83–1 at 35. As a result of this alleged conduct, plaintiff filed a grievance against Friedman, and subsequently received a memorandum from defendant Leifeld, dated October 19, 2009, stating that he investigated plaintiff's complaint about Friedman's actions "found no tangible evidence to support [plaintiff's] accusations of employee misconduct." Dkt. No. 83–1 at 54. The memorandum also stated that plaintiff's letter regarding Friedman's actions contained "unsupported statements and embellishments." *Id.* Friedman states that she did not "threaten, harass, or retaliate against Plaintiff in any

McFadden v. Friedman, Not Reported in F.Supp.3d (2015)

2015 WL 5603433

way" on October 8, 2009. Friedman Decl. ¶ 29. Plaintiff claims that Friedman performed a cell search and left his cell in a state of disarray. Because some level of disorder is to be expected in prison cell searches, plaintiff has failed to allege any facts by a reasonable fact-finder could conclude that Friedman's search was unusually punitive or out of the ordinary. *Cf. Smith,* 2005 WL 1026551, at *1–3 (finding that the plaintiff's claim that his legal papers and personal property were destroyed was sufficient to establish adverse action and defeat a summary judgment motion where "plaintiff lost his copies of numerous motions drafted by his lawyer, along with his copy of his grand jury minutes[,]" along with "nine hundred dollars worth of personal property.").

Finally, addressing plaintiff's allegation that Friedman issued a false contraband receipt relating to the clothesline, plaintiff fails to allege that he received any punishment or reprimand arising out of the seizure of contraband. As such, even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action. *See Pledger v. Hudson,* No. 99 Civ.2167LTSTHK, 2005 WL 736228, at *5 (S.D.N.Y. Mar.31, 2005). Plaintiff further argues in his supplemental response that Friedman's statement that plaintiff hung his clothesline in a manner not comporting with Eastern's policies is false because Eastern does not have such a policy against hanging clotheslines prior to 4 p.m. Dkt. No. 83 at 16; *see* Friedman Decl. ¶ 27. He also claims that he never owned a clothesline, and that Friedman's issuance of the contraband receipt was merely a pretext for her to search and vandalize his cell. Dkt. No. 83 at 16. Such argument does not change the Court's analysis because the injuries alleged, however frustrating they may be, are *de minimis.*

**\*14** Because the undersigned has determined that plaintiff has failed to show that he suffered an adverse action arising out of Friedman's actions on October 8, 2009, the undersigned need not determine whether there is a causal connection between plaintiff's protected conduct and Friedman's actions. Accordingly, there is no genuine issue of material fact as to Friedman's cell search and issuance of a contraband receipt on October 8, 2009, and it is recommended that defendants' motion on this ground be granted.

### 2. Leifeld

#### a. October 20, 2009 Misbehavior Report

Plaintiff alleges that, on October 20, 2009, Leifeld issued to him a false misbehavior report stating that he found and confiscated a pair of stolen headphones from plaintiff's cell. Amended Compl. at 12. Plaintiff claims that Leifeld issued the false misbehavior report in retaliation for the grievances plaintiff had previously filed against officers Jamil and Friedman. *Id.* Leifeld states that, on October 20, 2009, plaintiff handed him a pair of broken headphones and stated that a corrections officer had broken them. Leifeld Decl. ¶ 5. Upon further investigation, Leifeld determined that the headphones plaintiff handed him were possessed illegally and issued plaintiff a misbehavior report for violating Standard of Inmate Behavior 116.13 (Possession of Stolen Property). *Id.* ¶¶ 6–12. [5]

[5]     Plaintiff requests that the Court preclude the defendants from offering any evidence regarding a contraband receipt issued by Leifeld on October 20, 2009. Dkt. No. 83 at 21. The Court has reviewed defendants' motion papers in detail and defendants do not contend that Leifeld issued a contraband receipt on this date, nor is a contraband receipt referenced anywhere in defendants' motion for summary judgment. As such, plaintiff's request is denied.

Plaintiff meets the first prong of this First Amendment retaliation claim. *See Graham,* 89 F.3d at 80. The retaliatory conduct alleged by plaintiff is Leifeld's issuance of a false misbehavior report. Amended Compl. at 12. Plaintiff does not allege that he suffered any penalties or lost any privileges as a result of the misbehavior report. To the contrary, plaintiff provided a hearing disposition form stating that there was insufficient evidence to support the charge against him. Dkt. No. 83–1 at 52. The form also indicates that plaintiff did not receive any penalties. *Id.* at 51. Because plaintiff cannot direct the Court to any penalty or injury he suffered as a result of the misbehavior report, he has not shown that he suffered an adverse action. *See Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding no adverse action where misbehavior report resulted in a temporary loss of privileges).

Even if the Court were to find that plaintiff suffered an adverse action based on the misbehavior report, he has failed to demonstrate a causal connection between his protected activity and Leifeld's issuance of a misbehavior report. Plaintiff claims that Leifeld retaliated against him for grievances he had previously filed against Officers Jamil

McFadden v. Friedman, Not Reported in F.Supp.3d (2015)

2015 WL 5603433

and Friedman. Amended Compl. at 12. As stated, where a prison official's only alleged motive for retaliatory conduct is grievances filed against other officers, it is difficult to establish retaliation. *See Wright,* 554 F.3d at 274; Ciaprazi, 2005 WL 3531464, at \*8–9 (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff). Here, plaintiff's conclusory and speculative claims are insufficient to establish that Leifeld had a motive to retaliate against him for complaints filed against Jamil and Friedman.

**\*15** Accordingly, there is no genuine issue of material fact as to Leifeld's alleged violation of plaintiff's First Amendment rights arising out of his issuance of the October 20, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

#### b. December 27, 2009 Misbehavior Report

Plaintiff claims that defendants Leifeld and Geisler issued a false misbehavior report on December 27, 2009 in retaliation for past grievances filed against defendant Leifeld and other corrections officers. Amended Compl. at 13.

The crux of plaintiff's retaliation claim against defendant Leifeld is that Leifeld ordered him to travel to a different part of Eastern without an institutional pass or an escort at a time where he would need one, thereby effectively forcing plaintiff to violate Eastern's regulations. Amended Compl. at 12–13. Plaintiff admits that he did not follow Geisler's direction and instead stopped to use the restroom while on his way to obtain an institutional pass. Dkt. No. 66–4 at 18 (Hickey Decl. Exh. A). Geisler found plaintiff in the shower area and issued a misbehavior report for violations of multiple Standards of Inmate Behavior, of which plaintiff was found guilty of only one: Standard of Inmate Behavior 106.10 (Direct Order). Leifeld Decl. ¶ 28. Plaintiff was also placed on keeplock status after Geisler escorted him back to his cell. *Id.* ¶ 26. If plaintiff disagreed with the order given, he "had the opportunity to exercise his First Amendment rights to criticize prison rules through other means than disobeying [the] direct order ..." *Cook,* 1990 WL 303592, at \*4 (finding no adverse action where the alleged retaliatory misbehavior report averred that the plaintiff disobeyed a direct order). Because the misbehavior report issued by Leifeld and Geisler was not false, by plaintiff's own admission, it is not an adverse action. *Brewer v. Kamas,* 533 F.Supp.2d 318, 329

(W.D.N.Y.2008) (finding that the plaintiff could not avoid summary judgment where he failed to establish that the misbehavior report issued to him was false).

Because plaintiff has failed to meet the second prong of his First Amendment retaliation claim against Leifeld regarding the December 27, 2009 misbehavior report, the undersigned need not reach the third prong in the analysis. Accordingly, there is no genuine issue of material fact as to Leifeld's alleged violation of plaintiff's First Amendment rights as to the December 27, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

#### 4) Filkins

Plaintiff alleges that defendant Filkins subjected him to "harassment and retaliatory treatment" by filing a false misbehavior report against him. Amended Compl. at 15. Plaintiff claims that Filkins acted in retaliation for plaintiff's filing grievances against defendant Leifeld and other staff members. *Id.* at 14–15.

Plaintiff's filing of grievances against defendant Leifeld and other staff members at Eastern is constitutionally-protected conduct, and he therefore meets the first prong of his retaliation claim against Filkins. *See Graham,* 89 F.3d at 80.

**\*16** Plaintiff claims that he suffered an adverse action by Filkins filing a false misbehavior report against him. Amended Compl. at 15. However, plaintiff fails to establish the second and third prongs of his retaliation claim, which requires him to show: (1) that he suffered an adverse action, and (2) a causal connection between the protected conduct and the adverse action, for two reasons. *See Espinal,* 558 F.3d at 128. Where an inmate pleads guilty to the charges against him, he has failed to establish any evidence that the charges brought against him are false. *See Brewer,* 533 F.Supp.2d at 330 (granting summary judgment on retaliation claim where the plaintiff failed to set forth any evidence that the charges in the misbehavior report were false). Plaintiff pleaded guilty to violating Standard of Inmate Behavior 116.11, which prevents inmates from tampering with property. Filkins Decl. ¶ 15. As plaintiff has pleaded guilty to the conduct contained in the misbehavior report, plaintiff has failed to set forth any evidence demonstrating that a false misbehavior report was issued, and, therefore, has failed to establish that he suffered an adverse action. As to the third prong, plaintiff claims

that the reason behind Filkins' issuance of the allegedly false misbehavior report is plaintiff's filing of grievances against Leifeld and other Eastern staff members, not Filkins. Grievances filed against officers other than the disciplining officer, in most circumstances, do not establish the requisite causal connection between the protected conduct and the alleged adverse action. *See Ciaprazi,* 2005 WL 3531464, at *9 (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff). Because plaintiff has not provided any support for his claim that Filkins retaliated against him for his grievances against other officers, he has failed to show that there is a causal connection between his protected conduct and the misbehavior report.

Accordingly, there is no genuine issue of material fact as to Filkins' alleged violation of plaintiff's First Amendment rights as to the December 5, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

### 5) Geisler

Plaintiff claims that defendant Geisler retaliated against him for grievances filed against defendant Leifeld and other staff members at Eastern by filing a false misbehavior report against him. Amended Compl. at 14.

Plaintiff meets the first prong of the analysis. *See Graham,* 89 F.3d at 80. Plaintiff alleges that Geisler performed an adverse action when he co-signed a misbehavior report with Leifeld. Amended Compl. at 14. As stated previously, the December 27, 2009 misbehavior report does not amount to an adverse action. *See* section II.2.b *supra.* Plaintiff also fails to present a genuine issue of material fact as to a causal connection between his filing grievances and Geisler's co-signing of the misbehavior report. In order to prove this third prong, plaintiff must show that his prior filing of grievances was a " 'substantial or motivating factor' " in Geisler's issuance of a misbehavior report. *See Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002), 682 (quoting *Graham,* 89 F.3d at 79). It is difficult to establish a causal connection where the prior grievances cited by plaintiff as protected conduct did not implicate Geisler. *See Ciaprazi,* 2005 WL 3531464, at *9. Here, plaintiff alleges that Geisler acted in retaliation for grievances filed against Leifeld and other staff members at Eastern. Amended Compl. at 14. However, plaintiff provided

no evidence to suggest that Geisler knew of prior grievances filed against Leifeld or other officers, or that there was no legitimate reason for the filing of the misbehavior report. Further, plaintiff admitted during his deposition that he did not have any incidents or problems with Geisler prior to the December 27, 2009 incident. Dkt. No. 66–4 at 19. As such, he has failed to raise a genuine issue of fact as to a causal connection between the past grievances he filed and Geisler's co-signing of the December 27, 2009 misbehavior report. *See Ciaprazi,* 2005 WL 3531464, at *9.

**\*17** Accordingly, there is no genuine issue of material fact as to Geisler's alleged violation of plaintiff's First Amendment rights in connection with the December 27, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

### C. Allegations of Verbal Harassment and Threats

Plaintiff alleges that defendants Friedman and Filkins harassed and threatened him in retaliation for filing grievances. Amended Compl. at 9, 15. Defendants argue that plaintiff's claims of verbal threats and harassment are not actionable. Dkt. No. 66–1 at 21.

Verbal harassment or threats are generally not considered adverse action for the purpose of a First Amendment retaliation claim. *Marrero v. Kirkpatrick,* No. 08–CV–6237 (MAT), 2012 WL 2685143, at *7 (W.D.N.Y. July 6, 2012) (citing *Rosales v. Kikendall,* 677 F.Supp.2d 643, 648 (W.D.N.Y.2010)) (additional citation omitted). Further, verbal harassment and threats are generally not considered conduct " 'that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights.' " *Cabassa v. Smith,* No. 9:08–CV–0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr.30, 2009) (citing *Gill,* 389 F.3d at 380) (additional citation omitted). However, verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific. *Barrington v. New York,* 806 F.Supp.2d 730, 746 (S.D.N.Y.2011); *see also Ford v. Palmer,* 539 F. App'x 5, 5 (2d Cir.2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Filkins allegedly stated to plaintiff on December 5, 2009, "you are a smart ass nigger, you think that you can

go around and write officers up and nothing is going to happen to you, I don't think so we skin heads are not going to stand for it." Amended Compl. at 15. Such a statement is not sufficiently specific to constitute adverse action. *See Bartley,* 2006 WL 1289256, at *2–4 (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Friedman's statement is similar to Filkins' in that it lacks specificity. On July 14, 2009, two weeks after plaintiff filed a grievance against her, Friedman allegedly called plaintiff a racial slur, and stated, "I am going to make you wish you never wrote a grievance on me." Amended Compl. at 9. This threat is also not sufficiently specific to establish adverse action. *See Bartley,* 2006 WL 1289256, at *2–4.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Supervisor Liability

**\*18** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 201 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they hold a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319. 323–24 (2d Cir.1986)).

### 1. Brown

Plaintiff claims that he sent multiple appeals and complaint letters to defendant Brown regarding the actions of defendants Friedman, Leifeld, Geisler, and Filkins, and that defendant Brown has failed to remedy the constitutional violations alleged in the appeals and letters. *See* Dkt. No. 38 at 19–21, 24, 26, 33. Defendants argue that defendant Brown was not personally involved in any of the constitutional violations alleged. Dkt. No. 66–1 at 18.

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Further, where a plaintiff's sole accusation against a superintendent is that the superintendent affirmed the denial of plaintiff's grievance, it "is insufficient to establish personal involvement[.]" *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Also, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)).

Plaintiff alleges that his complaints regarding the July 1, 2009 and July 14, 2009 incidents with defendant Friedman were consolidated in an appeal sent to Brown on July 17, 2009. Dkt. No. 83 at 39. Brown responded to the appeals on August 13, 2009, finding the grievance to be without merit. Dkt. No. 83–1 at 93. Brown's affirmation of the denial of the grievance is insufficient to establish his personal involvement as to the July 1, 2009 and July 14, 2009 incidents. *See Joyner,* 195 F.Supp.2d at 506. Plaintiff also alleges that he sent a letter of complaint regarding Friedman's actions on October 8, 2009 to Brown. Amended Compl. at 21–22. Brown acknowledges that he received the letter and "forwarded Plaintiff's complaint

2015 WL 5603433

to appropriate subordinate staff for investigation." Brown Decl. ¶ 15, Exh. E. Because Brown only forwarded the complaint letter to subordinate staff for investigation, plaintiff has also failed to establish personal involvement for the October 8, 2009 incident. *See Vega,* 610 F.Supp.2d at 198.

**\*19** As to the October 20, 2009 incident with Leifeld, plaintiff claims that he sent a letter to Brown, and that Brown assigned Captain Pingotti, a non-party, to investigate the complaint. Amended Compl. at 25. Plaintiff also argues that defendant Brown has not responded to the complaint; however, this does not establish personal involvement. Brown cannot be found personally involved in the October 20, 2009 incident because he delegated investigation of that incident to a subordinate, as stated in plaintiff's complaint. *See Vega,* 610 F.Supp.2d at 198.

As to the December 5, 2009 incident with defendant Filkins, plaintiff claims that he sent a grievance letter to Brown on December 6, 2009. Amended Compl. at 34. As discussed, Brown's personal involvement cannot be found from plaintiff's sending of a letter, without more. *See Smart,* 441 F.Supp.2d at 643.

Finally, as to the December 27, 2009 incident regarding defendants Leifeld and Geisler, plaintiff argues that he sent a grievance letter to Brown on December 29, 2009 and has not yet received a response. Brown produced, as an exhibit to his declaration, his response to plaintiff's appeal, which accused Leifeld of making false statements on the misbehavior report dated December 27, 2009. *See* Dkt. No. 66–18 at 1, 5–6. The response is dated January 7, 2010. *Id.* at 1. As stated previously, Brown cannot be found personally involved solely by his affirming a grievance determination, without more. *See Joyner,* 195 F.Supp.2d at 506.

Plaintiff also states in his supplemental response that he spoke to Brown in February of 2010 "regarding the grievances filed in his office." Dkt. No. 83 at 37. Plaintiff also claims that Brown told plaintiff that he had spoken to defendant Fischer about "the retaliatory treatment" plaintiff was receiving and that plaintiff would be transferred to a new facility. *Id.* This conversation is also insufficient to establish personal involvement. *See Rosales,* 677 F.Supp.2d at 651–52 (finding no personal involvement where the plaintiff had a conversation with a superintendent regarding alleged constitutional violations and the superintendent stated that he would "look into the matter" but did nothing further).

Accordingly, because Brown was not personally involved in any of the alleged constitutional violations, the defendants' motion on this ground should be granted.

### 2. Fischer

Plaintiff alleges that he sent Fischer multiple letters regarding incidents with defendants Friedman, Leifeld, Geisler, and Filkins. Amended Compl. at 42–53, 55–57. Defendants argue that Fischer was not personally involved in any of the constitutional violations alleged by plaintiff. Dkt. No. 66–1 at 18–20.

As stated, sending letters or grievances to a prison official, without more, is insufficient to establish the personal involvement of the prison official. *Smart,* 441 F.Supp.2d at 643. Further, where an inmate alleges that he sent a letter to a prison official, and the prison official failed to investigate allegations of staff misconduct, the inmate must show more than merely reciting the fact that they sent a letter. *See Colon,* 58 F.3d at 873 (finding that an allegation that an inmate sent a letter to a superintendent is "insufficient to create a triable issue of fact[ ]" where plaintiff fails to specify the contents of the letter). "The bare fact that [the Commissioner] occupies a high position in the New York prison hierarchy is insufficient to sustain [a claim of supervisory liability]." *Id.* at 874.

**\*20** Plaintiff claims that he sent multiple letters to Fischer, and alleges that Fischer responded to those letters. Specifically, plaintiff alleges that Fischer responded to the letters on September 23, 2009, February 17, 2010, and March 3, 2010. Amended Compl. at 44, 46, 56. Plaintiff fails to detail the contents of these letters. Defendant Fischer claims that, as Commissioner, he received thousands of letters each year, and relied upon secretaries to determine the particular division or bureau to which each letter should be forwarded. Declaration of Brian Fischer ("Fischer Decl.") ¶ 3. Fischer states that he received copies of letters plaintiff sent to defendant Brown, Superintendent of Eastern, on July 17, 2009 and November 3, 2009. *Id.* ¶ 6, 8, Exh. A, B. Deputy Commissioner Lucien Leclaire responded to each letter, on August 24, 2009 and November 12, 2009, advising plaintiff that he must participate in the grievance process at Eastern in order to resolve his complaints. *Id.* The only contact between plaintiff and Fischer are the letters plaintiff wrote to defendant Brown on which Fischer was copied, and the responses plaintiff received from Fischer's office. These contacts are insufficient to establish Fischer's personal involvement. *See*

McFadden v. Friedman, Not Reported in F.Supp.3d (2015)

2015 WL 5603433

*Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) (finding that the Commissioner was not personally involved where all letters sent by the plaintiff were reviewed by staff and forwarded to a subordinate staff member for investigation and response).

Accordingly, because Fischer was not personally involved in any of the alleged constitutional violations, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that they are all entitled to qualified immunity. Dkt. No. 66–1 at 22. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)) (internal quotation marks omitted). This assessment is made " 'in light of the legal rules that were clearly established at the time [the official's action] was taken.' " *Wilson,* 526 U.S. at 614 (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted); *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 F. App'x 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*21** Here, plaintiff has failed to demonstrate a constitutional violation as to any defendant, and, therefore, has failed to meet the first prong. *Phillips,* 553 F. App'x at 17. As to the second prong, inmates possess a clearly-established right to engage in the grievance process without fear of retaliation from prison officials. *Baskerville v. Blot,* 224 F.Supp.2d 723, 738 (S.D.N.Y.2002) (citing *Franco v. Kelly,* 854 F.2d 584

(2d Cir.1988)). However, for the reasons established in the sections above, it was objectively reasonable for defendants to act as they did in disciplining plaintiff, confiscating contraband, and searching his cell. *See* sections B–D, *supra.* The misbehavior reports that plaintiff received were issued because defendants observed plaintiff violating one or more Standards of Inmate Behavior Rules. Similarly, the cell searches and subsequent confiscations were performed because defendants observed contraband in plaintiff's cell. For the reasons stated in the previous sections, defendants Friedman, Leifeld, Filkins, Geisler, Brown and Fischer are entitled to qualified immunity because they have shown that it was objectively reasonable to believe that they did not violate plaintiff's rights. *See Hathaway v. Coughlin,* 37 F.3d 63, 69 (2d Cir.1994).

Accordingly, defendants Friedman, Leifeld, Geisler, Filkins, Brown, and Fischer are entitled to qualified immunity, and it is alternatively recommended that defendants' motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby:

> **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 66) be **GRANTED** in all respects as to all claims and defendants; and it is further **ORDERED** that plaintiff's requests to preclude evidence of (1) any statement by defendant Friedman alleging that plaintiff disobeyed a direct order to turn his radio off, and (2) any contraband receipt issued to plaintiff by defendant Leifeld on December 5, 2009 for the seizure of headphones are **DENIED;** and it is further **ORDERED** that the Clerk serve a copy of this Report–Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Filed Aug. 13, 2015.

2015 WL 5603433

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5603433

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5441724

2013 WL 5441724
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Daniel K. MONKO, Plaintiff,
v.
Robert CUSACK, Corrections Officer,
Shawangunk Correctional Facility; and
Gerald Gardner, Corrections Lieutenant,
Shawangunk Correctional Facility, Defendants.

No. 9:11–CV–1218 GTS/TWD.
|
Sept. 27, 2013.

**Attorneys and Law Firms**

Daniel K. Monko, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Kevin P. Hickey, Esq., Assistant Attorney General,
Albany, NY, for Defendant.

*DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1**  Currently before the Court in this *pro se* prisoner
civil rights action, filed by Daniel K. Monko ("Plaintiff")
against the two above-captioned New York State correctional
employees ("Defendants"), are (1) Defendants' motion
for summary judgment, (2) United States Magistrate
Judge Therese Wiley Dancks' Report–Recommendation
recommending that Defendants' motion be granted, (3)
Plaintiff's Objection to the Report–Recommendation, and
(4) Defendants' Objection to the Report–Recommendation
(requesting that the Report–Recommendation be adopted
based, in the alternative, on Defendants' causation argument).
(Dkt.Nos.28, 36, 38, 39.) For the reasons set forth below,
Plaintiff's Objection is rejected; Defendants' Objection is
accepted; the Report–Recommendation is accepted and
adopted; Defendants' motion is granted for the reasons stated
in the Report–Recommendation as well as in Defendants'
Objection; and Plaintiff's Complaint is dismissed in its
entirety.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Amended Complaint**

Generally, in his Amended Complaint, Plaintiff asserts the
following claims: (1) a claim that Defendant Cusack retaliated
against Plaintiff in violation of the First Amendment by filing
two false misbehavior reports against him in response to his
complaints to Defendant Cusack's supervisor (Corrections
Sergeant Lutz) that he (Plaintiff) was not provided with
contraband receipts when Defendant Cusack confiscated food
items from his cell; (2) a claim that Defendant Gardner
similarly retaliated against Plaintiff in violation of the First
Amendment by failing to take steps (as a supervisor and
hearing officer) to rectify Defendant Cusask's issuance of
false misbehavior reports and by finding him guilty at
the disciplinary hearings despite the clear and convincing
evidence of his innocence; and (3) a claim that Defendant
Gardner denied Plaintiff due process under the Fourteenth
Amendment by finding him guilty of both misbehavior
charges despite the clear and convincing evidence of his
innocence and the misbehavior reports' retaliatory nature.
(Dkt. No. 12.) Familiarity with the factual allegations
supporting these claims in the Amended Complaint is
assumed in this Decision and Order, which is intended
primarily for the review of the parties. (*Id.*)

**B. Parties' Briefing of Defendants' Motion for
Summary Judgment**

Because the parties have demonstrated an accurate
understanding of their arguments on Defendants' motion
for summary judgment, the Court will not repeat those
arguments in this Decision and Order, which (again) is
intended primarily for the review of the parties.

**C. Magistrate Judge Dancks' Report–
Recommendation**

Generally, in her Report–Recommendation, Magistrate Judge
Dancks recommends that Defendants' motion be granted and
Plaintiff's Complaint be dismissed for the following reasons:
(1) Plaintiff has failed to adduce admissible record evidence
from which a rational fact finder could conclude that he
experienced a sufficiently serious adverse action to support a
retaliation claim against either Defendant, because the loss of
privileges for thirty-six days is *de minimus;* and (2) Plaintiff
has failed to adduce admissible record evidence from which
a rational fact finder could conclude that he possessed a
protected liberty or property interest to support a procedural

2013 WL 5441724

due process claim against Defendant Gardner, because the loss of privileges for thirty-six days is not an atypical and significant hardship in relation to the ordinary incidents of prison life. (Dkt. No. 36.) Familiarity with the particular findings and conclusions supporting these recommendations is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties. (*Id.*)

**D. Parties' Objections to the Report–Recommendation**

**\*2** Generally, in his Objection to the Report–Recommendation, Plaintiff asserts the following two arguments: (1) Plaintiff has established a retaliation claim under the First Amendment, because a similarly situated individual of ordinary firmness would be deterred from exercising his constitutional rights by (a) the mere *threat* of receiving a false misbehavior report and/of (b) a resulting loss of privileges for thirty-six days (as evidenced by the affidavit of Plaintiff's fellow inmate in the Special Housing Unit, Timothy Vail); and (2) contrary to Magistrate Judge Danck's characterization of Plaintiff's due process claim as being procedural in nature, it is actually substantive in nature, as evidenced by the word "substantive" in his Amended Complaint. (Dkt. No. 38.)

Generally, in their Objection to the Report–Recommendation, Defendants argue that, while the Report–Recommendation properly recommends that Defendants' motion be granted (for the reasons stated therein), the Report–Recommendation neglects to address, and endorse, Defendants' alternative argument for dismissal of Plaintiff's retaliation claim: that Plaintiff has failed to adduce admissible record evidence from which a rational fact finder could conclude that there was a causal connection between the protected speech and the adverse action. (Dkt. No. 39.) Defendants argue that Plaintiff's conduct would have resulted in the issuance of a misbehavior report regardless of whether Plaintiff complained to the area supervisor. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Review of a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's reportrecommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations,

or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. [3]

[1] *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2] *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion

of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    See *Zhao v. State Univ. of N.Y.,* 04–CV–0210, 2011 WL 3610717, at * 1 (E.D.N.Y. Aug.15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley,* 752 F.Supp.2d 311, 312–13 (W.D.N.Y.2009) ( "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[6]

4    See also *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

5    See *Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–*

*Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

6    See also *Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3** After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion for Summary Judgment

Magistrate Judge Dancks correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 36, at Part III.A.) As a result, this standard is incorporated by reference in this Decision and Order.

### III. ANALYSIS

After carefully reviewing all of the papers in this action (including Magistrate Judge Dancks' Report–Recommendation, and Plaintiff's objection thereto), the Court concludes that the Report–Recommendation is free of error: Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 36.) As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (*Id.*) The Court would only add the following two points.

First, regarding the causation argument asserted by Defendants in their Objection, the Court agrees with Defendants that, based on the current record evidence,

there is no genuine dispute that Plaintiff's continuation and escalation of his conduct would have resulted in the issuance of misbehavior reports regardless of whether Plaintiff complained to the area supervisor. (Dkt. No. 39, at 2.) Indeed, Plaintiff expressly invited the misbehavior reports as a way of forcing Defendant Cusack to identify the disciplinary rule(s) that he believed Plaintiff was violating by keeping food items in his cell. (Dkt. No. 35, at ¶ 24.)

Second, regarding the substantive due process argument asserted by Plaintiff in his Objection, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 272–73, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Here, because Plaintiff's substantive due process claim overlaps both his procedural due process claim and his retaliation claim, it must be dismissed. *See Rother v. NYS Dept. of Corr. and Cmty. Supervision,* 12–CV–0397, 2013 WL 4774484, at * 14 (N.D.N.Y. Sept.4, 2013) (Kahn, J.) ("Plaintiff's substantive-due-process claim overlaps entirely with her procedural-due-process claim-they both seek to remedy the same harm and challenge the same conduct.... Moreover, the harm and conduct challenged by the substantive-due-process, First Amendment, and equal-protection claims significantly overlap. Because the claim for substantive due process is subsumed by Plaintiff's other constitutional claims, it must be dismissed."); *Velez v. Levy,* 274 F.Supp.2d 444, 454 (S.D.N.Y.2003) ("[T]o the extent the plaintiff's substantive due process claim is based on the same allegations that give rise to the plaintiff's Fourteenth Amendment procedural due process claims, the underlying allegations must be analyzed under the relevant standards for a procedural due process claim, ... rather than standards that govern a claim for substantive due process."), *aff'd in part,* 401 F.3d 75 (2d Cir.2005).[7]

[7]    The Court notes that, even if it were to assume that Plaintiff had asserted an independent substantive due process claim, the Court is unable to find admissible record evidence establishing that the state action was arbitrary in the constitutional sense.

**\*4  ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 36) is ***ACCEPTED*** and ***ADOPTED;*** and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 28) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 12) is ***DISMISSED*** in its entirety. The Clerk is directed to enter judgment in favor of the defendants and close this case.

### *REPORT–RECOMMENDATION AND ORDER*

THÉRSE WILEY DANCKS, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).[1] Plaintiff alleges in his Amended Complaint that Defendant Robert Cusack ("Cusack"), a Corrections Officer at Shawangunk Correctional Facility ("Shawangunk"), violated his First and Fourteenth Amendment rights by filing two false misbehavior reports against him in retaliation for Plaintiff's verbal complaint to regular area supervisor, Corrections Sergeant Lutz ("Lutz"), that he was not being given contraband receipts when food items were removed from his cell. (Dkt. No. 28–3 at 41–43 .) Defendant Gerald Gardner ("Gardner"), a Corrections Lieutenant at Shawangunk and hearing officer at the disciplinary proceedings on the two misbehavior reports, is alleged to have found Plaintiff guilty despite the clear and compelling nature of Plaintiff's defense, and to have imposed sanctions against him. (Dkt. Nos. 12 at ¶¶ 57–62; 12–2 at 21–22, 33–34.) Plaintiff has asserted claims against Gardner for both retaliation and for violation of his Fourteenth Amendment right to due process in finding Plaintiff guilty of the charges in the allegedly false misbehavior reports. (Dkt. No. 12 at ¶¶ 83–84, 87–88.)

[1]    *See* Text Entry of October 29, 2012.

Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 28.) Plaintiff has opposed the motion. (Dkt. No. 35.) For the reasons that follow, I recommend that Defendants' motion be granted.

2013 WL 5441724

## I. BACKGROUND

### A. Daily Cell Searches and Confiscation of Food Without Issuing Contraband Receipts

Plaintiff has been incarcerated within the Department of Corrections and Community Supervision ("DOCCS") system since September of 1985. (Dkt. No. 28–3 at 13.) During the late summer and early fall of 2010, the time period relevant to Plaintiff's claims, he was confined at Shawangunk. *Id.* at 14, 16. Plaintiff had been at Shawangunk since 2001. *Id.* at 14.

Plaintiff was placed in the Special Housing Unit ("SHU") at Shawangunk in early August of 2010 for a contraband-related infraction. *Id.* at 26; Dkt. No. 28–4 at ¶ 7. He was housed with twelve or so other inmates when corrections officer David Degraff ("Degraff") moved from the night shift to the day shift. (Dkt. No. 28–3 at 16.) During the months of July and August of 2010, every time one particular inmate left his cell for a shower or his hour of recreation, Degraff went into his cell and took out food items. *Id.;* Dkt. No. 12 at ¶ 22. When that inmate began writing grievances complaining that Degraff was singling him out, Degraff started going into all of the inmate's cells and removing, among other things, food items that inmates had saved from breakfast to consume later in the day. (Dkt. No. 12 at ¶ 23.) Degraff told inmates who complained that they could blame the inmate who had filed the grievances. (Dkt. No. 28–3 at 18–19.) On September 10, 2010, when it became clear to Plaintiff that Degraff was trying to pit one inmate against another, Plaintiff complained verbally to Lutz about DeGraff's conduct and also wrote to the DOCCS Inspector Generals Office. (Dkt. No. 12 at ¶ 22.) Plaintiff told both Lutz and the Inspector Generals Office that Degraff was the only corrections officer performing the daily searches and removing food items. *Id.* at ¶ 29.

 **\*5** Plaintiff initially believed that Lutz would instruct Degraff to stop the searches. (Dkt. No 12 at ¶ 31.) Instead, beginning in September of 2010, all of the corrections officers, including Defendant Cusack, began going into the SHU inmates' cells and removing the inmates' things, including food items, on a daily basis, without leaving contraband receipts. (Dkt. No. 28–3 at 21–23, 28.) According to Plaintiff, because contraband receipts were not being issued, there was no record of the cell searches and inspections. (Dkt. No. 12 at ¶ 32.)

Plaintiff filed a grievance on October 10, 2010, complaining that contraband receipts were not being left when food items were removed from his cell. (Dkt. Nos. 12 at ¶ 33;12–2 at

13–14.) Lutz submitted an October 16, 2010, memorandum to the Inmate Grievance Program Supervisor responsive to the grievance. (Dkt. No. 12–2 at 15.) The memorandum stated that on or about September 10, 2010, Lutz had instructed the floor officers that he expected them to conduct daily cell inspections in addition to daily cell searches and, as had been the practice, to confiscate contraband, including but not limited to "food, food containers, and drag lines," in plain view. [2]  *Id.;* Dkt. No. 28–4 at ¶ 12. Lutz explained in the memorandum that visual inspections "are a good security practice to minimize the introduction of contraband in the Special Housing Unit." (Dkt. No. 12–2 at 15.) Lutz also disclosed in the memorandum that he had instructed the officers to give inmates contraband receipts for any items taken from their cells. *Id.* On October 20, 2010, the Inmate Grievance Review Committee concluded that contraband receipts should be given for items taken out of inmates' cells. *Id.* at 16.

[2]      Cusack explained in his Affidavit that "[a]lthough food is generally harmless in its original form, it can be altered or changed into may improper forms [e.g., fruit can be fermented into prison wine] if not properly controlled." (Dkt. No. 28–4 at ¶ 6.)

Prior to the determination of Plaintiff's grievance, on October 12, 2010, Cusack performed a regular scheduled search of Plaintiff's cell. [3] (Dkt. No. 28–3 at 28, 30–31.) During the search, Cusack confiscated state food, an extra state towel, and a fishing pole from Plaintiff's cell and left a contraband receipt. [4] (Dkt. No. 28–7 at 1.) According to Cusack, contraband receipts are required whenever a cell search is conducted whether or not contraband is found. (Dkt. No. 28–4 at ¶ 16.) Plaintiff had no complaint with the regular cell search, except for his belief that there was no rule in effect prohibiting inmates from keeping food in their cells at the time. (Dkt. No. 28–3 at 30–31.) Cusack, on the other hand, believed that all of the items confiscated from Plaintiff's cell were contraband and violated SITU policy. (Dkt. No. 28–4 at ¶ 17.) While Cusack believed that the items warranted confiscation, he did not issue a misbehavior report because it appeared to be an isolated incident. *Id.* In addition, it was Cusack's understanding from his training and experience that misbehavior reports are issued at the discretion of the corrections officer depending on the circumstances, and at that time Cusack believed discarding the items would resolve the issue. *Id.* at ¶ 18.

2013 WL 5441724

3     Plaintiff described the scheduled cell search as one done when an inmate's name comes up on the computer, and a thorough search of the inmate's property is conducted. (Dkt. No. 28–3 at 28.)

4     A fishing pole is a drag line crafted by prisoners and used as a tool to pass and retrieve items between inmates. (Dkt. Nos. 28–3 at 23; 28–4 at ¶ 15.) It is considered contraband. *Id.*

**\*6** The following day, October 13, 2010, while Plaintiff was in the yard, Cusack conducted a visual inspection of Plaintiff's cell and confiscated a container of milk and four slices of bread that were in a paper bag in his cell.[5] (Dkt. No. 28–3 at 31–33.) Cusack, believing that contraband receipts were not required for items found in a visual cell inspection, did not give Plaintiff a contraband receipt. (Dkt. Nos. 12 at ¶ 37; 28–4 at ¶ 22.) Cusack claims to have warned Plaintiff that he was not allowed to keep food items in his cell. (Dkt. No. 28–4 at ¶ 21.) Plaintiff contends that Cusack never gave him a direct order or any sort of direction on whether he could have food in his cell. (Dkt. No. 35 at p. 10, ¶ 23.)

5     Plaintiff, who converted to Judaism in 2005, received the Kosher cold alternative diet, which contained substantially more unprepared foods, including fruits and vegetables, than the regular meals served to the majority of inmates. (Dkt. No. 12 at ¶¶ 21–22, 34.) Because it was difficult to consume an entire meal in the short time allotted, Plaintiff was in the habit of saving his fresh fruits and vegetables to be consumed during the day. *Id.* at ¶ 34. Plaintiff had also been given authorization to keep the containers of milk given to him with breakfast when the milk was frozen. (Dkt. No. 28–3 at 32–33.)

The morning of October 14, 2010, Plaintiff made a verbal complaint to Lutz regarding Cusack's failure to give Plaintiff a contraband receipt for the food items he had confiscated the day before. (Dkt. Nos. 28–3 at 33–34;12 at ¶ 38.) Fifteen or twenty minutes later, Cusack and another corrections officer escorted Plaintiff to the yard for his recreation period. *Id.* at ¶ 40. According to Plaintiff, as they were walking towards the yard, Cusack said "So you want me to give you a contraband receipt for the food items I removed from your cell yesterday?"[6] Plaintiff replied, "If you are saying that the food items are contraband, then yes I want a contraband receipt." Cusack then asked Plaintiff, "Do you want the misbehavior

report that's gonna come with it?"[7] Plaintiff replied "If you are saying I broke a rule, then yes, I'll take that as well." Plaintiff then said "There is no rule saying we can't keep food in our cells." Cusack responded "we'll see." (Dkt. No. 35 at ¶ 24.) When Plaintiff returned to his cell after recreation, he noticed that Cusack had removed an apple, a banana, and half of a cucumber and had left contraband receipts for the food taken on October 13th and 14th. (Dkt. Nos. 12 at ¶ 41; 35 at ¶ 25.)

6     Cusack claims to have asked Plaintiff "in words or substance, whether he truly wanted to received contraband receipts for food items [Cusack] felt constituted illegal contraband." (Dkt. No. 28–4 at ¶ 2 1.)

7     According to Cusack, he asked Plaintiff "in words or substance, whether he also wanted the misbehavior report that would result from his disregard for SHU rules." (Dkt. No. 28–4 at ¶ 28 .)

**B. Misbehavior Reports and Plaintiff's Disciplinary Hearings**

The following day, Plaintiff was given two Tier II misbehavior reports written by Cusack. (Dkt. No. 12 at ¶ 42.) The first misbehavior report involved Cusack's October 13, 2010 visual inspection of Plaintiff's cell and confiscation of Plaintiff's milk and bread. (Dkt. No. 12–2 at 20.) Cusack indicated in the misbehavior report that Plaintiff "has been previously told that he can not keep food items in his cell." *Id.* Plaintiff was charged with possession of contraband, having an untidy cell or person, refusing a direct order, and property damage or loss. (Dkt. No. 28–15 at 1.) The second misbehavior report, which involved the confiscation of the banana, apple, and half a cucumber from Plaintiff's cell on October 14, 2010, included the same charges as the first. (Dkt. No. 12–2 at 32.) The misbehavior reports were endorsed by Lutz. (Dkt. Nos. 28–11 at 9; 28–13; 28–14.)

Defendant Gardner, as hearing officer, made a determination to hold a separate disciplinary hearing for each of the misbehavior reports. (Dkt. Nos. 28–11 at 1, 3; 28–12 at 1.) The disciplinary hearings were held on October 19th and 20th of 2010.[8] (Dkt. No. 28–11 at 1.) Plaintiff pleaded not guilty to the charges at both hearings. (Dkt. Nos. 28–11 at 2; 28–12 at 3.) Plaintiff argued that there was no rule prohibiting him from saving food given to him at meals, and that neither Cusack nor any other corrections officer or sergeant had given him a direct order that he could not keep food in his cell.

2013 WL 5441724

(Dkt. Nos. 28–11 at 5–6; 28–12 at 4.) Cusack testified that he had told Plaintiff he could not keep food in his cell prior to writing the misbehavior reports. (Dkt. No. 28–11 at 15–17.) When asked if he had given Plaintiff a "direct order" to that effect, Cusack testified that while he had not used the words "direct order," when he makes a statement to an inmate, the statement constitutes a direct order whether he uses the word "direct order" or not.[9] *Id.* at 16–17.

[8]   The transcripts from the hearings, submitted by Defendants in support of their motion for summary judgment, contain a substantial number of gaps in the testimony. (Dkt. Nos. 28–11 and 28–12.)

[9]   Lutz testified that when Cusack told Plaintiff he could not keep food in his cell, it constituted a "direct order." (Dkt. No. 28–12 at 10.)

**\*7**  In their testimony at the hearings, Lutz and Cusack both identified Section 2.401, subsection 5, of the SHU rulebook as the source of the rule prohibiting inmates from keeping food in their cells.[10] (Dkt. Nos. 28–11 at 14; 28–12 at 8, 13.) The rule provides:

[10]   The referenced SHU rulebook is SHU/PC/IPC Guidelines & Regulations No. 2.401. (Dkt. No. 28–8.) The provision at issue is subsection 6 of part V. Disciplinary Special Housing Rules (Directive 4933), not subsection 5. (Dkt. No. 28–8.)

Inmates will receive their meals in a food tray (unless on a restricted diet) and are expected to return both parts of that tray, utensils, and all other foods/liquid containers at the completion of each meal. Failure to do so will be considered a violation of Standards of Inmate Behavior Rule 116.10 and will result in a Tier III misbehavior report and pre-hearing restricted diet. Damage to the trays will be considered a violation of Standards of Inmate Behavior Rule 116.10 and may result in the requirement that monetary restitution be made.

(Dkt. No. 28–8 at 1.) Plaintiff argued that the provision applied only to containers, not food. (Dkt. No. 28–12 at 4.) Cusack testified that he considered food in inmates cells to be contraband according to the Rulebook provision. *Id.* at 12–13; *see also* Dkt. No. 28–4 at ¶¶ 19–20.

Lutz acknowledged telling Plaintiff on October 14, 2010, that he was supposed to have been given a contraband receipt for the food taken from his cell on October 13, 2010. *Id.* at 9. Lutz also testified that he had told Cusack to give Plaintiff

a receipt. *Id* . Gardner, over Plaintiff's objection and without explanation, refused to ask Lutz whether he had instructed Cusack to write the misbehavior report or Cusack had done it on his own. *Id.* at 10–11. However, Cusack testified that Lutz did not direct him to write the misbehavior reports. (Dkt. No. 28–11 at 13.)

Cusack testified at the hearings that if Plaintiff had not asked for contraband receipts, he would not have written the two misbehavior reports. (Dkt. Nos. 28–11 at 14; 28–12 at 11–13.) When asked why he had written the misbehavior reports, Cusack testified that because once Plaintiff asked for the contraband receipts, Cusack wanted to make it official—have everything on record. (Dkt. No. 28–12 at 15.)

Gardner found Plaintiff guilty of having contraband in his cell and refusing a direct order at the end of the disciplinary hearings on the two misbehavior reports and not guilty of untidy cell or person and property damage or loss. (Dkt. Nos. 28–15 at 1; 28–16 at 1.) The only penalty imposed on Plaintiff in connection with the guilty finding on the misbehavior report dealing with the October 13, 2010 contraband incident was counseling and reprimand. (Dkt. No. 28–15 at 1.) The penalty imposed in connection with the guilty finding on the misbehavior report for the October 14, 2010 contraband incident was thirty days keeplock and thirty days loss of packages, commissary, and phone. (Dkt. No. 28–16 at 1.) According to Plaintiff, he lost his postadjustment privileges—extra benefits such as headphones, extra clothing and personal property—for approximately a month as a result of the misbehavior reports. (Dkt. No. 28–3 at 45–46.)

## C. Reversal of the Guilty Findings and Revision of the SHU Rulebook

**\*8**  Plaintiff appealed the two determinations of guilt to Shawangunk Superintendent Joseph T. Smith, who designated Deputy Superintendent John Maly ("Maly") to handle the appeals. (Dkt. Nos. 12 at ¶¶ 63–65; 12–2 at 24–29, 36–39.) On February 9, 2011, Maly reversed both of the disciplinary hearing determinations and directed that all records of the hearings be expunged. (Dkt. No. 12–2 at 29–30, 39–40.) As a result of the expungement, the thirty days of keeplock was never imposed on Plaintiff. (Dkt. No. 28–3 at 46.) The same day the determinations were reversed, Maly issued a memorandum effective immediately prohibiting inmates in SHU from possessing unconsumed food and requiring unconsumed food to be returned with the feeding utensils at the end of each meal.[11] (Dkt. No. 28–

2013 WL 5441724

19 .) The memorandum stated that unconsumed food items retained by inmates after the meal period is over would be considered contraband. *Id.* The SHU rulebook section relied upon by Lutz and Cusack at Plaintiff's disciplinary hearings was revised on February 14, 2011, to add subsection 7, which provides that "Inmates must consume all meals at the time served. Inmates are not allowed to store food in their cell." (Dkt. No. 28–20.)

11    Cusack understands that the guilty findings were expunged because the rule on which he and Lutz had relied in deciding that inmates were not allowed to keep food in their cells was deemed ambiguous. (Dkt. No. 28–4 at ¶ 53.)

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on October 11, 2011. (Dkt. No. 1 .) His application to proceed *in forma pauperis* was granted on November 11, 2011. (Dkt.Nos.2, 4.) On December 12, 2011, Plaintiff filed an Amended Complaint, which was accepted as the operative pleading in this lawsuit by Order dated December 14, 2011. (Dkt.Nos .12, 13.)

Defendants filed their Answer to Plaintiff's Amended Complaint on January 19, 2011 (Dkt. No. 14), and a day later, Plaintiff filed a motion for partial summary judgment on liability and for an order directing Defendants to produce certified copies of the transcripts from the two disciplinary hearings at issue in the lawsuit. (Dkt. No. 16.) Defendants moved for denial of Plaintiff's motion for partial summary judgment without prejudice on the grounds that it was premature. (Dkt. No. 17.) In response, Plaintiff requested that he be allowed to withdraw the motion as premature. (Dkt. No. 18.) Plaintiff's request was granted by Text Order dated January 1, 2012.

Following discovery, Defendants filed the motion for summary judgment now before me for report and recommendation. (Dkt. No. 28.) Plaintiff thereafter filed papers in opposition to the motion. (Dkt. No. 35.)

## III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving

for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*9** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. [12] *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

12    Only admissible evidence need be considered by a court in ruling on a motion for summary judgment, and the court has "broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir.2009). Because Plaintiff's Amended Complaint (Dkt. No. 12) is verified, it will be treated as an affidavit in opposition to Defendants' summary judgment motion. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). The Affirmation submitted by Plaintiff in opposition to Defendants' motion (Dkt. No. 35 at 5–14) is unsworn and was not signed under penalty of perjury. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used); *see also* 1 0B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or in opposition to a motion for summary judgment need not be notarized when they are made under penalty of perjury, but unsworn statements will be rejected). However, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider papers that did not constitute affidavits or declarations. *See, e.g., Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at \*7, 2012 U.S. Dist. LEXIS 87834, at \*20–22 (W.D.N.Y. June 25, 2012). In light of Plaintiff's *pro se* status, and

2013 WL 5441724

because: (1) Plaintiff explained in his Affirmation that he was unable to submit a sworn affidavit because notary service was unavailable (although he presumably could have signed the Affirmation under penalty of perjury); (2) Defendants have not objected to consideration of the Affirmation; and (3) the Affirmation is generally consistent with the allegations in Plaintiff's Amended Complaint and his deposition testimony submitted as an Exhibit by Defendants, I have considered the Affirmation in opposition to Defendants' motion.

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) [13] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

[13]    Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk.

## IV. ANALYSIS

### A. Retaliation Claim Against Cusack

Plaintiff claims that Defendant Cusack filed two false misbehavior reports against him in retaliation for Plaintiff going over his head and complaining to Lutz that corrections officers, including Cusack, were confiscating food from inmates' cells without giving the inmates a contraband receipt. (Dkt. No. 28–3 at 41–43.) "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). False accusations contained in a misbehavior report can, however, rise to the level of a constitutional violation when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> **\*10**  [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Pidlypchak, 389 F.3d at 380 (citing Dawes, 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381, 383 (quoting

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 288 of 531
Monko v. Cusack, Not Reported in F.Supp.2d (2013)
2013 WL 5441724

*Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 493.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The protected First Amendment conduct on which Plaintiff relies in his retaliation claim is his complaint to Lutz that corrections officers were confiscating food from inmates' cells without giving the inmates contraband receipts. (Dkt. No. 28–3 at 41–43.) An inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim. *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS 29745 at *46 (N.D.N.Y. April 24, 2006) (finding that oral complaints made to corrections officers may have First Amendment protection for purposes of a retaliation claim), *aff'd,* 219 F. App'x 110 (2d Cir.2007); *Brewer v. Kamas,* 533 F.Supp.2d 318, 328 (W.D.N.Y.2008) (same). Therefore, the evidence may support a finding that Plaintiff was engaging in protected conduct when he complained to Lutz.

*11 However, the evidence does not support a finding of adverse action. Defendant Gardner imposed a penalty of only counseling and reprimand upon finding Plaintiff guilty after the hearing on the first misbehavior report. (Dkt. No. 28–15 at 1.) Gardner imposed a penalty of thirty days in keeplock, and thirty days loss of packages, commissary, and phones on the second. (Dkt. No. 28–16.) However, Plaintiff, by his own admission, did not spend any time in keeplock and testified at his deposition that his damages as a result of the finding of guilt were limited to a thirty-six day loss of post-adjustment privileges, including things like radio,

headphones, and personal photographs. (Dkt. No. 28–3 at 46–48.) "The filing of misbehavior reports that result in a temporary loss of various privileges such as permission to visit the commissary [does] not constitute adverse action because they are *de minimis." Gantt v. Lape,* No. 9:10–CV–0083 (GTS/GHL), 2012 WL 4033729, at *8, 2012 U.S. Dist. LEXIS 130052, at *24–25 (N.D.N.Y. July 31, 2012); *see also Bartley v. Collins,* No. 95–CV–10161(RJH), 2006 WL 1289256, *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006) ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary ... do not constitute adverse action because they were too *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights."); *Shaheen v. McIntyre,* No, 9:05–CV–0173 (TJM/GHL), 2007 WL 3274835, at *9, 2007 U.S. Dist. LEXIS 81895 (N.D.N.Y. Nov. 5, 2007) ("allegations of lost privileges, standing alone, would be too *de minimis* to constitute 'adverse action' ").

Even giving due consideration to Plaintiff's argument that because SHU inmates have so few privileges, losing what they do have is a significant loss (Dkt. No. 35 at 31), I find that Plaintiff's temporary loss of post-adjustment privileges in this case is too *de minimis* to constitute adverse action for purposes of his retaliation claim against Cusack. [14] Therefore, I recommend that the Court grant Defendant Cusack's motion for summary judgment.

[14]    While it is not entirely clear from the summary judgment record whether the thirty day loss of privileges imposed on Plaintiff by Gardner on the second misbehavior report was also carried out, even if it were, the penalty would be too *de minimis* to constitute adverse action.

### B. Retaliation and Due Process Claims Against Gardner

#### 1. Retaliation

Plaintiff claims that Gardner retaliated against him by failing to take steps in his supervisory capacity to rectify Cusack's issuance of false misbehavior reports and by finding him guilty at the disciplinary hearings despite the clear and convincing evidence of his innocence. (Dkt. Nos. 12 at ¶¶ 83–84, 28–3 at 70–72.) As discussed above with regard to Plaintiff's retaliation claim against Cusack, the temporary loss of privileges such as the post-adjustment privileges lost

by Plaintiff for thirty-six days are *de minimis* and do not constitute adverse action for purposes of a retaliation claim. *See Bartley v. Collins,* 2006 WL 1289256, at *7. Therefore, I recommend that Gardner be granted summary judgment dismissing Plaintiff's retaliation claim against him.

### 2. *Due Process*

**\*12**  Plaintiff claims that Gardner denied his Fourteenth Amendment right to due process by finding him guilty of the charges of possessing contraband and refusing a direct order in each of the two misbehavior reports filed by Cusack, despite clear and compelling evidence at the hearings that the charges were false and without merit, and the misbehavior reports had been written in direct retaliation for Plaintiff's verbal grievance to Lutz. (Dkt. Nos. 12 at ¶¶ 84, 88; 28–15 at 1; 28–16 at 1.)

To prevail on a § 1983 claim for denial of Fourteenth Amendment procedural due process rights, a plaintiff must demonstrate that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). Due process generally requires that "some kind of hearing" be provided to an individual by the state prior to depriving them of a property or liberty interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

An inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (same). There is no evidence that counseling and reprimand constitutes an atypical and significant hardship. (Dkt. No. 28–15 at 1.) Furthermore, Plaintiff did not serve any of the thirty days in keeplock, and it appears that the penalty of thirty day loss of packages, commissary, and phone may not have been carried out either. (Dkt. No. 28–16 at 1.) At most, the evidence shows that Plaintiff lost his post-adjustment privileges—extra benefits such as headphones, extra clothing and personal property—for thirty-six days. *Id.* at 45–46.

"[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *see also Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (holding temporary loss of various privileges—telephone, package, commissary and recreation—did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate"); *Johnson v. Enu,* No. 08–CV–158 (FJS/DRH), 2011 WL 3439179, at *12, 2011 U.S. Dist. LEXIS 86831, at *34–35 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Edelkind v. Killian,* No. 09 Civ. 5835(SHS) (MHD), 2011 WL 10599973, at *16, 2011 U.S. Dist. LEXIS 157207, at *46 (S.D.N.Y. Aug. 31, 2011) ("loss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest.").

**\*13**  I find that Plaintiff's thirty-six day loss of post-adjustment privileges, and a thirty day loss of telephone, commissary, and recreation, if those losses in fact occurred, do not give rise to a protected liberty interest. Therefore, I recommend that Defendant Gardner also be granted summary judgment dismissing Plaintiff's claim against him for denial of Plaintiff's Fourteenth Amendment due process rights in connection with the hearings on the misbehavior reports written by Defendant Cusack.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **GRANTED** and that the Court enter judgment in Defendants' favor; and it is

**ORDERED** that the Clerk provide Plaintiff with copies of all of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5441724

**Monko v. Cusack, Not Reported in F.Supp.2d (2013)**

2013 WL 5441724

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 9:11cv01218**<br>MONKO v. CUSACK ET AL | — | N.D.N.Y. | Oct. 11, 2011 | Docket |

**History**

There are no History results for this citation.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by   Lin v. Amazon.com, Inc.,   2nd Cir.,   November 27, 2024

2024 WL 4266008
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Yuyan LIN, Plaintiff,
v.
AMAZON.COM SERVICES, LLC, Defendant.

21-CV-6203 (KAM)(MMH)
|
Signed September 23, 2024

**Attorneys and Law Firms**

Yuyan Lin, Princeton, NJ, Pro Se.

Gary Moy, Devjani Mishra, Eli Z. Freedberg, Littler Mendelson P.C., New York, NY, for Defendant.

## MEMORANDUM & ORDER

KIYO A. MATSUMOTO, United States District Judge:

**\*1** Plaintiff Yuyan Lin ("Lin" or the "Plaintiff") commenced this diversity action on November 8, 2021, against Defendant Amazon.com Services, LLC, ("Amazon" or the "Defendant"), alleging violations of New York City Human Rights Law, Administrative Code of the City of New York § 8-101 et seq. ("NYCHRL") and the New York State Human Rights Law, Executive Law § 296 et seq. ("NYSHRL") as a result of Amazon's failure to reasonably accommodate Plaintiff's requests for lighter duty following her return from maternity leave. (ECF No. 1, Complaint ("Compl.") ¶¶ 1-6.) Plaintiff subsequently amended her complaint, (ECF No. 13, First Amended Complaint), and then, after the withdrawal of her counsel, amended her complaint for a second time while proceeding *pro se*, adding in an additional state law negligence claim against Amazon, (ECF No. 29, Second Amended Complaint ("SAC")). Defendant previously moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* ECF No. 47, Motion to Dismiss.) On September 5, 2023, the Court granted the Defendant's motion to dismiss the state law negligence claim and denied dismissal of the NYSHRL and NYCHRL

claims. (*See* ECF No. 61, M&O.) Defendant now moves for summary judgment as to Plaintiff's remaining causes of action alleging that Amazon failed to reasonably accommodate Plaintiff's requests for lighter duty following her maternity leave.

For the reasons set forth below, the Court finds no genuine disputes of material fact and **grants** Defendant's motion for summary judgment with respect to Plaintiff's remaining claims which are **dismissed** with prejudice.

## BACKGROUND

### I. Factual Background

The following facts are taken from the Defendant's Local Rule 56.1 statement, and from documents and transcripts cited in the Defendant's Local Rule 56.1 statement and attached to the motion for summary judgment. (*See* ECF No. 66, Defendant's Local Rule 56.1 Statement ("Def. 56.1").) Rather than either admitting or denying the statements made in the Defendant's Rule 56.1 Statement, Plaintiff instead submitted a declaration responding to the Defendant's list of exhibits, stating that she had not seen several of the annexed documents "before this action." (ECF No. 71, Plaintiff's Response regarding Defendant's Declaration of Discovery Evidence ("Pl. Resp.").) Plaintiff's objections to the evidence, which mainly appear to assert that she had not seen several documents prior to the initiation of litigation, do not challenge the authenticity of the documents and the Court may properly consider them on summary judgment even without authentication as would be required at trial. *Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008) (summary order) ("a party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party").

Because the Plaintiff failed to controvert the facts set forth in the Defendant's Rule 56.1 Statement, the Court may deem the facts admitted. *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Nonetheless, as the Second Circuit has instructed, "the local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Id.* (internal quotation marks and citation omitted). Therefore, the Court will consider only those assertions in the Defendant's Rule

**Lin v. Amazon.com Services, LLC, Slip Copy (2024)**
Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 294 of 531

2024 WL 4266008

56.1 Statement which are supported by evidence in the record that would be admissible at trial.

**\*2** Except as otherwise indicated, the facts set forth below from the Defendant's Local Rule 56.1 statement are undisputed. The court summarizes only those facts that are relevant and material to the adjudication of the instant motion.

Plaintiff was hired by Amazon on November 2, 2018, to serve as a "Fulfillment Associate" in the "Picking Department" of Amazon's fulfillment center located in Staten Island, New York – the center is referred to by Amazon as "JFK8." (Def. 56.1 ¶ 1.) According to Amazon's job description for the Fulfillment Associate role, Fulfillment Associates work in Amazon warehouses (a term the company uses interchangeably with "fulfillment center") to select, pack, and ship orders of Amazon's customers. (*Id.* ¶ 2.) At the time Plaintiff was hired by Amazon, she was approximately seven months pregnant. (ECF No. 84-1, Deposition of Yuyan Lin ("Pl. Dep."), at 116-17.) Plaintiff subsequently gave birth on January 20, 2019, and Amazon granted Plaintiff's request to go on leave for the birth of her child through early April 2019. (Def. 56.1 ¶¶ 4-6.) Plaintiff did not receive any medical treatment after the birth of her baby, and her doctor did not provide her with any instructions regarding limitations on activity post-birth. (Pl. Dep. at 121.)

While Plaintiff was on leave in March 2019, she called Amazon's Employee Resources Center to request a new position when she returned to work. (Def. 56.1 ¶ 7.) On a March 26, 2019, call, the Amazon representative instructed Plaintiff how to apply for a new position, and Plaintiff subsequently put in a request using an Amazon-internal application, "Amazon A to Z," to change her schedule based on "childcare issues." (*Id.* ¶¶ 8-9; Pl. Dep. at 127-28.) When Plaintiff requested the new schedule, she was presented with several available positions for that time, and she selected "single pack, pack flow, and picking" as her choices. (Pl. Dep. at 127.) Amazon appointed Plaintiff to the picking position, which was one of the options Plaintiff selected, and Plaintiff accepted the offer on April 11, 2019. (*Id.* at 127-28; SAC ¶ 14.)

After Plaintiff was selected for the picking position, she went through three days of training beginning on April 15, 2019, and was instructed that she would begin in the position with a three-week probationary period where she did not need to meet Amazon's otherwise applicable performance metrics. (Pl. Dep. at 78-79; ECF No. 67-10, Exhibit 10

to the Freedberg Declaration in Support of Defendant's 56.1 Statement ("Ex. 10"), at 1.) Plaintiff testified at her deposition that upon starting the new position, she felt fine, but due to repeated lifting, she began experiencing some discomfort, soreness, and pain, which worsened over time. (Pl. Dep. at 99.) Amazon has performance records for Plaintiff beginning on May 22, 2019, which show that she initially exceeded Amazon's productivity performance metrics for her position in May 2019, before dropping to 93-94% of expected performance in June 2019. (ECF No. 67-18, Exhibit 18 to the Freedberg Declaration in Support of Defendant's 56.1 Statement ("Ex. 18"), at 1.) On July 10, 2019, Plaintiff was given feedback by a manager that she was not meeting productivity expectations. (*Id.* at 1-2.)

**\*3** Beginning on June 30, 2019, and again on July 31, 2019, and August 31, 2019, Plaintiff began requesting reassignment from the picking position to either the single pack or pack flow positions. (ECF No. 67-21, Exhibit 21 to the Freedberg Declaration in Support of Defendant's 56.1 Statement ("Ex. 21"), at 1.) Amazon denied Plaintiff's requests. (*Id.*) On August 26, 2019, Plaintiff reported at the start of her shift that she was feeling pain in her lower back, and was taken for treatment at Amazon's on-site healthcare provider, AMCARE. (ECF No. 67-23, Exhibit 23 to the Freedberg Declaration in Support of Defendant's 56.1 Statement ("Ex. 23"), at 1.) Plaintiff reported that she had actually injured herself on the job around August 12, 2019, but that she did not report the injury because she thought the pain would go away. (*Id.*) Amazon's internal notes for Plaintiff's injury attribute it to her failure to "properly bend at the knee and/or squat[ ] when retrieving an item from one of the bottom bins." (*Id.*)

Plaintiff reported to AMCARE for daily follow-up treatment from August 27 through August 29, 2019, and then again from September 2 through September 4, 2019. (*Id.* at 6-12.) Plaintiff testified at her deposition that Amazon applied for Worker's Compensation on her behalf on September 5, 2019, and that she had been receiving Worker's Compensation payments from September 2019 to the date of her deposition. (Pl. Dep. at 51.) On September 6, 2019, Plaintiff subsequently went on a leave of absence from Amazon and has not returned to work at Amazon since that time. (*Id.* at 57; Def. 56.1 ¶ 31.)

## II. Procedural Background

Plaintiff, initially represented by counsel, brought the instant case on November 8, 2021, alleging violations of the NYSHRL and NYCHRL by Amazon. (*See generally* Compl.) Plaintiff's counsel submitted a First Amended Complaint on

2024 WL 4266008

March 24, 2022, (ECF No. 13), but subsequently moved to withdraw from representation of Plaintiff on April 28, 2022, (ECF No. 16). Magistrate Judge Henry held a status conference regarding Plaintiff's counsel's motion to withdraw on May 17, 2022, and granted the motion. (Minute Entry dated May 17, 2022.) After an unsuccessful settlement conference, Plaintiff, now proceeding *pro se*, moved to amend her complaint on July 7, 2022. (ECF No. 25.) Plaintiff's request to amend her complaint stated that the previous First Amended Complaint "did not reflect plaintiff's will" and that "[t]here is no factual discrimination content or issue in this case." (*Id.*)

This Court held a conference at which it discussed and granted Plaintiff's request for leave to amend on July 21, 2022, and directed Plaintiff to file her Second Amended Complaint by August 4, 2022. (Minute Entry dated July 21, 2022.) Plaintiff subsequently filed the SAC on July 25, 2022. (*See generally* SAC.) Defendant moved to dismiss Plaintiff's complaint, and the Court granted the motion in part, dismissing Plaintiff's state law negligence claims, but otherwise allowing the NYSHRL and NYCHRL claims to proceed on September 5, 2023. (ECF No. 61, M&O.) The parties continued with discovery under the supervision of Judge Henry while the motion to dismiss was being briefed and pending decision. On October 10, 2023, Magistrate Judge Henry certified the close of discovery, and Defendant indicated that it intended to proceed with requesting a pre-motion conference in anticipation of filing a motion for summary judgment. (Minute Entry dated October 10, 2023.)

This Court held a pre-motion conference to discuss Defendant's anticipated motion on January 25, 2024. (Minute Entry dated January 25, 2024.) At the conference, the Court explained a motion for summary judgment to Plaintiff and the requirement that an opposition to a Rule 56.1 Statement must respond to each numbered paragraph in the statement and provide admissible evidence in support of the opposition, and also set a briefing schedule. (*Id.*) Defendant filed the fully-briefed motion for summary judgment on March 22, 2024. (ECF No. 75, Notice of Motion for Summary Judgment; ECF No. 76, Defendant's Memorandum of Law in Support ("Def. Mem."); ECF No. 77, Defendant's Declaration in Support of Motion for Summary Judgment; ECF No. 78, Plaintiff's Memorandum in Opposition ("Pl. Mem."); ECF No. 79, Plaintiff's Affirmation in Opposition ("Pl. Aff."); ECF No. 80, Affirmation of Kriti Acharya; ECF No. 81, Defendant's Reply Memorandum of Law in Further Support ("Def. Reply").) Defendant also filed a copy of the January

25, 2024, letter it submitted to Plaintiff containing Local Rule 56.2, given Plaintiff's status as a *pro se* litigant. (ECF No. 83, Defendant's Local Rule 56.2 Declaration.) The Court subsequently requested that a complete copy of Plaintiff's deposition transcript be filed on the docket on August 15, 2024, and Defendant complied on the same day. (ECF No. 84.)

## LEGAL STANDARD

**\*4** Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. For a genuine issue of material fact to exist, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

In reviewing a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d. Cir. 1996)); *accord Tolan v. Cotton*, 572 U.S. 650, 651 (2014) ("[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' " (alteration in original) (quoting *Anderson*, 477 U.S. at 255)).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Anderson*, 477 U.S.

at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Because Plaintiff is *pro se*, the court is obliged to liberally construe Plaintiff's submissions and read them "to raise the strongest arguments they suggest." *Campbell v. We Transport, Inc.*, 847 F. App'x 88, 88-89 (2d Cir. 2021) (quoting *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017)). Plaintiff's *pro se* status, however, "d[oes] not eliminate [her] obligation to support [her] claims with some evidence to survive summary judgment." *Nguedi v. Fed. Reserve Bank of N.Y.*, 813 F. App'x 616, 618 (2d Cir. 2020). Plaintiff's "reliance on 'conclusory allegations' and 'unsubstantiated speculation' " will not suffice. *Id.* (quoting *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

## DISCUSSION

Defendant seeks summary judgment as to Plaintiff's remaining failure to accommodate claims under the NYSHRL and NYCHRL because "Plaintiff was not disabled under any law or statute and there is no record evidence to indicate that she asked for an accommodation because of any disability." (Def. Mem. at 1.) Plaintiff opposes Defendant's motion, arguing that it ignores "medical conditions that applied [sic] to all pregnant women." (Pl. Mem. at 3.) Plaintiff concedes that "no healthcare provider diagnosed her with an abnormal pregnancy-related condition that needed to be treated" but argues that Defendant was on notice of her pregnancy, and therefore her disability. (*Id.*) Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Defendant is entitled to summary judgment, and Plaintiff's claims are accordingly dismissed.

## I. Plaintiff's Failure to Accommodate Claims

**\*5**  To maintain a prima facie claim under the NYSHRL and NYCHRL for failure to accommodate, "an employee must show that: '(1) [s]he is a person with a disability under the meaning of [the relevant statute]; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, the employee could perform the essential functions of the job at issue; and (4) the employer has refused

to make such accommodations.' " *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)); *see also Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016) (explaining that the same standard for a prima facie case based on failure to accommodate exists under the ADA, NYSHRL, and NYCHRL); *Snowden v. Trustees of Columbia Univ.*, 612 F. App'x 7, 10 (2d Cir. 2015) (summary order) (analyzing a failure to accommodate claim under the NYCHRL). Here, Defendant argues that the Court need not go further than the initial inquiry – regarding whether Plaintiff has a disability, impairment, or condition covered under the statute – to find that Plaintiff's claim fails. (Def. Mem. at 8-9.) The Court agrees.

Under New York Executive Law § 296, it is an "unlawful discriminatory practice for an employer ... to refuse to provide reasonable accommodations to the known disabilities, or pregnancy-related conditions, of an employee ... in connection with a job or occupation sought or held." N.Y. Exec. Law § 296(3)(a). "Disability" is defined as "a physical, mental or medical impairment ... which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." *Id.* § 292(21); *see also Giordano v. City of New York*, 274 F.3d 740, 753 (2d Cir. 2001) (noting that the definition of disability under the NYSHRL is broader than the ADA definition). A "pregnancy-related condition" is any "medical condition related to pregnancy or childbirth that inhibits the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292(21-f). "Thus, an individual can be disabled under the [NYSHRL] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities." *Lovely H. v. Eggleston*, 235 F.R.D. 248, 260 (S.D.N.Y. 2006) (internal quotation marks and citation omitted); *see also Giordano*, 274 F.3d at 754 (no requirement for plaintiff to show that the disability "substantially limits a major life activity").

Under the NYCHRL, "disability" is defined as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102. "[P]hysical, medical, mental, or psychological impairment" is, in turn, defined as:

> (1) An impairment of any system of the body; including, but not limited to: the neurological system;

musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genitourinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system; or

(2) a mental or psychological impairment.

*Id.* § 8-102(16)(b).

As stated in this Court's previous order on Defendant's motion to dismiss, courts in the Second Circuit generally find that pregnancy itself is not necessarily a disability requiring accommodation. *See, e.g., LaBarbera v. NYU Winthrop Hosp.,* 527 F. Supp. 3d 275, 303 (E.D.N.Y. 2021), *appeal dismissed* (2d Cir. July 7, 2021) ("[P]regnancy itself is not a statutory 'pregnancy-related condition.' "); *Sam-Sekur v. Whitmore Grp., Ltd.,* No. 11-CV-4938 (JFB)(GRB), 2012 WL 2244325, at *7 (E.D.N.Y. June 15, 2012) (collecting cases). New York state courts likewise have concluded that a normal pregnancy, on its own, does not qualify as a disability within the meaning of the NYSHRL or NYCHRL. *Krause v. Lancer & Loader Grp., LLC,* 965 N.Y.S.2d 312, 322–23 (New York County Sup. Ct. 2013) ("This court has found no cases in this or other departments, nor does plaintiff cite any, holding that a [normal] pregnancy qualifies as a disability within the meaning of the State or City Human Rights Law."); *see also Cameron v. New York City Dep't of Educ.,* No. 15-CV-9900 (KMW), 2018 WL 1027710, at *13 (S.D.N.Y. Feb. 21, 2018) ("No court has held that a normal pregnancy qualifies as an 'impairment' under NYCHRL § 8-102(16)(B) or that discrimination against a woman on the basis of normal pregnancy is a form of 'disability' discrimination under the NYCHRL.").

**\*6** In light of the above precedent, the Court finds unavailing Plaintiff's arguments that *any* woman in the post-partum period should be considered to have a disability. (*See* Pl. Mem. at 3.) Plaintiff concedes in her Memorandum of Law that "no healthcare provider diagnosed her with an abnormal pregnancy-related condition that needed to be treated." (*Id.*) Plaintiff's primary argument continues to be that the "picker" role is "dangerous and harmful" to "women who are pregnant or are [in] their postpartum period" and therefore Amazon was negligent in allowing Plaintiff or similarly-situated women to perform the role. (*Id.* at 5.) This claim is essentially identical to the state common law negligence claim that this Court previously dismissed in granting Defendant's motion to dismiss – a claim which was explicitly barred because such

claims are "precluded by the exclusive remedy provisions of New York's Workers' Compensation statute." *Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128, 138 (2d Cir. 2001).

Plaintiff gave birth on January 20, 2019, and then subsequently returned to work in early April 2019. (Def. 56.1 ¶¶ 4-6.) Plaintiff did not receive any medical treatment after the birth of her baby, and her doctor did not provide her with any instructions regarding limitations on activity post-birth. (Pl. Dep. at 121.) Plaintiff asserts that many postpartum women suffer from "ligament laxity," (Pl. Mem. at 3), but Plaintiff offers no evidence to suggest that she personally suffered from the condition after giving birth. Plaintiff likewise does not suggest that she had a risky or complicated birth that led to continuing medical issues. *See McMyler v. Bank of Utica,* No. 19-CV-812 (MAD), 2021 WL 2778830, at *3 (N.D.N.Y. July 2, 2021) (granting summary judgment to defendant on NYSHRL disability discrimination claim where "[t]here is no evidence that Plaintiff suffered a [ ] risky or complex birth").

Plaintiff does not have a disability or "pregnancy-related condition," as defined by the NYSHRL, because she fails to offer evidence showing an inhibited "normal bodily function" specific to her, or a condition that is "demonstrable by medically accepted clinical or laboratory diagnostic techniques." *See* N.Y. Exec L. §§ 292(21), (21-f). Similarly, Plaintiff does not have a disability as defined by the NYCHRL because she failed to offer evidence showing an "impairment of any system of the body." N.Y.C. Admin. Code § 8-102(16)(b). Furthermore, as stated previously, "pregnancy itself is not a statutory pregnancy-related condition" in and of itself. *LaBarbera,* 527 F. Supp. 3d at 303. Plaintiff asserts only that she gave birth and was in the postpartum period, and standing alone, such assertions do not constitute evidence of disability. Because Plaintiff has failed to set forth any evidence showing that she had a "disability" within the meaning of the NYSHRL or NYCHRL the Court must, and does, find that her NYSHRL and NYCHRL failure to accommodate claims fail as a matter of law.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in its entirety, and Plaintiff's claims are dismissed with prejudice.

2024 WL 4266008

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4266008

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:21-CV-06203**<br>Lin v. Amazon.com, Inc. et al | — | E.D.N.Y. | Nov. 08, 2021 | Docket |

**History (3)**

**Direct History (2)**

🚩 1. Lin v. Amazon.com Services, LLC 🖙

2024 WL 4266008 , E.D.N.Y. , Sep. 23, 2024

*Appeal Filed by*

2. Lin v. Amazon.com, Inc.
, 2nd Cir. , Nov. 27, 2024

**Related References (1)**

3. Lin v. Amazon.com, Inc.
2023 WL 5720063 , E.D.N.Y. , Sep. 05, 2023

2000 WL 1538019
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNIVERSAL CALVARY CHURCH, et al., Plaintiffs,

v.

CITY OF NEW YORK, et al., Defendants.

No. 96CIV.4606(RPP)99CIV, 99CIV.9228,
99CIV.9227, 99CIV.12193, 99CIV12182,
99CIV.12236, 99CIV.12247, 99CIV.9230.
|
Oct. 17, 2000.

**Attorneys and Law Firms**

Rheingold, Valet, Rheingold & Shkolnik, P.C., New York, By
Paul D. Rheingold, Esq., Terrence McCartney, Esq., The Law
Office of Ronald L. Kuby, New York, By Ronald L. Kuby,
Esq., Daniel M. Perez, Esq., Counsel for Plaintiffs.

Michael D. Hess, Corporation Counsel for the City of New
York, New York, By Norma Kerlin, Esq., Charles Horn,
Counsel for Defendants.

OPINION

PATTERSON, D.J.

**\*1** This Opinion rules on in limine summary judgment
motions made in eleven separate cases, all of which were
grouped together and identified as Group A–1 cases for the
purposes of trial. [1] The original action, *Universal Calvary
Church, et al. v. The City of New York, et al.,* 96 Civ. 4606, was
commenced as a class action encompassing numerous claims
concerning events that occurred on August 20 and August 21,
1995 between over two hundred Plaintiffs, all members of the
Universal Calvary Church ("UCC"), and Defendants, twenty-
two individually named police officers, officials of the City
of New York, and a number of unidentified defendants. [2] The
parties have completed discovery.

[1]     Keith Williams was originally designated as a
        Plaintiff in Group A–1 but has since been
        reassigned to an as yet undetermined group.

[2]     The twenty-two named Defendants are as
        follows: Chief Louis Anemone ("Anemone"),

Officer Charles Barberi ("Barberi), Deputy
Chief George Brown ("Brown"), Officer
Kevin Brunner ("Brunner"), Chief Wilbur
Chapman ("Chapman"), Officer Kevin Craig
("Craig"), Officer Dominick De Lorenzo
("De Lorenzo"), Deputy Inspector Patrick
Devlin ("Devlin"), Officer Richard Difede
("Difede"), Officer Chris Lesiewicz ("Lesiewicz"),
Deputy Commissioner Jack Maple ("Maple"),
Officer Michael Moloney ("Moloney"),
Officer Brian O'Connor ("O'Connor"), Officer
James O'Hagan ("O'Hagan"), Officer Alex
Papagiannis ("Papagiannis"), Sergeant Phillip
Parrish ("Parrish"), Officer Patrick Prendergast
("Prendergast"), Sergeant Walter Picht ("Picht"),
Officer Eric Single ("Single"), Detective Joanne
Toole ("Toole"), Officer John Webber ("Webber"),
and Detective Denis Wiencko ("Wiencko"). For
the purposes of this opinion, all of the Defendants'
names have been spelled according to the master
list dated October 10, 2000, that Corporation
Counsel provided to the Court.

On January 9, 1998, the Court denied the UCC's motion
for class certification and ordered each individual Plaintiff
to file individual complaints. After some delay, Plaintiffs'
counsel filed individual complaints and, for some individuals,
amended complaints, ending on or about December 21, 1999.
All the complaints, rather than constituting individualized
complaints, by and large, contain the same causes of action
and name all the same Defendants as did the proposed
class action complaint. Defendants have now moved for
summary judgment with respect to each of the complaints
filed. [3] Most of the complaints contain some or all of the
following claims against various Defendants: 1) excessive
force (physical acts and noxious gas) under 42 U.S.C. § 1983,
in violation of the Fourth and Fourteenth Amendments; 2)
false arrest and imprisonment under 42 U.S .C. § 1983, in
violation of the Fourth and Fourteenth Amendments; 3) denial
of medical treatment under 42 U.S.C. § 1983 in violation
of the Fourteenth Amendment; 4) failure to intervene or
protect Plaintiffs under 42 U.S.C. § 1983 in violation of the
Fourth and Fourteenth Amendments; 5) failure to properly
supervise under 42 U.S .C. § 1983 in violation of the Fourth
and Fourteenth Amendments; 6) unlawful retaliation under
42 U.S.C. § 1983 for exercise of Plaintiff's right to free
exercise of his religion in violation of the First Amendment;
7) municipal liability for policies, customs, and practices
causing the aforesaid unconstitutional conduct; 8) malicious
prosecution under State common law; 9) assault and battery

(physical acts and noxious gas) under State common law; 10) false arrest and imprisonment under State common law; 11) intentional infliction of emotional distress under State common law; 12) negligent infliction of emotional distress under State common law; 13) conspiracy under State common law; 14) negligence under state common law; 15) negligence by City of New York in hiring, screening detention, and supervision under State law; 16) respondeat superior liability against the City for state law violations; and (17) prima facie tort. The liability of the City of New York for state and federal constitutional violations and negligent hiring, screening, retention, supervision, and training has been severed and is not at issue in this first trial. (Order dated May 31, 2000.) [4] On July 19, 2000, all Plaintiff withdrew all of their prima facie tort claims and withdrew all claims as against Brown. (McCartney Decl. ¶¶ 10–11.)

[3]     The Defendants have made summary judgment motions for almost every Defendant on almost every claim of every Plaintiff. The individual complaints submitted by the Plaintiffs are, in some and substance, a regurgitation of the initial class claim that was denied. They lack the specificity of claims based on their individual factual situation that was the very reason for denying class certification. The extensive summary judgment motions are, therefore, necessary to get the individual complaints into the proper form for the long scheduled trial.

[4]     Upon consent of the parties, the May 31, 2000 Order servered all of the Plaintiffs' *Monell* and negligent supervision etcetera claims. (May 31, 2000 Order ¶ 1.) As to the Plaintiffs' claims of respondeat superior liability of the City for state law violations, the Court held, "In view of defendants' failure to respond to plaintiffs' letter dated April 13, 2000, defendants are deemed to have stipulated that each individual defendant police officer was acting within the scope of his/her employment and that any verdict against any police officer will permit a judgment to be entered against the City of New York on the theory of *respondeat superior.*" (*Id.*)

*2   The general factual section below presents an overview of the case. To the extent that each individual Plaintiff has facts specific to his or her own case, they are outlined separately. [5]

[5]     Voluminous motions, papers, exhibits, and documents have been submitted in this case. This footnote is to explain the various citations used throughout the Opinion. When citing to papers submitted on behalf of all the Plaintiffs, the citation will be to "Pls.' Gen. 56.1 Stmt.¶ 1" or "Pls.' Mot. in Opp. at 1." When citing to papers for the Defendants, the name of the particular Plaintiff will also be designated, as in "Defs.' Mem. in Supp. Bennett at 1" or "Defs.' Reply Mem. Bennett at 1."

In referencing the 56.1 statement, the Defendants' Statements are cited when they are admitted by Plaintiffs or not properly denied by Plaintiffs together with reference to evidentiary support. (For example, "Defs.' 56.1 Stmt. Bennett ¶ 1." is cited as an admission of the statement if both sides agree.) If the Plaintiff denies a statement in accordance with R. 56.1, then the citation to the denial is, "Bennett's Resp. to Defs.' 56.1 Stmt. ¶ 1." A citation to the Plaintiff's separate 56.1 Statements is "Bennett's 56.1 Stmt. ¶ 1." The same is true for citations to exhibits attached to the submitted statements. (For example, "Defs.' 56.1 Stmt. Bennett, Ex. 1, at 1" or "Bennett's 56.1 Stmt., Ex. 1, at 1.") It was often necessary to look to the exhibits directly for support because the parties, at times, misstated the evidence in their 56.1 Statements.

Statement of Background Facts [6]

[6]     Federal Rule of Civil Procedure 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Furthermore, the Southern District of New York Local Rule 56.1 states:

(a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine

2000 WL 1538019

issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

(b) The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

(c) All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

(d) Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e).

In this case, Plaintiffs' papers are woefully short of specific facts and evidence to support their various claims. Despite the clear language of Rule 56 requiring specificity, Plaintiffs rarely offers an exact cite in support of their version of the facts. In a majority of the allegations, rather than citing to a particular paragraph of the Plaintiff's individual 56.1 statements or citing to a particular exhibit, Plaintiffs simply cite to "Plaintiffs' General Rule 56.1 Statement and Exhibits." Given that the General Rule 56.1 Statement is nonspecific and designed to be a general description for all 21 of the Group A Plaintiffs, and given that 116 exhibits are attached to this general statement, a vague cite to all of the exhibits is simply unacceptable. This places an immense burden on the Court to sift through enormous amounts of evidence without any guidance or direction from the Plaintiffs as to what evidence in particular, if any, supports their claims. Furthermore, the inadequacy of citations by the Plaintiffs is a main reason for both the problems in sorting out the disputed facts and the difficulty in deciding the motions. Overall, Plaintiffs have failed to satisfy the requirements of responding to a summary judgment motion as defined by Fed.R.Civ.P. 56 and Local R. 56.1.

In addition, as Defendants point out in their September 13, 2000 Letter from Norma Kerlin ("Kerlin Letter, 9/13/00"), an answer that "Plaintiff can neither admit nor deny this

statement based upon the factual record" is not a sufficient response to establish a disputed fact. Local Rule 56.1 clearly states that the moving party's 56.1 statement "will be deemed to be admitted unless controverted," Rule 56.1(c), and requires that such denials be supported by a specific citation to admissible evidence, Rule 56.1(d). As such, any of the Defendants' 56.1 Statements that Plaintiffs do not specifically deny and support such denial with specific evidence, and any of Plaintiffs' 56.1 Statements not supported by reference to specific evidence, will be deemed admitted for purposes of this summary judgment motion. See Fed.R.Civ.P. 56; Local Civ. R. 56.1; see also Millus v. D'Angelo, No. 00–7001, 2000 WL 1283747, at *1 (2d Cir. Sept. 12, 2000) (noting that the district court properly "granted summary judgment in favor of defendants following Millus's failure to deny, in accordance with Rule 56.1 of the court's local rules" various allegations of the defendants); Cooper v. Gottlieb, No. 95 Civ. 10543(JGK), 2000 WL 1277593, at *4 (S.D.N.Y. Sept. 8, 2000) (holding that a denial without evidence to support the denial is "conclusory" and "wholly inadequate under Local Civil Rule 56.1(d)"); Wenzhou Wanli Food Co., Ltd., v. Hop Chong Trading Co., Inc., No. 98 Civ. 5045(JFK), 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000) (noting that "[u]nsupported allegations will not suffice" in responding to a motion for summary judgment); Aztar Corp. v. N.Y. Entertainment, LLC, 15 F.Supp.2d 252, 254 n. 1 (E.D.N.Y.1998) (noting that "Defendants' 56.1 Statement is replete with responses of 'lack knowledge or information sufficient to either admit or deny.' Defendants have not created any issue of fact through this artifice."), aff'd 210 F.3d 354 (2d Cir.2000).

The Plaintiffs in this case are some of a large number of persons who attended an outdoor revival meeting at the Universal Calvary Church, an evangelical fundamentalist church, on Sutphin Boulevard in Queens County, New York, on August 20, 1995. During the service, a physical altercation arose when a retired police detective named Clifford Warsop, tried to enter the church grounds. [7] During the altercation with several church ushers, Warsop's gun was taken, and he was injured.

7   Warsop is the estranged common law husband of a
    UCC member, Ms. Angela Pennicooke. (Pls.' Gen.
    56.1 Stmt., Ex. 27A, ¶ 3; Defs.' 56 .1 Stmt. Bennett,
    Ex J, ¶ 3.) Warsop attempted to enter the revival to
    visit his children. (Pl.s' Gen. 27A, ¶ 3; Defs.' 56.1
    Stmt. Bennett, Ex. J, ¶ 2.) Warsop apparently is not
    and has never been a UCC member. (Pls.' Gen. Ex.
    27A, ¶ 3; Defs.' 56.1 Stmt. Bennett, Ex. J, ¶ 3.) He is
    not a party to this or any other lawsuit in connection
    with the events of August 20–21, 1995.

A member of the congregation called 911 and reported "man with a gun." Defendants Barberi and Difede responded to the 911 call in a police car, called an ambulance for Warsop, retrieved the gun, tried to find out what happened, and called for supervisory assistance. A supervisory sergeant arrived and was denied interview with the church ushers, as the revival meeting was still going on. The sergeant and his supervisor determined that no arrests should be made at that time.

Barberi accompanied Warsop in the ambulance to the Mary Immaculate Hospital, and then returned to his precinct. He was ordered to give a report of the incident to detectives for investigation. He did that, and defendants Detectives Toole and Wiencko were assigned to the case. They went with Barberi to the hospital where Toole conducted an interview of Warsop. Warsop was discharged from the hospital and expressed a desire to identify the persons he said had participated in the attack on him. He had twenty-three stitches around one of his eyes.

Toole, Wiencko, Barberi, and Warsop went back to the church. It was about 11:20 p.m., and the revival meeting had just ended. The detectives' car went around the block, and Warsop identified Nedley Walters, a plaintiff in a related case, as one who head-butted him and plaintiff Horace Gordon as the man who had taken his gun.

Detectives Toole and Wiencko approached Gordon and an altercation occurred. When they attempted to arrest Gordon, a large number of persons from the congregation came to his assistance, and another altercation occurred. The officers made radio calls for assistance and many police arrived. Also, a police mobilization alert was announced. Plaintiffs Gordon, Cornelius Caliz, Oneil Thompson, Michael Bennett, Woodrow Campbell, and two men who are not plaintiffs in this trial, were arrested. Several other plaintiffs were injured. During the altercation, blows were struck and mace or pepper spray was used. More police arrived, and the members of the congregation ran back into the church grounds, which were fenced and had a gate which was closed. During this time, mace was used by the police around the gate. A helicopter hovered overhead.

Thereafter, Anemone, Maple, Chapman, and Devlin from the Police Department arrived, and the pastor of the church had several talks with one or more of the police executives. The pastor and police executives finally reached an agreement that remaining members of the congregation and the police force could leave. They left around 4 a.m.

*3  Because of the similar legal claims made by each of the eleven Plaintiffs, this opinion will outline the elements of each cause of action and analyze the law in the claims for the initial Plaintiffs. As the opinion progresses to later Plaintiffs, it will present the specific factual situations of that Plaintiff and then refer to the legal analysis conducted in previous sections.

Discussion

Summary Judgment Standards

Rule 56(c) requires summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Transco Prods., Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (2d Cir.1994). The moving party has the burden of clearly establishing the absence of any triable issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). Pointing to the absence of necessary evidence can satisfy the movant's burden on summary judgment. *See id.* at 325; *Goenaga,* 51 F.3d at 18. Once the moving party offers specific evidence or identifies the lack of evidence to support his or her motion, the burden shifts to the opposing party to offer some evidence beyond the initial pleadings. *See Celotex,* 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred."); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) ("When, however, a party moves for summary judgment, and documents his motion, setting forth specific facts denying the claims, the opposing party must, 'set forth specific facts showing that there is a genuine issue for trial.' Mere conclusory allegations or denials will not suffice." (internal quotations omitted)).

To survive summary judgment, the nonmoving party must identify specific evidence that shows a genuine issue of material fact, not simply any factual dispute. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.,* 984 F.2d 1182, 1184–85 (2d Cir.1993). All inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party, *see Transco,* 38 F.3d at 555, and summary judgment will be precluded "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Cas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1560 (2d Cir.1991).

Horace Gordon's Claims

*I. Excessive Force Claims (physical acts)*

In his Complaint, Plaintiff Gordon alleges, "The conduct and actions of defendants Barberi, Parrish, Toole, Wiencko, and Moloney, acting individually and in concert with each other, acting under color of law, in assaulting plaintiff by pushing, hitting, striking, grabbing, dragging, choking him with a nightstick, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Gordon Compl. ¶ 101.) Defendants move for summary judgment on Gordon's claim of excessive force. The motion for summary judgment is denied as to Defendants Barberi, Toole, Wiencko, and Moloney, and the motion for summary judgment is granted as to Defendant Parrish.

**\*4** It is undisputed that Gordon's claims of excessive force originate from actions he alleges the Defendants took in an effort to arrest him. Therefore, Gordon's claims for excessive force arise under the Fourth Amendment of the Constitution. *See Graham v. Connor,* 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). The test for excessive force under the Fourth Amendment is "whether the officers'

actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397.

Here, Gordon's deposition testimony raises a genuine issue of material fact as to whether the arresting officers, [8] particularly Barberi and Toole, used excessive force and whether the other arresting officers either used excessive force themselves or should have intervened to prevent Barberi's and Toole's excessive use of force to effect the arrest. In his deposition, Gordon testified that the officers approached him from behind and did not identify themselves. (Gordon's 56.1 Stmt. ¶ 8.) Gordon has made specific allegations of the use of excessive force against Toole, Barberi, Wiencko, and Moloney. (*Id.* ¶¶ 8–13.) Crediting the Plaintiff's version of events for the purpose of summary judgment motions, a genuine dispute exists regarding the way in which these Defendants arrested Gordon and the amount of force they used.

[8]    Toole is listed as the official arresting officer on the police paperwork. The other Defendants, with the exception of Parrish, were involved in restraining and apprehending Gordon. Plaintiff offers no evidence that Parrish was involved in or present during the arrest of Gordon.

The question of whether or not these Defendants' actions, from an objective point of view, were so unreasonable as to constitute excessive force is a question for the jury. Summary judgment is denied as to Barberi, Toole, Wiencko, and Moloney on the claim of excessive force. Summary judgment is granted as to Defendant Parrish. Plaintiffs do not offer any evidence connecting Parrish with the arrest or allegations of force. There is no showing that he was involved in or even present at the time the arrest or use of force occurred. [9] Given the absence of evidence connecting Parrish to the use of excessive force against Gordon, summary judgment is granted on Gordon's excessive force claim as to Parrish.

[9]    According to Parrish's deposition, when he arrived at the scene at 11:20 p.m., four arrests were already made. (Pls.' Gen. 56.1 Stmt ., Ex. 19, at 102–03, 09.) Plaintiffs point to no evidence to the contrary.

*II. False Arrest and False Imprisonment Claim*

In his Complaint, Gordon alleges, "The conduct and actions of defendants Parrish, Toole, Wiencko, Barberi, and Moloney, acting individually and in concert with each other, acting under color of law, in arresting and imprisoning plaintiff without probable cause, was done intentionally, maliciously,

with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Gordon Compl. ¶ 104.) Defendants argue that Gordon's claim of false arrest and imprisonment must be dismissed against Toole, Wiencko, Barberi, Moloney, and Parrish because Toole, who initiated the arrest of Gordon, had probable cause to arrest and detain him and because the other police officers, who participated in the arrest of Gordon, assisted her in the lawful exercise of her duties. Gordon argues that Defendants lacked probable cause to arrest him because Warsop's account of an assault and robbery was not sufficiently trustworthy, and the Defendants were not reasonable in relying on it.

**\*5** The Second Circuit has held that a false arrest claim arising under § 1983 is "substantially the same" as a false arrest claim arising under state law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citations omitted); *Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *Dukes v. City of New York,* 879 F.Supp. 335, 340 (S.D.N.Y.1995). Gordon's false arrest claim is therefore governed by New York State law. [10] To establish a claim for false arrest under New York law, the plaintiff must show that " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged .' " *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (quoting *Broughton v. State,* 373 N.Y.S.2d 87, 93 (1975)). Defendants assert that Plaintiff has not presented any evidence to show the fourth element and that, because Toole had probable cause to arrest Gordon, the confinement was privileged.

[10]     Because a claim of false arrest is the same as a claim of false imprisonment, Gordon's claims will be analyzed under the same standard as one claim. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991) (citations omitted); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995).

It is clearly established in the Second Circuit that an arrest is justified if there was probable cause to arrest. *See Weyant,* 101 F.3d at 852 ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action

for false arrest,' whether that action is brought under state law or under § 1983." (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994))). Thus, if the police had probable cause to arrest Gordon, his claim for false arrest must fail against all Defendants. *See Singer,* 63 F.3d at 118; *Bernard,* 25 F.3d at 102–03. The burden of establishing the existence of probable cause for an arrest is on the Defendants. *See Raysor v. Port Auth.,* 768 F.2d 34, 39–40 (2d Cir.1985); *Broughton,* 373 N.Y.2d at 94–95; *Williams v. Moore,* 602 N.Y.S.2d 199, 201–202 (2d Dep't 1993).

The police have probable cause to arrest a person "when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852; *Singer,* 63 F.3d at 118–19. Whether or not an officer had probable cause to make an arrest is a question of what the officer knew at the time of the arrest and whether she or he was reasonable in relying on that knowledge. *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997) (account of complaining witness and officer's personal observations sufficient to establish probable cause). Probable cause is not dependent on the ultimate accurateness and truthfulness of that knowledge. *See Bernard,* 25 F.3d at 102 ("[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." (citing *Colon v. City of New York,* 468 N.Y.S.2d 453 (1983)); *Haussman v. Fergus,* 894 F.Supp. 142, 147 (S.D.N.Y.1995) ("[I]t should be noted that the validity of an arrest does not depend upon an ultimate finding of guilt or innocence. Rather, the soundness of the arrest hinges on the existence of probable cause at the time the arrest was made." (citing *Pierson v. Ray,* 386 U.S. 547, 555 (1967))). The Second Circuit has recently reiterated that a police officer may have probable cause to make an arrest based on the statement of a complainant. *See Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) ("Moreover, 'it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness.' " (quoting *Miloslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,* 993 F.2d 1534 (2d Cir.1993)); *Ricciuti,* 124 F.3d at 128 (finding that officer was entitled to believe visibly injured complainant despite protestations of innocence from arrestee); *see also Welch v. City of New York,* No. 95–Civ. 8953, 1997 WL 436382 (S.D.N.Y. Aug. 4, 1997), *aff'd.* 166 F.3d 1203 (2nd Cir.1998) (holding officer

reasonably relied on witness's complaint, despite plaintiff's denial and contrary explanation).

 **\*6**  Gordon acknowledges that Toole was assigned to investigate the alleged robbery (Defs.' 56.1 Stmt. Gordon ¶ 36; Gordon's Resp. to Defs.' 56.1 Stmt. ¶ 36), and has offered no evidence contradicting the following facts as to how Toole conducted her investigation and made the arrest of Gordon.

At about 10:20 p.m., on August 20, 1995, Toole listened to Barberi recount his findings of the alleged assault and robbery of Warsop. (Toole Dep., 2/19/97, at 58.) She did not read his draft report of the incident. (*Id.* at 60.) Toole discussed the case with her supervisor, Moynahan, as to whether the case should be assigned as a robbery to the Robbery Investigation Project ("RIP") or as an assault to the other detectives. Moynahan approved Toole's suggestion that she interview Warsop at the hospital. (*Id.* at 68–69.) Toole, accompanied by Wiencko and Barberi, found Warsop at Mary Immaculate Hospital. She observed that Warsop had blood over his eye and his shirt. The doctor informed her Warsop had received ten stitches inside his left eyebrow and thirteen stitches outside his left eyebrow wound, as well as contusions to the left cheek and a superficial cut of the right eye. (*Id.* at 81; Pls.' Gen. 56.1 Stmt., Ex. 27A.) Toole then proceeded to conduct an interview of Warsop in the emergency room.

According to Warsop, [11] he went to the UCC to visit his two children, but when he arrived, a man at the gate refused him entry. Warsop told Toole that this man summoned several other men from inside the tent, who then started shoving and punching him. In the course of the scuffle, Warsop claims that one of the men surrounding him took his gun from his waistband. (Toole Dep., 2/19/97, at 83–84.)

[11]    All of the Plaintiffs, especially the Group A–1 Plaintiffs who were arrested, focus their argument on discrediting Warsop's account of events and establishing their own. Although Plaintiffs' accounts may be completely accurate, Plaintiffs fail to realize that what actually happened when Warsop attempted to enter the UCC gate is not controlling on the issue of probable cause. Rather, what information the arresting police had when she approached Gordon is what establishes whether or not there was probable cause to arrest him. If a complainant tells the police a version of events that later turns out to be factually inaccurate, there is still probable cause for the arrests if, based

on what the complainant told the police, the police had probable cause. Similarly the facts that the charges against all five arrested Plaintiffs were later dismissed, that Warsop was criminally prosecuted, and that there was an Order of Protection, which was issued but not served on Warsop at the time of the UCC incident, do not effect the issue of whether Toole had probable cause to make the arrests based on the information she had at the time they made the arrests. If Warsop told Toole that Gordon and Walters assaulted and robbed him, she had probable cause to arrest them if she was reasonable in believing Warsop.

In the course of her interview, Toole asked Warsop if his wife had an order of protection against him, and Warsop stated that there was no order of protection. [12]  He also disclosed that he was on "three quarters," meaning he was retired from the police department due to a line of duty injury. (*Id.* at 86–87.)

[12]    Although an order of protection had been issued against Warsop, the order was never served on him. The reasons for this oversight are not revealed in the motion papers.

Warsop expressed a belief that he could identify his attackers and stated that he wanted to return to the UCC area and canvass to see if the perpetrators were still present. (*Id.* at 88.) Warsop explained that this was the last night of the revival, after which the tent was coming down, therefore the perpetrators would soon be dispersed. (*Id.*) According to Toole, she found Warsop's story believable when coupled with his visible injuries and Barberi's verbal report. (*Id.* at 87–89.) She felt she had probable cause to arrest. (*Id.* at 88–92.) Toole, Wiencko, Barberi, and Warsop then proceeded to leave the hospital to return to the UCC to look for perpetrators, and it was Toole's intent to arrest any perpetrators identified to her by Warsop. (*Id.*) [13]

[13]    Plaintiffs focus much of their argument for false arrest, as well as for their case in general, on the allegation that Toole, Wiencko, and Barberi used poor judgment in returning to the scene and attempting to arrest Gordon in view of the congregation. What Plaintiffs fail to realize is that whether or not Defendants used poor judgment is really inapposite for purposes of their claims here. The existence of probable cause is determined by examining whether or not

Defendants had sufficient information to believe that Plaintiffs committed a crime. If they had sufficient information and, therefore, probable cause to effect arrests, the fact that they may have used poor judgment in doing so does not create a false arrest claim.

When they arrived in the vicinity of Sutphin Boulevard and Ferndale Avenue, Warsop pointed out Walters and stated, "That's the one who head-butted me" (*id.* at 100) and, after their unmarked car circled the block, pointed out Gordon and stated, "That's the one who took my gun and—and either beat me or—something like that" (*id.*). At this point, Toole stopped the car, got out, and approached Gordon.

 **\*7** According to Gordon, the UCC revival had ended, and he was standing outside his parked car at the corner of Ferndale and Sutphin, using his keys to unlock the driver-side door, when three unidentified people approached him from behind and began attacking him. (Gordon Dep., 5/16/97, at 189–95.) Gordon claims that they never identified themselves as police. Gordon testified to a variety of specific acts of force used against him, including that Toole grabbed his hands and penis, Wiencko slapped him, and Barberi choked and kicked him. (*Id.*) Gordon acknowledges that Toole attempted to handcuff him. [14] The Defendants agree that it was Toole who made the arrest of Gordon. (Defs.' 56.1 Stmt. Gordon ¶ 4.)

[14]  Both Plaintiff Gordon's account and the testimony of the Defendants suggest that Toole was the officer who initiated the arrest of Gordon, although Gordon maintains that Toole, Wiencko, and Barberi approached him simultaneously. (Gordon Dep., 5/16/97, at 191, 197; Toole Dep., 2/19/97, at 101–02.)

Section 160.05 of the Penal Law of New York reads as follows:

A person is guilty of robbery in the third degree when he forcibly steals property. Robbery in [sic] the third degree is a class D felony.

Section 160.10 of the Penal Law of New York reads as follows:

A person is guilty of robbery in the second degree when he forcibly steals property and when:

1. He is aided by another person actually present; or

2. In the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:

(a) Causes physical injury to any person who is not a participant in the crime; or ....

Robbery in the second degree is a class C felony.

At the time Toole arrested Gordon, she had reason to believe that Warsop had been criminally assaulted and his gun taken from him. There is no evidence that she was aware that, as Gordon maintains, he had taken the gun for safekeeping and, thus, that there had been no larcenous intent. [15] Gordon has not presented evidence showing that there is a genuine issue of material fact as to whether Toole had probable cause to arrest Gordon for criminal assault or robbery in violation of 160.10 or 160.05 of the Penal Law of New York. *See People v. Jones,* 556 N.Y.S.2d 579 (1st Dep't 1990) (affirming guilty verdict against defendants for a violation of New York Penal Law § 160.05 for theft of headset and radio during physical confrontation in subway). [16]

[15]  Gordon claims that he took the gun from Warsop for safety reasons and gave it to Barberi as soon as he saw the police approach. (Gordon Dep., 5/16/97, at 159–175.) Barberi admits that he recovered the gun from Gordon, but he claims that Gordon turned over the gun only after three or four demands for production of the gun were made by Barberi. (Barberi Dep., 2/5/97, at 57–65.)

[16]  Plaintiff asserts that his experts will testify that " 'the standard of proof for probable cause for the arrest for robbery, riot and assault was not met,' and that 'the officers involved gave Mr. Warsop preferential treatment with malicious intent.' " (Gordon's Mem. in Opp. at 17.) This evidence is inadmissible. *See Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir.1995) (the proffered expert opinions regarding Fourth Amendment standards are conclusory and would not " 'assist the trier of fact to understand the evidence or to determine a fact in issue' " (quoting

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 309 of 531
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

Fed.R.Evid. 702)); *DiBella v. Suffolk County,* 574 F.Supp. 151 (E.D.N.Y.1983), *aff'd.,* 762 F.2d 990 (2d Cir.1985).

Warsop's account of events to Toole and his identification of Walters and Gordon was sufficient to give Toole reason to believe that Walters and Gordon had committed a crime. Warsop's account of events, coupled with his visible injuries and Barberi's account of events, gave Toole reason to find Warsop's account trustworthy. Plaintiff's unsupported allegation that Warsop received special treatment from the Defendants because he was a retired police officer is speculation and is insufficient to establish that Toole acted in bad faith.

Because Toole had probable cause to believe that an assault and robbery had taken place and that Gordon had participated in it, she had probable cause for the arrest, and the arrest is privileged. Toole is entitled to qualified immunity for that action. As governmental officials performing a discretionary function, police officers are entitled to qualified immunity, which shields them from civil damages and liability, so long as their conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Simms v. Village of Albion,* 115 F.3d 1098, 1106 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The doctrine provides protection "to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). The relevant inquiry is "whether a reasonable official could have believed [his or her conduct] to be lawful, in light of clearly established law and the information the [ ] officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). Qualified immunity may be decided before trial. *See Blisset v. Coughlin,* 66 F.3d 531, 538 (2d Cir.1995) ("[Q]ualified immunity may provide a defense from suit altogether where a defendant can show, in a motion for summary judgment, that 'he could, as a matter of law, reasonably have believed [his conduct] was lawful." ' (quoting *Anderson,* 483 U.S. at 641)). Toole and the officers who assisted her in enforcing her decision to arrest—Barberi, Wiencko, and Moloney—are protected from liability under 42 U.S.C. § 1983 for violation of Horace Gordon's Fourth Amendment right to be free of unlawful seizure. *See Bernard,* 25 F.2d at 102.

**\*8** Plaintiffs papers do not include any facts specific as to Defendant Parrish. Whatever their theory of his liability,[17] Parrish's participation in Gordon's arrest, if any, is also privileged under the above analysis. Since Toole had probable cause for the arrest, Gordon's false arrest claims fails.

Summary judgment is granted for all of the Defendants on the claim of false arrest and imprisonment.

[17]    Plaintiffs' General Statement of Facts allege that Parrish is liable because he encouraged Barberi to disobey Betts' orders. (Pls.' Gen. 56.1 Stmt. ¶ 8.) The Plaintiffs do not offer specific evidence to show the exact order Barberi allegedly disobeyed or how Parrish encouraged him to do this. Parrish testified that approximately four arrests had been made before he arrived at Sutphin and Ferndale. (Pls.' Gen. 56.1 Stmt., Ex. 19, at 109.) Regardless, the issue is mute because there was probable cause for the arrest of Gordon.

### III. Denial of Medical Treatment

Gordon's next claim alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied medical assistance and aid to Gordon in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment by refusing to provide prompt medical treatment to Gordon after he was arrested. (Gordon Compl. ¶ 110.) Defendants moved for summary judgment on the grounds that Gordon did not have a serious medical need, and he was not denied treatment.

A custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official (1) denied treatment needed to remedy a serious medical condition and (2) did so because of his deliberate indifference to that need. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996); *Farmer v.. Brennan,* 511 U.S. 825, 833–34 (1994). Although there is a factual dispute as to the extent of Gordon's injuries and whether or not he had a serious medical injury,[18] Gordon has offered no evidence that any of these Defendants denied him medical assistance and aid. The undisputed evidence shows that: the officers attempted to arrest Gordon at about 11:25 p.m. on August 20, 1995; during the arrest a considerable physical altercation involving a large crowd occurred; Gordon was brought to the precinct at 12:10 a.m. on Monday, August 21, 1995; he left for Queens General Hospital at 12:40 a.m. (Defs.' 56.1 Stmt. Gordon, Ex. M); and he was examined at 1:10 a.m. at the hospital (*Id.* at Ex. O). There is no showing that Gordon was in the custody of any of the Defendants after he was transported from the scene.

[18]        Gordon testified that his injuries include bleeding from his mouth, forehead, upper lip, and elbow (Gordon Dep., 5/20/97, at 256–57); scratches on his hand (*id.* at 256); swollen wrist (*id* . at 258); and eventually a loss of consciousness (*id.* at 277–78).

Gordon does point to evidence supporting his need for medical treatment, but he points to no evidence that, once evidenced, the necessary treatment was denied. In fact, all of the evidence suggests that Gordon received the necessary medical attention. To establish a claim under § 1983, Plaintiff must show a denial of medical treatment because of deliberate indifference to a serious medical need.

"The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, 'sufficiently serious,' [and] [s]econd, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (internal citations omitted). To meet the objective prong, plaintiffs must show a serious medical need, which is one that "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Id.* (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting). To meet the subjective prong, plaintiffs must show that a specific defendant was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the defendant drew the inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The subjective element of deliberate indifference "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835.

**\*9** Here, Gordon offers no evidence to support that any Defendant denied him treatment or that any delay in treatment was the result of deliberate indifference by any Defendant. Gordon received medical attention within one and one-half to two hours of his injuries. (Defs.' 56.1 Stmt. Gordon, Exs. M, O.) To the extent that he was visibly injured at the time of the arrest, his visible injuries were not so urgent as to require immediate attention, particularly considering there is no evidence that he requested treatment. When he got to the precinct and loss consciousness, he was taken to the hospital. (Gordon Dep., 5/20/97, at 277–82.)

There is no evidentiary showing of deliberate indifference to Gordon's medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 105–106 (1976); *Hathaway v. Coughlin,* 99 F.3d 550 (2d Cir.1996); *Rivera v. State of New York,* 1999 U.S. Dist. Lexis 129 \*20 (S.D.N.Y. January 12, 1999) (an hour and a half between the time plaintiff was shot and taken to the hospital not sufficient to assert claim of denial of medical attention). [19] Summary judgment is granted to all Defendants on Gordon's claim of denial of medical treatment.

[19]        Indeed, Plaintiff Michael Bennett testified that Gordon's injuries to his arm, which is the most serious injury Gordon claims, occurred in the van during a sharp turn as they arrived at the precinct, not before he was put in the van. (Bennett's 56.1 Stmt., Ex. 1, at 84.)

*IV. Failure to Intervene and Protect Claim*
Gordon's next § 1983 claim against Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Burner, and Papagiannis alleges failure to intervene and protect Plaintiff from unjustified and unreasonable treatment at the hands of other Defendants. Defendants argue that Plaintiff has failed to show evidence supporting a specific failure to intervene by any Defendant.

Under *Anderson v. Branen,* 17 F.3d 552 (2d Cir.1994), an officer is not liable for preventable harm caused by another officer unless the officer observes and has reason to know that: (1) excessive force is being used; (2) a citizen has been unjustifiably arrested; or (3) a constitutional violation has been committed; and (4) the officer had a realistic opportunity to intervene and prevent the harm from occurring. *See id.* at 557. Plaintiff's own evidence fails to show that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Difede, Webber, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Burner, and Papagiannis were even present at the scene at the time Gordon was allegedly subjected to excessive force and arrested. [20] Summary judgment is granted as to all those Defendants because Gordon has presented no proof that any of them were present at the time of such alleged treatment, were aware of such alleged unauthorized, unjustified, and unreasonable treatment, or had a reasonable opportunity to intervene and prevent that treatment. [21]

[20]        As Plaintiff cites in his own memorandum of law (Gordon's Mem. in Opp. at 23), "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to

protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Although a failure to intervene and protect claim does not require a showing of presence, it does require the officer to have observed or have reason to know of the alleged violation. *See Anderson* at 557. Gordon has identified evidence demonstrating neither.

21      Gordon tries to base a failure to intervene claim on the evidence that the supervisors did not prevent Barberi, Toole, and Wiencko from returning to the scene to make arrests. Plaintiff's evidence, however, does not show that there was an order not to make any later arrests in regard to the Warsop incident. All admissible evidence shows an order to make no summary arrests, meaning no arrests at the initial scene. (Pls.' Gen. 56.1 Stmt., Exs. 13, 17.) Furthermore, even if Plaintiff had evidence suggesting that a supervisor knew the officers were returning to the scene when there was a direct order not to return, that is not sufficient to show that they had knowledge that constitutional violations would occur. To the extent that Plaintiff's may have evidence to support a claim that one or more of Betts, Picht, or Parrish were negligent in their supervision in that they failed to clarify orders (Betts, Picht) or follow them (Parrish), there is no evidence presented that this negligence rose to the level required for a claim of failure to intervene or protect as outlined in *Anderson v. Branen.* To the extent that such evidence supports a common law negligent supervision claim, the parties are reminded that this claim has been severed, along with *Monell* claims, and is not at issue in this trial.

As for the remaining Defendants—Toole, Wiencko, Barberi, and Moloney—Plaintiff's evidence supports individual claims of excessive force, not a failure to intervene or prevent a constitutional violation. Summary judgment is granted as to all Defendants.

*V. Unlawful Retaliation for First Amendment Conduct Claim*

**\*10**  Gordon alleges that "the conduct of defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis, acting individually and in concert with each other, in arresting, assaulting, detaining, imprisoning, failing to protect, conspiring against, subjecting to harassing comments and maliciously prosecuting and intentionally inflicting emotional distress upon the plaintiff, was a direct result of defendants' animus toward plaintiff and/or as a direct result of plaintiff's having exercised his First Amendment rights to free exercise of his religion ... [and] was therefore an unlawful, oppressive and malicious attempt to harass, intimidate, and punish plaintiff for exercising his constitutional rights, in violation of the First, Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983." (Gordon Compl. ¶ 113.) Defendants move for summary judgment.

To establish a claim of unlawful retaliation for First Amendment conduct, Plaintiff must show that (1) his conduct was protected by the First Amendment and that (2) Defendants' conduct was "motivated by or substantially cause by" this protected conduct. *Gagliardi v.. Village of Pawling,* 18 F.3d 188, 194–95 (2d Cir.1994). If Plaintiff shows this, the burden shifts to the Defendants to show that they would have engaged in the same conduct even in the absence of Plaintiff's protected conduct. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977).

There is no evidence that Plaintiff was engaged in a First Amendment activity when he was allegedly assaulted and arrested. Plaintiff apparently bases his claim on the facts that he had recently left a religious service prior to his arrest and that during or after the ensuing melee several individuals heard unidentified officers make derogatory religious comments not to Gordon but to other UCC members. Furthermore, there is no showing that any of the Defendants who interacted with Gordon—Toole, Wiencko, Barberi, and Moloney—engaged in the conduct they did because of any First Amendment activity.[22] As to the other named Defendants, Plaintiff has offered no evidence connecting them to any activities relating to this specific Plaintiff.

22      According to Plaintiff's own papers, his theory for the officer's return to the UCC and arrest of Gordon was not that Gordon was a member of the UCC but that Warsop was a retired police officer. (Gordon's Mem. in Opp. at 17.)

Plaintiff has offered no evidence, direct or circumstantial, showing any of the Defendants' acts were a direct result of Defendants' animus toward Plaintiff for having exercised

his First Amendment rights to free exercise of his religion. Summary judgment is granted as to all Defendants.

*VI. Malicious Prosecution Claim*
Plaintiff claims Defendants Parrish, Wiencko, Barberi, and Moloney maliciously prosecuted him in violation of his statutory and common law rights under New York State law. (Gordon Compl. ¶ 145.) Defendants move for summary judgment on the grounds that Gordon cannot establish two of the necessary elements of such a claim.

**\*11** To state a claim of malicious prosecution under New York law,[23] a plaintiff must show: (1) commencement or continuation of a criminal proceeding by the defendants against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the criminal proceeding; and (4) malice. *See Brown v. City of New York,* 459 N.Y.S.2d 589, 590 (1st Dep't 1983); *Howland v. State of New York,* 487 N.Y.S.2d 956, 957 (Ct.Cl.1985). Plaintiff presents no evidence of Defendants Parrish, Wiencko, Barberi, or Moloney taking any action to commence the proceedings against the Plaintiff that were brought by the Queens District Attorney's office. Plaintiff also presents no evidence of any of these four Defendants taking any action to continue the proceedings against him. Gordon offers no evidence that these four Defendants signed a criminal complaint or in any way participated in his criminal prosecution. To the extent that they were involved in his arrest, they had probable cause. *See False Arrest Section* above. Thus, summary judgment is granted on Gordon's claim of malicious prosecution as against Defendants Parrish, Wiencko, Barberi, and Moloney.

23    It is undisputed that New York law is applicable to Plaintiff's malicious prosecution claim.

The analysis for Toole is different. Toole signed two separate criminal complaints against Gordon, one pertaining to the alleged robbery and assault of Warsop and one pertaining to Gordon's actions when he was arrested.[24] By signing criminal complaints against Gordon, Toole did commence criminal proceedings against Gordon. All charges from both criminal complaints were eventually dismissed by the District Attorney. (Certificate of Disposition for Gordon, Nos. 14657, 14658, Dated 12/06/96.) Each criminal complaint must be analyzed separately to determine whether or not there was an absence of probable cause for the proceedings.

24    The criminal complaint pertaining to the initial Warsop incident charges Gordon, along with Bennett and Walters, with assault in the second and third degree. (Pls.' Gen. 56.1 Stmt., Ex. 27(I).) The criminal complaint pertaining to activities during Gordon's arrest charges Gordon, along with Campbell, with assault in the second degree (two counts), riot in the fist degree, inciting to riot, obstructing governmental administration in the second degree, and resisting arrest. (*Id.,* Ex. 27(H).) Both criminal complaints were signed by Toole on August 21, 1995 and filed with the Criminal Court of the State of New York in the County of Queens.

Toole had probable cause for initiating the criminal proceeding against Gordon relating to the initial Warsop incident. The reasoning outlined in the section on false arrest applies here. Toole signed the criminal complaint against Gordon based on the allegations of Warsop. Toole was entitled to rely on Warsop's allegations and, thus, had probable cause for the arrest. Plaintiff offers no evidence that Toole had received evidence to the contrary by the time she signed the complaint. Thus, summary judgment is granted as to Gordon's claim of malicious prosecution based on the criminal complaint charging Gordon with the assault of Warsop.

Summary judgment is denied as to Toole for Gordon's claim of malicious prosecution based on the criminal complaint Toole signed charging Gordon with assault in the second degree (two counts), riot in the first degree, inciting to riot, obstructing governmental administration in the second degree, and resisting arrest. (Pls.' Gen. 56.1 Stmt., Ex. 27H.) There is conflicting evidence as to whether or not Toole had probable cause to initiate criminal proceedings against Gordon based on his actions during the arrest. Toole testifies that, after identifying herself as police, Gordon resisted arrest, assaulted Toole, and incited other UCC members to help him resist arrest. (Toole Dep., 2/19/97, at 105–12.) Gordon's deposition denies this account of events and claims that neither Toole nor any of the other officers involved identified themselves as police. (Gordon Dep., 5/16/97, at 193.) He also maintains that he did not shove, kick, hit, or in any other way assault Toole or the other police and that he was the one assaulted. (Gordon Dep., 5/20/97 at 242–43.) Because plaintiff's version is credited as true for the purposes of deciding summary judgment motions, Toole's testimony showing that she had probable cause to file this criminal complaint against Gordon cannot be deemed correct. If a jury credits Gordon's account of the arrest and his claims

of excessive force, it could find that Toole did not have probable cause to file the criminal complaint that commenced proceedings against Gordon for his actions allegedly taken in the course of his arrest. [25] Summary judgment is denied as to Gordon's claim of malicious prosecution against Toole based on this criminal complaint.

[25]     The fact that Gordon admits to struggling with the individuals he later discovered were police does not alter this analysis. In order to maintain a charge of resisting arrest against an individual, that individual must have been aware that he was being arrested. *See People v. Saitta,* 434 N.Y.S.2d 719, 720 (2d. Dep't 1981) (reversing a conviction for resisting arrest because testimony supported defendant's version of events that he was not informed of the police's identity and that "without being aware of the fact that he was being arrested, defendant could not have intentionally resisted arrest"). Whether or not the police identified themselves before attempting to arrest Gordon is a question of fact for the jury.

*VII. Intentional Infliction of Emotional Distress*

**\*12** Plaintiff's alleges intentional infliction of emotion distress against Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis for their "extreme and outrageous conduct, conduct utterly intolerable in a civilized community, which intentionally caused severe emotional distress to plaintiff." (Gordon Compl. ¶ 147.) Defendants move for summary judgment on the grounds that Gordon offers no evidence to support this claim.

Summary judgment is granted for Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Difede, Webber, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis because Gordon has offered no evidence of these defendants taking any action against him.

Summary judgment is also granted on the claims against Toole, Wiencko, Moloney, and Barberi because the allegations against them do not meet the stringent test required under New York law. To maintain a claim for intentional infliction of emotional distress, a plaintiff must show: (1) extreme and outrageous conduct; (2) with the intent to cause, or with reckless disregard of the substantial

probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. *See Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996) (citing *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993)). The standard is very high, and the law requires that the conduct must be "so outrageous ... and so extreme ... as to go beyond all possible bounds of decency." *Id.* Under the circumstances here, Gordon's claim for intentional infliction of emotional distress is subsumed under his excessive force claim. *See Bender v. City of New York,* 78 F.3d 787, 790, 791–92 (2d Cir.1996) (acknowledging that traditional torts may encompass claims for emotional distress); *Fischer v. Maloney,* 43 N.Y.2d 553, 553 (1978) ( "Indeed, it may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability."); *Anatsui v. Food Emporium,* No. 99 Civ. 1337(JGK), 2000 WL 1239068, at *7–*8 (S.D.N.Y. Sept. 1, 2000) (holding that derogatory comments and termination are "insufficient to constitute intentional infliction of emotional distress under New York law" (citations omitted)); *Muhlrad v. Mitchell,* No. 96 Civ. 3568(DLC), 1997 WL 182614, at *8 (S.D.N.Y. Apr. 14, 1997) (holding that allegations were insufficient to satisfy the element of outrageous conduct and noting "the New York Court of Appeals has never upheld a claim for intentional infliction of emotional distress"). Gordon's emotional distress resulting from the circumstances of his apprehension will be an element the jury may take into account in awarding any damages on the other claims. [26]

[26]     Gordon's testimony does present evidence of what might be outrageous conduct. Specifically, Gordon testified to numerous acts of excessive force by Barberi, Toole, Wiencko, and Moloney, and testified that Barberi referred to Gordon as a "nigger" and "fucker" in the course of his arrest. (Gordon Dep., 5/16/97, at 205.) To the extent that such actions support a claim for intentional infliction of emotional distress, this Court finds that they are covered under Gordon's excessive force claim. Gordon will be able to present any evidence of emotional damages in connection with this event if he succeeds on the excessive force claim. The emotional damages Gordon claims includes post traumatic stress disorder, post traumatic headaches, cognitive disorder, sexual difficulties, flashbacks,

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

fear, and guilt. (Gordon's Resp. to Defs.' 56.1 Stmt. ¶¶ 25–26.)

*VIII. Claims of Negligent Infliction of Emotional Distress and Negligence*

**\*13** Plaintiff's claims for negligent infliction of emotional distress and for negligence are dismissed against all Defendants because Plaintiff's testimony about Toole, Wiencko, Barberi, and Moloney does not bespeak of negligence but of intentional conduct. [27] Under the law in New York, once intentional conduct has been established, the actor is liable for assault and not negligence, even when physical injuries have been inflicted inadvertently. *See Mazzaferro v. Albany Motel Enterprises, Inc.,* 515 N.Y.S.2d 631, 633 (3d Dep't 1987)* (negligence and assault and battery claims are mutually exclusive); *Pranda v. City of Albany,* 956 F.Supp. 174, 183 (N.D.N.Y.1997).* Furthermore, Plaintiff has failed to identify any evidence suggesting either a bystander or a direct duty theory of negligent infliction of emotional distress as is required under New York law. *See Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1996).* As for the claims against supervisors, Plaintiff has offered no specific evidence that each of the individual supervisors were present or aware of the arrest of Gordon or use of excessive force by officers. [28] Summary judgment is granted for all Defendants.

[27]    Even Plaintiff's own motion papers do not support claims of negligence. Plaintiff's argument addresses failure to take action after imprisoning parishioners inside the fence. (Gordon's Mem. in Opp. at 34, 38.) It is undisputed that Gordon was arrested and in the police van and was never imprisoned inside the fence.

[28]    Plaintiff bases his claim of negligence against the supervisors on the allegation that Barberi "maliciously convinced his colleagues to return to the Church against the express order of Captain Betts." (Gordon's Mem. in Opp. at 37–38.) The evidence Plaintiff cites for this, however, is an expert report, which is not admissible for this purpose. In addition, even if Plaintiff had evidence to support this theory, it should still be intentional conduct as to Barberi. As for his supervisors, Plaintiff offers the theory that they should have known of Barberi's intentions and were negligent in failing to prevent his return. However, Plaintiff cites to no specific part of any admissible evidence to support this allegation. Furthermore, the cause of

action for negligent supervision has been severed and is not an issue in this trial. (May 31, 2000 Order.)

*IX. Conspiracy*

Plaintiff alleges that Defendants "conspired together and maliciously and willfully entered into a scheme to deprive plaintiff of his rights, liberty, well-being and to commit the above-alleged unlawful acts." (Gordon Compl. ¶ 153.) Defendants move for summary judgment on the grounds that Plaintiff offers no evidence to support such a claim. Plaintiff's claim for conspiracy is dismissed as to all Defendants. Plaintiff has presented no proof that the acts of Defendants flowed from a common scheme or plan. *See Schlotthauer v. Sanders,* 545 N.Y.S.2d 196, 197 (2d Dep't 1989).* In addition, Plaintiff's Memorandum of Law does not even address his conspiracy claim, and his 56.1 Statement in response to Defendants' claim that there is no evidence to support conspiracy simply cites to all of the general statements and exhibits without providing specific evidence. (Gordon's Resp. to Defs.' 56.1 Stmt. ¶ 60.) Summary judgment is granted for all Defendants on Gordon's conspiracy claim.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.) In his Complaint, Gordon failed to plead any common law claim for assault and battery. Gordon moves to amend the Complaint to allow for the addition of this claim, citing " 'law office error' " as the reason for the omission. (Letter from Paul Rheingold, Dated 10/10/2000.) Because Gordon clearly plead excessive force under § 1983 and the same facts establish a common law assault and battery claim, Gordon's motion to amend is granted. Therefore, Gordon also has a New York State common law claim for assault and battery (physical acts) against Barberi, Toole, Wiencko, and Moloney.

Conclusion

**\*14** Summary judgment is denied on the following claims by Gordon:

1. § 1983 excessive force against Barberi, Toole, Wiencko, Moloney

2. § 1983 malicious prosecution against Toole on the basis of the criminal complaint alleging assault in the second degree (two counts), riot in the first degree, inciting to riot, obstructing governmental administration in the second degree, and resisting arrest

Summary judgment is granted on the remaining claims by Gordon:

1. § 1983 excessive force against Parrish

2. § 1983 false arrest against all Defendants

3. § 1983 refusal to address serious medical needs against all Defendants

4. § 1983 failure to intervene or protect against all Defendants

5. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

6. common law malicious prosecution against Parrish, Barberi, Wiencko, Moloney, and Toole on the criminal complaint filed pertaining to Warsop's assault

7. common law intentional infliction of emotional distress against all Defendants

8. common law negligent infliction of emotional distress against all Defendants

9. common law conspiracy against all Defendants

10. common law negligence against all Defendants

Michael Bennett's Claims

On August 20, 1995, Michael Bennett was arrested and charged with assault in the second and third degrees. (Bennett's 56.1 Stmt. ¶ 19; Defs.' 56.1 Stmt. Bennett ¶ 14.) He was apprehended by an unidentified uniformed officer. (Pls.' Gen. 56.1 Stmt., Ex. 27A; Toole Dep., 2/19/97, at 172–79.) The official arresting officer on the paperwork was Toole. (Id.) Upon motion of the District Attorney, the Queens County Criminal Court, Judge Griffin dismissed all charges against Plaintiff on February 5, 1996 (Bennett's 56.1 Stmt. ¶ 22; Defs.' 56.1 Stmt. Bennett ¶ 15.)

The identity of the uniformed police officer who apprehended Bennett has not been established by either party. Defendants Toole, Wiencko, Barberi, and Moloney were all in the vicinity and participating in Gordon's arrest around the same time Bennett was arrested, but Bennett has not identified any of them, either in his deposition, his CCRB complaint, in an affidavit in opposition, or in any other way. In addition, none

of the named Defendants claim involvement with the Bennett arrest, even though they did offer information that they were involved in the arrests of other Plaintiffs. Defendants' explanation for Bennett's arrest is that Warsop pointed out Bennett, who he claims was involved in his attack, to an uniformed officer and that this uniformed officer arrested Bennett on the basis of Warsop's identification. (Defs.' 56 .1 Stmt. Bennett, Warsop Aff. ¶¶ 4–5 ("Sometime before 11:15 p.m. on August 20, 1995, I observed a male black individual at or near the corner of Sutphin and Ferndale, and recognized this person as one of the individuals who had assaulted me several hours earlier. I pointed this male black out to an uniformed police officer. The officer handcuffed the individual I had identified and removed him from the location where I was.");Pls.' Gen. 56.1 Stmt., Ex. 27A.) The next day, Toole showed Warsop a picture of Bennett, and Warsop identified the man in the picture as "one of the individuals who had participated in the assault upon me the previous evening ... [and] the same male black that I identified to the uniformed police officer on August 20, 1995." (Defs.' 56.1 Stmt. Bennett, Warsop Aff. ¶ 7.) On the basis of this post-arrest confirmatory identification, Toole signed a criminal complaint against Bennett for the assault of Warsop. (Pls.' Gen. 56.1 Stmt., Ex. 27A; Toole Dep., 2/19/97, at 176–81.)

**\*15** Bennett denies any involvement in the effort to prevent Warsop from entering the UCC grounds. (Bennett's 56.1 Stmt. ¶ 3.) Bennett maintains that he was in the tent area and nowhere near the gate when the altercation occurred and that his only involvement with the police was when they returned to the UCC the second time. (Id.) According to Bennett, after the UCC service had ended, a woman from the congregation ran into the gated area yelling, "They are going to kill him." (Defs.' 56.1 Stmt. Bennett, Ex. B, at 71.) Bennett walked out the gate and approached several individuals whom he observed beating Gordon and inquired, "What did he do?" (Bennett's 56.1 Stmt. ¶¶ 4–5.) Bennett alleges that, in response, officers, whom he cannot identify, attacked and arrested him. (Id. ¶¶ 5–6; Defs.' 56.1 Stmt. Bennett ¶¶ 3–6.) Specifically, Bennett testified that he was hit from behind with an object that felt like a bat or a stick (Bennett's 56.1 Stmt., Ex. 1, at 72), that he was thrown against a fence (id.), hit in the shoulder and thrown against a police car, and he was handcuffed (id. at 73; Bennett's 56.1 Stmt. ¶ 6). Bennett was then placed in the police van with Gordon, transported to the precinct, and detained until his arraignment.

The identity of the officers who attacked and apprehended Bennett is unknown to the Plaintiff and Defendants. The

only physical description Bennett can give is that the people attacking Gordon were "four guys" (Defs.' 56.1 Stmt. Bennett, Ex. B, at 69) in plainclothes, none in uniform (*id.* at 70), all in jeans, and one in a gray t-shirt (*id.*). They were "tall, big ... white guys," one of whom had a nightstick and one of whom had short blond hair. (*Id.* at 71.) When asked, "Do you know who the four guys or any of them were that were holding Horace Gordon?" he answered no. (Bennett's 56.1 Stmt., Ex. 1, at 69.) When asked, "Do you know who it was that hit you from behind either by physical description or any other identifying characteristics?" Bennett answered no. (*Id.* at 73.) Bennett described the officer who cuffed him as "a plainclothes officer, other [sic] gray shirt and jeans" (Defs.' 56.1 Stmt. Bennett, Ex. B, at 74), and that this was one of the four that had previously been with Gordon (*id.*). It is unclear how many officers Bennett is alleging used force against him and whether or not one of those officers is also the one who cuffed him. It is also unclear whether or not the officers who used force against him are the same ones who were arresting Gordon.[29]

[29]    Plaintiff continues to cite Bennett's 56.1 Stmt. ¶¶ 5–6 for the proposition that Bennett was hit and arrested by one of the officers who was involved in the Gordon arrest. The cited deposition, however, is not supportive. Bennett never testified that he was hit by the same officers who arrested Gordon, nor does he offer an opposing affidavit containing such a claim.

*I. § 1983 Excessive Force Claim*

In his Amended Complaint, Bennett alleges that, "The conduct and actions of defendants Barberi, Parrish, Toole, Wiencko, and Moloney, acting individually and in concert with each other, acting under color of law, in assaulting plaintiff by repeatedly striking his body with a nightstick, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Bennett Am. Compl. ¶ 93.) Defendants move for summary judgment because Bennett cannot identify any Defendant and because any force used was reasonable. The legal elements of this claim are discussed in the Gordon section above.

**\*16** Because Bennett's claim of excessive force occurred in the course of his arrest, his claim arises under the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 394 (1989). The testimony of Bennett raises a genuine issue of material fact regarding the manner in which he was arrested and the force that was used, therefore, his excessive force claim should survive summary judgment and go before a jury. Summary judgment is granted for all Defendants, however, because Bennett offers no evidence identifying or in any other way connecting any of the named officers as the ones that used force against him.

Bennett cannot show the required direct or personal involvement necessary to hold a defendant liable in his or her individual capacity for a § 1983 claim.[30] Plaintiff acknowledges that personal involvement is necessary for a finding of liability under § 1983 and maintains that he has satisfied this requirement by pointing to facts that show the named Defendants were personally present at the scene of the incident. For certain Defendants, Plaintiff's sole showing of personal involvement is evidence of the Defendant's presence at the scene of the incident at some point in time on the night in question. (Pls.' Gen. 56.1 Stmt.) For other Defendants, Plaintiff offers evidence that they were involved in specific acts. Bennett, however, has never identified any of the Defendants by name, description, or in any other way.

[30]    This analysis applies to all of the Plaintiffs' § 1983 claims.

In order to survive the motion for summary judgment on the § 1983 claims, there must be some evidence of the personal involvement of each Defendant. " ' [P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Whether a Defendant is a supervisor or not, the Plaintiff must allege some form of personal involvement for each Defendant. Without evidence supporting a Defendant's personal involvement, the motions for summary judgment on the § 1983 claims must be granted. If there is evidence to support personal involvement, any dispute is a question of fact for the jury. *See Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Moffitt,* 950 F.2d at 886. However, there still must be a supported allegation of personal involvement. Plaintiff must allege "a tangible connection between the acts of a defendant and the injuries suffered ." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986)

Plaintiff continuously argues that defendants cannot show non-involvement and, therefore, a factual dispute about personal involvement exists, and it must go to a jury. (Pls.' Mem. in Opp. at 3–9; Letter from Daniel Perez, Dated July 31, 2000 ("Perez Letter, 7/31/00").) Although Plaintiff is correct that the burden of identifying by name and badge number every police officer who allegedly participated in the incident cannot be placed on Plaintiff, it does not follow that the burden shifts to each and every individually named Defendant to prove his or her non-involvement. In arguing for a burden shift, plaintiff relies in part on the case of *Williams v. Smith*, 781 F.2d 319 (2d Cir.1986), and cases following it, and in part on a series of cases adopting the RESTATEMENT (SECOND) OF TORTS § 433 (1965).

**\*17** Contrary to Plaintiff's insinuation, *Williams* does not stand for the proposition that Defendants must submit affidavits of non-involvement, nor does it suggest that a plaintiff is relieved from showing personal involvement. Rather, *Williams* addresses the extent to which plaintiffs must respond to defendants' motions for summary judgment based on a lack of personal involvement. Once the defendant "documented his assertion of no personal involvement" by specifying in a summary judgment motion the extent of his involvement and denying involvement in ways alleged, the defendant had made a motion sufficient to require response by the plaintiff. *Williams*, 781 F.2d at 324.

Here, the parties agree that Toole's involvement in the arrest was only after the actual apprehension. Bennett does not even mention a woman in his testimony regarding the incident. There is no evidence to support Toole's involvement on an excessive force claim. With respect to Barberi, Wiencko, Moloney, and Parrish, Bennett testified that the police officers he observed with Gordon and the officers who arrested and put handcuffs on him were in plain clothes. (Defs.' 56.1 Stmt. Bennett, Ex. B, at 70–77.) Barberi, Moloney, and Parrish all wore uniforms on August 20, 1995. (Defs.' 56.1 Stmt. Bennett ¶ 8.) [31] At the time of Gordon's arrest, Wiencko was the only male officer in plain clothes. (Defs.' 56.1 Stmt. Bennett ¶ 9.) Although Defendants assert that Detectives do not carry nightsticks, the citation they offer does not support that assertion. (*Id.* ¶ 10.)

[31]    Plaintiff's response to this statement is, "Plaintiff can neither admit nor deny this statement based upon the factual record. Defendants may have changed clothes at various times on August 20,

1995." (Bennett's Resp. to Defs.' 56.1 Stmt. ¶ 8.) This is not a denial supported by specific, admissible evidence as is required under Rule 56.1. As such, it is deemed admitted.

Plaintiff is correct that, in certain situations, the burden must shift to each defendant to disprove his or her involvement. Here, Bennett has not offered facts showing that such a situation exists. The cases Bennett relies on hold that, once plaintiff has proven each defendant acted tortiously, the burden of proving which tortious defendant caused the particular harm or what part of the particular harm shifts to each tortious defendant. Each defendant then has the burden of proving his or her tortious conduct did not cause the harm or only caused part of the harm. The burden of proving that each defendant acted tortiously, however, remains on the plaintiff. For example, in *Rutherford v. Berkeley*, 780 F.2d 1444, 1448 (9th Cir.1986), the plaintiff could identify the three defendant officers as among the five or six surrounding him while he was assaulted, although he could not clearly state they had assaulted him. The Ninth Circuit found that this was sufficient evidence to go to a jury for consideration. *See id.* Similarly, in *Grandstaff v. City of Borger*, 767 F.2d 161, 168 (5th Cir.1985), the Fifth Circuit held that the plaintiff did not need to prove which officer, of the four officers who fired shots at plaintiff, fired the bullet that actually killed plaintiff in order to be found liable under § 1983. The court found each defendant "as much at fault as the others, and all are liable for the foreseeable consequences." *Id.; see also* RESTATEMENT (SECOND) OF TORTS § 433B, cmt. g (1965) (stating that the burden shifting rule "has no application to cases of alternative liability, where there is no proof that the conduct of more than one actor has been tortious at all. In such a case the plaintiff has the burden of proof both as to the tortious conduct and as to the causal relation.").

**\*18** In his § 1983 claim, Bennett makes specific allegations of the use of force by one or more specific persons. He has not shown that any of the named Defendants were the ones that either used force or stood by and watched as others did. He has not shown that they were aware of his particular situation. He has not identified them as the officers who were present. Although the Court understands that, in a chaotic situation such as this one, it is difficult to observe and remember every detail, all of the Plaintiffs in the various UCC cases have been through extensive discovery lasting several years. The Plaintiff attorneys have photographs of all of the named Defendants. In addition, many of the Plaintiffs engaged in CCRB proceedings in which they also had the opportunity to identify the Defendants. Bennett has never identified

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 318 of 531
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

any of the named Defendants, either by name, description, photograph, or witness testimony at any time in the course of this lawsuit. Bennett has not filed an opposing affidavit stating that he recognizes any of the named Defendants as an officer who used force against him. In the motion papers, Bennett's attorneys have failed to point to specific evidence that identifies any of the named Defendants as being involved in Bennett's arrest. The closest the attorneys offer is the fact that Barberi was carrying a flashlight and was "using it in the vicinity of Bennett's arrest." (Bennett's 56.1 Stmt. ¶ 6.)

Contrary to Plaintiffs' assertion, this Court is not requiring Plaintiffs "to recite from memory the name of his or her assailant." (Pls.' Mem. in Opp. at 9.) Plaintiff argues that "Plaintiffs similarly situated have reconstructed the events giving rise to their claims from an amalgam of police records, statements and testimony from police officers, and statements and testimony of witnesses." (*Id.*) Plaintiffs have failed to do this, and the Court is not responsible for the Plaintiffs' failure. The 56.1 Statements and motion papers lack the recitation of evidence that supports, circumstantially or otherwise, the personal involvement of any Defendant. The best Plaintiffs offer with respect to some Defendants is a time at which they arrived. For other Defendants, they do not even offer this. Aside from the claims against the supervisors, which will be addressed separately under the appropriate sections, mere presence at the site of a melee involving hundreds of people is not evidence of personal involvement for the purpose of holding individual defendants liable for constitutional violations.

Bennett does not offer any evidence connecting any of the Defendants to his attack or arrest. Without any evidence linking any of the Defendants to the use of force in any way, this Court cannot allow the charge to go to trial when the Defendants are being held personally liable for constitutional violations. Summary judgment is granted for all Defendants on Bennett's excessive force claim.

## II. § 1983 *False Arrest & Imprisonment Claim*
**\*19**  In his Amended Complaint, Plaintiff alleges that "The conduct and actions of defendants Parrish, Toole, Wiencko, Barberi, and Moloney, acting individually and in concert with each other, acting under color of law, in arresting and imprisoning plaintiff without probable cause, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of his acts, was done without lawful justification or reason, and was designed to and

did cause specific and serious harm, pain and suffering in violation of plaintiff's Constitutional rights as guaranteed under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendments to the United States Constitution." (Bennett Am. Compl. ¶ 96.) Defendants move for summary judgment on the grounds that Toole had probable cause to arrest Bennett and that Bennett has failed to identify any of the other named Defendants and, therefore, cannot sustain an action under § 1983. The elements for a false arrest claim are outlined in the Gordon section above.

Toole signed the criminal complaint based on Warsop's confirmation that the individual in the picture was the individual who assaulted him the night before and the individual whom he had then identified to the uniformed officer. Based on this statement, Toole had probable cause to sign the criminal complaint against Bennett for the arrest of Gordon. Summary judgment is therefore granted for Toole on Bennett's false arrest claim.

As discussed above, Toole was Bennett's official arresting officer, but she was not the one who apprehended Bennett and detained him initially. For Bennett's arrest to be privileged, the Defendants must show that this apprehending officer, who is not identified, had probable cause to arrest. The Defendants' evidence for probable cause is Warsop's affidavit stating that he identified Bennett to the officer. Warsop's affidavit, however, does not state exactly what he told the unidentified apprehending officer. His affidavit simply states, "I pointed this male black out to an uniformed officer. The officer handcuffed the individual I had identified and removed him from the location where I was." (Defs.' 56.1 Stmt., Warsop Aff. ¶ 4.) Furthermore, as Bennett describes the events, there would have been little opportunity for Warsop to identify him to anyone because he was arrested soon after he approached Gordon. [32]

[32]  The Court notes that Plaintiff Andre Pierre's testimony contradicts both Warsop's and Bennett's version of events. Pierre testified that, when he observed Plaintiff Cornelius Caliz get arrested, he also saw Bennett and heard Bennett ask the police, " 'Why are you arresting Caliz?' ... 'can I come down to the precinct with him' and [the officer] says, 'Oh you want to come with him." ' (Pierre's 56.1 Stmt., Ex. 1, at 53.)

On the basis of this evidence, it is not clear what Warsop told the unidentified officer or whether or not this information

was sufficient to give that officer probable cause to arrest Bennett. Despite this fact, Plaintiff has offered no evidence in any way tying any of the named Defendants to the officer who cuffed him. As discussed above, there must be a showing of personal involvement to make a claim under § 1983. Therefore, summary judgment is granted for all Defendants on Bennett's § 1983 false arrest and imprisonment claim.

### III. § 1983 Denial of Medical Treatment

**\*20** Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully denied him medical treatment by "refusing to take any steps to provide plaintiff with medical care to address a serious medical need, despite having full knowledge that it was necessary and warranted under the circumstances, and in refusing to allow plaintiff to seek prompt medical treatment for his injuries." (Bennett Am. Compl. ¶ 99.) Defendants move for summary judgment on the basis that Bennett did not have apparent medical injuries and did not seek medical assistance, despite his knowledge that it was available. Bennett maintains that he did have serious injuries and was denied treatment. The relevant law is presented in the Gordon section above.

While Bennett has offered evidence of injuries, [33] he has failed to offer evidence showing that he was denied treatment. The basis of Bennett's claim that the Defendants denied him medical treatment is that he told an officer at the precinct that he was in need of medical care, and the officer responded that if he sought medical attention, he would not be able to see the judge that day. Bennett testified that he replied, "[O]kay, I don't mind if I die in here, I just want to see the judge so I get out of here." (Bennett's 56.1 Stmt., Ex. 1, at 109.) This does not constitute a denial of medical treatment. Bennett offers no evidence that he was visibly injured, and he does not testify that he was told he could not receive medical treatment. In fact, his testimony suggests that he decided he would rather forego immediate treatment and see the judge as quickly as possible. [34] In addition, Bennett admits that Plaintiff Caliz, who was in the same cell as Bennett, accepted an offer of medical treatment from the police. (Bennett's 56.1 Stmt., Ex. 1, at 86.) In addition, Bennett admits that he was in the same cell as Gordon (id.), and the evidence suggests that he was therefore present when the police took Gordon to the hospital.

[33]    Bennett testified that he had the following injuries: back pain, pain in his left hand, and tightness in his thighs. (Bennett's 56.1 Stmt., Ex. 1, at 118–19.)

[34]    The statement that receiving medical attention would result in a delay in going before a judge is not a threat but a statement of fact. Because going to the hospital to receive medical treatment takes time, it often increase the time between arrest and arraignment. Such a delay does not constitute unnecessary delay for purposes of Fed.R.Crim.P. 5(a). See United States v. Isom, 588 F.2d 858, 862 (2d Cir.1978) (denying motion to suppress statements made after arrest but before arraignment because "The period during which appellant received medical treatment (at his request) and overnight lodging at the MCC should not be counted in computing unnecessary delay" (citing United States v. Marrero, 450 F.2d 373, 378 (2d Cir.1971)).

Summary judgment is granted for all Defendants on Bennett's claim of denial of medical treatment.

### IV. § 1983 Failure to Intervene or Protect

Bennett's claim for failure to intervene or protect alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed "to take any steps to intervene or protect plaintiff from the unauthorized, unjustified, and unreasonable treatment at the hands of the other defendants herein." (Bennett Am. Compl. ¶ 102.) Defendants move for summary judgment on the grounds that there is no evidence showing that any Defendant had knowledge of or reason to know of what happened to Bennett. The relevant law is presented in the Gordon section above.

**\*21** Bennett offers no evidence that any of the supervisory Defendants were present when Bennett was arrested or that they had knowledge of his arrest or the use of force against him. The point in time at which Bennett was arrested appears to be during the beginning of the melee, before ranking supervisors were on the scene or in control. As to the officers who were at the scene initially—Toole, Barberi, Wiencko, and Moloney—Bennett offers no evidence identifying any of them or in any way connecting them to his arrest.

2000 WL 1538019

Summary judgment is granted for all Defendants on Bennett's failure to intervene or protect claim.

## V. § 1983 *Failure to Properly Supervise*

Bennett's next claim alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast failed to properly supervise Toole, Wiencko, Barberi, Difede, Parrish, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis and "failed to exercise appropriate command functions, thereby acquiescing to and acknowledging the improper actions of the defendants." (Bennett Am. Compl. ¶ 105.)

Bennett does not offer evidence of a failure to supervise that is specific to the facts of his situation. Bennett admits that he was arrested before Anemone, Maple, Chapman, and Brown arrived on the scene (Bennett's Resp. to Defs.' 56.1 Stmt. ¶¶ 41–42) and admits Prendergast was not a supervisor (*id.* ¶ 43). As for Devlin and Parrish, Bennett has failed to identify evidence showing either personal wrongdoing or knowledge of or an opportunity to prevent violations of his rights. Bennett has not connected any of the supervisor Defendants to him, and he has not connected any of the subordinate Defendants to him.

Summary judgment is granted for all Defendants on Bennett's claim for failure to supervise.

## VI. § 1983 *Unlawful Retaliation for First Amendment Conduct*

Bennett claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis actions were "a direct result of defendants' animus toward plaintiff and/or [ ] a direct result of plaintiff's having exercised his First Amendment rights to free exercise of his religion." (Bennett Am. Compl.¶ 108.) Defendants move for summary judgment on the grounds that there is no evidence showing Bennett was engaged in First Amendment activity at the time of his arrest or that any of the Defendants were connected to Bennett's arrest or knew his religion. The elements of the cause of action are outlined in the Gordon section above.

As evidence of his unlawful retaliation claim, Bennett alleges that after his arrest several officers made derogatory religious comments (Bennett's 56.1 Stmt. ¶¶ 8–9) and that one non-UCC member was arrested but released for the commission of a crime (*id* . ¶ 13). This evidence does not support a claim for unlawful retaliation under the relevant standard. Bennett failed to offer evidence showing that the Defendants' conduct—arresting and using excessive force against him— was motivated by whatever First Amendment activity he was engaged in. Plaintiff's assertion that the arrest and release of a non-UCC member establishes that he was arrested simply because he was a church member is without merit. According to Bennett's own evidence, Officer Lefebure, who is not named as a defendant here, arrested a man for disorderly conduct because he was being loud and refused to leave. (Bennett's 56.1 Stmt ., Ex. 4, at 10–11.) This individual was issued a summons and released because "he met the parameters of being released on the scene" (*id.* at 15); that is, his proof of identification was valid, and he was only charged with a violation (*id.* at 15–16, 18).

**\*22** Bennett offers no evidence of any UCC member arrested for a similar charge—a violation—who had valid identification and was not released. All of the arrested UCC members, including Bennett, were arrested for and charged with, among other things, the crime of assault. The fact that a non-UCC member who was charged with the violation of disorderly conduct was issued a summons and released does not show animus or retaliation by any Defendant. Summary judgment is granted for all Defendants on Bennett's claim of unlawful retaliation for First Amendment conduct.

## VII. *Common Law Assault and Battery*

Bennett alleges that Defendants Toole, Wiencko, Barberi, Parrish, and Moloney engaged in conduct constituting assault and battery. (Bennett Am. Compl. ¶ 136.) Defendants move for summary judgment on the grounds that Bennett "cannot identify anyone who assaulted him. Therefore, he cannot prove intent." (Defs.' Mem. In Supp. Bennett at 9.)

Defendants have not cited any law supporting the position that intent cannot be proved without identification of the perpetrator of an assault and battery. Assault is "an intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat'l Ins. Co. v. Waterfront New York Realty Corp.,* 994 F .2d 105, 108 (2d Cir.1993). Battery is "an intentional wrongful physical contact with another person without consent." *Id.* (citations omitted). Intent is an element of both torts, but the plaintiff need only offer evidence that "there was bodily contact; that such contact was offensive; and that the defendant intended to make the

2000 WL 1538019

contact." *Masters v. Becker,* 254 N.Y.S.2d 633, 635 (2d Dep't 1964). Plaintiffs need only show that a defendant intended the contact, not that they intended the specific harm. *See Rivera v. Puerto Rican Home Attendants Servs. Inc.,* 930 F.Supp. 124, 133 (S .D.N.Y.1996) (recognizing that "the intent requisite to an assault under New York law is the intent either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact. To prove battery, the required intent is merely that the defendant intentionally made bodily contact and that the intended contact was itself offensive or without consent." (internal citations omitted)). The question of intent is a question of fact for the jury. *See Casimir v. Hoffman,* 213 N.Y.S.2d 499, 500 (2d Dep't 1961).

Crediting Bennett's version of events, there is sufficient evidence that an assault and battery occurred. Plaintiff did not consent to any touching and, based on the evidence he presents, the acts resulting in the physical contact were intentional, not accidental.

Summary judgment is granted on Bennett's assault and battery claim against Defendants Toole and Parrish. Bennett's own testimony does not support a claim that Toole or Parrish were involved in the use of force. In addition, summary judgment is granted for Defendants Barberi, Wiencko, and Moloney. Bennett has not identified these Defendants as the ones who assaulted and battered him. To deny summary judgment and allow the claim to proceed against these Defendants simply because Bennett names them in his Amended Complaint would only be inviting the jury to speculate without sufficient evidence. Summary judgment is granted for all named Defendants.

 **\*23** Defendants do not cite any law holding that a plaintiff may not proceed on this claim as against unidentified defendant police officers. The police officers on the scene were the authorized agents of the City of New York. Bennett's testimony supports a claim of assault and battery. A principal is generally liable for the acts of its agents acting within the scope of their authority. Therefore, Bennett may proceed with his common law claim of assault and battery against unidentified police officers.[35]

[35]    The parties are reminded of the Court's Order stating, "[D]efendants are deemed to have stipulated that each individual defendant police officer was acting within the scope of his/her employment and that any verdict against any police officer will permit a judgment to be entered against

the City of New York on the theory of *respondeat superior.*" (May 31, 2000 Order ¶ 1.) Given this stipulation, the Plaintiff could receive a judgment against the City if the jury finds that an unidentified officer assaulted and battered him, even though he could not receive judgment against any particular defendant.

### VIII. Common Law False Arrest & Imprisonment

Bennett alleges that Defendants Parrish, Toole, Wiencko, Barberi, and Moloney acted to falsely arrest and imprison him without probable cause. (Bennett Am. Compl. ¶ 139.) Defendants move for summary judgment. The elements of a false arrest claim are presented in the Gordon section above. The standard for false arrest is the same under § 1983 and common law. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996.)

Summary judgment is granted for Toole on Bennett's claim for false arrest and imprisonment. Toole had probable cause to arrest Bennett based on the post-arrest identification by Warsop. *See* Bennett's § 1983 section above. Summary judgment is granted for Parrish. The evidence suggests that Parrish did not arrive on the scene until after approximately four arrests. (Pls.' Gen. 56.1 Stmt., Ex. 19, at 109.) Summary judgment is also granted for Defendants Barberi, Wiencko, and Moloney. There is no showing that any of these Defendants were involved with the arrest of Bennett. Summary judgment is granted for all named Defendants.

Based on the analysis in Bennett's § 1983 false arrest claim above, the Defendants have not established that the unidentified officer who arrested Bennett had probable cause to do so. Defendants have not cited any law holding that a plaintiff cannot proceed with a false arrest claim against an unidentified defendant police officer. Therefore, Bennett will be allowed to present his claim that an unidentified officer falsely arrested him because he lacked probable cause.

### IX. Common Law Malicious Prosecution

Bennett claims that Defendants Parrish, Toole, Wiencko, Barberi, and Moloney are liable for maliciously prosecuting him. (Bennett Am. Compl. ¶ 142.) Defendants move for summary judgment. The elements of a malicious prosecution claim are explained in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for malicious prosecution. There is no evidence

connecting Bennett, Wiencko, Parrish, or Moloney to the criminal prosecution of Bennett. The only Defendant who is connected to the prosecution of Bennett is Toole, who signed the criminal complaint against him. (Pls.' Gen. 56 .1 Stmt., Ex. 271.) As discussed above, Toole had probable cause for the arrest of Bennett based on the post-arrest identification of him by Warsop. Plaintiff does not point to evidence that Toole received information contradicting this basis for probable cause by the time she signed the criminal complaint. Therefore, Toole had probable cause to sign the complaint and initiate criminal proceedings against Bennet. Summary judgment is granted for all Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*
**\*24** Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted to intentionally inflict emotional distress on him. (Bennett Am. Compl. ¶ 145.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for intentional infliction of emotional distress. Bennett fails to offer evidence to support the claim.

*XI. Common Law Negligent Infliction of Emotional Distress*
Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted to negligently inflict emotional distress on him. (Bennett Am. Compl. ¶ 148.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for negligent infliction of emotional distress. Bennett fails to offer evidence to support the claim.

*XII. Common Law Conspiracy*
Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to violate his rights. (Bennett Am.

Compl. ¶ 151.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for conspiracy. Bennett fails to offer evidence to support the claim.

*XIII. Common Law Negligence*
Bennett alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him severe injuries and emotional distress. (Bennett Am. Compl. ¶ 154.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Summary judgment is granted for all Defendants on Bennett's claim for negligence. Bennett fails to offer evidence to support the claim.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Bennett:

1. common law assault and battery against unidentified police officers

2. common law false arrest & imprisonment against unidentified police officers

Summary judgment is granted on the remaining claims by Bennett:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 false arrest and imprisonment against all Defendants

**\*25** 3. § 1983 denial of medical treatment against all Defendants

4. § 1983 failure to intervene or protect against all Defendants

5. § 1983 failure to properly supervise against all
Defendants

6. § 1983 unlawful retaliation for First Amendment conduct
against all Defendants

7. common law assault and battery against Defendants
Toole, Wiencko, Moloney, Barberi, Parrish

8. common law false arrest and imprisonment against
Defendants Toole, Wiencko, Molorey, Barberi, Parrish

9. common law malicious prosecution against all
Defendants

10. common law intentional infliction of emotional distress
against all Defendants

11. common law negligent infliction of emotional distress
against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Cornelius Caliz's Claims

Cornelius Caliz arrived at the UCC for the revival around 6:30
p.m. on August 20, 1995. (Caliz' 56.1 Stmt. ¶ 1.) There is no
evidence that he was involved in the initial Warsop incident.
Caliz testified that as he was leaving the service, he observed
several people beating Gordon. (Id. ¶ 4.) Caliz approached
the group, asked "what's the matter," and did not receive a
response. (Id. ¶ 5.) At this point, Caliz attempted to return to
the gated entrance to the UCC, but he was pushed, sprayed,
beaten, and handcuffed. (Id. ¶ 6.) Caliz was not able to identify
any of the people who attacked him (Id., Ex. 1, at 67.), but
Officers Single and Lesiewicz have admitted participating in
the arrest (Defs .' 56.1 Stmt. ¶¶ 6–12.)

I. § 1983 Excessive Force (physical acts)
In his Complaint, Caliz alleged that "unnamed defendant
police officers" used excessive force against him in the course
of his arrest. (Caliz Compl. ¶ 125.) Caliz failed to amend
his complaint to name any specific Defendants as having
used force against him. In his deposition, Caliz testified that
he could not identify the officers who he alleges used force
against him. (Caliz 56.1 Stmt., Ex. 1, at 65–67.) Caliz has
not shown the personal involvement of any officer in using

excessive force against him. [36] However, Single testified that
his arrest of Caliz was a struggle in which the two of them
fought over his baton and fell to the ground. (Defs.' 56.1 Stmt.
Caliz, Ex. D.) Single also admits to using his pepper spray.
Lesiewicz also testified that he was involved in the arrest. (Id.,
Ex. E.) Caliz claims he was hit from behind and attacked.
(Caliz's 56.1 Stmt., Ex. 1, at 65.) Based on this evidence,
summary judgment is denied as to Single and Lesiewicz, the
apprehending officers. Summary judgment is granted for all
Defendants.

[36]     Although discovery revealed that both Single and
Lesiewicz participated in the arrest, neither admit
to using excessive force (physical acts) against
Caliz. Furthermore, after Plaintiff discovered the
identity of some of the officers involved in the
arrests, he did not file an amended complaint,
submit an affidavit, or in any other way indicate
that he now could identify the officers who used
excessive force against him.

II. § 1983 Excessive Force (noxious gas)
Caliz alleges that Defendants Barberi, Webber, Craig, Single,
Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish,
Anemone, Maple, Chapman, Brown, and Devlin used
excessive force against him in the form of noxious gas. (Caliz
Compl. ¶ 128.) Defendants move for summary judgment.

*26   Caliz has identified evidence showing that Single
used pepper spray on him in the course of the arrest.
(Defs.' 56.1 Stmt. Caliz ¶¶ 7–8, 12.) Caliz has therefore the
shown personal involvement of Single sufficient to survive
a summary judgment motion. Whether or not the use of
pepper spray constitutes excessive force is a question for the
jury. Summary judgment is denied on Caliz's excessive force
claim for pepper spray against Single. Because Caliz offers
no other evidence supporting the personal involvement of any
Defendant in spraying him, summary judgment is granted for
all other Defendants.

III. § 1983 False Arrest and Imprisonment
Caliz alleges Defendants Anemone, Maple, Chapman,
Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko,
Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor,
O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis
falsely arrested and imprisoned him. (Caliz Compl. ¶¶ 131,
146.) Defendants move for summary judgment. The elements

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 324 of 531
Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)
2000 WL 1538019

of a false arrest claim are outline in the Gordon and Bennett sections above.

Defendants have the burden of showing probable cause for the arrest. Defendants claim that Single had probable cause to arrest Caliz because Caliz assaulted him by head butting him. Defendants argue that "Single's account should be credited, and Caliz's claim for false arrest dismissed." (Defs.' Mem. in Supp. Caliz at 4.) Caliz's version of events is contrary to Defendants. Caliz claims he was walking toward the gate when he was hit from behind and attacked. (Caliz' 56.1 Stmt. ¶ 6.) For the purposes of a summary judgment motion, Plaintiff's version of events must be credited as true. According to Caliz's account, he did not assault Single, and there was no probable cause for his arrest. Which version of events to believe is a credibility determination for the jury. Caliz identifies evidence showing the personal involvement of Single and Lesiewicz in his arrest and imprisonment. (Defs.' 56.1 Stmt. Caliz ¶ 43.) Summary judgment is denied on Caliz's false arrest claim against Single and Lesiewicz. Summary judgment is granted for all other Defendants because there is no showing of their personal involvement.

*IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise*
Caliz alleges that Defendants are liable for failure to intervene and protect and failure to supervise. (Caliz Compl. ¶¶ 134, 137.)

Summary judgment is granted for all Defendants. Caliz, who was arrested early on in the melee, does not show that any Defendants other than Single and Lesiewicz were on the scene, aware of the incident, or in a position to supervise.

*V. § 1983 Denial of Medical Treatment; § 1983 Unlawful Retaliation for First Amendment Conduct*
Caliz alleges Defendants are liable for denying him necessary medical treatment and for unlawfully retaliating against him. (Caliz Compl. ¶¶ 140, 143.)

Summary judgment is granted for all Defendants on Caliz's denial of medical treatment and unlawful retaliation claims. Caliz has not identified any evidence of a Defendant who denied him medical treatment. He has not shown that any Defendant retaliated against him for his religious conduct. Summary judgment is granted on both claims.

*VI. Common Law Assault and Battery (physical acts)*
**\*27** Caliz alleges that unidentified police officers who "tackled [him] from behind and struck him with nightsticks" are liable for assault and battery. (Caliz's Compl. ¶ 178.) Defendants move for summary judgment. The elements are set forth in the Bennett section above.

Caliz has alleged sufficient physical acts to support a claim for assault and battery. The evidence shows that Single and Lesiewicz were involved in Caliz's apprehension and alleged attack. Caliz also testified that there were other officers who were involved, but he has not presented evidence to establish their identities. Summary judgment is denied as to Single, Lesiewicz, and unidentified police officers. Summary judgment is granted to all other Defendants.

*VII. Common Law Assault and Battery (noxious gas)*
Caliz alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin inflicted assault and battery on him by spraying him with noxious gas. (Caliz Am. Compl. ¶ 181.) Defendants move for summary judgment.

Single admits to spraying Caliz with pepper spray. (Defs.' 56.1 Stmt. Caliz ¶ 7.) Such action can constitute assault and battery. Summary judgment is denied as to Single.

Summary judgment is granted on Caliz's assault and battery claim for noxious gas against all other Defendants. Caliz offers no evidence that any of the other Defendants sprayed him or authorized the spraying of noxious gas on him.

*VIII. Common Law False Arrest and Imprisonment*
Caliz alleges that Defendants Single, Parrish, Barberi, and Lesiewicz acted to falsely arrest and imprison him. (Caliz Compl. ¶ 187.)[37] Defendants moved for summary judgment. The relevant law is set forth in the Gordon and Bennett sections above.

[37]     In his Complaint, Caliz makes two claims for false arrest and imprisonment: one specifically against Single, Parrish, Barberi, and Lesiewicz for falsely arresting and imprisoning him (Caliz Compl. ¶ 187) and one against Defendants Anemone, Maple, Chapman, Brown, Devlin,

Picht, Parrish, Prendergast, Toole, Wiencko,, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis specifically for false imprisonment (*Id.* ¶ 184). The later claim appears to refer to the mass imprisonment of the UCC members during the surrounding of the UCC grounds. Because Caliz was already arrested prior to that alleged imprisonment, the Court grants summary judgment as to this claim. To the extent that Caliz has a false arrest claim against the specific Defendants who participated in his apprehension and arrest, it is considered above.

Caliz has shown the personal involvement of Single and Lesiewicz in his arrest. *See* § 1983 false arrest claim above. A common law and § 1983 claim have the same elements. Therefore, summary judgment is denied for Single and Lesiewicz.

Summary judgment is granted for Defendants Parrish and Barberi. Caliz does not shown that either Defendant was involved in apprehending him.

### IX. Common Law Malicious Prosecution

Caliz alleges malicious prosecution against Defendants Single, Parrish, Barberi, and Lesiewicz. (Caliz Compl. ¶ 190.) Defendants move for summary judgment. The elements of the tort of malicious prosecution are outlined in the Gordon and Bennett sections above.

The only evidence Caliz offers connecting any of the Defendants to his prosecution is Single, who initiated the arrest and signed the criminal complaint against him. Crediting Caliz's version of the facts, there was no probable cause for his arrest or prosecution. Therefore, there was no probable cause to sign a criminal complaint to initiate criminal proceedings. Summary judgment is denied as to Single.

Caliz offers no evidence that any other Defendant was connected with his criminal prosecution. Summary judgment is granted for Defendants Parrish, Barberi, and Lesiewicz.

### X. Common Law Intentional Infliction of Emotional Distress

**\*28**  Caliz alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

engaged in conduct that constitutes intentional infliction of emotional harm. (Caliz Compl. ¶ 193.) Plaintiff fails to offer evidence sufficient to meet the stringent test required under New York law. Summary judgment is granted for all Defendants.

### XI. Common Law Negligent Infliction of Emotional Distress

Caliz claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner and Papagiannis negligently caused him severe emotional distress. (Caliz Compl. ¶ 196.) Caliz offers no evidence of any negligent acts resulting in severe emotional distress. Summary judgment is granted for all Defendants.

### XII. Common Law Conspiracy

Caliz alleges that the Defendants conspired together to deprive him of his rights. (Caliz Compl. ¶ 199.)

Caliz's claim for conspiracy is dismissed as to all Defendants. Caliz offers no evidence of any conspiracy. Summary judgment is granted for all Defendants.

### XIII. Common Law Negligence

Caliz alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner and Papagiannis "negligently caused severe physical injuries, and caused extreme emotional distress." (Caliz Compl. ¶ 202.) Caliz has failed to offer evidence to establish this claim. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Caliz:

1.  § 1983 excessive force (physical acts) against Single, Lesiewicz

2.  § 1983 excessive force (noxious gas) against Single

3. § 1983 false arrest and imprisonment against Single, Lesiewicz

4. common law assault and battery (physical acts) against Single, Lesiewicz unidentified officers

5. common law assault and battery (noxious gas) against Single

6. common law false arrest and imprisonment against Single, Lesiewicz

7. common law malicious prosecution against Single

Summary judgment is granted on the following claims by Caliz:

1. § 1983 excessive force (physical acts) against all Defendants other than Single, Lesiewicz

2. § 1983 excessive force (noxious gas) against Barberi, Webber, Craig, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

3. § 1983 false arrest and imprisonment against Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, O'Hagan, De Lorenzo, Brunner, and Papagiannis

*29 4. § 1983 failure to intervene or protect against all Defendants

5. § 1983 failure to supervise against all Defendants

6. § 1983 denial of medical treatment against all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

8. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

9. common law false arrest as to Parrish, Barberi

10. common law malicious prosecution against Parrish, Barberi, Lesiewicz

11. common law intentional infliction of emotional distress against all Defendants

12. common law negligent infliction of emotional distress against all Defendants

13. common law conspiracy against all Defendants

14. common law negligence against all Defendants

Woodrow Campbell's Claims

Woodrow Campbell arrived at the UCC between 6:30 and 7 p.m. on August 20, 1995. (Campbell's 56.1 Stmt. ¶ 1.) The parties offer no evidence that Campbell was involved in the initial Warsop incident. Campbell testified that, after the service ended, he heard a commotion at the corner of Sutphin and Ferndale, and he went to take pictures. (Id. ¶¶ 4–5.) At some point, an officer told Campbell to stop taking pictures. (Id. ¶ 6; Defs.' 56.1 Stmt. Campbell ¶ 3.) When Campbell, who was standing on the hood of a car, did not stop taking pictures, the officer struck him on the leg numerous times (Campbell's 56.1 Stmt. ¶ 7; Defs.' 56.1 Stmt. Campbell ¶ 3) and also hit him in the chest and knee (Defs.' 56.1 Stmt. Campbell ¶ 6.) Campbell testified that he was pushed against a car, handcuffed, arrested, and dragged to a police car. (Campbell's 56.1 Stmt. ¶ 9; Defs.' 56.1 Stmt. Campbell ¶¶ 7–12 .) Campbell also testified that he was struck in the head, neck, and back. (Defs.' 56.1 Stmt. Campbell ¶¶ 12–18.) It is unclear exactly how many officers were involved. Campbell's testimony suggests that at least two officers used force against him and that more participated in his handcuffing and arrest. (Campbell 56.1 Stmt ., Ex. 1, at 128–51.)

I. § 1983 Excessive Force (physical acts)

Campbell alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig used excessive force against him in the course of his false arrest. (Campbell Compl. ¶¶ 121.) Defendants move for summary judgment on the grounds that Campbell has not been able to identify any of the named Defendants and, therefore, cannot show the necessary personal involvement for a § 1983 claim against those Defendants. The relevant law is presented in the Gordon and Bennett sections above.

Campbell does not identify, by name, photograph, description, or otherwise, any Defendant sufficient to

establish a showing of personal involvement. *See* Bennett section on § 1983 excessive force claims and personal involvement above. Campbell could not describe the officer who told him to stop taking pictures except to say that he was a male in uniform. (Defs.' 56.1 Stmt. Campbell ¶ 4 .) In addition, he was not able to identify any of the involved officers from photographs that he had viewed prior to his deposition. (Campbell's 56.1 Stmt., Ex. 1, at 129.) He also admits that he does not allege that a female assaulted him. (Defs.' 56.1 Stmt. Campbell ¶ 29; Campbell's Resp. to Defs.' 56.1 Stmt. ¶ 29.) The only other testimony Campbell offers is that one of the officers who hit him in the chest was tall. (Campbell's 56.1 Stmt., Ex. 1, at 134.) The exact number of officers Campbell claims were involved in the attack and arrest is also unclear from his deposition. Campbell does not point to any evidence or opposing affidavit establishing the personal involvement of any named Defendant in the use of excessive force against him; therefore, summary judgment is granted on his claim of excessive force for all Defendants.[38]

[38]    The only evidence connecting any Defendant to Campbell appears to be from the Defendants. In her deposition, Toole testified that she was in physical contact with Campbell in that he was punching and kicking her. (Toole Dep., 2/19/97, at 116; Pls.' Gen. 56.1 Stmt., Ex. 27 A, E, H.) Although this evidence supports the claim that Toole was in contact with Campbell, it does not show Toole's personal involvement for the excessive force claim because it does not support the allegation that she used force of any kind against Campbell; in fact, it supports the opposite. Furthermore, Campell's own deposition never mentions Toole or any woman officer in describing the use of force against him, and his testimony suggests that he did not interact with Toole until she questioned him the day after his arrest. (Defs.' 56.1 Stmt. Campbell, Ex. C, at 159–160.)

## II. *§ 1983* False Arrest

**\*30**  Campbell also alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig falsely arrested him without probable cause. (Campbell Comp. ¶ 142.) Defendants move for summary judgment. The relevant law is outlined in the Gordon and Bennett sections above.

Because Campbell does not show personal involvement for Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney,

and Craig, summary judgment is granted for those Defendants.

Summary judgment is denied on the false arrest claim against Toole. Campbell has filed an affidavit in opposition stating that he did not commit a crime or strike a police officer. (Campbell's 56.1 Stmt., Ex. 6.) In addition, it is undisputed that Toole was Campbell's official arresting officer. (Pls.' Gen. 56.1 Stmt., Ex. 27 A, E, H.) Furthermore, Defendants do not contest that there are material facts in dispute as to Toole's involvement in Campbell's arrest. (Defs.' 56.1 Stmt. Campbell ¶ 42.)

## III. *§ 1983* Failure to Intervene or Protect

Campbell alleges that Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for failure to intervene and protect him against the unauthorized and unjustified acts of other officers. (Campbell Compl. ¶ 130.) Defendants move for summary judgment. The relevant law is explained in the Gordon section above.

Campbell fails to offer evidence supporting this *§ 1983* claim. He does not offer evidence showing that any of these Defendants had knowledge or reason to know of the alleged excessive force, false arrest, or any other violation, or that there was an opportunity to intervene. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994.) Campbell's own testimony establishes that the excessive force and arrest occurred during the melee when everything was chaotic. He states that the forced used against him occurred in a matter of seconds. (Campbell's 56.1 Stmt., Ex. 1, at 145.) He has not shown awareness or opportunity for any Defendant to intervene. Under the circumstances, Campbell has not made a prima facie case against any of the named Defendants. Summary judgment is granted for all Defendants.

## IV. *§ 1983* Failure to Supervise

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast failed to properly supervise Defendants Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. (Campbell Compl. ¶ 133.) Defendants move for summary judgment. The relevant law is presented in the Bennett and Abraham sections.

Plaintiff admits that the excessive force and false arrest occurred before Anemone, Maple, Chapman, and Brown arrived on the scene (Defs.' 56.1 Stmt. Campbell ¶ 30) and that Prendergast was not a supervisor in August of 1995 (Id ¶ 31). Although Plaintiffs deny Defs.' 56.1 Stmt. ¶ 32 that "There is no evidence in the record demonstrating that Picht or Parrish had any knowledge of the alleged assault of Woodrow Campbell," they cite only to Pls.' Gen. 56.1 Stmts. and Exhibits and do not identify specific evidence contradicting this statement. (Campbell's Resp. to Defs.' 56.1 Stmt. ¶ 32.) Under Local Rule 56.1, this is an insufficient response to Defendants' 56.1 Statement. Campbell has not shown the personal involvement of any of these supervisors in the ways required by *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) and *Blyden v. Mancusi,* 186 F.3d 252, 264–65 (2d Cir.1999). Summary judgment is granted for all Defendants.

## V. § 1983 *Denial of Medical Treatment*

**\*31** Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Campbell Compl. ¶ 136.) Defendants move for summary judgment on the grounds that Campbell did not have a serious medical condition and that Campbell was aware of the availability of, but did not seek, medical treatment. (Defs.' 56.1 Stmt. Campbell, Ex. C, at 161.) The elements of a denial of medical treatment claim are presented in the Gordon section above.

Campbell testified that he did not seek medical treatment because he was afraid and did not want to remain in jail. (Campbell 56.1 Stmt., Ex. 1, at 161.) He did seek treatment a number of times after his release, and each time he was told he had bruises, no broken bones. (*Id.* at 167–77.) Campbell maintains that he suffered a number of injuries as a result of the incident. (Campbell's 56.1 Stmt. ¶ 17.)

This Court cannot assess the seriousness of Campbell's injuries on the evidence before it. Campbell does not demonstrate that his injuries were obvious.[39] Campbell did testify about the general nature of his injuries (Campbell's 56.1 Stmt., Ex. 1, at 161–72), but he has not shown that his injuries were brought to the attention of any Defendant and that that Defendant acted with deliberate indifference and denied him medical treatment. Plaintiff offers no evidence

that his injuries were visible or that any of the named Defendants had reason to know of them. Campbell did not ask for treatment. (Campbell 56.1 Stmt., Ex. 1, at 161.) He testified that he heard an officer in the precinct say that going to the hospital for medical treatment would delay the amount of time for which the arrestees would be held and that this made him afraid to ask for medical treatment. (Campbell's Response to Defs.' 56.1 Stmt. ¶ 35.)[40] The police officer's statement does not rise to the level of showing deliberate indifference. Furthermore, Plaintiff has not identified the person who made the statement. The evidence presented by Campbell in support of this claim does not amount to a prima facie case against any named Defendants.

| 39 | Campbell testified to injuries including pain in his chest (Campbell 56.1 Stmt, Ex. 1, at 167), breathing problems (*Id.*), headaches (*Id.* at 168), pain in his knee (*Id.*), and stated that he regularly visits a physical therapist for the pains in his knee and back (*Id.* at 173–75). |
|---|---|
| 40 | The statement that receiving medical attention would result in a delay in going before a judge is not so much a threat as a statement of fact. Because going to the hospital to receive medical treatment takes time, it often increase the time between arrest and arraignment. Such a delay does not constitute unnecessary delay for purposes of Fed.R.Crim.P. 5(a). *See United States v. Isom,* 588 F.2d 858, 862 (2d Cir.1978) (denying motion to suppress statements made after arrest but before arraignment because "The period during which appellant received medical treatment (at his request) and overnight lodging at the MCC should not be counted in computing unnecessary delay" (citing *United States v. Marrero,* 450 F.2d 373, 378 (2d Cir.1971)). |

Summary judgment is granted for all Defendants.

## VI. § 1983 *Unlawful Retaliation for First Amendment Conduct*

In his Complaint, Campbell claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in retaliatory conduct because of animus toward his exercise of the right to free exercise of religion. (Campbell Compl. ¶ 139.)

Defendants move for summary judgment. The elements of the claim are presented in the Gordon and Bennett sections above. For the reasons stated in those sections, Campbell has failed to identify sufficient evidence to support this claim. Summary judgment is granted for all Defendants.

### VII. Common Law Assault and Battery (physical acts)

**\*32** Campbell alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig are liable for assault and battery because they struck him with nightsticks. (Campbell Compl. ¶ 174.) Defendants move for summary judgment on the grounds that Campbell identifies no evidence connecting any of the above Defendants to his assault and battery. The elements of assault and battery are outlined in the Bennett section.

Defendants do not address the common law assault and battery claim in their Supporting Memorandum of Law; they first address it in their Reply papers. Defendants focus on the argument that any contact between Campbell and the police was justified or privileged because it occurred in the course of a lawful arrest. (Defs.' Reply Mem. Campbell at 16–17.) Whether there was a lawful arrest and whether the force used to effect it was reasonable are issues for the jury to resolve.

Campbell has identified sufficient evidence to support a claim of assault and battery. His testimony describing his arrest and attack show intentional, physical contact by a number of officers, some of which could be found by a jury to be excessive. Defendants are correct that Campbell does not identity any particular Defendant as the officer who came into physical contact with him. On a summary judgment motion, however, the Defendants have the burden of showing the plaintiff has no claim as a matter of law. Here, Plaintiff claims that the assaults and batteries were by uniformed police officers. Since these officers were the authorized agents of the City of New York, Campbell has a claim for assault and battery based on physical acts against unidentified police officers.

Because Campbell has not offered any evidence or a supporting affidavit identifying any of the named Defendants as his attackers, summary judgment is granted against all named Defendants, but Campbell will be allowed to proceed with his assault and battery against unidentified police officers.

### VIII. Common Law False Arrest

In his Complaint, Campbell alleges that Defendants Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig falsely arrested and imprisoned him. (Campbell Compl. ¶ 183.) Defendants move for summary judgment on the grounds that the only Defendant Campbell can connect to his arrest is Toole. The relevant law is outlined in the Gordon and Bennett sections above.

The elements of false arrest are the same under both § 1983 and common law. The Defendants have the burden of establishing probable cause for the arrest. Crediting Campbell's version for the purpose of summary judgment, there is a genuine dispute of material fact over whether or not there was probable cause for the arrest of Campbell. Campbell claims that he was simply taking pictures when he was assaulted and arrested. (Campbell 56.1 Stmt. ¶¶ 5–8.) Toole claims that Campbell was involved in the altercation surrounding Gordon and that Campbell physically assaulted her. (Toole Dep., 2/19/97, at 114–18.) Defendants concede that there is a material factual dispute with respect to Toole on this claim. (Defs.' 56.1 Stmt. Campbell ¶ 47.) Summary judgment is therefore denied on Campbell's false arrest claim against Toole and unidentified police officers who assisted in his apprehension. Because Campbell does not offer evidence identifying any of the other named Defendants as being involved in his arrest, summary judgment is granted as to the remaining named Defendants.

### IX. Common Law Malicious Prosecution

**\*33** Campbell alleges that Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig are liable for malicious prosecution. (Campbell Compl. ¶ 186.) Defendants move for summary judgment. The elements of malicious prosecution have been set forth the Gordon section above.

The only Defendant shown by any evidence to have been involved in the prosecution of Campbell is Toole, who signed a criminal complaint alleging that he assaulted her. (Pls.' Gen. 56.1 Stmt., Ex. 27H.) Campbell does not offer any evidence that any of the other named Defendants were involved in his prosecution. Accordingly, summary judgment is granted for Defendants Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, and Craig.

There is a genuine dispute of material fact with regard to Defendant Toole. Toole signed the criminal complaint that initiated the prosecution of Campbell. (*Id.*) Crediting Campbell's version of events, Toole did not have probable cause to arrest him or to initiate criminal proceedings against

him. Defendants agree that this is in dispute. (Defs.' 56.1 Stmt. Campbell ¶ 47.) Furthermore, Campbell has offered sufficient evidence of malice to survive summary judgment. Plaintiffs are not required to show direct evidence of malice. If the jury finds Campbell's testimony credible, they may find that Toole initiated the criminal prosecution for the improper motive of covering up his false arrest. [41] Juries may infer malice from a lack of probable cause. *See id.* ("New York courts have held that the existence of malice may be inferred from a finding that defendants lacked probable cause to initiate criminal proceedings." (citing *Maxwell v. City of New York,* 554 N.Y.S.2d 502, 505–506 (1st Dep't 1990)).

[41]    *See Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994) (noting that "New York courts traditionally consider the issue of malice to be a jury question" (citations omitted)).

Summary judgment is denied on Campbell's malicious prosecution claim against Toole.

### X. Common Law Intentional Infliction of Emotional Distress

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for intentionally inflicting emotional distress on him. (Campbell Compl. ¶ 189.) Campbell's claims of emotional distress include insomnia, headaches, loss of appetite, fearfulness, flashbacks, and nightmares. (Campbell 56.1 Stmt. ¶ 17.) The elements of this tort are outlined in the Gordon section above.

However, Campbell does not offer evidence sufficient to support this claim. There is no showing that any Defendant intentionally engaged in "extreme and outrageous conduct." To the extent that Campbell suffered emotional distress, he may present evidence of these injuries in the damages phase of his claims for false arrest and assault and battery.

Summary judgment is granted for all Defendants.

### XI. Common Law Negligent Infliction of Emotional Distress

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for negligently inflicting emotional

distress on him. (Campbell Compl. ¶ 192.) Defendants move for summary judgment. The elements of this tort are discussed in the Gordon section above.

**\*34**  Campbell does not show negligent acts resulting in severe emotional distress. The acts he testifies to are intentional, not negligent. Summary judgment is granted for all Defendants.

### XII. Common Law Conspiracy

In his Complaint, Campbell claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him. (Campbell Compl. ¶ 195.) Defendants move for summary judgment.

Campbell presents no evidence of a conspiracy. Summary judgment is granted for all Defendants.

### XIII. Common Law Negligence

Campbell alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for negligently causing severe physical injuries and extreme emotional distress. (Campbell Compl. ¶ 198.) Defendants move for summary judgment.

Campbell's claims are for intentional acts against him. He has failed to offer evidence to support a claim of negligence. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

### Conclusion

Summary judgment is denied on the following claims by Campbell:

1.  § 1983 false arrest against Toole

2.  common law assault and battery (physical acts) against unidentified officers

3. common law false arrest against Toole and unidentified officers

4. common law malicious prosecution against Toole.

Summary judgment is granted on the following claims by Campbell:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 false arrest against Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

3. § 1983 failure to intervene or protect against all Defendants

4. § 1983 failure to properly supervise against all Defendants

5. § 1983 denial of medical treatment against all Defendants

6. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

7. common law assault and battery (physical acts) against Toole, Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

8. common law false arrest against Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

9. common law malicious prosecution against Parrish, Prendergast, Wiencko, Barberi, Webber, Moloney, Craig

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

### Oniel Thompson's Claims

Oniel Thompson arrived at the UCC to attend the revival around 10 p.m. on August 20, 1995. (Thompson's 56.1 Stmt. ¶ 1.) He was not present at the UCC at the time the

Warsop incident occurred. (Id. ¶ 3.) After the service ended, Thompson was standing outside the gate on Sutphin, talking with Campbell, when Sister Jewel Fraser ran toward them screaming, "They are beating on Horace ." (Thompson's 56.1 Stmt., Ex. 1, at 57–58.) In his deposition, Thompson testified that he approached the corner of Ferndale and Sutphin and observed someone hitting Gordon. (Id. at 59–60.) He described this person as a white male, between six foot five and six foot six, in plain clothes with a walkie-talkie and a flashlight. (Id. at 61–62.) He also testified that this person was Barberi. (Id. at 127–28.) In his CCRB interview, which occurred a little over three months before his deposition, he described this individual as a white male, approximately six foot five, two hundred fifty pounds, in his twenties. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 3–4.)

**\*35** According to Thompson, as he and others approached Barberi and Gordon, Barberi told everyone to move back, and then he started spraying mace at everyone. [42] (Thompson's 56.1 Stmt., Ex. 1, at 63.) Thompson testified that he got sprayed in the eyes. (Thompson's 56.1 Stmt. ¶ 5.)

[42]    Barberi testified that he sprayed mace into the crowd assembling around Gordon in order to defend himself from their attacks. (Barberi *Dep.*, 2/5/97, at 136.)

At this point, Thompson started to go back to the church when an officer grabbed him and threw him to the ground (Thompson's 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. Thompson ¶ 21.) Thompson testified that he was then punched and kicked, he was thrown against the windshield of a car, hitting his head, he was slammed against a police van, and he was handcuffed and taken to a police car. (Thompson's 56.1 Stmt. ¶ 7; Defs.' 56.1 Stmt. Thompson ¶¶ 21–27).

There is a dispute over the number and identities of officers involved in this alleged excessive force and false arrest. According to Thompson's testimony, it appears that at least two and as many as six officers were involved. (Defs.' 56.1 Stmt Thompson., Ex. J, at 5; Thompson's 56.1 Stmt., Ex. 1, at 64–78.) Thompson cannot offer descriptions for some of the officers, but for others he describes race, weight, and height. (Defs.' 56.1 Stmt. Thompson ¶¶ 22, 25, 28, 29, 30, 31, 32, 37; Thompson's 56.1 Stmt. ¶¶ 5–7.) In addition, Plaintiff Brian Abraham testified that he observed Barberi use physical force against Thompson. [43] (Abraham 56.1 Stmt., Ex. 1, at 84–85, 90–93, 97.) The only other officer Thompson identifies is Toole, who he claims did not participate in the attack but

was standing near Gordon, Barberi, and himself. (Defs.' 56.1 Stmt., Ex. J, at 7–8, 15.)

[43]    Abraham testified, "I observed this Officer Barberi, I'm not sure of his name. He had a young man with his arm twisted up in the back, and he slammed him up against the car, and then he slammed him on the hood of the car. He slammed him down on the ground." (Abraham's 56.1 Stmt., Ex. 1, at 84.) He later identifies the "young man" as Oniel Thompson. (Id. at 85.) Although Abraham originally, stated he was unsure of Barberi's name, both he and the attorney asking the questions continue to refer to him as Barberi.

According to Toole, she was in the course of attempting to arrest Gordon when a mob of people came at her. (Toole Dep., 2/19/97, at 112–18.) She testified that Thompson tried to take her gun, at which point she pushed him. (Id.) She also testified that Thompson and Campbell were punching and kicking her. (Id.) Although Thompson identifies Toole as being at the scene, he does not claim that she used excessive force against him. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 15 ("Did O'Toole [sic] ever put her hands on you?" "No.").) Thompson told the CCRB interviewer that he may have bumped into Toole while trying to get away from the macing but that he did not try to take her gun. (Defs.' 56.1 Stmt. Thompson, ¶ 16.)

## I. § 1983 False Arrest[44]

[44]    In his Complaint, Thompson makes two claims for false arrest and imprisonment: one specifically against Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney for falsely arresting and imprisoning him (Thompson Compl. ¶ 117) and one against Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko,, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis specifically for false imprisonment (¶ 126). The later claim appears to refer to the mass imprisonment of the UCC members during the surrounding of the UCC grounds. Because the evidence shows that Thompson was already arrested before that imprisonment occurred, the Court grants summary judgment as to this claim. To the extent that Thompson has a false arrest claim

against the specific Defendants who participated in his apprehension and arrest, it is considered above.

In his Complaint, Thompson alleges that Defendants Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney falsely arrested and imprisoned him. (Thompson Compl. ¶ 117.) Defendants moved for summary judgment on the grounds that only Toole was involved in Thompson's arrest and that she had probable cause because Thompson tried to grab her gun. The elements of false arrest are outlined in the Gordon and Bennett sections above.

Although Thompson testified that several officers participated in his apprehension and arrest, the only Defendants shown by the evidence presented on this motion to have had personal involvement in Thompson's arrest are Toole and Barberi. Therefore, summary judgment is granted on Thompson's false arrest claim for Parrish, Wiencko, O'Connor, and Moloney.

**\*36** Summary judgment is denied on Thompson's false arrest claim against Toole. Crediting Thompson's version of events, Toole did not have probable cause to arrest him. Thompson testified that he was attempting to get away from Barberi, who was spraying him with mace, when he was identified by Toole as "He's the one," and the officers and arrested. (Defs.' 56.1 Stmt. Thompson ¶ 17.) There is a conflict between Toole's and Thompson's testimony. Whether or not Thompson attempted to take Toole's gun and assaulted her is an issue of fact for the jury to decide. Summary judgment is denied as to Toole.

Summary judgment is granted on Thompson's false arrest claim against Barberi. The evidence supplied by Abraham is sufficient to show that Barberi was personally involved in his arrest. Nonetheless, the evidence is insufficient to support a false arrest claim against Barberi. Thompson testified that he was attacked and arrest by unidentified police officers after Toole identified Thompson by stating, "He's the one." (Defs.' 56.1 Stmt. Thompson, Ex. G, at 64–76, Ex. J, at 7.) The arrest and assault on Thompson occurred after his identification by Toole. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 7.) Barberi, an apprehending officer, was entitled to rely on the statement of his fellow officer in arresting Thompson in the same way that police are entitled to rely on the statements of civilian complaining witnesses. See *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (holding that officers "are also entitled to rely on the allegations of fellow police officers" (citing *Bernard v. United States,* 25 F.3d 98, 102–03 (2d Cir.1994)). Any involvement he had in the arrest is privileged. Summary

judgment is granted for Barberi on Thompson's false arrest claim.

## II. *§ 1983 Excessive Force (physical acts)*

In his complaint, Thompson alleges that "The conduct and actions of the unnamed defendant police officers, acting under color of law, in assaulting Oniel Thompson, by hitting and pushing him into two parked vehicles, was done intentionally, maliciously, with a deliberate indifference and/or with a reckless disregard for the natural and probable consequences of their acts." (Thompson Compl. ¶ 120.) Defendants move for summary judgment stating that Thompson was not able to identify any Defendants who used physical force against him and, even if he could, their actions were objectively reasonable. The law of excessive force used in the course of an arrest is outlined in the Gordon section above.

Defendants acknowledge that Thompson testified to numerous actions of physical force used against him. (Defs.' 56.1 Stmt. Thompson ¶¶ 21–39; Thompson 56.1 Stmt. ¶¶ 5–7.) This testimony describes actions sufficiently serious, and the Court cannot find that, as a matter of law, they were objectively reasonable. Whether the degree of force used was reasonable in arresting Thompson is a question for the jury.

Based on the record on this motion, there is evidence that Barberi participated in the physical attack against him; therefore, summary judgment is denied as to Barberi. Because Thompson has not offered evidence identifying any other officer who participated in the use of force against him, no other officers are liable in his § 1983 action for excessive force based on physical acts. A § 1983 action cannot be maintained against unknown defendants. *See* the Bennett section on excessive force above. Summary judgment is granted for "unnamed defendant police officers" on this claim.

## III. *§ 1983 Excessive Force (noxious gas)*

**\*37** Thompson also brings an excessive force claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin on the allegation that they, "acting individually and in concert with each other" assaulted Thompson by spraying him with and exposing him to noxious gas. (Thompson Compl. ¶ 123.) Defendants move for summary judgment on the grounds that, in his deposition, Thompson testified that he was sprayed by an officer in plain clothes and that, of the named Defendants, only Maple was

in plain clothes. Defendants also argue that any use of force was justified.

Thompson testified that one officer who was approximately six foot six sprayed him (and the crowd) with mace. Barberi is the only Defendant who fits Thompson's description.[45] At one point in his testimony, Thompson identified the officer who sprayed him as Barberi. Although he does not admit to spraying Thompson in particular, Barberi does admit that he sprayed mace into the crowd gathering around Gordon's arrest. In addition, Thompson's description of the officer who maced him and who he later identified as Barberi is not entirely inconsistent. Thompson has presented no evidence that any other individual sprayed him with mace. Thompson's factual account of events does not support a claim for excessive force based on noxious gas against anyone but Barberi. Summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

[45]    Thompson's description of the sex, race, weight, height, and age of the officer are consistent with a description of Barberi. In addition, Barberi admits to being present and involved in the struggle with Gordon and admits to spraying mace on the approaching crowd. Thompson's description of the officer as being in plain clothes instead of uniform is not inconsistent with a description of Barberi.

Summary judgment is denied on Thompson's claim of excessive force based on noxious gas against Barberi.

## IV. *§ 1983 Failure to Intervene or Protect*

Thompson alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for failing to intervene or protect him from the unauthorized, unjustified, and unreasonable treatment he was subjected to by the various Defendants. (Thompson Compl. ¶ 129.) Defendants move for summary judgment on the basis that no named Defendant was involved in or aware of what happened to Thompson. The law on failure to intervene claims is outlined in the Gordon section above.

Summary judgment is granted for all Defendants on this claim. Thompson, like Campbell and the other arrested

Plaintiffs, has not identified evidence supporting this claim. He has not offered any evidence to show that any Defendant was in a position to intervene. *See* Campbell section above. Summary judgment is granted for all Defendants.

### V. *§ 1983 Failure to Properly Supervise*

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast are liable for failing to supervise their subordinate officers, Defendants Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. (Campbell Compl. ¶ 132.) Defendants move for summary judgment because Thompson has not submitted any evidence to show that any supervisory personnel who were or should have been aware of Thompson's arrest and assault.

**\*38** Like Campbell, Thompson has not shown facts sufficient to make this claim. Although Thompson need not show direct participation by each Defendant, he must make some showing of personal involvement as explained in *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) and *Blyden v. Mancusi,* 186 F.3d 252, 264–65 (2d Cir.1999). Plaintiff has failed to do so. Summary judgment is granted for all Defendants.

### VI. *§ 1983 Denial of Medical Treatment*

In his Complaint, Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Thompson Compl. ¶ 135.) Defendants move for summary judgment on the grounds that Thompson did not have injuries and did not seek treatment. The relevant law is explained in the Gordon and Bennett sections above.

In his deposition, Thompson testified that, when he arrived at the precinct after his arrest, he asked an officer for treatment for the effects of the noxious gas, and that the officer said nothing. (Thompson's 56.1 Stmt., Ex. 1, at 108–09.) In addition, in his CCRB interview, Thompson testified that when he was in the patrol car after he was arrested, he asked the officer who closed the door if he could get medical treatment " ' so I can get this mace out of my eyes,' " and that the officer just looked at him and closed the car door. (Defs.' 56.1 Stmt. Thompson, Ex. J, at 20.) On the basis of

this evidence, crediting either version, Thompson does show that he requested but was denied medical treatment. This is not, however, the test for the constitutional claim of denial of medical treatment. As is discussed in the Gordon and Bennett sections above, a plaintiff must show that a named defendant denied him medical treatment for a serious medical condition due to deliberate indifference. *See Weyant v. Okst,* 101F.3d 845, 856 (2d Cir.1996).

Thompson has not offered evidence to support his claim that any injuries he sustained were serious. Plaintiff does not offer evidence of any medical treatment before the date of July 25, 1996, eleven months after the incident. (Thompson 56.1 Stmt., Ex. 5.) In response to the question "Were there any medical conditions for which you required immediate attention that evening?" he answered "No." (Thompson's 56.1 Stmt., Ex. 1, at 109.) Furthermore, Thompson has not identified evidence suggesting that he was visibly injured or that he had any immediate injuries other than that his eyes were burning from the mace. Summary judgment is granted for all Defendants.

### VII. *§ 1983 Unlawful Retaliation for First Amendment Conduct*

Thompson alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him because he exercised his right to freedom of religion. (Thompson Compl. ¶ 138.) Defendants move for summary judgment. The relevant law is outlined in the Gordon section above.

**\*39** Thompson fails to provide evidentiary support for his claim of unlawful retaliation for his participation in a First Amendment activity. Summary judgment is granted for all Defendants.

### VIII. *Common Law Assault and Battery (physical acts)*

Thompson makes a claim for assault and battery against "the unidentified defendant police officers who hit and pushed [him] into two parked vehicles." (Thompson Compl. ¶ 170.) Defendants move for summary judgment on the grounds that the force used was "reasonable and not actionable." (Defs.' Mem. in Supp. Thompson at 9.) The law of assault and battery is outlined in the Bennett section above.

2000 WL 1538019

Thompson offers evidence of the use of force by Barberi and several other unidentified officers who participated in his apprehension. *See* § 1983 excessive force section for Thompson above. He has presented sufficient evidence to survive a motion for summary judgment. Summary judgment is denied for Barberi and unidentified police officers on Thompson's claim of assault and battery for physical acts.

*IX. Common Law Assault and Battery (noxious gas)*
Thompson also brings an assault and battery claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin for spraying him with or exposing him to noxious gas. (Thompson Compl. ¶ 173.) Defendants move for summary judgment.

Thompson testifies that Barberi sprayed him with mace. He does not offer any evidence that he was sprayed by anyone else or that he felt the effects of mace in the air. Because Thompson does not present evidence of the use of mace by anyone but Barberi, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

Evidence of the direct spraying of mace is sufficient to make out an assault and battery claim. *See* Abraham section above. Summary judgment is denied for Barberi.

*X. Common Law False Arrest*
Thompson alleges that Defendants Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney falsely arrested and imprisoned him without probable cause. (Thompson Compl. ¶ 176.) Defendants move for summary judgment and argue that Toole had probable cause to arrest Thompson.

A claim for false arrest is the same under § 1983 and common law. Based on the analysis in Thompson's § 1983 claim, summary judgment is granted for Defendants Parrish, Wiencko, Barberi, O'Connor, and Moloney, and summary judgment is denied for Defendant Toole.

*XI. Common Law Malicious Prosecution*
In his Complaint, Thompson alleges that Defendants Parrish, Toole, Wiencko, Barberi, O'Connor, and Moloney maliciously prosecuted him. (Thompson Compl. ¶ 179.) Defendants move for summary judgment on the grounds that

Thompson cannot prove the elements of lack of probable cause and malice. The relevant law is outlined in the Bennett section above.

**\*40** Thompson does not show that Defendants Parrish, Wiencko, Barberi, O'Connor, and Moloney were involved in his prosecution. Summary judgment is granted for those Defendants.

Summary judgment is denied for Toole. If the jury credits Thompson's testimony, they could find that Toole did not have probable cause to arrest Thompson and that she signed participated in his criminal prosecution out of malice. *See* Campbell section above.

*XII. Common Law Intentional Infliction of Emotional Distress*
Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for intentional infliction of emotional distress. (Thompson Compl. ¶ 185.) Defendants move for summary judgment.

Thompson has not presented sufficient evidence to support this claim. Summary judgment is granted for all Defendants.

*XIII. Common Law Negligent Infliction of Emotional Distress*
Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently inflicted emotional distress on him. (Thompson Compl. ¶ 188.) Defendants move for summary judgment.

Thompson has not presented evidence of negligent conduct. Summary judgment is granted for all Defendants.

*XIV. Common Law Conspiracy*
Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to deprive him of his

Constitutional and common law rights. (Thompson Compl. ¶ 191.) Defendants move for summary judgment.

Thompson offers no evidence to support his claim of a conspiracy. Summary judgment is granted for all Defendants.

*XV. Common Law Negligence*

Thompson alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for damages he alleges he sustained as a result of their negligent conduct. (Thompson Compl. ¶ 194.) Defendants move for summary judgment.

Thompson does not offer evidence of negligent conduct. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Thompson:

1. § 1983 false arrest against Toole

2. § 1983 excessive force (physical acts) against Barberi

3. § 1983 excessive force (noxious gas) against Barberi

   **\*41**  4. common law assault and battery (physical acts) against Barberi and unidentified police officers

5. common law assault and battery (noxious gas) against Barberi

6. common law false arrest against Toole

7. common law malicious prosecution against Toole

Summary judgment is granted on the remaining claims by Thompson:

1. § 1983 false arrest against Defendants Parrish, Wiencko, O'Connor, Moloney, Barberi

2. § 1983 excessive force (physical acts) against unnamed Defendants

3. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

4. § 1983 failure to intervene for all Defendants

5. § 1983 failure to supervise for all Defendants

6. § 1983 denial of medical treatment for all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct for all Defendants

8. common law assault and battery (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin

9. common law false arrest against Defendants Parrish, Wiencko, O'Connor, Moloney, Barberi

10. common law malicious prosecution against Defendants Parrish, Wiencko, O'Connor, Moloney, Barberi

11. common law intentional infliction of emotional distress for all Defendants

12. common law negligent infliction of emotional distress for all Defendants

13. common law conspiracy for all Defendants

14. common law negligence for all Defendants

Brian Abraham's Claims

Abraham arrived at the UCC to attend the revival around 7 p.m. on August 20, 1995. (Abraham's 56.1 Stmt. ¶ 1.) After the service, Abraham and his wife walked to their car to leave when they noticed a commotion at the corner of Sutphin and Ferndale Avenues. (*Id.* ¶ 2.) According to Abraham, he observed Barberi using force against Thompson. (*Id.* ¶ 3; Defs.' 56.1 Stmt. Abraham ¶ 2.) Abraham testified that as he approached Barberi, Barberi shoved him in the chest, and he stumbled back. (Abraham 56.1 Stmt. ¶ 4; Defs.' 56.1 Stmt. Abraham ¶ 3.) As a result of this contact, Abraham suffered "minor bumps and bruises." (Abraham 56.1 Stmt. ¶ 5.)

Abraham was also one of the numerous UCC members who was contained within the fence following the general melee. He asserts that he was detained against his will and was unable to leave until the morning of August 21, 1995. (Abraham 56.1 Stmt. ¶ 11; Abraham Resp. to Defs.' 56.1 Stmt. ¶ 16.) Abraham also claims that he experienced a burning sensation as a result of the pepper spray. (Defs.' 56.1 Stmt. Abraham ¶ 9.) It is unclear whether or not he was directly sprayed. In his deposition, Abraham testified only that he saw Barberi spraying pepper spray at the gate and that he later felt pepper spray in the air. (Defs.' 56.1 Stmt. Abraham, Ex. B, at 119.) [46]

[46]    Abraham denies Defs.' 56.1 Stmt. ¶ 8 that he was not sprayed directly, stating, "Defendants did not ask plaintiff if he had been directly sprayed during his deposition. Plaintiff was directly sprayed." (Abraham's Resp. to Defs.' 56.1 Stmt. ¶ 8.) The exhibit cited in support, however, is Abraham's Response 33 to Defs.' Second Set of Interrogatories, which states, "Yes. I was sprayed twice by Officer Barberi. I was near the Sutphin Boulevard gate the first time, and in the fenced in area, halfway between the Sutphin Boulevard gate and Ferndale Avenue the second time." Although answers to interrogatories are generally admissible under Federal Rule of Civil Procedure 56(c), Abraham's answers are not signed by him in accordance with the requirements of Rule 33(a)(2). Therefore, the responses to the interrogatories are not admissible evidence and cannot be considered by the Court on these motions for summary judgment.

### I. § 1983 Excessive Force (physical force)

**\*42**  Abraham alleges that Barberi used excessive force against him by pushing him in violation of his constitutional rights under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the Constitution. (Abraham Compl. ¶ 98.) Barberi moves for summary judgment on the grounds that the allegation of excessive force did not occur in the context of an arrest or seizure and that the allegation of non-arrest force does not shock the conscience. Abraham argues that the use of force occurred within the context of a seizure, that the Fourth Amendment applies, and that, under any standard, the allegation should survive summary judgment.

According to Abraham's own testimony, Barberi shoved him before he was enclosed in the fenced area. In fact, it appears Abraham was able to enter and exit the fenced area after

Barberi shoved him. Because the physical force Abraham testified about was not in the context of an arrest or seizure, the Fourteenth Amendment applies. *See Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995); *Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998). Thus, the test for excessive force is whether or not Barberi's conduct "shocks the conscience." *See Rodriguez,* 66 F.3d at 477. This Court finds that a single push that caused no more than minor injuries would not shock the conscience of a reasonable jury. Abraham approached an individual whom he knew to be a police officer while that officer was attempting to arrest an individual. Abraham's testimony describing the incident is, "What we are looking at, as if he is the officer, and he is in charge, and he wants a free rein to arrest this guy or whatever. And here I am standing there. He just reached out and pushed me back (indicating) as though to get out of the way and—or whatever the case may be." (Abraham's 56.1 Stmt., Ex. 1, at 96.) Given the chaotic atmosphere at the time and the fact that Abraham approached an officer attempting to arrest an individual, a single shove that caused him to fall either to the ground or against a tree and that resulted in only "minor bumps and bruises" does not shock the conscience. [47] (Abraham's 56.1 Stmt., Ex. 1, at 95–97.) Accordingly, motion for summary judgment is granted for Barberi on Abraham's excessive force claim based on physical acts.

[47]    Even if such conduct would shock the conscience of a reasonable jury, Barberi is evidently entitled to qualified immunity because the conduct occurred before the Second Circuit "clearly established [a] substantive due process right to be free from use of excessive force" for non-arrestees and non-prisoners. *Rodriguez,* 66 F.3d at 477.

### II. § 1983 Excessive Force (noxious gas)

Abraham also makes a claim for excessive force against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin on the grounds that they used excessive force against him "by spraying with or otherwise exposing to each plaintiff a noxious gas, to wit, either mace or pepper spray." (Abraham Compl. ¶ 104.) Defendants move for summary judgment.

Summary judgment is granted for all Defendants. Although Parrish, De Lorenzo, and others acknowledge using pepper spray during an altercation at the gate and Abraham testified that he saw Barberi using pepper spray at the gate (Abraham's 56.1 Stmt., Ex. 1, at 119), Abraham also testified that he was

not at the gate (*Id.* at 103–04). Abraham testified that he later felt pepper spray in the air and that the pepper spray caused burning, especially in his eyes. (Defs.' 56.1 Stmt. Abraham, Ex. B, at 103–04, 119.) [48] Abraham presents no evidence that he was directly sprayed with pepper spray. He also admits that he did not report any injury to the police or EMS or seek medical care for the burning. (Defs.' 56.1 Stmt. Abraham ¶ 32.) Abraham has not presented evidence that he was sprayed by Barberi or another other particular Defendant; he has only testified that he observed Barberi spraying at the gate and that he later felt the effects of mace in the air. This is not a sufficient showing of personal involvement of a defendant for a § 1983 claim of excessive force. *See* the Bennett section above.

[48]   As explained above, Abraham's attorney's Response 33 to Defendants' Second Set of Interrogatories does not comply with the Federal Rules of Civil Procedure and therefore cannot be considered as evidence.

**\*43** Summary judgment is granted for all Defendants.


### III. § 1983 *False Imprisonment*

In his Complaint, Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis imprisoned him against his will. (Abraham Compl. ¶ 107.) Defendants move for summary judgment on the grounds that there is no evidence that Abraham was involuntarily confined. Abraham argues that the police presence surrounding the UCC fence prevented him from leaving. The elements of a claim for false arrest and false imprisonment are the same. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991). The law is analyzed in the Gordon and Bennett sections above.

Because a claim for false arrest is "substantially the same" whether it arises under § 1983 or New York law, both claims will be analyzed under the same standard. *See Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citations omitted); *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991) (noting that, "save for the requirement that the constitutional tort be under color of state law, both torts are 'substantially the same' " (quoting *Raysor v. Port Auth.,* 768 F.2d 34, 39–40 (2d Cir.1985))). To establish a claim for false arrest or false imprisonment, a plaintiff must show that " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff

was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (quoting *Broughton v. State,* 373 N.Y.S.2d 451, 456 (1975)).

Abraham has identified evidence supporting each of these elements. Which Defendants are responsible is a separate question. Abraham offers evidence establishing the arrival times of several supervisory officers and shows that they were present for part of the time of the alleged imprisonment. Specifically, Anemone, Maple, Chapman, Devlin, and Parrish were all present and in charge during at least part of the police deployment and mobilization during which the UCC was surrounded by police. [49] (Pls.' Gen. 56.1 Stmt. ¶¶ 3, 4, 5, 6, 8.) Plaintiff has shown that all of these supervisors were in charge at some point in time during the period he testified he believed that he was not free to leave. In particular, Parrish has testified that he was the ranking officer on the scene until he was relieved by Devlin and that he proceeded immediately to the mouth of the gate and gave the order to spray mace at the people. (*Id.,* Ex. 20, at 130–38.) Summary judgment is therefore denied on Abraham's false imprisonment claim against Defendants Anemone, Maple, Chapman, Devlin, and Parrish.

[49]   This activity apparently initiated the ensuing false imprisonment period which ended some four hours later.

Summary judgment is granted for the remaining Defendants. To the extent that Plaintiff can establish any of these Defendants even participated in the false imprisonment, there is no evidence that they were doing anything other than following orders from superiors and could not have left the scene had they wanted to. Therefore these individual acts did not amount to false imprisonment and the remaining Defendants are entitled to qualified immunity for any participation in the false imprisonment.


### IV. § 1983 *Failure to Intervene*

**\*44** Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene or protect him from "the unauthorized, unjustified, and unreasonable treatment at the hands of the other defendants." (Abraham Compl. ¶ 110.) Defendants move for summary judgment on the grounds that

Abraham has not offered specific evidence showing a failure to intervene by any Defendant. The relevant law is identified in the Gordon section above.

Summary judgment is denied for Defendants Anemone and Maple. Abraham has offered evidence to show a genuine dispute of material fact for those Defendants. Abraham has presented evidence that these Defendants were present at the time of his alleged false imprisonment, were aware of such alleged unauthorized, unjustified, and unreasonable treatment, and had a reasonable opportunity to intervene and prevent that treatment. This is sufficient to meet the standard of *Anderson v. Branen,* 17 F.3d 552, 559 (2d Cir.1994) with respect to his claim of false imprisonment. Summary judgment is denied for Defendants Maple and Anemone. [50]

[50]    Abraham may proceed with his claim of failure to intervene and protect against Anemone and Maple only as it relates to their failures to intervene in the false imprisonment. There is no evidence that these Defendants were present or in a position to intervene during the general melee. Plaintiff may not present evidence of this claim as it relates to events other than false imprisonment.

Summary judgment is granted for all other Defendants. Abraham identifies no specific evidence that any other Defendant who was present was in an authoritative position, was aware of the imprisonment and failed to intervene.

*V. Unlawful Retaliation for First Amendment Conduct*
Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him for his First Amendment conduct. (Abraham Compl. § 113.) Defendants move for summary judgment. The relevant law is identified in the Gordon section above.

Abraham has offered no evidence that shows any of the Defendants' actions were a result of the Defendants' animus toward Abraham for having exercised his First Amendment rights to free exercise of his religion. Summary judgment is granted against all Defendants.

*VI. § 1983 Failure to Supervise*

Abraham claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast "failed to exercise appropriate command functions, thereby acquiescing to and acknowledging the improper actions" of Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. (Abraham Compl. ¶ 116.) Defendants moved for summary judgment.

Supervisors may be liable for the constitutional violations of their subordinates if there is a showing of personal involvement. A supervisor can be personally involved by: (1) directly participating in a violation, *see Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886–87 (2d Cir.1991) (citations omitted); (2) learning of a violation and failing to correct it, *see Williams,* 781 F.2d at 323–24; (3) creating or allowing the continuance of a policy or custom under which violations occur, *see id.;* (4) grossly negligent management, *see id.;* or (5) demonstrating "gross negligence" or "deliberate indifference" by "failing to act on information indicating that unconstitutional practices are taking place," *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). As the Second Circuit has defined personal involvement, Plaintiff must show that a supervisor participated in the violation, had knowledge of the violation, or should have had knowledge of a violation in order to be personally liable under § 1983. *See Blyden v. Mancusi,* 186 F.3d 252, 264–65 (2d Cir.1999). Holding a high position in the administration alone is not enough. *See Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Likewise, there is no respondeat superior liability for supervisors in § 1983 claims. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). Knowledge alone, however, can be enough for liability. *See, e.g., Rivera v. Coughlin,* No. 92 Civ. 3404(SS), 1994 WL 263417, at *5 (S.D.N.Y. June 13, 1994) (noting that "[a]n informed official who knows of an illegal policy or custom and permits it to continue is liable under § 1983" (citations omitted)). Whether the defendant is a supervisor or not, a plaintiff must allege some form of personal involvement for each defendant.

**\*45** Summary judgment is denied for Defendants Anemone and Maple on Abraham's claim of failure to supervise as it related to the alleged false imprisonment violation. As explained in the failure to intervene and protect section above, Abraham has offered sufficient evidence that Anemone and Maple failed to properly supervise their subordinates and that this contributed to the false imprisonment.

2000 WL 1538019

Summary judgment is granted for all other Defendants as it relates to the false imprisonment claim and for all Defendants for any failure to supervise relating to the physical acts against Abraham by Barberi. There is no evidence showing that any specific Defendant was present and aware of that act.

### VII. § 1983 Denial of Medical Treatment

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis "refus[ed] to take any steps to provide [him] with medical care to address a serious medical need, despite having full knowledge that it was necessary and warranted under the circumstances." (Abraham Compl. § 119.) Defendants move for summary judgment on the grounds that Abraham did not seek medical treatment and was not injured. The elements of the cause of action are outlined in the Gordon section above.

To establish a claim of denial of medical treatment, a plaintiff must show both that an official denied him treatment needed to remedy a serious medical condition and that he did so because of his deliberate indifference to that need. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). To be liable for deliberate indifference, the charged official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Here, there is a showing that Abraham was denied medical treatment for the time while he was imprisoned in the church yard. Abraham may be able to show deliberate indifference based on the evidence that police officers were spraying mace in a crowd of people, after which the people were not allowed to leave for a period of time, and during which medical attention has not been shown to have been made available. Although the extent of injuries from mace may vary from person to person, the fact that the Defendants were aware that mace had been sprayed puts them on notice that people may be injured, specifically when those people were denied access from leaving. Under the circumstances, a denial of opportunity to leave to obtain medical treatment may constitute an unconstitutional denial of rights.

Although there may be enough to show a denial of treatment, in Abraham's case there is no showing of a need or a serious

medical condition. Abraham testified that he did not report the burning he felt from the mace or any other injuries to the police or EMS. (Defs .' 56.1 Stmt. Abraham, Ex. B, at 119–20.) In addition, he testified that he took his wife to the hospital following the incident on August 21, 1995, but he did not seek treatment for himself. (*Id.* at 116–17.) Abraham offers no evidence that he ever sought medical treatment or that he suffered serious injuries. Summary judgment is granted to all Defendants on Gordon's claim of denial of medical treatment

### VIII. Common Law Assault and Battery (physical acts)

**\*46** Abraham alleges that Barberi "did inflict assault and battery upon [him] by pushing him." (Abraham Compl. ¶ 151.) Barberi moves for summary judgment. The elements of assault and battery are explained in the Bennett section above.

Abraham testified that Barberi hit him in the chest, causing him to fall backward. Abraham has offered sufficient evidence of the elements of both assault and battery. Summary judgment is denied against Barberi on Abraham's assault and battery claim for physical acts.

### IX. Common Law Assault and Battery (noxious gas)

Abraham alleges Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin committed assault and battery "by spraying with or otherwise exposing to each plaintiff a noxious gas." (Abraham Compl. ¶ 157.) Defendants move for summary judgment. The elements of assault and battery are outlined in the Bennett section above.

Abraham has presented evidence that he felt burning from mace sprayed by the police and that mace that was "in the air." As to the mace that was "in the air," Abraham has shown a battery by his testimony that the act of spraying mace by Barberi and other officers was intentional. Abraham need not show that a particular Defendant sprayed him directly with mace. He has shown that officers intentionally sprayed mace and that he came into physical contact with the mace, causing burning. The doctrine of transferred intent applies to the torts of assault and battery. If Plaintiff can show that the act of spraying mace was intentional, the fact that the mace made physical contact with him rather than the intended target does not foreclose his battery claim. *See American Ins. Co. v. Saulnier,* 242 F.Supp. 257, 261 (D.Conn.1965) (" 'If the defendant intends to commit an assault or a battery upon a third person, but succeeds instead in causing an unintended

harmful or offensive contact with the person of the plaintiff, the latter may recover as though the act were intended to affect him.... The intent is said to be 'transferred' to the victim." ' (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, at 33 (2d ed.1955)); RESTATEMENT (THIRD) OF TORTS § 1 (1999). Thus, if Abraham can show that he came into physical contact with the mace sprayed by Defendants, he has a claim for battery.

Summary judgment is denied on Abraham's battery claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish. Plaintiffs have shown evidence that each of these Defendants sprayed mace around the church yard during the night. (Pls.' Gen. 56.1 Stmt., Exs. 21, 22, 37, 47, 51, 55, 68, 71.) Because Abraham offers evidence only of physical contact and not of apprehension of such contact, summary judgment is granted for all Defendants on Abraham's assault claim.

Because Abraham offers no evidence that Defendants Anemone, Maple, Chapman, or Devlin sprayed mace or authorized that spraying, summary judgment is granted for those defendants.

## X. Common Law False Imprisonment

 **\*47** Abraham alleges common law false imprisonment against Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis on the same facts alleged in his § 1983 false imprisonment claim. (Abraham Compl. ¶ 160.) Because a claim for false arrest is analyzed under the same standard for both a § 1983 and a common law claim, the above § 1983 analysis applies. Summary judgment is denied on Abraham's false imprisonment claim against Defendants Anemone, Maple, Chapman, Devlin, and Parrish, but granted for the remaining Defendants.

## XI. Common Law Intentional Infliction of Emotional Distress

Abraham alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, O'Connor, Single, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in conduct that constitutes intentional infliction of emotional harm. (Abraham Compl. ¶ 163.) Defendants move

for summary judgment. The relevant law is presented in the Gordon section above.

Plaintiff fails to offer evidence sufficient to meet the stringent test required under New York law. [51] Summary judgment is granted for all Defendants.

[51]    To the extent that Abraham claims emotional damages from the assault and false imprisonment, he may testify as to these damages in the course of his testimony for the specific torts. This may include any emotional damages he suffered from hearing derogatory comments directed at him while he was imprisoned, as well as emotional damages resulting from the acts of battery and false imprisonment themselves.

## XII. Common Law Negligent Infliction of Emotional Distress

Abraham claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently cause severe emotional distress to him. (Abraham Compl. ¶ 166.) Defendants move for summary judgment.

Abraham offers no evidence of any negligent acts resulting in severe emotional distress. Summary judgment is granted for all Defendants.

## XIII. Common Law Conspiracy

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired together to deprive him of his rights. (Abraham Compl. ¶ 168.) Defendants move for summary judgment.

Abraham's claim for conspiracy is dismissed as to all Defendants. He has offered no proof of a common plan or scheme, *Schlotthauer v.. Sanders,* 545 N.Y.S.2d 196, 197 (2d Dept.1989), and did not even address the claim in his motion papers other than to offer a general denial.

## XIV. Common Law Negligence

2000 WL 1538019

Abraham alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis "negligently caused severe physical injuries, and caused extreme emotional distress." (Abraham Compl. ¶ 171.) Defendants move for summary judgment.

**\*48** Abraham's testimony of the use of physical force and false imprisonment are not evidence of negligence but of intentional acts. Thus, summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Abraham:

1. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

2. § 1983 failure to intervene and protect against Anemone, Maple

3. § 1983 failure to supervise against Anemone, Maple

4. common law assault and battery (physical acts) against Barberi

5. common law battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

6. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Abraham:

1. § 1983 excessive force (physical acts) against Barberi

2. § 1983 excessive force (noxious gas) against all Defendants

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

4. § 1983 failure to intervene against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

5. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

6. 1983 failure to supervise against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

7. § 1983 denial of medical treatment against all Defendants

8. common law assault (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

9. common law assault and battery (noxious gas) against Anemone, Maple, Chapman, Devlin

10. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

11. common law intentional infliction of emotional distress against all Defendants

12. common law negligent infliction of emotional distress against all Defendants

13. common law conspiracy against all Defendants

14. common law negligence against all Defendants

Gerald Bloomfield's Claims

Gerald Bloomfield arrived at the UCC between 7 and 8 p.m. on August 20, 1995 to attend the revival. (Bloomfield's 56.1 Stmt. ¶ 1.) The parties offer no evidence to suggest that Bloomfield was involved in the initial incident with Warsop. After the service had ended, Bloomfield noticed people running outside the gate, at which point he and Keno Reefer also ran out the gate. (Defs.' 56.1 Stmt. Bloomfield ¶¶ 3–4.) According to his testimony, Bloomfield and Reefer ran to the corner of Ferndale and Sutphin where they saw an officer choking Gordon. (*Id.* ¶¶ 4–5.) Bloomfield

asked the officer why he was choking Gordon. (*Id.* ¶¶ 4–6.) Although Bloomfield testified that he had trouble remembering everything, it appears that next Reefer grabbed Gordon around his chest (*Id.* ¶¶ 7–10), and Bloomfield helped to protect Gordon from other officers who were around them (*Id.* ¶ 12). Bloomfield and Reefer both got directly sprayed in the face and neck with pepper spray by a police officer. (*Id.* ¶ 13; Bloomfield's 56.1 Stmt. ¶ 4.) Bloomfield then jumped on top of a car, and the same officer who sprayed him with pepper spray struck him repeatedly in the leg, causing Bloomfield to fall off the car onto the ground. (Bloomfield's 56.1 Stmt. ¶¶ 5–6; Defs.' 56.1 Stmt. Bloomfield ¶¶ 17–20.) Some church members then took Bloomfield back into the church yard. (Defs.' 56.1 Stmt. Bloomfield ¶ 21.) It is undisputed that Bloomfield testified that it was Barberi who sprayed him and that he was not told the identity of Barberi until the next day. (Defs.' 56.1 Stmt. Bloomfield ¶¶ 22–23.) [52]

[52] In his deposition, Bloomfield described the officer who sprayed him and hit him with flashlight as follows: "He was tall, extremely tall, he's the tallest one that I could see out there, he had on a police uniform." (Defs.' 56.1 Stmt. Bloomfield, Ex. B at 139.) When asked if he ever learned the name of the officer who hit and sprayed him, he replied "I was told his name was Barberi." (*Id.*)

### I. *§ 1983 Excessive Force (physical acts)*
**\*49** Bloomfield alleges Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him in that they physically hit him. (Bloomfield Am. Compl. ¶ 96.) Defendants move for summary judgment. The relevant law is set forth in the Gordon and Abraham sections above.

Bloomfield offers evidence showing the personal involvement of Barberi in the use of force against him. His testimony, however, only states that he was struck in the leg. (Bloomfield's 56.1 Stmt. ¶¶ 5–6.) This action did not occur within the course of an arrest. Given that Bloomfield admits that he was approaching and attempting to interfere with an officer making an arrest, this Court finds that such action does not shock the conscience. Summary judgment is granted for Barberi on Bloomfield's claim of excessive force for physical acts.

Bloomfield offers no other evidence showing the personal involvement of any of the remaining named Defendants.

Therefore, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin on Bloomfield's claim of excessive force for physical acts.

### II. *§ 1983 Excessive Force (noxious gas)*
Bloomfield alleges Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him by spraying him with or exposing him to noxious gas. (Bloomfield Am. Compl. ¶ 99.) Defendants move for summary judgment. The relevant law is outlined in the Caliz section above

Bloomfield offers evidence showing the personal involvement of Barberi; therefore, summary judgment is denied on Bloomfield's claim of excessive force as to Barberi for spraying him in the face and neck with noxious gas. Bloomfield offers no evidence showing the personal involvement of any of the other named Defendants. Summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin on Bloomfield's claim of excessive force with noxious gas.

### III. *§ 1983 False Imprisonment*
In his Complaint, Bloomfield alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted to falsely imprison him against his will. (Bloomfield Am. Compl. ¶ 102.) Defendants move for summary judgment. The elements of this claim are explained in the Gordon and Abraham sections above.

Summary judgment is denied as to Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted as to all other Defendants. *See* Abraham section above.

### IV. *§ 1983 Failure to Intervene or Protect*
Bloomfield claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene or protect him from the unjustified

actions of other Defendants. (Bloomfield Am. Compl. ¶ 105.) Defendants move for summary judgment.

**\*50** Summary judgment is denied as to Defendants Anemone and Maple with respect to Bloomfield's claim for false imprisonment. Summary judgment is granted as to all other Defendants. *See* Abraham section above.

### V. § 1983 *Failure to Supervise*

Bloomfield claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, and Prendergast failed to properly supervise Defendants Toole, Wiencko, Barberi, Difede, Webber, Moloney, Single, Craig, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis. Defendants move for summary judgment.

Summary judgment is denied as to Defendants Anemone and Maple on Plaintiff's false imprisonment claim. Summary judgment is granted for all other Defendants as it relates to the false imprisonment and for all Defendants as it relates to Plaintiff's other claims.

### VI. § 1983 *Denial of Medical Treatment*

Bloomfield alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him medical treatment in violation of his rights. (Bloomfield Am. Compl. ¶ 111 .) Defendants move for summary judgment.

Although Bloomfield does claim he sustained some injuries, [53] he has not shown a deliberate indifference. There is no evidence that he attempted to seek medical treatment from any Defendant. Bloomfield has failed to show that any defendants showed deliberate indifference to his medical condition. Summary judgment is granted for all Defendants on Bloomfield's denial of medical treatment claim.

[53]    Bloomfield testified that "[M]y eyes was [sic] burning, my chest was scarred up, my face was itching, burning, whatever the spray had done, I believe my shirt was open or torn, I was in pain. I remember kind of limping around. I was breathing heavy." (Defs.' 56.1 Stmt. Bloomfield, Ex. B, at 170; Bloomfield 56.1 Stmt. ¶ 7 (injures to leg, back, hand).)

### VII. § 1983 *Unlawful Retaliation for First Amendment Conduct*

Bloomfield alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him for his First Amendment conduct. (Bloomfield Am. Compl. ¶ 114.) Defendants move for summary judgment.

Bloomfield has offered no evidence that shows any of the Defendants' actions were a result of their animus toward Bloomfield for having exercised his First Amendment rights to free exercise of his religion. Summary judgment is granted against all Defendants.

### VIII. *Common Law Assault and Battery (physical force)*

Bloomfield claims Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin engaged in acts constituting assault and battery. (Bloomfield Am. Compl. ¶ 146.) Defendants move for summary judgment on the grounds that he was not seriously injured, he was simply attempting to rescue Gordon, and that his claims "are frivolous" and an example of "raw vigilantism." (Defs.' Mem. in Supp. Bloomfield at 9.)

Summary judgment is granted on Bloomfield's assault and battery claim against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin. Bloomfield presents no evidence connecting these Defendants to any attack on him. Summary judgment is denied on his claim against Barberi and unidentified police officers. *See* the Bennett section above.

### IX. *Common Law Assault and Battery (noxious gas)*

**\*51** Bloomfield claims Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Anemone, Maple, Chapman, Brown, and Devlin engaged in acts constituting assault and battery. (Bloomfield Am. Compl. ¶ 149.) Defendants move for summary judgment.

Summary judgment is denied on the noxious gas assault and battery claim against Defendant Barberi. Summary judgment is granted for Anemone, Maple, Chapman, Brown, Devlin, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, and

Papagiannis since there is no evidence that their actions caused Bloomfield to be the victim of assault and battery.

*X. Common Law False Imprisonment*
Bloomfield claims Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him. (Bloomfield Am. Compl. ¶ 152.) Defendants move for summary judgment.

A false imprisonment claim is analyzed in the same way under § 1983 and common law. *See* Abraham section above. Therefore, Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish, and summary judgment is granted for the remaining Defendants.

*XI. Common Law Intentional Infliction of Emotional Distress*
Bloomfield alleges Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in conduct that constitutes intentional infliction of emotional harm. (Bloomfield Am. Compl. ¶ 155.) Plaintiff fails to offer evidence sufficient to meet the stringent test required under New York law. Summary judgment is granted for all Defendants.

*XII. Common Law Negligent Infliction of Emotional Distress*
Bloomfield claims that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently cause severe emotional distress to him. (Bloomfield Am. Compl. ¶ 158.) Bloomfield offers no evidence of any negligent acts resulting in severe emotional distress. Summary judgment is granted for all Defendants.

*XIII. Common Law Conspiracy*
Bloomfield's claim for conspiracy is dismissed as to all Defendants. (Bloomfield Am. Compl. ¶ 161.) He has offered no proof of a common plan or scheme, *Schlotthauer v. Sanders,* 545 N.Y.S.2d 196, 197 (2d Dept.1989), and did not

even address the claim in his motion papers other than to offer a general denial.

*XIV. Common Law Negligence*
Bloomfield alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis "negligently caused severe injuries, and caused extreme emotional distress." (Bloomfield Am. Compl. ¶ 164.) Bloomfield has not presented evidence to support a claim of negligence. Summary judgment is granted for all Defendants. *See* Abraham section above.

**\*52** Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Bloomfield:

1. § 1983 excessive force (noxious gas) against Barberi

2. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

3. § 1983 failure to intervene against Anemone, Maple

4. § 1983 failure to supervise as to the false imprisonment against Anemone, Maple

5. common law assault and battery (physical acts) against Barberi, unidentified police officers

6. common law assault and battery (noxious gas) against Barberi

7. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish
Summary judgment is granted on the remaining claims by Bloomfield:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner,

Papagiannis, Parrish, Anemone, Maple, Chapman, and Devlin

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

4. § 1983 failure to intervene against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

5. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

6. 1983 failure to supervise against Chapman, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

7. § 1983 denial of medical treatment against all Defendants

8. common law assault and battery (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Jason Parke's Claims [54]

[54]    Unlike the other Group A–1 Plaintiffs, Parke does not specify individual defendants for each claim. Rather, he alleges each cause of action against "defendants." The Court will assume for purposes of this motion that Parke is alleging each cause of action against each of the twenty-two named Defendants.

Jason Parke arrived at the UCC for the revival between 6 and 7 p.m. on August 20, 1995. (Parke's 56.1 Stmt. ¶ 1.) Neither party offers evidence that Parke was involved in the initial Warsop incident. After the service, Parke went to his car and was driving on Ferndale toward Sutphin when he observed Barberi and two or three other officers around Gordon. (*Id.* ¶¶ 3–4; Defs.' 56.1 Stmt. Parke ¶ 3.) Parke testified that he observed Barberi drag Gordon with a nightstick to a patrol car. (Parke's 56.1 Stmt., Ex. 1, at 128–133.) According to Parke, at this point in time police were jumping on and trampling people. (*Id.* at 133.) Parke then jumped out of his car and ran toward the church because his family was supposed to be waiting by the church gate for him to pick them up. (*Id.*) Before Parke got to the gate, Barberi took his nightstick and shoved him against a tree, causing him to slip and fall and fracture his finger. (*Id.* at 137–41.) Parke also testified that, during this confrontation, Barberi's nightstick and fists came into contact with Parke's chest. (Defs.' 56.1 Stmt. Parke ¶¶ 8–9.) According to Parke, after he fell to the ground, he ran into the church yard. (*Id.* ¶ 10.)

**\*53** Parke also testified that he was sprayed with mace twice, once in the back (Defs.' 56.1 Stmt. Parke, Ex. B, at 170), and once directly on his face (*Id.* at 170). Parke has not identified who sprayed him either time. (Defs.' 56.1 Stmt. Parke ¶ 20.) In addition to the allegations of force, Parke claims that he was imprisoned in the UCC yard. (Parke's 56.1 Stmt. ¶¶ 10, 11, 14.)

### I. § 1983 Excessive Force (physical acts)

Parke alleges that defendants used excessive force against him by "assaulting [him] by striking [his body] with nightsticks and fists, shoving [him], and causing [him] to fall to the ground." (Parke Compl. ¶ 75.) Defendants move for summary judgment and argue that the alleged conduct does not shock the conscience.

Barberi is the only Defendant who Parke testified made physical contact with him; therefore, summary judgment is granted for all other Defendants. [55]

[55]    Defendants argue that the Court should dismiss Parke's claims against Barberi because they are not plausible. In support of this argument, Defendants claim that Parke "suddenly" identified Barberi during his deposition even though he had failed to do so in his CCRB complaint and his interview with the Queens District Attorney. (Defs.' Mem. in

Supp. Parke at 4; Defs.' 56.1 Stmt. Parke ¶¶ 11–12.) Parke denies this allegation as to the CCRB complaint. (Parke's Resp. to Defs.' 56.1 Stmt. ¶ 12.) Parke neither admits nor denies as to the DA interview. (*Id.* at ¶ 11.) Parke's credibility is not a matter to be decided by the Court on a summary judgment motion. It is an issue for determination by the jury.

According to Parke's testimony, he was not under arrest or seized by the police when Barberi shoved him with his nightstick held between his fists. (Defs.' 56.1 Stmt. Parke, Ex. B, at 146–47.) Because the alleged excessive force did not occur within the context of an arrest or seizure, the Fourteenth Amendment applies. *See* Abraham and Bloomfield sections above. Given Parke's own account of event, UCC members and police officers were running everywhere at the time when he was shoved by Barberi. During such a chaotic event, this Court does not find that the actions of Barberi against Parke were sufficiently heinous for a reasonable jury to find that they shock the conscience. Furthermore, since the event occurred prior to *Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995), Barberi is entitled to qualified immunity for those acts. Summary judgment is granted for Barberi.

## II. § 1983 Excessive Force (noxious gas)

In his Complaint, Parke claims that Defendants deliberately sprayed his face and head with a noxious gas. (Parke Compl. 78.) Defendants move for summary judgment.

It is undisputed that Parke was sprayed in the back and face. (Defs.' 56.1 Stmt. Parke ¶¶ 18–19.) It is also undisputed that Parke has not identified who sprayed him. (*Id.* at ¶ 20.) Because Parke has not shown the personal involvement of any Defendant in the spraying of mace, Parke cannot maintain an action under § 1983. *See* Bennett section above. Summary judgment is granted for all Defendants.

## III. § 1983 False Imprisonment

Parke alleges that Defendants imprisoned him within the church yard without probable cause. (Parke Compl. ¶ 81.) Defendants move for summary judgment on the ground that Parke was not confined. The elements of false imprisonment are explained in the Gordon and Abraham sections above.

In support of their argument that Parke was not falsely imprisoned, the Defendants cite evidence that Parke was able to go outside the gate twice during the four hour period that he

was allegedly imprisoned. (Defs.' 56.1 Stmt. Parke ¶¶ 22–24.) Parke disputes this evidence. (Parke's 56.1 Stmt. ¶ 10; *id.,* Ex. 1, at 189–91; Parke's Resp. to Defs.' 56.1 Stmt. ¶¶ 22–24.)

**\*54** Parke has presented sufficient evidence of false imprisonment to survive this summary judgment motion. Parke and all of the non-arrested Group A–1 Plaintiffs have presented evidence that the there was a large police response to the UCC and that the police were deployed at the exits to the church premises. *See* Abraham section above. Whether or not Parke was imprisoned for a period of time or whether he felt free to leave the UCC premises is a question of fact for the jury. For the reasons stated in the Abraham section above, summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all other Defendants.

## IV. § 1983 Failure to Intervene and Protect

Parke brings a claim against supervisory officer Defendants for failing to intervene and protect him from the unlawful conduct of the subordinate defendants. (Parke Compl. ¶ 90.) Defendants move for summary judgment.

Summary judgment is denied for Defendants Anemone and Maple on Parke's claim that they failed to intervene and protect him during the alleged false imprisonment. Summary judgment is granted for all other Defendants and for any claims relating to the use of force by Barberi. *See* Abraham section above.

## V. § 1983 Failure to Supervise

Parke brings a claim against supervisory officer Defendants for failing properly to supervise the subordinate defendants. (Parke Compl. ¶ 90.) Defendants move for summary judgment.

Summary judgment is denied for Defendants Anemone and Maple on Parke's claim that they failed properly to supervise Defendants who were in authority during the false imprisonment. Summary judgment is granted for all other Defendants and for any claims for failure to supervise the claimed use of force by Barberi. *See* Abraham section above.

## VI. § 1983 Denial of Medical Treatment

Parke alleges that the Defendants denied him necessary medical treatment for his injuries. (Parke Compl. ¶ 84.) Defendants move for summary judgment on the grounds that

Parke had no serious medical injuries. The relevant law for this claim is outlined in the Gordon and Abraham sections above.

Parke testified that he experienced burning from the mace (Parke's 56.1 Stmt., Ex. 1, at 170) and that he sustained other injuries, including a swollen finger, pains in his back, chest, and neck (Defs.' 56.1 Stmt. Parke, Ex. B, at 206–09). However, Parke admits that he did not seek medical treatment on August 20 or 21, 1995. (Defs.' 56.1 Stmt. Parke ¶ 36.) Based on the evidence before the Court, it appears Parke did not seek any medical treatment until June 27, 1996 (Parke's 56.1 Stmt., Ex. 5 (report from Greater Metropolitan Medical Services) and September 12, 1996 (Parke's 56.1 Stmt., Ex. 3 (psychological evaluation)). The seriousness of Parke's injuries is not clear.

Although Parke has offered evidence supporting his claim of injuries, he has not shown that he was denied medical treatment by the any of Defendants' deliberate indifference to his visible injuries. Summary judgment is granted for all Defendants.

## *VII. § 1983 Unlawful Retaliation for First Amendment Conduct*

**\*55** Parke alleges that the Defendants' conduct constitutes unlawful retaliation for his First Amendment conduct. (Parke Compl. ¶ 95.) Defendants move for summary judgment.

Parke fails to offer evidence to support this claim. The only evidence he cites is that he was properly on church property at the time of the incident and that an unidentified officer said to him, "Let your God feed the baby." (Parke's 56.1 Stmt. ¶ 14.) This is insufficient to show that any Defendants' conduct was motivated by animus for Parke's exercise of his right to freedom of religion. [56] Summary judgment is granted for all Defendants.

[56]    To the extent that Parke is alleging emotional and psychological damages from this comment and several other comments containing racial epithets, Parke may offer evidence of the comments and the distress they caused in presenting the damages he has suffered from any false imprisonment or from any assault and battery against him.

## *VIII. Common Law Assault and Battery (physical acts)*

Parke alleges that the Defendants "did inflict assault and battery upon [him]." (Parke Compl. ¶ 109.) Defendants move for summary judgment on the grounds that Parke has failed to show intent and injury.

Parke testified that Barberi shoved him with his nightstick. There is no evidence to suggest that this was not an intentional act. Parke has offered sufficient evidence of an assault and battery. Summary judgment is denied as to Barberi. Summary judgment is granted for all other Defendants.

## *IX. Common Law Assault and Battery (noxious gas)*

Parke also asserts an assault and battery claim against Defendants for the spraying of noxious gas. (Parke Compl. ¶ 109.) Defendants move for summary judgment on the grounds that Parke has not identified who sprayed him. The relevant law for this claim is outlined in the Abraham and Bloomfield sections above.

It is undisputed that Parke was twice sprayed with mace. There is no evidence to suggest that these were not intentional acts. Evidence has been presented on the motion that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish discharged their mace canisters during the August 20–21 incident. Many of these officers admit to discharging mace at the gate, where Parke has testified he was maced in the face. Parke is allowed to proceed with his assault and battery claim against these Defendants. Summary judgment is granted for all other Defendants.

## *X. Common Law False Imprisonment*

Parke alleges that Defendants falsely imprisoned him without cause by surrounding the UCC grounds. (Parke Compl. ¶ 112.) Defendants move for summary judgment. The relevant law is outlined in the Abraham section above.

A claim for false imprisonment is the same under § 1983 and common law. Summary judgment is denied as to Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all other Defendants.

## *XI. Common Law Intentional Infliction of Emotional Distress*

Parke brings a cause of action against Defendants for intentional infliction of emotional distress. (Parke Compl. ¶ 115.) Defendants move for summary judgment.

Parke fails to present sufficient evidence of this claim. *See* sections above. To the extent that Parke claims emotional distress from the use of force, the use of mace, and the false imprisonment, his claim is subsumed under those specific causes of action. To the extent that Parke claims emotional distress from the comments unidentified Defendants made to him while he was falsely imprisoned, he may present evidence of any comments and the distress they caused him during his testimony on false imprisonment.

*XII. Common Law Negligent Infliction of Emotional Distress*

**\*56** Parke alleges that Defendants negligently caused him severe emotional distress. (Parke Compl. ¶ 118.) Defendants move for summary judgment.

Parke's testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XIII. Common Law Conspiracy*

Parke alleges that the Defendants conspired against him to deprive him of his rights. (Parke Compl. ¶ 121.) Defendants move for summary judgment.

Parke does not present evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIV. Common Law Negligence*

Parke alleges that Defendants negligently caused him injuries and distress. (Parke Compl. ¶ 124.) Defendants move for summary judgment.

Parke's testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Parke:

1. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

2. § 1983 failure to intervene and protect during the false imprisonment against Anemone, Maple

3. § 1983 failure to supervise during the false imprisonment against Anemone, Maple

4. common law assault and battery (physical acts) against Barberi

5. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

6. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the following claims by Parke:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against all Defendants

3. § 1983 false imprisonment against remaining Defendants

4. § 1983 failure to intervene and protect against remaining Defendants

5. § 1983 failure to supervise against remaining Defendants

6. § 1983 denial of medical treatment against all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

8. common law assault and battery (physical acts) against remaining Defendants

9. common law assault and battery (noxious gas) against remaining Defendants

10. common law false imprisonment against remaining Defendants

11. common law intentional infliction of emotional distress against all Defendants

2000 WL 1538019

12. common law negligent infliction of emotional distress against all Defendants

13. common law conspiracy against all Defendants

14. common law negligence against all Defendants

Elisha Williams' Claims

Elisha Williams arrived at the UCC for the revival around 7:15 p.m. on August 20, 1995. (Williams' 56.1 Stmt. ¶ 1.) After the revival ended, Williams saw a crowd of people including both UCC members and police officers gathering outside the gate around Gordon, and, as he moved toward the crowd, he observed police officers pulling Gordon. (Williams' 56.1 Stmt., Ex. 1, at 42–45.) Williams testified that he saw the police handcuff Gordon and put him in a squad car, at which point the police returned to the crowd and started grabbing people. (*Id.* at 45.) According to Williams, "the tall police officer" whom he was able to identify as Barberi then pushed him to the ground and lifted his nightstick to hit him but did not in fact hit him. (Defs.' 56.1 Stmt. Williams ¶¶ 2–3.) Bloomfield said, "Leave him alone, just leave him alone." (Defs.' 56.1 Stmt. Williams, Ex. 1, at 46.) At this point, Williams tried to return inside the gate. (Williams' 56.1 Stmt., Ex. 1, at 46 .) Before he got to the gate, he observed an officer spraying mace, and Williams' eyes started to burn. (*Id.* at 47.) It is not clear from the testimony whether the officer sprayed Williams directly or was spraying in the air. (*Id.*) Williams cannot identify the officer who sprayed the mace. (Defs.' 56.1 Stmt. Williams ¶¶ 17–18; Williams' Resp. to Defs.' 56.1 Stmt. ¶¶ 17–18.) At this point, Williams ran in the gate and under the tent. (Williams' 56.1 Stmt., Ex. 1, at 48.)

**\*57** According to Williams, during the chaos some people inside the UCC grounds closed the gate. (Defs.' 56.1 Stmt. Williams ¶ 25.) Some UCC members were still outside the gate and had to enter through the Glassboro gate. (Williams' 56.1 Stmt., Ex. 1, at 48–50.) Williams also testified that unidentified officers pushed on the gate, trying to get in, while UCC members pushed back, trying to keep the gate closed. Williams was able to leave the UCC at daylight the next morning. (Defs.' 56.1 Stmt. Williams, Ex. B, at 57.) As he left, Williams testified that he initially went to the ambulances outside the church to receive medical attention but that he left before receiving treatment because he was afraid of being arrested. (*Id.* at 52–53.)

*I. § 1983 Excessive Force (physical acts)*

Williams alleges that unnamed Defendants used excessive force against him by pushing him. (Williams Compl. ¶ 114.) In his deposition, Williams was able to identify this officer as Barberi. Defendants move for summary judgment on the grounds that Williams' identification of Barberi is not credible and that, if true, the actions alleged do not shock the conscience. The relevant law is outlined in the Abraham and Lewis sections above.

Williams does not allege sufficient evidence to make out a claim of excessive force. Although he does identify Barberi sufficiently as the officer who pushed him and raised his nightstick, these actions did not occur in the course of an arrest. The relevant test, therefore, is found in the Fourteenth Amendment. Williams' own description of the event suggests a chaotic scene with both church members and officers running everywhere as officers tried to grab and arrest certain people. In context of the melee, a reasonable jury could not find a push sufficient force to shock the conscience. Furthermore, under the circumstances revealed by the evidence, Barberi would be entitled to qualified immunity for Williams' § 1983 claim based on *Rodriguez v. Phillips,* 66 F.3d 470 (2d Cir.1995). Summary judgment is granted for all Defendants.

*II. § 1983 Excessive Force (noxious gas)*

Williams also brings an excessive force claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin for spraying him with noxious gas. (Williams Compl. ¶ 123.) Defendants move for summary judgment.

Williams testified that he was affected by noxious gas sprayed by an officer before he went back into the church grounds (Defs.' 56.1 Stmt. Williams, Ex. B, at 46–47), but he was not able to identify the officer. Williams has not presented evidence of the personal involvement of any of the named Defendants sufficient to sustain a § 1983 claim. When asked in his deposition if the officer who sprayed him was the same one who pushed him, he answered, "No, no, no, I don't think it was him, no." (Williams' 56.1 Stmt., Ex. 1, at 47.) Williams has presented no other evidence showing the personal involvement of any Defendant.

**\*58** Summary judgment is granted for all Defendants.

2000 WL 1538019

### III. § 1983 False Imprisonment

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him against his will and without probable cause. (Williams Compl. ¶ 126.) Defendants move for summary judgment on the grounds that Williams has not shown that he was involuntarily detained. The relevant law is outlined in the Abraham section above.

Plaintiff has presented sufficient evidence to support a claim of false imprisonment. Williams has testified that, due to the police deployment, he was not able to leave the UCC grounds during the night. When asked in his deposition if he tried to leave before the morning, he answered, "You can't leave, they came in the line there all night, no one could leave, you can't leave." (Defs.' 56.1 Stmt. Williams, Ex. B, at 57.) Defendants are correct that Williams also testified that it was the UCC people, not the police who closed the gate and that people were able to enter the UCC grounds through a different gate on Glassboro. (Defs.' 56.1 Stmt. Williams ¶¶ 25, 29.) Both of these statements, however, appear to be referring to the beginning of the event as to which there is evidence of false imprisonment. It is not sufficient for Defendants to show that Williams was able to leave later on in the evening or at any time before the next morning. If the Plaintiff was imprisoned without reasonable cause for any period of time there is a false imprisonment. The issues of if and why the UCC members enclosed themselves within the fence, and whether or not the police deployment caused them to do so or prevented them from leaving are questions for the jury, as is the period of time and reasonableness of any imprisonment.

Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants. *See* Abraham section above.

### IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise

Like the other non-arrested Group A–1 Plaintiffs, Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene and protect him from the unjustified treatment he received and that the supervisory officers failed to properly supervise their subordinates. (Williams Compl. ¶¶ 129, 132.) Defendants move for summary judgment.

Both parties present the same facts as they have for each proceeding Plaintiff. The analysis for Williams is the same as for all of the non-arrested Group A–1 Plaintiffs. Summary judgment is denied for Anemone and Maple as to the failure to intervene or supervise while the Plaintiff was falsely imprisoned. Summary judgment is granted for all remaining Defendants.

### V. § 1983 Denial of Medical Treatment

**\*59** Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Williams Compl. ¶ 135.) Defendants move for summary judgment on the grounds that medical treatment was available and that Williams did not have a serious medical need. The relevant law is outlined in the sections above.

Williams testified that when he was allowed to leave the church on the morning of August 21, 1995, he initially stopped at the ambulance for treatment to his eyes and shoulder but that he left before receiving treatment. (Defs.' 56.1 Stmt. Williams, Ex. B., at 60–64.) According to Williams, he left without receiving treatment because he heard from other UCC members that the police were arresting people. (*Id.* at 52, 60–64) Williams claims that he needed treatment for injuries to his shoulder and back and for the effects of the mace on his eyes and chest. (Williams' 56.1 Stmt. ¶¶ 7–8.) He does testify that he saw three doctors, including a psychiatrist, for his injuries, but the evidence before the Court does not reveal the dates of these appointments or the diagnoses. (Defs.' 56.1 Stmt. Williams, Ex. B, at 60–72.)

Williams has not presented evidence that any Defendant was aware of his injuries and that the Defendants denied him medical treatment with deliberate indifference. Furthermore, according to his own testimony, medical treatment was, in fact, made available. Williams testified that he did not stay in the ambulance to receive treatment because he heard that UCC members were being arrested. That testimony does not establish that a Defendant denied Williams medical treatment, nor does it show deliberate indifference by a Defendant.

Summary judgment is granted for all Defendants.

*VI. § 1983 Unlawful Retaliation for First Amendment Conduct*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted in the ways alleged because of their animus toward him and because he was exercising his right to the free exercise of religion. (Williams Compl. ¶ 138.) Defendants move for summary judgment. The elements of this claim are outlined in the Gordon section above.

For the reasons stated in the sections above, this Court finds that Williams has failed to present sufficient evidence to support his claim for unlawful retaliation for First Amendment conduct. Summary judgment is granted for all Defendants.

*VII. Common Law Assault and Battery (physical acts)*

In his Complaint, Williams alleges that an unnamed defendant police officer inflicted assault and battery on him by pushing him. (Williams Compl. ¶ 170.) Defendants move for summary judgment. The law is presented in the Bennett and Abraham sections above.

**\*60** Williams testified that Barberi pushed him to the ground and then raised his nightstick to hit him, but did not actually hit him. For the reasons outlined in sections above, this is sufficient evidence of assault and battery to survive a summary judgment motion. Summary judgment is denied for Barberi.

Williams does not offer any other evidence of physical acts against him; therefore, Summary judgment is granted for all other Defendants.

*VIII. Common Law Assault and Battery (noxious gas)*

Williams also brings an assault and battery claim against Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin alleging that they sprayed him with or exposed him to noxious gas. (Williams Compl. ¶ 179.) Defendants move for summary judgment. The law is outlined in sections above.

Williams testified that he observed an officer spraying mace and that, as a result, his eyes and chest began to burn. Although Williams does not identify which officer sprayed the mace, evidence has been submitted on this motion that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis all sprayed mace during the altercation that night. Williams does not have to establish that a Defendant intended to spray him with mace, only that the act of spraying mace by police officers was intentional. Williams has therefore presented sufficient evidence to proceed with a claim of battery.

Summary judgment is denied for Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish. Williams does not present evidence that Defendants Anemone, Maple, Chapman, or Devlin sprayed mace; therefore, summary judgment is granted for these Defendants.

*IX. Common Law False Imprisonment*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis are liable for falsely imprisoning him against his will without probable cause. (Williams Compl. ¶ 182.) Defendants move for summary judgment.

As is explained in the sections above, a false imprisonment claim is the same under both § 1983 and common law. Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for the remaining Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*

Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in extreme and outrageous conduct that intentionally inflicted emotional distress on him. (Williams Compl. ¶ 185.) Defendants move for summary judgment.

As explained in the sections above, Williams has not presented sufficient evidence of this claim. To the extent that Williams has evidence that he suffered emotional distress, he may present that evidence of damages in conjunction

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

with his other claims. Summary judgment is granted for all Defendants.

*XI. Common Law Negligent Infliction of Emotional Distress*
 **\*61**  Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him severe emotional distress. (Williams Compl. ¶ 188.) Defendants move for summary judgment.

Williams' testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XII. Common Law Conspiracy*
Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to deprive him of his rights. (Williams Compl. ¶ 191.) Defendants move for summary judgment.

Williams has not presented evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIII. Common Law Negligence*
Williams alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him injuries and distress. (Williams Compl. ¶ 194.) Defendants move for summary judgment.

Williams' testimony shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Williams:

1. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

2. § 1983 failure to intervene and protect (as to the false imprisonment) against Anemone, Maple

3. § 1983 failure to supervise (as to the false imprisonment) against Anemone, Maple

4. common law assault and battery (physical acts) against Barberi

5. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

6. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Williams:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against all Defendants

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

4. § 1983 failure to intervene and protect against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

5. § 1983 failure to supervise against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

 **\*62**  6. § 1983 denial of medical treatment for all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct for all Defendants

8. common law assault and battery (noxious gas) against Anemone, Maple, Chapman, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

Gaye Lewis' Claims

Gaye Lewis arrived at the UCC for the revival around 7:20 p.m. on August 20, 1995. (Lewis' 56.1 Stmt. ¶ 1.) She was preparing to leave after the service when she heard a commotion outside the gate and, staying on the fenced church grounds, went to the corner of Sutphin Boulevard and Ferndale to see what was going on. (*Id.* 2.) She testified that she observed several white, male police officers beating and arresting Gordon. (*Id.* 3.) According to Lewis, she was then sprayed through the fence with pepper spray by Barberi. (Defs.' 56.1 Stmt. Lewis, Ex. B, at 34–35.) Lewis testified that she knew it was Barberi because she was able to see his name plate. [57] (Defs.' 56.1 Stmt. Lewis ¶ 14.) Lewis also testified that later when she was trying to close the gate, she tripped, fell, and hurt her knee. ((Lewis' 56.1 Stmt., Ex. 1, at 54.) Finally, Lewis testified that "Officer Greg" hit the fence when they were trying to close it, causing pain and swelling. (Defs.' 56.1 Stmt. Lewis ¶¶ 2–5.) [58]

[57]   Lewis' 56.1 Stmt. ¶ 4 states that she was sprayed not only by Barberi but also by other police officers. Plaintiff presents no admissible evidence to support this. Based on Lewis' deposition, the only Officer she claims sprayed her with mace is Barberi. (Defs.' 56 .1 Stmt. Lewis, Ex. B, at 34–35.)

[58]   Defendants argue that Lewis' identification of the officer as "Greg" and not "Craig" casts doubt on her credibility. The Court notes that both names

sound alike when spoken aloud and that this discrepancy could be the result of something as minor as court reporter error. Furthermore, the CCRB report, which the Defendants cite, is not admissible evidence. This report is a summary of the interview, not a transcript of the interview itself. The Court will hear the evidence identifying Defendant Craig.

*I. § 1983 Excessive Force (physical acts)*

In her Complaint, Lewis alleges that Defendant Craig used excessive force against her because, when he hit the fence, her finger was injured. (Defs.' 56.1 Stmt. Lewis, Ex. B, at 55, 60.) Defendants move for summary judgment on the grounds that this act does not constitute excessive force under the Fourteenth Amendment. The law is outlined in sections above.

Lewis does not present sufficient evidence to show that she was seized at the time her injury occurred. According to her own testimony, it was she and other UCC members who were trying to close the gate. She injured her finger and fell when Craig hit the fence. (Lewis' 56.1 Stmt., Ex. 1, at 54–56.) She was not injured in the course of an arrest or a seizure because the officers were trying to keep the gate open, not close the people in. Therefore, the Fourteenth Amendment Due Process Clause applies. Under these circumstances, the Defendants are entitled to qualified immunity. *See Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995). The conduct of Craig does not shock the conscience, given the context of the melee.

Summary judgment is granted for Defendant Craig.

*II. § 1983 Excessive Force (noxious gas)*

 **\*63**  Lewis alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against her in that they sprayed her with or exposed her to noxious gas. (Lewis Compl. ¶ 130.) Defendants move for summary judgment on the ground that such conduct does not shock the conscience.

Lewis does not present evidence that Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, or Devlin sprayed her with mace. In her deposition, Lewis testified that Barberi sprayed her through the fence. She does not present evidence that she was sprayed by anyone else.

Universal Calvary Church v. City of New York, Not Reported in F.Supp.2d (2000)

2000 WL 1538019

Therefore, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

Summary judgment is denied on Lewis' excessive force claim against Barberi. According to her testimony, Barberi sprayed her and others through the fence near Sutphin and Ferndale. Although there is evidence that the scene was chaotic, there is no evidence that the people who were watching Barberi and Gordon from behind a fence were a danger to Barberi. Whether or not, under the circumstances that the evidence shows Barberi was facing, his spraying of mace on people who were separated from him by a fence shocks the conscience is a question for the jury.

*III. § 1983 False Imprisonment*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned her against her will. (Lewis Compl. ¶ 133.) Defendants move for summary judgment on the grounds that Lewis was not involuntarily confined.

Lewis' claim is similar to Williams' in that both parties present evidence of voluntary movement at certain points in time and inability to leave the church grounds at other points in time. Whether or not and when Lewis was able to leave the UCC grounds is a question of fact for the jury. Lewis has presented sufficient evidence of a large police deployment to maintain a false imprisonment claim. *See* Abraham and Williams sections above.

Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

*IV. § 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise*
Like the other non-arrested Group A–1 Plaintiffs, Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene and protect her from the unjustified treatment she received and that the supervisory officers failed to properly

supervise their subordinates. (Lewis Compl. ¶¶ 136, 139.) Defendants move for summary judgment.

**\*64** Both parties present the same facts as they have for each proceeding Plaintiff. The analysis for Lewis is the same as for all of the non-arrested Group A–1 Plaintiffs. *See* sections above.

Summary judgment is denied for Anemone and Maple as to the failure to intervene and supervise the false imprisonment situation. Summary judgment is granted for all remaining Defendants.

*V. § 1983 Denial of Medical Treatment*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied her necessary medical treatment. (Lewis Compl. ¶ 142.) Defendants move for summary judgment on the grounds that Lewis did not have a serious medical need. The relevant law is outlined in the sections above.

Lewis has not presented evidence that she was denied medical treatment. Furthermore, she has not shown that her injuries were sufficiently obvious or serious to support a constitutional claim. Lewis testified that she sought medical attention for her knee and finger, but not her eyes. The Plaintiff's evidence does not establish when she sought this treatment.

Lewis has made no showing that a Defendant was aware of her injuries and denied her medical treatment out of deliberate indifference to those injuries. Summary judgment is granted for all Defendants.

*VI. § 1983 Unlawful Retaliation for First Amendment Conduct*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis acted in the ways alleged because of their animus toward her and because she was exercising her right to the free exercise of religion. (Lewis Compl. ¶ 145.) Defendants move for summary judgment. The elements of this claim are outlined in the Gordon section above.

For the reasons stated in the sections above, summary judgment is granted for all Defendants. Lewis has not identified sufficient evidence to support her claim.

*VII. Common Law Assault and Battery (physical acts)*
Lewis alleges that Defendant Craig is liable for assault and battery because when he hit the fence, her finger was injured. (Lewis Compl. ¶ 180; Defs.' 56.1 Stmt. Lewis, Ex. B., at 54–56.) Defendants move for summary judgment on the grounds that this Lewis' claims are not credible. The law is outlined in sections above.

Lewis presents sufficient evidence of an intentional physical act to proceed with a claim of assault and battery. According to her own testimony, Craig hit the fence, and her finger was injured. (Lewis' 56.1 Stmt., Ex. 1, at 54–56.) She claims that Craig's acts caused her injuries to her finger and knees. (*Id.*) Although this Lewis' account does not support an act sufficiently severe to show a § 1983 violation, she has presented sufficient evidence of a common law assault and battery. Summary judgment is denied for Craig.

*VIII. Common Law Assault and Battery (noxious gas)*
 **\*65** Lewis alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against her in that they sprayed her with or exposed her to noxious gas. (Lewis Compl. ¶ 186.) Defendants move for summary judgment on the ground that such conduct does not shock the conscience.

Lewis does not present evidence that Defendants Webber, Defendants Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, or Devlin sprayed her with mace. In her deposition, Lewis testified that Barberi sprayed her through the fence. She does not present evidence that she was sprayed by anyone else. Therefore, summary judgment is granted for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin.

Summary judgment is denied on Lewis' assault and battery with noxious gas claim against Barberi. According to her testimony, Barberi sprayed her and others through the fence near Sutphin and Ferndale. This is sufficient evidence of an assault and battery.

*IX. Common Law False Imprisonment*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned her against her will. (Lewis Compl. ¶ 189.) Defendants move for summary judgment on the grounds that Lewis was not involuntarily confined.

A false imprisonment claim is the same under § 1983 and common law. Based on the analysis above, Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in extreme and outrageous conduct that intentionally inflicted emotional distress on her. (Lewis Compl. ¶ 192.) Defendants move for summary judgment.

As explained in the sections above, Lewis has not presented sufficient evidence of this claim. To the extent that Williams has evidence that she suffered emotional distress, she may present that evidence in conjunction with her surviving claims. Summary judgment is granted for all Defendants.

*XI. Common Law Negligent Infliction of Emotional Distress*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused her severe emotional distress. (Lewis Compl. ¶ 195.) Defendants move for summary judgment.

 **\*66** Lewis presents evidence of intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XII. Common Law Conspiracy*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor,

O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against her to deprive her of her rights. (Lewis Compl. ¶ 198.) Defendants move for summary judgment.

Lewis has not presented evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIII. Common Law Negligence*
Lewis alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Pendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused her injuries and distress. (Lewis Compl. ¶ 201.) Defendants move for summary judgment.

The evidence presented by Lewis shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion
Summary judgment is denied on the following claims by Lewis:

1. § 1983 excessive force (noxious gas) against Barberi

2. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

3. § 1983 failure to intervene and protect on the false imprisonment against Anemone, Maple

4. § 1983 failure to supervise on the false imprisonment against Anemone, Maple

5. common law assault and battery (physical acts) against Craig

6. common law assault and battery (noxious gas) against Barberi

7. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Lewis:

1. § 1983 excessive force (physical acts) against Craig

2. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, Devlin

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

4. § 1983 failure to intervene and protect against Anemone, Maple, Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

5. § 1983 failure to supervise on the false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

6. § 1983 denial of medical treatment against all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct against all Defendants

*67 8. common law assault and battery (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

2000 WL 1538019

Andre Pierre's Claims

Andre Pierre arrived at the UCC to attend the arrival around 6:30 p.m. on August 20, 1995. (Pierre's 56.1 Stmt. ¶ 1.) After the service, Pierre was at the corner of Sutphin on Ferndale when he observed a struggle between Gordon and Barberi and another officer. (Pierre's 56.1 Stmt., Ex. 1, at 45–46.) Pierre testified that he recognized Barberi from the earlier incident with Warsop and that he approached Barberi to ask, "What's going on here? What's the matter?" (Id at 46.) According to Pierre, Barberi said, " 'just get back, get back,' " swung a black object at him, striking him on his elbow and poking him in his stomach. (Id.) It is undisputed that Pierre testified that Barberi hit and poked him "in order to get [him] back from the area where police officers were struggling with Horace Gordon." (Defs.' 56.1 Stmt. ¶ 2; Pierre's Resp. to Defs.' 56.1 Stmt. ¶ 2.)

According to Pierre, after observing Caliz, Bennett, and Campbell get arrested, he and other UCC members went get back into the gated area of the church and tried to close the gate. (Pierre's 56.1 Stmt., Ex. 1, at 58–59.) Next, police surrounded the church, and the members were not allowed to leave. (Id. at 60.) Pierre testified that he specifically said and heard officers tell people that they could not leave. (Id. at 60–61.)

Pierre also testified that he saw two officers at the gate entrance attempting to push open the gate and spraying mace on the people near the gate. (Id. at 64–65.) He recognized one of these officers as Barberi, but he has not identified the other one. (Id.) According to Pierre, "[T]hey were just spraying at random. They were just spraying down the line. I mean, I got sprayed. Everybody next to me, the people in front of me, the side of me. Everybody that was at the fence at that particular moment, you know, got sprayed or affected by the spray." (Id. at 65.) As a result of the spraying mace, Pierre experienced burning his eyes and shoulders. (Id. at 73–74.)

I. § 1983 Excessive Force (physical acts)
Pierre alleges that Defendant Barberi used excessive force against him when he hit and pushed him. (Pierre Compl. ¶ 134.) Defendants move for summary judgment on the grounds that this act does not constitute excessive force under the Fourteenth Amendment. The law is outlined in sections above.

*68 Pierre's own account of the event is that he approached Barberi while Barberi was attempting to arrest Gordon and that Barberi pushed him back in order to get him away from the site of the arrest. This conduct as testified to by Pierre would not be sufficient for a reasonable jury to find it would shock the conscience and thus constitute excessive force under the Due Process Clause.

Summary judgment is granted for Defendant Barberi.

II. § 1983 Excessive Force (noxious gas)
Pierre alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him in that they sprayed him with or exposed him to noxious gas. (Pierre Compl. ¶ 143.) Defendants move for summary judgment on the ground that Pierre has not testified that Barberi sprayed him.

Pierre does not present evidence that Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, or Devlin sprayed him with mace. Summary judgment is granted for these Defendants.

In his deposition, Pierre testified that he saw Barberi and another officer spraying mace through the gate. (Pierre's 56.1 Stmt., Ex. 1, at 64.) Pierre also testified that he was sprayed with the mace by Barberi and the other Officer through the gate. (Id. at 65.) Pierre has offered sufficient evidence of excessive force by use of noxious gas to proceed. Summary judgment for Barberi is denied on this claim. See Lewis above.

III. § 1983 False Imprisonment
Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him against his will. (Pierre Compl. ¶ 146.) Defendants move for summary judgment on the grounds that Pierre was not involuntarily confined.

Pierre's claim is similar to that of Williams and Lewis in that both parties present evidence of voluntary movement at certain points in time and inability to leave at other points in time. Pierre has presented sufficient evidence of a police deployment around the perimeter of the church grounds to

maintain a false imprisonment claim. He testified that he heard officers specifically tell people they could not leave. (Pierre's 56.1 Stmt., Ex. 1, at 59–61.) He also testified that the police surrounded the church and were lined up the entire length of Sutphin Boulevard. (*Id.*) Whether or not and for what period of time Pierre was not free to leave the UCC grounds is a question of fact for the jury. *See* Abraham and Williams sections above.

Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

### IV. *§ 1983 Failure to Intervene and Protect; § 1983 Failure to Supervise*

**\*69** Like the other non-arrested Group A–1 Plaintiffs, Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis failed to intervene and protect him from the unjustified treatment he received and that the supervisory officers failed to properly supervise their subordinates. (Pierre Compl. ¶¶ 149, 152.) Defendants move for summary judgment.

Both parties present the same facts as they have for each proceeding Plaintiff. The analysis for Pierre is the same as for all of the non-arrested Group A–1 Plaintiffs. *See* sections above.

Summary judgment is denied for Anemone and Maple. Summary judgment is granted for all remaining Defendants.

### V. *§ 1983 Denial of Medical Treatment*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis denied him necessary medical treatment. (Pierre Compl. ¶ 155.) Defendants move for summary judgment on the grounds that Pierre did not have a serious medical need. The relevant law is outlined in the sections above.

Pierre testified that he experienced a burning sensation in his eyes and shoulders. (Pierre's Resp. to Defs.' 56.1 Stmt. ¶¶ 29, 31.) Pierre admits that he never sought medical treatment for this injury from any Defendant and he has not shown that any

Defendant was aware of the extent of his injury or his need for medical treatment. (Defs.' 56.1 Stmt. Pierre ¶ 32.)

Pierre has not presented evidence that he had a serious medical injury that required treatment. Summary judgment is granted for all Defendants.

### VI. *§ 1983 Unlawful Retaliation for First Amendment Conduct*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis unlawfully retaliated against him for his religious beliefs. (Pierre Compl. ¶ 158.) Defendants move for summary judgment. The elements of this claim are outlined in the Gordon section above.

For the reasons stated in the sections above, summary judgment is granted for all Defendants. Pierre has not presented sufficient evidence to support his claim.

### VII. *Common Law Assault and Battery (physical acts)*

Pierre alleges that Defendant Barberi is liable for assault and battery because he hit and pushed him. (Pierre Compl. ¶ 190.) Defendants move for summary judgment. The law is outlined in sections above.

Pierre has identified sufficient evidence of an intentional physical act to proceed with a claim of assault and battery. According to his testimony, Barberi hit and pushed him. Whether such acts were reasonable under the circumstances is a jury question. Summary judgment is denied as to Barberi.

### VIII. *Common Law Assault and Battery (noxious gas)*

**\*70** Pierre alleges that Defendants Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, and Devlin used excessive force against him by spraying him with noxious gas. (Pierre Compl. ¶ 199.) Defendants move for summary judgment.

Pierre testified that Barberi and another officer sprayed mace on the people behind the gate. Pierre does not have to establish that either officer specifically intended to spray him to make out an assault and battery claim. *See* Abraham section above.

Pierre identifies Barberi as a police officer who intentionally used mace against the persons behind the gate; therefore, summary judgment is denied for Barberi. Although Pierre has not identified the other officer, the evidence is sufficient to establish that Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish all sprayed mace at some point during the incident. Defendants are correct that this is not enough to establish personal involvement under § 1983, but it is sufficient for a common law claim. Summary judgment is denied for Defendants Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, and Parrish.

Because Pierre does not offer evidence that Defendants Anemone, Maple, Chapman, Brown, or Devlin sprayed mace or were present or aware of the macing when it occurred, summary judgment is granted for these Defendants.

*IX. Common Law False Imprisonment*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis falsely imprisoned him against her will. (Pierre Compl. ¶ 202.) Defendants move for summary judgment on the grounds that Pierre was not involuntarily confined.

A false imprisonment claim is the same under § 1983 and common law. Based on the analysis above, Summary judgment is denied for Defendants Anemone, Maple, Chapman, Devlin, and Parrish. Summary judgment is granted for all remaining Defendants.

*X. Common Law Intentional Infliction of Emotional Distress*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis engaged in extreme and outrageous conduct that intentionally inflicted emotional distress on him. (Pierre Compl. ¶ 205.) Defendants move for summary judgment.

As explained in the sections above, Pierre has not presented sufficient evidence that the Defendants engaged in extreme and outrageous conduct with the intent to inflict emotional distress on him. To the extent that Pierre has evidence that he suffered emotional distress,[59] he may present that evidence

in conjunction with his surviving claims. Summary judgment is granted for all Defendants.

59    Pierre testified that heard some officers make comments taunting the UCC members, such as " '[Y]ou call yourself church people, you are nothing, but a bunch of black savages." ' (Defs.' 56 .1 Stmt., Ex. B, at 58.) He also described feelings of anxiety in dealing with police and stated that he saw a doctor for his emotional condiction. (*Id.* at 82–85.) He did not testify that any of the Defendants engaged in this conduct.

*XI. Common Law Negligent Infliction of Emotional Distress*

**\*71**  Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him severe emotional distress. (Pierre Compl. ¶ 208.) Defendants move for summary judgment.

Pierre presents evidence of intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

*XII. Common Law Conspiracy*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis conspired against him to deprive him of his rights. (Pierre Compl. ¶ 211.) Defendants move for summary judgment.

Pierre has not presented evidence of a conspiracy. Summary judgment is granted for all Defendants.

*XIII. Common Law Negligence*

Pierre alleges that Defendants Anemone, Maple, Chapman, Brown, Devlin, Picht, Parrish, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, and Papagiannis negligently caused him injuries and distress. (Pierre Compl. ¶ 214.) Defendants move for summary judgment.

The evidence presented by Pierre shows intentional acts by the Defendants, not negligent acts. Summary judgment is granted for all Defendants.

Prior to this opinion, all Plaintiffs withdrew all claims for prima facie tort and all claims against Defendant Brown. (McCartney Decl. ¶¶ 10–11.)

Conclusion

Summary judgment is denied on the following claims by Pierre:

1. § 1983 excessive force (noxious gas) against Barberi

2. § 1983 false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

3. § 1983 failure to intervene and protect (as to the false imprisonment) against Anemone, Maple

4. § 1983 failure to supervise (as to the false imprisonment) against Anemone, Maple

5. common law assault and battery (physical acts) against Barberi

6. common law assault and battery (noxious gas) against Barberi, Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish

7. common law false imprisonment against Anemone, Maple, Chapman, Devlin, Parrish

Summary judgment is granted on the remaining claims by Pierre:

1. § 1983 excessive force (physical acts) against all Defendants

2. § 1983 excessive force (noxious gas) against Webber, Craig, Single, Lesiewicz, De Lorenzo, Brunner, Papagiannis, Parrish, Anemone, Maple, Chapman, Brown, Devlin

3. § 1983 false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

4. § 1983 failure to intervene and protect against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

*72 5. § 1983 failure to supervise against Chapman, Devlin, Parrish, Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

6. § 1983 denial of medical treatment for all Defendants

7. § 1983 unlawful retaliation for First Amendment conduct for all Defendants

8. common law assault and battery (noxious gas) against Anemone, Maple, Chapman, Devlin

9. common law false imprisonment against Picht, Prendergast, Toole, Wiencko, Barberi, Difede, Webber, Moloney, Craig, Single, O'Connor, O'Hagan, Lesiewicz, De Lorenzo, Brunner, Papagiannis

10. common law intentional infliction of emotional distress against all Defendants

11. common law negligent infliction of emotional distress against all Defendants

12. common law conspiracy against all Defendants

13. common law negligence against all Defendants

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 1538019

**Filings (7)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Docket 1:99cv12182**<br>CAMPBELL, ET AL v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Dec. 21, 1999 | Docket |
| **2. Docket 1:99cv12247**<br>LEWIS, ET AL v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Dec. 21, 1999 | Docket |
| **3. Docket 1:99cv12193**<br>CALIZ, ET AL v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Dec. 21, 1999 | Docket |
| **4. Docket 1:99CV12236**<br>GORDON v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Dec. 21, 1999 | Docket |
| **5. Docket 1:99cv09228**<br>BENNETT v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Aug. 26, 1999 | Docket |
| **6. Docket 1:99cv09227**<br>BLOOMFIELD, ET AL v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Aug. 26, 1999 | Docket |
| **7. Docket 1:99cv09230**<br>PARKE, ET AL v. CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Aug. 26, 1999 | Docket |

**History (5)**

**Direct History (1)**

1.  Universal Calvary Church v. City of New York
    2000 WL 1538019 , S.D.N.Y. , Oct. 17, 2000

**Related References (4)**

2.  Universal Calvary Church v. City of New York
    1997 WL 473539 , S.D.N.Y. , Aug. 19, 1997

🚩 3.  Universal Calvary Church v. City of New York
    177 F.R.D. 181 , S.D.N.Y. , Jan. 09, 1998

4.  Universal Calvary Church v. City of New York
    1999 WL 350852 , S.D.N.Y. , June 02, 1999

5.  Universal Calvary Church v. City of New York
    2000 WL 1745048 , S.D.N.Y. , Nov. 28, 2000

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 936297
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ulysses WILLIAMS, Plaintiff,

v.

Robert MULLER, Defendant,

No. 98 CIV. 5204(BSJ).
|
Aug. 17, 2001.

**Attorneys and Law Firms**

Ulysses Williams, Pro Se, Orleans Correctional Facility,
Albion, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York, Of
Counsel: Susan H. Odessky, New York, for Defendant.

MEMORANDUM AND ORDER

DUFFY, D.J.

**\*1** Plaintiff, Ulysses Williams ("Williams" or "plaintiff"),
proceeding *pro se,* is currently an inmate at Orleans
Correctional Facility in Albion, New York. From late
1997 until early 1998, the time period relevant for this
lawsuit, plaintiff was incarcerated at Fishkill Correctional
Facility ("Fishkill"). On December 12, 1997, plaintiff filed
a grievance alleging that Officer C. Madura ("Madura") and
Officer Robert Muller ("Muller" or "defendant") "spread
malicious rumors to the inmate population that [plaintiff]
was illegally selling Inmate Liaison Committee ("ILC")
supplies" in retaliation against prior grievances that plaintiff
had allegedly filed against the officers. *See* Ex. A. On
January 15, 1998, the Superintendent of the Inmate Grievance
Program denied plaintiff's grievance seeking suspension of
the two officers.

Plaintiff's complaint in this action, dated February 20, 1998,
reasserts his December 12, 1997 retaliation claim against
Muller, pursuant to 42 U.S.C. § 1983. In addition, plaintiff
complains of a second act of retaliation under § 1983 by
Muller, allegedly made in response to plaintiff's filing of the
December 12, 1997 grievance. On January 9, 2001, Muller
moved for summary judgment pursuant to Rule 56(c) of the
Federal Rules of Civil Procedure. Because plaintiff has failed

to establish either of his retaliation claims, defendant's motion
for summary judgment is granted in its entirety. [1]

[1]    Because plaintiff's retaliation claims are dismissed
       on the merits, I find it unnecessary to address
       defendant's allegations that plaintiff failed to show
       physical injury to support his claim of emotional
       damages pursuant to 42 U.S.C. § 1997e(e) or
       that defendant is shielded from liability under the
       Eleventh Amendment.

*FACTS*

On December 12, 1997, plaintiff filed a grievance against
correction officers Madura and Muller, alleging that they had
spread rumors that plaintiff had been illegally selling supplies
from the ILC—an inmate organization within the facility—to
other inmates. *See* Ex. A. Furthermore, plaintiff claims that he
"encountered several confrontations with other inmates due to
such rumors; in which could have ended in physical conflict."
*See* Pl.'s Aff. at 7. Plaintiff alleges that defendant spread such
rumors with the intention of provoking such "confrontations."
*Id.* Plaintiff does not deny that he was found in possession of
ILC supplies, but he alleges that he was in charge of issuing
such supplies and that therefore his possession was lawful.

On January 15, 1998, the Superintendent of Fishkill
ruled that plaintiff's grievance was baseless. *See* Ex.
A. The Superintendent stated that prison officials had
found "excessive ILC supplies" in plaintiff's locker. *Id.*
Plaintiff appealed the Superintendent's findings, and on
January 28, 1998, the New York State Department of
Correctional Services ("DOCS") Central Office Review
Committee ("CORC") upheld the Superintendent's denial of
the grievance.

Plaintiff alleges that a little over a month after he filed the
December 12, 1997 grievance, Muller retaliated against him
by filing a meritless Inmate Misbehavior Report. *See* Ex. F.
Muller contends that on January 14, 1998, while stationed on
the stairwell of Fishkill's A–Floor monitoring inmate traffic,
he questioned plaintiff as to the contents of the bag which
plaintiff was carrying. Allegedly, plaintiff refused to answer
his questions. Furthermore, Muller contends that plaintiff
yelled at him. According to defendant, this confrontation
blocked inmate traffic in the hallway for fifteen minutes. *See*
Ex. G. Muller alleges that he gave plaintiff a direct order to
step to the side and to stop yelling. Plaintiff allegedly refused
to do so and demanded to see a sergeant "right now." A

Williams v. Muller, Not Reported in F.Supp.2d (2001)

2001 WL 936297

sergeant was notified and plaintiff was escorted to the Special Housing Unit ("SHU"). *Id.*

**\*2** In his deposition, plaintiff denied all allegations that he behaved inappropriately. As a result of plaintiff's alleged conduct, however, Muller filed an Inmate Misbehavior Report against plaintiff, charging him with failure to comply with search procedures, disobeying a direct order, threatening an officer, and creating a disturbance. *Id.* Plaintiff plead "not guilty" to these charges, and a hearing was held on January 19, 1998. At the conclusion of the hearing, plaintiff was found guilty of all charges and sentenced to thirty days of keeplock, under which he lost his right to receive packages, his commissary privileges, and his telephone privileges. *See* Ex. E.

On January 20, 1998, plaintiff appealed from this disciplinary action. According to defendant, plaintiff appealed on the grounds that the thirty day period of loss of privileges should have begun on the date of his confinement on January 14, 1998, rather than on the date of the hearing on January 19, 1998. *See* Ex. F. Although evidence exists that plaintiff wrote in his appeal that he was not challenging the merits of the disciplinary report itself, plaintiff disputes this finding and claims he appealed the merits of the misbehavior report as well as the length of his confinement. *See* Ex. F. Plaintiff's appeal was denied. *See* Ex. A.

One month later, on February 20, 1998, plaintiff filed the instant complaint. On July 22, 1998, Chief Judge Thomas P. Griesa, U .S.D.J., partially dismissed the complaint filed *in forma pauperis* under 28 U.S.C.1915(a) as to defendants Commissioner Glenn S. Goord and Superintendent Wayne L. Strack, and under 28 U.S.C.1915(d) as to defendant Lieutenant Officer Iacovino.

Muller moved to dismiss the remaining claims and on April 25, 2000, Judge Barbara S. Jones, U.S.D.J., dismissed the first five of five of plaintiff's claims because plaintiff had failed to exhaust administrative remedies within the prison grievance system before filing suit in a federal court, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a). *See Williams v. Muller,* 2000 WL 487954 at \*3 (S.D.N.Y. Apr. 25, 2000). Judge Jones denied defendant's motion to dismiss with respect to claims six and seven stating § 1983 claims for retaliation because plaintiff had succeeded in exhausting the administrative remedies for these claims. Muller now moves for summary judgment as to both retaliation claims. For the reasons set forth below, his motion is granted in its entirety.

*LEGAL STANDARD*

*A. Summary Judgment* [2]

[2]
  When a party proceeds *pro se,* he is entitled to some form of notice of the requirements necessary to oppose summary judgment. *See McPherson v. Coombe,* 174 F.3d 276, 280–82 (2d Cir.1999). In the instant case, defendant's filing of his "Notice to Pro Se Litigant" adequately informed plaintiff of his pleading requirements.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). On a motion for summary judgment, the moving party has the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). If satisfied, the nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). While the court must construe all evidence and inferences in favor of the nonmoving party, to sustain its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). "Mere conclusory allegations or denials will not suffice." [3] *Williams,* 781 F.2d at 323.

[3]
  Because Williams is proceeding *pro se,* however, I have given the allegations in his pleadings a particularly liberal construction. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

*B. Standard for Retaliation Claims*

**\*3** Prisoners have a constitutional right to "petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Nonetheless, courts recognize that retaliation claims may be easily fabricated and that some prisoners file such claims with frequency. Thus, courts must examine prisoner retaliation claims with "scepticism and particular care." *Id.*

To prevail on a retaliation claim, a plaintiff must demonstrate that he 1) engaged in constitutionally protected conduct and that 2) such conduct was a "substantial or motivating factor" behind the prison official's allegedly retaliatory acts. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted). Constitutionally protected conduct has been broadly defined, and may include not only the filing of prison grievances, but even the wearing of religious headgear. *See Nicholas v. Tucker,* 89 F.Supp.2d 475, 477 (2d Cir.2000). Retaliatory acts have been defined as "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights." *Smith v. Deckelbaum,* 2000 WL 1855128 at *3 (S.D.N.Y. Dec. 19, 2000) (citations omitted). While courts have broadly defined actionable retaliation in a prison setting, not every response to a prisoner's exercise of a constitutional right is actionable. *See Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001).

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions: (1) the outcome of any hearing concerning the allegedly retaliatory charges; (2) the inmate's prior disciplinary record; (3) any statements made by the defendant concerning his motivation; and, (4) the temporal proximity between the protected activity and the defendant's adverse action. *See Colon,* 58 F.3d at 872–73. Finally, even if a prison official acts with retaliatory intent, as long as his act is motivated by both "proper and improper reasons," a plaintiff's retaliation claim will fail. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

*DISCUSSION*

*A. Plaintiff's Retaliation Claim for "Spreading Rumors"*
Plaintiff has failed to establish his first retaliation claim. According to this claim, Muller violated plaintiff's constitutional rights when he spread rumors about plaintiff in retaliation for grievances that plaintiff had filed previously against Muller. *See* Ex. D. Plaintiff further alleges that such rumors incited his fellow prisoners to "confront" him. *See* Pl.'s Aff. at 7. Although plaintiff has not specifically identified or produced copies of any such prior grievances, Muller admits that plaintiff had filed the "same complaint" against him twice before. *See* Ex. A. Because I must construe all inferences in favor of the nonmoving party, I posit for the purpose of this discussion that plaintiff has established that he engaged in "protected activity."

**\*4** However, even accepting that plaintiff did in fact file a prior grievance which motivated Muller to spread rumors about him, plaintiff's retaliation claim still must fail as the spreading of rumors alone does not amount to a constitutional violation.

As indicated above, courts treat prisoners' claims of retaliation with great skepticism, and such claims typically must include an administrative action against a prisoner that is improperly motivated. *See Dawes,* 239 F.3d at 492; *see also Graham,* 89 F .3d at 80. The retaliatory action must be sufficient to "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional right." *Dawes,* 239 F.3d at 493.

If the alleged retaliatory act does not inhibit or punish an inmate's right of free speech it is considered *de minimis. Id.* "Many verbal responses by officials of resentment or even ridicule" are not actionable. *Id.* at 493 (citing *Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D.Mich.1997)). In the instant case, the alleged spreading of rumors constitutes just such a "verbal response." Although plaintiff claims the rumors were intended to incite the inmates to harm plaintiff, no physical harm occurred. Therefore, even if Muller did indeed spread rumors about plaintiff, such actions on his part do not give rise to a retaliation claim.

For the reasons set forth above, plaintiff has failed to establish the second element of his first retaliation claim. This claim, therefore, is dismissed.

*B. Plaintiff's Retaliation Claim for the a "False" Misbehavior Report*
Plaintiff's second claim asserts that Muller filed a "false" misbehavior report against him in retaliation for plaintiff's December 12, 1997 grievance. *See* Ex. E. Plaintiff succeeds in establishing the first prong of this retaliation claim, in that the filing of his December 12, 1997 grievance was indeed protected activity. However, a retaliation claim must also establish a causal link between the protected activity and the alleged retaliatory act. Plaintiff has failed to prove such a connection exists.

According to Muller, he issued the misbehavior report against plaintiff because plaintiff violated prison disciplinary rules. Muller alleges that plaintiff failed to obey his direct orders, threatened him, and failed to comply with search procedures. *See* Exs. E, G. Plaintiff contends that he complied with Muller's search of his person and of his bag, that he did not

2001 WL 936297

yell or threaten Muller, and that Muller issued a report against him solely as an act of retaliation.[4] *See* Ex. H at 127–28.

[4]    Plaintiff originally claimed that a corrections officer and an inmate, "Barnet," witnessed this incident. However, in his deposition, plaintiff alleged that he forgot the name of the officer and he reaffirmed his withdrawal of Barnet as a witness. *See* Ex. H at 133–37.

As discussed above, a court can consider four factors in determining whether a causal connection exists between a plaintiff's protected activity and a prison official's action. The first factor a court can examine is the outcome of any hearing concerning the allegedly retaliatory charges. *See Colon,* 58 F.3d 865 at 872. In the instant case, plaintiff faced a disciplinary hearing on January 15, 1998 where he was charged with creating a disturbance, refusing a direct order, making threats, and refusing to be searched. *See* Ex. E. Plaintiff was found guilty of all charges and sentenced to thirty days of keeplock. Plaintiff then appealed the length of his confinement and, as he alleges, the merits of the report as well.[5] *See* Ex. F, H at 138–40. Plaintiff's appeal was denied. *See* Ex. A. This outcome strongly suggests the existence of proper reasons for Muller's actions, and raises an inference of non-retaliation.

[5]    As indicated *supra,* there is some dispute as to whether plaintiff actually appealed the merits of the misbehavior report. *See* Pl.'s Aff. at 8. However, a determination as to whether he did, or did not, appeal the merits of the report has no bearing on this decision.

**\*5** The second factor that a court can look to is an inmate's prior disciplinary record. In the instant case, plaintiff had been disciplined previously at Fishkill for making illegal copies, for smuggling, and for stealing.[6] *Id.* at 58–62. Plaintiff's disciplinary record further weakens his retaliation claim.

[6]    Plaintiff's disciplinary record includes behavior prior to his arrival at Fishkill. Notably, plaintiff

was disciplined for a "movement violation" and for disobeying a direct order at Coxsackie Correctional Facility. *See* Ex. H at 56–57. Furthermore, plaintiff was disciplined for fighting with another inmate at Auburn Correctional Facility. *Id.* at 63. Finally, at Orleans Correctional Facility, plaintiff was disciplined for giving an officer "the birdie." *Id.* at 64.

The third factor a court can evaluate is any statement made by the defendant concerning his motivation for his allegedly retaliatory acts. In the instant case, plaintiff has offered no evidence, besides conclusory allegations, of statements made by Muller concerning his motivation for filing the report. The final factor a court can review is the temporal proximity between the protected activity and the retaliatory action. Muller issued his report four weeks after plaintiff filed his grievance. Although such a time period could conceivably be considered as evidence of temporal proximity, such evidence is merely circumstantial and, standing alone, is not enough for a retaliation claim to survive summary judgment. *See Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000).

Thus, even if temporal proximity is established, plaintiff's second retaliation claim cannot survive Muller's motion for summary judgment. *See Crawford v. Braun,* 2001 WL 127306 at *6 (S.D.N.Y. Feb. 9, 2001). Plaintiff's second retaliation claim, therefore is dismissed.

*CONCLUSION*

For the foregoing reasons, Williams has failed to factually support either of his retaliation claims pursuant to 42 U.S.C.A. § 1983. Therefore, Muller's motion for summary judgment is granted. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 936297

---

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:98cv05204**<br>WILLIAMS v. GOORD, ET AL | — | S.D.N.Y. | July 22, 1998 | Docket |

**History (2)**

**Direct History (1)**

1.  Williams v. Muller 👓
    2001 WL 936297 , S.D.N.Y. , Aug. 17, 2001

**Related References (1)**

2.  Williams v. Muller
    2000 WL 487954 , S.D.N.Y. , Apr. 25, 2000

2009 WL 969932

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Vincent BOUKNIGHT, Plaintiff,

v.

Warden Robert SHAW, Officer

Rivera, Captain Matthew, Defendants.

No. 08 Civ. 5187(PKC).

|

April 6, 2009.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Vincent Bouknight brings this action *pro se* under 42 U.S.C. § 1983, seeking monetary damages for violations of his constitutional rights. Defendants move to dismiss under Rule 12(b) (6), Fed.R.Civ.P., for failure to state a claim. For the reasons explained below, the motion is granted.

BACKGROUND

A. *Facts*

The following facts, taken from plaintiff's Amended Complaint ("A.C."), are accepted as true for the purposes of this motion. [1]

[1]     Because the pages of plaintiff's Amended Complaint are not numbered, the Court will refer to the page numbers inserted on the copy submitted by defendants. *See* Chestnov Decl. ex. A.

At the time of the events at issue here, plaintiff was a pre-trial detainee at Riker's Island. (A.C. at 1.) On April 7, 2007, at or about 10:50 p.m., defendant Officer Rivera began spreading rumors to inmates who were "active gang members of the Latin Kings and Bloods." (*Id.*) Officer Rivera told these inmates that plaintiff was "a rat, snitch and a homosexual." (*Id.*) Officer Rivera allegedly intended to "incite[ ] such gang members to get [plaintiff] out of the housing area, because of [Officer Rivera's] personal dislike[ ]

of homosexuals, and snitches." (*Id.*) That night, plaintiff endured about three and a half hours of inmates calling him a snitch and a homosexual. (*Id.*) During the remainder of the week, inmates continued to "tortur[e] [plaintiff] with such abusive words, stating and calling [him] a snitch." (*Id.*) This incident led plaintiff to write to defendant Warden Shaw and to file a grievance. (*Id.* at 1–2.) Neither Mr. Shaw nor the grievance committee responded. (*Id.* at 2.)

In May, plaintiff was moved to a different housing unit and was "hired as house gang." (*Id.*) On or about July 14, 2007, Officer Rivera remarked that she "can't have snitches and homosexuals working in my house." (*Id.*) About two days later, plaintiff was fired by Officer Rivera from his working assignment. (*Id.*) During these two days and for the remainder of the week, Officer Rivera "prolonged the torture and told inmates[ ] that she didn't like me being in her house because I was a homosexual and a snitch." (*Id.*) On or about July 30, 2007, plaintiff filed a grievance. (*Id.*) The grievance committee responded that Mr. Shaw would review plaintiff's grievance "because of the lack of jurisdiction regarding a harassment issue." (*Id.*) Also on July 30, Officer Rivera wrote plaintiff up for an infraction. (*Id* .) As she was writing plaintiff up, she was saying, "If the inmates didn't get you out of the house, I will get you out, you snitch gay, homosexual." (*Id.*) Officer Rivera "guarantee[d] ... that [plaintiff] will be going to the box (lock up)." (*Id.*) Plaintiff was found guilty of the infraction and was sentenced to twenty days in lock up. (*Id.*) Defendant Captain Matthew threatened to tamper with plaintiff's food when plaintiff entered lock up. (*Id.* at 3.)

On August 2, 2007, plaintiff wrote to Warden Shaw regarding Officer Rivera. (*Id.* at 2.) Plaintiff received no response. (*Id.*) When plaintiff attempted to speak to Mr. Shaw upon seeing him at plaintiff's housing area, Mr. Shaw did not make himself available. (*Id.*) On August 30, 2007, Officer Rivera locked plaintiff in his cell for the day and did not let him out. (*Id.* at 2–3.)

B. *Procedural History*

**\*2** Plaintiff filed his complaint on June 6, 2008. In an Order dated the same day ("June 6 Order"), Chief Judge Kimba M. Wood granted plaintiff's request to proceed *in forma pauperis* and directed plaintiff to submit an amended complaint within sixty days to cure several defects in his original pleading. The court held that "[p]laintiff's present allegations of harassment, threats and the spreading of rumors regarding his sexuality and snitching are insufficient to sustain a claim under § 1983" because "threats or profanity alone do not constitute

2009 WL 969932

a violation of any federally protected right." June 6 Order at 2. The court explained that "in order to state a claim for incitement in violation of his rights, [plaintiff] must allege facts showing that prison officials were deliberately indifferent because they knew and disregarded an excessive risk to his safety or created an environment that subjected him to a significant risk of injury." *Id.* at 2–3. The court also held that plaintiff's allegation of retaliation was "conclusory" and that "the issuance of the misbehavior report, without more, fails to state a retaliation claim," *Id.* at 3. Rather, "[i]n order to establish a retaliation claim," the court instructed that "plaintiff must show that prison officials retaliated against him for engaging in protected conduct." *Id.* at 4. The court explained that "[t]he amended complaint must be specific and must provide a nexus between each named defendant, plaintiff's exercising of his [constitutional] right and the resulting retaliation." *Id.*

Plaintiff filed an Amended Complaint on July 2, 2008 and defendants thereafter moved to dismiss. In an order dated February 18, 2009, the Court extended plaintiff's time to respond to March 31, 2009. (Doc. # 20.) To date, the Court has received no response from plaintiff.

## DISCUSSION

### A. *Rule 12(b)(6)*
A *pro se* complaint is reviewed under a more lenient standard than that applied to "formal pleadings drafted by lawyers." *Haines v. Kerner.* 404 U.S. 519, 520 (1972) (per curiam). Plaintiffs' *pro se* pleadings "must be read liberally and should be interpreted 'to raise the strongest arguments that they suggest.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

Rule 8(a) (2), Fed.R.Civ.P., requires only "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, ____, 127 S.Ct. 1955, 1964 (2007) (quotation omitted) (alteration in original). When a defendant tests the sufficiency of a complaint by a motion under Rule 12(b)(6), "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Twombly,* 127

S.Ct. at 1965) (footnote omitted). The complaint is measured against a "flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) (emphasis in original), *cert. granted,* 128 S.Ct. 2931 (2008). This "does not require heightened fact pleading of specifics, [but] it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig .,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974) (footnote omitted); *see also Erickson v. Pardus.* 551 U .S. 89, ____, 127 S.Ct. 2197, 2200 (2007) (per curiam).

### B. *Section 1983*
**\*3** To state a claim for the violation of civil rights under 42 U.S.C. § 1983, plaintiff must allege "that state officials, acting under color of state law, deprived [him] of a right guaranteed [to him] by the Constitution or laws of the United States. Moreover, defendants' actions at that time must have been objectively unreasonable in light of clearly established federal law; otherwise, those actors are entitled to qualified immunity." *Rodriguez v. Phillips,* 66 F.3d 470, 473 (2d Cir.1995). For the reasons explained below, plaintiff's Amended Complaint, construed liberally to raise the strongest arguments it suggests, fails to state a claim under § 1983. Thus, the Court need not address qualified immunity.

#### 1. *Verbal Harassment*
Verbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Aziz Zarif Shabazz v. Pico.* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (quotation omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (collecting cases). Plaintiff alleges that Officer Rivera verbally harassed him by calling him "a rat, snitch and a homosexual." (A.C. at 1.) Plaintiff also alleges that Captain Matthew threatened to tamper with plaintiff's food while plaintiff was in lock up. (*Id* at 3.) These instances of verbal harassment, standing alone, are insufficient as a matter of law to state a claim for relief under § 1983.

Bouknight v. Shaw, Not Reported in F.Supp.2d (2009)

2009 WL 969932

2. *Failure to Protect / Excessive Force*

Construing the Amended Complaint liberally, it can also be read to allege an infliction of cruel and unusual punishment. Where, as here, the prisoner was a pre-trial detainee, "the relevant constitutional provision is not the Eighth Amendment but is, instead, the Due Process Clause" because the Eighth Amendment only applies where there has been a "formal adjudication of guilt." *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983). The Second Circuit has held that an "unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant v. Okst.* 101 F.3d 845, 856 (2d Cir.1996). Thus, the analysis is the same under the Due Process Clause as it would be under the Eighth Amendment. *See Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000); *Brewster v. Nassau County,* 349 F.Supp.2d 540, 552 (E .D.N .Y.2004).

The Eighth Amendment imposes duties on prison officials, who must provide "humane conditions of confinement," including taking "reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation omitted). Not "every injury suffered by one prisoner at the hands of another," however, "translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. A prisoner establishes a violation of the Eighth Amendment only if he satisfies two requirements. First, the plaintiff must establish that his injury has been "objectively, sufficiently serious" to have denied him "the minimal civilized measure of life's necessities." *Id.* (quotation omitted). Second, the prison official must have had " 'a sufficiently culpable state of mind' amounting to at least deliberate indifference." *Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (quoting *Farmer,* 511 U.S. at 834), *overruled on other grounds, Swierkiewicz v. Sorema N .A.,* 534 U.S. 506 (2002). Deliberate indifference exists when the prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837.

**\*4** "[T]he spreading of rumors [by a corrections officer] alone does not amount to a constitutional violation." *Williams v. Mullen* 98 Civ. 5204(BSJ), 2001 WL 936297, at \*4 (S.D.N.Y. Aug. 17, 2001). But a prisoner can state a claim under the Eighth Amendment against a corrections officer who spreads malicious rumors about him if the rumors "incited other inmates to assault [the plaintiff] ..., thereby placing him at grave risk of physical harm." *Young v. Coughlin,* 93 Civ. 262(DLC), 1998 WL 32518, at \*7 (S.D.N.Y. Jan. 29, 1998). However, if the plaintiff fails to allege—with concrete facts, not conclusory assertions—that

he has suffered an objectively "sufficiently serious" injury or that the corrections officer acted with a "sufficiently culpable state of mind," then the claim must be dismissed. *See, e.g., Dawes,* 239 F.3d at 493 ("[Plaintiff] does nothing more than state in conclusory terms that the references to him as an 'informant' and a 'rat' ... opened him up to assault from his fellow inmates .... Absent some factual showing that the comments by the prison officials actually risked inciting other inmates against [plaintiff], we are unwilling simply to assume that prison inmates would be incited ... to attack 'one of their own' who was labeled an 'informant' and a 'rat' "); *Young,* 1998 WL 32518, at \*6–\*8 (dismissing claim that corrections officer "directed other inmates to sexually harass and 'jump' [plaintiff]" because the officer's "comments were not 'objectively, sufficiently serious' to state an Eighth Amendment violation" and plaintiff had failed to "allege harm of federal constitutional magnitude"); *Brewster,* 349 F.Supp.2d at 552–53 (dismissing for failure to state a claim complaint alleging that corrections officers "subjected [plaintiff] to 'abusive language, gestures, taunts, jeers, laughter, and harassment,' and spread false rumors among other inmates that [plaintiff] is a homosexual, thief, or rapist"); *Walsh v. Goord,* 07 Civ. 0246(CGS), 2007 WL 1572146, at \* 10 (W.D.N.Y. May 23, 2007) (holding that prisoner failed to state a claim where he "allege[d] that he was identified [by corrections officers] as a snitch and a child molester and that, as a result, he was subjected to assaults and rape at the hands of other inmates"; but granting leave to replead).

Plaintiff's allegations fail to meet either the objective or subjective standards necessary to state a claim under the Eighth Amendment against Officer Rivera. To satisfy the objective prong, plaintiff must "establish the deprivation of a basic human need such as reasonable safety," *Benjamin v. Fraser,* 343 F.3d 35, 51 n. 17 (2d Cir.2003) (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)), due to Officer Rivera's creation of "a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. Here, plaintiff has alleged only that, one night, he endured about three and a half hours of inmates calling him a snitch and a homosexual, and that during the remainder of the week, inmates continued to "tortur[e] [plaintiff] with such abusive words, stating and calling [him] a snitch." (A.C. at 1.) Plaintiff has not alleged any facts that, if proven, would establish that he ever faced actual or imminent harm. The Court is "unwilling simply to assume" that such a risk existed merely because Officer Rivera spread rumors about him. *Dawes,* 239 F.3d at 493. Thus, plaintiff has failed to allege an injury that was sufficiently serious by objective standards.

**\*5** To satisfy the subjective prong, plaintiff must allege that Officer Rivera acted "maliciously and sadistically to cause harm" or, at least, was deliberately indifferent to "an excessive risk to inmate health or safety." *See Trammell v. Keane,* 338 F.3d 155, 162–63 (2d Cir.2003); *Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002). As Chief Judge Wood explained, plaintiff's mere allegation that Officer Rivera spread rumors about him was insufficient to show that she had the requisite culpable state of mind. *See* June 6 Order at 2–3. Plaintiff's Amended Complaint is similarly insufficient because he has not "ampli[fied] [his] claim with some factual allegations ... needed to render the claim *plausible.*" *Iqbal,* 490 F.3d at 157–58 (emphasis in original). Plaintiff alleges that "Officer Rivera incited such gang members to get me out of the housing area, because of her personal dislike[ ] of homosexuals, and snitches." (A.C. at 1.) But none of plaintiff's allegations, if proven, would establish that Officer Rivera intended to incite inmates to harm plaintiff physically. Nor has plaintiff alleged that Officer Rivera knew and disregarded the fact that her comments had created an environment that subjected plaintiff to a significant risk of injury. Thus, plaintiff has failed to allege that Officer Rivera acted with the requisite culpable state of mind.

To the extent that the Amended Complaint can be construed liberally to allege claims under the Eighth Amendment against Warden Shaw and Captain Matthew, these claims must also be dismissed. Plaintiff has failed to allege any objectively "sufficiently serious" injury that resulted from Captain Matthew's threat that he would tamper with plaintiff's food (A.C. at 3) or Warden Shaw's refusal to speak with plaintiff (*id.* at 2). Plaintiff also has not alleged sufficient facts to make out a plausible claim that Warden Shaw was deliberately indifferent to an excessive risk of harm faced by plaintiff. Plaintiff alleges that after he wrote to Warden Shaw regarding Officer Rivera's verbal harassment, plaintiff was transferred to a different housing unit. (*Id.*) This indicates that Warden Shaw responded to his grievance. Thus, the allegations in the Amended Complaint fail to state a claim under the Eighth Amendment.

### 3. *Retaliation*

The Amended Complaint may be construed liberally to allege that Officer Rivera retaliated against plaintiff in violation of his rights under the First Amendment. After plaintiff filed a grievance against Officer Rivera, she wrote up plaintiff for an infraction. (*Id.* at 2.) Plaintiff alleges that "she wrote me up for revenge." (*Id.* at 16.) A "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997). In order to prevail on a retaliation claim, a plaintiff bears the burden to prove, "first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Thus, there must be "a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quotation omitted). Prisoners' claims of retaliation must be examined with "skepticism and particular care," *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995), because they are " 'Prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Graham,* 89 F.3d at 79 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*6** Plaintiff has failed to allege the requisite causal connection between his filing of a grievance and Officer Rivera's writing him up for an infraction. As Chief Judge Wood explained, plaintiff's assertion that Officer Rivera "wrote me up for revenge" (A.C. at 16) is conclusory. June 16 Order at 3. Plaintiff has not alleged any facts that would establish that Officer Rivera was motivated by plaintiff's filing of a grievance against her. Plaintiff's mere speculation is insufficient. In fact, plaintiff alleges that as Officer Rivera was writing him up, she was saying, "If the inmates didn't get you out of the house, I will get you out, you snitch gay, homosexual." (*Id.* at 2.) This tends to show that Officer Rivera was motivated by her personal dislike of plaintiff, not that she was reacting to his filing of a grievance. Indeed, Officer Rivera had exhibited verbal hostility toward plaintiff since April 2007, before he ever filed a grievance. (*Id.* at 1.) Thus, plaintiff has failed to allege facts sufficient to state a plausible claim of retaliation in violation of his rights under the First Amendment.

### C. *PLRA*

There is an independent basis for dismissing plaintiff's claims seeking compensatory damages for mental and emotional injuries. The Prison Litigation Reform Act of 1995 ("PLRA") states in relevant part: "No Federal civil action may be brought by a prisoner ... for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). In the section of his

Amended Complaint titled "Injuries," plaintiff states: "she infliction [sic] of emotional distress and pain and suffering compensatory damages punitive damages." (A.C. at 16.) And in the section seeking relief, plaintiff "request[s] ... as follows[:] mental damages, compensatory damages, punitive damages, emotional distress, award me in the amount of $1,000,000.00 dollars." (*Id.* at 18.) Because plaintiff has not alleged that he suffered any physical injury in connection with defendants' alleged infliction of emotional distress, his claims seeking compensatory damages for mental or emotional injuries must be dismissed under the PLRA,

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for failure to state a claim is granted. To the extent the Amended Complaint raises state law claims, the Court declines to exercise supplemental jurisdiction over them. 28 U.S.C. § 1367(c)(3). The Clerk shall enter judgment for defendants. Defendants are directed to provide plaintiff with copies of all unpublished opinions cited herein.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 969932

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Docket 1:08cv05187**<br>BOUKNIGHT v. SHAW ET AL | — | S.D.N.Y. | June 06, 2008 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History**

There are no History results for this citation.

Mallard v. Redner, Not Reported in Fed. Supp. (2023)

2023 WL 8828866

2023 WL 8828866
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Larry MALLARD, Plaintiff,

v.

Steven M. REDNER, et al., Defendants.

9:21-CV-1080 (LEK/TWD)
|
Signed March 13, 2023

**Attorneys and Law Firms**

LARRY MALLARD, Plaintiff pro se, 13-B-2942, Clinton Correctional Facility, P.O. Box 2000, Dannemora, NY 12929.

Rachael Ouimet, Esq., Assistant Attorney General, HON. LETITIA JAMES, New York State Attorney General - Albany, The Capitol, Albany, NY 12224, Attorney for Defendants.

**DECISION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** Plaintiff Larry Mallard ("plaintiff" or "Mallard"), proceeding pro se in this 42 U.S.C. 1983 action, alleges wrongdoing while he was incarcerated at Mid-State Correctional Facility ("Mid-State C.F."). Dkt. No. 66 ("Am. Compl."). A complete history of this action to date can be found in prior Decisions and Orders, including this Court's Order and Report-Recommendation issued on October 28, 2022 (the "Oct. 2022 Order and Report-Rec."). *See* Dkt. No. 65.

Presently pending is plaintiff's second motion to amend his amended complaint.[1] Dkt. No. 86. Defendants oppose the motion. Dkt. No. 96.

[1]   On December 19, 2022, plaintiff submitted a "proposed second amended complaint" (Dkt. No. 84) with exhibits (Dkt. No. 85). The submissions were not accompanied by a motion for leave to file an amended complaint. On December 22, 2022, plaintiff filed the within motion with a proposed

second amended complaint. Thus, the Court will not consider the submissions at Dkt. No. 84 or Dkt. No. 85 in the context of the within motion.

**II. THE FIRST MOTION TO AMEND AND OCTOBER 2022 ORDER AND REPORT-RECOMMENDATION**

In May 2022, defendant Molly M. Annarino ("Annarino") moved to dismiss the complaint as against her. Dkt. No. 44. On July 1, 2022, in response to defendant's motion to dismiss, plaintiff filed a cross motion to amend his complaint. Dkt. No. 51. In support of the motion, plaintiff submitted a proposed amended complaint with exhibits. *See* Dkt. No. 51-1. The proposed pleading added new defendants and included new causes of action. *See id.* With the proposed amended complaint, plaintiff asserted the following: (1) Eighth Amendment excessive force claims against defendants Lucas J. Short ("Short") and Steven M. Redner ("Redner"); (2) Eighth Amendment failure-to-intervene claims against defendants Corrections Officers Walker ("Walker") and Annarino; and (3) Fourteenth Amendment due process claims against Annarino, and defendants Hearing Officer Barbosa ("Barbosa") and Hearing Officer Martin ("Martin"). *See generally* Dkt. No. 51-1.

Following review of the motion to amend and proposed pleading, this Court issued the Oct. 2022 Order and Report-Rec. and granted the motion, in part. *See generally* Dkt. No. 65. The Court directed a response to the following: (1) Eighth Amendment claims against Short, Redner, Walker, and Annarino; and (2) Fourteenth Amendment due process claims against Barbosa and Martin. *See id.* The undersigned recommended that the remaining claims be dismissed. *See id.*

In a Decision and Order issued on January 24, 2023 (the "Jan. 2023 Order"), the Court accepted and adopted the Oct. 2022 Order and Report-Rec. Dkt. No. 89.

**III. DISCUSSION**

**A. The Second Motion to Amend**

The legal standards governing amendment of pleadings pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure were set forth in the Oct. 2022 Report-Rec. and will not be restated in this Decision and Order. *See* Oct. 2022 Report-Rec. at 3-4.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 380 of 531

Mallard v. Redner, Not Reported in Fed. Supp. (2023)

2023 WL 8828866

## B. Summary of Proposed Second Amended Complaint [2]

[2]

In the Oct. 2022 Order and Report-Rec., the Court noted that plaintiff submitted exhibits with the proposed amended complaint, that were relevant to the incident described in the complaint. *See* Dkt. No. 51 at 4, n.1. The Court considered the documents in the context of the § 1915 review. *See id.* Plaintiff did not attach the exhibits to the proposed second amended complaint. "Although it is well settled that an amended complaint supersedes a prior complaint in its entirety, it is clear to the court that plaintiff intended to attach the exhibits to his amended complaint." *Wellington v. Langendorf*, No. 12-CV-1019 (FJS/DEP), 2013 WL 3753978, at *3 (N.D.N.Y. July 15, 2013). To require plaintiff to file an amended complaint that includes the original exhibits is, "an unnecessary procedural hoop that would waste resources and delay resolution of this action." *Alexander v. U.S.*, No. 13-CV-678, 2013 WL 4014539, at *4 (N.D. Cal. Aug. 5, 2013). Because plaintiff is a pro se plaintiff, the Court will consider the documentation attached to the amended complaint (*see* Dkt. No. 66 at 9-40) as incorporated by reference in the proposed second amended complaint.

**\*2** In support of the motion, plaintiff submitted a proposed second amended complaint. Dkt. No. 86-2 ("Prop. Sec. Am. Compl."). The factual allegations are substantially the same as those in the amended complaint. *Compare* Am. Compl. *with* Prop. Sec. Am. Compl. With the proposed second amended complaint, plaintiff asserts the following new claims: (1) First Amendment retaliation claims against Redner and Annarino; and (2) conspiracy claims against Redner, Annarino, Walker, and Short. *See* Prop. Sec. Am. Compl. at ¶¶ 42-44.

## C. Analysis

Defendants oppose plaintiff's motion to amend and argue that (1) plaintiff failed to comply with Local Rules 7.1(b) and 15.1 and; (2) the proposed amendments would be futile. Dkt. No. 96.

The Court has thoroughly reviewed the proposed pleading and finds that the claims asserted are sufficiently related to the original claims, defendants, and amended complaint. It does not appear to this Court that plaintiff has delayed unduly in bringing his motion, the requested amendments

do not significantly change the theory of the case, and the Court is not persuaded that resolution of this matter will be significantly delayed by the filing of the amended pleading. While defendants correctly note that plaintiff has not identified the amendments in the proposed pleading, "either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means," *see* N.D.N.Y.L.R. 15.1(a), in the interest of judicial economy and with special solicitude afforded to plaintiff, the court will review the proposed second amended complaint for futility.

### 1. Eighth Amendment Claims Against Short, Redner, Walker, and Annarino

As a result of the Jan. 2023 Order, Short, Redner, Walker, and Annarino were directed to respond to plaintiff's Eighth Amendment claims. These claims are repeated and realleged in the proposed second amended complaint. Prop. Sec. Am. Compl. at ¶¶ 39-40. Accordingly, plaintiff's motion to amend, in this regard, is granted.

### 2. Due Process Claims Against Barbosa and Martin

As a result of the Jan. 2023 Order, Barbosa and Martin were directed to respond to plaintiff's Fourteenth Amendment due process claims. These claims are repeated and realleged in the proposed second amended complaint. Prop. Sec. Am. Compl. at ¶ 41. Accordingly, plaintiff's motion to amend, in this regard, is granted.

### 3. Retaliation Claims

Plaintiff alleges Redner and Annarino used excessive force and issued a false misbehavior report on May 16, 2021, in retaliation for plaintiff's "complaint" against defendants "no more than six months prior[.]" Prop. Sec. Am. Compl. at ¶ 37.

Claims of retaliation find their roots in the First Amendment. *Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). To state a cognizable First Amendment retaliation claim, a plaintiff's complaint must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Id.* at 380 (internal quotation

Mallard v. Redner, Not Reported in Fed. Supp. (2023)

2023 WL 8828866

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 381 of 531

marks omitted); *accord, Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). Courts must approach claims of retaliation " 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)). Conclusory statements are not sufficient to support retaliation claims; the claims must be supported by specific facts. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

**\*3** Here, the proposed pleading lacks any facts in support of plaintiff's claim that Redner and Annarino were motivated to retaliate based upon plaintiff's protected speech. Indeed, there are no factual allegations related to plaintiff's "complaint" against Redner and/or Annarino including when it was filed, with whom it was filed, the substance of the complaint, or how and when Redner and Annarino became aware of the complaint. The wholly conclusory characterization of defendants' actions as retaliatory fails to state a claim of retaliation. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) (Claims of retaliation must be "supported by specific and detailed factual allegations" and not stated "in wholly conclusory terms.") (quoting *Flaherty*, 713 F.2d at 13); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (wholly conclusory claims of retaliation "can be dismissed on the pleadings alone"); *Gill*, 824 F.2d at 194 (same). Plaintiff's conclusory assertion that he engaged in speech protected under the First Amendment, and his failure to allege facts plausibly showing a causal connection between protected speech and adverse action specific to each defendant, fails to state a claim for retaliation.

Accordingly, plaintiff's motion to amend to assert retaliation claims is denied as futile.

### 4. Conspiracy

A conspiracy claim under Section 1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Id.*; *see*

*also Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (to maintain a conspiracy action, the plaintiff "must provide some factual basis supporting a meeting of the minds").

Plaintiff has alleged in conclusory fashion that Redner, Annarino, Walker, and Short conspired to "cover[ ] up retaliation and excessive force[.]" Prop. Sec. Am. Compl. at ¶ 44. However, plaintiff's proposed amended pleading fails to set forth the factual details necessary to sustain a conspiracy claim; i.e., the existence of an agreement and meeting of the minds, including details of time, place, and the alleged effect of the conspiracy. *See Clayton v. City of Poughkeepsie*, No. 06 Civ. 4881, 2007 WL 2154196, at \*5 (S.D.N.Y. June 21, 2007). The pleading lacks factual allegations to plausibly suggest that there was any meeting of the minds between any of the defendants.

Plaintiff fails to state a conspiracy claim against any defendant, and therefore this portion of the motion to amend is denied as futile.

### 5. Freedom of Association

To the extent plaintiff mentions a "denial of intimate associations" in his accompanying Memorandum of Law, (Dkt. No. 86-1 at 7-10), he fails to allege or list any such claim in his proposed second amended complaint or identify any individual involved in such a claim. *See* Second Amended Complaint (Dkt. No. 86-2 at ¶¶ 39-44). Accordingly, such proposed amendment, if any, is denied as futile.

### IV. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's motion to amend is **GRANTED in part and DENIED in part** as follows: (1) plaintiff's request to amend to include Eighth Amendment claims against Redner, Short, Walker, and Annarino is **GRANTED**; (2) plaintiff's request to amend to include due process claims against Barbosa and Martin is **GRANTED**; (3) plaintiff's request to amend to include First Amendment retaliation claims is **DENIED**; (4) plaintiff's request to amend to include conspiracy claims is **DENIED**; and (5) the motion is otherwise **DENIED;** and it is further

**ORDERED** that the proposed second amended complaint (Dkt. No. 86-2) and all exhibits annexed thereto shall be filed

Mallard v. Redner, Not Reported in Fed. Supp. (2023)

2023 WL 8828866

by the Clerk as the second amended complaint. The second amended complaint will supersede and replace the previously filed amended complaint and will be the operative pleading; and it is further

**ORDERED** that a response to the second amended complaint be filed by the defendants, or his/her counsel, as provided for in the Federal Rules of Civil Procedure;

**\*4  ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include** **a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so may result in the dismissal of the action**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 8828866

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (6)**

**Direct History (1)**

1. Mallard v. Redner 🐦
   2023 WL 8828866 , N.D.N.Y. , Mar. 13, 2023

**Related References (5)**

2. Mallard v. New York
   2021 WL 12163914 , N.D.N.Y. , Oct. 01, 2021

3. Mallard v. New York
   2021 WL 12163913 , N.D.N.Y. , Nov. 09, 2021

4. Mallard v. New York
   2022 WL 21871936 , N.D.N.Y. , Jan. 03, 2022

5. Mallard v. Redner
   2022 WL 18491534 , N.D.N.Y. , Oct. 28, 2022

*Report and Recommendation Adopted by*

6. Mallard v. Redner
   2023 WL 418046 , N.D.N.Y. , Jan. 25, 2023

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 8169570

2005 WL 8169570
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Phillip LEWIS, Plaintiff,

v.

CITY OF ALBANY POLICE DEPT.; William Bonnani;
and Lawrence Heid, Police Officer, Defendants.

1:04-CV-0152 (DNH)(RFT)
|
Signed 02/14/2005

**Attorneys and Law Firms**

PHILLIP LEWIS, Plaintiff, Pro Se, 03-A-3581, Groveland
Correctional Facility, 7000 Sonyea Road, Sonyea, New York
14556.

OF COUNSEL: JOHN W. LIGUORI, ESQ., STEPHEN J.
REHFUSS, ESQ., BRENNAN, REHFUSS LAW FIRM, 12
Dove Street, Suite 202, Albany, New York 12210.

**MEMORANDUM-DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

 **\*1** Plaintiff Phillip Lewis ("plaintiff"), an inmate in
custody of the New York State Department of Correctional
Services ("DOCS"), [1] brings this action pursuant to 42
U.S.C. § 1983 alleging that the defendants violated his
constitutional rights. Specifically, plaintiff alleges that when
arresting plaintiff on November 23, 2002 in the City of
Albany, the defendant police officers used excessive force
against plaintiff, conducted an unreasonable search, violated
plaintiff's substantive due process rights, and denied plaintiff
equal protection. Dkt. No. 1.

[1]      The events referenced in the complaint occurred
prior to Plaintiff's incarceration.

Plaintiff seeks substantial monetary damages.

Presently before the Court is the defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56. [2] Dkt. No.
16. Plaintiff has filed a response opposing the motion. Dkt.
No. 21. Plaintiff has also filed a letter request to address the

issue of whether service of the summons and complaint is
complete, and to impose sanctions against the defendants.
Dkt. No. 22. Defendants have responded in opposition to
this letter request. Dkt. No. 20. The plaintiff's letter will be
addressed prior to addressing defendants' motion to dismiss
and/or for summary judgment.

[2]      The motion was actually filed pursuant to Fed. R.
Civ. P. 12(b)(6) and 56. Since defendants submitted
additional documents and an affidavit, in addition
to the pleadings, the motion will be considered as
brought pursuant to Fed. R. Civ. P. 56.

**II. Letter request**

Plaintiff argues that since the defendants actually interposed
an answer to plaintiff's complaint, it is clear that the summons
and complaint were served upon the defendants. Plaintiff
states that it is "physically impossible for the [defendants]
to have answered their complaint without receiving the
summons at the same time, therefore rendering any statement
contrary to this fact untrue...." Dkt. No. 22 at 8.

Defendants respond by stating that although the U.S.
Marshals Office sent the summons and complaint by mail to
the defendants, together with an acknowledgment of receipt
form, defendants did not return the acknowledgment form.
Dkt. No. 20, Memorandum of Law at 3; *id.*, Affidavit at 2; *id.*,
Ex. G. Defendants state that plaintiff did not thereafter attempt
service by another method. "Thus plaintiff did not obtain
personal jurisdiction over the defendants and the plaintiff's
basis for sanctions is without merit." *Id.*, Affidavit at 2.

Sanctions may be imposed against a party or an attorney, after
notice and opportunity to respond, for information improperly
contained in a pleading. Fed. R. Civ. P. 11. Pursuant to a Rule
11, sanctions are appropriate:

> when it appears that a pleading has
> been interposed for any improper
> purpose, *or where,* after reasonable
> inquiry, a competent inquiry could
> not form a reasonable belief that the
> pleading is well grounded in fact and
> is warranted by existing law or a
> good faith argument for the extension,

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 386 of 531

Lewis v. City of Albany Police Dept., Not Reported in Fed. Supp. (2005)

2005 WL 8169570

modification or reversal of existing
law.


**\*2** *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243,
254 (2d Cir. 1985) (emphasis in original).


The imposition of sanctions is inappropriate in this case.
When the defendants interposed their answer, it appears that
service upon the defendants was not complete. The USM-285
forms filed by the U.S. Marshals Office with respect to
defendants City of Albany Police Department and Lawrence
Heid indicate that the summonses for these defendants had
been returned unexecuted. Dkt. Nos. 12 and 13. There is
no proof on the record that service upon defendant Bonnani
was complete prior to the filing of defendants' answer. Thus,
plaintiff has not shown that the affirmative defense (lack
of personal jurisdiction over the defendants) was interposed
for any improper purpose. Nor has plaintiff shown that
the affirmative defense was not grounded in fact. Plaintiff's
request for sanctions will be denied.


However, the defendants have now waived any further right
to assert the defense of lack of personal jurisdiction. Although
the defendants reserved this affirmative defense in their
answer, they did not raise the defense in their subsequent
motion to dismiss plaintiff's complaint. *Compare* Dkt. No. 6
*with* Dkt. No. 16. This failure to raise the issue of personal
jurisdiction in their motion to dismiss or for summary
judgment constitutes a waiver of the defense. "[E]ven if a
litigant preserves the improper service of process defense by
including it in his answer, undue delay in challenging personal
jurisdiction by a motion to dismiss may constitute a waiver."
*Caruolo v. A C and S, Inc.,* No. 93 CIV. 3752, 1998 WL
633684, at \*3 (S.D.N.Y. 1998); *see also Burton v. Northern
Dutchess Hospital,* 106 F.R.D. 477, 481-82 (S.D.N.Y. 1985)
(failure of defendants to contest sufficiency of service of
process in their motion for summary judgment pursuant to
Fed. R. Civ. P. 56, even though they had preserved the defense
in their answer, constituted waiver of the defense). Since the
defendants have not raised the defense of lack of personal
jurisdiction in their pending motion for summary judgment,
the defense is deemed waived.


## III. Motion for Summary Judgment

### A. Summary Judgment Standard

Summary judgment may be granted when the moving party
carries its burden of showing the absence of a genuine issue

of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje,* 896
F.2d 716, 720 (2d Cir. 1990)(citations omitted). "Ambiguities
or inferences to be drawn from the facts must be viewed in
the light most favorable to the party opposing the summary
judgment motion." *Id.* However, when the moving party has
met its burden, the nonmoving party must do more than
"simply show that there is some metaphysical doubt as to
the material facts." *Matsushita Electric Industrial Co., Ltd. v.
Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also
Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).
At that point, the nonmoving party must come forward with
specific facts showing that there is a genuine issue for trial.
*Id.* Once the movant has properly supported the motion for
summary judgment with affidavits, the non-movant may not
rest upon the mere allegations of the complaint but must come
forward with affidavits or other evidence sufficient to create a
genuine issue of material fact. *Sunshine Books, Ltd. v. Temple
University,* 697 F.2d 90, 96 (3d Cir.); Fed. R. Civ. P. 56(e).


**\*3** In addition to deciding that there are no issues of fact
warranting a trial on the matter

> [w]here appropriate, a trial judge may dismiss for failure
> to state a cause of action upon a motion for summary
> judgment. "A motion for summary judgment may be made
> solely on the pleadings, when it is so made it is functionally
> the same as a motion to dismiss or a motion for judgment
> on the pleadings." ... Summary judgment procedure may
> be properly invoked for determination of a legal question.
> *Agrashell, Inc. v. Hammons Products Co.,* 248 F.Supp. 258
> (S.D.N.Y.), aff'd 352 F.2d 443 (2D Cir. 1996).

*Schwartz v. Compagnie General Transatlantique,* 405 F.2d
270, 273-74 (2d Cir. 1968). "Only where one of the parties
is entitled to judgment as a matter of law upon material facts
not genuinely in dispute is the Court warranted in granting
summary judgment." *Corsini v. Ross,* No. 97 Civ. 0968, 1997
WL 539950, at \*3 (S.D.N.Y. Aug. 28, 1997).


### B. Background

The facts are related herein in the light most favorable to
plaintiff as the non-movant. *See* Section A, *supra.*


On November 23, 2002, plaintiff was approached by members
of the Albany Police Department. When the police officers
asked whether he had a weapon, plaintiff replied that he did.
Dkt. No. 1 at 4. Plaintiff was then instructed to get down on
the ground with his hands straight out, and upon doing so,
plaintiff's hands were handcuffed behind his back. Plaintiff

Lewis v. City of Albany Police Dept., Not Reported in Fed. Supp. (2005)

2005 WL 8169570

states that he offered no resistance to defendant Bonnani, or any other officer, during this time. *Id.* Plaintiff told the officers where his weapon was, and the officers retrieved it. *Id.* At this point, the defendant William Bonnani ("Bonnani") began standing on plaintiff's head, laughing at him, and grinding his face into the asphalt pavement. *Id.* Defendant Lawrence Heid ("Heid") and ten to fifteen other City of Albany police officers, both male and female, were present, but "refused to intervene" to stop Bonnani from harming plaintiff. *Id.* Another officer then said that "it was his turn," and this officer also stood on plaintiff's face, grinding his face into the pavement and stones, "causing severe physical and psychological damage." Id. Bonnani then put on rubber gloves, pulled plaintiff's pants and underwear down, and conducted a rectal search in front of all the police officers present, as well as in front of civilian witnesses. *Id.* at 4 - 5. Plaintiff was then "kicked and assaulted viciously" by six to eight police officers. *Id.* at 5. During the course of this assault, the paddy wagon drivers forced their way past the assaulting officers and dragged plaintiff, with his pants still down, to the paddy wagon. *Id.* At his request, plaintiff was taken to the Albany Memorial Hospital before being taken to the police station. *Id.*

Plaintiff claims that the actions of the defendants violated his constitutional rights. Specifically, plaintiff claims that he was denied equal protection and due process, and he was subjected to an unreasonable search and seizure, as well as excessive force during his arrest.

### C. Discussion

Defendants argue that summary judgment dismissing this action is appropriate because plaintiff has a concurrent action pending in state court which addresses claims similar in nature to those contained in the present Federal action. Defendants also assert that plaintiff has failed to state claims for equal protection, substantive due process, illegal search and seizure, or use of excessive force.

### 1. Pending state court action

**\*4** Defendants' first argument in support of their motion to dismiss plaintiff's action rests upon a question of jurisdiction. Defendants claim that because plaintiff has a parallel action pending in state court, this Federal action should not be allowed to proceed. Essentially, defendants ask the Court to abstain from jurisdiction over this present action or, in the alternative, stay proceedings on the present action pending resolution of the pending state court action.

Although federal courts have a "virtually unflagging obligation" to exercise their jurisdiction, *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), there are several traditional categories of abstention. *See Younger v. Harris,* 401 U.S. 37, 43-54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (abstention appropriate where there is a pending state criminal proceeding); *Burford v. Sun Oil Co.,* 319 U.S. 315, 317-34, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (abstention appropriate to avoid interference with attempts to establish coherent state policy and issues of peculiarly local concern); *Railroad Comm'n v. Pullman* Co., 312 U.S. 496, 498-501, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (abstention appropriate to avoid unnecessary resolution of a constitutional issue that might be mooted by state court construction of a state law); *see also MacDonald v. Village of Northport,* 164 F.3d 964, 967-68 (6th Cir. 1999).

*Village of Westfield, N.Y. v. Welch's,* 170 F.3d 116, 120 (2d Cir. 1999). This case does not fall within any of the traditional categories of abstention.

In *Colorado River,* the Supreme Court held that abstention may also be appropriate in cases that do not fit neatly within these traditional categories. *See Colorado River,* 424 U.S. at 817-18, 96 S.Ct. 1236; *DeCisneros v. Younger,* 871 F.2d 305, 307 (2d Cir. 1989). Abstention under *Colorado River* applies where ... "state and federal courts exercise concurrent jurisdiction simultaneously." *Burnett v. Physician's Online, Inc.,* 99 F.3d 72, 76 (2d Cir. 1996). The Supreme Court held that although a pending action in a state court does not generally bar proceedings involving the same matter in a federal court, a federal court may dismiss a federal suit for "reasons of wise judicial administration" where there are "exceptional" circumstances. *Colorado*

2005 WL 8169570

*River*, 424 U.S. at 818, 96 S.Ct. 1236; *see also Burnett, 99 F.3d at 76.*

*Village of Westfield, N.Y.*, 170 F.3d at 120. "The many factors to be considered in deciding whether to postpone exercising jurisdiction make the decision, in the last analysis, a matter committed to the court's discretion." *Microsoftware Computer Sys., Inc. v. Ontel Corp.*, 686 F.2d 531, 537 (7th Cir. 1982). However, "[i]f there is any substantial doubt that the parallel litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to the parallel litigation." *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001).

Defendants point to an application pending in state court, filed by plaintiff on November 7, 2003, in which he requested permission to file a late notice of claim against the City of Albany and some of its officers pursuant to New York General Municipal Law § 50-e. Plaintiff's state court application, as well as his Federal complaint, both relate to his arrest and alleged assault on November 23, 2003 by City of Albany police officers. Dkt. No. 16, Affidavit at ¶¶ 3-4. The application to file a late notice of claim was denied by Order of State Supreme Court Justice Bernard J. Malone, Jr., dated January 14, 2004. Dkt. No. 16, Ex. C. Plaintiff's state court application is currently pending, on appeal, before the New York State Appellate Division. *Id.* at ¶ 4. Defendants state that the state court complaint filed with plaintiff's application to file a late notice of claim alleges that plaintiff "was subjected to excessive force, illegal arrest, illegal search and seizure, and assault and battery, resulting in personal injury." *Id.*

 **\*5** Plaintiff opposes defendants' request to dismiss this action on the basis of abstention. He states that on November 7, 2003, he filed an application in Supreme Court, Albany County, to file a late notice of claim against the City of Albany and its agents alleging personal injury resulting from assault and battery. Dkt. No. 21, Affidavit in Opposition at ¶ 13. He further argues that an "application for permission to file a late notice of [claim] is exactly what it implys [*sic*] not a notice of claim it was never allowed to proceed to be a notice of claim." *Id.* Plaintiff also states that, in any event, he believes that he has abandoned his state court action.

The state court papers submitted by the defendants have been reviewed. The papers include, in their entirety: (1) plaintiff's application to file a late notice of claim, dated 11/7/2003 (Dkt. No. 16, Ex. A); (2) defendants' opposition to plaintiff's

petition to file a late notice of claim, dated 12/16/2003 (*Id.*, Ex. B); (3) the Decision and Order of Justice Malone dated 01/14/2004 which denied plaintiff's application (*Id.*, Ex. C); and (4) plaintiff's notice of appeal to the Appellate Division, Third Department, dated 2/05/2004 (*Id.*, Ex. F). In denying plaintiff's application, Judge Malone noted that the papers considered in reviewing the application included the **proposed** summons, complaint and bill of particulars.[3]

[3]     The Order also indicated that all of the papers, including the Order, were being returned to the attorney for the defendant.

The defendants have not met their burden of showing that plaintiff has an actual action pending in state court which is parallel to this action. Instead, the plaintiff has the **potential** for having such an action pending in state court in the future. The viability of the state court action appears to be dependent upon the Appellate Division, Third Department, reversing Justice Malone's order and granting plaintiff permission to file a late notice of claim against the City of Albany and its employees. Since the defendants have not shown that plaintiff is likely to succeed in being allowed to proceed with a state court action, it would be improper to dismiss or stay this action. *See AAR Int'l, Inc.*, 250 F.3d at 518 ("If there is any substantial doubt that the parallel litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to the parallel litigation."). Therefore, there is no basis to abstain from jurisdiction over the present action.

Defendants' motion to dismiss plaintiff's complaint on the grounds that there is a parallel state action pending must be denied.

### 2. Failure to state a claim

Defendants also seek to dismiss plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6), claiming that he has failed to state claims for equal protection, substantive due process, unreasonable search and seizure, or use of excessive force.

When a summary judgment motion is made solely on the pleadings, it is functionally the same as a motion to

2005 WL 8169570

dismiss for failure to state a claim upon which relief can be granted.

*Katz v. Molic,* 128 F.R.D. 35, 38 (S.D.N.Y. 1989) (citing *Schwartz,* 405 F.2d at 273).

> The standard by which a court tests a motion to dismiss a *pro se* plaintiff's complaint is whether, taking the allegations of the complaint as true, *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), and reviewing them under a less stringent standard than formal pleadings drafted by counsel, *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972), it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief, *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court decides as a threshold matter whether the complaint states an actionable claim. No further submissions or discovery will alter the court's determination.

**\*6** *Katz,* 128 F.R.D. at 38-39. In reviewing a challenge to the sufficiency of a pleading, "[the] court's function ... is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985).

In light of the above, the remaining portions of defendants' summary judgment motion will be reviewed, where appropriate, in accordance with the above standards established for review of a motion to dismiss.

### a. Equal protection

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assoc. v. Village of Mineola,* 273 F.3d 494, 499 (2d Cir. 2001) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). "To prove an equal protection violation, claimants must

prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir. 1995) (citations omitted). "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir. 2000)(citing *Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir. 1999)).

In his complaint, plaintiff alleges that he was attacked by Bonnani "because [Bonnani] disliked [plaintiff] because of his color and made remarks about Black this and that." Dkt. No. 1 at 5. Plaintiff also alleges that he "was racially stereotyped and assaulted by insane jealousy and dislike...." *Id.*

Defendants argue that plaintiff has failed to state a claim for denial of equal protection. Dkt. No. 16, Memorandum of Law at 5-6. Specifically, defendants assert that plaintiff's equal protection claim fails because (1) it is based on "pure speculation and conjecture"; (2) plaintiff has failed to show how he was treated differently than other similarly situated persons; (3) plaintiff has failed to show that the actions of the officers "were unlawful in light of the fact that the plaintiff was, admittedly in possession of weapons and was resisting arrest"; and (4) plaintiff's alleged attack was participated in by a member of his own race.[4] *Id.* at 6.

> [4]     While defendants attempt to introduce evidence to support their argument that plaintiff has no equal protection claim -- e.g. defendants state that the presence of a "light skinned black officer" defeats plaintiff's claim -- defendants have produced no affidavits to support such evidence.

In this case, plaintiff has alleged that he is a member of a protected class and has been treated differently and vindictively because of his race and on account of Bonnani's discriminatory animus towards plaintiff's race. The allegations, though sparse, are sufficient to state a claim for equal protection at the pleading stage. Thus, defendants' motion to dismiss plaintiff's equal protection claim must be denied.

### b. Substantive due process

Defendants argue that plaintiff's due process claim under the Fourteenth Amendment should be dismissed because it duplicates plaintiff's more specific claim under the Fourth Amendment, that he was subjected to an unreasonable search

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 390 of 531

Lewis v. City of Albany Police Dept., Not Reported in Fed. Supp. (2005)

2005 WL 8169570

and seizure. In *Albright v. Oliver*, 510 U.S. 266 (1994), the Supreme Court stated that:

> **\*7** [a]s a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.

*Albright,* 510 U.S. at 272 (citation omitted). "Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " *Albright,* 510 U.S. at 273 (quoting *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989)).

Turning to the complaint in this action, plaintiff claims that he was subjected to an unreasonable search in violation of his rights under both the Fourth and Fourteenth Amendments to the United States Constitution. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Since plaintiff has alleged a more specific claim for unreasonable search and seizure under the Fourth Amendment, plaintiff's Fourteenth Amendment claim arising from the same search is duplicative and is therefore barred by the rule set forth in *Albright, supra.* Accordingly, plaintiff's substantive due process claim will be dismissed.

#### c. Search and seizure claim; excessive force claim

Finally, defendants contend that plaintiff's claims for illegal search and seizure and use of excessive force during his arrest should be dismissed because plaintiff has failed to set forth sufficient facts to support these claims. Defendants argue plaintiff has "failed to produce a single witness to this alleged public strip search" or to "the alleged beating and excessive force used in his arrest, despite his claims in his pleadings that there were people on the street, screaming at the APD officers to stop hurting him." Dkt. No. 16, Rehfuss Aff. at 6-8. Defendants also state that there "is no record of any strip search being conducted against the plaintiff, either in public or at the police station." *Id.*, Rehfuss Aff. at 6; *see also id.* at Ex. B. Finally, defendants argue the plaintiff has "failed to support his claim of excessive force in light of the circumstances surrounding his arrest." *Id.*, Rehfuss Aff. at 8. Defendants seem to contend that if excessive force was used, it was justified under the circumstances. [5]

[5]    Defendants' motion vacillates between arguing that plaintiff has failed to state claims for unreasonable search and excessive force, and that plaintiff has not set forth sufficient facts to support either claim. Therefore, this claim will be reviewed under the standards for both motions to dismiss and motions for summary judgment.

In response, plaintiff argues that the fact that there is no public record of the improper search is of no consequence because "when do police record illegal activities unless caught on videotape." Dkt. No. 21, Statement of Material Facts at 8. Plaintiff also argues that he cooperated completely with his arresting officers and therefore the use of excessive force was not justified. *Id.* at 8-10.

**\*8** Defendants have failed to support their request for summary judgment in respect to plaintiff's illegal search and excessive force claims. Plaintiff's complaint contains sufficient allegations to support such claims. The submissions of a *pro se* plaintiff should be held " 'to less stringent standards than formal pleadings drafted by lawyers....' " *Hughes v. Rowe*, 449 U.S. 5, 9 (1980)(quoting *Haines v. Kerner*, 404 U.S. 519 (1972). In fact, district courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d

2005 WL 8169570

Cir. 1999))(quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)). When judged with the liberality afforded *pro se* plaintiffs, plaintiff alleges enough to overcome a pleading challenge at this early stage.

If, on the other hand, defendants are claiming that no questions of fact remain with respect to these claims, this argument also fails. They have not presented affidavits, based upon personal knowledge of the affiants, to support their claims that an illegal search did not occur and that excessive force, under the circumstances, was not used against the plaintiff. *See* Fed. R. Civ. P. 56(e). (Affidavits in support of or opposition to a summary judgment motion must be made on personal knowledge, setting forth facts which would be admissible at trial by an affiant who is competent to testify to the matters within the affidavit.) Defendants have failed to carry their burden of showing the absence of a genuine issue of material fact. [6] Many questions of fact remain which must be resolved by the fact finders.

[6]    Plaintiff's obligation to go beyond his pleading when responding to a motion for summary judgment does not arise until defendants have properly supported the motion with affidavits, or other evidence, demonstrating that there are no

genuine issues of fact. *See* Fed. R. Civ. P. 56; *see also Thompson,* 896 F.2d at 720; *Sunshine Books. Ltd.,* 697 F.2d at 96.

Defendants' motion to dismiss plaintiff's claims of illegal search and seizure and use of excessive force must be denied.

THEREFORE, it is

ORDERED, that

1. Plaintiff's letter request for sanctions is DENIED;

2. Defendants' affirmative defense of lack of personal jurisdiction is DISMISSED;

3. Plaintiff's substantive due process claim under the Fourteenth Amendment is DISMISSED; and

4. Defendants' motion in all other respects is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8169570

---

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (3)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Memorandum of Law**<br>Phillip LEWIS, Plaintiff, v. CITY OF ALBANY POLICE DEPARTMENT, William Bonnani, and Lawrence Heid, Defendants.<br>2006 WL 1468254 | PDF | N.D.N.Y. | Apr. 27, 2006 | Motion |
| **2. Memorandum of Law**<br>Phillip LEWIS, Plaintiff, v. CITY OF ALBANY POLICE DEPARTMENT, William Bonnani, and Lawrence Heid, Defendants.<br>2004 WL 3507604 | PDF | N.D.N.Y. | July 29, 2004 | Motion |
| **3. Docket 1:04-CV-00152**<br>Lewis v. City of Albany Police Dept. et al | — | N.D.N.Y. | Feb. 09, 2004 | Docket |

**History (10)**

**Direct History (1)**

1. Lewis v. City of Albany Police Dept. 👓
   2005 WL 8169570 , N.D.N.Y. , Feb. 14, 2005

**Related References (9)**

2. Lewis v. City of Albany Police Dept.
   2006 WL 1454818 , N.D.N.Y. , May 22, 2006

3. Lewis v. City of Albany Police Dept.
   2007 WL 9771120 , N.D.N.Y. , Mar. 26, 2007

🚩 4. Lewis v. City of Albany Police Dept.
   547 F.Supp.2d 191 , N.D.N.Y. , Apr. 24, 2008

   *Affirmed by*

5. Lewis v. City of Albany Police Dept.
   332 Fed.Appx. 641 , 2nd Cir.(N.Y.) , May 07, 2009

   *Certiorari Denied by*

6. City of Albany Police Dept. v. Lewis
   558 U.S. 1050 , U.S. , Nov. 30, 2009

🚩 7. Lewis v. City of Albany Police Dept.
   554 F.Supp.2d 297 , N.D.N.Y. , May 20, 2008

   *Affirmed by*

8. Lewis v. City of Albany Police Dept.
   332 Fed.Appx. 641 , 2nd Cir.(N.Y.) , May 07, 2009

   *Certiorari Denied by*

9. City of Albany Police Dept. v. Lewis
558 U.S. 1050 , U.S. , Nov. 30, 2009

10. Lewis v. City of Albany Police Dept.
2009 WL 2356798 , N.D.N.Y. , July 29, 2009

970 F.Supp.2d 78
United States District Court, N.D. New York.

Sgt. Marie ROTHER, Plaintiff,

v.

The NYS DEPARTMENT OF CORRECTIONS
AND COMMUNITY SUPERVISION; Brian Fischer,
Commissioner of NYS Department of Corrections and
Community Supervision; Greene Correctional Facility;
Coxsackie Correctional Facility; David Morse (in both
his official and individual capacity); James Weeks (in
both his official and individual capacity); John Doe;
and Richard Roe (as unknown individual defendants in
both their official and individual capacities), Defendants.

No. 1:12–CV–0397 (LEK/CFH)
|
Sept. 4, 2013.

**Synopsis**
**Background:** Female corrections officer brought action
against state department of corrections, correctional facility,
supervisors and coworkers, alleging sex discrimination
and retaliation under Title VII, denial of equal protection
pursuant to § 1983, denial of due process under Fourteenth
Amendment, First Amendment retaliation, conspiracy under
§ 1985, and various state claims. Defendants moved to
dismiss.

**Holdings:** The District Court, Lawrence E. Kahn, J., held
that:

[1] officer's complaint alleged hostile work environment
claim;

[2] complaint failed to state claim for constructive discharge;

[3] complaint stated claim for retaliation;

[4] officer's speech was not on matter of public concern;

[5] complaint stated claim for violation of Equal Protection
Clause; and

[6] officer's complaint failed to sufficiently allege a factual
basis for conspiracy claim.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss; Motion to
Dismiss for Failure to State a Claim; Motion to Dismiss for
Lack of Subject Matter Jurisdiction.

West Headnotes (58)

[1] **Federal Courts** 🔑 Suits Against States;
Eleventh Amendment and Sovereign Immunity

**Federal Courts** 🔑 Suits for injunctive or
other prospective or equitable relief; Ex parte
Young doctrine

**Federal Courts** 🔑 Agencies, officers, and
public employees

Eleventh Amendment immunizes states and state
agencies from suits that seek both monetary
damages and injunctive relief. U.S.C.A.
Const.Amend. 11.

2 Cases that cite this headnote

[2] **Federal Courts** 🔑 Abrogation by Congress

**Federal Courts** 🔑 Waiver by State; Consent

States may waive their sovereign immunity
under the Eleventh Amendment or Congress
may abrogate that immunity pursuant to
authority granted by a subsequent constitutional
amendment. U.S.C.A. Const.Amend. 11.

8 Cases that cite this headnote

[3] **Federal Courts** 🔑 Agencies, officers, and
public employees

The "state" for purposes of the Eleventh
Amendment generally includes state officials
sued in their official capacities. U.S.C.A.
Const.Amend. 11.

9 Cases that cite this headnote

[4] **Federal Courts** 🔑 Suits for injunctive or
other prospective or equitable relief; Ex parte
Young doctrine

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 396 of 531
Rother v. NYS Dept. of Corrections and Community Supervision, 970 F.Supp.2d 78 (2013)
2013 WL 4774484

**Federal Courts**  ⚖  Agencies, officers, and public employees

Under the narrow *Ex Parte Young* exception to the general rule of Eleventh Amendment immunity from suit, a plaintiff may sue a state official acting in his official capacity, notwithstanding the Eleventh Amendment, for prospective, injunctive relief from violations of federal law. U.S.C.A. Const.Amend. 11.

6 Cases that cite this headnote

[5]    **Federal Courts**  ⚖  Suits for injunctive or other prospective or equitable relief;  Ex parte Young doctrine

**Federal Courts**  ⚖  Agencies, officers, and public employees

A party may sue a state official under the *Ex Parte Young* exception to the general rule of Eleventh Amendment immunity from suit to stop a present and continuing violation of federal law that is premised on past state actions, but cannot obtain relief that would be tantamount to an award of damages for those past actions. U.S.C.A. Const.Amend. 11.

[6]    **Federal Courts**  ⚖  Suits for injunctive or other prospective or equitable relief;  Ex parte Young doctrine

**Federal Courts**  ⚖  Agencies, officers, and public employees

In the employment context, a request for reinstatement is not barred by the general rule of Eleventh Amendment immunity from suit because reinstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll; the recovery of attorney fees is also permitted as relief ancillary to prospective relief. U.S.C.A. Const.Amend. 11.

1 Case that cites this headnote

[7]    **Federal Courts**  ⚖  Agencies, officers, and public employees

A claim for damages, including back pay, front pay, and compensatory and punitive damages, is barred by the general rule of Eleventh Amendment immunity from suit for state officials sued in their official capacities. U.S.C.A. Const.Amend. 11.

5 Cases that cite this headnote

[8]    **Civil Rights**  ⚖  Adverse actions in general

In an employment discrimination case, an "adverse employment action" is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.

[9]    **Civil Rights**  ⚖  Hostile environment; severity, pervasiveness, and frequency

In the context of an employment discrimination case, a hostile work environment constitutes an adverse employment action.

3 Cases that cite this headnote

[10]    **Civil Rights**  ⚖  Hostile environment; severity, pervasiveness, and frequency

On a claim for hostile work environment in an employment discrimination action, the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.

7 Cases that cite this headnote

[11]    **Civil Rights**  ⚖  Hostile environment; severity, pervasiveness, and frequency

A plaintiff alleging hostile work environment in an employment discrimination action may show that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of his working environment.

3 Cases that cite this headnote

2013 WL 4774484

**[12]**    **Civil Rights**  🔑  Hostile environment;
severity, pervasiveness, and frequency

On a claim for hostile work environment in
an employment discrimination action, courts
should examine the totality of the circumstances,
including: the frequency of the discriminatory
conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes
with the victim's job performance.

3 Cases that cite this headnote

**[13]**    **Civil Rights**  🔑  Hostile environment;
severity, pervasiveness, and frequency

Female corrections officer's complaint alleged
"severe and pervasive" element of sexually
hostile work environment claim against
correctional facility and state department of
corrections under Title VII, by alleging that
coworker told officer, in front of inmates,
coworkers, and officer's subordinates, that she
had received administrative-sergeant position
by performing sexual favors and that she
was a "bitch and a backstabber," "a stupid
cunt," and a "whining bitch" who "sucked,"
that officer was subjected to discriminatory
coworker shunning and tire-slashing threats,
assignment denials, performance criticisms,
discipline, vigilant monitoring, and denial of
overtime and leave pay denials, and, through
description of emotional and psychological toll
of treatment, that officer subjectively perceived
her work environment to be abusive. Civil Rights
Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e
et seq.

1 Case that cites this headnote

**[14]**    **Civil Rights**  🔑  Constructive discharge

An employee is constructively discharged in
violation of employment discrimination statutes
when his employer, rather than discharging
him directly, intentionally creates a work
atmosphere so intolerable that he is forced to quit
involuntarily.

4 Cases that cite this headnote

**[15]**    **Civil Rights**  🔑  Constructive discharge

In the employment discrimination context,
the inquiry in a constructive discharge claim
is objective, determining whether working
conditions become so intolerable that a
reasonable person in the employee's position
would have felt compelled to resign; this is a
demanding standard.

3 Cases that cite this headnote

**[16]**    **Civil Rights**  🔑  Constructive discharge

The standard for constructive discharge is even
higher than that required to prevail on a hostile
environment claim.

1 Case that cites this headnote

**[17]**    **Civil Rights**  🔑  Constructive discharge

A claim of constructive discharge by a plaintiff
alleging employment discrimination must be
dismissed as a matter of law unless the evidence
is sufficient to permit a rational trier of fact
to infer that the employer deliberately created
working conditions that were so difficult or
unpleasant that a reasonable person in the
employee's shoes would have felt compelled to
resign.

4 Cases that cite this headnote

**[18]**    **Civil Rights**  🔑  Constructive discharge

In employment discrimination cases, the
constructive-discharge inquiry focuses on the
working conditions preceding the employee's
resignation.

1 Case that cites this headnote

**[19]**    **Civil Rights**  🔑  Constructive discharge

Constructive discharge is unlikely to be found
in an employment discrimination case where
an employee's working conditions materially
improve before she resigns.

**[20]**    **Civil Rights** 🔑  Constructive discharge

Female corrections officer did not show that reasonable employee in her position would have felt compelled to resign, as required to support constructive discharge claim in gender discrimination action against correctional facility, state department of corrections, and coworkers under Title VII, even though coworker called officer "a stupid cunt" and a "whining bitch" in front of other coworkers; coworker's comments took place eight months before officer's retirement and approximately three months before she stopped working, incident took place at facility different from one where officer worked when she went on leave and to which she would have returned had she not resigned, and much of defendants' conduct while officer was on leave, including alleged delay in filing workers' compensation paperwork, had little impact on her working conditions. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3 Cases that cite this headnote

**[21]**    **Civil Rights** 🔑  Constructive discharge

Apprehension of future termination is insufficient to establish constructive discharge in an employment discrimination case; instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast.

1 Case that cites this headnote

**[22]**    **Civil Rights** 🔑  Constructive discharge

In an employment discrimination action, when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge.

**[23]**    **Civil Rights** 🔑  Constructive discharge

Prospect of termination for female correctional officer was too remote to give rise to constructive discharge claim premised on inevitable termination, in Title VII action

against correctional facility, state department of corrections, and coworkers; when officer ceased working and then later retired, she had been formally counseled twice, had never been suspended, and was facing possibility of unspecified additional discipline. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

**[24]**    **Civil Rights** 🔑  Adverse actions in general

Retaliation is actionable under Title VII only where it amounts to a materially adverse action, i.e., an action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination; this is a lesser standard than the adverse-employment-action standard. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[25]**    **Civil Rights** 🔑  Discipline

**Prisons** 🔑  Conduct and control in general

**Public Employment** 🔑  Exercise of Rights; Retaliation

Female correctional officer's complaint alleged "materially adverse action" element of Title VII retaliation claim against correctional facility and state department of corrections by alleging that officer endured unmerited criticism and discipline, failure to remedy coworker's mistreatment, repeated coworker shunning and threats of tire slashing, video-camera monitoring, denial of vacation pay, and delay in filling out workers' compensation paperwork. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[26]**    **Constitutional Law** 🔑  Public or private concern; speaking as "citizen"

The First Amendment protects a public employee's speech from retaliation only where the employee spoke on a matter of public concern. U.S.C.A. Const.Amend. 1.

1 Case that cites this headnote

[27]  **Constitutional Law** 👉 Public or private
concern; speaking as "citizen"

A public employee's speech deals with matters
of public concern for First Amendment purposes
when it can be fairly considered as relating to any
matter of political, social, or other concern to the
community, or when it is a subject of legitimate
news interest; that is, a subject of general interest
and of value and concern to the public. U.S.C.A.
Const.Amend. 1.

1 Case that cites this headnote

[28]  **Constitutional Law** 👉 Public or private
concern; speaking as "citizen"

Public employee speech that primarily concerns
an issue that is personal in nature and generally
related to the speaker's own situation, such as his
or her assignments, promotion, or salary, does
not address matters of public concern for First
Amendment purposes. U.S.C.A. Const.Amend.
1.

1 Case that cites this headnote

[29]  **Constitutional Law** 👉 Prisons; parole and
probation officers

**Prisons** 👉 Conduct and control in general

**Public Employment** 👉 Protected activities

Female correctional officer's speech was not
on a matter of public concern, as required
to support First Amendment retaliation claim
against correctional facility and state department
of corrections; all officer's complaints regarding
discrimination, whether made internally or to
Equal Employment Opportunity Commission
(EEOC) and New York State Division of Human
Rights, concerned only discrimination against
her. U.S.C.A. Const.Amend. 1.

[30]  **Constitutional Law** 👉 Procedural due
process in general

**Constitutional Law** 👉 Duration and timing
of deprivation; pre- or post-deprivation
remedies

To plead a violation of procedural due process,
a plaintiff must plausibly allege that he was
deprived of property without constitutionally
adequate pre- or post-deprivation process; a
plaintiff must first identify a property right,
second show that the government has deprived
him of that right, and third show that the
deprivation was effected without due process.
U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[31]  **Constitutional Law** 👉 Termination or
discharge

Pursuant to the Due Process Clause of
the Fourteenth Amendment, while a public
employee with a property right in her job is
normally entitled to a pre-termination hearing,
employees who are constructively discharged are
not. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[32]  **Constitutional Law** 👉 Termination or
discharge

As long as a meaningful post-resignation hearing
is available, a constructively discharged public
employee has received constitutionally adequate
process. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[33]  **Public Employment** 👉 Exclusive,
Concurrent, and Conflicting Remedies

Under New York law, Article 78 proceedings
are available to public employees, including
employees of state agencies. N.Y.McKinney's
CPLR 7801.

1 Case that cites this headnote

[34]  **Public Employment** 👉 Time for review

Under New York law, where a plaintiff
is constructively discharged, the statute of

limitations applicable to commencing Article 78 proceedings begins to runs on the date of the resignation. N.Y.McKinney's CPLR 217(1), 7801.

**[35]    Constitutional Law    🗝 Rights and interests protected; fundamental rights**

To state a substantive due process claim, a plaintiff must allege that: (1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary. U.S.C.A. Const.Amend. 14.

20 Cases that cite this headnote

**[36]    Constitutional Law    🗝 Egregiousness; "shock the conscience" test**

For a substantive due process claim to survive a motion to dismiss for failure to state a claim, it must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. U.S.C.A. Const.Amend. 14.

13 Cases that cite this headnote

**[37]    Constitutional Law    🗝 Relationship to Other Constitutional Provisions; Incorporation**

Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims. U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**[38]    Federal Civil Procedure    🗝 Alternate, Hypothetical and Inconsistent Claims**

Substantive-due-process claims must be dismissed where they are merely duplicative of claims explicitly protected under other constitutional sources. U.S.C.A. Const.Amend. 14.

15 Cases that cite this headnote

**[39]    Constitutional Law    🗝 Public Employment Relationships**

Female correctional officer's substantive-due-process claim against state department of corrections and correctional facility was subsumed by her other constitutional claims; harm and conduct challenged by substantive-due-process claim significantly overlapped with officer's First Amendment, procedural-due-process, and equal-protection claims. U.S.C.A. Const.Amends. 1, 14.

28 Cases that cite this headnote

**[40]    Constitutional Law    🗝 Intentional or purposeful action requirement**

**Constitutional Law    🗝 Similarly situated persons; like circumstances**

To prove a violation of the Equal Protection Clause a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination. U.S.C.A. Const.Amend. 14.

**[41]    Constitutional Law    🗝 Public employees and officials in general**

**Prisons    🗝 Conduct and control in general**

**Public Employment    🗝 Disparate treatment**

Female correctional officer's complaint stated a § 1983 claim against state department of corrections and correctional facility for violation of the Equal Protection Clause, where complaint alleged that no male employee was subjected to treatment of which she complained, including excessive monitoring, procedurally irregular discipline, and denial of overtime, and that officer was criticized and disciplined repeatedly for proper and innocuous conduct while male coworker received no criticism or discipline for his patently improper and inappropriate verbal tirade, which included explicitly sexist language. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

[42]    **Civil Rights** 🔑 Vicarious liability and respondeat superior in general; supervisory liability in general

A supervisor's liability under § 1983 cannot rest on respondeat superior. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[43]    **Civil Rights** 🔑 Vicarious liability and respondeat superior in general; supervisory liability in general

In a § 1983 action, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that the violation was occurring. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[44]    **Civil Rights** 🔑 Criminal law enforcement; prisons

Mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[45]    **Civil Rights** 🔑 Prisons and jails; probation and parole

Conclusory allegations in female corrections officer's complaint regarding personal involvement of state's commissioner of corrections were insufficient to implicate commissioner in § 1983 claim for violations of Equal Protection Clause; complaint merely alleged that individual defendants negligently supervised persons committing equal protection violations and that supervisory "personnel did not remedy the situation after they were advised of it and were thus grossly negligent in their performance of their duties and/or allowed a custom or practice of discrimination and retaliation to pervade the workplace," and officer pointed to nothing suggesting that commissioner had any reason to know about her discrimination complaints or workers' compensation claims. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

[46]    **Civil Rights** 🔑 Liability of Public Employees and Officials

Personal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under § 1983. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[47]    **Civil Rights** 🔑 Liability of Public Employees and Officials

In a § 1983 action against a public official sued in his official capacity, all that a plaintiff must show for injunctive or declaratory relief is that the official had: (1) a direct connection to, or responsibility for, the alleged illegal actions; and (2) the authority to perform the required act. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[48]    **Civil Rights** 🔑 Employment practices

State's commissioner of corrections, by virtue of his supervisory position, had both a direct connection to alleged gender discrimination against female corrections officer and authority to reinstate and transfer officer, as required to support officer's § 1983 equal protection claim against commissioner in his official capacity seeking injunctive or declaratory relief. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[49]    **Conspiracy** 🔑 Equal privileges and immunities; equal protection

In order to make out a conspiracy claim under § 1985, a plaintiff must demonstrate: (1) a

conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1985(3).

3 Cases that cite this headnote

[50]  **Conspiracy**  🔑  Civil rights conspiracies

The pleading standard for a conspiracy claim under § 1985 is demanding; even detailed allegations of parallel conduct do not suffice without some factual basis for inferring the existence of an agreement. 42 U.S.C.A. § 1985(3).

4 Cases that cite this headnote

[51]  **Conspiracy**  🔑  Civil rights conspiracies

Female corrections officer's complaint failed to sufficiently allege a factual basis for conspiracy claim against state's commissioner of corrections, coworkers, and supervisor based on alleged equal protection violations; individual defendants' discriminatory actions differed significantly, defendants occupied different positions, and officer, at most, alleged somewhat parallel action in that each of the defendants allegedly discriminated against her in some way. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1985(3).

[52]  **Infliction of Emotional Distress**  🔑  Extreme or outrageous conduct

In order to make out an Intentional Infliction of Emotional Distress (IIED) claim in New York, a plaintiff must demonstrate extreme and outrageous conduct; conduct is extreme and outrageous only where it so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and [be] utterly intolerable in a civilized community.

5 Cases that cite this headnote

[53]  **Limitation of Actions**  🔑  Continuing injury in general

Under New York's continuing-violations doctrine, otherwise time-barred conduct may give rise to intentional infliction of emotional distress (IIED) liability where the plaintiff alleges continuous harm extending into the limitations period; the series of events alleged to constitute continuous harm must not be isolated and sporadic. N.Y.McKinney's CPLR 215(3).

More cases on this issue

[54]  **Infliction of Emotional Distress**  🔑  Sex in general

Coworker's alleged conduct was insufficiently extreme and outrageous to support female corrections officer's claim for intentional infliction of emotional distress under New York law; coworker's alleged verbal tirade against officer, although highly offensive, misogynist, and demeaning, was a one-time occurrence unaccompanied by physical contact or the threat thereof, an alleged vandalism, shunning, and threats of tire slashing, however disconcerting, did not involve actual or threatened physical contact or implicate immediate bodily harm.

3 Cases that cite this headnote
More cases on this issue

[55]  **Infliction of Emotional Distress**  🔑  Sex in general

Supervisor's alleged conduct, including unmerited counseling and failure to remedy coworker's harassment of female corrections officer, was insufficiently extreme and outrageous to support officer's claim for intentional infliction of emotional distress under New York law.

3 Cases that cite this headnote
More cases on this issue

**[56]    Federal Civil Procedure** 👈 **Alternate, Hypothetical and Inconsistent Claims**

Under New York law, a duplicative prima facie tort claim must be dismissed.

2 Cases that cite this headnote

**[57]    Labor and Employment** 👈 **Wrongful discharge in general**

There is no New York tort of wrongful discharge.

**[58]    Labor and Employment** 👈 **Wrongful discharge in general**

**Torts** 👈 **Nature and form of remedy**

Under New York law, because there is no tort of wrongful discharge, where a plaintiff brings a claim for prima facie tort, or other tort, seeking to challenge the termination of her employment, the claim must be dismissed.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*85** Karen L. Kimball, Office of Karen L. Kimball, Wynantskill, NY, for Plaintiff.

Gregory J. Rodriguez, Office of Attorney General, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE E. KAHN, District Judge.

**I. INTRODUCTION**

**\*\*1** In this employment action, Plaintiff, Sergeant Marie Rother ("Plaintiff"), brings a number of claims arising out of her treatment by supervisors and co-workers while she was employed by Defendant the NYS Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 23 ("Amended Complaint"). Presently before the Court is Defendants' Motion to dismiss. Dkt. No. 25 ("Motion"). For the reasons that follow, the Motion is granted in part and denied in part.

**II. BACKGROUND** [1]

[1]    Because this matter is before the Court on a motion to dismiss, the allegations of the Amended Complaint are accepted as true and form the basis of this section. *See Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 408 (2d Cir.2000); *see also Matson v. Bd. of Educ.,* 631 F.3d 57, 72 (2d Cir.2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual allegations "in a light most favorable to the plaintiff and draw[ ] all reasonable inferences in her favor").

Plaintiff began working as a DOCCS corrections officer in 1998. Am. Compl. ¶ 6. She was promoted to sergeant in 2009 and was subsequently transferred to Defendant Coxsackie Correctional Facility ("Coxsackie") in March 2010. *Id.* ¶ 18.

**A. Treatment at Coxsackie**

At Coxsackie, Plaintiff was one of only two female sergeants. *Id.* ¶¶ 36, 39. Plaintiff was passed over in favor of male employees for overtime assignments for which she was qualified. *Id.* ¶ 51. She was denied training in an area of expertise, **\*86** and was temporarily denied mandatory sexual harassment training. *Id.* ¶¶ 52–54, 110–1. Plaintiff was entitled by virtue of her "seniority, training, and experience" to vacant single-shift job assignments but was instead assigned to work at various times. *Id.* ¶¶ 55–56, 61. She was also forced to wait to be assigned to an open administrative-sergeant position. [2] *Id.* ¶ 61.

[2]    It is unclear whether the administrative-sergeant position entailed working different shifts.

Defendant Lieutenant James Weeks ("Weeks") disciplined Plaintiff for her conduct relating to a nurse's administration of medicine to an inmate, [3] as well as Plaintiff's "inappropriate shower shoes, inappropriate response to an inmate's bad behavior and inappropriate preparation of a disciplinary meal for an inmate." *Id.* ¶¶ 145–48, 150–67. Weeks informally "counseled" Plaintiff for these incidents and formally "counseled" Plaintiff twice for the medication incident. *Id.* ¶¶ 150–51, 155, 176. The first formal counseling violated "protocol" in that there was no list of charges prepared. *Id.* ¶ 160. Both formal counselings violated "union rules" prohibiting multiple counselings for a single incident. [4] *Id.* ¶ 178. Documentation of the formal counseling was to remain

2013 WL 4774484

in Plaintiff's personnel file for three years. *Id.* ¶ 182. Plaintiff was also unfairly chastised by a supervisor for leaving a document with a supervisor's secretary rather than giving it to the supervisor himself. *Id.* ¶¶ 143–44. Plaintiff alleges that all of the conduct for which she was disciplined or chastised was proper.

3    The Amended Complaint provides little information regarding this incident. As alleged, Plaintiff "responded" to an "incident" that was "mishandled" by a nurse "with respect to an inmate's medication." Am. Compl. ¶¶ 145–46. The nurse filed a false report regarding this incident and Plaintiff was ordered by a "Lt. Meigs" to do likewise. *Id.* ¶¶ 147–48. Plaintiff "questioned" this order, was chastised for doing so, and then filed the false report. *Id.* ¶¶ 149–50. It is unclear what aspect of this conduct Plaintiff was disciplined for. *Id.* ¶¶ 150, 155.

4    The second formal counseling appears to have been a mere continuation of the first formal counseling, which, as discussed *infra*, was not completed because of Plaintiff's medical issues. However, Plaintiff alleges that both formal counselings violated "union rules" because the informal counseling she had already received constituted the one permitted counseling for the medication incident. Am. Compl. ¶ 177–78.

Plaintiff points to three incidents of harassing and injurious personal treatment at Coxsackie. In early January 2011, Defendant David Morse ("Morse"),[5] a Coxsackie and DOCCS employee,[6] told Plaintiff—in front of inmates, her co-workers, and her subordinates—that she had received her administrative-sergeant position by performing sexual favors and that she was a "bitch and a backstabber," "a stupid cunt," and a "whining bitch" who "sucked." *Id.* ¶¶ 63, 65–66.

5    Other individuals named as Defendants in this action include Brian Fischer ("Fischer"), the Commissioner of DOCCS, as well as John Doe ("Doe") and Richard Roe("Roe"), whom the Amended Complaint describes as "any unknown employees of DOCC[S], Greene Correctional Facility or Coxsackie Correctional Facility who participated in discrimination and retaliation against Sgt. Rother and/or any of the other known and unknown actions which violated any of her

rights as set forth in this complaint." Am. Compl. ¶ 32. Morse, Weeks, Fischer, Doe, and Roe will be collectively referred to as "the Individual Defendants."

6    The Amended Complaint does not provide Morse's position. Plaintiff now alleges that Morse was a co-worker with "superior responsibility." Dkt. No. 29 ("Response") at 23.

**\*87  \*\*2**  Approximately two weeks later, Plaintiff discovered that her chair had been removed and replaced with a chair intended for inmates, and that her computer and phone were no longer working. *Id.* ¶¶ 90–107. The loss of Plaintiff's phone prevented her from using the emergency response system she had needed to do so. *Id.* ¶¶ 103–06. She later found her chair "in pieces hidden behind large boxes." *Id.* ¶¶ 92–95.

In early March 2011, Weeks formally counseled Plaintiff in a small, airless inmate hearing room, even though such rooms were not used to counsel other DOCCS employees.[7] *Id.* ¶¶ 154–74. Weeks spent half an hour quietly thumbing through the employee manual, which intimidated Plaintiff, as did the unprecedented use of an inmate hearing room. *Id.* ¶¶ 159, 161–63. Although Weeks told Plaintiff that she did not need a union representative at the meeting, she was permitted to request one. *Id.* ¶¶ 164–65.

7    This was the first of the medication-incident-related formal counselings discussed *supra.*

Plaintiff suffered severe physical and psychological reactions as a result of the Morse incident and Weeks's formal counseling. She suffered from "elevated blood pressure, shaking and nausea" after Morse's tirade. *Id.* ¶ 74 This incident made Plaintiff feel unsafe because her "credibility, authority and professionalism had been damaged in a significant way." *Id.* ¶ 78. Plaintiff passed out and was taken to the hospital after she left the inmate hearing room where Weeks was formally counseling her; she was diagnosed with anxiety, panic attacks, and stress.[8] *Id.* ¶¶ 168–75.[9]

8    Weeks was aware, or should have been aware, that Plaintiff had a "history of migraines" and therefore should have known that the counseling session was likely to distress her. Am. Compl. ¶ 174.

9    The New York Workers' Compensation Board subsequently found that Plaintiff had: (1) suffered

2013 WL 4774484

stress as a result of the Morse and formal-counseling incidents; and (2) presented credible evidence that these incidents had caused Post Traumatic Stress Disorder, adjustment disorder, anxiety, and depression. *Id.* ¶¶ 251–58.

Plaintiff repeatedly complained, both verbally and in writing, about this putatively discriminatory treatment. She complained to Weeks, Lieutenant Kenneth Baldwin ("Baldwin"), an "EAP" officer, Deputy Security Superintendent Christopher Miller ("Miller"), and the Department of Diversity Management about Morse's tirade. *Id.* ¶¶ 70, 73, 79, 80, 82, 124–27. She complained about the destruction of her chair to "Lieutenant Humphrey" ("Humphrey") and Miller. *Id.* ¶¶ 98–101. Everyone to whom she complained was dismissive and took no remedial action even though video recordings of the Morse and chair incidents were available. *See generally* Am. Compl. Morse was not disciplined for his conduct. *Id.* ¶ 142. Plaintiff alleges that, as a result of her complaints about Morse, she was shunned by her co-workers and advised to check the tires of her vehicle because "rats" had their tires slashed. *Id.* ¶¶ 109–10. She also complained about this shunning but no remedial action was taken. *Id.* ¶¶ 139.

### B. Treatment at Greene

Plaintiff then transferred to Defendant Greene Correctional Facility ("Greene") (collectively with DOCCS and Coxsackie, the "Employer Defendants") on March 14, 2011. *Id.* ¶ 184. Plaintiff was denied a position to which she was entitled by job seniority and was instead assigned to the most difficult cell block, an assignment she could have declined but chose to accept to **\*88** show that she was a "team player." *Id.* ¶¶ 185–86. Her performance was regularly scrutinized on video monitors and tapes that were generally reviewed only after an incident and were not used to regularly scrutinize male employees. *Id.* ¶¶ 191–203. Supervisors met with Plaintiff on multiple occasions to criticize her performance. *Id.* ¶¶ 192–94. She was formally counseled for her conduct in keeping a cell block "under control," even though Plaintiff argued that her "solution was the safer solution." *Id.* ¶¶ 200, 205.

**\*\*3** On April 6, 2011, Plaintiff was told by another sergeant that she would be disciplined for an incident that had happened on his shift, when Plaintiff was not working. *Id.* ¶¶ 210–11. Plaintiff had a severe physiological reaction to this news, including hyper-ventilation, nausea, sweating, high

blood-pressure, and a migraine. *Id.* ¶¶ 213–20. She was taken to the hospital. *Id.*

### C. Treatment Pre–Retirement

The following day, Plaintiff was told by her doctor that she should not work for two weeks. *Id.* ¶ 221. She gave Greene paperwork needed to obtain workers' compensation payments for the two-week period, but "Lieutenant Mahoney" refused to fill it out for four months because he believed Plaintiff's injury was not work related. *Id.* ¶¶ 224–30. Plaintiff also received a letter from Defendants in late July 2011 demanding that she "immediately return to work or be considered AWOL" even though she was on approved medical leave. *Id.* ¶¶ 231–32. [10]

[10]    It is unclear when or how Plaintiff, who was told by her doctor in early April that she should not work for two weeks, was approved by DOCCS to be on medical leave through July.

Defendants falsely claimed that Plaintiff did not have sick or vacation time and thus did not pay her while she was on leave. *Id.* ¶ 234. Defendants also falsely claimed that Plaintiff was AWOL and on "probationary status," which, in combination with the failure to complete the workers' compensation paperwork, rendered her "essentially" ineligible for a facility transfer that she likely would have received had she been eligible. *Id.* ¶¶ 235–36.

In May 2011, Plaintiff filed a discrimination complaint with the New York State Division of Human Rights ("DHR"), [11] which commenced an investigation. *Id.* ¶¶ 9, 237. Defendants did not provide DHR with relevant videos or documentation, and falsely told DHR that Plaintiff had been on probation when she stopped working. *Id.* ¶¶ 238–40. Morse falsely described his tirade and claimed that Plaintiff had lost her temper and behaved unprofessionally. *Id.* ¶¶ 248–49. Weeks truthfully but misleadingly claimed that Plaintiff had not filed a written complaint with him; Plaintiff had instead followed established procedure by filing a complaint with Baldwin. *Id.* ¶¶ 246–47.

[11]    This complaint was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). Am Compl. ¶ 9.

Greene has also failed to return personal items left by Plaintiff. *Id.* ¶ 250. On September 2, 2011, Plaintiff retired. *Id.* ¶ 263. She is currently receiving disability benefits from both

the Social Security Administration and the New York State Retirement System. *Id.* ¶¶ 266–67.

**D. Procedural History**

Plaintiff filed a Complaint with the Court on March 2, 2012. Dkt. No. 1 ("Original Complaint"). Defendants subsequently filed a Motion to dismiss and accompanying Memorandum of law. Dkt. Nos. 14 ("Original Motion"); 14–1 ("Original **\*89** Memorandum"). Plaintiff then moved to amend the Original Complaint, and Defendants agreed to withdraw the Original Motion if the Court permitted Plaintiff to amend. Dkt. Nos. 18, 21. The Court permitted Plaintiff to do so, and Plaintiff then filed the Amended Complaint. Dkt. No. 22; Am. Compl. In it, she brought eight claims: (1) discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.;* (2) retaliation under Title VII; (3) denial of equal protection pursuant to 42 U.S.C. § 1983; (4) denial of procedural and substantive due process; (5) First Amendment retaliation;[12] (6) conspiracy under 42 U.S.C. § 1985(3); (7) intentional infliction of emotional distress ("IIED"); and (8) prima facie tort. Am. Compl at 25–35. Plaintiff sought damages as well as declaratory and injunctive relief. *Id.* at 36–37. Defendants then filed the Motion and an accompanying Memorandum of law seeking dismissal of the Amended Complaint for both lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted, pursuant to Rules 12(b)(1) and 12(b)(6), respectively, of the Federal Rules of Civil Procedure. Mot.; Dkt. No. 25–1 ("Memorandum"). Many of the specific grounds on which Defendants sought dismissal were identical to the grounds raised in the Original Memorandum. *Compare* Original Mem., *with* Mem. Plaintiff filed the Response and Defendants a Reply. Resp.; Dkt. No. 30 ("Reply").

[12]   While Plaintiff explicitly states that her equal-protection claim is brought pursuant to § 1983, she does not state the specific procedural mechanism upon which her due-process and First Amendment claims rest. These claims, to the extent they seek damages, must be brought pursuant to § 1983 as well. *See Koumantaros v. City Univ. of N.Y.,* No. 03 Civ. 10170, 2007 WL 840115, at \*5 (S.D.N.Y. Mar. 19, 2007) ("Plaintiff claims defendant violated the due process and equal protection clauses of the Fourteenth Amendment.... [B]ecause § 1983 provides a remedy for plaintiff's causes of action, plaintiff cannot base her constitutional claims directly on the Fourteenth Amendment." (citing

*Pauk v. Bd. of Trustees of City Univ. of N.Y.,* 654 F.2d 856, 865 (2d Cir.1981))); *see also Koger v. Woody,* No. 9–cv–90, 2009 WL 1766639, at \*7 (E.D.Va. June 22, 2009) ("A claim of 'retaliation' for the exercise of First Amendment rights must be asserted under 42 U.S.C. § 1983.").

**III. DISMISSAL UNDER RULE 12(b)(1)**

**\*\*4** **[1]**   Defendants argue that the Eleventh Amendment deprives the Court of subject-matter jurisdiction over Plaintiff's claims to the extent those claims are brought against the Employer Defendants or for damages against the Individual Defendants in their official capacities. Mem. at 5–6.[13] "The Eleventh Amendment immunizes states and state agencies from suits that seek both monetary damages and injunctive relief." *Kozaczek v. N.Y. Higher Educ. Servs. Corp.,* No. 10–cv–107, 2011 WL 3687379, at \*4 (D.Vt. Aug. 23, 2011) (citing *Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978)).[14] DOCCS and it facilities are **\*90** state agencies for purposes of the Eleventh Amendment. *See Simmons v. Gowanda Corr. Facility,* No. 13–CV–0647, 2013 WL 3340646, at \*2 (W.D.N.Y. July 1, 2013); *Jackson v. Johnson,* 985 F.Supp. 422, 426 (S.D.N.Y.1997).

[13]   Plaintiff correctly notes that Defendants failed to comply with Local Rule 7.1(a)(2), which requires that motions to dismiss for lack of subject-matter jurisdiction must be accompanied by an affidavit. Resp. at 21. The Court deems this omission harmless because Defendants have raised only legal arguments. Moreover, even if Defendants' failure to file an affidavit rendered dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure inappropriate, the Court would still *sua sponte* dismiss, pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, those claims over which it lacked subject-matter jurisdiction.

[14]   Plaintiff argues that her claims should not be dismissed on Eleventh Amendment grounds before she conducts discovery regarding the Employer Defendants' "patterns and practices with respect to sex discrimination and constitutional violations." Resp. at 21. This appears to be a reference to the requirement that a municipality cannot be held liable under § 1983 unless the violation of an individual's rights was the result of a custom or

policy. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690–695, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This requirement has no bearing on states' sovereign immunity under the Eleventh Amendment.

**[2]** States may waive their sovereign immunity or Congress may abrogate that immunity pursuant to authority granted by a subsequent constitutional amendment. *Gollomp v. Spitzer,* 568 F.3d 355, 366 (2d Cir.2009); *In re Deposit Ins. Agency,* 482 F.3d 612, 623 (2d Cir.2007). Congress did so in passing Title VII pursuant to its enforcement power under Section Five of the Fourteenth Amendment. *See Nevada Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 729–30, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The Motion, to the extent it seeks dismissal of Plaintiff's Title VII claims under Rule 12(b)(1), is therefore denied. Because Congress has not abrogated, and New York has not waived, sovereign immunity with respect to Plaintiff's non-Title VII claims, *see, e.g., Santiago v. N.Y.S. Dep't of Corr. Servs.,* 945 F.2d 25, 30 (2d Cir.1991); *Moore v. City of New York,* No. 08–CV–2449, 2011 WL 795103, at *4, *7 n. 3 (E.D.N.Y. Feb. 28, 2011); *Koumantaros,* 2007 WL 840115, at *5, those claims, to the extent they are brought against the Employer Defendants, are dismissed for lack of subject-matter jurisdiction.

**[3]  [4]  [5]  [6]  [7]** "The 'state' for purposes of the Eleventh Amendment generally includes ... state officials sued in their official capacities." *Riley v. Town of Bethlehem,* 44 F.Supp.2d 451, 457 (N.D.N.Y.1999) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). In *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the U.S. Supreme Court "carved out a 'narrow exception to the general rule of Eleventh Amendment immunity from suit.'" *Murray v. New York,* 585 F.Supp.2d 471, 472 (W.D.N.Y.2008) (quoting *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 438, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004)). Under this exception, "'a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.'" *State Emps. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 95 (2d Cir.2007) (quoting *In re Deposit Ins. Agency,* 482 F.3d at 617). A party may sue under *Ex Parte Young* to stop a present and continuing violation of federal law that is premised on past state actions, but cannot obtain relief that would be tantamount to an award of damages for those past actions.[15] *See Papasan v. Allain,* 478 U.S. 265, 278, 281, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); **\*91** *State*

*Emps. Bargaining Agent Coalition,* 494 F.3d at 97–98. In the employment context, a request for reinstatement is not barred by the Eleventh Amendment because "[r]einstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll." *Dwyer v. Regan,* 777 F.2d 825, 836 (2d Cir.1985). The recovery of attorneys' fees is also permitted as relief ancillary to prospective relief. *N.Y.C. Health & Hosps. Corp. v. Perales,* 50 F.3d 129, 135 (2d Cir.1995). However, a claim for damages, including back pay, front pay, and compensatory and punitive damages, is barred by the Eleventh Amendment. *See Campbell v. Ark. Dep't of Corr.,* 155 F.3d 950, 962 (8th Cir.1998); *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 698 (3d Cir.1996); *Freeman v. Mich. Dep't of State,* 808 F.2d 1174, 1179 (6th Cir.1987); *Dwyer,* 777 F.2d at 836. Plaintiff's non-Title VII claims against the Individual Defendants in their official capacities are therefore, to the extent damages are sought, dismissed for lack of subject-matter jurisdiction.[16]

[15]  Plaintiff argues that her claims against the Individual Defendants should not be dismissed on Eleventh Amendment grounds before she conducts discovery "with respect to their official vs. individual capacities ... and thus a determination of immunity and/or qualified immunity." Resp. at 21. But because the Eleventh Amendment automatically applies where a state official is sued for damages in her official capacity, and because Defendants seek dismissal only of Plaintiff's damages claims against the Individual Defendant in their official capacities, the requested discovery would be irrelevant.

[16]  Plaintiff has not brought Title VII claims against the Individual Defendants, as there is no individual liability under Title VII. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1314 (2d Cir.1995).

## IV. DISMISSAL UNDER RULE 12(b)(6)

### A. Legal Standard

**\*\*5** To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see*

*also* FED. R. CIV. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. *See Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556, 127 S.Ct. 1955. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *See id.* at 678–79, 129 S.Ct. 1937. Where a plaintiff has already been given notice of a claim's deficiencies and the opportunity to amend her complaint, a court may dismiss that claim with prejudice. *See Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998). Leave to amend should also be denied if any amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Rivera v. Governor of N.Y.,* 92 Fed.Appx. 25, 25–26 (2d Cir.2004).

**B. Title VII Claims**

*1. Discrimination*

 **[8]**   **[9]**   **[10]**   **[11]**   **[12]**   Defendants argue that Plaintiff's Title VII discrimination claim must **\*92** be dismissed because Plaintiff has not alleged any conduct amounting to an adverse employment action. *See* Mem. at 6–13; *Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir.2006) (noting that conduct is actionable as discrimination under Title VII only where it amounts to an "adverse employment action"). "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft,* 336 F.3d 128, 133 (2d Cir.2003) (internal quotation marks omitted). A hostile work environment constitutes an adverse employment action. *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). "[T]he misconduct shown

must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* at 374 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). A plaintiff may show that "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) (citation and internal quotation marks omitted). "[C]ourts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.,* 702 F.3d 685, 693 (2d Cir.2012) (citation, internal quotation marks, and alterations omitted).

 **\*\*6**   **[13]**   Here, Plaintiff alleges that she was subjected to a public verbal tirade featuring the use of offensive and explicitly gendered terms—a tirade that reduced her standing among co-workers and inmates and had the potential to endanger her safety. Such conduct might, alone, suffice to give rise to a hostile-work-environment claim. *See Dawson v. Cnty. of Westchester,* 373 F.3d 265, 273 (2d Cir.2004) (reversing grant of motion to dismiss where correctional-officer plaintiffs' co-workers disseminated sexually-explicit letters written by inmates regarding plaintiffs); *Howley v. Stratford,* 217 F.3d 141, 154 (2d Cir.2000) (reversing grant of summary judgment on hostile-work-environment claim based primarily on a single incident where supervisor publicly called firefighter-plaintiff a "whining cunt" and suggested that she had not been promoted because she did not "suck cock good enough"). This is particularly so given the dangerous nature of correctional work:

> [I]n the prison context especially, officers must depend upon their co-workers for mutual protection and rely upon them for their own ability to assert authority over others in potentially dangerous situations. In such a setting, actions of co-officers and superiors that undermine an officer's sense of personal safety or compromise her capacity to command respect and

obtain compliance from co-workers, subordinates, and inmates assume greater, not lesser, significance.

*Dawson*, 373 F.3d at 273 (2d Cir.2004); *see also Howley*, 217 F.3d at 154 (noting that the "fomenting of gender-based skepticism" might easily diminish the respect accorded plaintiff and thereby impair her ability to lead in the "life-threatening circumstances often faced by firefighters"). Plaintiff's allegations regarding Morse's public tirade, in combination with putatively discriminatory co-worker shunning and tire-slashing threats, assignment denials, performance criticisms, discipline, vigilant monitoring, safety-threatening phone vandalism, and overtime- and leave-pay denials, **\*93** are certainly sufficient to plausibly suggest the existence of an objectively hostile environment. *See Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir.2004) (holding that plaintiff could offer proof of her unsuccessful efforts to secure managerial positions in support of her hostile work-environment claim); *Duzant v. Electric Boat Corp.* 81 Fed.Appx. 370, 371–72 (2d Cir.2003) (affirming denial of employer's summary judgment motion on discriminatory-denial-of-overtime claim); *Parrott v. Krasicky*, No. 12–CV–820, 2013 WL 3338570, at \*2 (D.Conn. July 2, 2013) (denying motion to dismiss discriminatory-denial-of-paid-leave claim); *Pratesi v. N.Y.S. Unified Ct. Sys.*, No. 08–4828, 2010 WL 502950, at \*11 (E.D.N.Y. Feb. 9, 2010) (finding plaintiff's allegations of harassing comments and discriminatory non-promotion sufficient to withstand a motion to dismiss her hostile-work-environment claim); *Anderson v. Nassau Cnty. Dep't of Corr.*, 558 F.Supp.2d 283, 295–96 (E.D.N.Y.2008) (denying summary judgment on hostile-work-environment claim based on discriminatory statements, failure to promote, and improper discipline). Plaintiff has also sufficiently alleged, through her description of the emotional and physiological toll of Defendants' treatment, that she subjectively perceived her work environment to be abusive.

**\*7** **[14]** **[15]** **[16]** **[17]** Plaintiff also argues that her retirement was an adverse employment action because she was constructively discharged. *See* Resp. at 12. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry*, 336 F.3d at 151–52. "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542

U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). This is a "demanding" standard. *Miller v. Praxair, Inc.*, 408 Fed.Appx. 408, 410 (2d Cir.2010). "The standard for constructive discharge is even higher than that required to prevail on a hostile environment claim." *Mandel v. Champion Int'l Corp.*, 361 F.Supp.2d 320, 327 (S.D.N.Y.2005); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir.2000) (denying summary judgment on hostile-work-environment claim but granting summary judgment on constructive discharge claim). "[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir.1993).

**[18]** **[19]** The constructive-discharge inquiry focuses on the working conditions preceding the employee's resignation. *See McKelvey v. Sec'y of U.S. Army*, 450 Fed.Appx. 532, 535 (6th Cir.2011) ("Plaintiffs alleging constructive discharge must establish that 'the working environment *at the time of their resignation*' forced them to quit." (quoting *Baughman v. Battered Women, Inc.*, 211 Fed.Appx. 432, 440 (6th Cir.2006))); *Petrosino*, 385 F.3d at 230 (finding no constructive discharge, despite eight-year hostile work environment, because employee had endured that harassment and employer's actions immediately preceding resignation had not " 'ratcheted' " the harassment up to " 'the breaking point' " (quoting *Suders*, 542 U.S. at 147–48, 124 S.Ct. 2342)); *Woodcock v. Montefiore Med. Ctr. Univ. Hosp.*, No. 98–CV–4420, 2002 WL 403601, at \*7 (E.D.N.Y. Jan. 28, 2002) (finding no constructive discharge **\*94** where plaintiff resigned months after most of the incidents upon which the constructive-discharge claim was premised). Constructive discharge is therefore unlikely to be found where an employee's working conditions materially improve before she resigns. *See Aguirre v. City of Miami*, No. 04–23205–CIV, 2007 WL 2700579, at \*5 (S.D.Fla. Sept. 12, 2007).

**[20]** In this case, Plaintiff did not retire until September 2011. The most egregious discriminatory incident, Morse's tirade, took place eight months before her retirement and approximately three months before she stopped working. Moreover, this incident took place at a different facility than the facility at which Plaintiff was working when she went on leave and to which Plaintiff would have returned had she not resigned. Plaintiff has not alleged that this incident, the vandalism of her chair and phone, or the co-worker

shunning at Coxsackie had any carry-over effect on her work environment at Greene. [17] *See Butts v. N.Y.C. Dep't of Hous. Pres.,* No. 00–CV–6307, 2007 WL 259937, at *21 (S.D.N.Y. Jan. 27 2007) (finding no constructive discharge where much of the conduct underlying Plaintiff's constructive-discharge claim occurred under previous supervisors).

[17]  Even if these incidents had happened more recently and at Greene, they likely would not give rise to a constructive-discharge claim. As discussed *supra,* an employer must intentionally create intolerable working conditions for a constructive-discharge claim to lie. *See Whidbee,* 223 F.3d at 74. Thus, the conduct giving rise to an employee's resignation must be the result of an employer's "deliberate action." *Id.* An employer's negligent failure to prevent or remedy co-worker harassment does not amount to deliberate action. *Id.* Plaintiff has, at most, alleged that the Employer Defendants were negligent with respect to Morse's tirade and the co-worker shunning.

**8  At Greene, Plaintiff: (1) received a job assignment that she "would have preferred" not to have and that she could have refused; (2) was watched while working; (3) was criticized for what she perceived to be appropriate conduct; (4) was given a single formal counseling that did not carry with it any reduction in pay or responsibility; and (5) and was told by another sergeant that she would be disciplined for an incident for which she was not responsible. After Plaintiff stopped working in April 2011, Defendants delayed filling out her workers' compensation paperwork, made false statements to the DHR, denied Plaintiff paid leave, and "effectively" prevented her from a lateral transfer to another facility. Much of Defendants' conduct while Plaintiff was on leave had little impact on her working conditions—had Plaintiff returned to Greene, Morse's inaccurate statements to the DHR or Defendants' failure to timely fill out the workers' compensation paperwork would not have affected Plaintiff's day-to-day experience. *Cf. Cecil v. U.S. Postal Serv.,* No. 3 Civ. 8404, 2004 WL 1886202, at *2 (S.D.N.Y. Aug. 24, 2004) (finding that significant time period between the commencement of plaintiff's sick leave and her retirement "makes it less likely that the resignation was prompted by an atmosphere so intolerable that a reasonable person would have felt compelled to resign." (internal quotation marks omitted)). Defendants' post-Coxsackie conduct, however discriminatory or unpleasant, cannot give rise to a constructive discharge

claim, because a reasonable employee would not have felt compelled to resign. *See Miller,* 408 Fed.Appx. at 410 ("[R]outine disagreements with supervisors or mild criticisms ... are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a constructive discharge claim"); **95 *Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847 (10th Cir.2000)** (no constructive discharge where plaintiff's telephone calls were monitored and her employer refused to further investigate her discrimination complaint after she filed an EEOC complaint); *Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 241 (4th Cir.1997) (holding that supervisor's ordering of other employees to spy on plaintiff and plaintiff's unfavorable assignment did not amount to a constructive discharge); *Stetson,* 995 F.2d at 360–62 (holding that plaintiff's dissatisfaction with criticisms of his work, his compensation, and employer's failure to allow him to transfer, did not support claim of constructive discharge); *Trimble v. Alliance–DeKalb/Rock–Tenn Co.,* 801 F.Supp.2d 764, 778 (N.D.Ill.2011) (finding that a constructive-discharge claim "clearly fail[ed]" where the plaintiff was "subjected to increased monitoring, received a negative review, was removed from the interview committee, and received a verbal warning—all without cause"); *Carone v. Mascolo,* 573 F.Supp.2d 575, 597 (D.Conn.2008) (finding no constructive discharge where plaintiff received four letters of reprimand and a suspension); *Chavez v. Iberia Foods Corp.,* No. 05 CV 2464, 2007 WL 1959028, at *8 (E.D.N.Y. June 29, 2007) (granting summary judgment on constructive-discharge claim where plaintiff was allegedly deprived of bonuses and health benefits to which he was entitled).

**9  However severe Plaintiff's reaction may have been to the treatment she received, and however many entities may have deemed Plaintiff disabled or unable to work as a result of that treatment, the intolerability of working conditions is an objective test. *See, e.g., Munday,* 126 F.3d at 241 (finding no constructive discharge where plaintiff went on job-stress-related disability leave); *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156 (2d Cir.1993); *Carone,* 573 F.Supp.2d at 597 (D.Conn.2008); *Nakis v. Potter,* 422 F.Supp.2d 398, 416 (S.D.N.Y.2006).

[21]  [22]  [23]  A constructive-discharge claim may also lie where an employee resigns in the face of an impending and inevitable termination. *See Bragg v. Navistar Int'l Transp. Corp.,* 164 F.3d 373, 377 (7th Cir.1998) ( "Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."); *Lopez v. S.B. Thomas,* 831 F.2d 1184, 1189 (2d Cir.1987)

(finding constructive discharge where employee was told that he would be fired at the end of a 90–day period). However, "apprehension of future termination is insufficient to establish constructive discharge—instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Torrech–Hernandez v. Gen. Elec. Co.,* 519 F.3d 41, 52 (1st Cir.2008); *see also Stetson,* 995 F.2d at 361 (finding no constructive discharge where employer "never either expressly or implicitly suggested that [plaintiff's] employment would be terminated"). Thus, "when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge." *Bailey v. N.Y.C. Bd. of Educ.,* 536 F.Supp.2d 259, 266 (E.D.N.Y.2007); *see also Carmellino v. District 20,* No. 03 Civ. 5942, 2006 WL 2583019, at *4 (S.D.N.Y. Sept. 6, 2006). When she ceased working and then later retired, Plaintiff had been formally counseled twice, had never been suspended, and was facing the possibility of unspecified additional discipline. The prospect of termination was simply too remote to give rise to a constructive-discharge claim premised on inevitable termination. Plaintiff's Title VII discrimination claim, to the extent it alleges constructive discharge, is therefore dismissed. The Court denies Plaintiff leave to amend because: (1) the Original Memorandum gave

**\*96** Plaintiff notice of the infirmities of her constructive-discharge allegations; and (2) any amendment would be futile. *See* Original Mem. at 6–9, 12–13, 16–20.

### *2. Retaliation*

**[24]** **[25]** Defendants also seek dismissal of Plaintiff's Title VII retaliation claim on the ground that the conduct at issue was insufficiently adverse. Mem. at 18. Retaliation is actionable only where it amounts to a materially adverse action—an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). This is a "lesser standard" than the adverse-employment-action standard discussed *supra. Evarts v. S. New Eng. Tel. Co.,* No. CV 1124, 2006 WL 2864716, at *10 (D.Conn. Oct. 2, 2006). The litany of putatively retaliatory conduct Plaintiff endured following her discrimination complaints, including unmerited criticism and discipline, the failure to remedy Morse's treatment, repeated co-worker shunning and threats of tire slashing, video-camera monitoring, denial of vacation pay, and delay in filling out workers' compensation paperwork, might well have dissuaded a reasonable employee

from complaining about discrimination. *See Richardson v. N.Y.S. Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999) ("[U]nchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the [adverse action requirement]."), abrogated on other grounds by *Burlington N.,* 548 U.S. 53, 126 S.Ct. 2405; *Uddin v. City of New York,* 316 Fed.Appx. 4, 5–6 (2d Cir.2008) (finding disciplinary charges that were to remain in employee's file, as well as employer's removal of employee's phone, sufficiently adverse); *Klaes v. Jamestown Bd. of Public Utils.,* No. 11–CV–606, 2013 WL 1337188, at *11 (W.D.N.Y. Mar. 29, 2013) (finding adverse action based on Plaintiff's compelled use of sick-time benefits). Plaintiff has thus sufficiently alleged a materially adverse action. However, for the reasons discussed *supra,* Plaintiff cannot make out a claim for retaliatory constructive discharge.

### **C. Constitutional Claims**

**\*\*10** Plaintiff brings four constitutional claims: (1) First Amendment retaliation; (2) denial of procedural and substantive dues process; (3) denial of equal protection under § 1983; and (4) conspiracy under § 1985(3). Am. Compl. at 26–31. The first claim is brought against "each Defendant;" the second against the Employer Defendants and the Individual Defendants in their official capacity; the third against "all Defendants;" and the fourth against Morse, Weeks, Roe, and Doe. *Id.* Defendants seek dismissal of that part of each of these claims not dismissed for lack of subject-matter jurisdiction.

### *1. First Amendment Retaliation*

**[26]** **[27]** **[28]** The First Amendment protects a public employee's speech from retaliation only where the employee spoke "on a matter of public concern." *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps,* —— U.S. ——, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011) (citation and internal quotation marks omitted). Thus, speech that "primarily **\*97** concerns an issue that is personal in nature and generally related to [the speaker's] own situation, such as his or her

assignments, promotion, or salary, does not address matters of public concern." *Jackler v. Byrne,* 658 F.3d 225, 236 (2d Cir.2011) (internal quotation marks omitted); *see also Ezekwo v. N.Y.C. Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir.1991) (upholding the dismissal of a medical resident's First Amendment claim involving complaints about aspects of residency program that negatively affected her because those complaints were "personal in nature and generally related to her own situation"); *Agard v. N.Y.S. Dep't of Taxation & Fin.,* No. 10–CV–4726, 2012 WL 601474, at *6 n. 7 (E.D.N.Y. Feb. 23, 2012) ("[R]etaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by the mere fact that one or two of a public employee's comments could be construed broadly to implicate matters of public concern." (quoting *Ruotolo,* 514 F.3d at 190) (quotation marks and brackets omitted)).

[29]  All of Plaintiff's complaints regarding discrimination, whether made internally or to the EEOC and DHR, concerned only discrimination against her. This speech was therefore not on a matter of public concern. *See Pressley v. City of New York,* No. 11–CV–3234, 2013 WL 145747, at *10 (E.D.N.Y. Jan. 14, 2013) (finding speech unprotected where "Plaintiff's EEOC complaints concerned unfair treatment and denial of transfers, which involves her own situation and is not a public matter"); *Jay Jian–Qing Wang v. Swain,* No. 09–CV–306, 2011 WL 887815, at *9 (N.D.N.Y. Mar. 14, 2011) ("The mere filing of an EEOC complaint does not equate with First Amendment protected speech .... [T]he nature of EEOC complaints are to address personal grievances about the way an employee has been treated by an employer."); *cf. Friel v. Cnty. of Nassau,* 947 F.Supp.2d 239, 257, 2013 WL 2316644, at *16 (E.D.N.Y.2013) (finding protected speech where plaintiff's EEOC charge concerned how challenged policy was causing " 'system-wide' gender discrimination impacting all female detectives, not just the Plaintiff"). For the same reason, Plaintiff's internal complaints regarding discipline she received, to the extent those complaints alleged merely that such discipline was procedurally improper or unfair, do not amount to speech regarding matters of public concern.

**11  Plaintiff argues that some of her communications implicated prison safety, management, and inmate-welfare issues. Resp. at 15–16. But these communications cannot constitute protected speech because: (1) the Amended Complaint does not allege that Plaintiff addressed these issues; and (2) even if Plaintiff did address these issues,

she did so in the context of complaining about her own working conditions or defending her conduct in the face of Defendants' criticisms and imposition of discipline. *See Garcia v. City of Hartford Police Dep't,* No. 95–CV–279, 2011 WL 4460321, at *13–14 (D.Conn. Sept. 27, 2011) (granting motion for summary judgment where plaintiff spoke at a press conference in order to defend himself from his employer's accusations); *Carroll v. Neumann,* 204 F.Supp.2d 1344, 1351 (S.D.Fla.2002) (finding that speech by plaintiff-toxicologist criticizing his employer's procedures was not on a matter of public concern because speech was made in the context of plaintiff's defending himself against an internal investigation of errors occurring in his lab). Plaintiff now claims that she complained about "the improper use of State time (stalking on video monitors)" and "the vandalism of State property, which was a safety concern for everyone assigned  *98  to that work space." Resp. at 15. But while the Amended Complaint does allege that Plaintiff complained about being monitored and having her equipment vandalized, it does not allege Plaintiff ever addressed the budgetary and safety implications of this conduct. Even if she had done so, and even though Plaintiff does allege that she addressed inmate disciplinary procedures, she did so only in the context of either: (1) expressing concerns about her own working conditions; or (2) responding to, and attempting to challenge, reprimands and discipline. *See* Am. Compl. ¶¶ 98–101, 202, 205–06. This speech was therefore unprotected.

Plaintiff also alleges that she "questioned" an order to falsify a report regarding an incident that had been "mishandled by [a] nurse ... with respect to an inmate's medication." *Id.* ¶¶ 146–49. But her allegations regarding the incident and Plaintiff's speech are entirely too sparse and vague to sufficiently allege that the latter was protected—speech questioning an order to lie is not inherently protected.[18] *Cf. Buazard v. Meridith,* 172 F.3d 546, 549 (8th Cir.1999) ("If, as plaintiff contends, his superior ordered him to lie and then demoted him for refusing, an injustice has been done. But it is not one actionable ... on a free-speech theory."); *Poli v. SEPTA,* No. Civ. A. 97–6766, 1998 WL 405052, at *8 (E.D.Pa. July 7, 1998) (finding employee-plaintiff's speech unprotected where plaintiff questioned employer's order because of consequences he believed he might face if he complied). Plaintiff's First Amendment retaliation claim is therefore dismissed. The Court denies Plaintiff leave to amend her First Amendment claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. *See* Original Mem. at 6–12, 16–20.

18    Defendants previously noted that the Original Complaint's description of this incident was "vague" and "conclusory." Original Mem. at 13. Despite being put on notice of this deficiency, Plaintiff failed to provide any additional details in the Complaint.


*2. Due Process*


*a. Procedural Due Process*

**12** [30]    The Fourteenth Amendment provides, in relevant part, that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process." *J.S. v. T'Kach,* 714 F.3d 99, 105 (2d Cir.2013) (citing *Ahlers v. Rabinowitz,* 684 F.3d 53, 62 (2d Cir.2012)). "[A] plaintiff must 'first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process.' " *Id.* (quoting *Local 342 v. Town Bd. of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994)) (second alteration in original).

Plaintiff premises her claim for deprivation of due process on her putatively constructive discharge. Am. Compl. ¶¶ 298–302. Her claim fails for two reasons. First, even if Plaintiff had a property right in her continued employment, she has not shown that she was deprived of that right—the Court has already determined *supra* that she was not constructively discharged. *See Abel v. City of Algona,* No. C07–956, 2008 WL 4542428, at *9 (W.D.Wash. Oct. 8, 2008) (applying Title VII constructive-discharge standard to claim for denial of procedural due process).

[31]    [32]    Moreover, even if Plaintiff was constructively discharged, she cannot show that she did not receive due process. **99** While a public employee with a property right in her job is normally entitled to a pre-termination hearing, *see Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), employees who are constructively discharged are not. *See Hoover v. Cnty. of Broome,* 340 Fed.Appx. 708, 711 (2d Cir.2009); *Giglio v. Dunn,* 732 F.2d 1133, 1134–35 (2d Cir.1984) ("When an employee resigns, the only possible dispute is whether the

resignation was voluntary or involuntary, and this cannot be determined in advance."); *Fortunato v. Liebowitz,* No. 10 Civ. 02681, 2012 WL 6628028, at *4 (S.D.N.Y. Dec. 20, 2012). [19] As long as a meaningful post-resignation hearing is available, a constructively discharged employee has received constitutionally adequate process. *Giglio,* 732 F.2d at 1135; *Hoover,* 340 Fed.Appx. at 711. A hearing under N.Y. C.P.L.R. § 7801 *et seq.* ("Article 78 hearing") is meaningful. *Giglio,* 732 F.2d at 1135; *Hoover,* 340 Fed.Appx. at 711. Thus, if Plaintiff could have initiated an Article 78 proceeding, she has not been denied due process.

19    Plaintiff correctly notes that, in general, a pre-deprivation hearing may be required where the deprivation is predictable because it is the result of an established policy or procedure. *Hellenic Am. Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 880 (2d Cir.1996). However, courts in this circuit have consistently found that this principle is inapplicable to constructive-discharge claims and that a pre-resignation hearing is therefore not required even when the constructive discharge was the result of an established policy or procedure or was otherwise predictable. *See Giglio,* 732 F.2d at 1134–35; *Stenson v. Kerlikowske,* No. 99–7833, 2000 WL 254048, at *1 (2d Cir. Mar. 3, 2000); *Fleming v. Kerlikowske,* No. 99–7677, 1999 WL 1212553, at *2 (2d Cir. Dec. 10, 1999); *Fortunato,* 2012 WL 6628028, at *4.

[33]    [34]    Article 78 proceedings are available to public employees, including employees of state agencies. *See Giglio,* 732 F.2d at 1135; *Sebast v. Mahan,* 754 F.Supp.2d 423 (N.D.N.Y.2010); *Allen v. Howe,* 84 N.Y.2d 665, 621 N.Y.S.2d 287, 645 N.E.2d 720 (1994). The only argument Plaintiff advances regarding the putative unavailability of an Article 78 proceeding is that Defendants' "actions in refusing to cooperate in providing paperwork to Worker's Compensation delayed the process beyond the 90 days limitation of an Article 78." Resp. at 18. Plaintiff errs in suggesting that Defendants' delay in filling out workers' compensation paperwork caused the statute of limitations for an Article 78 proceeding to run, thereby rendering this adequate procedure unavailable to Plaintiff. Where a plaintiff is constructively discharged, the statute of limitations applicable to commencing Article 78 proceedings—N.Y. C.P.L.R. § 217(1)—begins to runs on the date of the resignation. *See Lewis v. State Univ. of N.Y. Downstate Med. Ctr.,* 35 A.D.3d 862, 826 N.Y.S.2d 722, 724 (2006);

*Meyers v. City of New York,* 208 A.D.2d 258, 622 N.Y.S.2d 529, 534 (1995)[20] Here, Plaintiff resigned in September 2011, after Defendants had submitted the required workers' compensation paperwork. Moreover, Plaintiff has offered no explanation as to how the paperwork delay prevented her from bringing an Article 78 proceeding. While a workers' compensation finding might have provided some support for her assertion that she was constructively discharged, Plaintiff has not pointed to any authority suggesting that such a finding is a prerequisite to commencing an Article 78 proceeding or that an Article 78 hearing that takes place without such a finding is constitutionally defective. Her claim for a violation of procedural due process is **\*100** therefore dismissed. Furthermore, the Court denies Plaintiff leave to amend her procedural-due-process claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. *See* Original Mem. at 9–12. 15–20.

20      The statute of limitations is four months, not ninety days. *See* N.Y. C.P.L.R. § 217(1).

### b. Substantive Due Process

**\*\*13** **[35]** **[36]** Plaintiff's claim for a violation of substantive due process also fails. "To state a substantive due process claim, a plaintiff must allege that: (1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary." *JG & PG ex rel. JGIII v. Card,* No. 08–CV–5668, 2009 WL 2986640, at \*5 (S.D.N.Y. Sept. 17, 2009). "For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Velez v. Levy,* 401 F.3d 75, 93 (2d Cir.2005) (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

As alleged in the Amended Complaint, Plaintiff's substantive-due-process claim is premised on her constructive discharge. *See* Am. Compl. ¶¶ 301–02. Because the Court has already determined that Plaintiff was not constructively discharged, this claim must be dismissed. *See Carone,* 573 F.Supp.2d at 596 (D.Conn.2008).

**[37]** **[38]** The claim fails for another reason. "Where a particular Amendment provides an explicit textual source

of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (internal quotation marks omitted). Thus, substantive-due-process claims must be dismissed where they are "merely duplicative of claims explicitly protected under other constitutional sources." *Roman v. Velleca,* No. 11–CV–1867, 2012 WL 4445475, at \*10 (D.Conn. Sept. 25, 2012).

**[39]** Here, Plaintiff's substantive-due-process claim overlaps entirely with her procedural-due-process claim— they both seek to remedy the same harm and challenge the same conduct. *See* Am. Compl. ¶¶ 296–302. Moreover, the harm and conduct challenged by the substantive-due-process, First Amendment, and equal-protection claims significantly overlap. Because the claim for substantive due process is subsumed by Plaintiff's other constitutional claims, it must be dismissed. *See Cronin v. St. Lawrence,* No. 08–CV–6346, 2009 WL 2391861, at \*8 (S.D.N.Y. Aug. 5, 2009).

In her Response, Plaintiff argues that her substantive-due-process claim is also premised, in part, on Defendants' discriminatory failure to transfer her, provide her with paid leave, and submit her workers' compensation paperwork. Resp. at 19. But a claim based on this conduct is also subsumed by Plaintiff's equal-protection claim; moreover, this conduct does not shock the conscience and thus does not rise to the level of a substantive-due-process violation. *See Thomas v. N.Y.C. Dep't of Educ.,* 938 F.Supp.2d 334, 354–55 (E.D.N.Y.2013) (holding that discriminatory failure to accommodate disabled plaintiff and compelled leave of absence did not amount to a substantive-due-process violation). Plaintiff's claim for a violation of substantive due process is therefore dismissed. The Court denies Plaintiff leave to amend because any amendment would be futile.

### \*101 3. Equal Protection

**\*\*14** **[40]** **[41]** "To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Defendants argue that Plaintiff has failed to point to comparators—similarly situated male employees who received more favorable treatment than she did—and has offered only "conclusory" allegations of

discriminatory intent. Mem. at 20–21. But Plaintiff alleges that no male employee was subjected to the treatment of which she complains, including excessive monitoring, procedurally irregular discipline, and the denial of overtime. *See* Am. Compl. ¶¶ 157, 197. Because Plaintiff was one of only two female sergants at Coxsackie, some of these male employees would almost necessarily have been supervised by the same supervisors as Plaintiff and had similar job responsibilities. Moreover, Plaintiff alleges that she was criticized and disciplined repeatedly for proper and innocuous conduct while Morse received no criticism or discipline whatsoever for his patently improper and inappropriate tirade, and that she was to be disciplined for conduct committed by a male sergeant. These comparator allegations are sufficient. *See Russell v. Aid to Developmentally Disabled, Inc.,* No. 12–CV–389, 2013 WL 633573, at *12 (E.D.N.Y. Feb. 20, 2013)* (finding that plaintiff's allegations that she received more severe punishment than male co-workers for similar offenses met comparator requirement).

In addition to this comparator evidence, Plaintiff has offered additional evidence of discrimination, including the explicitly sexist language used by Morse; Defendants' repeated contravention of DOCCS policy and standard practice in, *inter alia,* watching her on video monitors, counseling her multiple times for the same incident, denying her overtime and training, and failing to give her assignments to which she was entitled; and Defendants' discipline of Plaintiff for proper conduct. This is sufficient evidence of discriminatory intent. *See Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107 (2d Cir.2004) (denying employer's motion for summary judgment where the plaintiff offered evidence of discriminatory comments); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1226–27 (2d Cir.1994) (finding sufficient evidence of discriminatory intent where employer's treatment of plaintiff violated its own policy); *Bonura v. Chase Manhattan Bank, N.A.,* 795 F.2d 276, 277 (2d Cir.1986) (same); *see also EEOC v. La. Office of Cmty. Servs.,* 47 F.3d 1438, 1446 (5th Cir.1995) (noting that employer actions that are "irrational" may give rise to inference of discrimination). Thus, Plaintiff has sufficiently alleged a § 1983 claim for equal protection. However, for the reasons discussed *supra,* the claim is dismissed to the extent it seeks to hold the Individual Defendants liable for constructively discharging Plaintiff.

**15 [42] [43] [44]** Defendants seeks dismissal of the equal-protection claim against Fischer because Plaintiff has failed to allege personal involvement. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation and internal quotation marks omitted). Thus, a supervisor's liability "cannot rest on respondeat superior." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). Supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a **\*102** report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). But "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks omitted).

**[45]** The Amended Complaint does allege that the Individual Defendants negligently supervised persons committing equal-protection violations and that "[s]upervisory personnel did not remedy the situation after they were advised of it and were thus grossly negligent in their performance of their duties and/or allowed a custom or practice of discrimination and retaliation to pervade the workplace." Am. Compl. ¶¶ 288, 295. Plaintiff has thus alleged personal involvement by Fischer. However, these allegations are entirely conclusory.

Plaintiff's additional allegations in the Response are also insufficient. She claims that Fischer may have known about the other Individual Defendants' conduct because: (1) Defendants "vigorous[ly]" contested her DHR complaint and workers' compensations claim; and (2) DOCCS has settled certain "civil lawsuits" in the last few years—settlements that were covered in a *New York Times* article. Resp. at 23.

Plaintiff has pointed to nothing suggesting that the Commissioner of DOCCS has any reason to know about DHR complaints or workers' compensation claims, even when they are vigorously contested. Indeed, Plaintiff's logic would require that allegations of Fischer's personal involvement be found sufficient any time a prisoner's internal grievance regarding putatively § 1983—violative conduct is denied. And Plaintiff does not allege that the settled civil lawsuits involved any of the Individual Defendants, or even that these lawsuits involved discrimination. *Cf. Murphy v. Goord,*

445 F.Supp.2d 261, 266 (W.D.N.Y.2006) (finding allegations of prison superintendent's personal involvement in beating insufficient where prisoner-plaintiff pointed to unrelated lawsuit against superintendent; book describing conditions at plaintiff's prison; and another lawsuit alleging rights—violations by DOCCS officials). Plaintiff has not plausibly alleged that Fischer knew or should have known about the Individual Defendants' conduct. She has done no more than use "mere linkage in the prison chain of command ... to implicate a state commissioner of corrections ... in a § 1983 claim." *Richardson,* 347 F.3d at 435. The § 1983 claim against Fischer, to the extent it seeks damages, is therefore dismissed. Furthermore, the Court denies Plaintiff leave to amend because: (1) the Original Memorandum gave Plaintiff notice of the infirmities of her allegations regarding Fischer's personal involvement; and (2) any amendment would be futile. *See* Original Mem. at 20

 **\*\*16** **[46]** **[47]** **[48]** However, " '[p]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983.' " *Duffy v. Evans,* No. 11 Civ. 7605, 2012 WL 4327605, at \*4 n. 2 (S.D.N.Y. Sept. 19, 2012) (quoting *Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001) (citation omitted)). All that a Plaintiff must show is that the official had: (1) "a direct connection to, or responsibility for, the alleged illegal action[s]"; and (2) "the authority to perform the required act." **\*103** *Zappulla v. Fischer,* No. 11 Civ. 6733, 2013 WL 1387033, at \*10 (S.D.N.Y. Apr. 5, 2013) (internal quotation marks omitted and alteration in original). Fischer, by virtue of his supervisory position, has both a direct connection to the discrimination and the authority to reinstate and transfer Plaintiff. *Cf. id.* (refusing to dismiss prisoner-plaintiff's § 1983 claim against Fischer to the extent it sought an injunction compelling the provision of adequate medical care).[21] The Motion, to the extent it seeks dismissal of Plaintiff's equal-protection claim for injunctive or declaratory relief against Fischer in his official capacity, is therefore denied.

[21]   The Court's finding that Plaintiff was not constructively discharged likely precludes the injunctive relief sought by Plaintiff. *See Hertzberg v. SRAM Corp.,* 261 F.3d 651, 660 (7th Cir.2001) (holding that, in the Title VII context, an employee who resigns and fails to demonstrate that she was constructively discharged is not entitled to reinstatement). But Defendants have not sought dismissal of Plaintiff's claims against Fischer on this ground.

*4. Conspiracy*

[49]   [50]   Plaintiff alleges that the equal protection violations discussed *supra* were the result of a conspiracy by the Individual Defendants. Am. Compl. ¶¶ 310–16. In order to make out a § 1985(3) claim, a plaintiff must demonstrate: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Bhd. of Carpenters v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). "[A] plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003). The pleading standard for a conspiracy claim is demanding. *See Kiryas Joel Alliance v. Village of Kiryas Joel,* 495 Fed.Appx. 183, 190 (2d Cir.2012) (noting that vague and conclusory allegations that defendants entered into unlawful agreement are insufficient); *Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999) (same). Even detailed allegations of parallel conduct do not suffice without some factual basis for inferring the existence of an agreement. *See Twombly,* 550 U.S. 544, 127 S.Ct. 1955.

[51]   Plaintiff has not sufficiently alleged a factual basis for her conspiracy claim. The Individual Defendants' discriminatory actions differed significantly: Morse insulted Plaintiff publicly, while Weeks failed to discipline Morse for doing so and improperly counseled Plaintiff. Moreover, the Defendants also occupied different positions: Morse was a co-worker of Plaintiff's at Coxsackie, Weeks a supervisor, Fischer the Commissioner of DOCCS, and Doe and Roe occupied undetermined positions at Coxsackie, Greene, or some other section of DOCCS. Plaintiff has, at most, alleged somewhat parallel action in that each of the Defendants allegedly discriminated against her in some way. Plaintiff's conspiracy claim is therefore dismissed. Furthermore, the Court denies Plaintiff leave to amend her conspiracy claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. *See* Original Mem. at 21.

#### D. State Tort Claims

##### 1. IIED

**\*\*17** **[52]** In order to make out an IIED claim in New York, a plaintiff must demonstrate **\*104** extreme and outrageous conduct. *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 702 (1993). Conduct is extreme and outrageous only where it "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency ... and [be] utterly intolerable in a civilized community." *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 90 (1983) (internal quotation marks omitted). "Very few claims satisfy the extreme and outrageous requirement of a[n] IIED claim. In fact, none of the IIED claims considered by the New York Court of Appeals have survived because the conduct was not sufficiently outrageous." *Elmowitz v. Exec. Towers at Lido,* 571 F.Supp.2d 370, 378 (E.D.N.Y.2008).

**[53]** IIED claims have a one-year statute of limitations. *See Koster v. Chase Manhattan Bank,* 609 F.Supp. 1191, 1198 (S.D.N.Y.1985); *Hansen v. Petrone,* 124 A.D.2d 782, 508 N.Y.S.2d 500 (1986); N.Y. C.P.L.R. § 215(3). Conduct occurring more than a year before the March 2, 2012 filing of the Original Complaint can therefore be the basis for an IIED claim only if the continuing-violations doctrine applies. Under the continuing-violations doctrine, otherwise time-barred conduct may give rise to IIED liability where the plaintiff alleges continuous harm extending into the limitations period. *White v. City of New York,* No. 09–CV–10127, 2010 WL 2697054, at \*3 (S.D.N.Y. July 7, 2010); *see also Acosta v. Loews Corp.,* 276 A.D.2d 214, 717 N.Y.S.2d 47, 50 (2000). The series of events alleged to constitute continuous harm must not be isolated and sporadic. *White,* 2010 WL 2697054, at \*3.

##### a. Morse

**[54]** Morse publicly insulted Plaintiff in January 2011. Plaintiff's telephone was disabled and her chair dismantled at about the same time by "unknown persons"—persons who might have included Morse. Am. Compl. ¶ 26. However, Plaintiff also alleges conduct by Morse that may have fallen within the limitations period: his incitement of her co-workers to shun her and threaten her with tire slashing. Even if this were a sufficiently continuous course of

conduct for application of the continuing-violations doctrine, Morse's aggregate conduct is insufficiently extreme and outrageous. His tirade, although highly offensive, misogynist, and demeaning, was a one-time occurrence unaccompanied by physical contact or the threat thereof; likewise, the vandalism, shunning, and threats of tire slashing, however disconcerting, did not involve actual or threatened physical contact or implicate immediate bodily harm. [22] *See Biberaj v. Pritchard Indus., Inc.,* 859 F.Supp.2d 549, 557, 564–65 (S.D.N.Y.2012) (granting defendants summary judgment on IIED claim where Plaintiff alleged that supervisor and another employee repeatedly told her, in front of others, that she was "shit," "nothing," an animal, a "bitch," a "slut," and a "whore"; and where plaintiff left work twice in an ambulance as a result of this conduct); *Salvatore v. KLM Royal Dutch Airlines,* No. 98 Civ. 2450, 1999 WL 796172, at \*2–3 (S.D.N.Y. Sept. 30, 1999) (finding that supervisor's comments to employee-plaintiffs, including statement that one plaintiff "looks like a whore" and women were "cunts," accompanied by unwanted touching, were insufficient to give rise an to IIED claim); **\*105** *Walther v. Maricopa Int'l Inv., Corp.,* No. 97 Civ. 4816, 1998 WL 689943, at \*4 (S.D.N.Y. Sept. 30, 1998) (finding that defendant's alleged conduct, including threatening plaintiff by saying "cocksucker, you're gonna pay," making unannounced visits to plaintiff's home late at night, and frequently calling and leaving messages on plaintiff's phone, was insufficient to give rise to IIED liability); *Boyce v. N.Y.C. Mission Soc'y,* 963 F.Supp. 290, 297 (S.D.N.Y.1997) (dismissing IIED claim where plaintiff alleged that her supervisor yelled and cursed at her, indicated that she was not liked, and pounded on her office door); *Kirwin v. N.Y.S. Office of Mental Health,* 665 F.Supp. 1034, 1040 (E.D.N.Y.1987) (dismissing IIED claim where plaintiff alleged that she was "ostracized and isolated" from fellow staff); *Seltzer v. Bayer,* 272 A.D.2d 263, 709 N.Y.S.2d 21, 23 (2000) (finding that IIED claim should have been dismissed where defendant allegedly dumped a pile of cement on the sidewalk in front of plaintiff's house, tossed lighted cigarettes into plaintiff's backyard, and threw eggs on his front steps); *Owen v. Leventritt,* 174 A.D.2d 471, 571 N.Y.S.2d 25, 25 (1991) (finding that public threat to kill pregnant plaintiff was insufficient to give rise to an IIED claim and noting that "mere threats ... no matter how upsetting, are insufficient to constitute the tort of intentional infliction of emotional distress"); *cf. Bujnicki v. Am. Paving & Excavating, Inc.,* No. 99–CV–646S, 2002 WL 34691183, at \*1–3, \*7–9 (W.D.N.Y. Jan. 22, 2002) (holding that IIED was sufficiently alleged where plaintiff endured daily public humiliation and verbal harassment, was not permitted to

take breaks, had water and a shovel thrown at her, and was ordered to continue working after she fell ill); *Wishner v. Cont'l Airlines,* No. 94 CIV. 8239, 1997 WL 420286, at *1–3, *6 (S.D.N.Y. July 25, 1997) (denying motion for summary judgment on IIED claim where plaintiff's supervisor called her a "fucking cunt" with such regularity that she thought he believed it was her first name; there were crude and explicit cartoons and photographs of nude women directed at plaintiff in the lunch and break rooms; and plaintiff was forced to perform menial tasks, regularly called racist and sexist names, and subjected to a supervisor's unwanted sexual advances and threats); *Kohlhausen v. SUNY Rockland Cmty. Coll.,* No. 10–CV–3168, 2011 WL 1404934, at *15–16 (S.D.N.Y. Feb. 9, 2011) (finding IIED sufficiently alleged where supervisor-defendant repeatedly threatened to "kill and destroy [plaintiff]," yelled that he wanted to "kick [plaintiff] in the uterus and smash her in the face," warned her not to "fuck" with him or she would be "dead," threatened to lower her into her coffin after she'd committed suicide, and actually slashed her tires); *Weisman v. Weisman,* 108 A.D.2d 853, 485 N.Y.S.2d 570, 570–71 (1985) (finding IIED sufficiently alleged where defendant: (1) destroyed windows in a house where plaintiff and her children were staying, thereby exposing them to severe cold; and (2) threatened plaintiff's life by displaying a bullet).

22    Morse's putatively false statements to the DHR were made months later and are insufficiently related to his earlier conduct for application of the continuing-violations doctrine. Moreover, as discussed *infra,* those statements cannot give rise to IIED liability.

### b. Weeks

**\*\*18** **[55]** Plaintiff premises her IIED claim against Weeks on his hearing-room counseling, his other unmerited counseling, his false reports to the DHR, and his failure to remedy Morse's harassment or the vandalism of Plaintiff's chair, computer, and phone. Am. Compl. ¶¶ 317–25. Even if this conduct were sufficiently continuous for application of the continuing-violations doctrine, it is insufficiently extreme and outrageous. At the hearing-room counseling Weeks did no more than sit quietly and, for half an hour, thumb through the employee manual in a room that, however airless, was regularly used for inmate hearings. Plaintiff was not confined—indeed, **\*106** she was permitted to call a union representative and subsequently left the room when she began

to feel ill. Even if this conduct was, as Plaintiff claims, likely to induce stress and lead to a migraine headache, it is a far cry from conduct deemed sufficiently outrageous to give rise to an IIED claim. *See Kaminski v. United Parcel Serv.,* 120 A.D.2d 409, 501 N.Y.S.2d 871, 872–73 (1986) (affirming non-dismissal of an IIED claim where supervisors subjected the plaintiff to three hours of confinement, abusive language, and threats of criminal prosecution and prison time on Riker's Island); *Vasarhelyi v. New Sch. for Soc. Research,* 230 A.D.2d 658, 646 N.Y.S.2d 795, 795, 797 (1996) (finding extreme and outrageous conduct where criminal attorneys retained by the plaintiff's employer interrogated the plaintiff for ten hours, during which time they were "hostile, abusive and threatening," stated that the FBI in Washington was assisting in the investigation, humiliated the plaintiff for her poor knowledge of English, probed into her personal relationships with co-workers and her husband, and impugned her honesty and chastity); *cf. Boyce,* 963 F.Supp. at 297 (dismissing IIED claim where plaintiff alleged that her supervisor yelled and cursed at her, indicated that she was not liked, pounded on her office door, and temporarily prevented her from leaving her supervisor's office). The other complained-of conduct, however discriminatory or disconcerting, is also insufficient to give rise to an IIED claim. *See Gallo v. Alitalia–Linee Aeree,* 585 F.Supp.2d 520, 554 (S.D.N.Y.2008) (dismissing IIED claim where plaintiff alleged that his complaints of harassment went unheeded); *Daniels v. Alvarado,* No. 03 CV 5832, 2004 WL 502561, at *6 (E.D.N.Y. Mar. 12, 2004) (finding that putatively false statements submitted to the DHR accusing plaintiff of incompetence, fraud, and unjustified billing practices were insufficiently outrageous); *Murphy,* 58 N.Y.2d at 303, 461 N.Y.S.2d 232, 448 N.E.2d 86 (affirming dismissal of IIED claim where plaintiff was unjustly transferred, demoted, and then discharged in a humiliating manner); *Burlew v. Am. Mut. Ins. Co.,* 63 N.Y.2d 412, 482 N.Y.S.2d 720, 472 N.E.2d 682, 685 (1984) (dismissing an IIED claim premised on employer's refusal to authorize an operation for a work-related injury). The IIED claim against Weeks must therefore be dismissed.

### c. Roe and Doe

**\*\*19** Plaintiff premises her IIED claims against Roe and Doe on conduct identical or similar to Weeks' and Morse's conduct, as well their role in monitoring Plaintiff on the video monitors at Greene. Am. Compl. ¶¶ 317–25. For the same reasons discussed *supra,* the IIED claims against Roe and Doe must be dismissed. The Court denies Plaintiff

leave to amend her IIED claim because: (1) the Original Memorandum gave Plaintiff notice of this claim's infirmities; and (2) any amendment would be futile. *See* Original Mem. at 22–23

### 2. Prima Facie Tort

**[56]**   Plaintiff also brings a claim for prima facie tort. Am. Compl. ¶¶ 336–63. The claim is deficient for two reasons. First, it is duplicative of the IIED claim, as it is premised on the same misconduct and alleges much of the same harm —nearly every paragraph alleges that Defendants caused Plaintiff "emotional harm" or "emotional distress." *Id.* A duplicative prima facie tort claim must be dismissed. *See Chao v. Mount Sinai Hosp.,* No. 10 CV 2869, 2010 WL 5222118, at *15 (S.D.N.Y. Dec. 17, 2010)* (dismissing prima facie tort claim where liability was premised on same conduct underlying defamation claim); **\*107** *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349, 355 (1985)* ("[P]rima facie tort should not become a catch-all alternative for every cause of action which cannot stand on its own legs. Where relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort." (internal citations and quotation marks omitted)).

**[57]   [58]**   Second, Plaintiff's claim for prima facie tort challenges her constructive discharge by seeking to recover her lost wages and benefits. *See* Am. Compl. ¶¶ 358, 361, 363. But there is no New York tort of wrongful discharge. *Murphy,* 58 N.Y.2d at 304, 461 N.Y.S.2d 232, 448 N.E.2d 86. Thus, where a plaintiff brings a claim for prima facie (or other) tort seeking to challenge the termination of her employment, the claim must be dismissed. *See id.* (dismissing prime face tort claim as an attempt to bring a wrongful discharge claim); *see also Jones v. Ecological Analysts, Inc.,* No. 84 Civ. 1226, 1986 WL 6168, at *5 (S.D.N.Y. May 27, 1986)* (dismissing plaintiff's claim for prima facie tort as an attempt to bootstrap a wrongful-discharge tort onto Title VII discrimination claims); *Shipper v. Avon Prods., Inc.,* 605 F.Supp. 701, 706–07 (S.D.N.Y.1985)*; *Brooks v. Blue Cross of Ne. N.Y., Inc.,* 190 A.D.2d 894, 593 N.Y.S.2d 119, 120 (1993)* (granting summary judgment where the allegations underlying plaintiff's prima facie tort claim, including that his discharge followed a "campaign of harassment" that included "unjustifiable criticism of his working ability" and "threats of firing," were too closely related to the unavailable cause of

action of wrongful discharge). Plaintiff's claim for prima facie tort is therefore dismissed. The Court denies Plaintiff leave to amend her prima-facie-tort claim because any amendment would be futile.

### V. CONCLUSION

**\*\*20**   Accordingly, it is hereby:

**ORDERED,** that Defendants' Motion (Dkt. No. 25) is **GRANTED in part** and **DENIED in part;** and it is further

**ORDERED,** that the Amended Complaint's (Dkt. No. 23) Third Claim (for denial of equal protection under § 1983); Fourth Claim (for denial of procedural and substantive due process); and Fifth Claim (for First Amendment retaliation) are, to extent they are brought against the Employer Defendants, **DISMISSED with prejudice** for lack of subject-matter jurisdiction; and it is further

**ORDERED,** that the Amended Complaint's (Dkt. No. 23) Third Claim (for denial of equal protection under § 1983); Fourth Claim (for denial of procedural and substantive due process); Fifth Claim (for First Amendment retaliation); Sixth Claim (for conspiracy under § 1985(3)); Seventh Claim (for IIED); and Eighth Claim (for prima facie tort) are, to the extent that they seek damages—including back bay, front pay, punitive damages, and compensatory damages— against the Individual Defendants in their official capacities, **DISMISSED with prejudice** for lack of subject-matter jurisdiction; and it is further

**ORDERED,** that the remainder of Amended Complaint's (Dkt. No. 23) Fourth Claim (for denial of procedural and substantive due process); Fifth Claim (for First Amendment retaliation); Sixth Claim (for conspiracy under § 1985(3)); Seventh Claim (for IIED); and Eighth Claim (for prima facie tort) are **DISMISSED with prejudice;** and it is further

**ORDERED,** that the Amended Complaint's (Dkt. No. 23) Third Claim (for denial of equal protection under § 1983) is, to the extent it is brought against Fischer in his individual capacity, **DISMISSED with prejudice;** and it is further

**\*108  ORDERED,** that the Amended Complaint's (Dkt. No. 23) First Claim (for Title VII discrimination); Second Claim (for Title VII retaliation); and Third Claim (for denial of equal protection under § 1983) are, to the extent they allege constructive discharge, **DISMISSED with prejudice;** and it is further

**ORDERED,** that the Motion (Dkt. No. 25), to the extent it seeks dismissal of the Amended Complaint's (Dkt. No. 23) non-constructive-discharge: (1) First Claim (for Title VII discrimination); (2) Second Claim (for Title VII retaliation); (3) Third Claim (for denial of equal protection under § 1983) against the non-Fischer Individual Defendants in their individual capacities; and (4) Third Claim (for denial of equal protection under § 1983) for injunctive and declaratory relief against all Individual Defendants in their official capacities, is **DENIED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

970 F.Supp.2d 78, 2013 WL 4774484

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.** **Memorandum of Law by Sgt. Rother in Opposition to Defendants' Renewed Motion to Dismiss on the Pleadings** <br> Sgt. Marie ROTHER, Plaintiff, v. THE NYS DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, Brian Fischer, Commissioner of NYS Department of Corrections and Community Supervision, Greene Correctional Facility, Coxsackie Correctional Facility, and the individuals David Morse (in both his official and individual capacity), James Weeks (in both his official and individual capacity), as well as John Doe and Richard Roe (as unknown individual Defendants in both their official and individual capacities), Defendants. <br> 2013 WL 12313990 | — | N.D.N.Y. | Jan. 07, 2013 | Motion |

**History**

There are no History results for this citation.

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 423 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

2018 WL 2561023
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Anthony BLUE, Plaintiff,
v.
The CITY OF NEW YORK, Cyrus R.
Vance, Jr., and Erica O'Brien, Defendants.

16-CV-9990 (VSB)
|
Signed 06/04/2018

**Attorneys and Law Firms**

Anthony Blue, pro se.

Morgan Chmiel McKinney, New York City Law Department,
New York, New York, Counsel for Defendants.

**OPINION & ORDER**

Vernon S. Broderick, United States District Judge

**\*1** Plaintiff Anthony Blue brings this pro se action pursuant
to 42 U.S.C. §§ 1983 and 1985 against the City of New
York (the "City"), Police Officer Andre Williams (together
with the City, the "City Defendants"), District Attorney Cyrus
Vance, Jr., and Assistant District Attorney Erica O'Brian (the
"DA Defendants," and collectively with the City Defendants,
"Defendants"), alleging malicious prosecution, denial of his
right to a fair trial, abuse of process, failure to intervene,
conspiracy, and municipal liability, as well as numerous New
York state law claims. Before me are motions to dismiss filed
by the City Defendants and the DA Defendants. Because
I find that Plaintiff's allegations are insufficient to survive
a motion to dismiss, both the DA Defendants' and City
Defendants' motions to dismiss Plaintiff's federal claims,
as well as state law claims analyzed under the same legal
standard, are granted and these claims are dismissed with
prejudice because amendment would be futile. To the extent
that Plaintiff's factual allegations can be construed to make out
additional state law claims, I decline to exercise jurisdiction
over these claims and they are also dismissed.

**I. Background** [1]

[1] The following factual summary is drawn from
the allegations of Plaintiff's second amended
complaint, filed August 15, 2017 ("Second
Amended Complaint"), which I assume to be true
for the purposes of this motion. *See Kassner v. 2nd
Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir.
2007). My references to these allegations should
not be construed as a finding as to their veracity,
and I make no such findings.

On August 27, 2012, at or about 2:25 p.m., Plaintiff was
arrested by Williams on the sidewalk at 615 West 164th
Street, New York, New York. (SAC ¶¶ 14–15.) [2] He was then
transported by patrol car to the 33rd Precinct of the New York
City Police Department ("NYPD"). (*Id.* ¶ 16.) Once he arrived
at the Precinct, Plaintiff was confined to a holding cell on the
second floor. (*Id.* ¶ 17.) From the cell, he saw Williams and
another police officer talking in the conference room adjacent
to the cell. (*See id.* ¶ 18.)

[2] "SAC" refers to the Second Amended Complaint.
(Doc. 40.)

The next day, August 28, 2012, Plaintiff observed Williams
and other NYPD officers participating in a conference call
with Vance and O'Brien. (*Id.* ¶ 20.) Plaintiff believes Vance
and O'Brien instructed Williams to obtain a search warrant for
Plaintiff's automobile and told Williams and the other officers
to search Plaintiff's apartment. (*See id.* ¶¶ 20–21.) That
night, Plaintiff observed Williams engage in a speaker phone
conversation with Vance and O'Brien. (*Id.* ¶ 22.) According
to Plaintiff, during this phone conversation Vance, O'Brien,
and Williams discussed and drafted a search affidavit alleging
that Plaintiff was involved in a "drug buy and bust operation"
and that Plaintiff had drugs and a gun in his apartment. (*Id.*)
Plaintiff was confined in his holding cell in the 33rd Precinct
for over thirty-six hours. (*Id.* ¶ 23.)

**\*2** Williams and other NYPD officers searched Plaintiff's
apartment and informed Vance and O'Brien that through this
search they obtained jewelry, electronics, documents, and
other miscellaneous items. (*Id.* ¶ 24.) Plaintiff believes that
O'Brien then instructed Williams and another NYPD officer
to draft false documents stating that a laptop and other items
were recovered from Plaintiff's apartment and requested that
they forward the items to the New York County District
Attorney's Office. (*Id.* ¶ 25.) On or about August 29, 2012 at
11:00 a.m., Plaintiff was arraigned on the charge of attempted
burglary. (*Id.* ¶ 28.) Bail was set at $40,000, but because

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 424 of 531

**Blue v. City of New York, Not Reported in Fed. Supp. (2018)**

2018 WL 2561023

he could not pay, Plaintiff stayed in the New York City Department of Corrections. (*Id.* ¶ 29.)

Plaintiff was released on his own recognizance on August 31, 2012, and later that same day was arrested again at the direction of Vance and O'Brien. (*Id.* ¶ 30.) Plaintiff was taken to the 33rd Precinct and detained in a holding cell. (*Id.* ¶ 31.) At about 8:00 p.m., Plaintiff alleges he observed Williams and O'Brien engage in several speaker phone conversations in which they conspired to falsify documents and a felony complaint to charge Plaintiff with possession of stolen property. (*Id.* ¶ 32.) On September 1, 2012, Plaintiff was arraigned in Bronx County on the charge of possession of stolen property. (*Id.* ¶ 34.) Plaintiff also alleges that on or about September 16, 2012, he filed a complaint with the NYPD's Internal Affairs Bureau regarding Williams's interactions with Vance and O'Brien, but that the NYPD did not respond or investigate his complaint. (*Id.* ¶ 35.)

On or about March of 2013, a grand jury proceeding took place in which, according to Plaintiff, Williams gave false testimony that "he investigated an alleged burglary on June 5, 2012 and recovered a laptop" which was "taken from [Plaintiff's] home." [3] (*Id.* ¶ 37.) On March 25, 2013, an indictment charging plaintiff with six counts of burglary was filed in New York County ("Indictment"). [4] (*Id.* ¶ 43; *see also* McKinney Decl. Ex. B.) Specifically, the Indictment charged Plaintiff with six separate burglaries occurring on May 15, June 1, June 5, June 12, June 13, and June 19 of 2012. (*See* McKinney Decl. Ex. B.) Pursuant to this Indictment, Plaintiff was again arrested on or about May 15, 2013. (SAC ¶ 45.) Because Plaintiff was arrested in another state, he was transported to New York for his appearance in New York County Supreme Court. [5] (*Id.* ¶ 46.) Subsequently, Plaintiff moved to suppress certain physical evidence recovered from the searches and to dismiss the Indictment because it was based on evidence fabricated by Vance, O'Brien, and Williams, amongst others. (*See* Edelman-Reyes Decl. Ex. 10.) [6] Plaintiff alleges that Williams and other NYPD officers gave false testimony both during the suppression hearing conducted pursuant to *Dunaway/Mapp* and later during Plaintiff's jury trial. (SAC ¶¶ 50–54.) The jury trial commenced on October 1, 2015, and on October 15, 2015, a jury found Plaintiff guilty with respect to five of the six counts and not guilty with respect to the June 5, 2012 Burglary count (the "June 5 Burglary"). (*See id.* ¶ 55.)

[3] Plaintiff alleges that during the grand jury proceeding Williams and an additional NYPD officer gave false testimony at the behest of Vance and O'Brien. (SAC ¶¶ 37–38.) Plaintiff also claims that the charge of attempted burglary was dismissed by the grand jury and sealed in his favor, (*id.* ¶ 39), but then subsequently, when Plaintiff threatened to file a suit against them, Vance and O'Brien retaliated against him by manufacturing a fraudulent indictment to charge Plaintiff with the six burglaries, (*id.* ¶¶ 40–43.)

[4] Plaintiff alleges that the court "issued an unauthorized nonexistent grand jury warrant without a judge's permission causing plaintiff to be arrested." (SAC ¶ 45.) Because on a motion to dismiss pursuant to Rule 12(b)(6) I may consider a document incorporated by reference into a complaint if that document is "integral to the complaint" in the sense that "a plaintiff has relied on the terms and effect of a document in drafting the complaint," *see Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (internal quotation marks omitted), I will consider the Indictment, (*see* McKinney Decl. Ex. B). "McKinney Decl." refers to the Declaration of Morgan C. McKinney in Support of Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b), filed September 29, 2017. (Doc. 50.)

[5] Plaintiff alleges that Vance and O'Brien continued to mislead the state court because they "knew they were acting outside of their jurisdiction and that no court impaneled a grand jury to vote on the bogus charges," but nonetheless submitted Williams's "false testimony grand jury minutes from the previous case that was dismissed and sealed, causing the court and plaintiff to believe that a grand jury had in fact indicted plaintiff on the false charges manufacture[d] in the fraudulent indictment filed by the defendants." (SAC ¶¶ 48–49.)

[6] "Edelman-Reyes Decl." refers to the Declaration of Karen Edelman-Reyes in Support of the DA Defendants' Motion to Dismiss, filed September 28, 2017. (Doc. 45.) I take judicial notice of the documents filed in the state court proceeding but do not make any determination as to the truth of the matters asserted therein. *See Kramer v.*

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

*Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

## II. Procedural History

**\*3** Plaintiff filed his complaint in this action on December 28, 2016 (the "Complaint"). (Doc. 2.) On June 16, 2017, the DA Defendants filed a motion to dismiss the Complaint. (Docs. 18–22.) On July 6, 2017, in response to the DA Defendants' motion to dismiss, Plaintiff filed an amended complaint (the "First Amended Complaint"), (Doc. 27), as well as a declaration in opposition to the DA Defendants' motion to dismiss, (Doc. 26). The DA Defendants filed a motion to dismiss the First Amended Complaint on July 24, 2017. (Doc. 29–33.) Plaintiff then filed the Second Amended Complaint on August 15, 2017. (Doc. 40.) On September 28, 2017, DA Defendants filed their motion to dismiss the Second Amended Complaint, together with their memorandum of law and supporting declaration. (Docs. 44–46.) The next day, September 29, 2017, the City filed a motion to dismiss the Second Amended Complaint, along with their memorandum of law and supporting declaration. [7] (Docs. 49–51.) Plaintiff filed his opposition to both the DA Defendants' and City Defendants' motions to dismiss along with a supporting declaration on October 20, 2017. (Docs. 53–54.) The DA Defendants filed their reply on November 8, 2017, (Doc. 57), and the City Defendants filed their reply on November 17, 2017, (Doc. 62).

[7]  Although Williams was named as a Defendant in the Second Amended Complaint, he had not yet been served at the time that Plaintiff filed his Second Amended Complaint. (*See* Doc. 60, at 1.) However, by letter dated November 15, 2017, counsel for the City informed me that it would also represent Williams in the instant action, and requested that I deem the City Defendants' motion to dismiss as Williams' response to the Second Amended Complaint. (*Id.*) I thus consider the City's motion to dismiss as the City Defendants' motion to dismiss, and will refer to this motion as the City Defendants' motion to dismiss for the remainder of this Opinion and Order.

## III. Legal Standards

### A. *Motion to Dismiss*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ). In considering a motion to dismiss, a court may also "consider matters of which judicial notice may be taken under Fed.R.Evid. 201, including public records such as arrest reports, indictments, and criminal disposition data." *Smith v. City of New York*, No. 12 Civ. 4572(KPF), 2013 WL 6158485, at *1 (S.D.N.Y. Nov. 25, 2013). "If a court takes judicial notice of documents pertinent to a motion to dismiss, it need not convert the motion to dismiss into a motion for summary judgment." *Jones v. Rivera*, No. 13-cv-1042 (NSR), 2015 WL 8362766, at *3 (S.D.N.Y. Dec. 7, 2015) (quoting *Chapman v. Abbott Labs.*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013) ).

Blue v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 2561023

## B. *Section 1983*

**\*4** Section 1983 provides a civil claim for damages against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1703 (2015). Further, "in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

## C. *Pro Se Litigant*

Even after *Twombly* and *Iqbal*, a "document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ). Further, pleadings of a pro se party should be read "to raise the strongest arguments that they suggest." *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Jorgensen v. Epic/ Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) ). Nevertheless, dismissal of a pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). In other words, "the duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted).

## IV. Discussion

Plaintiff brings § 1983 and New York law claims against the City Defendants and DA Defendants for malicious prosecution, denial of a right to a fair trial, abuse of process, conspiracy, and failure to intervene. (*See generally* SAC.) Plaintiff also brings claims for conspiracy pursuant to 42

U.S.C. § 1985 and municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (*See id.*) All of Plaintiff's claims stem from his arrest and subsequent prosecution with regard to the June 5 Burglary. I consider each claim in turn below.

## A. *Malicious Prosecution*

### 1. Applicable Law

To state a malicious prosecution claim under § 1983, a plaintiff must allege the elements of a state-law malicious prosecution claim. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). The elements of malicious prosecution are: (1) the initiation of a prosecution against a plaintiff; (2) without probable cause; (3) begun with malice; and (4) resulting in a termination in the plaintiff's favor. *See Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996).

In actions brought pursuant to § 1983, a plaintiff must also have suffered a sufficient post-arraignment deprivation of liberty implicating his Fourth Amendment rights. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) ("Additionally, there must be a post-arraignment seizure for a § 1983 malicious prosecution claim...."); *Rohman v. N.Y.C. Transit Auth. (NYCTA)*, 215 F.3d 208, 215 (2d Cir. 2000) ("The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.' " (quoting *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) ) ). Thus, "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Woodward v. Morgenthau*, 740 F. Supp. 2d 433, 439 (S.D.N.Y. 2010) (quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) ).

#### a. Prosecutorial Immunity

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 427 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

**\*5** Although the text of § 1983 does not include language with respect to immunities, "the Supreme Court has ruled that 'Congress did not intend § 1983 to abrogate immunities well grounded in history and reason.' " *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) ). This includes prosecutorial immunity, which grants absolute immunity for state prosecutors and "creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a district attorney." *Id.* Under this doctrine, "a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is immune from a civil suit for damages under § 1983." *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (citations and internal quotation marks omitted); *see also Burns v. Reed*, 500 U.S. 478, 486 (1991) ("[P]rosecutors are absolutely immune from liability under § 1983 for their conduct in initiating a prosecution and in presenting the State's case insofar as that conduct is intimately associated with the judicial phase of the criminal process." (citations and internal quotation marks omitted) ). The doctrine of absolute immunity for prosecutors is in place in order to ensure public trust in the prosecutor's office—"public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Shmueli*, 424 F.3d at 237.

A prosecutor's immunity is expansive, and as long as a prosecutor's conduct implicates the official prosecutorial function (*i.e.*, the initiation and pursuit of a criminal prosecution or any "prosecutorial activities intimately associated with the judicial phase of the criminal process"), and the prosecutor has a colorable claim of authority (*i.e.*, the prosecution is within that prosecutor's jurisdiction), absolute immunity will attach. *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987). "[A]bsolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate," and this immunity would "even include ... allegedly conspiring to present false evidence at a criminal trial." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994); *see also Shmueli*, 424 F.3d at 237 (stating that prosecutors are entitled to absolute immunity even when conduct would be "reprehensible," including where there are allegations of knowing use of perjured testimony or deliberate withholding of exculpatory information). "[I]nvestigative acts reasonably related to decisions whether or not to begin or to carry on a particular criminal prosecution ... are shielded by absolute immunity when done by prosecutors." *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012).

The absolute immunity accorded to prosecutors protecting them from malicious prosecution claims under § 1983 also protect them from malicious prosecution claims under New York law. *See Shmueli*, 424 F.3d at 238; *see also Imbler v. Pachtman*, 424 U.S. 409, 424 (1976). Thus, if absolute immunity is conferred with respect to a § 1983 claim, the prosecutor is entitled to the same immunity for a New York state law claim.

### b. Probable Cause

"The existence of probable cause is a complete defense to a claim of malicious prosecution in New York, and indictment by a grand jury creates a presumption of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) (internal citation and quotation marks omitted). This presumption may only be rebutted by "evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* (quoting *Savino*, 331 F.3d at 72). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Savino*, 331 F.3d at 73. Thus, at the motion to dismiss stage, a plaintiff must plausibly allege that his indictment was procured through bad-faith police conduct. *See, e.g., Manganiello*, 612 F.3d at 162 (finding that an indictment was secured through bad faith or perjury where there is "some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment" (internal quotation marks omitted) ); *Smalls v. City of New York*, 181 F. Supp. 3d 178, 187 (E.D.N.Y. 2016) (finding that although the plaintiff would likely need "more than bald assertions of perjury and fraud to survive summary judgment" the allegations in the complaint that a police officer "filed an accusatory instrument against him and fabricated grand jury testimony" is enough to survive a motion to dismiss).

### 2. Application

#### a. DA Defendants

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 428 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

**\*6**  Here, Plaintiff brings claims against the DA Defendants under both § 1983 and state law for malicious prosecution with respect to the June 5 Burglary. More specifically, Plaintiff brings claims against Vance and O'Brien for malicious prosecution based on their "commencement and continued prosecution of the illegal judicial proceeding against plaintiff, including the arrest, imprisonment, post deprivation of liberty, and false charges against plaintiff" for the June 5 Burglary. (SAC ¶ 65.)

This, however, describes only "prosecutorial activities intimately associated with the judicial phase of the criminal process," Barr, 810 F.2d at 361, or those that are "associated with [the prosecutor's] function as an advocate," Dory, 25 F.3d at 83. The DA Defendants' alleged discussions with Williams all took place after Plaintiff's arrest and in connection with the prosecution of the six burglary counts in the Indictment. (See id. ¶¶ 15–55.) In addition, the DA Defendants had jurisdiction to prosecute Plaintiff for the burglaries pursuant to New York state statutes, as the burglaries all occurred within New York. Thus, even if the DA Defendants did, among other things, "manufacture[ ] false testimony, statements, evidence and documents" during Plaintiff's prosecution, (id. ¶ 55), absolute immunity would attach to the DA Defendants' actions. Therefore, Plaintiff's federal and state malicious prosecution claims against the DA Defendants are dismissed, as the DA Defendants are entitled to absolute prosecutorial immunity.

### b. City Defendants

Plaintiff also brings a claim against Williams for malicious prosecution based on the "commencement and continued prosecution of the illegal judicial proceeding against plaintiff, including the arrest, imprisonment, post deprivation of liberty, and false charges against plaintiff" for his June 5 Burglary charge. (SAC ¶ 65.) The City Defendants argue that this claim must be dismissed because Plaintiff has failed to sufficiently allege the elements of malicious prosecution claim under § 1983 and New York law. (See City Defs.' Mem. 5–6.)[8]

[8]  "City Defs.' Mem." refers to the Memorandum of Law in Support of Defendant City of New York's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b), filed September 29, 2017. (Doc. 51.)

As an initial matter, although the indictment by a grand jury creates a presumption of probable cause, Manganiello, 612 F.3d at 162, I find that Plaintiff's allegations are sufficient to overcome this presumption at this stage of the proceeding. If true, Plaintiff's allegations plainly suggest that the Indictment was grounded in false evidence and Williams's perjured testimony. (See SAC ¶¶ 37–38.) Although Plaintiff will need to provide more than "bald assertions" to survive summary judgment, Smalls, 181 F. Supp. 3d at 187, at the motion to dismiss stage he has sufficiently rebutted the presumption of probable cause created by the Indictment.

However, Plaintiff has not established a deprivation of liberty implicating his Fourth Amendment rights. Because § 1983 is "designed to compensate injuries caused by ... constitutional deprivation," a plaintiff must sufficiently allege a deprivation of liberty amounting to a constitutional violation in order to make out a malicious prosecution claim. Singer, 63 F.3d at 116 (internal quotation marks omitted); see also Rohman, 215 F.3d at 215 ("Since the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings." (quoting Singer, 63 F.3d at 116) ); Holmes v. City of New York, No. 14 CV 5253-LTS-RLE, 2017 WL 519250, at \*3 (S.D.N.Y. Feb. 8, 2017) ("[A]n actionable deprivation of liberty must flow from the challenged prosecution, in order to ensure that the malicious prosecution claim is not merely one seeking review of a prosecutorial decision."). Where a plaintiff is required to make court appearances in connection with the criminal charges underlying the malicious prosecution claim, courts have found that the deprivation of liberty element is satisfied. See Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013) ("We have consistently held that a post-arraignment defendant who is obligated to appear in court in connection with criminal charges whenever his attendance is required suffers a Fourth Amendment deprivation of liberty." (internal quotation marks omitted) ); Rohman, 215 F.3d at 215–16 (finding that the deprivation of liberty element was satisfied where the plaintiff had to return to court on at least five occasions and was required to "render himself at all times amenable to the orders and processes of the court"). If, however, the court appearances are attributable to other pending criminal charges against the plaintiff, court appearances are not sufficient to make out the necessary post-arraignment deprivation of liberty. See Coleman v. City of New York, 688 Fed.Appx. 56, 58 (2d Cir. 2017) (summary order).

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

**\*7** Here, although Plaintiff was acquitted for the June 5 Burglary, there is no question that he was convicted on the remaining five burglary charges brought against him in the same proceeding, and that throughout the pendency of the June 5 Burglary charge, he was also in custody pursuant to the other five charges. (*See id.* ¶ 55; *see also* City Defs.' Mem. 6.) Thus, Plaintiff has failed to allege a post-arraignment deprivation of liberty. *See Coleman*, 688 Fed.Appx. at 58 (finding that the "ongoing requirement of appearing in court" was not a sufficient deprivation of liberty when it was "not solely attributable to the ... charges [in question]" because "[e]ven if [those] charges had never been, [the plaintiff] still would have had the obligation to appear on account of the other criminal charges").

Because even absent the June 5 Burglary charge, Plaintiff would have been required to appear in court on account of the other five charges of which he was convicted, Plaintiff has failed to show the post-arraignment deprivation of liberty necessary for his malicious prosecution claim against Williams. Accordingly, the City Defendants' motion to dismiss with respect to Plaintiff's federal and state malicious prosecution claims is granted, and these claims are also dismissed.

**B. *Right to a Fair Trial***

**1. Applicable Law**

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer." *Harris v. City of New York*, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) ). Thus, a defendant's right to a fair trial is violated "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *see also Jovanovic v. City of New York*, 486 Fed.Appx. 149, 152 (2d Cir. 2012) (summary order) ("A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result."). A defendant whose rights have been violated in such manner may bring an action for damages pursuant to § 1983 for deprivation of a right to a fair trial separate from a claim for malicious prosecution. *See id.*; *see also Nibbs v. City of New York*, 800 F. Supp. 2d 574, 575

(S.D.N.Y. 2011) ("Pursuant to § 1983 and prevailing case law, denial of a right to a fair trial is a separate and distinct cause of action [from malicious prosecution]."). However, "there is no denial of a criminal defendant's right to a fair trial without prejudice to that defendant, i.e., a conviction." *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 472 (S.D.N.Y. 2009).

**2. Application**

Plaintiff alleges that the DA Defendants fabricated evidence and called Williams to the stand to testify falsely in the jury trial, depriving Plaintiff of his right to a fair trial under § 1983. (*See* SAC ¶¶ 52–58.) Specifically, Plaintiff claims that DA Defendants "tampered with alleged evidence by opening an evidence bag and altering a bag belonging to plaintiff's girlfriend by scribbling pen marks to make it appear similar to a complaining victims to influence the jury's decision." (*Id.* ¶ 54.) Further, Plaintiff alleges that Williams forwarded "false documents, statements and evidence" at the instruction of the DA Defendants, (*see id.* ¶ 106), and that both DA Defendants and Williams used these false documents and evidence during his criminal proceeding, (*see id.* ¶ 112).

I find that Plaintiff fails to make out a claim for denial of a right to a fair trial against either the DA Defendants or Williams. Plaintiff's only allegations are generalized and conclusory allegations that Williams "forwarded false documents, statements, and evidence to the New York County D.A.'s Office at the instructions, advice, and behest of [the DA Defendants.]" (*Id.* ¶ 106.) Putting aside the fact that Plaintiff's allegations are generalized and conclusory, even assuming the bag that Plaintiff alleges was falsified was forwarded by Williams to the DA Defendants and presented to the jury, Plaintiff has not plausibly alleged how or why the altered bag would influence the jury's ultimate determination of guilt.[9] Thus, Plaintiff has not plausibly alleged a claim for denial of a right to a fair trial, which requires a "police officer [to] create[ ] false information likely to influence a jury's decision" and "forward[ing of]" that information to prosecutors." *Ricciuti*, 124 F.3d at 130; *see also Davenport*, 2017 WL 4356883, at \*18 (finding that a plaintiff's claim for denial of a right to a fair trial failed because "he [did] not present any evidence that [the investigative officer] forwarded incomplete evidence to the District Attorney's Office").

[9]    Plaintiff has made no plausible showing that, even assuming it had been forwarded to the

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 430 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

DA Defendants, the bag "was material to the prosecutor's case" and thus was likely to influence a jury's decision. *Davenport v. City of New York*, 15-CV-5890 (MKB), 2017 WL 4356883, at *18 (E.D.N.Y. Sept. 28, 2017).

**\*8** Finally, Plaintiff cannot show that he suffered any deprivation of liberty as a result of his prosecution for the June 5 Burglary because as stated above, Plaintiff was—and would have been—in custody pursuant to his other five burglary charges even absent the charge for the June 5 Burglary. Additionally, Plaintiff acknowledges that he was acquitted of his June 5 Burglary charge. (*See* SAC ¶ 55.) Plaintiff has thus failed to establish a deprivation of liberty as is required for a claim for denial of a right to a fair trial. *See Jovanovic*, 486 Fed.Appx. at 152.

Therefore, both the DA Defendants' and City Defendants' motions to dismiss with respect to Plaintiff's claim for denial of his right to a fair trial are granted, and these claims are dismissed.

### C. *Abuse of Process*

#### 1. Applicable Law

Abuse of process under both § 1983 and New York law requires a defendant to "(1) employ regularly issued legal process to compel performance or forbearance of some act, (2) with the intent to do harm without excuse or justification, (3) in order to obtain a collateral objective beyond the legitimate ends of the process." *Lopez v. City of New York*, 901 F. Supp. 684, 691 (S.D.N.Y. 1995); *see also Savino*, 331 F.3d at 76.

In order to successfully make out the third prong of an abuse of process claim, the plaintiff must show that "defendants acted with malice or with a collateral objective that was outside the legitimate ends of the legal process," and merely alleging that a defendant lacked probable cause is not enough. *See Savino*, 331 F.3d at 77; *see also Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 572 (S.D.N.Y. 2012). "[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution," and there must be a "claim that [the defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77; *see also Coleman*, 585 Fed.Appx. 788 ("[R]etaliation for some offense

will not suffice as a collateral motive for the purposes of an abuse of process claim...."). Thus, if a defendant "uses the process of the court for its proper purpose, though there is malice in his heart, there is no abuse of the process." *Rodriguez v. Vill. of Sleepy Hollow*, No. 13-CV-8465 (NSR), 2015 WL 4597446, at *8 (S.D.N.Y. July 29, 2015) (quoting *Hauser v. Bartow*, 273 N.Y. 370, 374 (1937) ).

#### 2. Application

Here, Plaintiff rests his claim regarding abuse of process on the allegation that the DA Defendants and Williams arraigned Plaintiff on false charges, caused him to be held in custody, manufactured a false indictment against him, and elicited false testimony in order to "retaliat[e] against plaintiff for filing complaints against them and to protect themselves from future law suits and loss of their jobs." (SAC ¶¶ 42–43; *see also id.* ¶¶ 91–97.) This is not, however, sufficient for an abuse of process claim, as it does not demonstrate that either Williams or the DA Defendants sought some collateral objective outside of the "legitimate ends of the process." *Dellutri*, 895 F. Supp. 2d at 572 (quoting *Savino*, 331 F.3d at 76). In fact, the Second Circuit in *Savino* specifically stated that alleging that a defendant is seeking to retaliate against a plaintiff is not enough to make out a claim for abuse of process. 331 F.3d at 77 ("[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."). Because the Second Amended Complaint does not allege that Williams or the DA Defendants used the judicial processes for anything other than their proper purposes, both the DA Defendants' and City Defendants' motions to dismiss are granted as to Plaintiff's federal and state abuse of process claims.

### D. *Conspiracy*

#### 1. Applicable Law

**\*9** To prove conspiracy under § 1983, "a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 431 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

*Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 287 (S.D.N.Y. 2013) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ). Moreover, the plaintiff must prove an "actual violation of constitutional rights"—in other words, "the lawsuit will stand only insofar as the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right." *Singer*, 63 F.3d at 119. In addition, to state a claim for conspiracy pursuant to 42 U.S.C. § 1985(3), "a plaintiff must allege: (1) a conspiracy; (2) the purpose of which was to deprive a person or class of persons of equal protection of the laws or of equal privileges or immunities under the law; (3) actions by the defendants in furtherance of the conspiracy; (4) injury to plaintiff's person or property or deprivation of a right as a result of these actions; and (5) class-based discriminatory animus." *Little v. City of New York*, 487 F. Supp. 2d 426, 441 (S.D.N.Y. 2007). A claim under § 1985(3) must be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 829 (1983) ).

In order to survive a motion to dismiss, § 1983 and § 1985 conspiracy claims must "provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end, augmented by some details of time and place and the alleged effects of the conspiracy." *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (internal quotation marks omitted). The plaintiff must also allege overt acts in which the defendants engaged to further the agreement, as well as an actual violation of the rights that defendants were alleged to have conspired to violate. *See id.* at 209. "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) ).

Absolute prosecutorial immunity may shield prosecutors from a claim of conspiracy brought pursuant to § 1983 when they are acting within their role as an advocate. *See Pinaud*, 52 F.3d at 1148 ("[T]hough it may initially seem peculiar to hold that even a conspiracy among prosecutors is shielded by absolute immunity, the fact that such a conspiracy is certainly not something that is *properly* within the role of

a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it." (internal quotation marks omitted) ). "As this Court and other[ ] circuits have repeatedly held, since absolute immunity covers virtually all acts, regardless of motivation, associated with the prosecutor's function as an advocate, when the underlying activity at issue is covered by absolute immunity, the plaintiff derives no benefit from alleging a conspiracy." *Id.* (citation and internal quotation marks omitted).

Further, even where a plaintiff has adequately alleged the elements of a conspiracy, under the doctrine of intracorporate conspiracy "officers, agents and employees of a single corporate entity are legally incapable of conspiring together" and thus cannot be held liable for conspiracy under § 1985(3) or § 1983. [10] *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quotation marks omitted); *see also Randle v. Alexander*, 960 F. Supp. 2d 457, 475 (S.D.N.Y. 2013). There is an exception to this doctrine, however, where a plaintiff shows that the "individuals are motivated by an independent personal stake in achieving the corporation's objective." *Little*, 487 F. Supp. 2d at 442.

[10]   Although the Second Circuit recognizes this rule in the context of § 1985 conspiracy claims, it has not ruled whether the intracorporate conspiracy doctrine applies to § 1983 claims. *See Chamberlain*, 986 F. Supp. 2d at 388. Courts in this District, however, have applied the doctrine to bar conspiracy claims brought pursuant to § 1983. *See id.* ("Several District Courts in the Circuit have addressed the question, however, and have held that the rationale behind the intracorporate conspiracy rule—that there is no conspiracy if the conduct is essentially a single act by agents of a single entity acting with[in] the scope of their employment—applies with equal force in the Section 1983 context."); *Anemone v. Metropolitan Trans. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006) (collecting cases applying the intracorporate conspiracy doctrine to conspiracy claims brought pursuant to § 1983).

## 2. Application

**\*10** Plaintiff alleges that (1) Williams conspired with the DA Defendants to "falsify statements, documents, testimony, affidavits, evidence and information" which was presented

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 432 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

to the grand jury, resulting in his arrest, (SAC ¶¶ 117–19);
(2) the DA Defendants conspired with each other to fabricate
an indictment against him, (*id.* ¶¶ 120–21); (3) Williams
conspired with the DA Defendants to arrest Plaintiff on
false charges to cover up the fraudulent act of filing a false
indictment, (*id.* ¶ 122); and (4) Williams conspired with the
DA Defendants to tamper with evidence, therefore depriving
him of a fair trial, (*id.* ¶¶ 123–24). The City Defendants and
DA Defendants argue that these claims are either barred by
the intracorporate conspiracy doctrine or, in the alternative,
that Plaintiff has failed to sufficiently allege the elements of
conspiracy. (*See* DA Defs.' Mem. 16–18; City Defs.' Mem.
10–11.) [11]

[11]    "DA Defs.' Mem." refers to the Memorandum
        of Law in Support of District Attorney Cyrus
        R. Vance and Assistant District Attorney Erin
        O'Brien's Motion to Dismiss Pursuant to Federal
        Rule 12(b)(6), filed September 28, 2017. (Doc. 46.)

As an initial matter, Plaintiff's allegations that the DA
Defendants conspired with one another to fabricate an
indictment, (SAC ¶¶ 120–21), are dismissed based on
absolute prosecutorial immunity, *see Pinaud*, 52 F.3d at 1148,
and the intracorporate conspiracy doctrine, *see Hartline*, 546
F.3d at 99 n.3. During the time of the alleged conspiracy, the
DA Defendants were acting in their capacity as advocates
in connection with their prosecution of the six burglary
counts, and thus the DA Defendants are protected by absolute
immunity with respect to Plaintiff's § 1983 conspiracy claim.
Even assuming the DA Defendants were not entitled to
prosecutorial immunity, Plaintiff's § 1983 and § 1985 claims
would be barred pursuant to the intracorporate conspiracy
doctrine. Vance and O'Brien are both prosecutors in the
New York County District Attorney's Office, and thus part
of a single corporate entity. *See Hartline*, 546 F.3d at 99
n.3. Further, Plaintiff does not allege any facts that could
support an inference that either prosecutor was motivated by
an "independent personal stake" in the prosecution, *Little*, 487
F. Supp. 2d at 442, and therefore Plaintiff's claim does not
fall under the exception to the intracorporate conspiracy rule.
Accordingly, the DA Defendants' motion to dismiss is granted
with respect to Plaintiff's claims that the DA Defendants
conspired with one another, because the claims are barred
by prosecutorial immunity for the § 1983 claim and the
intracorporate conspiracy doctrine for the § 1983 and § 1985
claims.

In addition, Plaintiff has failed to allege that the conspiracies
were in any way motivated by "racial or ... otherwise class-
based, invidious discriminatory animus." *Mian*, 7 F.3d at
1088 (internal quotation marks omitted). Although Plaintiff
alleges that at the time of his arrest, NYPD officers,
including Williams, were "acting on defendant City of New
York official policies and customs of arresting individuals
of African American decent [sic] and manufacturing false
evidence against individuals on the pretext of being involved
in illegal activities," (SAC ¶ 15), this statement is conclusory
and devoid of any factual support, and Plaintiff provides
no evidence suggesting that Williams or the DA Defendants
were acting with discriminatory animus with respect to the
alleged conspiracies surrounding his arrest and prosecution.
Therefore, all of Plaintiff's § 1985 conspiracy claims fail, and
the DA Defendants' and City Defendants' motions to dismiss
with respect to Plaintiff's § 1985 conspiracy claims are also
granted in light of Plaintiff's failure to plausibly allege racial
discriminatory animus.

Plaintiff contends that Williams and the DA Defendants
conspired to (1) falsify and tamper with documents and
(2) arrest Plaintiff on false charges in violation § 1983 by
depriving him of his Fourth, Fifth, Sixth, and Fourteenth
Amendment rights. (*See* SAC ¶¶ 117–25.) With regard to
the alleged conspiracies between the DA Defendants and
Williams, I find that the intracorporate conspiracy doctrine
does not apply, since the DA Defendants and Williams
represent separate entities—as employees of the New York
County District Attorney's Office and the New York City
Police Department, respectively, the DA Defendants are
employees of the state and Williams is an employee of the
City. *See Dunlop v. City of New York*, No. 06 Civ. 0433(RJS),
2008 WL 1970002, at *13–14 (S.D.N.Y. May 6, 2008)
(denying motion to dismiss conspiracy claim between New
York County District Attorney's Office and the New York City
Police Department based upon the intracorporate conspiracy
doctrine); *see also Baez v. Hennessy*, 853 F.2d 73, 77 (2d
Cir. 1988) ("When prosecuting a criminal matter, a district
attorney in New York State, acting in a quasi-judicial capacity,
represents the State not the county."). However, Plaintiff fails
to plausibly allege that Williams and the DA Defendants
conspired with one another to inflict an unconstitutional
injury and that the conspiracy created an "actual violation
of constitutional rights" as necessary to sustain a § 1983
conspiracy action. *See Singer*, 63 F.3d at 119. Because
all of Plaintiff's claims alleging an actual violation of his
constitutional rights have been dismissed, as detailed above,
Plaintiff's § 1983 conspiracy claims are similarly dismissed.

2018 WL 2561023

*See Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (dismissing the plaintiff's conspiracy claims where he could not establish an actual violation of his constitutional rights through claims for false arrest or use of excessive force); *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 627 (S.D.N.Y. 2015) ("Because none of plaintiff's claims alleging an actual violation of is constitutional rights remain against [the defendant], his conspiracy claims are similarly subject to dismissal.").

### E. *Failure to Intervene*

#### 1. Applicable Law

**\*11**  A failure to intervene claim is grounded in the rule that "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *see also Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014). "Liability only attaches if (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Bouche v. City of Mount Vernon*, No. 11 Civ. 5246(SAS), 2012 WL 987592, at \*5 (S.D.N.Y. Mar. 23, 2012) (quoting *Tavares v. City of New York*, No. 08 Civ. 3782(JSR)(JCF), 2010 WL 234974, at \*4 (S.D.N.Y. Jan. 19, 2010) ). A plaintiff's allegations may not be vague or conclusory, *see id.* at \*7, and whether it succeeds or fails depends on whether the plaintiff successfully alleges an underlying constitutional violation, *see Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) ("An underlying constitutional violation is an essential element of a failure to intercede claim under § 1983.").

#### 2. Application

Plaintiff alleges that the DA Defendants and City Defendants failed to intervene and thus should be held liable. (*See* SAC ¶¶ 131–38.) Plaintiff's failure to intervene claim fails as a matter of law because he has not established an underlying constitutional violation. As there is no predicate violation of Plaintiff's constitutional rights, his failure to intervene claim is dismissed and the motions of the DA Defendants and City Defendants to dismiss with respect to the failure to intervene claims are granted.

### F. *Municipal Liability*

#### 1. Applicable Law

Because the language of § 1983 makes clear that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort," a municipality "cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691. In order to succeed on a claim against a municipality under § 1983 based on acts of government officials, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 636 (S.D.N.Y. 2015) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) ). Thus, a plaintiff must establish a violation of his constitutional rights in order to succeed in a claim for municipal liability. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986).

When determining whether municipal liability applies, a court must "conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Cowan*, 95 F. Supp. 3d at 637 (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 Fed.Appx. 827 (2d Cir. 2003) ). In order to prevail, a plaintiff must allege one of "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted). A plaintiff cannot show a "policy" or "custom" sufficient to impose municipal liability merely by providing "[p]roof of a single incident of unconstitutional activity ... unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy." *City of Okla. v. Tuttle*, 471 U.S. 808, 823–24 (1985);

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

see also *Cowan*, 95 F. Supp. 3d at 637 ("Generally, a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (internal quotation marks omitted) ).

**\*12** Further, a "[p]laintiff must ... prove a causal link between the policy, custom or practice and the alleged injury in order to find liability against a municipality." *Brandon*, 705 F. Supp. 2d at 277; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Accordingly, in order to survive a motion to dismiss, a plaintiff "cannot merely allege the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 540 (S.D.N.Y. 2015) (internal quotation marks omitted).

## 2. Application

Plaintiff's Second Amended Complaint asserts that the City should be held liable because it has "customs, policies, practices, ordinances and regulations" that has deprived him of his constitutional rights, including "[w]rongfully arresting individuals," "manufacturing evidence against individuals," "unlawfully searching detainees," "arresting innocent persons in order to meet 'productivity' goals," and "wrongfully and unreasonably brutalizing innocent members of the public, despite the lack of probable cause to do so."[12] (*See* SAC ¶¶ 144–45.) As an initial matter, Plaintiff has failed to demonstrate an underlying constitutional violation with respect to the June 5 Burglary, as I have dismissed all of his other claims. Thus, his municipal liability claim must also fail. *See Cowan*, 95 F. Supp. 3d at 636; *see also Martinez v. City of New York*, 340 Fed.Appx. 700, 702 (2d Cir. 2009) (summary order) ("Because the arresting officers in this case did not violate plaintiff's constitutional rights, there can be no municipal liability even if plaintiff had alleged a specific policy or custom that led to his detainment.").

---

[12]     In their reply memorandum, the City Defendants claim that Plaintiff appears to raise an argument for municipal liability based on the City's failure to train for the first time in his opposition. (*See* City Defs. Reply 8; *see generally* Pl.'s Opp.) Although a plaintiff typically cannot amend a complaint through claims raised for the first time in an opposition, because of Plaintiff's pro se status

I will "read the facts alleged ... for whatever claims may properly be based on such facts." *Finch v. New York*, No. 10 CV 9691(VB), 2012 WL 2866253, at \*8 (S.D.N.Y. May 30, 2012); *see also Vlad-Berindan v. MTA N.Y.C. Transit*, No. 14-cv-675 (RJS), 2014 WL 6982929, at \*6 (S.D.N.Y. Dec. 10, 2014) (holding in connection with a pro se plaintiff's motion that "to the extent claims alleged for the first time in motion papers could have been asserted based on the facts alleged in the complaint, they should be considered"). To the extent that the facts in the Second Amended Complaint allege municipal liability based on failure to train, I find that Plaintiff offers only conclusory allegations. He does not provide any facts detailing a municipal training program causing a "pattern of similar constitutional violations by untrained employees" as necessary to make out a failure to train claim. *See Simms v. City of New York*, 480 Fed.Appx. 627, 629–30 (2d Cir. 2012) (summary order) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train.... Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ) ). "City Defs.' Reply" refers to the Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Pursuant to FRCP 12(B), filed November 17, 2017. (Doc. 62.) "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition of Cyrus Vance, Jr. and Erica O'Brien's Motion to Dismiss Pursuant to Federal Rule 12(b)(6), filed October 20, 2017. (Doc. 54 Ex. 1.)

**\*13** In addition, the Second Amended Complaint does not sufficiently allege an official policy or custom, as it only contains conclusory allegations that the City has a policy or practice of wrongfully arresting, searching, and brutalizing individuals or manufacturing evidence against them. *See Kucharczyk*, 95 F. Supp. 3d at 540 ("[C]onclusory allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details."). The only specific allegations contained in the Second Amended Complaint relate to Plaintiff's arrest and the June 5 Burglary charges, and are not sufficient to establish municipal liability.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 435 of 531

Blue v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 2561023

*See* Cowan, 95 F. Supp. 3d at 637. Thus, Plaintiff fails to state a claim of municipal liability, and the City Defendants' motion to dismiss with respect to this claim is granted.

### G. *State Law Claims*

Plaintiff also brings state law claims pendent to, and based on, the same facts as his federal law claims. Plaintiff's state law claims for malicious prosecution and abuse of process, which are governed by the same standard as its federal counterparts, are dismissed with prejudice as detailed above. With respect to Plaintiff's reference to New York law in his denial of a right to allow Plaintiff to amend his complaint, I find that it would a right to a fair trial claim, his conspiracy claims, and his failure to intervene claims, to the extent that Plaintiff's factual allegations are sufficient to state claims for violations of New York state law, I decline to exercise jurisdiction over them for the reasons described below.

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine —judicial economy, convenience, fairness, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). Indeed, "when federal claims are dismissed early in the litigation ... dismissal of state law claims is appropriate." Karmel v. Liz Claiborne, Inc., No. 99 Civ.3608IWK, 2002 WL 1561126, at *3 (S.D.N.Y. July 15, 2002) (internal quotation marks omitted). Having dismissed all of Plaintiff's claims over which I had original jurisdiction as well as state law claims governed by the same standard, I decline to exercise jurisdiction over Plaintiff's pendent state law claims to the extent that his factual allegations give rise to them. Accordingly, those claims are dismissed.

### H. *Leave to Replead*

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "[I]t is within the sound discretion of the court whether to grant leave to amend." In re Alcon S'holder Litig., 719 F. Supp. 2d 280, 281 (S.D.N.Y. 2010) (quoting John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994) ). Generally, when

courts grant a motion to dismiss, amendments are favored because they "tend to facilitate a proper decision on the merits." Sokolski v. Trans Union Corp., 178 F.R.D. 393, 396 (E.D.N.Y. 1998) (internal quotation marks omitted). Thus, a plaintiff is typically granted leave to amend in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed ... or futility of amendment." Alcon, 719 F. Supp. 2d at 281–82 (quoting Foman v. Davis, 371 U.S. 178, 182 (1962) ).

Given that I have provided Plaintiff with multiple opportunities to amend his complaint, I find that it would be futile to allow Plaintiff to amend once more. *See* Best v. City of New York, No. 12 Civ. 7874(RJS)(SN), 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014) ("Plaintiff has been given ample opportunity to amend his pleadings and the Court can only afford him so many bites at the apple."); Dyson v. N.Y. Health Care, Inc., 353 Fed.Appx. 502, 503–04 (2d Cir. 2009) (summary order) (affirming a district court's dismissal of a third amended complaint where "the district court afforded [the plaintiff] three opportunities to file an amended complaint" but "despite these, she did not plead any facts sufficient to show that she was plausibly entitled to any relief"). Accordingly, Plaintiff is denied leave to amend the Second Amended Complaint.

### V. **Conclusion**

**\*14** Because Plaintiff failed to plausibly allege claims against the DA Defendants and City Defendants, their motions to dismiss are GRANTED in their entirety, and Plaintiff's claims are dismissed with prejudice as to all of his § 1983 and § 1985 claims as well as all state law claims analyzed under the same standard. To the extent that Plaintiff's allegations in the Second Amended Complaint can be construed to give rise to additional state law claims, I decline to exercise jurisdiction over these claims and they are dismissed without prejudice to filing those claims in state court.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion and Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *Cf.* Coppedge v. United States, 369 U.S. 438, 444–45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a nonfrivolous issue). The Clerk of Court is respectfully directed to mail a copy of this Opinion and Order to the pro se Plaintiff and enter judgment for Defendants.

2018 WL 2561023

**All Citations**

SO ORDERED.

Not Reported in Fed. Supp., 2018 WL 2561023

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.** **Docket 1:16-CV-09990**<br>Blue v. City of New York et al | — | S.D.N.Y. | Dec. 28, 2016 | Docket |

**History**

There are no History results for this citation.

2004 WL 1161174
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Gerard CRUDELE, Plaintiff,

v.

THE CITY OF NEW YORK POLICE
DEPARTMENT, the City of New York, Stanley
Edelman and Howard Safir, Individually
and in their Official Capacity, Defendants.

No. 97 Civ. 6687(RCC).
|
May 24, 2004.

*MEMORANDUM OPINION AND ORDER*

CASEY, J.

**\*1** Gerard Crudele ("Plaintiff") brings this action against the City of New York Police Department ("NYPD"), the City of New York, Stanley Edelman, and Howard Safir (collectively, "Defendants"), challenging the constitutionality of the NYPD sick-leave policy on the basis that it prevents officers from exercising their fundamental rights and alleging that Defendants conspired to deny Plaintiff his constitutional rights, thereby violating 42 U.S.C. § 1985. Presently before the Court is Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is DENIED.

I. BACKGROUND [1]

[1]       The facts set forth in this section are undisputed.

Plaintiff was employed as a New York City Transit Police Officer from December 1980 until he retired on July 27, 1997. In February 1993, Plaintiff suffered a fall while on duty at a Brooklyn subway station, sustaining injuries to his back, legs, head, and shoulders. After this accident and until his retirement, Plaintiff took lengthy periods of sick leave.

From the date of Plaintiff's injury until April 1995, Plaintiff's sick leave conditions were governed by the New York City Transit Authority. Although the Transit Authority's sick leave policy required Plaintiff to remain in his residence when he

reported sick, it allowed him substantial flexibility to leave his home for various reasons. (*See* Crudele Dep. at 70, 72, 80.)

After the Transit Authority merged with the NYPD in April 1995, the conditions governing Plaintiff's sick leave became much more restrictive. The NYPD sick leave policy allows officers unlimited paid sick leave; however, officers reporting sick must comply with certain conditions, which are set forth in the NYPD Patrol Guide. Unless he or she is unable to travel, an officer claiming to be sick must report to a district surgeon employed by the NYPD's Medical Division, who is responsible for assessing an officer's condition and determining whether he or she is fit to return to work. The officer is prohibited from leaving his or her residence, with two exceptions. First, an officer may, with permission from the "sick desk," leave his or her residence to attend a medical appointment. Second, an officer may leave his residence for other reasons for a specified time period, provided that he or she has obtained a pass from the district surgeon. Such passes are typically granted for periods of between four and sixteen hours. (*See* Edelman Dep. at 82–87.) An officer may appeal the denial of a request for an out-of-residence pass to the clinic supervisor. (Valenti Aff. at ¶ 12.)

Due to his frequent absences, Plaintiff was designated as "Chronic Absent, Category B," a category applicable to officers who have been out sick on six or more occasions during a twelve-month period or have been out sick on four or more occasions totaling 40 or more sick days during a twelve-month period. (*Id.* at ¶¶ 5–7.) Because of these officers' sick leave histories, the district surgeon applies a stricter standard in determining whether or not to grant a request for time out of residence. When a "Category B" officer makes such a request, it is generally denied or limited to no more than four hours. (*Id.* at ¶ 4.) The policy makes no accommodation for an officer who is out sick due to a long-term disability.

**\*2** The NYPD Absence Control Unit monitors officers' compliance with the sick-leave requirements, focusing primarily on officers with a "Chronic" designation. When an officer reporting sick is found to be out of residence at an unauthorized time, the Absence Control Unit is authorized to take a range of disciplinary measures against the officer, up to and including filing Charges and Specifications against the officer. Where discipline beyond a simple warning is contemplated, the unit typically consults with the NYPD Advocate's Office before taking any action. (*Id.* at ¶ 16.)

2004 WL 1161174

## II. DISCUSSION

In order to prevail on a motion for summary judgment, the moving party must establish that there are no genuine issues of material fact and that judgment is warranted as a matter of law. *Fed.R.Civ.P. 56(c)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)*. Facts, and all inferences drawn therefrom, must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *American Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). If the moving party meets its burden, then the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250.

### A. Constitutionality of Sick Leave Policy

A policy regulating a municipality's agents or employees is generally evaluated under "rational basis" review. *See Kelley v. Johnson,* 425 U.S. 238, 245 (1976). Accordingly, such a regulation will be upheld as long as the municipal government can show a rational relationship between the challenged regulation and the state interest it is intended to promote. *Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968). The vast majority of courts that have considered municipal sick-leave policies similar to the one at issue here have evaluated the constitutionality of these policies under a rational basis standard of review. *See, e.g., Crain v. Bd. of Police Comm'rs of the Metro. Police Dep't,* 920 F.2d 1402, 1409 (8th Cir.1991); *Capasso v. Metro. Transp. Auth.,* 198 F.Supp.2d 452, 460 (S.D.N.Y.2002); *Monahan v. City of New York Dep't of Corrs.,* 10 F.Supp.2d 420 (S.D.N.Y.1998); *Uryevick v. Rozzi,* 751 F.Supp. 1064, 1068 (E.D.N.Y.1990); *Korenyi v. Dep't of Sanitation,* 699 F.Supp. 388 (E.D.N.Y.1988); *Voorhees v. Shull,* 686 F.Supp. 389, 394 (E.D.N.Y.1987). *But see Pienta v. Vill. of Schaumburg, Ill.,* 710 F.2d 1258 (7th Cir.1983). Under the rational relationship test, the Court must ensure not only that the policy is rationally related to a valid state interest, but also that it is connected to that interest in a "non-arbitrary fashion." *Capasso,* 198 F.Supp.2d at 460; *Uryevick,* 751 F.Supp. at 1064.

There is no doubt that the City has a strong interest in preventing malingering among police officers. The NYPD officers have the benefit of an extremely generous sick leave policy, and some restrictions on the use of that policy are not only acceptable, but necessary to the maintenance of an effective police force. Accordingly, the NYPD's policy requiring an officer to remain in his residence when he is too sick to report for work is rationally related to its interest in preventing abuse of a policy that allows for unlimited paid sick leave.

**\*3** The Court's inquiry does not end here: the Court must also determine whether the regulation is connected to the state interest in a "non-arbitrary fashion." This requirement is particularly important where the regulation imposes on an employee's fundamental rights, such as the right to vote or attend religious services.

The NYPD sick leave provisions are highly restrictive; an officer is confined to his residence for twenty-four hours a day, seven days a week, unless he obtains an out-of-residence pass from the district surgeon. [2] Because an officer out sick must obtain a pass to leave his residence for any reason other than a medical appointment, the officer's rights to vote or to attend religious services are highly dependent on the issuance of such a pass.

[2]     Indeed, Plaintiff claims not only that he was confined to his property, but that he was not even permitted to sit outside in his yard. (*See* Crudele Aff. at ¶ 35.)

Courts considering similar municipal sick-leave policies have reached varying results; however, courts have generally struck down sick leave policies that subject an officer's rights to vote, exercise his or her religion, and freely associate to the unfettered discretion of a government official. *See, e.g., Capasso,* 198 F.Supp.2d at 461 (holding sick-leave policy requiring firefighters to remain at home in the absence of permission from the Communications Desk Supervisor unconstitutional because the policy "[did] not indicate how the supervisor [made] such a determination"); *Uryevick,* 751 F.Supp. at 1071 (sick leave policy requiring an officer to remain at home from 9:00 a.m. to 5:00 p.m., unless written permission was granted by the Desk Officer for a "reasonable purpose and time," was unconstitutional because there were no guidelines defining what was "reasonable"); *Voorhees,* 686 F.Supp. at 395 (sick-leave policy requiring police officer to obtain permission from Police Surgeon or other supervisory officer was unconstitutional because it lacked guidelines for the granting or withholding of such permission); *Philadelphia Lodge No. 5 v. City of Philadelphia,* 599 F.Supp. 254, 258 (E.D.Pa.1984) (sick-leave policy requiring a firefighter to obtain permission to leave his residence was unconstitutional because it lacked guidelines for the determination of when

Crudele v. City of New York Police Dept., Not Reported in F.Supp.2d (2004)

2004 WL 1161174

such permission would be granted). *But see Crain,* 920 F.2d 1402, 1409–10 (upholding sick-leave policy requiring officers to remain at home at all times except to receive medical treatment or if they received permission from the police surgeon or chief of police); *Serge v. City of Scranton,* 610 F.Supp. 1086, 1088 (M.D.Pa.1985) (upholding sick-leave policy requiring an officer to remain at home unless he obtained approval from a district surgeon); *Loughran v. Codd,* 432 F.Supp. 259 (E.D.N.Y.1976) (same).

Defendants rely on two cases in this Circuit in support of their argument that the NYPD sick leave policy is constitutional. The first, *Monahan v. City of New york Dep't of Corrs.,* 10 F.Supp.2d 420 (S.D.N.Y.1998), upheld the constitutionality of a sick-leave policy that required an officer out sick to remain in his or her residence for all but four hours each day. The second, *Loughran v. Codd,* 432 F.Supp. 259 (E.D.N.Y.1976), upheld the constitutionality of a sick leave policy similar to the policy at issue in this case.

**\*4** Despite Defendants' arguments, *Monahan* has limited relevance to this case. There, Judge Rakoff held that the sick-leave policy at issue allowed officers to leave their homes for up to four hours per day and therefore did not violated their constitutional rights. 10 F.Supp.2d at 425. Judge Rakoff specifically distinguished the policy before him from those held to be unconstitutional in *Uryevick* and *Voorhees,* which required officers to remain at home the entire day. Id. Unlike the policy upheld in *Monahan,* the NYPD sick leave policy requires officers to remain in their residences twenty-four hours per day, seven days per week. Because the policy in *Monahan* and the policy at issue here are significantly different, the Court rejects Defendants' argument that *Monahan* is dispositive.

Neither is *Loughran* dispositive. Although *Loughran* upheld a sick-leave policy similar to the one at issue here, subsequent cases in this Circuit have found such policies unconstitutional. *See, e.g., Capasso,* 198 F.Supp.2d at 461; *Uryevick,* 751 F.Supp. at 1071; *Voorhees,* 686 F.Supp. at 395. In *Capasso,* Judge Connor found facially unconstitutional a sick-leave policy requiring an officer out sick to stay home for twenty-four hours per day unless he or she obtained a pass from the Communications Desk Supervisor. 198 F.Supp.2d at 461. Judge Connor specifically distinguished *Monahan,* noting that the policy in that case allowed officers to leave their homes for up to four hours each day and was therefore much less restrictive. *See id.* Noting that other cases in this Circuit have struck down similar policies, Judge Connor denied the

defendants' motion for summary judgment, holding that the sick leave policy was facially unconstitutional. *Id.; see also Uryevick,* 751 F.Supp. at 1071; *Voorhees,* 686 F.Supp. at 395. In light of the highly restrictive nature of the policy at issue here, the Court finds that the policy more closely resembles those at issue in *Capasso, Voorhees,* and *Uryevick* than the policy upheld in *Monahan.*

The constitutional concerns raised by subjecting an officer's constitutional rights to the discretion of a district surgeon may be mitigated by the existence of guidelines that restrict such discretion. *See id.* at 461; *Uryevick,* 751 F.Supp. at 1071; *Voorhees,* 686 F.Supp. at 395; *Philadelphia Lodge No. 5,* 599 F.Supp. at 259. Here, there is a factual dispute as to whether the district surgeon's discretion is subject to specific guidelines. (*Compare* Crudele Aff. at ¶¶ 29–33 (asserting that he was not made aware of any rules or guidelines applicable to the district surgeon's decision to grant or deny a pass and that Dr. Edelman indicated to Crudele that that decision was entirely within Dr. Edelman's discretion) *with* Edelman Dep. at 81–88 (suggesting that a decision to grant or deny a pass depends on the officer's medical condition, how the officer presents himself or herself to the district surgeon, and the distance from the officer's residence that he or she intends to travel.) Because there is conflicting evidence as to the existence of guidelines, the Court will hold an evidentiary hearing to resolve the issue prior to a definitive ruling on the constitutionality of the NYPD sick leave policy.

**B.** *Section 1985 Conspiracy Claim and Qualified Immunity of Individual Defendants*

**\*5** Defendants also move for summary judgment on Plaintiff's Section 1985 claim based on the intracorporate conspiracy doctrine and for dismissal of the claims against the individually-named defendants on the basis of qualified immunity. Because Plaintiff has submitted no response to these sections of Defendants' motion, they are deemed to have abandoned these claims. See *See Dineen v. Stramka,* 228 F.Supp.2d 447, 454 (S.D.N.Y.2002); *Anti–Monopoly Inc. v. Hasbro, Inc.,* 958 F.Supp. 895 (S.D.N.Y.1997); *see Taylor v. City of New York,* 269 F.Supp.2d 68, 75 (E.D.N.Y 2003). For the reasons set forth below, the Court also finds that these claims must be dismissed on the merits.

The third cause of action in the complaint alleges that Defendants "conspired to deprive plaintiff of due process and equal protection of the law ... and thereby violated 42 U.S.C. § 1985." The "intracorporate conspiracy" doctrine provides that there can be no actionable conspiracy where

2004 WL 1161174

the persons alleged to have engaged in the conspiracy are a corporation and one or more of its agents within the scope of their employment. *See Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 70–71 (2d Cir.1976); *Agugliaro v. Brooks Bros.,* 802 F.Supp. 956, 962 (S.D.N.Y.1992). The doctrine applies not only to private corporations, but also to public entities. *See Silverman v. City of New York,* 2001 U.S. Dist. LEXIS 22537 (S.D.N.Y. Nov. 19, 2001). Dr. Edelman and Commissioner Safir were acting in the scope of their employment by the NYPD and the City of New York at the time of the events underlying this case. Accordingly, the intracorporate conspiracy doctrine precludes Plaintiff's conspiracy claim against them.

Defendants additionally argue that the claims against the individually named defendants must be dismissed under the doctrine of qualified immunity. The doctrine of qualified immunity precludes liability for civil damages against government officials "where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 614 (1999) (internal quotation marks and citations omitted). The critical inquiry is whether it was objectively reasonable for a defendant to think that the challenged conduct did not violate the plaintiff's constitutionally established rights. *See Behrens v. Pelletier,* 516 U.S. 299, 306 (1996). The law in this area is not sufficiently clear to warrant the doctrine of qualified immunity inapplicable. Accordingly, the claims as to the individually named defendants are dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's Section 1985 claims are dismissed based on the doctrine of intracorporate immunity, and all claims against the individually named defendants are dismissed based on the doctrine of qualified immunity. The Court finds that there is a factual dispute as to the existence of guidelines applicable to a district surgeon's decision whether or not to issue of an out-of-residence pass. Accordingly, Defendants' motion for summary judgment is DENIED as to the constitutionality of the NYPD sick-leave policy.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 1161174

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 1:97CV06687**<br>CRUDELE v. THE CITY OF NEW YORK, ET AL | — | S.D.N.Y. | Sep. 09, 1997 | Docket |

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (3)**

**Direct History (1)**

   1.  Crudele v. City of New York Police Dept. 🐾
     2004 WL 1161174 , S.D.N.Y. , May 24, 2004

**Related References (2)**

🚩 2.  Crudele v. New York City Police Dept.
2001 WL 1033539 , S.D.N.Y. , Sep. 07, 2001

   3.  Richburg v. City of New York Dept. of Correction
2003 WL 151985 , S.D.N.Y. , Jan. 22, 2003

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   Mahar v. U.S. Xpress Enterprises, Inc.,   N.D.N.Y., July 21, 2009

2002 WL 523270

United States District Court, S.D. New York.

Martin STONER, Plaintiff,

v.

NEW YORK CITY BALLET COMPANY, Defendant.

No. 99 Civ. 0196(BSJ).

|

April 8, 2002.

Order & Opinion

JONES, J.

## I. INTRODUCTION

*1  Pro se Plaintiff, Martin Stoner ("Stoner"), brings this action against the New York City Ballet Company ("Ballet") pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law 290 et seq., and the Administrative Code of the City of New York ("NYCHRL"), §§ 8-101 et seq., alleging employment discrimination in that he has been retaliated against by the Ballet since 1998 because of his alleged protected conduct. [1] A detailed summary of Plaintiff's contentions and the facts of this case is set forth in this court's May 8, 2001, Order and Opinion. See Stoner v. New York City Ballet Co., No. 99 Civ. 0196(BSJ), 2001 WL 492430, at *1-* (S.D.N.Y. May 8, 2001) [hereinafter Stoner I ]. Some of the more pertinent background facts are also described below.

[1]  The analysis used in considering employment discrimination claims brought under the NYSHRL and the NYCHRL is the same as it is in Title VII claims. See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n. 1 (2d Cir.2000) (citing Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n. 1 (2d Cir.1999); Landwehr v. Grey Adver. Inc., 622 N.Y.S.2d 17, 18 (1st Dep't 1995)).

## A. FACTS

Plaintiff has been employed as a violinist with the Ballet's orchestra since 1976. (Complaint ("Compl.") ¶ 9.) From approximately 1980, Stoner was in a group of male and female substitute musicians known as "necessaries." The necessaries sought, among other things, health benefits and entry into the basic orchestra without audition. In particular, Stoner has fought continuously, but unsuccessfully, for the right to automatic entry to the orchestra without audition for rotation players. (Stoner Dep. at 113, 134-35.) Currently, a collective bargaining agreement ("CBA") between the Ballet and the Associated Musicians of Greater New York, Local 802, American Federation of Musicians, AFL-CIO, ("Union") governs the employment of orchestra musicians.

In 1983, the Ballet and the Union adopted a procedure into their CBA to govern the process by which musicians would attain entry into a permanent opening in the basic orchestra. (Goldberg Aff. ¶ 5.) There are several options available to fill a permanent position in the orchestra under the CBA. (See Menaker Decl. of 6/11/01, Ex. C.) These options, which a joint management-musicians Audition Committee "shall attempt to satisfy in the following order of preference," include:

> 1. to appoint a player from the orchestra or from among the players who have substituted for orchestra members on a regular basis without audition, on the basis of personal knowledge; 2. to appoint a player recommended to it, but only after a personal audition before the Committee; 3. to appoint a player chosen through open auditions.

(Menaker Decl. of 6/11/01, Ex. C, at 35-36, 40-41.) Eight votes are required for appointments under options one and two. (Id. at 41.) If there are insufficient votes to appoint an applicant to the orchestra, the Committee must hold an open audition. (Id. at 40-42.)

Although he has never been a basic or permanent member of the orchestra, Plaintiff has been a rotator since 1985, when the Ballet first recognized musicians of that status. Rotators

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

are replacement musicians who are the first musicians to be called in when a permanent orchestra member is absent. (Goldberg Aff. of 2/16/99, ¶ 3.) According to Stoner, during the 1998-1999 winter season, he played in approximately "95% of the required performances," which is more than some of the basic orchestra members of the violin section played. (Pl.'s Aff. in Opp'n to Def.'s Mot. for Summ. J. ¶ 67.)

## B. PLAINTIFF'S CLAIMS

**\*2** In his Complaint, Stoner claimed that the Ballet retaliated against him in violation of Title VII because he "testified in a Federal Court civil rights proceeding against [the Ballet]." (Compl. ¶ 2.) Specifically, Stoner claims that on June 2 and September 24, 1997, he was deposed in connection with *Pray v. New York City Ballet,* 96 Civ. 5723 (*"Pray"* ), a sexual harassment lawsuit initiated against the Ballet by three female violinists. The plaintiffs in the *Pray* litigation alleged that they had been subjected to a hostile work environment by Laurance Fader ("Fader"), a fellow musician, who was the head of the Union Negotiating Committee. Stoner testified against Fader and Jack Katz, another musician who was the Chairman of the Audition Committee. According to Stoner, his testimony was damaging to the Ballet. (Compl. ¶¶ 10-12.) Stoner claims that since that time the Ballet has consistently retaliated against him for his participation in the *Pray* litigation, principally by failing to promote him to the basic orchestra without audition.

## C. PENDING MOTIONS

Currently multiple motions are pending before this court. Both Defendant and Plaintiff move for reconsideration of different portions of this court's May 8, 2001, Order and Opinion. Plaintiff also moves to amend his Complaint. Moreover, Plaintiff has raised additional arguments and claims in correspondence to the court to which Defendant has responded by letter brief. Finally, Plaintiff has filed a motion for sanctions against Defendant. [2]

[2]    Many of this court's problems in resolving Plaintiff's motions and claims stem from Plaintiff's own conduct. Throughout this litigation, Plaintiff's claims have represented an ever-moving target. For example, although Plaintiff informed the court, by letter dated April 21, 1999, that he intended to

move for leave to amend his Complaint, Plaintiff did not make the motion until more than a year later, after both Defendant's and Plaintiff's motions for summary judgment were fully submitted. *See Stoner I,* 2001 WL 492430, at *5, *5 n. 7. Even after decision on dispositive motions, Plaintiff has repeatedly changed his claims and raised entirely new theories of liability, often only briefly mentioned and buried in correspondence to the court or in unrelated motion papers. As late as December of 2001, Plaintiff articulated new bases for liability in correspondence to the court. Defendant is entirely correct when it asserts that "Plaintiff has employed a succession of tactics-including [two] failed request[s] for a preliminary injunction, a campaign of abusive, and then abandoned, discovery requests, repeated attempts to embroil defendant's counsel in this litigation, and a barrage of untimely supplemental requests and briefs-to delay the inevitable dismissal of his [original] complaint." (Mem. of Law in Opp'n to Pl.'s Mot. for Leave to Amend the Compl. at 1.)

## II. PLAINTIFF'S MOTION FOR RECONSIDERATION

Plaintiff seeks reconsideration of this court's May 8, 2001, Order and Opinion, which addressed Defendant's Motion for Summary Judgment, Plaintiff's Cross-motion for Summary Judgment, and Plaintiff's first Motion to Amend the Complaint. Plaintiff contends that the court erred by overlooking evidence, failing to view the evidence in the light most favorable to Plaintiff, failing to draw inferences in Plaintiff's favor, denying Plaintiff adequate discovery, [3] misapplying the law, failing to view the record as a whole, and impermissibly resolving issues of fact. (*See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Recons. ("Pl.'s Recons. Mem.") at 1.)

[3]    To the extent that Plaintiff seeks reconsideration of the denial of his requests for additional discovery, the court denies Plaintiff's Motion to Reconsider his discovery requests. This court and Magistrate Judge Michael H. Dolinger have repeatedly reconsidered and denied Plaintiff's overly-broad requests for discovery. *See, e.g.,* Order of May 18, 1999(MHD); Order of Nov. 6, 1999(MHD); Order of Aug. 18, 2000(MHD); Order of Nov. 20, 2000(BSJ). Plaintiff can make no colorable claim that any evidence or authority has been overlooked

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

with respect to his repeated, vexatious requests for overly broad discovery.

### A. LEGAL STANDARDS

Motions for reconsideration governed by Local Civil Rule 6.3 are within the sound discretion of the district court. *Schaffer v. Soros,* No. 92 Civ. 1233, 1994 WL 592891, at [*]1 (S.D.N.Y. Oct. 31, 1994). The rule provides in pertinent part: "There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." Rule 6.3 must be applied so as to avoid re-litigating repetitive arguments on issues previously decided. *System Management Arts, Inc. v. Avesta Tech., Inc.,* 106 F.Supp.2d 519, 521 (S.D.N.Y.2000). Therefore, the movant must demonstrate that the court overlooked controlling decisions or factual matters that were put before it on the underlying motion that might reasonably be expected to alter the conclusion reached by the court on the underlying motion. *Dellefave v. Access Temporaries, Inc.,* No. 99 Civ. 6098, 2001 WL 286771, at [*]1 (S.D.N.Y. Mar. 22, 2001). The movant may not "advance new facts, issues or arguments not previously presented to the Court." *Morse/Diesel, Inc. v. Fidelity & Deposit Co. of Md.,* 768 F.Supp. 115, 116 (S.D.N.Y.1991). Moreover, the parties may not "reargue those issues already considered." *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996).

### B. PLAINTIFF'S DISMISSED RETALIATION CLAIMS

**\*3** Plaintiff seeks reversal of this court's decision dismissing portions of his retaliatory failure to promote claim on summary judgment. Contrary to this court's rulings, Plaintiff argues that he did, in fact, demonstrate an adverse employment action sufficient to withstand summary judgment. Specifically, Plaintiff claims that the court overlooked evidence demonstrating (1) that persons hostile to Stoner improperly influenced the Ballet's decision to deny Stoner direct entry to the orchestra, (2) that it would have been futile for Stoner to audition because the process was unfair to him, and (3) that not all openings in the violin section have been filled by open auditions. (*See* Pl.'s Recons. Mem. at 2-6.) Plaintiff's assertions are entirely without merit.

Plaintiff, for the most part, rehashes the arguments he made before this court in motions decided in the May 8, 2001, Order and Opinion. With respect to the "evidence" Plaintiff claims the court overlooked about the Ballet's denial of Plaintiff's direct entry into the orchestra and the alleged futility of the audition process, Plaintiff's arguments continuously fail to distinguish between unsupported, irrelevant hearsay and evidence that would support his claims. *See H. Sand & Co., Inc. v. Airtemp,* 934 F.2d 450, 454-55 (2d Cir.1991) ("[T]estimony ... that would not be admissible if testified to at the trial may not properly be set forth in [the Rule 56(e) ] affidavit.") (internal quotations and citations omitted); *see also Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir.1995) (finding conclusory allegations in affidavits insufficient). Moreover, Plaintiff's allegations regarding the "open" or "closed" nature of the auditions overlook the crucial distinction between openings for principal positions and entry into the basic orchestra, which are governed by different processes under the CBA. (*See* Def.'s Mem. in Opp. to Pl.'s Mot. for Recons. at 6-7.)

Plaintiff's arguments citing law allegedly ignored by the court are similarly unavailing. The "controlling" precedents submitted by Plaintiff are, in fact, inapplicable to Plaintiff's retaliation claims. The doctrines cited by Plaintiff deal with aspects of discrimination and hostile work environment claims unrelated to Plaintiff's failure to demonstrate an adverse employment action in support of his retaliation claims. (*See* Pl.'s Recons. Mem. at 3.) Since Plaintiff has failed to demonstrate that the court overlooked any evidence or controlling law that, if considered, could reasonably be found to alter the court's decision to dismiss some of his retaliation claims in its May 8, 2001, Order and Opinion, the court denies Plaintiff's Motion for Reconsideration of those claims. *See Dellefave,* 2001 WL 286771, at [*]1.

### C. PLAINTIFF'S PROPOSED AMENDMENTS TO THE COMPLAINT

#### 1. RETALIATORY FAILURE TO PROMOTE

In its Order and Opinion of May 8, 2001, the court granted in part and denied in part Plaintiff's first Motion to Amend the Complaint. At that time, Plaintiff's first Proposed Amended Complaint sought to add two new sets of allegations of retaliatory conduct on the part of the Ballet. The first set occurred between 1984 and December 1997 and was allegedly precipitated by protected activity in which Stoner claimed he began to engage on January 1, 1980. Plaintiff alleged that the Ballet retaliated against him by failing to

promote him to the basic orchestra in 1984; November, 1985; November, 1990; February, 1992; November, 1992; and February, 1996; and by failing to investigate and to take remedial action regarding his complaints that Fader harassed him in January, 1985; January, 1988; January, 1993; May and June, 1997; and December, 1997. *Stoner I,* 2001 WL 492430, at *8. The second set occurred after the filing of the original Complaint in this litigation on January 11, 1999. *Stoner I,* 2001 WL 492430, at *5.

**\*4** Assuming, for the purposes of the motion, that Plaintiff had engaged in protected activity and had demonstrated a discriminatory policy or mechanism,[4] the court found Plaintiff's new claims concerning the Ballet's conduct before February 5, 1998, were time-barred and that Plaintiff failed to set forth a continuing violation sufficient to warrant an exception to the statutorily required limitations on filing time. *Stoner I,* 2001 WL 492430, at *7. Therefore, the court denied Plaintiff leave to amend by adding retaliation claims concerning any conduct of the Ballet prior to February 5, 1998.[5]

[4]   Plaintiff's complaint that the court erred by concluding that he could not show an "ongoing policy or mechanism" of discrimination, (*see* Pl.'s Recons. Mem. at 11), entirely ignores the fact that in deciding the motion, the court assumed such a policy or mechanism to exist. *See Stoner I,* 2001 WL 492430, at *7.

[5]   The court did, however, permit Plaintiff to add two allegations of retaliation allegedly occurring after the filing of his original Complaint. *See Stoner I,* 2001 WL 492430, at *8.

For the most part, Plaintiff's objections to the court's decision concern the findings that his allegations prior to 1998 were time-barred because Plaintiff failed to set forth a continuing violation. (*See* Pl.'s Recons. Mem. at 8-11.) Under Title VII, a claimant must file a discrimination claim "with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local employment agency, within 300 days of the alleged discriminatory action." *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 712 (2d Cir.1996). This statutory requirement is analogous to a statute of limitations, so a charge filed after the stated time frame will be barred. *Id.* The continuing violation doctrine provides an exception to

that rule. "Under that doctrine, if a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson,* 251 F.3d 345, 359 (2d Cir.2001) (internal quotations and citations omitted). The Second Circuit has held that

> [a]lthough the continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination, and although acts so 'isolated in time ... from each other ... [or] from the timely allegations[ ] as to break the asserted continuum of discrimination' will not suffice, *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 766, a continuing violation may be found 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994).

*Fizgerald,* 251 F.3d at 359. A plaintiff may not rely on such a continuing violation theory, however, unless he has asserted a continuing violation in the administrative proceedings. *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851 (1985).

The evidence Plaintiff suggests that the court "overlooked" when denying his Motion to Amend by adding retaliatory conduct occurring prior to February 5, 1998, consists almost entirely of hearsay allegations contained within Plaintiff's own self-serving affidavits. (*See, e.g.,* Pl.'s Recons. Mem. at 9-10.) Moreover, Plaintiff has continually "reconstrued" the often contradictory facts and conclusory allegations on which he relies to support his claims of a continuing violation in an attempt to make his case resemble favorable precedent. For example, Plaintiff initially claimed that he has been engaged in protected activity since at least January 1, 1980. (Proposed Am. Compl. ¶¶ 12, 16-17.) However, as the court noted in its May 8, 2001, Order and Opinion, Stoner's own allegations and the documents he relies upon do not support his claim that the NLRB charges [Stoner raised in the early 1980s] related to gender based discrimination." *Stoner I,* 2001 WL 492430, at *6. Moreover, even assuming that there was a continuing policy or mechanism of gender-based discrimination, Plaintiff, by his own admissions, should have been on notice no later than the mid-1980s of the Ballet's discriminatory policy. Consequently, Plaintiff's notice precluded application of the continuing violation doctrine. *See Stoner I,* 2001 WL 492430, at *7.

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

**\*5** In an apparent attempt to circumvent those notice limitations of the continuing violation doctrine, Plaintiff asserted in his Memorandum in Support of Plaintiff's Motion for Reconsideration that despite his complaints and charges filed with the NLRB, (1) his awareness was not triggered because he wasn't regularly harassed until he was noticed for his deposition in May 1997, and (2) it was reasonable for him not to assert his rights until 1998 because he thought the discrimination might be mitigated by a Union settlement in 1985. (Pl.'s Recons Mem. at 10.) The latter assertions is an admission by Plaintiff that he was aware of the alleged discrimination prior to 1985; otherwise, Plaintiff would have no reason to believe there were any "adverse consequences" to be mitigated by the settlement. Moreover, any reliance by Plaintiff on the Union settlement to bring about changes in the audition process would necessarily have been negated by the next occasion on which auditions were held to fill an opening in the orchestra, which occurred in November of 1985. (*See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Recons. at 10.)

Further "clarifying" his position in his Memorandum of Law in Support of Plaintiff's [second] Motion for a Preliminary Injunction, Plaintiff asserted:

> In his complaint and in two amended complaints, Stoner has alleged an ongoing pattern of retaliation by the Ballet. However, Stoner now asserts that there was a break in his protected activity from approximately 1985 to 1997. In other words, Stoner's early activity from 1980-1985 was gender-based, protected opposition and his protected activity from 1997-present was also gender-based.

(Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. at 1-2.) Stoner's most recent averments only serve to demonstrate that he cannot meet the continuity requirements necessary to qualify for a tolling of the statutory filing period under the continuing violation doctrine. The law is clear that discrete, sporadic incidents do not meet the frequency requirement. *See Weeks v. New York State Div. of Parole,* 273 F.3d 76, 84 (2d Cir.2001) ("Absent unusual circumstances, a two-year gap is a discontinuity that defeats use of the continuing violation exception.")

Now, however, Plaintiff "alleges that his well-documented fight against auditions for the Rotation Players from 1985-97 (which is undisputed) did not constitute a twelve year gap in Stoner's gender-based protected activity." (Pl.'s Mem. of Law in Supp. of Sanctions at 4.) While Plaintiff's position with respect to the time periods in which he was engaged in protected activity and his awareness of the alleged discrimination by the Ballet has shifted dramatically and repeatedly since the outset of this litigation, Plaintiff's reclassification of the facts on which he relies does not demonstrate that the court overlooked any evidence that, if considered, could reasonably be found to alter the court's decision to deny his Motion to Amend to add retaliatory conduct occurring before February 5, 1998.

**\*6** Stoner argues that the court should reconsider his continuing violation claims not only in light of those new assertions by Stoner but also because the Supreme Court has granted *certiorari* in *Morgan v. Amtrak,* 232 F.3d 1008 (9th Cir.2000), *cert. granted,* 121 S.Ct. 2547 (2001), a Ninth Circuit case. In *Morgan,* as in prior cases, the Ninth Circuit rejected the application of the test articulated in *Berry v. Board of Supervisors,* 715 F.2d 971 (5th Cir.1983), to continuing violation claims predicated upon the assertion of a hostile environment. Specifically, the Ninth Circuit rejected the strict "notice limitation" of the continuing violation doctrine in the context of hostile work environment claims after finding that "most cases of hostile environment are not capable of facile identification." First, the granting of *certiorari* by the Supreme Court does not represent a change in law warranting reconsideration, and Plaintiff does not point to any change in the law of this Circuit warranting reconsideration. Second, the twelve-year break in Plaintiff's "protected activity" and the attendant harassment admitted by Stoner is dispositive of his claim for continuing violation under any standard adopted by the courts. *See Weeks,* 273 F.3d at 84 (holding that where the events pleaded are few and unlinked and no discriminatory incidents were alleged during a three-year period prior to the limitations period there could be no continuing violation); *Morgan,* 232 F.3d at 1015 (holding that the incidents of discrimination cannot be "isolated, sporadic or discrete" and that the incidents prior to the limitations period must be sufficiently related to those occurring within the limitations period).

Plaintiff, by his own admission, was harassed only once during the twelve-year period prior to his testimony in the *Pray* litigation, (*see* Mem. of Law in Supp. of Prelim. Inj.

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

at 1-2), and was unaware of any gender-based harassment against women at the Ballet from at least 1990 to 1996, (*see* Reply Aff. in Supp. of Pl.'s Rule 15 Mot. of 8/14/00, ¶ 10). Moreover, much of the evidence Plaintiff cites to demonstrate harassment both shortly before and then following his *Pray* deposition reveals that even Plaintiff did not believe the harassment was gender-based. For example, in a letter dated May 18, 1997, Stoner complained to Local 802 and the Ballet about a hostile environment. (First Proposed Am. Compl. ¶ 25.) However, the text of the letter itself demonstrates that Plaintiff's complaints at that time had nothing to do with gender-based harassment. (*See* Letter from Stoner to Executive Board, Local 802 of 5/19/97.) Plaintiff also cites two letters written in 1985 and 1988, (First Proposed Am. Compl. ¶¶ 19-20); however, those letters make no reference to gender-based discrimination. Thus, as this court found in its Order and Opinion of May 8, 2001, the alleged discrimination and Stoner's protected activity occurring outside the statutory limitations period, which appears to be labor-related, is not related to the gender-based discrimination alleged during the limitations period and cannot support a continuing violation allegation. *See Stoner I,* 2001 WL 492430, at *6. Furthermore, in this case, Plaintiff's claims must be rejected as untimely since Plaintiff, by his own admission, had *actual* notice that he should assert his rights as far back as the early 1980s. (*See* Am. Aff. in Supp. of Pl.'s Cross-mot. for Summ. J. ¶ 34 ("Lawyers that [Stoner] met with in the early 1980's, including former New York City Mayor John Lindsay, suggested to me that I and a group of women ... file Federal discrimination charges in District Court.").)

**\*7** Plaintiff admits to actual notice of discrimination and the non-continuity of the alleged harassment. Under either theory, the continuing violation exception to the statutorily imposed filing time limits is inapplicable.[6] Thus, the court denies Plaintiff's Motion for Reconsideration with respect to those amendments. *See Dellefave,* 2001 WL 286771, at *1. Although Plaintiff may disagree with the manner in which the court applied the relevant legal standard to the facts before it, such disagreement does not justify reconsideration. *In re Houbigant, Inc.,* 915 F.Supp. 997, 1001 (S.D.N.Y.1996) (A Rule 6.3 motion is "not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."); *see also Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988) (The strict standards of Rule 6.3 aim "to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.").

[6]   In addition to the court's finding that the claims were time-barred and failed to set forth a viable continuing violation exception, the court notes that Plaintiff would be entirely unable to establish an adverse employment action with respect to the allegations that the Ballet retaliated against him by failing to promote him to the basic orchestra in 1984; November, 1985; November, 1990; February, 1992; November, 1992; and February, 1996. *See Stoner I,* 2001 WL 492430, at *4 (dismissing identical retaliation claims). Thus, there is an additional ground upon which the court finds futility and, therefore, denies Plaintiff leave to amend to add these particular retaliation claims. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d 45, 47 (2d Cir.1998); *Keady v. Nike, Inc.,* 116 F.Supp.2d 428, 440 (S.D.N.Y.2000), *vacated in part on other grounds,* 2001 WL 1168334 (2d Cir.2001) (Table, Text in Westlaw). The court also finds that Plaintiff's continued reassertion of these claims, given the court's rulings concerning Plaintiff's failure to establish an adverse employment action with respect to the Ballet's allegedly retaliatory failure to promote Stoner to the basic orchestra, demonstrates bad faith and warrants denial of leave to amend on that ground as well. *See Keady,* 116 F.Supp.2d at 441.

## 2. SECTION 1985(2) CLAIM

Plaintiff also contends that the court erred in denying leave to amend to add a claim under 42 U.S.C. § 1985(2). Plaintiff sought to amend his Complaint to assert a cause of action against the Ballet under 42 U.S.C. §§ 1981, 1985(2), and 1985(3) because it engaged in a conspiracy with "its officers, and its attorneys to deprive him of equal protection of, and equal privileges and immunities under the Fourteenth Amendments [sic]." *Stoner I,* 2001 WL 492430, at *9. The court analyzed Plaintiff's new conspiracy claim and properly found that it was not cognizable under either § 1981 or § 1985(3), *see id.,* and those two claims are not addressed in Plaintiff's Motion for Reconsideration. However, the court did not analyze Plaintiff's claim under § 1985(2) sufficiently. Therefore, the court grants Plaintiff's Motion for Reconsideration with respect to Plaintiff's Motion to Amend the Complaint to add a claim under 42 U.S.C. § 1985(2).

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

On reconsideration, the court denies Plaintiff's Motion to Amend the Complaint to add a conspiracy claim under 42 U.S.C. § 1985(2). While it is clear that pro se plaintiffs generally should be afforded the opportunity to amend their complaints, *see Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991), "[a]fter the filing of a responsive pleading, the grant or denial of leave to amend is within the discretion of the district court," *Keady,* 116 F.Supp.2d at 440. A motion to amend should be denied when the amendment would be futile. *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d 45, 47 (2d Cir.1998); *Keady,* 116 F.Supp.2d at 440. Amendments have been found futile where a plaintiff cannot state a claim or where the claims would be subject to dismissal on some other basis. *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 340 (S.D.N.Y.1999), *aff'd,* 210 F.3d 354 (2d Cir.2000); *Azurite Corp. Ltd. v. Amster & Co.,* 844 F.Supp. 929, 939 (S.D.N.Y.1994) ("Azurite's proposed amendment would be futile because the factual foundations of Azurite's new allegations are insufficient, as a matter of law, to withstand defendants' motion for summary judgment."), *aff'd,* 52 F.3d 15 (2d Cir.1995). Additionally, leave to amend may be denied upon a finding of bad faith or when the plaintiff has acted with the intention of unduly delaying the litigation. *Keady,* 116 F.Supp.2d at 441.

**\*8** At the time Plaintiff moved to amend his Complaint, he failed to state a cognizable claim under § 1985(2).[7] It is well established that a plaintiff must allege the existence of a § 1985 conspiracy with particularity. *See Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). When Plaintiff moved to add a § 1985 claim, he failed to identify specific individuals involved in the conspiracy or to cite to any agreement, concerted activity, or overt act taken in furtherance of the conspiracy. *See id.* However, Plaintiff has gradually refined his conspiracy allegations over time, and the court analyzes the claim as it has evolved throughout this pro se Plaintiff's numerous submissions.

[7]  42 U.S.C. § 1985 provides in pertinent part: "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified ... the party so injured or deprived may have an action for recovery of damages, occasioned

by such injury or deprivation, against any one or more of the conspirators."

In his Motion for Reconsideration, Plaintiff claims that he is alleging two conspiracies: a conspiracy to deter Plaintiff from testifying during his *Pray* deposition and a conspiracy to retaliate against him for attending that deposition. (*See* Pl.'s Recons. Mem. at 12.) Later, in a letter to the court, Plaintiff alleged that "Pat Turk, a former Company Manager, and Anne Parsons, the current Company Manager, conspired with Kathleen McKenna, the Ballet's outside counsel, to injure [Plaintiff]" within the meaning of § 1985(2). (*See* Letter from Stoner to the court of 10/15/01, at 1.) Plaintiff claims that the alleged conspirators caused him emotional and financial harm by retaliating against him for his participation in the *Pray* case. Specific acts then alleged by Plaintiff included conspiring to enforce the Ballet's promotion procedures selectively and to deny him promotions for both temporary and permanent positions. (*See id.*) The conspirators are also alleged to have conspired "to cover up allegations of gender-based harassment and a hostile workplace" with respect to both Plaintiff's testimony in the *Pray* case and in the instant suit. (*See id.* at 2.)

In a letter to the court dated November 5, 2001, Plaintiff clarifies that he is asserting no less than three different claims under § 1985(2). First, Plaintiff claims that Kathleen McKenna, counsel for Defendant, and Pat Turk violated § 1985(2) "by conspiring to cover up ongoing and repeated instances of gender-based retaliation and harassment during the period of [Plaintiff's] *Pray* depositions" from May 1997 to June 1998. (Letter from Stoner to the court of 11/4/01, at 2.) Second, Plaintiff claims that Kathleen McKenna and Brooks Parsons, Chief Financial Officer of the Ballet, (*see* Menaker Decl. of 6/11/01, Ex. B, Ex. 1, at 3), violated § 1985(2) "by conspiring to cover up ongoing and repeated instances of gender-based retaliation and harassment" from June 1990 to December 1998. (Letter from Stoner to the court of 11/4/01, at 2.) Third, Plaintiff claims that Kathleen McKenna and Anne Parsons violated § 1985(2) "by conspiring to cover up ongoing and repeated instances of gender-based retaliation and harassment" from May 1998 to the present. (*Id.*)

**\*9** Concerted action among the directors, officers, and managers of a corporation cannot constitute a conspiracy. *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.), *cert. denied,* 439 U.S. 1003 (1978); *Burrell v. City Univ.,* 995 F.Supp. 398, 414 (S.D.N.Y.1998). That prohibition against intra-corporate conspiracies applies to claims lodged under § 1985. *See, e.g., Herrmann,* 576 F.2d at 459 (finding no claim

for conspiracy stated under § 1985(2) where each alleged conspirator was either a trustee or a faculty member of an educational corporation). Since all of the conspiracy theories alleged by Plaintiff involve a conspiracy between officers of the Ballet-Pat Turk, Anne Parsons and Brooks Parsons, they fail under the intra-corporate conspiracy doctrine.

Plaintiff attempts to surmount the intra-corporate conspiracy doctrine by alleging that Defendant's outside counsel Kathleen McKenna was also a conspirator. This ploy can be seen most clearly in Plaintiff's most recent letter, which splits the conspiracy into three separate conspiracies, each of which includes the Ballet's outside counsel and one officer of the Ballet. (*See* Letter from Stoner to the court of 11/4/01.) Of course, there can be no conspiracy between a corporation and its counsel where the advice or concerted activity was within the scope of the representation. *See Heffernan v. Hunter,* 189 F.3d 405, 413-14 (3d Cir.1999) (dismissing claims under §§ 1985(1) and (2) because there could be no conspiracy between attorney and client where attorneys acted within the scope of their representation, even if attorney may have had mixed motives such as enhancing his reputation); *Doherty v. American Motors,* 728 F.2d 334, 340 (6th Cir.1984) (citing the general rule that a corporation cannot conspire with its agents, finding no conspiracy where it was clear the attorneys were motivated "not by personal concerns" but by concern for their clients). Indeed, "treating the involvement of a lawyer as the key unlocking § 1985 would discourage corporations from obtaining legal advice before acting, hardly a sound step to take." *Travis v. Gray Comm. Mental Health Ctr.,* 921 F.2d 108, 111 (7th Cir.1990).

In response, Plaintiff alleges that Kathleen McKenna participated in the conspiracies to further "her own self-interest to prevent [Plaintiff] from deposing Proskauer attorneys or otherwise involve [ ] various members of the Proskauer legal team in the instant matter ." (Letter from Stoner to the court of 11/4/01, at 2.) Therefore, Plaintiff claims that Kathleen McKenna had a "personal stake" in the conspiracy. (*See id.*) Plaintiff is correct that "[t]here is a 'personal interest' or 'personal stake' exception to the intracorporate conspiracy doctrine, ... which permits a § 1985 claim where there are individuals who are 'motivated by an independent personal stake in achieving the corporation's objective.' " *Salgado v. City of New York,* No. 00 Civ. 3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (quoting *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir.1976)). However, none of the motivations of counsel recited by Plaintiff support the Ballet's alleged goal

of retaliation against Stoner. Any alleged attempt by counsel to prevent the deposition of attorneys represents neither a personal stake in the Ballet's alleged retaliation nor a direct attempt to retaliate against Plaintiff. Therefore, Plaintiff has failed to allege a personal stake on the part of the Ballet's counsel sufficient to preclude assertion of the intra-corporate conspiracy doctrine in this case. Since Plaintiff's attempt to allege a claim under § 1985(2) would necessarily fail, the court denies Plaintiff's Motion to Amend the Complaint to add a conspiracy claim. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440.

## III. DEFENDANT'S MOTION FOR RECONSIDERATION AND/OR RENEWED MOTION FOR SUMMARY JUDGMENT [8]

[8]

The court agrees with Defendant that the claims remaining following the court's Order and Opinion of May 8, 2001, were addressed in the motion papers and other submissions at that time. However, both parties, particularly Plaintiff, have regularly made voluminous submissions to the court through correspondence and interrelated motions. To the extent that any of the facts or documents relied upon herein were not formally submitted specifically in support of Defendant's Motion for Summary Judgment, Plaintiff's Cross-motion for Summary Judgment, or Plaintiff's first Motion to Amend the Complaint being reconsidered at this time, the court construes Defendant's motion as a renewed motion for summary judgment on the outstanding claims. *See, e.g., Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 955 F.Supp. 203, 210 (S.D.N.Y.1997); *Bentley v. New York,* Nos. 82 Civ. 3492 & 82 Civ. 5774, 1986 U.S. Dist. LEXIS 28224, at *4-*5 (S.D.N.Y. Mar. 13, 1986).

## A. TEMPORARY POSITIONS IN JANUARY AND DECEMBER, 1998

**\*10** In its Order and Opinion dated May 8, 2001, the court held that Plaintiff had adequately established a prima facie case of retaliation in support of his allegations that Defendant discriminated against him by hiring temporary employees ahead of him in January and December, 1998.

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

*Stoner I,* 2001 WL 492430, at *5. The court, therefore, denied Defendant's Motion for Summary Judgment with respect to those claims. *Id.* Defendant now seeks reconsideration of that decision. (*See* Mem. of Law in Supp. of Def.'s Mot. for Recons. and/or Renewed Mot. for Summ. J. ("Def.'s Recons. Mem.") at 6-9.) Defendant argues that the court overlooked evidence that conclusively establishes that the appointment of a substitute player to fill a temporary opening in the orchestra in both January and December of 1998 was neither discriminatory nor retaliatory. Defendant also argues that Plaintiff's claims regarding the January appointment are time-barred and that Plaintiff cannot establish a causal connection between his failure to be appointed to the temporary openings and his protected activity. (*Id.*) Defendant is correct that the court overlooked evidence that would reasonably be expected to affect the outcome of Defendant's Motion for Summary Judgment; therefore, the court grants reconsideration of Defendant's motion with respect to these claims. *See Dellefave,* 2001 WL 286771, at *1.

## B. PLAINTIFF'S PROPOSED AMENDMENTS TO THE COMPLAINT

### 1. APPOINTMENT OF A "NEW" ROTATOR

In its Order and Opinion dated May 8, 2001, the court permitted Plaintiff to amend his Complaint to add two new claims. *Stoner I,* 2001 WL 492430, at *8. The first amendment added a new claim of retaliation alleging that "the Ballet created a new violin Rotation Player after plaintiff lost his TRO on February 19, 1999 which plaintiff alleges was intended to impact adversely on plaintiff's work." (First Proposed Am. Compl. ¶¶ 49, 50, 52.) At that time, the court noted that "[w]hile the Ballet claims that this allegation is moot because it recognized that it erred in creating a new rotator and shortly thereafter revoked the new rotator's status, this Court finds that Stoner should be allowed to allege it in his Complaint as the Ballet's actions may have caused Stoner to miss performances he might otherwise have been asked to perform." *Stoner I,* 2001 WL 492430, at *8 n. 14. Citing evidence overlooked by the court, Defendant seeks reconsideration of that finding. Specifically, Defendant contends that the court overlooked evidence showing that the 1999 rotator appointment took place and was rescinded between seasons, negating any potential adverse impact on Plaintiff's employment, and that appointment to rotator

status is not discretionary, negating any inference of causal connection. (*See* Def.'s Recons. Mem. at 2.)

The Order and Opinion of May 8, 2001, makes it clear that the court did not take notice of evidence establishing that the 1999 rotator appointment was both made and rescinded during the off-season. *See Stoner I,* 2001 WL 492430, at *8, *8 n. 14. Defendant is correct that if the court had taken that evidence into consideration, it would reasonably have been expected to alter the outcome reached by the court. Thus, the court grants reconsideration of its decision with respect to Plaintiff's Motion to Amend the Complaint to add this claim. *See Dellefave,* 2001 WL 286771, at *1.

### 2. ORCHESTRA MEMBERS PLAYING MORE THAN SIX PERFORMANCES

**\*11** The second amendment the court permitted in its Order and Opinion dated May 8, 2001, permitted Plaintiff to add a claim that "the Ballet allowed a large number of members of the violin section to play more than six performances per week during the week ending February 28, 1999 which caused [Plaintiff] to lose work." (First Proposed Am. Compl. ¶ 49.) *See Stoner I,* 2001 WL 492430, at *8. Defendant now seeks reconsideration of that decision. Specifically, Defendant argues that the court overlooked evidence showing that basic members of the Ballet orchestra are permitted to work more than six performances per week under the CBA and routinely did so as early as 1994. Defendant is correct that the court did not consider that evidence. Since that evidence could reasonably have been expected to alter the outcome reached by the court, the court grants Defendant's Motion for Reconsideration with respect to this amendment to the Complaint. *See Dellefave,* 2001 WL 286771, at *1.

## IV. RECONSIDERATION

### A. LAW GOVERNING RETALIATION CLAIMS

Title VII provides that "it shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). Title

VII claims are analyzed under the familiar three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). The plaintiff in a Title VII action has the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993). In order to establish a prima facie claim of retaliation, a plaintiff must show (1) that he was participating in a protected activity; (2) that his employer knew of his participation in the protected activity; (3) that the employer took adverse action against him; and (4) that a causal connection existed between the protected activity and the adverse action. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993) (citations omitted).

If the plaintiff satisfies that initial burden, the burden of production shifts to the defendants to "articulate a legitimate, clear, specific and non-discriminatory reason" for their actions. *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). Once a nondiscriminatory basis is advanced, the burden of persuasion shifts back to the plaintiff to show the finder of fact that the reasons proffered by the defendants are pretextual. *Hicks,* 509 U.S. at 515; *Quaratino,* 71 F.3d at 64. That is, the plaintiff must demonstrate by a preponderance of the evidence both (1) that the asserted basis for the employer's conduct is false, and (2) that the real reason for that conduct was unlawful discrimination. *Hicks,* 509 U.S. at 515-16.

## B. TEMPORARY POSITIONS IN JANUARY AND DECEMBER, 1998

**\*12**  During the winter 1997-1998 season, Janet Berman ("Berman"), the Associate First Chair of the second violin section, left the orchestra. (Menaker Decl. of 6/11/01, Ex. B, Ex. 1.) In response, Gordon Boelzner ("Boelzner")-at that time the Music Director-selected Alexander Simonescu ("Simonescu"), a member of the basic orchestra, for that Associate First Chair position. (*Id.*) The selection of Simonescu was made pursuant to the CBA. (*See* Menaker Decl. of 6/11/01, Ex. C, at 12-13 ("Replacements for any of the foregoing who cease to be associate first chair players by reason of leaving the basic orchestra shall be selected by the Music Director.").) The departure of Berman and the assumption of her Associate First Chair position by Simonescu created a vacancy in the violin section. (Menaker Decl. of 6/11/01, Ex. B, Ex. 1.) Pending the holding of auditions to fill that vacancy, Nancy McAlhany, a substitute player, was appointed as a temporary replacement. Her

appointment was made by Boelzner in agreement with the principal of the second violin section of the orchestra pursuant to the procedures set forth in Article XII of the CBA. (Menaker Decl. of 6/11/01, Ex. C., at 36, 43.)

In December 1998, auditions were held to fill five openings in the violin section, including the opening temporarily filled by McAlhany. All violin rotators, including Stoner, were invited to audition. Even though he had previously requested, on October 10, 1998, that the Ballet "count [him] in," (Menaker Decl. of 6/11/01, Ex. D, Ex. 3), Stoner did not audition, (Menaker Decl. of 6/11/01, Ex. D ¶ 19). Of the twenty musicians who auditioned, only four were selected for entry into the orchestra. The Audition Committee was unable to decide on a fifth violinist. (Menaker Decl. of 6/11/01, Ex. D ¶ 19.) Pursuant to the procedures set forth in Article XII of the CBA, a temporary appointment was made until another audition could be held. (*See* Menaker Decl. of 6/11/01, Ex. C, at 43 ("A temporary opening of one (1) season or less shall be filled by a player mutually agreeable to the Music Director and the principal of the section having the temporary opening.").) Andy Schaw, who received the most votes among the unsuccessful candidates in the December 1998 audition, was temporarily appointed to the vacancy. Auditions to permanently fill that position were held in February 1999.

On reconsideration, the court first notes that Defendant is correct that Plaintiff's claims regarding the January temporary appointment are time-barred and are, therefore, dismissed. *See Stoner I,* 2001 WL 492430, at [*]7 ("[A]ny allegedly unlawful employment actions that occurred ... on or before February 5, 1998-are time barred."). Unfortunately, by the time Plaintiff submitted opposition papers to Defendant's Motion for Reconsideration, Plaintiff's claims had once again metamorphosed. In his opposition, Plaintiff asserted new allegations that the Ballet's "failure to appoint him to a permanent opening was due to the selective application of the audition procedure" and that, similarly, the Ballet's failure to promote him to these two temporary openings was also due to the selective application of the audition procedure. (Reply Mem. in Opp'n to Def.'s Mot. for Recons. and/or Renewed Mot. for Summ. J. ("Pl.'s Recons. Reply") at 1.) It is from of these new allegations that Plaintiff attempts to resurrect a continuing violation.

**\*13**  Plaintiff's new continuing violation claim must fail. As the court has already discussed, Plaintiff cannot maintain a continuing violation claim. [9] *See* discussion *supra* Part II.C.1. Moreover, the record demonstrates that Plaintiff's failure to

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

be appointed to both temporary positions not causally connected to his participation in the *Pray* litigation. Both appointments were made pursuant to clear, unambiguous procedures set forth in the CBA, which does not require that rotators receive any priority in the filling of temporary openings. Stoner has the least seniority of the three rotators in the violin section, and not one of the three rotators-Helen Strilec, Sue Ellen Colgan, or Plaintiff-was selected to fill the temporary openings. (Menaker Decl. of 6/11/01, Ex. D ¶ 7; Ex. E, at 2.) Stoner himself admits that the Ballet used this same appointment procedure to fill temporary openings prior to his deposition in *Pray,* with the same result. (*See* Menaker Decl. of 6/11/01, Ex. B, Ex. 3 (Stoner NLRB Charge asserting that, on January 1, 1997, the Ballet, allegedly motivated by Stoner's continued Union activity, hired and seated a subordinate ahead of him).) There are no circumstances surrounding these temporary appointments that could give rise to an inference of retaliation. Plaintiff has failed to establish a prima facie case of retaliation with respect to either of the temporary appointments. Therefore, the court grants Defendant's Motion for Summary Judgment with respect to the January and December, 1998, temporary positions and dismisses those claims.

9      The court also notes that both temporary appointments were made pursuant to a specific provision of the CBA that could not possibly involve selective application. The provisions are clear and unambiguous and were followed by the Ballet. (*See, e.g.,* Menaker Decl. Ex. C, at 43 ("A temporary opening of one (1) season or less shall be filled by a player mutually agreeable to the Music Director and the principal of the section having the temporary opening.").) The evidence on which Plaintiff relies to attempt to establish an issue of fact with respect to the application of the CBA for these two appointments consists entirely of inadmissible hearsay contained in Plaintiff's own self-serving affidavit. Since it is clear that neither of these temporary appointments involved selective application of the audition procedure, they cannot be part of Plaintiff's any alleged continuing violation based on selective application of provisions in the CBA.

C. APPOINTMENT OF A "NEW" ROTATOR

The Ballet has two New York seasons-a winter season from November to February and a spring season from May to June. (Menaker Decl. of 6/11/01, Ex. A ¶ 14.) There is also a three-week tour in July in Saratoga that is not part of the regular season. (Def.'s Recons. Mem. at 3.) In January of 1999, Nancy McAlhany ("McAlhany"), a substitute violist who had played with the orchestra for several years, sought appointment to rotator status under the CBA. (Menaker Decl. of 6/11/01, Ex. F at 4; Ex. G ¶ 5.) Article XIV of the CBA provides that a rotation player "shall be defined as any musician who has worked, or who in the future works, at least fifty (50%) percent of the New York City weeks in at least four out of five consecutive years...." (Menaker Decl. of 6/11/01, Ex. C, at 47.) McAlhany herself approached Arnold Goldberg ("Goldberg"), Personnel Manager of the Ballet orchestra, claiming that she had sufficient performances under the CBA to request appointment under rotator status. (Menaker Decl. of 6/11/01, Ex. G ¶ 5.) Goldberg confirmed McAlhany's performance information and informed her of her appointment on March 31, 1999, when the Ballet was not in season. The Union then notified Goldberg, and it was later determined, that incorrect performance criteria, using calendar years rather than the Ballet's seasonal years, had been applied. Since it turned out McAlhany did not yet qualify for rotator status, her appointment was revoked on April 31, 1999. (Menaker Decl. of 6/11/01, Ex. F, at 4.)

**\*14** On reconsideration, the court denies Plaintiff's Motion to Amend the Complaint to add a claim of retaliation through the appointment of McAlhany as a new rotation player on February 19, 1999. The entire process occurred while the Ballet was not in season; therefore, McAlhany never worked as a rotator and her brief, if mistaken, appointment did not affect Plaintiff's own employment in any way. When Plaintiff moved to amend adding this claim, Plaintiff failed to identify a single negative effect the temporary appointment had on his employment. Given the undisputed facts about McAlhany's appointment, the court finds that Plaintiff will never be able to establish an adverse employment action with respect to this claim. [10] Since this proposed amendment to the Complaint is futile, the court denies Plaintiff's Motion to Amend his Complaint with respect to this claim. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939.

10      The court is aware that a plaintiff need not plead facts sufficient to meet the requirements of a prima facie case, including an adverse employment action, in order to survive a motion to dismiss. *See*

*Swierkiewicz v. Sorema,* 122 S.Ct. 992, 997 (2002) ("The prima facie case under *McDonnell Douglas* ... is an evidentiary standard, not a pleading requirement.") Under the standard announced in *Swierkiewicz,* it is possible this claim might survive a motion to dismiss. Nevertheless, even if the court were to permit Plaintiff to amend his Complaint by adding this claim, the claim would immediately be subject to dismissal on a motion for summary judgment. *See Azurite,* 844 F.Supp. at 939.

Once again, in response to the court's earlier decisions and Defendant's arguments, Plaintiff attempts to conjure up a new claim including an adverse employment action. Stoner now argues that the adverse employment action stems from the chilling effect of Defendant's allegedly retaliatory activity. (*See* Pl.'s Recons. Reply at 3.) By the time Plaintiff filed his most recent Motion for a Preliminary Injunction, his claim had grown into the contention that the Ballet's actions against him caused a chilling effect that is deterring Ballet employees, the Orchestra Committee, and the Union from protecting their own rights or cooperating as witnesses in this case.

In support of his claim of chilling effect, Stoner cites to an inapposite line of cases in the Second Circuit, particularly *Holt v. Continental Group, Inc.,* 708 F.2d 87, 91 (2d Cir.1983) ("A retaliatory *discharge* carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act or from providing testimony for the plaintiff in her effort to protect her own rights.") (emphasis added). (*See* Pl.'s Recons. Reply at 3.) The cases on which Plaintiff relies relate to retaliatory discharge, which Plaintiff does not and cannot allege. Moreover, the notion of a chilling effect is analyzed in the context of preliminary injunction motions and irreparable harm determinations, not as an adverse employment action.

As this court noted in its denial of Plaintiff's most recent request for a preliminary injunction,

> In this action, Plaintiff's contentions regarding a chilling effect upon fellow employees are wholly unsupported.... When Plaintiff merely demands appointment to the regular orchestra but refuses to participate in the audition process, *see Stoner,* 2001 WL 492430, at *2, the resulting selection

of another musician can not have a chilling effect on the other employees.

*Stoner v. New York City Ballet Co.,* No. 99 Civ. 0196, 2001 WL 1505492, at *2 (S.D.N.Y. Nov. 26, 2001) [hereinafter *Stoner II* ]. Plaintiff also asserts that the Ballet is chilling participation by the Orchestra Committee and the Union in dealing with matters related to this case. Plaintiff cites the Union's refusal of his request to file a grievance about the selective application of the contract, a change in the attitude of the Orchestra Committee towards him after February of 2000, and the failure of rotators and other musicians to complain or assist in his lawsuit as evidence that the Ballet is chilling their efforts to exercise their rights. (*See* Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. at 3-6.) *See also Stoner II,* 2001 WL 1505492, at *3. However, the "evidence" cited by Plaintiff does not support a finding of any chilling effect caused by the Ballet's actions. *See Stoner II,* 2001 WL 1505492, at *2-*3. Thus, even Plaintiff's newest allegations of a chilling effect do not affect the futility of raising this claim. Therefore, the court denies Plaintiff leave to amend to add this claim. *See supra* note 10 and accompanying text. Even if the court were to permit Plaintiff leave to amend adding this claim, such claim would immediately be subject to dismissal on a motion for summary judgment. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939.

### D. ORCHESTRA MEMBERS PLAYING MORE THAN SIX PERFORMANCES

**\*15** Under the CBA, members of the basic orchestra are compensated for a minimum of six performances per week. (Menaker Decl. of 6/11/01, Ex. C, at 3.) In addition, they are permitted to work more than six performances, and if they do so, they receive additional compensation.[11] (*Id.* at 16.) Regular, or basic, players in the orchestra have, in fact, routinely played more than six performances per week since at least 1994. (Menaker Decl. of 6/11/01, Ex. I; Def.'s Mem. of Law in Supp. of Summ. J. ("Def.'s Summ. J. Mem.") at 5.) That practice has consistently occurred during the Ballet's winter season. (Menaker Decl. of 6/11/01, Ex. F; Def.'s Amend. Br. at 5, n. 4.) Plaintiff himself complained of the practice in a letter to the Executive Board of Local 802 dated January 4, 1994. The letter indicated that members of the basic orchestra were "routinely" being allowed to play

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

more than six performances per week. (Def.'s Summ. J. Mem. at 5; Menaker Decl. of 6/11/01, Ex. I.)

11    It is clear from the face of the CBA that no selective application of that contract is involved in the decision by an individual musician to play more than six performances per week; the CBA expressly permits regular members of the orchestra to do so.

Based on the evidence presented, the court finds that it is undisputed that the Ballet's routine practice of permitting basic members of the orchestra to play more than six performances per week predated Plaintiff's participation in the *Pray* litigation by at least three years. Thus, Plaintiff can not put forward a credible claim that the practice is causally related to his participation in the *Pray* litigation or his filing of an unsuccessful motion for a temporary restraining order in this case in February of 1999. Moreover, Plaintiff's own evidence negates any possible inference of an adverse employment action as well. The chart of performances attached to his opposition by Plaintiff does not support the conclusion that he lost work in comparison with other players who are similarly situated but for Stoner's participation in protected activities. (*See* Pl.'s Recons. Reply at 3-4; Ex. 2.) Plaintiff erroneously focuses on the performers in other sections of the orchestra, but examination of the records for violin rotators indicates that all three violin rotators-Stoner, Colgan, and Strilec-played three performances during the week in question. (*See* Pl.'s Recons. Reply Ex. 2.) Stoner worked exactly the same amount as the other two violin rotators, both of whom are senior to him and neither of whom has participated in Stoner's alleged protected activities. (*See id.*) Since Plaintiff will not be able to demonstrate a prima facie claim of retaliation concerning the orchestra members playing more than six performances in any given week, Plaintiff's claim of retaliation in this instance would be futile. *See supra* note 10 and accompanying text. Even if the court were to permit Plaintiff to amend his Complaint to add such a claim, it would be subject to immediate dismissal on a motion for summary judgment. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939. Therefore, the court denies Plaintiff's Motion to Amend with respect to this claim.

V. PLAINTIFF'S SECOND MOTION TO AMEND THE COMPLAINT

**\*16** Plaintiff moves to amend his original Complaint pursuant to Rule 15, Federal Rules of Civil Procedure, for the purpose of stating new allegations of retaliatory conduct on the part of the Ballet. (*See* Pl.'s Mem. of Law of 7/6/01, at 1.) Plaintiff alleges that these recent retaliatory events were precipitated by Stoner's filing of his Complaint in this action, filing his first Proposed Amended Complaint, and his correspondence to Ms. Anne Parsons, the Ballet's Company Manager, dated December 21, 2001, complaining about the Ballet's audition procedure. (*See id.*) Plaintiff alleges that all three of those activities were protected activities. (*See id.*)

Plaintiff's most recent proposed amended Complaint asserts three new allegations of retaliation: the Audition Committee's failure to appoint Stoner to a permanent position in the orchestra on January 18, 2001, and the Ballet's failure to appoint Stoner to two temporary openings in the orchestra in the fall of 2000 and the spring of 2001. (*See id.; see also* Proposed Am. Compl. of 7/6/01, at 2.) Stoner claims that all three incidents involved the selective application of the CBA, and that such selective application constitutes an ongoing policy or mechanism of discrimination engaged in by the Ballet. (*See* Proposed Am. Compl. of 7/6/01, at 2.)

A. PERMANENT POSITION IN JANUARY, 2001

First, Stoner asserts that the Ballet failed to appoint him to a permanent position in the orchestra on January 18, 2001. With the exception of its more recent date, this claim is identical to the failure to promote claims raised and addressed by the court when dealing with the parties' initial motions for summary judgment. The court dismissed those claims, and Plaintiff sought reconsideration of that decision. Essentially, Plaintiff's second Motion to Amend the Complaint to add the January 2001 position seeks a second reconsideration of this court's ruling in *Stoner I.* Plaintiff, urging the court to ignore its earlier ruling, asserts that under the law of the case doctrine "there is no imperative duty to follow the earlier ruling." (Mem. of Law in Support of Mot. for Leave to Amend Compl. at 3.) However, "the law of the case counsels against reconsideration absent 'compelling circumstances,' including an intervening change of law, the availability of new evidence, or to correct a clear error or prevent manifest injustice." *Scottish Air Int'l v. British Caledonian Group, PLC,* 152 F.R.D. 18, 25 (S.D .N.Y.1993) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.,* 737 F.Supp. 792, 796 (S.D.N.Y.1990); *United States v. Uccio,* 940 F.2d 757, 757 (2d Cir.1991)). Plaintiff's claim that a perceived lack of discovery

prior to the original summary judgment motions in this case somehow constitutes compelling circumstances for the court to revisit those rulings, (*see* Pl.'s Reply Mem. of 8/14/01, at 3), fails entirely in the face of this court's repeated scrutiny of discovery in this case and the court's prior rulings finding adequate discovery had been conducted. *See supra* note 4.

**\*17** Once again, Plaintiff molds his claims to fit potentially favorable precedent and to fill gaps identified in this court's previous rulings. Plaintiff now specifically asserts that the Ballet's failures to appoint him result in lost benefits, including sick pay, vacation pay, and personal days. (*See* Pl.'s Mem. of Law of 7/6/01, at 5-6.) Plaintiff's new allegations miss the point, however. As the court ruled previously, Plaintiff cannot establish an adverse employment action as a part of his retaliatory failure to promote claim because he has failed to apply for the specific position he alleges he was denied. *See Stoner I,* 2001 WL 492430, at \*4 (citing *Brown v. Coach Stores,* 163 F.3d 706, 710 (2d Cir.1998)). In an effort to create "new" evidence that surmounts that insufficiency, Plaintiff "fulfilled" the application requirement with a letter dated December 21, 2000, which demanded direct appointment to the permanent orchestra without audition. (*See* Pl.'s Mem. of Law of 7/6/01, at 6.) Although the Committee determined that certain musicians, including Stoner, need not submit to the initial round of auditions but could proceed directly to the final audition, (Parsons Decl. of 7/27/01, ¶ 9), Plaintiff did not audition. Again, Plaintiff fails to appreciate that "it is undisputed that Stoner did not audition for the position of permanent orchestra member after the *Pray* litigation" and that his "contention that the Ballet was required to appoint him to the basic orchestra ... without audition is without merit." *Stoner I,* 2001 WL 492430, at \*4.

Plaintiff also clarifies his argument concerning the application of the CBA. He alleges that the Audition Committee must proceed through the three audition options in order, (*see* Menaker Decl. of 6/11/01, Ex. C, at 41), and that the Ballet is bypassing the required step E(2). Plaintiff overlooks the fact that it is provision E(1), not E(2), that would permit the direct appointment of a player from the substitutes without audition. (*See* Menaker Decl. of 6/11/01, Ex. C, at 41.) Moreover, at a meeting on January 18, 2001, the Audition Committee explicitly considered that possibility but "concluded that no musicians would be appointed for direct entry into the violin section of the basic orchestra." (Parsons Decl. of 7/27/01, at 2; *see also* Parsons Aff. of 6/11/01, ¶ 3.)

Even if the court assumes, for the purposes of this motion, that the Audition Committee consistently failed to follow the steps listed in the CBA in order, Plaintiff cannot present any evidence to suggest that the alleged practice was instituted in response to his participation in a protected activity. As the court has already ruled about Plaintiff's earlier, identical claims arising from auditions in 1998, "the Ballet has set forth undisputed evidence that open auditions are not only provided for in the current collective bargaining agreement, but have been used to fill every permanent violin opening since the audition procedure was adopted in the collective bargaining agreement of 1983." *Stoner I,* 2001 WL 492430, at \*4. Thus, "the undisputed facts that open auditions have been used to fill every permanent violin opening in the basic orchestra since 1983, and that Stoner did not audition, although invited to do so, adequately rebuts" Stoner's allegation that timing alone can establish causal connection.

**\*18** Since Plaintiff cannot establish either an adverse employment action or causal connection with respect to this claim of retaliatory failure to promote, the court denies Plaintiff's motion to amend his Complaint to add this allegation. *See supra* note 10 and accompanying text. Any such amendment would be futile because it would be subject to immediate dismissal on a motion for summary judgment. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939. The court also finds that Plaintiff's continued reassertion of these identical retaliatory failure to promote claims, given the court's rulings concerning Plaintiff's failure to establish an adverse employment action, demonstrates bad faith and, therefore, warrants denial of leave to amend. *See Keady,* 116 F.Supp.2d at 441. This claim is identical to several others previously dismissed by the court, and Plaintiff's own actions attempting to "cure" the defect in his claims with his December, 2001, letter reveal his knowledge that the claim is not viable.

## B. TEMPORARY POSITIONS, FALL OF 2000 AND SPRING OF 2001

As the court has already noted with respect to Plaintiff's other claims relating to temporary positions, pursuant to Article XII(H) of the CBA, temporary openings are filled by the Music Director in agreement with the principal of the affected section. (*See* Menaker Decl. of 6/11/01, Ex. C, at 43.) The CBA does not include any provision requiring that such an opening be filled by a rotation player or any particular

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

individual. In this instance, both vacancies created by the absences of regular musicians Catherine Sim and Aaron Stolow were filled by making the performances available equally to the three violin rotators, instead of appointing a single person to fill the vacancies. (*See* Parsons Decl. of 7/27/01, ¶¶ 11-13.) Thus, Stoner received equal consideration and equal opportunity to perform with the other rotators. Moreover, Stoner has the least seniority of the three violin section rotation players-Strilec, Colgan, and Stoner. (*See* Parsons Decl. of 7/27/01, ¶ 11.) Thus Stoner cannot establish either an adverse employment action or a causal connection or inference of discrimination with respect to these two claims.

Any amendment to add these two claims would be subject to immediate dismissal on a motion for summary judgment, and so amendment would be futile. *See Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440; *Azurite,* 844 F.Supp. at 939. Since amendment to add these two claims would be futile, the court denies Plaintiff's Motion to Amend the Complaint with respect to these two claims. *See supra* note 10 and accompanying text. The court also finds that Plaintiff's attempt to amend to add these two claims was made in bad faith and therefore warrants denial of leave to amend. *See Keady,* 116 F.Supp.2d at 441. These allegations are nearly identical to those raised previously concerning temporary appointments. Moreover, Plaintiff deliberately attempted to obfuscate the issues surrounding these claims by failing to address either of these claims in his Memorandum of Law. Plaintiff never revealed to the court that he himself was actually given the opportunity to share equally in these appointments with the two other rotators.

### C. PLAINTIFF'S REPLY

**\*19** Plaintiff's Reply Memorandum of August 14, 2001, in support of his second Motion to Amend the Complaint makes it clear that his Motion to Amend is really a second motion for reconsideration of this court's Order and Opinion of May 8, 2001. The Reply does not even address the new claims asserted in the second Motion to Amend; instead, it recites four numbered arguments seeking reversal of the court's prior rulings. Clearly, Plaintiff's arguments are extremely untimely, and most of the arguments do not merit discussion.[12] One of Plaintiff's newly articulated bases for his claims, however, warrants attention from the court. Plaintiff now claims that the court overlooked evidence demonstrating an adverse employment action through the repeated failure of the Ballet

to remedy the harassment of Stoner by Fader and others. (*See* Pl.'s Reply Mem. of 8/14/01, at 3 (citing *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (holding that retaliatory harassment may constitute an actionable "adverse employment action")).)

[12]    For example, Plaintiff again complains that he was not afforded adequate discovery. (*See* Pl.'s Reply Mem. of 8/14/01, at 2-3.) The court will not revisit the issue again.

### 1. THE SHIFTING CONTOURS OF PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

For the first time in his Cross-motion for Summary Judgment, Plaintiff asserted as "background" that he was motivated to file his complaint to deter ... a hostile workplace." (Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. at 3.) However, he alleged only (1) that a hostile environment constitutes an adverse employment action and (2) that "Plaintiff is alleging the existence of a hostile environment which made it impossible for plaintiff to get a fair hearing at an audition." (Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. at 14-15.) Only later, when he first moved to amend the Complaint, did Plaintiff tie his hostile work environment claim to a continuing violation theory. At that time, he stated "I am also asserting that the conduct alleged in my amended complaint constitutes a "continuing violation." (Aff. in Supp. of Pl.'s Mot. to Amend Compl. of 6/23/00, ¶ 9.)

During the course of this litigation, Plaintiff has raised various allegations of direct harassment of Plaintiff by Fader and others. Recently, however, those allegations have expanded to include Fader's harassment of other, female players and to assert what amounts to a poorly-defined continuing violation/ hostile work environment claim predicated on gender-based discrimination against women. Plaintiff's hostile work environment claim, as most recently alleged, appears to have something to do with "the effect of Fader's harassment of Ms. Pray and others on Stoner." (Letter from Stoner to the court of 10/19/01, at 2.) As pointed out by Defendant, "Plaintiff apparently now recognizes that absent an aggregation of various and sundry complaints about isolated incidents of alleged 'harassment' occurring over a period of almost twenty years (with a break of twelve years in between 'incidents'), his complaints, as a matter of law, cannot satisfy the 'severe and pervasive' requirements of a hostile work environment

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

claim." (Letter from Defendant to the court of 12/17/01, at 1 n. 1.)

**\*20** Contrary to Plaintiff's assertions, the court did, in fact, address Plaintiff's hostile work environment claims, as they were originally pleaded, in its Order and Opinion of May 8, 2001. To prevail on a claim for gender-based hostile work environment under Title VII, a plaintiff must prove that he is a member of a protected class, that the harassment was based upon his membership in the protected class, and that the harassment was sufficiently severe and pervasive to affect a term, condition or privilege of employment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995). In his Cross-motion for Summary Judgment, the only term or condition of employment that Plaintiff asserted was affected was that Plaintiff could not receive a fair hearing at an audition. However, the court found that (1) plaintiff failed to produce any evidence to support the futility of the auditions, (2) it was undisputed that the audition process guaranteed anonymity, (3) the Ballet had accommodated Stoner's request not to have Fader attend the one audition in which Stoner participated, and (4) "there is no proof that demonstrates the Ballet's audition process was unfair to Stoner ." *Stoner I,* 2001 WL 492430, at *\*4*. Plaintiff has not identified any change in the law or any evidence that the court overlooked when denying Plaintiff's Cross-motion for Summary Judgment with respect to his hostile work environment claims. Thus, there is no basis for reconsideration of that motion. *See Dellefave,* 2001 WL 286771, at *\*1*.

Considered broadly, however, Plaintiff's voluminous submissions and correspondence may be construed to raise a claim for continuing violation hostile work environment with slightly different contours than the claim as alleged prior to the court's Order and Opinion of May 8, 2001. Therefore, the court will construe those submissions by Plaintiff as a motion to amend the Complaint to add his newest conception of his hostile work environment claim. Plaintiff now claims that he has established a continuing violation hostile work environment based on Fader's harassment of Stoner and the effect of Fader's gender-based harassment of Ms. Pray and others on Stoner. The court finds that Plaintiff has failed to allege a gender-based hostile work environment claim and denies Plaintiff leave to amend to add such a claim. The court continues to decline to find allegations of a continuing violation sufficient to warrant tolling the statutory time limitations governing Plaintiff's claims; however, the court finds that Plaintiff has sufficiently alleged a claim of

retaliatory harassment and grants Plaintiff leave to amend the Complaint to maintain a single retaliation claim asserting only retaliatory harassment occurring after February 5, 1998.

## 2. NO GENDER-BASED HOSTILE
## WORK ENVIRONMENT CLAIM

Plaintiff has failed to state a claim for a gender-based hostile work environment. Plaintiff's allegations that Fader and others harassed *women* working for the Ballet's orchestra do not support his claim because they fail to allege specific acts to support a claim that the work environment was hostile towards men, like Stoner. *See Smith v. AVSC Int'l, Inc.,* 148 F.Supp.2d 302, 311 (S.D.N.Y.2001). Allegations of harassment against other employees may be relevant to a plaintiff's hostile work environment claim. *Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 190 (2d Cir.2001) ("[W]e recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination."). However, the employees subject to the harassing acts must be in the same protected class as the plaintiff in order for the plaintiff's own hostile work environment claim to withstand a motion to dismiss. *See AVSC Int'l,* 148 F.Supp.2d at 310; *see also Leibovitz,* 252 F.3d at 186 (holding the plaintiff's hostile work environment claim was proper because she was "a member of the protected class that she claims was subjected to discrimination" unlike other cases where plaintiffs "asserted Title VII rights on behalf of a protected class of employees to which the plaintiff did not belong").

**\*21** Moreover, none of the alleged acts of harassment committed directly against Plaintiff support a claim that Plaintiff is being harassed because he is a *male* employee. In order for Title VII to be employed to combat a hostile work environment, a causal connection must exist between the gender of the plaintiff and the resultant disparity in treatment in the workplace. *DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304, 308 (2d Cir.1986). As the Second Circuit has stated, when read in the context of the legislative history of Title VII, the term "sex" "logically could only refer to membership in a class delineated by gender," rather than harassment for engaging in an activity regardless of gender. *See DeCintio,* 807 F.2d 304, 306 (2d Cir.1986); *see also Trans World Airlines v. Hardison,* 432 U.S. 63, 71 (1977) ("The emphasis of both the language and the legislative history of [Title VII] is on eliminating discrimination in employment; similarly situated employees are not to be treated differently

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

solely because they differ with respect to race, color, religion, sex, or national origin."); *Gregory v. Daly,* 243 F.3d 687, 691-92 (2d Cir.2001) (referring to the "prohibited causal factor" requirement). Since Plaintiff cannot possibly allege facts in this situation that would state a claim for hostile work environment harassment against him based upon his gender, the court denies Plaintiff leave to amend to add such a claim—any such amendment would be futile. *Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d at 47; *Keady,* 116 F.Supp.2d at 440.

## VI. PLAINTIFF'S RETALIATORY HARASSMENT CLAIM

Having found that Stoner cannot state a hostile work environment claim, however, the court notes that Plaintiff is proceeding pro se. Therefore, the court must construe the claims raised in Plaintiff's submissions broadly in an attempt to determine whether Plaintiff may have alleged facts sufficient to state any other claim with respect to harassing acts directed at Plaintiff. So doing, the court finds that Plaintiff can state a *retaliation* claim for retaliatory harassment imposed upon him for his participation in the *Pray* litigation. The court applies "the same standards in determining whether *retaliatory* harassment constitutes an adverse employment action" for the purposes of a retaliation claim based upon harassment as it does "in assessing whether harassment *imposed because of sex* works an actionable alteration in the terms or conditions of employment." *Gregory v. Daly,* 243 F.3d 687, 701 (2d Cir.2001) (citing *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (holding that retaliatory harassment may constitute an actionable "adverse employment action" if it works a "materially adverse change in the terms and conditions of employment" (internal quotation marks omitted))).

To sustain a hostile work environment claim, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment...." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). The conduct at issue must create an *objectively* hostile work environment, and the victim must *"subjectively* perceive the environment to be abusive." *Id.* at 21-22 (emphasis added). The plaintiff must show either that a single incident was "extraordinarily severe," or that a series of harassing incidents were "sufficiently continuous and concerted" to have altered

the conditions of the plaintiff's working environment. *Cruz v. Coach Stores,* 202 F.3d 560, 570 (2d Cir.2000) (citations omitted).

**\*22** Looking at only instances after 1997, Plaintiff alleges direct harassment by Fader on May 20, 1997; December 26, 1997; December 28, 1997; and June 11, 1998. [13] (*See* Letter from Defendant to the court of 12/17/01, Ex. K, Stoner Statement of 12/20/98, at 1.) Fader allegedly tried to distract Stoner and behaved inappropriately during the orchestra's performances. Plaintiff has submitted sufficiently specific facts with respect to these allegations to warrant amendment of the Complaint in this case. The court grants Plaintiff leave to amend the Complaint to contain a single claim alleging retaliatory harassment. However, the court has previously discussed multiple bases for a finding that Plaintiff cannot allege a continuing violation exception to the statutory filing limitation in this case. *See supra* Part II.C.1. Those rationales apply equally to Plaintiff's retaliatory harassment allegations. Therefore, Plaintiff's retaliatory harassment claims prior to February 5, 1998, are time-barred; Plaintiff may assert a claim only for retaliatory harassment occurring after February 5, 1998.

[13]    All other allegations of harassment of other men at the Ballet pointed to by Plaintiff consist of wholly unsupported allegations based entirely on inadmissible hearsay. (*See* Letter from Stoner to the court of 1/8/02, at 1-2.)

## VII. PLAINTIFF'S MOTION FOR SANCTIONS

With permission of the court, Plaintiff filed a Motion for Sanctions against Defendant on December 31, 2001. The court directed Defendant not respond to the motion. Plaintiff asserts that Defendant's submission to the court of December 17, 2001, was an abuse of process. (*See* Pl.'s Mem. of Law in Supp. of Sanctions at 1.) Plaintiff's allegations are meritless. The court expressly granted Defendant permission to make the filing in a telephone conference with the parties on December 10, 2001. Moreover, Defendant's filing constitutes a response to various and sundry new allegations raised by Plaintiff long after the appropriate time, including a letter from Plaintiff to the court dated October 19, 2001. Plaintiff himself abused the leave granted to him by the court to file the motion for sanctions. After a brief one-page discourse on the alleged abuse of Defendant's submission of December 17, 2001, Plaintiff devotes an additional *five* pages to rehashing

Stoner v. New York City Ballet Co., Not Reported in F.Supp.2d (2002)

2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

and offering new argument on his hostile work environment and continuing violation claims. Moreover, Plaintiff attaches a new seven-page affidavit that purports to "support" his motion for sanctions but instead reframes and enlarges upon the other "evidence" in support of his claims. If there is any abuse of process here, it is on the part of Plaintiff. For the foregoing reasons, the court denies Plaintiff's Motion for Sanctions.

## VIII. CONCLUSION

For the reasons discussed above, the court GRANTS in part and DENIES in part Plaintiff's Motion for Reconsideration of its Order and Opinion of May 8, 2001. Specifically, the court GRANTS reconsideration of Plaintiff's Motion to Amend the Complaint to add a claim under 42 U.S.C. § 1985(2). On reconsideration, the court DENIES Plaintiff's Motion to Amend the Complaint to add a conspiracy claim under 42 U.S.C. § 1985(2). The court also GRANTS Defendant's Motion for Reconsideration of its Order and Opinion of May 8, 2001. On reconsideration, the court GRANTS Defendant's Motion for Summary Judgment with respect to Plaintiff's claims concerning the January and December, 1998, temporary positions. On reconsideration, the court also DENIES Plaintiff's Motion to Amend the Complaint to add a claim of retaliation through the appointment of a "new" rotation player on February 19, 1999, and DENIES Plaintiff's Motion to Amend the Complaint to add a claim of retaliation through permitting basic members of the orchestra to play more than six performances per week.

 **\*23** With respect to motions filed after and unrelated to the court's Order and Opinion of May 8, 2001, the court DENIES Plaintiff's second Motion to Amend the Complaint. Moreover, with one exception, the court DENIES Plaintiff

leave to amend to add any of the other new claims raised in Plaintiff's extensive submissions to the court in the form of correspondence. The court also DENIES Plaintiff's Motion for Sanctions.

The court GRANTS Plaintiff leave to amend the Complaint to contain a single claim alleging retaliatory harassment occurring after February 5, 1998. Plaintiff is ORDERED to submit his final proposed amended Complaint on or before May 8, 2002. The court will not grant further leave to amend the Complaint in this case.

If either party believes further discovery must be conducted in order to obtain more complete information concerning this narrowly defined claim, that party must submit a request for further discovery to the court clearly indicating the specific discovery sought and the precise reasons why the discovery is deemed necessary. The parties are ORDERED to submit to this court any proposed requests and schedules for further discovery necessitated by this amendment to the Complaint no later than two weeks after the filing of Plaintiff's Amended Complaint.

The court further ORDERS that any party seeking to file a motion or a request for relief with the court, even in correspondence, must first request a pre-motion conference, to be held by the court as soon as practicable following the request.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 523270, 88 Fair Empl.Prac.Cas. (BNA) 1867

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (6)

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Amended Complaint**<br>Martin STONER, Plaintiff, v. THE NEW YORK CITY BALLET COMPANY, Defendant.<br>2002 WL 33965051 | PDF | S.D.N.Y. | May 21, 2002 | Pleading |
| **2. Memorandum of Law in Support of Defendant's Motion for Summary Judgment**<br>Martin STONER, Plaintiff, v. THE NEW YORK CITY BALLET COMPANY, Defendant.<br>1999 WL 34770408 | PDF | S.D.N.Y. | June 01, 1999 | Motion |
| **3. Affidavit of Stuart B. Kleinman, M.D., in Support of Defendant's Opposition to Plaintiff's Motion for a Protective Order**<br>Martin STONER, Plaintiff, v. THE NEW YORK CITY BALLET COMPANY, Defendant.<br>2002 WL 33963280 | PDF | S.D.N.Y. | Nov. 27, 2002 | Expert Materials |
| **4. Affirmation of Psychiatrist, Robert Lloyd Goldstein, M.D., In Support of Plaintiff's Motion for A Protective Order**<br>Martin STONER, Plaintiff, v. NEW YORK CITY BALLET COMPANY, Defendant.<br>2002 WL 33963278 | PDF | S.D.N.Y. | Nov. 26, 2002 | Expert Materials |
| **5. (Report or Affidavit of Robert Lloyd Goldstein, M.D.)**<br>STONER, v. THE N.Y.C. BALLET CO.<br>1999 WL 34769342 | — | S.D.N.Y. | 1999 | Expert Materials |
| **6. Docket 1:99cv00196**<br>STONER v. THE N.Y.C. BALLET CO | — | S.D.N.Y. | Jan. 11, 1999 | Docket |

**History (10)**

**Direct History (2)**

⚑ 1.  Stoner v. New York City Ballet Co.
2001 WL 492430 , S.D.N.Y. , May 08, 2001

*Reconsideration Granted in Part by*

⚑ 2.  Stoner v. New York City Ballet Co.
2002 WL 523270 , S.D.N.Y. , Apr. 08, 2002

**Related References (8)**

3.  Stoner v. New York City Ballet Co.
1999 WL 1018075 , S.D.N.Y. , Nov. 08, 1999

4.  Stoner v. New York City Ballet Co.
2000 WL 1191320 , S.D.N.Y. , Aug. 22, 2000

5.  Stoner v. New York City Ballet Co.
2001 WL 1505492 , S.D.N.Y. , Nov. 26, 2001

6.  Stoner v. New York City Ballet Co.
2002 WL 31399609 , S.D.N.Y. , Oct. 24, 2002

7.  Stoner v. New York City Ballet Co.
2002 WL 31399613 , S.D.N.Y. , Oct. 24, 2002

8.  Stoner v. New York City Ballet Co.
2002 WL 31875404 , S.D.N.Y. , Dec. 24, 2002

9.  Stoner v. New York City Ballet Co.
2003 WL 749893 , S.D.N.Y. , Mar. 05, 2003

10.  Stoner v. New York City Ballet Co.
2003 WL 1739012 , S.D.N.Y. , Apr. 02, 2003

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 465 of 531

Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)

2005 WL 1460424

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Harrison v. New York,   E.D.N.Y.,   March 20, 2015

2005 WL 1460424
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward P. GRIFFIN-NOLAN, Plaintiff,
v.
PROVIDENCE WASHINGTON INSURANCE
COMPANY and Howard Blute, in his
Individual Capacity as Manager for the
Business Development Executives at
Washington Insurance Company, Defendants.

No. 504CV1453FJSGJD.
|
June 20, 2005.

**Attorneys and Law Firms**

Chamberlain, D'Amanda, Oppenheimer & Greenfield LLP, The Galleries of Syracuse, Syracuse, New York, for Plaintiff, Mairead E. Connor, of counsel.

City of Syracuse Corporation Counsel, Syracuse, New York, for Defendants, David H. Walsh, IV, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

**\*1**  Plaintiff's complaint asserts (1) a 42 U.S.C. § 1983 cause of action for false arrest and denial of First Amendment rights against Defendants City of Syracuse ("City"), Mullen, and Hennessey, alleging that Defendants arrested him for speaking to Defendant officers about their conduct in arresting a third-party; (2) a § 1983 cause of action for false arrest and denial of First Amendment rights against all Defendants, alleging that they arrested him because they believed he might file a complaint of police misconduct; (3) a § 1983 cause of action for failure to train against Defendant City, alleging that Defendant City acted with deliberate indifference in failing to train its officers with

respect to what constitutes the crime of obstruction of justice and how to handle the public; (4) a § 1985(3) cause of action against all Defendants for conspiracy to deprive him of the equal protection of the law and of his equal privileges and immunities, alleging that Defendants conspired to so deprive him out of animus for his attempt to prevent them from injuring a third-person on the basis of that third-person's race or color; (5) a common law false arrest claim against all Defendants; (6) a common law false imprisonment claim against Defendants Mullen, Cecile, and City; (7) a common law malicious prosecution claim against all Defendants; (8) a common law libel claim against Defendant Hennessey, alleging that he made false statements in his Complaint Information; and (9) a claim for attorney's fees pursuant to 42 U.S.C. § 1988.

Based upon these claims, Plaintiff seeks (1) declaratory relief with respect to all causes of action, (2) injunctive relief with respect to all causes of action other than those made pursuant to § 1983, (3) compensatory damages, (4) exemplary or punitive damages, and (5) costs, disbursements, and legal fees.

Currently before the Court is Defendants' motion to dismiss Plaintiff's complaint pursuant to Rules 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure. [1]

[1]    Defendants' motion to dismiss does not address Plaintiff's claim for attorney's fees pursuant to 42 U.S.C. § 1988.

II. BACKGROUND [2]

[2]    Given the procedural posture of this case, the Court assumes the truth of the allegations in Plaintiff's complaint.

On the evening of December 16, 2003, Plaintiff was working as a licensed massage therapist at his booth in the Carousel Center mall. See Dkt. No. 1 at ¶ 10. Around 8:00 p.m. of that evening, he saw a "Hispanic man of color" ("Paredes") walking toward him and noticed a mall security officer pointing Paredes out to Defendants Hennessey and Mullen. See id. at ¶ 11. When Defendant Hennessey tried to stop Paredes by placing his hand on Paredes' chest, Paredes spat on the floor and continued shouting that he was going to kill someone. See id. at ¶ 12. Defendant Hennessey then took Paredes behind Plaintiff's booth, told him to show some

2005 WL 1460424

respect, and smashed his back and head against a concrete pillar. *See id.* at ¶¶ 13-14. Paredes then either pushed or kicked at Defendant Hennessey, at which point they both tumbled and knocked over Plaintiff's booth. *See id.* at ¶¶ 15-16. With Paredes face-down on the floor, Defendant Hennessey placed his knee in Paredes' back and began punching him in the back. *See id.* at ¶¶ 18-19. Defendant Mullen then also placed his knee in Paredes' back and began punching him in the back and sides. *See id.* at ¶ 21. Defendant officers each hit Paredes six or more times after they had subdued him. *See id.* at ¶ 22.

**\*2** Plaintiff crouched by Defendant officers and told them that they had gone over the top and were out of control. *See id.* at ¶ 24. Defendant Mullen told Plaintiff to get back, and Plaintiff complied. *See id.* at ¶¶ 26-27. After Defendant officers continued to punch Paredes in the back, Plaintiff again told them that they were over the top. *See id.* at ¶¶ 28-29. Defendant Mullen told Plaintiff that, if he did not stop, he would be arrested for Obstructing Governmental Administration. *See id.* at ¶ 30. Plaintiff stopped speaking to Defendant officers, and they pulled Paredes up and led him away. *See id.* at ¶¶ 31-32.

At approximately 9:00 p.m., Defendant Mullen returned to Plaintiff's booth with Defendant Cecile and a mall security guard. *See id.* at ¶ 33. Defendant Cecile told Plaintiff that he understood that Plaintiff had been involved in an incident earlier in the evening and asked Plaintiff to explain what happened. *See id.* at ¶ 34. As soon as Plaintiff began to explain, Defendant Cecile stopped him and asked him whether he understood that he could be arrested. *See id.* at ¶ 35. Defendant Cecile told Plaintiff that, at the time of the incident, it was Defendants Hennessey's and Mullen's call whether to arrest Plaintiff but that, if Plaintiff made a complaint, it would be his call whether to arrest Plaintiff. *See id.* at ¶ 37. After Plaintiff said that he was not sure how the complaint procedure worked, Defendant Cecile showed Plaintiff the patch on his shoulder and said, " 'It's right here with me, right now." ' *See id.* at ¶¶ 38-39. Plaintiff told Defendant Cecile that he did not think that this was the only way to file a complaint. *See id.* at ¶ 40. Defendant Cecile then told Plaintiff that, if he filed a complaint, Defendant Cecile would take him down. *See id.* at ¶ 41. Next, Defendant Cecile told Defendant Mullen, " 'He's not happy. We're going to get a complaint. Take him in,' or words to that effect." *See id.* at ¶ 42. When Plaintiff said that he had things at his booth that he could not leave unsecured, Defendant Cecile told him that he should have thought of that before. *See id.* at ¶ 44. Upon Defendant Cecile's direction, Defendant Mullen arrested

Plaintiff for Obstructing Governmental Administration by giving him an appearance ticket. *See id.* at ¶¶ 45-46.

That same night, Defendant Hennessey submitted a complaint information affidavit in support of Plaintiff's arrest. *See id.* at ¶ 47. The affidavit contained a number of statements that were false and that Defendant Hennessey knew to be false when he made them. *See id.* at ¶¶ 48-49. Plaintiff's counsel filed a motion to dismiss the information for insufficiency. *See id.* at ¶ 51. On January 10, 2004, the Syracuse City Court dismissed the information in its entirety. *See id.* at ¶ 52.[3] In or about November 2004, Carousel Center management informed Plaintiff that he could not set up his booth during the holiday season because it was concerned about potential negative publicity arising from these incidents. *See id.* at ¶ 53.

[3]      It appears to the Court that this dismissal actually occurred on January 14, 2004, and was made pursuant to New York Criminal Practice Law § 170.40. *See* Dkt. No. 9 at Pt. 5.

**\*3** Plaintiff filed the instant action on December 15, 2004. *See* Dkt. No. 1.

### III. DISCUSSION

A. Defendants' motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure

Defendants argue that the Court lacks personal jurisdiction over them because Plaintiff failed to serve them with summonses. The docket sheet contains four affidavits of service that indicate that each Defendant was served with the summons and the complaint sometime between January 12, 2005, and January 26, 2005. *See* Dkt. Nos. 5-8. Perhaps these affidavits are mistaken; Plaintiff's counsel has filed an affidavit stating that Plaintiff personally served summonses and complaints for all Defendants upon Defendants' counsel on February 8, 2005, one day after Defendants filed their motion to dismiss. *See* Dkt. Nos. 9, 14 at ¶ 4. Since Defendants do not address insufficiency of service of process in their reply memorandum of law, the Court presumes that they were served summonses and are abandoning their motion to dismiss pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Regardless, both Local Rule 7.1(a)(2) and common sense dictate that a motion to dismiss for a failure to serve summonses requires a supporting affidavit, which Defendants have not provided. *See* L.R. 7.1(a)(2).

2005 WL 1460424

Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

**B. Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure**

*1. Standard of review*

In considering a motion to dismiss for failure to state a claim, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Hence, dismissal is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (quotation omitted).

*2. Defendant City's liability for Plaintiff's § 1983 claims*

A municipality may only be held liable under § 1983 when its policies or customs result in a plaintiff's constitutional injury. *See Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978). The existence of a policy or custom may be inferred when a plaintiff presents evidence that a " 'municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction....' " *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quotation and footnote omitted). Contrary to some earlier Second Circuit cases, there is no heightened pleading requirement for claims of municipal liability. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-68 (1993) (rejecting contention that "plaintiff must do more than plead a single instance of misconduct" to state a claim for municipal liability); *contra Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993) (citation omitted). As the Supreme Court noted, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168-69.

**\*4** Plaintiff's complaint alleges that Defendant City has a policy or custom of threatening those who verbally challenge, or indicate the desire to file a complaint about, police misconduct with Obstructing Governmental Administration and that Defendant City has shown deliberate indifference in failing to train its police officers in how to handle the public while making arrests and failing to train its officers about

what constitutes the crime of Obstructing Governmental Administration. *See* Dkt. No. 1 at ¶¶ 55, 64, 71-73. Plaintiff's allegations of municipal liability are directly related to his allegation of personal injury and, if shown to be true according to the evidence, might support a determination of municipal liability. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City for failure to adequately plead municipal liability.

*3. Plaintiff's § 1983 and common law false arrest and false imprisonment claims*

*a. elements of false arrest and false imprisonment*

"The elements of false arrest ... under § 1983 are 'substantially the same' as the elements under New York law." *Boyd v. City of N.Y.,* 336 F.3d 72, 75 (2d Cir.2003) (quotation omitted). The elements of false arrest and false imprisonment claims are identical: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (quotation omitted).

The central dispute between the parties is whether the issuance of an appearance ticket constitutes the requisite confinement.

*b. common law false arrest and false imprisonment*

Every New York case of which the Court is aware that has considered whether the issuance of an appearance ticket constitutes confinement has held that the issuance of an appearance ticket, in and of itself, does not constitute confinement for purposes of a common law false arrest or false imprisonment claim. *See Du Chateau v. Metro-North Commuter R.R. Co.,* 253 A.D.2d 128, 129, 132 (1st Dep't 1999) (citations omitted) (police officer escorted plaintiff from train, talked to him, and issued an appearance ticket); *Kramer v. Herrera,* 176 A.D.2d 1241, 1241 (4th Dep't 1991) (citations omitted); *Pozzanghera v. Anderson,* 136 A.D.2d 912, 913 (4th Dep't 1988) ("Plaintiff's sole contention is that he was detained by the service of an appearance ticket. This did not restrict plaintiff's freedom and, therefore, does not form a basis for his wrongful arrest claim." (citation omitted)); *Pritchett v. State,* 61 A.D.2d 1110, 1110 (3d Dep't 1978); *cf. Reinhart v. Jakubowski,* 239 A.D.2d 765, 766 (3d Dep't 1997) (issuance of criminal summons requiring court appearance insufficient to support false arrest claim); *Vill. of*

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 468 of 531

Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)

2005 WL 1460424

*Ellenville v. Searles,* 235 A.D.2d 692, 693 (3d Dep't 1997) (brief traffic stop in order to serve process did not constitute requisite confinement) (citations omitted).

 **\*5**  Plaintiff contends, however, that his complaint alleges more than the mere issuance of an appearance ticket. Conduct that accompanies the issuance of an appearance ticket certainly can constitute confinement for purposes of a false arrest or false imprisonment claim. *See Wiggins v. Metro-North Commuter R.R. Co.,* 228 A.D.2d 198, 198 (1st Dep't 1996)* (police escorted plaintiff off train, questioned him in a railroad police facility, and issued an appearance ticket). Unfortunately, Plaintiff does not specify which of his allegations he believes show that Defendants confined him. The relevant allegations are:

33. Approximately one hour later, at about 9:00 p.m., Officer Mullen returned to Plaintiff's booth with [Sergeant Cecile] and a mall security guard.

34. Sergeant Cecile told Plaintiff that he understood he had been involved in an incident earlier and asked the Plaintiff what happened.

35. As the Plaintiff began to tell him, Sergeant Cecile interrupted Plaintiff and asked if Plaintiff understood that he could be arrested.

36. Plaintiff was quite surprised at this statement as he had complied with Officer Mullen's directive and had not interfered with Paredes' arrest or done anything unlawful.

37. Sergeant Cecile said that right then it was the officer's call, but if they were going to receive a complaint from the Plaintiff, it would be his call whether to arrest Plaintiff.

38. Plaintiff said that he was not sure how the complaint procedure worked.

39. Sergeant Cecile showed Plaintiff the patch on his shoulder and said, "It's right here with me, right now."

40. Plaintiff said that he did not think that was the only way to file a complaint.

41. Sergeant Cecile then told Plaintiff, "I'll tell you right now if you're filing a complaint, I'm taking you down," or words to that effect.

42. Sergeant Cecile told Officer Mullen, "He's not happy. We're going to get a complaint. Take him in," or words to that effect.

43. Plaintiff explained that he had expensive things in his booth that he could not leave unsecured.

44. Sergeant Cecile told Plaintiff that he should have thought of that before.

45. Sergeant Cecile told Officer Mullen to give Plaintiff an appearance ticket, which Officer Mullen did.

*See* Dkt. No. 1 at ¶¶ 33-45. Although Plaintiff alleges that Defendant Cecile threatened to arrest him, the mere threat to arrest does not constitute confinement. *See Blumenfield v. Harris,* 3 A.D.2d 219, 220 (1st Dep't 1957) (citations omitted), *aff'd* 3 N.Y.2d 905 (1957). [4]

[4]
In articulating his first cause of action, Plaintiff alleges that "[i]n the course of arresting Plaintiff, plaintiff was not free to leave and was confined against his will at the Carousel Center." *See* Dkt. No. 1 at ¶ 58. However, in light of the more specific allegations that Plaintiff made in his statement of facts, this allegation is too vague and conclusory to support a reasonable inference that Defendants confined him.

Accepting all of Plaintiff's allegations as true and drawing every reasonable inference from them, the Court does not find that he has alleged that Defendants took any actions that would constitute confinement for purposes of a common law false arrest or false imprisonment claim. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim.

*c. § 1983 false arrest*

 **\*6**  The question of whether the issuance of an appearance ticket constitutes confinement for purposes of § 1983 is not so clear. Defendants rely upon *Angel v. Kasson,* 581 F.Supp. 170, 177-78 (N.D.N.Y.1983) ("[I]t [is] well settled that the issuance of such tickets under the provisions of N.Y.Crim. Proc. Law § 150.10 does not constitute an arrest." (citation and footnote omitted)). Plaintiff, on the other hand, relies upon *Dorman v. Castro,* 214 F.Supp.2d 299 (E.D.N.Y.2002), which states that,

[a]lthough this is a close case, the Court finds that Plaintiffs were subject to a "seizure" under the Fourth Amendment. Plaintiffs claim that their liberty was restrained because "at the point when the Plaintiffs were informed that they were

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 469 of 531

Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)

2005 WL 1460424

being issued a Summons" they "were not free to leave until the Plaintiffs had the Summons in hand."

*Id.* at 308 (quotation omitted). *Dorman* goes on to note that "district courts in this circuit that have analyzed *Murphy [v. Lynn,* 118 F.3d 938 (2d Cir.1997) ], however, have held that the mere issuance of an appearance ticket, without any restraint on travel, is a sufficient restraint of liberty to constitute a 'seizure' under the Fourth Amendment." *Id.* (citing *Kirk v. Metropolitan Trans. Auth.,* No. 99 CV 3787, 2001 WL 258605, *15 (S.D.N.Y. Mar. 14, 2001); *Kirton v. Hassel,* No. 96 CV 1371, 1998 WL 146701, *6 (E.D.N.Y. Mar. 25, 1998); *Sassower v. City of White Plains,* 992 F.Supp. 652, 656 (S.D.N.Y.1998)) (other citation omitted). [5]

[5]   Contrary to *Dorman'* s statement, two of the supporting cases it cites do not involve appearance tickets and the third, *Kirk,* involves a desk appearance ticket that the defendant issued after the plaintiff had been arrested and detained. *Kirk,* 2001 WL 258605, *2-*4.

*Dorman* and all the supporting cases that it cites rely upon *Murphy. Murphy,* applying *Albright v. Oliver,* 510 U.S. 266 (1994), held that, in order for a plaintiff to establish a § 1983 malicious prosecution claim, he "must show ... that the initiation or pendency of judicial proceedings" resulted in a Fourth Amendment "seizure." *Murphy,* 118 F.3d at 944. The court went on to hold that "[t]he liberty deprivations regulated by the Fourth Amendment are not limited to physical detention." *Id.* at 945. Finally, the court, relying upon Justice Ginsburg's solitary concurrence in *Albright,* held that

while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and *may order him to make periodic appearances,* such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.

*Id.* at 946 (emphasis added).

Like *Murphy,* all three of the supporting cases that *Dorman* cites concern malicious prosecution claims. There is certainly considerable similarity between the analysis of a § 1983 malicious prosecution claim and a § 1983 false arrest claim; both arise out of the Fourth Amendment's protection against unreasonable seizures. However, *Murphy* does not expressly address false arrest claims. Furthermore, there is reason to constrain the application of *Murphy* to the precise issues it addresses. Judge Jacobs, dissenting in *Murphy,* after noting the majority's reliance upon Justice Ginsburg's solitary concurrence, pointed out that "[a] probable cause determination is required only for 'those suspects who suffer restraints on liberty *other* than the condition that they appear for trial." ' *Id.* at 953, 955 (quoting *Gerstein [v. Pugh],* 420 U.S. [103,] 125 n. 26, 95 S.Ct. [854,] 869 n. 26 [ (1975) ] (Judge Jacobs' emphasis)) (footnote omitted). In *Sassower,* Judge Lowe noted the novelty of the *Murphy* holding and quoted Judge Jacobs' statement that " 'strange is the majority's holding that [plaintiff] was seized within the meaning of the Fourth Amendment because he was required to appear in court." ' *Sassower,* 992 F.Supp. at 655, 656 (quotation omitted).

**\*7** Although in the context of a malicious prosecution claim *Murphy* would be controlling, given the tenuousness of its reasoning, the Court holds that the issuance of an appearance ticket does not, in and of itself, constitute confinement for purposes of a § 1983 false arrest or false imprisonment claim. Furthermore, since the circumstances surrounding the issuance of the appearance ticket in this case do not present any alternative forms of the restraint of Plaintiff's liberty, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 false arrest claim for failure to state a claim.

### *4. Plaintiff's § 1983 First Amendment claims*

Second Circuit First Amendment retaliation case law is, to put it mildly, confusing. There are at least three formulations of the elements of a First Amendment retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) ((1) protected speech or conduct, (2) the defendant's adverse action against the plaintiff, and (3) " 'a causal connection between the protected speech and the adverse action" ' (quotation omitted)); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir.2002) ((1) conduct that the First Amendment protects that (2) prompts or substantially causes the defendant's action (citations omitted)); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) ((1) protected speech or conduct that (2) motivates or substantially causes the defendant's action, which action (3) effectively chills the

2005 WL 1460424

plaintiff's exercise of his First Amendment right (citation omitted)).

In an attempt to make sense of this case law, one approach is to distinguish cases according to broad types. The great majority of First Amendment retaliation cases arise in the prisoner and public employee contexts. Less typical are those cases, like the one currently before the Court, in which a private citizen alleges that state actors took some action against him in retaliation for his exercise of his First Amendment rights. Unfortunately, even in this subset of cases, there is disagreement about the elements of the claim. The most recent case in this subset to set forth the elements of a First Amendment retaliation claim is *Dougherty.* In that case, the plaintiff alleged that the defendants had revoked a previously issued building permit in retaliation for his exercise of his First Amendment rights. Although the court indicated that there may have been additional protected speech, it specifically noted the plaintiff's allegation that the permit revocation occurred soon after the defendants' receipt of his opposition papers to their motion to dismiss an action that he had filed in relation to an earlier denial of a permit. *See Dougherty,* 282 F.3d at 91-92. The court held that the circumstances that the plaintiff alleged gave rise to a sufficient inference of a causal relationship between his protected conduct and the defendants' action to withstand a motion to dismiss. *See id.* at 92.

**\*8** The next most recent case in the subset of private citizen plaintiffs is *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *Garcia* involved a student who claimed that the defendants dismissed him from medical school in retaliation for his exercise of his First Amendment rights. The court followed the same formulation of the elements of a First Amendment retaliation claim as did *Gill* but concluded that the plaintiff's assertions did not satisfy the third element of that formulation. *See id.* at 106-07 (quotation and other citation omitted).

After *Garcia,* the next most recent case in this subset is *Curley.* The facts of that case are more analogous to those of the instant action than are those of either *Dougherty* or *Garcia.* The plaintiff in *Curley* alleged that the defendants arrested him in retaliation for comments that he had made while campaigning for municipal office about a police cover-up and failure to discipline. *See Curley,* 268 F.3d at 72-73. The court found that the defendants were entitled to summary judgment on the plaintiff's First Amendment retaliation claim because the existence of probable cause to arrest him negated

the second element of such a claim and because the fact that the plaintiff continued his campaign and later campaigned for another municipal office negated the third, "chilling," element of the claim. *See id.* at 73.

*Curley* is distinguishable from *Dougherty* and *Garcia.* All the Second Circuit cases that the Court has found involving a private citizen plaintiff who alleges that the defendant arrested him in retaliation for his exercise of his First Amendment rights have articulated the same formulation of the elements of a First Amendment retaliation claim as did *Curley. See Kerman v. City of N .Y.,* 261 F.3d 229, 241-42 (2d Cir.2001) (citation omitted); *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998) (citations omitted). Although it might be difficult to explain the distinction between private citizen arrestee plaintiff cases and the other private citizen plaintiff cases, the distinction is present in the case law. Therefore, the Court will follow the *Curley* formulation of the elements of a First Amendment retaliation claim. [6]

[6]     The only Second Circuit case that Plaintiff cites in support of his First Amendment retaliation claims is *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). *Gagliardi* applies the same formulation of the elements of the claim as does *Dougherty. See id.* at 194 (quotation and other citations omitted). However, *Gagliardi,* like *Dougherty,* is a private citizen zoning dispute case rather than a private citizen arrestee case.

The only challenge [7] that Defendants currently make to Plaintiff's First Amendment retaliation claims is that he fails to allege that they prevented him from filing a compliant, i.e., he fails to allege that Defendants' actions effectively chilled him from exercising his First Amendment rights. However, this challenge reads Plaintiff's claims too narrowly. Two distinct forms of speech are at issue in Plaintiff's first two causes of action. Plaintiff's first cause of action alleges that he verbally complained about Defendants' actions during the course of their arrest of Paredes. From Plaintiff's second cause of action, it may be reasonably inferred that he also desired to file a formal complaint about Defendants' actions after the arrest incident. With respect to the second cause of action, Plaintiff has not alleged that Defendants' actions effectively chilled him from filing a complaint. Therefore, Plaintiff's second cause of action fails to state a First Amendment claim. Accordingly, the Court grants Defendants' motion to dismiss the First Amendment claims in Plaintiff's second cause of action for failure to state a claim.

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 471 of 531

Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)

2005 WL 1460424

7    It is possible that Plaintiff's conduct in criticizing Defendants' actions during the course of their arrest of Paredes may not be protected activity. If the allegations in Defendant Hennessey's affidavit in support of the complaint information are true, Defendants likely had probable cause to arrest Plaintiff for Obstructing Governmental Administration and, thus, their threat to arrest him on that charge was privileged. *See* Dkt. No. 1 at ¶ 48. However, since Defendants have not raised the issue of whether Plaintiff's conduct was privileged, and the Court must accept the allegations in Plaintiff's complaint as true, the Court cannot address this issue at this time.

**\*9** However, with respect to Plaintiff's first cause of action, the Court finds that it may reasonably infer from the complaint that Defendants' conduct effectively chilled Plaintiff's speech. The relevant allegations are:

> 24. Plaintiff then crouched down and told the officers that they were "over the top" and that they were "out of control" or words to that effect.

> 25. Plaintiff did this because the police officers were brutalizing Paredes.

> 26. Officer Mullen told Claimant to get back.

> 27. Claimant complied by stepping back.

> 28. Officers Mullen and Hennessey then continued to punch Paredes on the back after Paredes was subdued.

> 29. Plaintiff told the officers again that they were "over the top" or words to that effect.

> 30. Officer Mullen then told the Plaintiff that if he didn't stop, he would be arrested for Obstructing Governmental Administration.

> 31. Plaintiff stopped speaking to the officers.

*See* Dkt. No. 1 at ¶¶ 24-31. Accordingly, since Plaintiff has sufficiently alleged that Defendants' (or at least Defendant Mullen's) actions effectively chilled his exercise of his First Amendment rights, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim.

*5. Plaintiff's § 1985(3) claims*

Defendants have asserted three bases for the dismissal of Plaintiff's § 1985(3) claims. First, they argue that Plaintiff, as a white person, lacks standing to assert a § 1985(3) claim. Second, they contend that Defendants, as agents or employees of a corporate entity, by definition, may not conspire with one another. Finally, they assert that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*i. standing*

Despite the age and extensive use of § 1985(3), case law contains little discussion of the question of who has standing to assert a claim under that statute. [8] However, the Court finds that the case law provides sufficient guidance to answer the question currently before it: whether a non-minority person who alleges that he was injured by a conspiracy that aimed to deprive minority persons of the equal protection of the law has standing to assert a § 1985(3) claim.

8    The parties have cited conflicting precedents, none of which are binding on this Court. Defendants cite two cases for the proposition that a plaintiff asserting a § 1985(3) claim must himself be a member of a class that the statute protects: *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 692 (S.D.N.Y.1996) (citations omitted); *McLoughlin v. Altman,* No. 92 Civ. 8106, 1993 WL 362407, *6 (S.D.N.Y. Sept. 13, 1993) (citation omitted). Although *McLoughlin* cites *Griffin v. Breckinridge,* [403 U.S. 88, 102,] 91 S.Ct. 1790, 1798 (1971), for the proposition that "a claimant must show, among other things, that she belonged to the type of class that is protected by that statute," *McLoughlin,* 1993 WL 362407, at *6, it does not appear that *Griffin* stands for such a proposition. Likewise, although *Puglisi* discusses several other cases, when it holds "that plaintiff cannot bring this § 1985(3) claim because ... plaintiff is not a member of the class protected by the statute nor a member of the race triggering the alleged racial discrimination[,]" *McLoughlin* is the only case that the court cited that supports this holding. *Puglisi,* 947 F.Supp. at 692.

> The cases upon which Plaintiff relies are also suspect. He contends that a white person who has sought to vindicate the rights of members of a racial minority and against whom the

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 472 of 531

Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)

2005 WL 1460424

defendants conspire has standing to assert a § 1985(3) claim. He cites three primary cases to support this proposition: *Maynard v. City of San Jose,* 37 F.3d 1396, 1403-04 (9th Cir.1994) (citations and footnote omitted); *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 216 (E.D.N.Y.1996) (citing *Maynard* ); *Bryant v. Polston,* No. IP 00-1064-C-T/G, 2000 WL 1670938, *7 (S.D.Ind. Nov. 2, 2000) (citing *Maynard* ). In *Maynard,* the Ninth Circuit sought to apply the law of that circuit which provided that "[p]laintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined 'require[s] and warrant[s] special federal assistance in protecting their civil rights.' " *Maynard,* 37 F.3d at 1403 (quotations and other citation omitted). The court reasoned that, because Title VII "grants special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices" and "to all employees-regardless of race-who are subjected to retaliation for assisting in the investigation of discriminatory employment practices," such persons may have standing to assert a § 1985(3) claim. *Id.* (citation omitted). The plaintiff in *Maynard* had alleged that his employer and other defendants had retaliated against him for complaining about discriminatory hiring practices. *See id.* at 1399-1400. Since it does not appear that the Second Circuit has articulated a general statement of the requirement for standing under § 1985(3), the Court does not find *Maynard* persuasive.

The Supreme Court has discussed the statute's purpose: "[t]he predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,* 463 U.S. 825, 836 (1983). This statutory purpose implies that, if a white person who sought to vindicate the rights of members of a racial minority were injured by a conspiracy that aimed to deny members of that racial minority of the equal protection of the laws, he would have standing to assert a § 1985(3) claim.

**\*10** At least two Courts of Appeals have expressly held that a plaintiff asserting a § 1985(3) claim need not himself be a member of a class that the statute protects. *See Cutting v. Muzzey,* 724 F.2d 259, 260 (1st Cir.1984) (holding that a non-Italian had standing to assert a § 1985(3) claim against members of a town planning board who allegedly conspired to deprive Italians of access to housing); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1244 (3d Cir.1978) (*en banc* ) ("[M]embers of a conspiracy to deprive women of equal rights are liable under § 1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether male or female."), *vacated on other grounds,* 442 U.S. 366 (1979).[9] Although the Second Circuit has not addressed whether a white person may have standing to assert a § 1985(3), the Court finds that, in light of the discussion in *Scott,* the holdings of *Cutting* and *Novotny* are persuasive. Therefore, the Court concludes that the fact that Plaintiff is white does not, in and of itself, bar him from asserting a § 1985(3) claim. Consequently, since Plaintiff has alleged that a conspiracy whose object was to deprive the constitutional rights of a member of a racial minority injured Plaintiff while he was seeking to vindicate those rights, the Court finds that he has adequately alleged standing for his 42 U.S.C. § 1985(3) claim.

9
    The Supreme Court vacated *Novotny* because the plaintiff in that case alleged that the conspiracy that injured him had the goal of depriving women of their Title VII rights. The Court held that, because allowing a plaintiff to base a § 1985(3) cause of action upon rights that Title VII created would circumvent the procedural requirement that Congress had built into Title VII, "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Novotny,* 442 U.S. at 378. Since the Fourth Amendment creates the rights of Paredes of which Plaintiff alleges Defendants conspired to deprive him, the Court's holding does not bar Plaintiff's action.

*ii. intra-corporate conspiracy doctrine*

" 'Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together[ ]" ' while acting within the scope of their employment. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (quotations and other citations omitted); *see Crudele v. City of N.Y. Police Dep't,* No. 97 Civ. 6687, 2004 WL 1161174, *5 (S.D.N.Y. May 24, 2004) (citations omitted). Although

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 473 of 531

Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)

2005 WL 1460424

courts first applied this doctrine to cases involving public corporations, they have subsequently held that the doctrine is applicable to municipal entities and their officers, agents, and employees. *See County of Nassau,* 345 F.Supp.2d at 304 (citation omitted); *Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003)*.* "However, '[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.' ' *County of Nassau,* 345 F.Supp.2d at 304-05 (quotation omitted); *see Stoner v. N.Y. City Ballet Co.,* No. 99 Civ. 0196, 2002 WL 523270, *9 (S.D.N.Y. Apr. 8, 2002) (quotation and other citation omitted).

Individual Defendants are officers of Defendant City. *See* Dkt. No. 1 at ¶¶ 7-9. Plaintiff's allegation that at the time that individual Defendants "conspired to violate Plaintiff's civil rights and committed acts in furtherance of such conspiracy, they were acting as police officers for the City of Syracuse[ ]" is presumably an admission that individual Defendants were acting within the scope of their employment. *See* Dkt. No. 1 at ¶ 79.

**\*11** Nonetheless, Plaintiff contends that the personal interest exception applies. "[T]hat exception applies where 'a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose.' " *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (quotation and other citation omitted); *see Salgado v. City of N.Y.,* No. 00 Civ. 3667, 2001 WL 290051, *9 (S.D.N.Y. Mar. 26, 2001). Plaintiff has not alleged that individual Defendants had a personal interest in their alleged conspiracy. *See* Dkt. No. 1 at ¶¶ 77-83. In his motion papers, Plaintiff concedes that he "does not allege Defendants' personal stake in their bias against Plaintiff or Paredes...." *See* Dkt. No. 15 at 14. However, he contends that he has "allege[d] sufficient facts to infer that the Defendants were motivated by personal gain in silencing Plaintiff about what he witnessed concerning their brutality and/or misconduct in subduing and arresting Paredes and preventing Plaintiff from filing a complaint about such misconduct." *See id.* at 14-15 (citations omitted). He further argues that "the complaint alleges sufficient facts to infer that Defendants' employment opportunities and interest in not answering a complaint about their misconduct was Defendants' personal stake or interest in participating in the conspiracy." *See id.* at 15. However, since Defendant City arguably has the same general interest, Plaintiff's allegations do not give rise to a reasonable inference that individual

Defendants' interests in the alleged conspiracy were distinct from those of Defendant City.

Accordingly, since the intra-corporate conspiracy doctrine applies, the Court grants Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim. [10]

[10]    Since the Court concludes that the intra-corporate conspiracy doctrine applies, it will not address Defendants' alternative argument that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*6. Plaintiff's common law malicious prosecution claims*

In order to recover for malicious prosecution, a plaintiff must establish four elements: that a criminal proceeding was commenced; that it was terminated in favor of the accused; that it lacked probable cause; and that the proceeding was brought out of actual malice. *Cantalino v. Danner,* 96 N.Y.2d 391, 394-95 (2001) (citations omitted). Defendants argue that a dismissal in the interest of justice of an accusatory instrument pursuant to New York Criminal Practice Law § 170.40 cannot constitute a favorable termination. However, Defendants only cite pre-*Cantalino* case law to support their argument. *Cantalino* directly addressed "whether the dismissal of criminal charges against plaintiff in the interest of justice constituted a termination in her favor." *Id.* at 395. It expressly rejected "a per se rule that a dismissal in the interest of justice can never constitute a favorable termination," and held that

> the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused. A case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges....

**\*12** *Id.* at 396 (internal citation omitted). Unfortunately, in this case, the state court did not state on the record its

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 474 of 531
Griffin-Nolan v. Providence Wash. Ins. Co., Not Reported in F.Supp.2d (2005)
2005 WL 1460424

reasons for dismissing the charges. *See* Dkt. No. 9 at 2. Furthermore, even if the state court had stated its reasons on the record, that record is not part of Plaintiff's pleadings. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's common law malicious prosecution claims for failure to state a claim.

*7. Plaintiff's common law libel claim*

Defendants argue (1) that Plaintiff has failed to comply with New York Civil Practice Law and Rules § 3016(a)'s requirement that a complaint asserting a claim for libel or slander set forth the particular words complained of and (2) that, if the Court dismisses all of Plaintiff's federal claims, it should decline to exercise jurisdiction over his state claims.

Since federal law governs the procedural issues in this case, " 'the mode of pleading defamation is governed by Rule 8, Fed.R.Civ.P." ' *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986) (quotation omitted). Therefore, the heightened pleading requirement of New York Civil Practice Law and Rules § 3016(a) does not apply to this action. *See Silverman v. City of N.Y.,* No. 98-CV-6277, 2001 WL 218943, *8 (E.D.N.Y. Feb. 2, 2001) (quotation and other citation omitted). The allegations of libel in Plaintiff's complaint satisfy Rule 8's requirements of "a short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8(a), (e)(1); *see* Dkt. No. 1 at ¶¶ 47-49, 94-96. Furthermore, the Court has not dismissed all of Plaintiff's federal claims. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's libel claim for failure to state a claim.

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion to dismiss Plaintiff's complaint for insufficient service of process is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City of Syracuse for failure to sufficiently allege municipal liability is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his second cause of action is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim is GRANTED; and the Court further

**\*13** ORDERS that Defendants' motion to dismiss Plaintiff's common law malicious prosecution claims for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common libel claim for failure to state a claim is DENIED.

IT IS SO ORDERED. [11]

[11]    The following claims of Plaintiff remain in this action: (1) § 1983 claims for denial of First Amendment rights against Defendants City, Mullen, and Hennessey, alleging that these Defendants arrested him for speaking to Defendant officers about their conduct in arresting a third-party; (2) § 1983 claims for failure to train against Defendant City; (3) common law malicious prosecution claims against all Defendants; (4) a common law libel claim against Defendant Hennessey; and (5) a claim for attorney's fees pursuant to 42 U.S.C. § 1988.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1460424

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (4)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Answer**<br>Edward P. GRIFFIN-NOLAN, Plaintiff, v. CITY OF SYRACUSE, Sergeant Daniel Cecile (individually and in his official capacity); Officer James Mullen, (individually and in his official capacity); Officer David Hennessey (individually and in his official capacity), Defendants.<br>2005 WL 2169465 | PDF | N.D.N.Y. | June 29, 2005 | Pleading |
| **2. Complaint**<br>Edward P. GRIFFIN-NOLAN, Plaintiff, v. CITY OF SYRACUSE, Sergeant Daniel Cecile (individually and in his official capacity), Officer James Mullen (individually and in his official capacity), Officer David Hennessey (individually and in his official capacity), Defendants.<br>2004 WL 3513361 | PDF | N.D.N.Y. | Dec. 15, 2004 | Pleading |
| **3. Defendants' Reply Memorandum of Law**<br>Edward P. GRIFFIN-NOLAN, Plaintiff, v. CITY OF SYRACUSE, Sergeant Daniel Cecile (individually and in his official capacity); Officer James Mullen, (individually and in his official capacity); Officer David Hennessey (individually and in his official capacity), Defendants.<br>2005 WL 2169463 | PDF | N.D.N.Y. | Apr. 05, 2005 | Motion |
| **4. Defendants' Memorandum of Law**<br>Edward P. GRIFFIN-NOLAN, Plaintiff, v. CITY OF SYRACUSE, Sergeant Daniel Cecile (individually and in his official capacity); Officer James Mullen, (individually and in his official capacity); Officer David Hennessey (individually and in his official capacity), Defendants.<br>2005 WL 2169461 | PDF | N.D.N.Y. | Feb. 07, 2005 | Motion |

**History (2)**

**Direct History (1)**

🚩  1.  Griffin-Nolan v. Providence Wash. Ins. Co.
2005 WL 1460424 , N.D.N.Y. , June 20, 2005

**Related References (1)**

2.  Griffin-Nolan v. City of Syracuse
2009 WL 1806670 , N.D.N.Y. , June 24, 2009

2019 WL 7500501

2019 WL 7500501
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard H. LIVINGSTON, Plaintiff,

v.

William HOFFNAGLE, et al., Defendants.

No. 9:19-CV-0353 (GLS/CFH)
|
Signed 11/08/2019

**Attorneys and Law Firms**

Richard H. Livingston, 326 N. Beech Street, Syracuse, New York 13207, Plaintiff pro se.

OF COUNSEL: CHRISTOPHER J. HUMMEL, ESQ. [1], Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

[1]     The undersigned bears no relation to counsel for defendants.

**REPORT-RECOMMENDATION AND ORDER** [2]

[2]     This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Richard H. Livingston ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Correctional Sergeant ("Sgt.") William Hoffnagle, Correction Officer ("C.O.") Dustin Hollenbeck, and C.O. Chris King—who, at all relevant times were employed at Upstate Correctional Facility ("Upstate")—violated his constitutional rights under the First and Eight Amendments. See Dkt. No. 1 ("Compl."). [3]

[3]     Following initial review of plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Senior

District Judge Gary L. Sharpe dismissed certain claims with and without prejudice. See Dkt. No. 4. The Court dismissed plaintiff's Fourteenth Amendment Due Process and Equal Protection Claims. See Dkt. Nos. 1, 4. Further, Judge Sharpe's Decision and Order dismissed plaintiff's claims insofar as plaintiff sought monetary damages against defendants in their official capacity pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915(A) as barred by the Eleventh Amendment. See Dkt. No. 4 at 8.

Presently pending before the Court is defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 12. Plaintiff did not file a response. [4] For the reasons that follow, it is recommended that defendants' motion be granted in part and denied in part.

[4]     In lieu of filing a response, plaintiff submitted a letter stating that he relied "solely" on a previous report and recommendation in a separate case arising out of largely the same facts and circumstances as alleged herein in which Magistrate Judge Peebles recommended granting defendants' motion to dismiss plaintiff's prior complaint on the basis that plaintiff failed to exhaust administrative remedies, but "note[d] that 'the outcome could very well have been different if plaintiff had, in fact, permitted the thirty-day period to elapse prior to commencing [that] suit." Dkt. No. 14 (quoting Livingston v Hoffnagle et al., 9:17-CV-1158 (MAD/DEP), Dkt. No. 28 at 18 n.11).

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the non-moving party. See section II.A. infra. At all times relevant to this complaint, plaintiff was incarcerated at Great Meadow Correctional Facility ("Great Meadow"). See generally Compl. On August 1, 2017, plaintiff was transferred from Clinton Correctional Facility ("Clinton") to Upstate, [5] where he was to be housed in solitary confinement for six months as a result of his involvement in an altercation with another inmate at Clinton. See Compl. at 5 ¶ 8; Dkt. No. 1-1 at 2. Upon his arrival to Upstate, plaintiff requested that

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 478 of 531
Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)
2019 WL 7500501

Sgt. Hoffnagle, the area supervisor, place him in protective custody because "he was in fear for his life and safety" as a result of the prior altercation, which he characterized as a "gang attack." Compl. at 5 ¶ 8. According to plaintiff, the inmate with whom he had engaged in an altercation at Clinton was a gang member and had initiated the fight with plaintiff. See id. However, plaintiff "had gotten the best of" him, which plaintiff believed became widely known throughout DOCCS. Id. Therefore, plaintiff asserts, he was worried that a gang member at Upstate would retaliate against him. See id. Plaintiff alleges that, in response to his request for protective custody, Sgt. Hoffnagle directed his two subordinates, C.O. Hollenbeck and C.O. King, "to dissuade" plaintiff from requesting protective custody. Id. at 12 ¶ 45.

5      Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. Samuels v. Selsky, No. 01-CV-8235 (AGS), 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

**\*2**  Plaintiff states that defendants "tortured" him by locking him in a holding cell, "chained and handcuffed tightly," with no food, water, or bathroom access between 1:00 P.M. and 6:30 P.M. Id. at 9 ¶ 39, 5 ¶ 12. He asked defendants "over 10 times" to loosen his chains and handcuffs, for water, and to use the bathroom "for relief," but defendants ignored his requests. Id. at 6 ¶ 13, 10 ¶ 40. Between 5:30 P.M. and 6:30 P.M., plaintiff "threaten[ed] to file grievances and lawsuits" against defendants based on "constitutional violations." Id. at 6 ¶ 15. In response, C.O. King told plaintiff that "the Sgt. wants to write plaintiff a ticket" and that "he was instructed to write a misbehavior report" based on plaintiff's "refus[al] of a direct order to lock into a cell," which plaintiff denies, stating that "this was not the case." Id. at 6 ¶¶ 17, 18. Sometime between 6:00 p.m. and 6:30 p.m., plaintiff was placed in a cell with a "violent gang banger," purportedly in contravention of DOCCS Directive No. 4003B, and given a tray of food that was "freezer cold." Id. at 6 ¶ 20. Plaintiff states that he was housed with this inmate as "punishment" for requesting protective custody. Id. at 6 ¶ 20, 7 ¶ 22. Plaintiff alleges that being housed with this "gang member" caused him "psychological pain" and loss of "sleep for days in fear of his life." Id. at 11 ¶ 43.

On August 3 and August 7, 2017, plaintiff filed two nearly identical grievances concerning the events that occurred on August 1, 2017. See id. at 7; Dkt. No. 1-1 at 4, 5.

On September 25, 2017, plaintiff's grievance was denied. See Dkt. No. 1-1 at 10-11. Plaintiff appealed the denial to Central Office Review Committee (CORC). See id. at 12. On December 12, 2018, CORC denied plaintiff's appeal as without merit. See id. at 16.

## II. Discussion [6]

6      All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard for Motions
### Pursuant to Fed. R. Civ. P. 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal quotation marks and citation omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 479 of 531
Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)
2019 WL 7500501

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

 **\*3** Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### B. Eighth Amendment

Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. Hudson v. McMillian, 503 U.S. 1, 9-10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir 2000) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)).

### 1. Excessive Force

Plaintiff alleges that defendants used excessive force in violation of his Eighth Amendment rights by applying his chains and handcuffs too tightly. Compl. at 10 ¶¶ 12, 41. Plaintiff states that the tightness of the chains and handcuffs caused "soreness." Id. at 10 ¶ 41. He further contends that he "asked over 10 times" for his handcuffs and chains to be loosened and "continued to complain about the tightness and soreness for [six] hours," but defendants refused to loosen the chains and handcuffs. See id. at 6 ¶ 14. He alleges that the chains and handcuffs were applied tightly in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff has failed to state a claim for excessive force because plaintiff's alleged injury is *de minimis* for constitutional purposes. See Dkt. No. 12-1 at 5.

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. See Davidson v. Flynn, 32 F.3d 27, 30 (2d Cir. 1994). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 8 (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims, 230 F.3d at 22 (internal quotation marks, alteration, and citation omitted). However, "the malicious use of force to cause harm[ ] constitute[s] [an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." Id. at 7.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 480 of 531

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citations omitted). Thus, the key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (Observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider:

> **\*4** the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

"While handcuffs must be reasonably tight to be effective, overly tight handcuffing may constitute excessive force." Burroughs v Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and citation omitted). For example, in Davidson, the plaintiff alleged that correction officers "placed ... handcuffs and leg irons and waist chain on [him] so tight as to cut into [his] flesh[,] reduce circulation[,] and cause swelling," which left a scar on his right ankle and numbness in the area, and caused his "wrists [to be] numb for several months afterwards." Davidson, 32 F.3d at 29. Further, the plaintiff alleged that the defendants purposefully placed the handcuffs and chains too tightly in retaliation for filing lawsuits, and that they refused his requests to loosen the restraints. See id. at 29, 30. The Second Circuit concluded that the plaintiff's complaint in Davidson

> plainly allege[d] both the objective and subjective components of a

cause of action for an Eighth Amendment violation: the handcuffs were allegedly placed on the plaintiff too tightly, leading to serious and permanent physical injury (the objective component), and such excessive force was applied to the plaintiff wantonly and maliciously in retaliation for being a litigious inmate (the subjective component).

Id. at 30 (internal quotation marks and brackets omitted).

By contrast, courts routinely dismiss claims of excessive force based on tight handcuffing where an inmate asserts only a *de minimis* injury without plausible allegations of wantonness or maliciousness. [7] For instance, in Burroughs v. Mitchell, the Court dismissed a *pro se* inmate's excessive force claim where he alleged only that the defendants "handcuffed him tightly, which caused cuts to his wrist." Burroughs v. Mitchell, 325 F. Supp.3d 249, 265 (N.D.N.Y. 2018) (internal quotation marks omitted). Similarly, in Burroughs v. Petrone, the Court dismissed the *pro se* inmate's excessive force claim based on tight handcuffing where the complaint alleged, without more, that the handcuffs caused "pain, swelling, and bruising." Burroughs v. Petrone, 138 F. Supp. 3d 182, 213 (N.D.N.Y. 2015) (internal quotation marks and brackets omitted).

[7]

> As defendants observe, some relevant caselaw appears to suggest that, in order to state an Eighth Amendment excessive force claim based on tight restraints, a plaintiff must allege a permanent injury. See Dkt. No. 12-1 (citing, among other cases, Burroughs v. Petrone, 138. F. Supp. 3d 182, 213 (N.D.N.Y. 2015) ("In the absence of any facts alleging any permanent injury as a result of handcuffing, plaintiff's excessive force claims against Weeks, S. King, Melendez, and McKeown fail to state a cause of action under § 1983.")). However, many of those cases assess excessive force claims under the Fourth Amendment. See Bourdon v. Roney, No. 9:99-CV-0769 (LEK/ GLS), 2012 WL 21058177, at * 9-10 (N.D.N.Y. Mar. 6, 2003) (assessing an arestee's Fourth Amendment excessive force claim arising out of events that occurred during the course of the plaintiff's arrest); Jackson v. City of New York,

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) (same); Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468–69 (S.D.N.Y. 2008) (same); Layou v. Crews, No. 9:11-CV-0114 (LEK/RFT), 2013 WL 5494062, at *7 (N.D.N.Y. Sept. 30, 2013) (same). It is well settled that Fourth Amendment excessive force claims are assessed under the objective reasonableness standard, which does not apply to post-conviction inmates and, unlike the Eighth Amendment standard that includes both objective and subjective elements, is an "exclusively objective analysis" under which the defendant's "intent is irrelevant." Franks v. New Rochelle Police Dep't, No. 13-CV-636 (ER), 2015 WL 4922906, at *10 (S.D.N.Y. Aug. 18, 2015).

Further, the complaint in the Eighth Amendment excessive force case relied on by defendants, which cites to cases assessing Fourth Amendment excessive force claims, lacked allegations of wantonness, which allowed the court to bypass the subjective analysis and dismiss the Eighth Amendment excessive force claim on the objective prong alone. See Petron, 138 F. Supp. 3d at 213 (dismissing the plaintiff's Eighth Amendment excessive force claim where the complaint was devoid of allegations of malicious force and alleged only a de minimis injury). As discussed in section II.B.1., "[t]he appropriate test" for assessing an excessive force claim brought "under the Eighth Amendment involves both subjective and objective elements." Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). Accordingly, this Report-Recommendation & Order will apply the test articulated in Blyden.

*5  Further, where a pro se inmate's complaint alleged that overly tight handcuffing caused "pain in his wrists and pain, numbness[,] and swelling in his foot and ankle," the court concluded that the alleged injuries were "more than likely to prove de minimis." Warren v. Purcell, No. 03-CV-8736 (GEL), 2004 WL 1970642, at *8 (S.D.N.Y. Sept. 3, 2004). However, the court in Warren declined to determine whether such injuries were sufficiently serious for purposes of the Eighth Amendment because it concluded that the complaint failed to satisfy the subjective element, reasoning that the complaint did not "attribute[ ] any improper or retaliatory motive to the defendant officers, either in attaching the cuffs in ... the first instance, or in failing to loosen them once he complained." Id.

Moreover, in Wilson v. Woodbourne Corr. Facility, the pro se inmate alleged only that the defendants used excessive force by applying "handcuffs ... too tightly when escorting [him]." Wilson v. Woodbourne Corr. Facility, No. 9:11-CV-1088 (DNH/ATB), 2012 WL 1377615, at *4 (N.D.N.Y. Mar. 21, 2012), report and recommendation adopted sub nom. Wilson v. Depolo, No. 9:11-CV-1088, 2012 WL 1366590 (N.D.N.Y. Apr. 19, 2012). Noting the absence of any facts in the complaint alleging that the defendant correction officers were aware that the restrains were causing pain or that the plaintiff requested the restraints to be loosened, the Court concluded that the "[p]laintiff's allegation, without more, ... [wa]s clearly de minimis, and ... certainly not repugnant to the conscience of mankind." Id. (internal quotation marks omitted).

Here, the undersigned finds that plaintiff has sufficiently pleaded a per se claim for excessive force because he has alleged facts which plausibly suggest that the force asserted was done maliciously for the purpose of causing harm. See Hudson, 503 U.S. at 9-10. Although, as defendants correctly contend, plaintiff's alleged injury resulting from the "tight" handcuffs and chain—"soreness"—is de minimis, Compl. at 10 ¶¶ 12, 41; see Warren, 2004 WL 1970642, at *8 (holding that temporary pain, numbness and swelling as a result of tight handcuffing was "more than likely to prove de minimis"); Ruggiero v Fisher, No. 15-CV-00962 (RJA/JJM), 2018 WL 7892966, at *7 (W.D.N.Y. Sept. 27, 2018), report and recommendation adopted sub nom. Ruggiero v. Fisher, No. 15-CV-962-A, 2019 WL 1438810 (W.D.N.Y. Apr. 1, 2019) (temporary discomfort resulting from tight restraints held to be de minimis), "[t]he absence of serious injury [while] relevant to the Eighth Amendment inquiry, ... does not end it." Hudson, 503 U.S. at 7.

Plaintiff alleges that he asked defendants to "loosen the chains and [handcuffs] over ... 10 times," "complain[ed] about the tightness and soreness for [six] hours," that defendants ignored his "constant pleas and cries to loosen the chains and [hand]cuffs" and tightly chained and handcuffed him in order to make him "break[ ] down and forget about wanting protective custody." Compl. at 6 ¶ 13, 9 ¶ 37. Based on these allegations, the undersigned finds that the complaint sufficiently pleads facts plausibly suggesting that the use of force was malicious and done for the purpose to cause harm. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) ("[T]he malicious use of force to cause harm constitutes an 'Eighth Amendment violation per se ... whether or not significant injury is evident.' ") (quoting Blyden, 186 F.3d at

2019 WL 7500501

263) (alteration omitted)). Thus, although plaintiff does not allege that he suffered any significant or permanent injury as a result of the tight handcuffs and chains, "any or even ... no injuries resulting from the events plaintiff described could amount to a *per se* constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005)); Cf. Warren, 2004 WL 1970642, at *8 (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness, and swelling, and no improper or wanton motive was alleged for the officers' actions).

**\*6** Accordingly, it is recommended that defendants' motion to dismiss on this ground be denied.

### 2. Failure to Protect

Plaintiff next alleges that defendants failed to protect him in violation of his Eighth Amendment rights by placing him in a holding cell with a "violent gang member" despite his numerous requests to be placed in protective custody. Compl. at 11 ¶ 42. He further alleges that as a result of being housed with this other inmate, he was unable "to sleep for days in fear of his life" and experienced "psychological pain." Id. at 11 ¶ 43. Defendants argue that plaintiff's claim fails to state a cause of action for failure to protect because plaintiff "does not allege that the inmate he was housed with assaulted him[] or caused any other injury whatsoever." Dkt. No. 12-1 at 6.

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. at 825, 832-33 (1994)). "[A] state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm" (objective prong); and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety (subjective prong). Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63,

66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started.").

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred from that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp. 2d 344, 359 (N.D.N.Y. 2009). Negligence by a prison official is insufficient to amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

**\*7** As to the objective prong, plaintiff does not allege facts plausibly suggesting that he faced a substantial risk of serious harm from his cellmate. As urged by defendants, plaintiff does not claim that the inmate with whom he was housed on August 1, 2017, threatened or assaulted him in any way. Rather, plaintiff alleges only that he could not sleep for some uncertain amount of time and that he experienced unspecified "psychological pain" as a result of being housed with this inmate. Compl. at 11 ¶ 43. Such conclusory and speculative fears certainly do not " 'contemplate[ ] 'a condition of urgency, ... that may produce death, degeneration, or extreme pain.' " Hathaway, 37 F.3d at 66 (quoting Nance, 912 F.2d at 607). Further, given the absence of allegations of actual physical injury, plaintiff has failed to satisfy the objective element of the test. See Dzwonczyk v. Syracuse City Police Dep't, 710 F. Supp. 2d 248, 267 (N.D.N.Y. 2008) ("where, as here, the plaintiff does not allege that he was assaulted or

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 483 of 531
Livingston v. Hornfagle, Not Reported in Fed. Supp. (2019)
2019 WL 7500501

threatened by other inmates, or where plaintiff only alleges that he was in fear of an assault, a claim for failure to protect must be dismissed"); Johnson v. Lynn-Caron, No. 9:11-CV-386 (GLS/CFH), 2013 WL 5465594, *5 (N.D.N.Y. Sept. 30, 2013) (dismissing the plaintiff's failure to protect claim where the plaintiff did not demonstrate actual physical harm); Jamison v. Hayden, No. 9:03-CV9-13 (FJS/DRH), 2008 WL 907316, at *3 (N.D.N.Y. Mar. 31, 2008) (dismissing an inmate's failure to protect claim where the only injury alleged was "severe stress" in the absence of allegations of actual physical injury); Dolberry v. Levine, 567 F. Supp. 2d 413, 418 (W.D.N.Y. 2008) (dismissing a failure to protect claim where the plaintiff failed to proffer evidence showing he was subjected to any physical harm); see also Garcia v. Rodriguez, No. 05-CV-5915 (JSR), 2007 WL 2456631, at *2 (S.D.N.Y. Aug. 24, 2007) (holding that even an isolated threat from one inmate to another that an inmate would "get hurt," without any other present or past violent indications between the two inmates, does not demonstrate a substantial risk of serious harm).

As to the subjective prong, plaintiff fails to contend that defendants actually knew of and disregarded an excessive risk to his safety. Although plaintiff alleges that he explained to defendants "his reason for requesting [protective custody]"—that he had a general fear of retaliation for the altercation at Clinton—the complaint is devoid of any factual allegations that he informed defendants that the particular inmate with whom he was housed at Upstate had a connection to the inmate involved in the altercation at Clinton, knew of that incident, posed any specific risk to his safety as a result thereof, or engaged in any threatening or assaultive behavior toward plaintiff. Compl. at 11 ¶ 42. Therefore, the complaint fails to allege sufficient factual allegations that defendants could have "actually inferred from that disclosure that a substantial risk of serious harm existed" as a result of plaintiff's placement with his cellmate. Murray, 668 F. Supp. 2d at 359. Indeed, it is well settled that a defendant's knowledge of a plaintiff's generalized fear of harm is an insufficient basis upon which to establish a failure to protect claim. See Burns v. Martuscello, No. 9:13-CV-0486 (LEK/CFH), 2015 WL 541293, at *13 (N.D.N.Y. Feb. 10, 2015) (internal quotation marks omitted) ("Eighth Amendment failure to protect claims are not to be based on a defendant's knowledge of a general risk of harm to an inmate.") (internal quotation marks omitted); see also Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (holding the failure to protect the plaintiff against a general threat of harm is insufficient to raise a failure to protect

claim under the Eighth Amendment), vacated in part on other grounds, 738 F.3d 509 (2d Cir. 2013). Thus, the complaint does not sufficiently state a claim for failure to protect against defendants. [8]

[8]    In addition, to the extent that plaintiff also contends that defendants violated DOCCS Directive 4003B by housing him with the alleged gang member, it is well settled that "[f]ailure to follow a DOCCS Directive does not give rise to a § 1983 claim." Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 n.8 (N.D.N.Y. July 14, 2015); see Cabassa v. Gummerson, No. 9:01-CV-1039 (DNH/GHL), 2008 WL 4416411, at *6 n.24 (N.D.N.Y. Sept. 24, 2008) (violation of a DOCCS Directive does not give the plaintiff a claim under 42 U.S.C. § 1983); see also Ahlers v. Nowicki, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.").

*8    Accordingly, it is recommended that plaintiff's failure to protect claim be dismissed.

### 3. Conditions of Confinement

Reading plaintiff's allegations to raise the strongest arguments they suggest, the complaint alleges that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by placing him in a holding cell for a maximum period of five and one-half hours, during which time he was handcuffed, denied access to a bathroom, deprived of food and water, and housed with a "violent gang member." Compl. at 10 ¶ 40, 11 ¶ 43. Defendants argue that the alleged conditions of plaintiff's confinement do not rise to the level of an Eighth Amendment violation. See Dkt. No. 12-1 at 4-6.

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is well settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer, 511 U.S. at 832 (internal quotation marks and citations omitted); see Blyden, 186 F.3d at 263 ("society does not expect or intend prison conditions

2019 WL 7500501

to be comfortable, [and] only extreme deprivations" of basic human needs "are sufficient to sustain a [conditions of confinement] claim.") (internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996) (citations omitted). Objectively, the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted). The objective prong can be satisfied where the plaintiff pleads "conditions [that] either alone or in combination, pose an unreasonable risk of serious damage to [the inmate's] health." Darnell v. Pineiro, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). There is no "static test" to determine whether or not an alleged deprivation is sufficiently serious to satisfy the objective prong. Id. (internal quotation marks omitted). Rather, courts must determine whether the conditions violate "contemporary standards of decency." Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)) (additional citation omitted). To satisfy the subjective test, the inmate must show that "the defendant official acted with a sufficiently culpable state of mind ... such as deliberate indifference to [the inmate's] health or safety." Id. (internal quotation marks and citation omitted); see also Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002).

Unconstitutional conditions of confinement have generally been found when the duration of the deprivation is sufficiently long, or when the deprivation is an ongoing condition of an inmate's confinement, rather than the result of a single, isolated incident. See Hutto v. Finney, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of grue might be tolerable for a few days and intolerably cruel for weeks or months.") (internal quotation marks omitted); Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) ("[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in [an Eighth Amendment] analysis. Conditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months." (citations omitted)); Walker v. Schriro, No. 11-CV-9299 (JPO), 2013 WL 1234930, at *13 (S.D.N.Y. 2013) (allegations that the plaintiff was temporarily deprived of food, shower, linens, running water or bathroom were insufficient to state a claim "[g]iven that none of the[ ] deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of the [p]laintiff's mistreatment precludes a finding that [the p]laintiff can satisfy the requirement of an objectively serious deprivation").

### i. Handcuffing/Denial of Bathroom Access

**\*9** "Individuals in custody do not have a constitutional right to use the bathroom ... whenever they please." Treat v. Cent. New York Psychiatric Ctr., No. 9:12-CV-602, 2013 WL 6169746, at *2 (N.D.N.Y. Nov. 20, 2013). It is well settled held that "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." Whitted v. Lazerson, No. 96-CV-2746 (AGS), 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); see Odom v. Keane, No. 95-CV-9941 (SS), 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (Sotomayor, J.) (concluding that, the absence of a working toilet in prison cell for approximately ten hours, without any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment. In the absence of allegations of serious physical harm or serious risk of contamination, courts have routinely rejected unconstitutional conditions of confinement claims where plaintiffs have alleged that they experienced pain or discomfort and were forced to relieve themselves in their clothing as a result of waiting to use a bathroom. See Whitted, 1998 WL 259929, at *2 (finding that the inmate failed to establish an objective injury where he was forced to wait one and a half hours to use the bathroom, during which time he "was forced to hold his bowel movement at painful levels, and at times partially urinated and defecated in his clothing."); Gill v Riddick, No. 9:03-CV-1456, 2005 WL 755745, at *16 (N.D.N.Y. Mar. 31, 2005) (concluding no Eighth Amendment violation in the absence of allegations of serious injury to the inmate's health as a result of being forced to hold his urine for approximately 70 minutes); Bourdon v. Roney, No. 9:99-CV-0769 (LEK/GLS), 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (observing that "[t]he standard for analyzing a pre[-]trial detainee's [conditions of confinement] claim is the same as the Eighth Amendment standard," and holding that the pre-trial detainee's allegations of being deprived of bathroom privileges for a maximum of three hours while locked in a hot police car without water "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time" in violation of his constitutional rights); see also Qawi v. Howard, No. Civ-A-98-220 (GMS), 2000 WL 1010281, at *3-4 (D. Del. July 7, 2000) (holding that the denial of the use of a bathroom for six hours during which the inmate was forced to urinate in drinking cup and bowl and defecate into

a paper bag did not constitute sufficiently serious deprivation because the duration of the condition was brief and the inmate suffered no significant health risk).

On the other hand, courts have, under certain circumstances, found that the denial of bathroom access may give rise to an Eighth Amendment violation. For example, in Hart v. City of New York, the Court refused to dismiss an inmate's Eighth Amendment claim where he alleged that the defendant correction officers ignored his repeated requests to use the bathroom for 12 hours, which forced plaintiff to "repeatedly soil himself and remain[ ] imprisoned in urine-soaked clothing," despite having been informed that the plaintiff suffered from multiple sclerosis which caused the need for frequent urination. Hart v. City of New York, No. 11-CV-4678 (RA), 2013 WL 6139648, at *7 (S.D.N.Y. Nov. 18, 2013). Further, in DeBlasio v. Rock, the Court denied the defendants' motion for summary judgment as to an inmate's Eighth Amendment claim of unconstitutional conditions of confinement where he alleged that the defendant correction officers handcuffed him behind his back and refused to "remove [his] handcuffs so that he could use the bathroom" for five hours, ultimately forcing the inmate to urinate and defecate on himself. DeBlasio v. Rock, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *16 (N.D.N.Y. Sept. 26, 2011).

Here, plaintiff has not alleged any "serious physical harm or a serious risk of contamination" as a result the denial of bathroom access on August 1, 2017. Whitted, 1998 WL 259929, at *2. Rather, plaintiff contends only in conclusory terms that he requested "to use the restroom for relief." Compl. at 6 ¶ 13. The complaint does not allege that plaintiff experienced any pain or significant discomfort, that he was forced to urinate or defecate in his clothing, or that he has suffered any persisting physical injury as a result of his experience. Cf. Whitted, 1998 WL 259929, at *2. Further, unlike in Hart, plaintiff does not allege that he made defendants aware of any medical condition which would necessitate an exceptional need for bathroom access, or that this deprivation extended beyond the single, isolated incident on August 1, 2017. Cf. Hart, 2013 WL 6139648, at *7; accord Hutto, 437 U.S. at 686–87.

Moreover, although Rock involved a handcuffed inmate who was deprived bathroom access for a comparable period of time to plaintiff, that case appears distinguishable. The plaintiff in Rock specifically alleged that the defendants had applied handcuffs behind his back, which prevented him from using the bathroom in his cell for approximately five hours until he was forced to urinate and defecate on himself. See id. Here, by contrast, plaintiff asserts only that his handcuffs and chains were applied "tight" and that he requested that the handcuffs and chain be loosened but does not state any facts from which the Court can infer that his handcuffs hindered him from relieving himself. Cf. Rock, 2011 WL 4478515, at *16. Thus, the present case appears more analogous to cases in which an inmate has alleged an Eighth Amendment violation based on temporary discomfort due to a fairly brief and isolated denial of bathroom access without any serious physical harm or serious risk of contamination. See Whitted, 1998 WL 259929, at *2.

*10 Similarly, concerning the application of "tight" handcuffs and chain, the complaint fails to allege facts demonstrating that the use of these restraints while plaintiff was confined in his cell was sufficiently serious such that it posed "an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). As discussed in detail in part II.B.1 supra, plaintiff alleged only that he suffered temporary "soreness" as a result of the application of the chains and handcuffs and does not allege that he sought or required medical attention, or that he is currently suffering any injury as a result thereof. Compl. at 10 ¶ 41. Such minor discomfort cannot be said to pose an "unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30; see also Hudson, 503 U.S. at 9 ("routine discomfort is part of the penalty that criminal offenders pay for their offenses against society" (internal quotation marks and citation omitted)). Thus, plaintiff's Eighth Amendment claim for unconstitutional conditions of confinement insofar as premised upon the application of tight handcuffs and temporary denial of bathroom access fails to satisfy the objective prong of the Eighth Amendment test. Accordingly, it is unnecessary to reach the subjective prong because "without a constitutional violation, [d]efendants clearly could not have acted with 'deliberate indifference.' " Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### ii. Denial of Food and Water

Plaintiff asserts that defendants subjected him to unconstitutional conditions of confinement in violation of his Eighth Amendment rights by depriving him of food and water between 1:00 P.M. and sometime between 6:00 P.M. and 6:30 P.M. on August 1, 2017, when he arrived at

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 486 of 531

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

Upstate. See Compl. at 6 ¶ 20, 11 ¶ 43. He concedes that, "[b]etween 6[:00] p.m. [and] 6:30 p.m., [he] was offered a hot tray of food, which was freezer cold." Id. at 6 ¶ 20. Defendants contend that plaintiff fails to state a claim because the temporary deprivation of food and water "has been routinely found insufficient to state a[n] [Eighth Amendment] conditions[ ]of[ ]confinement claim." Dkt. No. 12-1 at 5.

The deprivation of food, as any other deprivation, must be tested by the same Eighth Amendment analysis. In order to rise to the level of an Eighth Amendment claim, the deprivation must be sufficiently serious, and the defendant must have been deliberately indifferent to the inmate's health or safety. See Farmer, 511 U.S. at 834. As the Second Circuit has noted, courts have not explicitly held that the denial of food is a *per se* violation of a prisoner's Eighth Amendment rights. See Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983) (citing Moss v. Ward, 450 F. Supp. 591, 596 (W.D.N.Y. 1978)). However, "under certain circumstances[,] a substantial deprivation of food may well be recognized as being of constitutional dimension." Id. For example, depriving a prisoner of all food for four consecutive days was held to have violated the Eighth Amendment. Moss, 450 F. Supp. at 596-97.

On the other hand, "isolated" deprivations of food do not typically rise to the level of an Eighth Amendment violation. Reeder v. Hogan, No. 9:09-CV-520, 2012 WL 4107822, at *18 (N.D.N.Y. July 11, 2012), report and recommendation adopted 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012). For example, allegations of intermittent deprivations for periods of approximately eight- and one-half hours, twenty-three hours, and during periods of confinement, were held insufficient to state an Eighth Amendment conditions of confinement claim. See Little v. Mun. Corp., 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014); see also Konovalchuk v. Cerminaro, No. 9:11-CV-01344 (MAD/CFH), 2014 WL 272428, at *21 (N.D.N.Y. Jan. 24, 2014) (holding that an inmate's claim that he missed two consecutive meals while being transported to-and-from the courthouse was "not substantial and d[id] not amount to cruel and unusual punishment."); Zimmerman v. Seyfert, No. 9:03-CV-1389 (TJM), 2007 WL 2080517, at *27 (N.D.N.Y. July 19, 2007) (holding that requiring the plaintiff to go eleven hours without eating did not rise to the level of a constitutional claim). Moreover, courts in this Circuit have held that being denied a single meal does not give rise to a constitutional deprivation. See, e.g., Hankerson v. Nassau Cnty. Corr. Facility, No. 12-CV-5282 (SJF/WDW), 2012 WL 6055019, at *3 (E.D.N.Y.

Dec. 4, 2012) ("[The plaintiff's] allegation that he was denied a single meal while incarcerated ... does not give rise to a constitutional deprivation."); Scarbrough v. Evans, No. 11-CV-131 (NAM/DRH), 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012) ("[T]he denial of a single meal is insufficient to state a claim for relief.") (citations omitted).

**\*11** Here, it is undisputed that plaintiff did not receive food from 1:00 P.M. until between 6:00 P.M. and 6:30 P.M. on August 1, 2017—a deprivation which lasted, at most, five and one-half hours. See Compl. at 11 ¶ 43. Thus, plaintiff's claim in this regard fails to satisfy the objective prong of the test, as he does not allege a deprivation of "the measure of food necessary to maintain health, but rather ha[s] described the sort of isolated withholding[ ] that do[es] not typically rise to [the] level of constitutional significance." Reeder, 2012 WL 4107822, at *18; see Zimmerman, 2007 WL 2080517, at *27.[9] Further, as defendants argue, the lack of a meal over the course of five and one-half hours is "not an atypical experience for most people over the course of an ordinary day, let alone those ... subjected to the more restrictive ... conditions of a prison setting." Dkt. No. 12-1 at 7. Indeed, this alleged deprivation is less significant than deprivations of food found to be insufficient to state a claim for cruel and unusual punishment. See Konovalchuk, 2014 WL 272428, at *21; Zimmerman, 2007 WL 2080517, at *27. Thus, even affording the complaint the most liberal construction possible, plaintiff does not even assert the denial of a single meal—a legally insufficient basis to support a constitutional claim. See Hankerson, 2012 WL 6055019, at *3; Scarbrough v. Evans, 2012 WL 4364511, at *5.

9
    Insofar as the complaint may be construed as alleging an Eighth Amendment violation based on the provision of "freezer cold" food, plaintiff fails to state a claim. Compl. at 6 ¶ 20. It is well established that "[t]he provision of cold food, is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Martin v. Oey, No. 9:16-CV-00717 (TJM/TWD), 2017 WL 6614680, at *6 (N.D.N.Y. Nov. 28, 2017) (internal quotation marks and citation omitted). Here, the complaint is devoid of allegations that the food was prepared or served under conditions presenting an immediate danger to plaintiff's health or wellbeing; therefore, the alleged provision of

2019 WL 7500501

cold food, without more, fails to state a claim upon which relief may be granted. See id.; see also Brooks v. NYC DOC Comm'r, No. 14-CV-6283 (RRM/CLP), 2016 WL 4530456, at *4-5 (E.D.N.Y. Aug. 29, 2016) (sua sponte dismissing cause of action based on the failure to provide hot meals where there was no allegation that the inmate did not receive nutritionally adequate meals).

Plaintiff likewise fails to allege facts sufficient to state a claim for cruel and unusual punishment based on the temporary denial of drinking water. Liberally construing plaintiff's claim, his deprivation of drinking water coincided with his deprivation of food. See Compl. at 5 ¶ 12. Therefore, as plaintiff admits that he was provided a meal sometime between 6:00 P.M. and 6:30 P.M., this claim, too, amounts only to a short, isolated deprivation and, therefore, does not arise to the level of an Eighth Amendment violation. See Mortimer Excell v. Fischer, No. 9:08-CV-945, 2009 WL 3111711, at *5-6 (N.D.N.Y. Sept. 24, 2009) (holding that, to the extent the plaintiff alleged that he was denied water during the same 24-hour period he was denied a meal, he failed to state a constitutional claim); McGee v. Pallito, No. 10-CV-11, 2011 WL 6291954, at *13 (D. Vt. Aug. 3, 2011) ("temporary deprivations of drinking water are not unconstitutional"), report and recommendation adopted, 2011 WL 6294202 (D. Vt. 2011); see also Beckford v. Portuondo, 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."). Thus, plaintiff's Eighth Amendment claim premised on the denial of food and water fails to satisfy the objective element of the Eighth Amendment test. Therefore, as plaintiff has failed to adequately plead a constitutional violation, it is unnecessary to reach the subjective prong. See Gill, 2005 WL 755745, at *16 (quoting Odom, 1997 WL 576088, at *5).

### iii. Plaintiff's Cellmate

**\*12**  Liberally construed, the complaint also alleges that plaintiff was subjected to unconstitutional conditions of confinement because he was housed with a "violent gang member." Compl. at 11 ¶ 43, 7 ¶ 22. Plaintiff contends that, as a result of being housed with this inmate, he was unable to "sleep for days" and experienced "psychological pain." Id. at 11 ¶43. Defendants posit that plaintiff fails to a claim in this regard because he "does not allege that he suffered any injury or harm as a result." Dkt. No. 12-1 at 8.

Despite plaintiff's conclusory assertion, he has failed to proffer sufficient factual allegations to establish an Eighth Amendment claim based on his placement with his cellmate at Upstate. Iqbal, 556 U.S. at 678. Even viewing the facts in the light most favorable to plaintiff, he does not allege how being placed in the cell with this inmate "pose[d] an unreasonable risk of serious damage to [his] health." Darnell, 849 F.3d 17, 30 (2d Cir. 2017) (quoting Walker, 717 F.3d at 125). As discussed in section II.B.2. supra, the complaint does not state any factual allegations which could plausibly suggest that defendants' act of housing him with the purported gang member placed him at risk of harm. Indeed, plaintiff does not allege that his cellmate threatened or harmed him in any way, and plaintiff has not alleged any communication between him and defendants indicating that he informed defendants that his cellmate presented any specific risk to him, or that defendants were aware of, but disregarded, any such risk. See section II.B.2. supra.

Further, plaintiff's vague assertion that he lost sleep for an unspecified number of days as a result of being housed with this inmate fails to assert facts plausibly alleging an objectively serious injury. See generally Phelan v. Durniak, No. 9:10-CV-666 (FJS/RFT), 2014 WL 4759937, at *10 (N.D.N.Y. Sept. 24, 2014) (holding that the plaintiff's allegations that he was unable to sleep and suffered migraines because of the noise of the other inmates' televisions and radios late at night failed to satisfy the objective element of an Eighth Amendment claim); Cf. Mena v. City of New York, No. 13-CV-2430 (RJS), 2014 WL 4652570, at *4 (S.D.N.Y. Sept. 18, 2014) (concluding that the plaintiff plausibly alleged facts to support an inference that he was objectively prevented from sleeping at all for approximately two and one half days from being forced to lie on a cold, wet floor in a cell large enough for only one inmate as opposed to the three inmates who were housed there). Moreover, plaintiff's assertion that he suffered psychological pain is wholly conclusory and, as discussed in section II.B.2, the complaint contains no allegations that plaintiff ever sought therapy or other medical treatment following the alleged placement with his cellmate. See Iqbal, 556 U.S. at 664. Plaintiff has, therefore, failed to state an Eighth Amendment claim against defendants based on the alleged placement in the cell with a purported gang member.

In sum, the complaint fails to allege "conditions [that] either alone or in combination, pose[d] an unreasonable risk of serious damage to [the plaintiff's] health." Darnell, 849 F.3d at 30 (quoting Walker, 717 F.3d at 125). Accordingly, it is

2019 WL 7500501

recommended plaintiff's Eighth Amendment conditions of confinement claim be dismissed.

### C. First Amendment Retaliation

Plaintiff alleges that defendants retaliated against him by placing him in a cell with a "violent gang member" for threatening to file grievances and a federal civil rights lawsuit based on their denial of plaintiff's requests for protective custody, to loosen his chains and handcuffs, food and water, and bathroom access, in violation of his First Amendment rights. Compl. at 9-10 ¶ 39. The complaint may also be construed as asserting a First Amendment retaliation claim based on C.O. King's alleged threat to file a false misbehavior report against plaintiff. See id. at 6 ¶¶ 17. Defendants contend that plaintiff fails to sufficiently plead a First Amendment retaliation claim because "[p]laintiff's verbal requests for protective custody ... do not constitute protected speech," and even if they did, "the alleged application of tight handcuffs and chains" and the temporary denial of food, water, and bathroom access does not constitute adverse action. Dkt. No. 12-1 at 10, 11.

**\*13** In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must allege the following: that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). Because of the potential for abuse and the "ease with which claims of retaliation may be fabricated," courts must examine prisoner retaliation claims with "skepticism and particular care." Johnson v. Eggersdorf, 8 F. App'x 140, 144 (2d Cir. 2001) (summary order) (quoting Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)).

It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)). Further, courts in this Circuit have routinely found that a prisoner's threat of filing a grievance

or lawsuit constitutes protected activity. See Flemming v. King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at *4 (N.D.N.Y. June 20, 2016) (concluding that inmate's threat to file lawsuit sufficient to establish protected activity), report and recommendation adopted, No. 9:14-CV-0316 (DNH/DEP), 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016); Gibson v. Fischer, No. 9:10-CV-0968 (LEK/TWD), 2014 WL 7178346, at *15 (N.D.N.Y. Dec. 15, 2014) (denying summary judgment as to retaliation claim where the plaintiff threatened to file a grievance); Sprau v. Coughlin, 997 F. Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint sufficient to establish protected activity). Here, plaintiff's threat to file grievances and a lawsuit constitutes protected activity; therefore, the complaint satisfies the first prong of the First Amendment retaliation test. See Flemming, 2016 WL 5219995, at *4; Gibson, 2014 WL 7178346, at *15; Sprau v. Coughlin, 997 F. Supp. at 393.

To adequately plead an "adverse action," a plaintiff must allege that he was subject to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." Gill, 389 F.3d at 381 (internal quotation marks and citations omitted). Courts in this Circuit have found that a prison official defendant's "refusal of protective custody" can be an "adverse action" for the purposes of a First Amendment retaliation claim because it could cause a prisoner to "fear[ ] for his safety." Cruz v. Grosso, No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *7 (N.D.N.Y. May 23, 2014); see also Cruz v. Lee, No. 14-CV-4870 (NSR/JCM), 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) ("[p]laintiff alleges that [the d]efendants' denial of protective custody ... constitutes an adverse action because [the p]laintiff feared for his safety without custodial protection. It cannot be said, as a matter of law, that this fear would not deter a similarly situated individual from filing further lawsuits or grievances. Therefore, [the p]laintiff has sufficiently alleged an adverse action.").

Here, plaintiff alleges that he requested protective custody out of fear that a gang member would retaliate against him for his altercation at Clinton and that defendants denied his request. See Compl. at 5 ¶ 8. Thus, accepting plaintiff's allegations as true, defendants' denial of protective custody could be considered adverse action. See Lee, 2016 WL 1060330, at *6; Grosso, 2014 WL 2176256, at *6.

**\*14** As for the third element,

"[p]roof of causal connection can be established indirectly by showing that the protected activity was followed closely

2019 WL 7500501

by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant."

DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116 (2d Cir. 1987) (internal citations omitted). With regard to temporal proximity, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001).

However, as the Second Circuit explained:

> [P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. Accordingly, while we have held that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation, we have consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim.

Faulk v. Fisher, 545 F. App'x 56, 58 (2d Cir. 2013) (summary order) (internal citations and quotation marks omitted). For example, in Lee, the court concluded that an inmate sufficiently established a causal connection where he alleged facts demonstrating a "close temporal proximity" between the protected activity of filing a lawsuit and the adverse action of defendants denying his requests for protective custody "taken together with [the d]efendants' knowledge of the protected activity and statements tending to demonstrate a retaliatory motive." Lee, 2016 WL 1060330, at *7. Similarly, in Grosso, the inmate alleged that he informed the defendant of his pending lawsuit the same day that the defendant refused him protective custody status and that the defendant stated the reason for denying protective custody was because the inmate was "go[ing] against [prison] [a]dministration." Grosso, 2014 WL 2176256, at *7. Observing the temporal proximity of

the protected activity and adverse action, and noting that the defendant's statement "plausibly suggest[ed] a reason for the refusal of protective custody [that] related to retaliation," the Court concluded that the inmate established the causation prong for a First Amendment retaliation claim. Id.

Here, although close in temporal proximity, as the complaint makes clear, the adverse action of denying plaintiff's request for protective custody occurred prior to plaintiff threatening to file grievances and lawsuits, and well before plaintiff actually filed his two grievances or the present lawsuit. See Compl. at 6 ¶¶ 15, 20. Therefore, as the alleged adverse action preceded plaintiff's threat to file grievances and a lawsuit, plaintiff cannot show that defendants' denial of protective custody was motivated by this conduct. See, e.g., Gustafson v. Vill. of Fairport, 106 F. Supp. 3d 340, 353 (W.D.N.Y. 2015) (holding that the plaintiff failed to establish a causal link to support his First Amendment retaliation claim where the alleged adverse action of defendant police officers beating him preceded his constitutionally-protected expression of requesting an attorney).

**\*15** Additionally, insofar plaintiff's claim can be read to allege that defendants retaliated against him in violation of his First Amendment rights based on his repeated requests for protective custody, the complaint fails to state a claim because such requests do not appear to be constitutionally-protected speech. Rather, plaintiff's request for protective custody, in effect, constitutes a request for transfer to housing of his preference, which is not constitutionally protected speech. See Barrow v. Buren, No. 9:12-CV-01268 (MAD/CFH), 2015 WL 417084, at *13 (N.D.N.Y. Jan. 30, 2015) (concluding that an inmate's transfer requests were not constitutionally-protected speech); see generally McMahon v. Fischer, 446 F. App'x 354, 357 (2d Cir. 2011) (summary order) ("A prisoner has no right to housing in a particular facility"). Plaintiff's position would yield absurd results, as every denial of an oral request for protective custody status would give rise to a First Amendment retaliation claim. Therefore, the undersigned finds that the complaint fails to satisfy the first element for a First Amendment retaliation claim in this regard.

Moreover, to the extent that the complaint may be read as alleging that defendants retaliated against plaintiff for stating his intention to file grievances and lawsuits based on C.O. King's purported threat to file a false misbehavior report, even assuming arguendo that plaintiff's stated intention could be considered constitutionally-protected speech, plaintiff fails to state a First Amendment retaliation claim. See Compl. at 6 ¶

Case 9:22-cv-00242-AMN-MJK   Document 75   Filed 03/04/25   Page 490 of 531

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

16, 17. As articulated in the complaint, C.O. King informed plaintiff that he had been instructed to file a misbehavior report and that "the Sgt. want[ed] to write [him] a ticket" based on plaintiff's refusal to follow a direct order to lock into a cell shortly after stating that he would file grievances and lawsuits. See Compl. at 6 ¶¶ 17, 19. Plaintiff denies that he refused to follow a direct order from defendants. See id. at 6 ¶¶ 18. Therefore, liberally construing the complaint, plaintiff appears to allege that C.O. King threatened to file a false misbehavior report.

As an initial matter, plaintiff does not allege that C.O. King actually wrote a misbehavior report, and no misbehavior report is contained in plaintiff's submissions; rather, plaintiff merely asserts that C.O. King threatened write a misbehavior report. In any event, it is well settled that a correction officer's filing of a false misbehavior report to prevent an inmate from seeking redress does not rise to the level of a constitutional violation in the absence of evidence that the filing of the false report actually hindered or prevented the inmate from exercising his constitutional right to seek redress through either the prison grievance procedure or by filing a lawsuit. See Nelson v. Michalko, 35 F. Supp. 2d 289, 294 (W.D.N.Y. 1999); Husbands v. McClellan, 957 F. Supp. 403, 407 (W.D.N.Y. 1997). Here, plaintiff does not allege that C.O. King's purported threat to file a false misbehavior report in any way hindered or prevented him from exercising his First Amendment right to file grievances and lawsuits. Indeed, it is undisputed that plaintiff, in fact, did file two grievances and this lawsuit subsequent to C.O. King's purported threat. Accordingly, based on the foregoing, it is recommended that plaintiff's First Amendment retaliation claim be dismissed in its entirety and that defendants' motion be granted on this ground.

### D. Conspiracy

Plaintiff alleges that defendants "entered into an agreement that if [he] continue[d] to request protective custody status, and make their job extensive by filing extra paperwork[,] they ... [would] ... keep [him] locked in a holding cell, chained and tightly cuffed, without food, water or use of the bathroom, until [he] br[oke] down and forg[ot] about wanting protective custody." Compl. at 9 ¶ 37. Defendants argue that plaintiff's conspiracy claim must be dismissed because the underlying claims upon which it is based fail to state a claim for relief. See Dkt. No. 12-1 at 10.

**\*16** In order to support a claim for conspiracy pursuant to § 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009). "An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient." McRae v. Fischer, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432743, at *6 (N.D.N.Y. June 6, 2018), report and recommendation adopted, No. 9:17-CV-0146 (BKS/CFH), 2018 WL 3432700 (N.D.N.Y. July 16, 2018). Although exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. See Ciambriello, 292 F.3d at 325.

Here, even construing the facts in the light most favorable to plaintiff, plaintiff has failed to allege anything more than conclusory allegations of a conspiracy. There are no allegations outlining with specificity when, why, or how an alleged conspiracy occurred or the existence of an explicit or implicit agreement between any or all of the defendants. Even though exacting specifics are unnecessary at the pleading stage, the complaint is devoid of factual allegations establishing that defendants had any meeting of the minds in which they contemplated "break[ing] plaintiff down" until he "forgot about wanting protective custody status." Compl. at 9 ¶ 37; see Anilao, 774 F. Supp. 2d at 512-13. Rather, plaintiff merely alleges, in conclusory fashion, that defendants "entered into an agreement" to do so. Compl. at 9 ¶ 37. Likewise, plaintiff conclusorily alleges that defendants wanted to curtail him from requesting protective custody status in order to avoid "filing extra paperwork," but fails to offer any indication as to when, where, or how defendants agreed to execute the purported conspiracy. Compl. at 9 ¶ 37. Beyond stating that C.O. King informed plaintiff that Sgt. Hoffnagle wanted to write him a misbehavior report for failing to follow a direct order to lock into a cell, which plaintiff does not allege was ever filed, the complaint fails to plead a "meeting of the minds between any of the[ ] [d]efendants to act in concert to inflict a constitutional injury on [p]laintiff." Cusamano, 604 F. Supp. 2d at 432.

In any event, although not addressed by the parties, plaintiff's claim also fails as it is likely barred by intracorporate

2019 WL 7500501

conspiracy doctrine. The intracorporate conspiracy doctrine provides that officers, employees, and agents of a single corporate entity are legally incapable of conspiring together. See Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008). Although the Second Circuit has recognized that the doctrine applies in the Section 1985 context, see id., it has not passed directly on the doctrine's applicability in the Section 1983 context. However, district courts within the Circuit have applied the doctrine to such claims. See Vega v. Artus, 610 F. Supp. 2d 185, 205-06 (N.D.N.Y. 2009) (dismissing conspiracy claim pursuant to intracorporate conspiracy doctrine where all of the defendants were DOCCS employees acting within the scope of their employment); see also Williams v. Korines, No. 9:16-CV-1157 (FJS/TWD), 2018 WL 4521204, at *5 n.1 (N.D.N.Y. Sept. 21, 2018) (concluding that the intracorporate conspiracy doctrine applied to an inmate's Section 1983 conspiracy claim); Richard v. Dignean, 126 F. Supp. 3d 334, 338-39 (W.D.N.Y. 2015) (finding intracorporate conspiracy doctrine applicable to claim by inmate against prison officials for discrimination against him based on race and religion); Toliver v. Fischer, No. 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at *22 (N.D.N.Y. Jan. 29, 2015) (dismissing conspiracy claim by inmate against DOCCS personnel under the intracorporate conspiracy doctrine).

 *17 An exception to the intracorporate conspiracy doctrine applies when the individuals are "pursuing personal interests wholly separate and apart from the entity." Ali v. Connick, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). However, a plaintiff must show more "than simply alleging that the defendants were motivated by personal bias against the plaintiff." Medina v. Hunt, No. 9:05-CV-1460 (DNH), 2008 WL 4426748, at *8 (N.D.N.Y. Sept. 25, 2008); see also Vega, 610 F. Supp. 2d at 205 (holding that "in order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against plaintiff.").

Here, all defendants were DOCCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intracorporate conspiracy doctrine applies. See Vega, 610 F. Supp. 2d at 205-06. Additionally, plaintiff has not alleged facts to plausibly suggest that the exception to the intracorporate conspiracy doctrine applies. Plaintiff's conclusory allegation

that defendants conspired to violate his constitutional rights in retaliation for his repeated requests for protective custody, which would have "ma[de] their job extensive by" creating "extra paperwork" for them to file, Compl. at 9 ¶ 37, does not appear to establish that defendants acted out of personal interests wholly separate and apart from Upstate. See, e.g., Richard v. Leclaire, No. 9:15-CV-00006 (BKS/TWD), 2017 WL 9511181, at *13, (N.D.N.Y. July 10, 2017) (concluding that the *pro se* inmate failed to allege facts to establish the personal interest exception to the intracorporation conspiracy doctrine where he alleged that the defendants conspired to file a false misbehavior report and rig a disciplinary hearing so that he would be found guilty in retaliation for being found not guilty in a prior prison disciplinary proceeding). Indeed, the Complaint specifically alleges that, "[a]t all relevant times[,] defendants acted under color of law," Compl. at 5 ¶ 6, which contradicts any claim that defendants acted out of personal interest wholly distinct from those of Upstate. See Dowd v. DeMarco, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018) (holding that the personal interest exception to the intracorporation conspiracy doctrine did not apply where the inmate's complaint alleged that the defendant correction officers' purported acts "were conducted within the scope of their official duties or employment." (internal quotation marks omitted)). Rather, plaintiff appears to allege that defendants acted out of personal bias against him, which is insufficient to defeat the application of the intracorporate conspiracy doctrine. See generally Medina, 2008 WL 4426748, at *8.

Accordingly, it is recommended that plaintiff's conspiracy claim be dismissed.

### E. Supervisory Liability

Plaintiff alleges that, after he informed Sgt. Hoffnagle that he desired to be placed on protective custody status, Sgt. Hoffnagle "sent his subordinates[,]" C.O. King and C.O. Hollenbeck, to "dissuade [him from] checking into [protective custody] by threatening to issue a misbehavior report," after which the alleged First and Eighth Amendment violations occurred. Compl. at 12 ¶ 45. Defendants argue that plaintiff's supervisory claims against Sgt. Hoffnagle must be dismissed because the underlying First and Eighth Amendment claims upon which they are based fail to state claims upon which relief can be granted. See Dkt. No. 12-1 at 8-9.

**\*18** Supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). In this Circuit, the " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (additional citations omitted)). However, supervisory personnel may be considered personally involved in their subordinate's conduct if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Wright, 21 F.3d at 501 (additional citation omitted)). [10] Absent a subordinate's underlying constitutional violation, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability.").

[10]    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011) (recognizing that several District Courts in the Second Circuit have debated Iqbal's impact on the five Colon factors), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175, 185 (W.D.N.Y.

2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Construing the complaint liberally, plaintiff appears to allege supervisory liability under Colon factor one. See Colon, 58 F.3d at 873. As discussed in section II.B.1 supra, plaintiff has plausibly asserted a claim for excessive force. Therefore, it is recommended that defendants' motion to dismiss plaintiff's supervisory liability claim against Sgt. Haffnagle, insofar as it is based upon his excessive force claim, be denied. However, as discussed in sections II.B.2.-D supra, plaintiff has failed to adequately allege the remainder of his constitutional claims and, therefore, cannot state a claim for § 1983 supervisory liability based upon those allegations. See Elek, 815 F. Supp. 2d at 808.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory liability claim against Sgt. Hoffnagle insofar as it is based upon plaintiff's Eighth Amendment failure to protect and conditions of confinement claims and First Amendment retaliation claim. It is further recommended that defendants' motion to dismiss plaintiff's supervisory claim be denied insofar as it is based upon plaintiff's Eighth Amendment excessive force claim.

### III. Conclusion

**\*19 WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion to Dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **GRANTED IN PART** and the following of plaintiff's claims be **DISMISSED WITH PREJUDICE**:

(1) Eighth Amendment failure to protect claim;

(2) Eighth Amendment conditions of confinement claim;

(3) Conspiracy claim; and

(4) First Amendment retaliation claim;

(5) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment failure to protect, conditions of confinement, and

Case 9:22-cv-00242-AMN-MJK     Document 75     Filed 03/04/25     Page 493 of 531

Livingston v. Hoffnagle, Not Reported in Fed. Supp. (2019)

2019 WL 7500501

conspiracy claims, and First Amendment retaliation claim, and it is further

**RECOMMENDED**, that defendants' motion to dismiss based upon Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) be **DENIED** as to plaintiff's:

> (1) Eighth Amendment excessive force claim;

> (2) Supervisory claim against Sgt. Hoffnagle insofar as that claim is based upon plaintiff's Eighth Amendment excessive force claim; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72. [11]

[11]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 7500501

---

End of Document          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1. Docket 9:19-CV-00353**<br>Livingston v. Hoffnagle et al | — | N.D.N.Y. | Mar. 21, 2019 | Docket |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (4)**

**Direct History (2)**

1. Livingston v. Hoffnagle 👓
   2019 WL 7500501 , N.D.N.Y. , Nov. 08, 2019

*Report and Recommendation Adopted by*

2. Livingston v. Hoffnagle
   2020 WL 95431 , N.D.N.Y. , Jan. 08, 2020

**Related References (2)**

3. Livingston v. Hoffnagle
   2021 WL 3888283 , N.D.N.Y. , Aug. 03, 2021

*Report and Recommendation Adopted by*

4. Livingston v. Hoffnagle
   2021 WL 3885247 , N.D.N.Y. , Aug. 31, 2021

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2006 WL 2333961
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael MORENO, Plaintiff,
v.
T. RICKS, Superintendent, Upstate
Correctional Facility, et al., Defendants.

No. 9:02-CV-1435 (PAM/GJD).
|
Aug. 9, 2006.

**Attorneys and Law Firms**

Michael Moreno, Attica, NY, pro se.

Charles J. Quackenbush, New York State Attorney General,
The Capitol Albany, NY, for Defendants.

### MEMORANDUM AND ORDER

PAUL A. MAGNUSON, District Judge.

 *1  This matter is before the Court [1] on Defendants' Motion
for Summary Judgment. Plaintiff has not opposed the Motion.
Based on the submissions by Defendants, the Court finds
that summary judgment is appropriate because there are
no genuine issues of material fact remaining for trial and
Defendants are entitled to judgment as a matter of law.

[1]     Pursuant to an assignment under 28 U.S.C. §
        294(d), the undersigned is the Judge of record in
        this case.

### BACKGROUND

Plaintiff is an inmate at the Attica Correctional Facility, but
his claims stem from events that occurred during his time at
the Upstate Correctional Facility in New York ("Upstate").
Upstate is a maximum security facility that operates as a
Special Housing Facility for inmates serving disciplinary
sentences. The prison is designed to segregate inmates with
histories of significant disciplinary problems from the general
prison population. Defendants are numerous prison officials
at Upstate.

When Plaintiff arrived at Upstate, he was assigned to a
double-bunk cell. He complained constantly about having to
share a cell and sought to be assigned to a single-bunk cell
or transferred to another facility. On August 21, 2001, he was
assigned a new cellmate, Israel Diaz. Plaintiff continued to
complain about the double cell, but Plaintiff and Diaz bunked
together without conflict for almost a month. Prison officials
observed Diaz's demeanor and behavior to be peaceful and
non-aggressive. Plaintiff never complained to prison staff
of any threat of physical danger from Diaz, although he
continued to ask for a single cell or to be transferred.

On September 22, 2001, Plaintiff stood inside his cell with
his arms extended through the feedup hatch in his door.
This interfered with the delivery of lunch trays through the
hatch. Prison staff repeatedly ordered him to retract his arms,
but Plaintiff said he would not move his as until he was
assigned to a single cell. [2] Plaintiff voiced no complaints
about Diaz, and Diaz had no visible reaction to Plaintiff's
behavior. That evening, Defendant Royce Corbine heard
someone kicking Plaintiff's cell door, and when he arrived
at the cell, he observed an injury to Plaintiff's face. Corbine
summoned Defendant William Allen, who removed Diaz and
Plaintiff from the cell. Plaintiff said that Diaz had attacked
him, but Diaz denied any altercation and said Plaintiff had
injured himself. No prison officials were present during the
altercation. Plaintiff was immediately brought to a nurse for
medical treatment, and the nurse cleaned and bandaged a
cut on Plaintiff's lip. There were no other injuries other than
some minor scratches and abrasions on his knuckles. At a
subsequent disciplinary hearing, Plaintiff was convicted of
fighting, but Diaz was found not guilty.

[2]     Plaintiff was later convicted in an administrative
        hearing of refusing to obey direct orders to remove
        his arms from the feedup hatch.

Plaintiff brings a deliberate indifference claim under the
Eighth Amendment based on the altercation with Diaz. The
Amended Complaint alleges that Plaintiff and Diaz had asked
prison officials several times to be moved to separate cells,
but the officials refused. Plaintiff further avers that prison
officials told Diaz that Plaintiff was an informant and a
homosexual, which accelerated the conflict. According to
the Amended Complaint, prison staff stood by and mocked
Plaintiff during the altercation.

2006 WL 2333961

**\*2** In addition to the September 22, 2001 incident, Plaintiff also brings claims against Defendants for denial of recreation, closing his hand in the feedup hatch, spreading rumors, and giving his mail to other inmates. Finally, Plaintiff alleges that officials retaliated against him for filing this case by depriving him of food, banging on his cell wall on one occasion, and writing false misbehavior reports in September 2001 and May 2002.

## DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must resolve ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). However, as the United States Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quotations omitted).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 323. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

### B. Qualified Immunity

Defendants assert they are entitled to qualified immunity on all of Plaintiff's claims. "For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore,* 237 F.3d 156, 162 (2d Cir.2001) (citation omitted). A court must first determine whether the facts in the record show a violation of the plaintiff's constitutional rights. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001); *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Saucier* ). If there is no constitutional

violation, the inquiry ends, and the defendant is entitled to summary judgment on qualified immunity grounds. *See Saucier,* 533 U.S. at 201; *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211-12 (2d Cir.2003). However, if the facts establish a constitutional violation, the court must then decide if the constitutional right was clearly established at the time of the alleged violation. *See Saucier,* 533 U.S. at 201; *Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002).

1. *Eighth Amendment Claim*

**\*3** Plaintiff's primary constitutional claim is founded on the Eighth Amendment's prescript that prison officials must guard the safety of inmates in their custody. *See Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996). To show deliberate indifference to safety, "the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm" and "that the defendant prison officials possessed sufficient culpable intent." *Id.*

The record before the Court reveals that Plaintiff and Diaz lived peacefully together for almost a month. Diaz was quiet and compliant. Plaintiff never told corrections officers that Diaz threatened him or posed a risk of serious harm. At a disciplinary hearing after the purported fight, Plaintiff was convicted for fighting, but Diaz was not. Plaintiff has not demonstrated that the conditions of his incarceration posed a serious risk of substantial harm. Plaintiff also has no evidence that any Defendant acted with the requisite state of mind. There was no history of violence between Plaintiff and his cellmate, and neither Plaintiff nor Diaz had complained to prison staff about each other. Thus, Defendants had no cause to believe that Plaintiff was in danger.

Plaintiff has failed to show either that he was incarcerated under conditions posing a serious risk of grave harm or that any Defendant possessed culpable intent. Defendants are therefore entitled to qualified immunity on the Eighth Amendment claim because Plaintiff has not shown a violation of a constitutional right. [3]

[3]     The Eighth Amendment claim also fails because Plaintiff suffered no more than minor and temporary injuries. *See Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (stating that a de minimus injury does not amount to a violation of the Eighth Amendment).

2. *Retaliation*

Plaintiff asserts several bases for his retaliation claim. He avers that corrections officers issued a misbehavior report on September 26, 2001,[4] in retaliation for filing grievances and complaints. Plaintiff also alleges that prison officials deprived him of food on four occasions in November 2002 in retaliation for filing this case.

[4]    The record actually contains two misbehavior reports issued on this day, and the Court will address both reports.

Prison officials may not retaliate against inmates for exercising their rights to access the courts or petition the government for the redress of grievances. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To establish a claim for retaliation under § 1983, Plaintiff must show that: "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." *Spies v. Kelleher,* 151 Fed. App'x 72, 73 (2d Cir.2005) (citing *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003)). Courts should view inmates' retaliation claims with skepticism because retaliation claims are easily fabricated. *See id.* (citation omitted).

Plaintiff's claim of retaliation based on the September 2001 misbehavior reports fail for lack of causation. There is no evidence from which to infer that his grievances and complaints caused prison staff to file the reports. Rather, prison officials issued one of the reports because Plaintiff prevented his cellmate from entering their cell by holding the cell door closed, and the other report because Plaintiff was lying on the wrong bunk in his cell.

**\*4** The claim of retaliation based on deprivation of food also fails for lack of causation. Prison records indicate that Plaintiff's meals were withheld on only two occasions in November 2002, the reason being that Plaintiff refused to comply with orders to stand in the back of his cell during meal delivery. On another occasion, Plaintiff complained of being served a partial meal, but the grievance was investigated and found to be false. There is no evidence in the record supporting a causal connection between protected conduct and the withholding of food.

Plaintiff has not shown that Defendants retaliated against him either by filing misbehavior reports or by withholding food. Accordingly, Defendants are entitled to qualified immunity on these claims.

### 3. *Additional Claims*

Turning to Plaintiff's remaining claims, there is no evidence whatsoever that any prison official closed Plaintiff's hand in a feedup hatch, spread rumors about him, gave his mail to other inmates, denied him recreation, banged on his cell door, or issued a misbehavior report in May 2002. A party opposing summary judgment may not rely solely on the allegations in the complaint but must identify specific factual issues in the record. *See Anderson,* 477 U.S. at 256. Accordingly, Defendants are entitled to summary judgment on these claims.

### CONCLUSION

Defendants are entitled to summary judgment on all claims. Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Docket No. 64) is **GRANTED,** and this case is **DISMISSED with prejudice.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2333961

---

End of Document        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

🏴 KeyCite Blue Flag – Appeal Notification

Appeal Filed by  Ryder v. Czajka,  2nd Cir.,  February 20, 2025

2025 WL 391179

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Joshua RYDER, Plaintiff,

v.

Paul CZAJKA, Columbia Cnty. Dist. Atty; Ryan Carty,
Columbia Cnty. Assist. Dist. Atty; Columbia County
District Atty's Office; Columbia County; Jason C.
Finn, Hudson Police Detective Sergeant; Brennan
Keeler, N.Y. State Trooper; Michael J. Burns, N.Y.
State Police Investigator; Sean Tashjian, N.Y. State
Police Investigator David Jimenez, N.Y. State Police
Senior Investigator; and John Does #1-10, Defendants.

1:23-CV-1102 (GTS/MJK)
|
Signed February 4, 2025

**Attorneys and Law Firms**

LEO GLICKMAN, ESQ., STOLL GLICKMAN &
BELLINA LLP, Counsel for Plaintiff, 300 Cadman Plaza
West, Suite 12th Floor, Brooklyn, NY 11201.

STEPHEN M. GROUDINE, ESQ., MURPHY BURNS LLP,
Counsel for County Defendants and Defendant Finn, 407
Albany Shaker Road, Loudonville, NY 12211.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, AIMEE COWAN, ESQ., Assistant Attorney
General, Counsel for State Defendants, 300 South Green
Street, Suite 300, Syracuse, NY 13202.

**<u>DECISION and ORDER</u>**

GLENN T. SUDDABY, United States District Judge

 **\*1**  Currently before the Court, in this civil rights action
brought by Joshua Ryder ("Plaintiff") against the 19
above-captioned individuals and entities ("Defendants"),
are essentially [1] the following two motions: (1) a motion
filed by Columbia County District Attorney Paul Czajka,
Columbia County Assistant District Attorney Ryan Carty, the
Columbia County District Attorney's Office, and Columbia

County ("the County Defendants"), as well as Hudson Police
Detective Sergeant Jason C. Finn ("Defendant Finn"), to
dismiss Plaintiff's claims against them for lack of subject-
matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and
failure to state a claim upon which relief can be granted
pursuant to Fed. R. Civ. P. 12(b)(6); and (2) a motion filed
by New York State Trooper Brennan Keeler, New York State
Police Investigator Michael J. Burns, New York State Police
Senior Investigator David Jimenez, and New York State
Police Investigator Sean Tashjian ("the State Defendants") to
dismiss Plaintiff's claims against them for failure to state a
claim upon which relief can be granted pursuant to Fed. R.
Civ. P. 12(b)(6). (Dkt. Nos. 4, 13, 18, 31, 36.) For the reasons
set forth below, the motion filed by the County Defendants
and Defendant Finn is granted, and the motion filed by the
State Defendants is granted.

1      The motion practice in this case has been
complicated by (1) the fact that three of the
four State Defendants filed a motion to dismiss
before the fourth State Defendant had been served
(necessitating the filing of a separate motion to
dismiss by that fourth State Defendant after such
service), (2) the fact that Plaintiff filed an Amended
Complaint after that fourth State Defendants had
filed a motion to dismiss the original Complaint
(necessitating the filing of supplemental briefing
by all movants), and (3) the fact that one of the
aforementioned supplemental briefs appeared in
the form of yet another motion. For the sake of
simplicity and clarity in this Decision and Order,
the Court has combined all motions, and briefs,
into two sets: one by the County Defendants and
Defendant Finn, and one by the State Defendants.

**I. RELEVANT BACKGROUND**

  **A. Plaintiff's Claims**

Generally, Plaintiff's Amended Complaint alleges that
Defendants committed various forms of misconduct between
his arrest for a felony and misdemeanor on September 7,
2021, and the termination of his employment as a welfare
fraud investigator in the Columbia County Department of
Social Services on November 18, 2022. (Dkt. No. 19.) More
specifically, the Amended Complaint alleges as follows: on
September 7, 2021, Plaintiff was detained for questioning
by members of local and state law enforcement without
probable cause or reasonable suspicion as part of a City
of Hudson Police Department investigation of a local gang

called "Men of Business" in an operation nicknamed "Men Outta Business"; on October 29, 2021, Plaintiff was arrested for, and charged with, Third Degree Criminal Sale of a Firearm and Fifth Degree Conspiracy by members of state law enforcement without probable cause or reasonable suspicion; over the course of more than one year, he was then forced to report to court for multiple appearances to defend himself against false charges; but on December 12, 2022, the Columbia County District Attorney's Office admitted to having no good faith basis to oppose Plaintiff's motion to dismiss the criminal charges against him; and on December 16, 2022, the charges were dismissed. (*Id.*)

**\*2** The Amended Complaint also alleges that, meanwhile, in response to a request pursuant to the New York State Freedom of Information Law ("FOIL") dated September 14, 2022, the District Attorney's Office improperly disclosed the contents of Plaintiff's wiretapped text communications with a narcotics-distribution suspect (Khalid Lord) to a private lawyer (Elena DeFio-Kean, Esq.) and her law firm (Hinman Straub PC) on September 16, 2022. (*Id.*) Moreover, the Amended Complaint alleges that Ms. DeFio then sent the text communications to the Columbia County Attorney (Rob Fitzsimmons, Esq.) on October 18, 2022, nine days after which Plaintiff was placed on administrative leave by a member of the County Human Resources Department (April DeLaurentis) and then one week later was improperly given an ultimatum by another member of the County Human Resources Department (Michaele Williams-Riordan): either voluntarily resign or contest his termination (and right to receive unemployment compensation) at a hearing. (*Id.*) Finally, the Amended Complaint alleges that, under coercion, Plaintiff resigned on November 18, 2022. (*Id.*)

Generally, based on these factual allegations, the Amended Complaint asserts five claims: (1) a claim of unlawful disclosure and use of eavesdropping information pursuant to 18 U.S.C. §§ 2517 and 2520(g) against the County Defendants and John Does #1-10 ("First Claim"); [2] (2) a claim of false arrest and false imprisonment pursuant to the Fourth Amendment and 42 U.S.C. § 1983 against Detective Finn and the State Defendants ("Second Claim"); (3) a claim of malicious prosecution pursuant to 42 U.S.C. § 1983 against Detective Finn and the State Defendants ("Third Claim"); (4) a claim of deprivation of the right to a fair trial pursuant to 42 U.S.C. § 1983 against Detective Finn and the State Defendants ("Fourth Claim"); and (5) a claim of tortious interference with contractual relations against Defendants

Czajka and Carty and the Office of the Columbia County District Attorney ("Fifth Claim"). (*Id.*)

[2]    The Court notes that the Amended Complaint does *not* claim that this disclosure violated FOIL. (*See generally* Dkt. No. 19, at ¶¶ 39, 40, 41, 50-57, 73-78.) Nor does the Amended Complaint claim that the text communications were obtained without a warrant or through entrapment, or were in any way distorted. (*Id.* at ¶¶ 5, 8, 25, 27, 38, 40, 43, 50-57, 77.) Nor does the Amended Complaint allege or claim that the text communications were sealed at the time of disclosure. (*Id.* at ¶¶ 8, 40, 43, 50-57, 77; *compare* Dkt. No. 31, Attach. 4, at 10 [attaching page "8" of Defs.' Suppl. Memo. of Law, asserting the materials were unsealed] *with* Dkt. No. 37 [Plf.'s Reply Memo. of Law, failing to deny that assertion].) Rather, the Amended Complaint claims that Ms. DeFio-Kean and Hinman Straub were "prohibited recipients" under 18 U.S.C. § 2517. (*Id.* at ¶¶ 39-40, 52.) Finally, to help establish the timeliness of this claim, the Amended Complaint (dated November 14, 2023) claims that less than two years have elapsed since May 13, 2022, when Defendant Czajka gave Plaintiff notice of the eavesdropping warrant (although that notice had been due 90 days after the August 9, 2021, expiration of the warrant, under state law). (*Id.* at ¶¶ 27, 57.)

**B. Parties' Briefing on Defendants' Motions to Dismiss**

**1. Motion Filed by the County Defendants and Defendant Finn**

**a. Moving Defendants' Memoranda of Law-in Chief**

Generally, in their memoranda of law-in chief, the County Defendants and Defendant Finn assert the following six arguments. (Dkt. No. 4, Attach. 3; Dkt. No. 31, Attach. 4.) First, the moving Defendants argue, Plaintiff's First and Fifth Claims against Defendant Columbia County District Attorney's Office must be dismissed, because that Office lacks any legal existence distinct from the District Attorney, and thus is not an entity capable of being sued. (*Id.*)

Second, the moving Defendants argue, Plaintiff's First and Fifth Claims against Defendant Czajka must be dismissed for numerous alternative reasons. (*Id.*) More specifically, Defendants argue, Plaintiff's First Claim against Defendant Czajka must be dismissed for two reasons: (a) to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Czajka disclosed the material in question as part of his prosecution of Plaintiff (which appears to be the case from the timing of the purported pre-dismissal disclosure to a County official performing an investigation for the County), the claim must be dismissed, because it alleges that Defendant Czajka was acting in his prosecutorial capacity, and thus he is absolutely immune from prosecution under the Eleventh Amendment (regardless of whether that claim is asserted against Defendant Czajka in his official capacity or his individual capacity, and regardless of whether the Amended Complaint alleges that Defendant Czajka conspired with others to deprive Plaintiff of his rights, because the immunity attaches to Defendant Czajka's function, not the manner in which he performed it); and (b) to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Czajka acted in an administrative capacity, the claim is not actionable, because the claim would be alleging that he acted as an agent of the County (not State), and the Amended Complaint fails to allege facts plausibly suggesting that there has been a disclosure to anyone other than County officials and/or employees so as to satisfy the third-party requirement of 18 U.S.C. § 2520 (which is especially true given the Amended Complaint's nefailure to allege facts plausibly suggesting that Defendant Czajka personally acted, much less acted willfully and unlawfully). (*Id.*)

**\*3** Similarly, Defendants argue, Plaintiff's Fifth Claim against Defendant Czajka must be dismissed for four reasons: (a) the Amended Complaint fails to allege facts plausibly suggesting either the relevant terms of the contract that were breached or Defendant Czajka's knowledge of that contract; (b) in any event, the Amended Complaint fails to allege facts plausibly suggesting that the contract in question was with a third party, because Plaintiff's employment contract was allegedly with the County, which employed Defendant Czajka; (c) in any event, the Amended Complaint fails to allege facts plausibly suggesting that the contract in question was breached by that third party, only that his contractual relationship with the third party was "injured" when that third party coerced him to resign (as alleged in Paragraph 78 of the Amended Complaint); and (d) in any event, Plaintiff's Notice of Claim (the filing of which is required to bring this supplemental state law claim) did not reveal a theory

of liability premised on a claim of tortious interference with contract. (*Id.*)

Third, the moving Defendants argue, Plaintiff's First and Fifth Claims against Defendant Carty must be dismissed for reasons similar to those that his First and Fifth Claims against Defendant Czajka must be dismissed (which are stated in the preceding two paragraphs). (*Id.*) To those reasons, the moving Defendants add that, to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Carty acted in an administrative capacity, the claim must be dismissed for the alternative reason that the Amended Complaint alleges only a proper FOIL disclosure of unsealed material by one County agent to another County agent who was conducting an investigation on behalf of the County, as permitted by 18 U.S.C. § 2517(1),(2). (*Id.*)

Fourth, the moving Defendants argue, in the alternative, Plaintiff's First and Fifth Claims against the Defendants Columbia County, Czajka, and Carty must be dismissed for two reasons: (a) on November 17, 2022, Plaintiff knowingly, and with the representation of his labor union, executed a Stipulation of Settlement Agreement which, in pertinent part, released and discharged the "COUNTY OF COLUMBIA, ... [its] officials, ... [and its] employees ... from all actions, causes of actions, suits, ... [and] contractual benefits pursuant to any collective bargaining agreements ... arising out of [Plaintiff's] employment by the County ..."; and (b) although Plaintiff did not explicitly incorporate the Settlement Agreement into his Amended Complaint, the Court may nonetheless consider it on the moving Defendants' motion to dismiss because it is integral to the Amended Complaint, authentic, accurate and relevant. (*Id.*)

Fifth, the moving Defendants argue, Plaintiff's Second, Third and Fourth Claims against Defendant Finn must be dismissed, because Plaintiff has failed to allege facts plausibly suggesting the personal involvement and direct intentional participation of Finn in the constitutional violations alleged for the following reasons: (a) Plaintiff acknowledges that it was not Finn but Defendant Keeler who arrested him; (b) Plaintiff acknowledges that it was not Finn but Defendant Burns who commenced the criminal prosecution against him; and (c) Plaintiff does not even allege that Finn was present at Plaintiff's arrest by state police, such that Finn could have intervened in that arrest. (*Id.*)

Sixth, the moving Defendants argue, to the extent that Plaintiff's claims for punitive damages against Defendant

Columbia County District Attorney's Office and Defendants Czajka and Carty in their official capacity survive the above-stated arguments, those claims must be stricken, because it is clearly established that no claim for punitive damages lies against a governmental entity. (*Id.*)

**b. Plaintiff's Opposition Memorandum of Law**

Generally, in his opposition memorandum of law, Plaintiff asserts the following five arguments. (Dkt. No. 37.) First, Plaintiff argues, his First Claim against Defendant Columbia County District Attorney's Office is actionable for the following reasons: (a) the claim is permitted by the plain language of 18 U.S.C. § 2520(a), which provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate"; and (b) in *Organizacion JD Ltda. v. U.S. Department of Justice*, 18 F.3d 91 (2d Cir. 1994), the Second Circuit concluded that governmental entities (such as a district attorney's office) are potentially liable under similar language in a related stored communications statute, 18 U.S.C. § 2707 (which provides that "any ... person aggrieved by any violation of this chapter ... may, in a civil action, recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate"). (*Id.*)

 **\*4** Second, Plaintiff argues, his First and Fifth Claims against Defendant Czajka are actionable for numerous reasons. (*Id.*) More specifically, Plaintiff argues, his First Claim against Defendant Czajka is actionable, because Czajka is not absolutely immune from liability given that he was not acting as an officer of the court when he allegedly disclosed the eavesdropped materials but was simply responding to a FOIL request by a private lawyer (as alleged in Paragraphs 39-41 of the Amended Complaint). (*Id.*)

Similarly, Plaintiff argues, his Fifth Claim against Defendant Czajka is actionable for the following reasons: (a) Paragraph 74 of the Amended Complaint alleges facts plausibly suggesting the relevant term of the collective bargaining agreement that was breached (i.e., the provision regarding Plaintiff's continuing employment with the County); (b) the Amended Complaint alleges facts plausibly suggesting that the contract in question was with a third party, because Defendant Columbia County District Attorney's Office is

not an administrative arm of Columbia County; (c) although the Amended Complaint does not use the word "breach," it alleges facts plausibly suggesting that the contract in question was breached by that third party, by alleging that two employees of Columbia County (part of or together with the Columbia County Human Resources Department) coerced him to resign by placing him on leave and then telling him that, within "just a couple of days," he "must resign or contest ... [his] termination [at a] hearing"; and (d) the Notice of Claim sufficiently describes a theory of liability of tortious interference with contract by stating that, under duress of the illegally disclosed intercepted communications, he was forced to sign a contract resigning from his employment (stating all of the elements of a claim of tortious interference with contract, and presenting information sufficient for Defendant Czajka to investigate that claim). (*Id.*)

Third, Plaintiff argues, his First and Fifth Claims against Defendant Carty are actionable for the same reasons that his his First and Fifth Claims against Defendant Czajka are actionable (which are stated in the preceding two paragraphs). (*Id.*)

Fourth, Plaintiff argues, his First and Fifth Claims against the Defendants Columbia County, Czajka, and Carty survive the Stipulation of Settlement Agreement for three reasons: (a) the Settlement Agreement is not integral to the Amended Complaint, because the moving Defendants offer no citation to the Amended Complaint showing how it relies heavily on the Settlement Agreement's terms and effect (a requirement of integration); (b) any agreement, written or otherwise, that Plaintiff shall resign and release the County from liability is void because it was obtained under duress and illegal means (as Plaintiff alleged regarding his termination in his Amended Complaint), because a choice between contesting his termination in a hearing and voluntarily resigning is no choice at all, especially when the choice was created by illegally obtained information; and (c) in any event, the Settlement Agreement does not release Defendants Czajka and Carty, because the District Attorney's Office and its employees are distinct from, and not part of, Columbia County. (*Id.*)

Fifth, Plaintiff argues, his Second, Third and Fourth Claims against Defendant Finn are actionable for the following reasons: (a) Defendant Finn's presence at Plaintiff's arrest is not a prerequisite for false arrest liability; (b) Paragraphs 21, 22, 28, 30, 59, and 63 of the Amended Complaint allege facts plausibly suggesting that, at the very least, Finn had

reason to know that a false arrest of Plaintiff was likely to occur (most notably due to Finn's presence on September 7, 2021, when Plaintiff was threatened that he would suffer the consequences if he did not cooperate in the investigation), yet he did not intervene to stop it; and (c) page 2 of the Incident Report memorializing Plaintiff's arrest on October 29, 2021, [3] identifies the investigative team as "SIU-21-199"), which includes Finn. (*Id.*)

[3]    Although Plaintiff's opposition memorandum of law refers to his arrest as occurring on October 20, 2021, both the paragraph of the Amended Complaint that it cites and the Incident Report itself state that his arrest occurred on October 29, 2021. (Dkt. No. 37, at 26 [attaching page "20" of Plf.'s Opp'n Memo. of Law]; Dkt. No. 19, at ¶ 30; Dkt. No. 19, Attach. 3, at 1.)

**c. Moving Defendants' Reply Memorandum of Law**

 **\*5**  Generally, in their reply memorandum of law, the County Defendants and Defendant Finn assert the following six arguments. (Dkt. No. 40.) First, the moving Defendants argue, despite the fact that Defendant Columbia County District Attorney's Office is an "entity," none of the cases cited by Plaintiff (including *Organizacion JD Ltda*) stand for the point of law that a federal statute allows a plaintiff to sue an entity that is otherwise recognized as non-suable. (*Id.*) Furthermore, the moving Defendants argue, Plaintiff has also asserted these two claims against three suable Defendants (i.e., Defendants Columbia County, District Attorney Czajka, and Assistant District Attorney Carty), rendering the claims against Defendant Columbia County District Attorney's Office duplicative and unnecessary. (*Id.*)

Second, the moving Defendants argue, Plaintiff's First and Fifth Claims against Defendant Czajka must be dismissed for numerous reasons. (*Id.*) More specifically, Defendants argue, Plaintiff's First Claim against Defendant Czajka must be dismissed because, although Plaintiff speculates (in his opposition memorandum of law) that Czajka *directed* Defendant Carty to disclose the materials in question to the private attorney who had submitted the FOIL request, the Amended Complaint (particularly Paragraph 41) is conspicuously devoid of any factual allegations plausibly suggesting that Czajka *directed* Carty to do so: it merely contains an allegation (in Paragraph 39) that the attorney

*addressed* her FOIL request to Czajka, which is insufficient. (*Id.*)

Similarly, the moving Defendants argue, Plaintiff's Fifth Claim against Defendant Czajka must be dismissed because, despite Plaintiff's argument to the contrary, his Amended Complaint fails to alleges key elements of a claim of tortious interference with contract, and that his Notice of Claim does not give faire notice of such a claim. (*Id.*) More specifically, Defendants argue as follows: (a) in addition to failing to allege that Plaintiff was a party to the collective bargaining agreement he references, the Amended Complaint fails to allege facts plausibly suggesting that a term of the collective bargaining agreement that protects Plaintiff's right to continued employment under the circumstances alleged (i.e., when the options were a disciplinary hearing or voluntary resignation); (b) the fact that Defendant Columbia County District Attorney's Office is distinct in certain respects from Defendant Columbia (particularly in its role as a prosecutor for the state) County does not render it a third party, particularly where Plaintiff alleges that Defendant Czajka was not acting as a prosecutor at the time in question (but as an administrator, which could only be for the County); (c) Plaintiff concedes that his Amended Complaint does not use the word "breach," and an "injur[y]" is not necessarily a breach, particularly where, as here, the Amended Complaint alleges no specific provision of the collective bargaining agreement that protects Plaintiff's right to continued employment under the circumstances alleged; and (d) the Notice of Claim conspicuously fails to reference either the existence or breach of any contract between Plaintiff and Columbia County (including but not limited to a collective bargaining agreement), and thus it fails to sufficiently describe a theory of liability of tortious interference with contract. (*Id.*)

Third, the moving Defendants argue, Plaintiff's First and Fifth Claims against Defendant Carty must be dismissed for each of the two alternative reasons originally stated in their supplemental memorandum of law-in chief (which have not been successfully rebutted by Plaintiff in his opposition memorandum of law). (*Id.*)

Fourth, the moving Defendants argue, contrary to Plaintiff's argument, his First and Fifth Claims against the Defendants Columbia County, Czajka, and Carty do not survive the Stipulation of Settlement Agreement for three reasons: (a) the Settlement Agreement is integral to the Amended Complaint, because Paragraphs 43 and 53 of the Amended Complaint

expressly allege that Plaintiff's resignation was coerced, yet the Settlement Agreement clearly contradicts that allegation, and demonstrates that he had a choice to either voluntarily resign or face a disciplinary hearing pursuant to Civil Service Law Section 75 and Article XI of the Collective Bargaining Agreement (showing the consideration that Plaintiff received in exchange for his voluntary resignation, as well as the negotiation and circumstances of that resignation); (b) the Settlement Agreement cannot be void due to duress, because Paragraph 15 states that "[e]ach party enters into this Agreement of their own free will and have not been coerced into doing so," any allegations to the contrary in Plaintiff's Amended Complaint are conclusory, and a disciplinary hearing pursuant to the Civil Service Law and Collective Bargaining Agreement was a lawful next step under the circumstances; and (c) not only does the Settlement Agree release Columbia County from liability but it releases Defendants Czajka and Carty (as County officials and/or employees) as well. (*Id.*)

**\*6** Fifth, the moving Defendants argue, contrary to Plaintiff's argument, his Amended Complaint does not allege facts plausibly suggesting, but offers mere speculation, that Defendant Finn reasonably should have known that a false arrest would occur and had a reasonable opportunity to stop it. (*Id.*)

Sixth, the moving Defendants argue, because Plaintiff's response papers do not oppose the moving Defendants' challenge to Plaintiff's claims for punitive damages against Defendant Columbia County District Attorney's Office and Defendants Czajka and Carty in their official capacity, he has conceded the merit of that challenge, and those claims must be dismissed. (*Id.*)

### 2. Motion Filed by the State Defendants

#### a. State Defendants' Memoranda of Law-in-Chief

Generally, in their memoranda of law-in-chief, the State Defendants assert two arguments. (Dkt. No. 13, Attach. 1; Dkt. No. 18, Attach. 1; Dkt. No. 36.)

First, the State Defendants argue, Plaintiff's Second, Third, and Fourth Claims against them must be dismissed for lack of personal involvement in the constitutional violations alleged for the following reasons: (a) the Amended Complaint fails to allege facts plausibly suggesting that Defendant Keeler

created, relied on, or forwarded any "false" information giving rise to a false arrest, malicious prosecution, or deprivation of the right to a fair trial, only that Keeler received advice from Defendant Burns regarding the case against Plaintiff, and then arrested Plaintiff "at the behest of Defendants Finn, Burns and Tashjian"; (b) the Amended Complaint fails to allege facts plausibly suggesting that Defendant Burns created, relied on, or forwarded any "false" information giving rise to a false arrest, malicious prosecution, or deprivation of the right to a fair trial, only that Burns questioned Plaintiff on September 7, 2021, advised Defendant Keeler regarding the case against Plaintiff, commanded or urgently asked Keeler to arrest Plaintiff on October 29, 2021, and then wrote and signed criminal charging documents against Plaintiff on or about October 29, 2021; (c) the Amended Complaint fails to allege facts plausibly suggesting that Defendant Tashjian created, relied on, or forwarded any "false" information giving rise to a false arrest, malicious prosecution, or deprivation of the right to a fair trial, only that Tashjian questioned Plaintiff on September 7, 2021, and commanded or urgently asked Defendant Keeler to arrest Plaintiff on October 29, 2021; and (d) the Amended Complaint fails to allege facts plausibly suggesting that Defendant Jimenez created, relied on, or forwarded any "false" information giving rise to a false arrest, malicious prosecution, or deprivation of the right to a fair trial, only that Jimenez "was the supervisor who signed off on Defendant Keeler's arrest paperwork." (*Id.*)

Second, the State Defendants argue, in the alternative, Plaintiff's Second, Third, and Fourth Claims against Defendant Jimenez (a supervisor) must be dismissed for lack of personal involvement in the constitutional violations alleged for the following reasons: (a) the Amended Complaint fails to allege facts plausibly suggesting that Defendant Jimenez violated the Constitution "through [his] own individual actions," as required by *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); and (b) an alleged failure to supervise an offending subordinate, and/or signing off on an offending subordinate's arrest paperwork, are insufficient to establish such personal involvement. (*Id.*)

#### b. Plaintiff's Opposition Memorandum of Law

**\*7** Generally, in his opposition memorandum of law, Plaintiff argues that he has sufficiently alleged the personal involvement of the State Defendants in the alleged constitutional violations for the following reasons: (a) rather

than contest whether the elements of Plaintiff's Second, Third and Fourth Claims have been plausibly pled, the State Defendants argue only that they were not personally involved in the alleged violations; (b) the personal involvement of Defendant Keeler is plausibly suggested by the factual allegations that he received advice from Defendant Burns regarding the case against Plaintiff, arrested Plaintiff "at the behest of Defendants Finn, Burns and Tashjian," and then "processed" Plaintiff at the Police Barracks with his attorney (as indicated in the Incident Report); (c) the personal involvement of Defendant Burns is plausibly suggested by the factual allegations that Burns was a member of the "Men Outta Business" investigative team, threateningly questioned Plaintiff on September 7, 2021, advised Defendant Keeler regarding the case against Plaintiff, commanded or urgently asked Keeler to arrest Plaintiff on October 29, 2021, and then wrote and signed criminal charging documents against Plaintiff on or about October 29, 2021; (d) the personal involvement of Defendant Tashjian is plausibly suggested by the factual allegations that Tashjian was a member of the "Men Outta Business" investigative team, threateningly questioned Plaintiff on September 7, 2021, commanded or urgently asked Defendant Keeler to arrest Plaintiff on October 29, 2021, and signed the arrest-process Incident Report (as the reporting officer); (e) the personal ineinvolvement of Defendant Tashjian is plausibly suggested by the factual allegations that Jimenez was a member of the "Men Outta Business" investigative team, and "was the supervisor who signed off on Defendant Keeler's arrest paperwork;" and (f) to the extent that each of the State Defendants did not directly take action that gave rise to Plaintiff's Second, Third and Fourth Claims, Plaintiff's Amended Complaint alleges facts plausibly suggesting that those State Defendants are liable for failing to intervene in that directly taken action. (Dkt. No. 38.)

### c. State Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, the State Defendants assert the following three arguments: (a) contrary to Plaintiff's argument that the State Defendants have not contested whether the elements Plaintiff's Second, Third and Fourth Claims have been plausibly pled, the State Defendants have contested those elements, particularly all elements requiring that the any "false" information, "illegality" or "malicious" motivation were associated with Plaintiff's arrest, prosecution and trial; (b) in any event, the personal involvement of the State Defendants has not been plausibly suggested by the facts alleged in the Amended Complaint,

and indeed one of the cases relied on by Plaintiff (*Pittman v. City of New York*, 14-CV-4140, 2014 WL 7399308, at *10 [E.D.N.Y. Dec. 30, 2014]), actually found a *failure* to plead personal involvement; (c) Plaintiff's arguments with regard to Defendant Jimenez disregard the individual action required by *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020); and (d) Plaintiff's failure-to-intervene claims are precluded by his failure to allege facts plausibly suggesting any underlying constitutional violations. (Dkt. No. 41.)

## II. GOVERNING LEGAL STANDARDS

### A. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction. *Makarova*, 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 [2d Cir. 1996]). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved and inferences drawn in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Makarova*, 201 F.3d at 113). Finally, generally, a dismissal for lack of subject-matter jurisdiction must be without prejudice (because the Court lacks jurisdiction to pass on the merits of the claims asserted). *See Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017) ("One other wrinkle: when a case is dismissed for lack of federal subject matter jurisdiction, 'Article III deprives federal courts of the power to dismiss [the] case with prejudice.' ").

### B. Motion to Dismiss for Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549

F. Supp.2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on de novo review).

**\*8** Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." Jackson, 549 F. Supp.2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Jackson, 549 F. Supp.2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [4]

[4]    Accord, Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); Hudson v. Artuz, 95-CV-4768, 1998 WL 832708, at \*1 (S.D.N.Y. Nov. 30, 1998); Powell v. Marine Midland Bank, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

The Supreme Court has explained that such fair notice has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. Jackson, 549 F. Supp.2d at 212, n.18 (citing Supreme Court cases); Rusyniak v. Gensini, 629 F. Supp.2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 Moore's Federal Practice § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. Rusyniak, 629 F. Supp.2d at 213, n.22 (citing Supreme Court and Second Circuit cases); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in Bell Atlantic Corp. v. Twombly, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly, 127 S. Ct. at 1968-69. Rather than turn on the conceivability of an actionable claim, the Court clarified, the "fair notice" standard turns on the plausibility of an actionable claim. Id. at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." Id. at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. Id.

**\*9** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." Iqbal, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," id., it "does not impose a probability requirement." Twombly, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. Iqbal, 129 S. Ct. at 1949 (internal citations and alterations omitted).

Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [5]

[5]    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the

relevance of the document.") e[internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

**III. ANALYSIS**

### A. Motion Filed by the County Defendants and Defendant Finn

#### 1. Whether Plaintiff's First and Fifth Claims Against Defendant Columbia County District Attorney's Office Must Be Dismissed

##### a. First Claim

**\*10**    As an initial matter, the Court will not squarely rely on the cases cited by the moving Defendants regarding this claim because they all arise under 42 U.S.C. § 1983, which (unlike 18 U.S.C. § 2520) is expressly limited to claims against a "person." *See* 42 U.S.C. § 1983 (providing, in pertinent part, that "[e]very person ... shall be liable ..."). However, the Court does rely on the point repeatedly made in those cases regarding sovereign immunity: even if Defendant Columbia County District Attorney's Office could be sued, such suit would be barred by the Eleventh Amendment, because, "[w]hen prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988); *see, e.g., Bryan v. New York*, 14-CV-8305, 2015 WL 4272054, at *3 (S.D.N.Y. July 13, 2015) ("Even if the DA's Office could be sued, such claims would be barred by the Eleventh Amendment. District attorneys' offices enjoy the State's sovereign immunity because New York district attorneys acting in a quasi-judicial capacity[ ] represent the State not the county, ... and the office does not have a legal

existence separate from the District Attorney himself ....")
(internal quotation marks and citations omitted). [6]

[6]    The Court notes that the Second Circuit decision
cited by Plaintiff–*Organizacion JD Ltda. v. U.S.
Department of Justice*, 18 F.3d 91 (2d Cir. 1994)–
did not regard district attorney's offices (much less
a claim under 18 U.S.C. § 2520).

To the extent that Plaintiff argues that he is asserting
this claim against Defendant Columbia County District
Attorney's Office in its administrative capacity, the claim is
not actionable for three alternative reasons: (a) by alleging
facts plausibly suggesting that the material in question was
disclosed before dismissal to an agent of the County who was
performing an investigation, the Amended Complaint alleges
that Defendant Office disclosed it not in its administrative
capacity but as part of a function that was intimately
associated with a prosecutor's function as an advocate; (b)
in any event, even if the Amended Complaint could be
construed as alleging that Defendant Office was acting in
an administrative capacity, it fails to allege facts plausibly
suggesting that there has been a disclosure by a County
entity [7] to anyone other than another County official and/or
employee (but rather alleges only a disclosure by a County
entity to an attorney and law firm known to have "represented
Columbia County in the past," who then confirmed a
reasonable expectation that they were acting as County
employees and/or agents by promptly disclosing the material
to "the County Attorney for Columbia County," *see* Dkt.
No. 19, at ¶¶ 39, 42); and (c) in any event, the Amended
Complaint fails to identify any of the offending members
of that Office (other than Defendants Czajka and Carty,
who have already been sued for allegedly acting in their
administrative capacities), raising the issue of the Office's
lack of involvement in the violation alleged.

[7]    *See Ying Jing Gan v. City of New York*, 996 F.2d
522, 536 (2d Cir. 1993) ("With respect, however, to
claims centering not on decisions whether or not,
and on what charges, to prosecute but rather on
the administration of the district attorney's office,
the district attorney has been treated not as a state
official but rather as an official of the municipality
to which he is assigned.").

Similarly, to the extent that Plaintiff argues that he is
(somehow) asserting this claim against Defendant Columbia
County District Attorney's Office in its individual capacity,

the claim would not be actionable for two alternative reasons:
(a) absolutely immunity would still protect Defendant Office
from liability, because the immunity attaches to Defendant
Office's function, not the manner in which it performed that
function; and (b) in any event, the Amended Complaint fails
to identify any of the offending members of that Office (other
than Defendants Czajka and Carty, who have already been
sued in their individual capacities), raising the issue of the
Office's lack of involvement in the violation alleged.

**\*11**  Furthermore, to the extent Plaintiff argues that Congress
abrogated states' Eleventh Amendment immunity for liability
under the federal Wiretap Act because the term "entity" in
18 U.S.C. § 2520 includes states, this Court has not been
persuaded of that fact. As the Supreme Court has repeatedly
explained, Congress must make its intention "unmistakably
clear in the language of the statute." *See, e.g., Hoffman v.
Conn. Dep't of Income Maintenance*, 492 U.S. 96, 101 (1989).
Here, the Court can find no unmistakably clear intention. For
the sake of brevity, the Court will not linger on the fact that
the effect of the term "entities" on *states* appears diluted by
the term's inclusion of *municipal* entities. More important is
the fact that § 2520(a) provides only a cause of action to vindicate
rights identified in other portions of the federal Wiretap Act
(many of which limit liability to "person[s]," "officer[s]," or
"official[s]").

Relatedly, and as an alternative basis for the Court's ruling,
the Court relies on the Seventh Circuit's reasoning in *Seitz
v. City of Elgin*: even though "entity" as used in 18 U.S.C.
§ 2520 includes government units, § 2520 does not provide
a cause of action against such units because § 2520 itself
creates no substantive rights; rather, § 2520 provides only a
cause of action to vindicate rights identified in other portions
of the federal Wiretap Act, specifically communications
"intercepted, disclosed, or intentionally used in violation of
this chapter." *Seitz v. City of Elgin*, 719 F.3d 654, 657 (7th Cir.
2013). Here, the particular violation of this chapter alleged
by Plaintiff is 18 U.S.C. § 2517. (Dkt. No. 19, at ¶ 54.)
However, § 2517 protects against only actions taken by a
"person," "officer," or "official," not actions taken by an
"office" or "entity." 18 U.S.C. § 2517. Because § 2520 creates
a cause of action only for "violation[s] of" the federal Wiretap
Act, it necessarily follows that § 2520 confers a cause of
action to enforce § 2517 only against a "person," "officer," or
"official" referenced in that section. *Cf. Seitz*, 719 F.3d at 658
("Only a 'person' can violate § 2511(1). And because § 2520
creates a cause of action only for 'violation[s] of' the FWA,
it necessarily follows that § 2520 confers a cause of action

to enforce § 2511(1) only against persons as defined by the statute."). As a result, as the Seventh Circuit found in *Seitz*, the Court finds that "nothing in the 1986 amendments altered the scope of the substantive violation [alleged in this action] by expanding it beyond 'persons' as defined in the [federal Wiretap Act]." *Seitz*, 719 F.3d at 658.

The Court adds that no part of its above-stated analysis is changed by 18 U.S.C. § 2520(g), which provides that "[a]ny willful disclosure or use by an investigative or law enforcement officer or governmental entity of information beyond the extent permitted by section 2517 is a violation of this chapter for purposes of section 2520(a)." This is because § 2517 does not proscribe (and thus effectively "permits") disclosures and uses by governmental "offices" or "entities," proscribing only disclosures and uses by "person[s]," "officer[s]," and "official[s]." 18 U.S.C. § 2517.

For each of these two alternative reasons, the Court dismisses Plaintiff's First Claim against Defendant Columbia County District Attorney's Office.

### b. Fifth Claim

With regard to Plaintiff's Fifth Claim against Defendant Columbia County District Attorney's Office, the Court dismisses that claim for three alternative reasons.

First, the Court relies on the fact that Plaintiff's opposition memorandum of law does not appear to oppose the moving Defendants' challenge to this state law claim against Defendant Office (focusing only on Plaintiff's federal claim against Defendant Office). (*See generally* Dkt. No. 37, at 8-9 [attaching pages "2" and "3" of Plf.'s Opp'n Memo. of Law].) In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.)

(collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases). Here, the moving Defendants have met their modest burden. [8]

[8]    Alternatively, the Court can, and does, deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made–i.e., referencing some claims or defenses but not others–a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

**\*12**    Second, even if the Court were to subject Defendant Office's arguments regarding this claim to the heightened scrutiny appropriate for a contested motion, the Court would and does find that those arguments survive that scrutiny. Specifically, the Court finds that Defendant Office is protected from liability on this claim by sovereign immunity under the Eleventh Amendment for the reasons as stated above in Part III.A.1.a. of this Decision and Order.

Third, in the alternative, the Court would and does find that this claim suffers from the defects identified by the moving Defendants in their reply memorandum of law: (a) in addition to failing to allege that Plaintiff was a party to the collective bargaining agreement he references, the Amended Complaint fails to allege facts plausibly suggesting that a term of the collective bargaining agreement protects Plaintiff's right to continued employment under the circumstances alleged (e.g., the right against having to choose between voluntary resignation or a disciplinary hearing upon the County's receipt of incriminating evidence and/or learning of the imminent filing of a criminal charge); [9] (b) the fact that Defendant Columbia County District Attorney's Office is

distinct in certain respects from Defendant Columbia County (particularly in its role as a prosecutor for the state) does not render it a third party, particularly where Plaintiff alleges that Defendant Office was not acting as a prosecutor at the time in question (but as an administrator, which could only be for the County);[10] (c) Plaintiff concedes that his Amended Complaint does not use the word "breach," and an "injur[y]" is not necessarily a breach, particularly where, as here, the Amended Complaint alleges no specific provision of the collective bargaining agreement that protects Plaintiff's right to continued employment under the circumstances alleged; and (d) the Notice of Claim conspicuously fails to reference either the existence or breach of any contract between Plaintiff and Columbia County (including but not limited to a collective bargaining agreement), much less the contract term that was breached, and thus it fails to sufficiently describe a theory of liability of tortious interference with contract.[11] *See, supra,* Part I.B.1.c. of this Decision and Order.

[9]     *See Wolff v. Rare Medium, Inc.,* 210 F. Supp.2d 490, 499 (S.D.N.Y. 2002) (dismissing claim of tortious interference with contractual relations, because "the Amended Complaint fails to identify the exact terms breached as a result of [defendant's] acts"), *aff'd,* 65 F. App'x 736 (2d Cir. 2003). (*See also* Dkt. No. 4, Attach. 3, at 9 [attaching page "8" of Moving Defs.' Memo. of Law, citing cases].)

[10]    *Cf. Perros v. Cnty. of Nassau,* 238 F. Supp.3d 395, 403 (E.D.N.Y. 2017) (dismissing claim of tortious interference with prospective economic advantage by county employees against county entities and officials, because plaintiffs alleged they had "a business relationship" with defendants, and "[a] claim of tortious interference requires a business relationship with a third party, not the defendant"). (*See also* Dkt. No. 4, Attach. 3, at 9-10 [attaching pages "8" and "9" of Moving Defs.' Memo. of Law, citing cases].)

[11]    (*See* Dkt. No. 4, Attach. 3, at 11 [attaching page "10" of Moving Defs.' Memo. of Law, citing cases].)

For each of these three alternative reasons, the Court dismisses Plaintiff's Fifth Claim against Defendant Columbia County District Attorney's Office.

## 2. Whether Plaintiff's First and Fifth Claims Against Defendant Czajka Must Be Dismissed

### a. First Claim

**\*13**   After carefully considering the matter, the Court dismisses this claim for each of the two alternative reasons offered by the moving Defendants. *See, supra,* Parts I.B.1.a. and I.B.1.c. of this Decision and Order.

First, to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Czajka disclosed the material in question as part of a prosecutor's function as an advocate (which appears to be the case from the timing of the alleged pre-dismissal disclosure to an agent of the County who was performing an investigation for the County), the claim must be dismissed, because it alleges that Defendant Czajka was acting in his prosecutorial capacity, and thus he is absolutely immune from prosecution under the Eleventh Amendment (regardless of whether that claim is asserted against Defendant Czajka in his official capacity or his individual capacity, and regardless of whether the Amended Complaint alleges that Defendant Czajka conspired with others to deprive Plaintiff of his rights, because the immunity attaches to Defendant Czajka's function, not the manner in which he performed it). *Id.*

Moreover, to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Czajka acted in an administrative capacity, the claim is not actionable, because the claim would be alleging that he acted as an agent of the County (not the State),[12] and the Amended Complaint fails to allege facts plausibly suggesting that there has been a disclosure to anyone other than by a County official to another County official and/or employee; rather, Paragraphs 39 and 42 of the Amended Complaint allege only a disclosure to an attorney and law firm known to have "represented Columbia County in the past," who then confirmed a reasonable expectation that they were acting as County employees and/or agents by promptly disclosing the material to "the County Attorney for Columbia County." *Id.*

[12]    *See Ying Jing Gan,* 996 F.2d at 536 (recognizing that, to the extent that a district attorney makes decisions on the administration of the district attorney's office, the district attorney is to be treated

an official of the municipality to which he is assigned).

Second, even if the Amended Complaint has alleged facts plausibly suggesting a disclosure to a third party for purposes of 18 U.S.C. § 2520, the Court agrees with Defendants that Plaintiff's First Claim against Defendant Czajka must be dismissed because, although Plaintiff speculates (in his opposition memorandum of law) that Czajka directed Defendant Carty to disclose the materials in question to the private attorney who had submitted the FOIL request, the Amended Complaint (particularly Paragraph 41) is conspicuously devoid of any factual allegations plausibly suggesting that Czajka *directed* Carty to do so: it merely contains an allegation (in Paragraph 39) that the attorney addressed her FOIL request to Czajka, which is insufficient. *Id.* Such an allegation is not enough to plausibly suggest Defendant Czajka's personal involvement in the violation alleged. In rending this finding, the Court relies on analogous Section 1983 cases in which prison superintendents have been found not personally liable where letters of complaint were addressed to them but then acted on by subordinates. [13] This is especially true where, as here, there is no factual allegation plausibly suggesting that Defendant Czajka even read Ms. Elena DeFio-Kean's letter. [14]

[13]   *See, e.g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997) (finding that a Department of Corrections Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *accord, Grullon v. City of New Haven,* 720 F.3d 133, 140 (2d Cir. 2013); *Swindell v. Supple,* 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord,* 212 F. Supp.2d 123, 126 (W.D.N.Y. 2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

[14]   *Cf. Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D.N.Y. Feb. 20, 2007) (McAvoy,

J., adopting Report-Recommendation by Lowe, M.J., on de novo review) ("[T]here is no evidence in the record that Defendant Goord ever read any of the three letters sent to him by Plaintiff concerning the events of October of 2003, sufficient to give him knowledge that any policy or custom violated the constitution.").

**\*14**   For each of these two alternative reasons, the Court dismisses Plaintiff's First Claim against Defendant Czajka.

### b. Fifth Claim

After carefully considering the matter, the Court dismisses this claim for each of the following four alternative reasons offered by the moving Defendants in their reply memorandum of law: (1) in addition to failing to allege that Plaintiff was a party to the collective bargaining agreement he references, the Amended Complaint fails to allege facts plausibly suggesting that a term of the collective bargaining agreement that protects Plaintiff's right to continued employment under the circumstances alleged (i.e., when the options were a disciplinary hearing or voluntary resignation); (2) the fact that Defendant Columbia County District Attorney's Office is distinct in certain respects from Defendant Columbia County (particularly in its role as a prosecutor for the state) does not render it a third party, particularly where Plaintiff alleges that Defendant Office was not acting as a prosecutor at the time in question (but as an administrator, which could only be for the County); (3) Plaintiff concedes that his Amended Complaint does not use the word "breach," and an "injur[y]" is not necessarily a breach, particularly where, as here, the Amended Complaint alleges no specific provision of the collective bargaining agreement that protects Plaintiff's right to continued employment under the circumstances alleged; and (4) the Notice of Claim conspicuously fails to reference either the existence or breach of any contract between Plaintiff and Columbia County (including but not limited to a collective bargaining agreement), and thus it fails to sufficiently describe a theory of liability of tortious interference with contract. *See, supra,* Part I.B.1.c. of this Decision and Order.

For each of these four alternative reasons, the Court dismisses Plaintiff's Fifth Claim against Defendant Czajka.

### 3. Whether Plaintiff's First and Fifth Claims Against Defendant Carty Must Be Dismissed

#### a. First Claim

After carefully considering the matter, the Court dismisses this claim for the reasons offered by the moving Defendants. *See, supra,* Parts I.B.1.a. and I.B.1.c. of this Decision and Order.

More specifically, to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Carty disclosed the material in question as part of a prosecutor's function as an advocate (which appears to be the case from the timing of the alleged pre-dismissal disclosure to an agent of the County who was performing an investigation for the County), the claim must be dismissed, because it alleges that Defendant Carty was acting in his prosecutorial capacity, and thus he is absolutely immune from prosecution under the Eleventh Amendment (regardless of whether the claim is brought against him in his official or individual capacity, and regardless of whether the claim alleges he conspired with others to deprive Plaintiff of his rights). *Id.*

Meanwhile, to the extent that Plaintiff's First Claim may be construed as alleging that Defendant Carty acted in an administrative capacity, the claim is not actionable for each of two alternative reasons: (1) that claim does not allege the existence of a third-party disclosure as required by 18 U.S.C. § 2520 (but only a disclosure by one agent of the County [15] to another known agent of the County [16]); and (2) in any event, the Amended Complaint alleges only a FOIL disclosure by one "investigative or law enforcement officer" who was "proper[ly] perform[ing] ... [his] official duties" to "another investigative or law enforcement officer" who was "proper[ly] perform[ing] ... [her] official duties," as permitted by 18 U.S.C. § 2517(1),(2). *Id.*

[15]    *See Ying Jing Gan v.*, 996 F.2d at 536 (recognizing that, to the extent that a district attorney makes decisions on the administration of the district attorney's office, the district attorney is to be treated an official of the municipality to which he is assigned).

[16]    (*See, e.g.,* Dkt. No. 19, at ¶¶ 39, 42 [alleging, "Ms. Williams-Riordan's claim that a wiretapped

communication was divulged by the District Attorney to the County of Columbia was true. On September 14, 2022, Elena DeFio-Kean, Esq. from the Hinman Straub law firm submitted a FOIL request to 'District Attorney Paul Czajka.' ... Ms. DeFio-Kean and Hinman Straub had represented Columbia County in the past.... On October 18, 2022, Ms. DeFio-Kean sent the materials to the County Attorney for Columbia County, Rob Fitzsimmons, Esq. ... [N]ine days later, Mr. Ryder was placed on administrative leave and one week later he was told by Ms. Williams-Riordan that she had received information about the wiretap ...."].) The Court notes that the obvious implication of Plaintiff including the fact that counsel had previously represented the County in the same paragraph as the fact that counsel requested the material in question, and three paragraphs before the fact that counsel then provided the material to the County, is that Defendant Czajka should have reasonably expected that counsel would give the material to the County. But Plaintiff cannot create this implication without creating another obvious implication, which inures to his detriment: that counsel had requested the material *on behalf of* the County, as one of its agents. Indeed, this implication is inescapable, because the only alternative implication is that counsel was not acting as an agent (e.g., on a standing instruction and/or retainer) but in the hope of soliciting future business from a former client, which is simply implausible under the circumstances alleged.

**\*15**  For each of these reasons, the Court dismisses Plaintiff's First Claim against Defendant Carty.

#### b. Fifth Claim

After carefully considering the matter, the Court dismisses this claim for the reasons offered by the moving Defendants. *See, supra,* Parts I.B.1.a. and I.B.1.c. of this Decision and Order. More specifically, the Court dismisses Plaintiff's Fifth Claim against Defendant Carty for the same four alternative reasons that the Court dismisses Plaintiff's Fifth Claim against Defendant Czajka. *See, supra,* Part III.A.2.b. of this Decision and Order.

#### 4. Whether, in the Alternative, Plaintiff's First and Fifth Claims Against Defendants Columbia County, Czajka, and Carty Must Be Dismissed Under the Parties' Stipulation of Settlement Agreement

After carefully considering the matter, the Court answers this question in the affirmative for the three reasons offered by the moving Defendants. *See, supra,* Parts I.B.1.a. and I.B.1.c. of this Decision and Order.

First, the Court finds that the Settlement Agreement is integral to the Amended Complaint. The Amended Complaint expressly references Plaintiff's allegedly "coerc[ed]" "resign[ation]" in four paragraphs. (Dkt. No. 19, at ¶¶ 5, 43, 53, 78.) Moreover, in a fifth paragraph, the Amended Complaint indicates the purported basis for that alleged coercion: the fact that, on or about November 3, 2022, Plaintiff was told that, unless he voluntarily resigned within a couple of days, the County would hold a hearing at which (1) the record would include the wiretapped communications that the Amended Complaint elsewhere alleges were illegally disclosed and (2) the County would contest his right to receive unemployment compensation. (*Id.* at ¶ 38.) In this way, the Amended Complaint can fairly and accurately be described as relying heavily on the terms and effect of Plaintiff's resignation on November 18, 2022.

Meanwhile, the terms and effect of Plaintiff's resignation on November 18, 2022, are memorialized in the Stipulation of Settlement Agreement between Defendant Colombia County, Plaintiff and his labor union dated November 17, 2022. (Dkt. No. 31, Attach. 2.) For example, among other things, the Settlement Agreement shows the following: (1) the nature of the "termination hearing" alleged in Paragraph 38 of the Amended Complaint (i.e., one arising under Section 75 of the Civil Service Law Section 75 and Article XI of the Collective Bargaining Agreement); (2) the consideration that Plaintiff received in exchange for his voluntary resignation (which included the payment of the balance of his vacation and compensatory time, the opportunity of the 2022 Health Insurance Buyout at the County Spouse election of $2,000, a neutral reference, and an agreement that the County would not contest his application for unemployment benefits); and (3) the number of days that Plaintiff was in fact given to make the choice alleged in Paragraph 38 of the Amended Complaint (i.e., approximately 14, not "a couple"). (*Id.* at 3-4, 5.) In addition, the General Release (attached to the Settlement Agreement) expressly regards

"contractual benefits pursuant to any collective bargaining agreements" (*id.* at 8), undermining Plaintiff's claim that the moving Defendants interfered with an unspecified term of a collective bargaining agreement (Dkt. No. 19, at ¶¶ 74-75). [17]

[17]  The Court notes that, although Plaintiff characterizes the agreement in question as a "purported" one, he does not dispute the authenticity, accuracy or relevance of the version supplied by the moving Defendants. (Dkt. No. 37, at 9-10 [pages "3" and "4" of Plf.'s Opp'n Memo. of Law].) *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted].

**\*16**  Second, the Court finds that the Settlement Agreement is not void due to duress under the circumstances alleged. For the sake of brevity, the Court will not linger on the effect of Paragraphs 14 through 16 of the Settlement Agreement (which expressly regard, among other things, the fact that Plaintiff had been fully and fairly represented during negotiations, the fact that Plaintiff read and understood the Agreement, and the fact that he entered into it "of [his] own free will" and was "not ... coerced into doing so"). (Dkt. No. 31, Attach. 2, at 5.) [18]  More important is the thinness of the reed on which Plaintiff attempts to base his grave claim of coercion: his allegation that the choice referenced in Paragraph 38 was foisted upon him through the threatened use of illegally disclosed information, amidst a torrent of other factual allegations plausibly suggesting that (1) the disclosure (which was between a County agent to a County employee pursuant to a FOIL request) was lawful, (2) at least 14 days was afforded to make the choice in question, and (3) he was fully and fairly represented during negotiations. Simply stated, enough fact has not been alleged to plausibly suggest duress regarding the Settlement Agreement under the circumstances.

[18]  The Court notes that conspicuously missing from Plaintiff's Amended Complaint is any factual allegation plausibly suggesting that he was not fully and fairly represented during negotiations, or

that he did not read and understand the Settlement Agreement.

Third, the Court finds that the Settlement Agreement releases from liability all three of the Defendants making this argument: Defendant Columbia County, Defendant Czajka, and Defendant Carty. As an initial matter, Plaintiff's argument on this subject does not extend to Defendant Columbia County, only to Defendants Czajka and Carty. (Dkt. No. 37, at 13 [attaching page "7" of Plf.'s Opp'n Memo. of Law].) Furthermore, the Court rejects Plaintiff's argument that Defendants Czajka and Carty were not acting as County officials and/or employees under the circumstances alleged, for the reasons stated above in Part III.A.2.a. and III.A.3.a. of this Decision and Order.

For each of these reasons, the Court dismisses Plaintiff's First and Fifth Claims against Defendants County of Columbia, Czajka, and Carty on this alternative ground.

### 5. Whether Plaintiff's Third, Fourth and Fifth Claims Against Defendant Finn Must Be Dismissed for Lack of Personal Involvement

After carefully considering the matter, the Court answers this question in the affirmative for the reasons offered by the moving Defendants. *See, supra,* Parts I.B.1.a. and I.B.1.c. of this Decision and Order. To those reasons, the Court adds the following analysis.

To establish a claim of failure to intervene against Defendant Finn, Plaintiff must prove, among other things, as follows: (1) that Finn knew, or had reason to know, that the alleged violation was occurring or was likely to occur; (2) that Finn had a reasonable opportunity to intervene and stop the violation; and (3) that Finn did not take reasonable steps to intervene. *Escalera v. Lunn,* 361 F.3d 737, 748, n.4 (2d Cir. 2004); *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir. 2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11-12 (2d Cir. 1988).

Here, the Court cannot find facts plausibly suggesting that Defendant Finn either knew or had reason to know that the alleged violations were likely to occur. Neither being a member of the "Men Outta Business" investigative team nor informing Plaintiff that he would lose his job and have his pistol license revoked if he did not cooperate with that team's investigation (or being present when other investigative-team members did so) plausibly suggests that Defendant

Finn knew, had reason to know, that the subsequent alleged constitutional violations were likely to occur. (Dkt. No. 19, at ¶¶ 23, 28.) Moreover, the Amended Complaint does not allege that Defendant Finn was present at Plaintiff's arrest by state police on October 29, 2021. (*Id.* at ¶ 30.) Similarly, the Amended Complaint does not allege that Defendant Finn was present when criminal charges were filed against Plaintiff by state police, or when those charges were subsequently pursued by the District Attorney's Office. (*Id.* at ¶¶ 31, 36, 63, 70.)

**\*17** Indeed, it is difficult for the Court to find that the Amended Complaint has even alleged facts plausibly suggesting that the underlying alleged violations did in fact occur. Just because the charges against Plaintiff were ultimately dropped (due to a lack of a "good faith defense" to a motion to dismiss) does not mean that his arrest was in fact false (i.e., without probable cause), that his prosecution was in fact malicious, or that his trial was in fact unfair. (Dkt. No. 19, at ¶¶ 6, 44, 67.) [19] Moreover, the Amended Complaint is conspicuously devoid of factual allegations plausibly suggesting that the wiretapped text communications presumably giving rise to Plaintiff's arrest and prosecution were obtained without a warrant or through entrapment, or were in any way fabricated. (*See generally* Dkt. No. 19, at ¶¶ 5, 8, 25, 27, 38, 40, 43, 50-57, 77.) [20] The closest the Amended Complaint comes to alleging the lack of probable cause is when, in support of his Fourth Claim (for denial of a fair trial), he alleges that "Defendants knowingly forwarded false information to prosecutors (verbally and in written reports), that Ryder attempted to purchase an illegal firearm with the intent to distribute it to a third party and further conspired with another to obtain an illegal firearm to distribute it to a third party and/or failed to intervene in such unconstitutional actions despite having the opportunity to do so." (*Id.* at ¶ 70.) However, this conclusory allegation fails to allege facts plausibly suggesting (a) how or why this information was false, (b) how Defendant Finn in particular participated in its forwarding, (c) how prosecutors relied on it, and (d) how that reliance resulted in the denial of a fair trial. (*Id.*)

19    *See, e.g., Warren v. Byrne,* 699 F.2d 95, 98 (2d Cir. 1983) ("Dismissal of the criminal charges against appellants likewise had no conclusive effect on the issues created by appellants' claim of malicious prosecution. Malicious prosecution is based upon a defendant's alleged lack of probable cause to

Case 9:22-cv-00242-AMN-MJK    Document 75    Filed 03/04/25    Page 517 of 531

believe the plaintiff guilty of the crime for which he was prosecuted; and favorable termination has no bearing whatever in and of itself on want of probable cause.") (internal quotation marks omitted); *Lewis v. City of New York*, 11-CV-5044, 2014 WL 12829437, at *4 (E.D.N.Y. Jan. 2, 2014) ("[T]he fact that charges were dismissed or the defendant is ultimately acquitted does not mean that probable cause for the arrest did not exist.").

20    To the extent that Plaintiff suggests that the criminal charges against him were dismissed on December 16, 2022, because Defendant Czajka violated the 90-day warrant-expiration-notice requirement under N.Y. Crim. Proc. Law § 700.50(3), Plaintiff has not alleged facts plausibly suggesting that Defendant Finn knew, or had reason to know, that Czajka was likely to, or did, violate that requirement on December 8, 2021 (90 days after the expiration of the warrant on August 9, 2021). This is especially true, given the factual allegations plausibly suggesting that Defendant Finn was present when Plaintiff was orally informed of the results of that warrant on September 7, 2021. (Dkt. No. 19, at ¶¶ 21, 22, 25.) *See also New York v. Bialostok*, 80 N.Y.2d 738, 747 (N.Y. 1993) ("While CPL 700.50(3) requires written notice, the failure to comply should not result in an order of suppression here when defendant had oral notice of the eavesdropping within the statutory period ....").

In any event, with regard to the third and fourth elements, when considering the reasonableness of any opportunity to intervene, one may consider (in addition to the intervening individual's physical proximity to the violation and the duration of that violation) whether the intervening individual had any authority or power over the offending individual(s). *See, e.g., Rendely v. Town of Huntington*, 03-CV-3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) ("Because Ryan and Rinker were civilian employees of the Town of Huntington, and thus no law enforcement officials, they had no authority of duty to intervene to prevent the Suffolk County police from taking plaintiff into custody."). [21]

21    *See also Porter v. Sauve*, 15-CV-1106, 2016 WL 11807254, at *6, n.15 (N.D.N.Y. Jan. 29, 2016) (Sharpe, J.) ("[B]ecause there are no factual allegations in the complaint which plausibly suggest that Nurse Fairchild had the authority to

intervene when correctional officers were forcibly extracting plaintiff from his cell, plaintiff's Eighth Amendment failure to intervene claim is dismissed as against this defendant."); *White v. Clark*, 12-CV-0986, 2012 WL 5877160, at *6 (N.D.N.Y. Nov. 20, 2012) (Mordue, J.) ("[D]efendants Smith and Rushford are identified as nurses, and there is nothing to suggest that they have the authority to intervene while correctional officers are using force on an inmate."); *Lewis v. Johnson*, 08-CV-0482, 2010 WL 3785771, at *8 (N.D.N.Y. Aug. 5, 2010) (Baxter, M.J.) ("In any event, [Nurse Davenport] lacked the authority to intervene while correction officers were using force on an inmate, even if she were present.").

   **\*18** Here, Defendant Finn was allegedly a City of Hudson Police Detective Sergeant, while the person who arrested Plaintiff (Defendant Keeler) was allegedly a New York State Trooper, and the person who commenced a criminal prosecution against Plaintiff (Defendant Burns) was allegedly a New York State Police Investigator. (Dkt. No. 19, at ¶¶ 15-16 & Caption.) Simply stated, the Amended Complaint does not allege facts plausibly suggesting that Defendant Finn possessed the authority to prevent Defendant Keeler from arresting Plaintiff, or Defendant Burns from commencing a criminal prosecution against Plaintiff, or the Columbia County District Attorney's Office from prosecuting Plaintiff under the circumstances alleged. (*See generally* Dkt. No. 19.)

For each of these alternative reasons, the Court dismisses Plaintiff's Second, Third, and Fourth Claims against Defendant Finn.

### 6. Whether, in the Alternative, Plaintiff's Claims for Punitive Damages Against Defendant Columbia County District Attorney's Office and Defendants Czajka and Carty in Their Official Capacity Must Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons offered by the moving Defendants. *See, supra,* Parts I.B.1.a. and I.B.1.c. of this Decision and Order.

### B. Motion Filed by the State Defendants

After carefully considering the matter, the Court dismisses Plaintiff's Second, Third, and Fourth Claims against the State Defendants for the reasons offered by the State Defendants.

*See, supra,* Parts I.B.2.a. and I.B.2.c. of this Decision and Order. To those reasons, the Court adds only three points (which are intended to supplement and not supplant the reasons of the State Defendants).

First, the State Defendants' arguments of lack of personal involvement are only strengthened by the implausibility of the violations in which they are alleged to have been personally involved. Contrary to Plaintiff's argument that the State Defendant have not challenged the elements of Plaintiff's claims, the State Defendants have done so with regard to several of those elements, and have done so successfully. As Plaintiff himself argues, his Second Claim (for false arrest) requires the element of the confinement being "not otherwise privileged" (e.g., not supported by probable cause); his Third Claim (for malicious prosecution) requires the element of the "lack of probable cause for commencing the proceeding"; and Fourth Claim (for denial of a fair trial) requires the elements of the creation and forwarding of "false information" likely to influence a jury's decision. (Dkt. No. 38, at 4-5 [attaching pages "1" and "2" of Plf.'s Opp'n Memo. of Law].)

Here, the State Defendants have argued that the Amended Complaint does not allege facts plausibly suggesting that the State Defendants created, relied on, or forwarded any "false" information giving rise to a false arrest, malicious prosecution, or deprivation of the right to a fair trial. *See, supra,* Parts I.B.2.a. and I.B.2.c. of this Decision and Order. As the Court has previously observed, just because the charges against Plaintiff were ultimately dropped (due to a lack of a "good faith defense" to Plaintiff's motion to dismiss) does not mean that his arrest was in fact false (i.e., without probable cause), that his prosecution was in fact malicious, or that his trial was in fact unfair. *See, e.g., Warren,* 699 F.2d at 98; *Lewis,* 2014 WL 12829437, at *4. As the Court has also previously observed, Plaintiff's Amended Complaint lacks any factual allegations plausibly suggesting that the wiretapped text communications presumably giving rise to Plaintiff's arrest and prosecution were obtained without a warrant or through entrapment, or were in any way fabricated. (*See generally* Dkt. No. 19, at ¶¶ 5, 8, 25, 27, 38, 40, 43, 50-57, 77.)

**\*19** Simply stated, although it may be *conceivable* that the text communications between Plaintiff and Khalid Lord were not incriminating (and that Defendants Finn, Burns, and Tashjian simply threatened Plaintiff with a baseless prosecution if he did not cooperate with their investigation into the activities of Mr. Lord), that fact

is *implausible,* given (1) the number of Defendants who treated the text communications as incriminating, (2) the number of different offices and departments employing those Defendants (and the different levels of government that those offices and departments were located in), (3) the duration of the investigation and prosecution of Plaintiff (during which time Defendants treated the text communications as incriminating), and (4) Plaintiff's conspicuous failure (in his 14-paged, 78-paragraph Amended Complaint) to allege the nature of his successful motion to dismiss in state court or even the simple fact that the text communications were not in fact incriminating.

Second, to the extent that Plaintiff suggests that the criminal charges against him were dismissed on December 16, 2022, because Defendant Czajka violated the 90-day warrant-expiration-notice requirement under N.Y. Crim. Proc. Law § 700.50(3), Plaintiff has not alleged facts plausibly suggesting that the State Defendants knew, or had reason to know, that Czajka was likely to, or did, violate that requirement on December 8, 2021 (90 days after the expiration of the warrant on August 9, 2021). This is especially true, given the factual allegations plausibly suggesting that Defendants Burns and Tashjian were present when Plaintiff was orally informed of the results of that warrant on September 7, 2021. (Dkt. No. 19, at ¶¶ 21, 22, 25.) *See also Bialostok,* 80 N.Y.2d at 747.

Third, and finally, to the extent that Plaintiff claims that the State Defendants did not directly take action giving rise to Plaintiff's Second, Third and Fourth Claims but failed to intervene in that directly taken action, those claims are precluded for each of two reasons: (a) as a threshold matter, the Amended Complaint fails to allege facts plausibly suggesting any underlying constitutional violations in which the State Defendants could have intervened; and (b) in any event, the Amended Complaint fails to allege facts plausibly suggesting that the State Defendants were present during, and had the opportunity and authority to prevent, the directly taken action giving rise to those constitutional violations.

For all of these reasons, the Court dismisses Plaintiff's Second, Third, and Fourth Claims against the State Defendants.

### C. Plaintiff's Remaining Claims Against John Does #1-10

After carefully considering the matter, the Court dismisses without prejudice Plaintiff's remaining claims against Defendants John Doe #1-10 for failure to diligently name

under Fed. R. Civ. P. 41(b), failure to timely serve under Fed. R. Civ. P. 4(m), lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and/or failure to state a claim under Fed. R. Civ. P. 12(b)(6) for the reasons stated above.

**ACCORDINGLY**, it is

**ORDERED** that the County Defendants' and Defendant Finn's motion to dismiss Plaintiff's claims against them for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. Nos. 4, 31) is **GRANTED**; and it is further

**ORDERED** that the State Defendants' motion to dismiss Plaintiff's claims against them for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. Nos. 13, 18, 36) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 19) is **DISMISSED with prejudice**,[22] except for Plaintiff's First and Fifth Claims against the County Defendants to the extent those claims allege that those Defendants were acting in their prosecutorial capacity, which are **DISMISSED without prejudice**.

[22]   *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim [e.g., despite having been given leave to replead its claim], a complaint should be dismissed with prejudice.") (citation omitted).

**All Citations**

Slip Copy, 2025 WL 391179

---

**End of Document**                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:23-CV-01102**<br>Ryder v. Czajka et al | — | N.D.N.Y. | Aug. 30, 2023 | Docket |

**History (2)**

**Direct History (2)**

1. Ryder v. Czajka ☞
2025 WL 391179 , N.D.N.Y. , Feb. 04, 2025

*Appeal Filed by*

2. Ryder v. Czajka
, 2nd Cir. , Feb. 20, 2025

2009 WL 3672105

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

*MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

**I. REQUEST FOR RECONSIDERATION**
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF
ACTION**
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

2009 WL 3672105

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

[1]    See *Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at *7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at *9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is **GRANTED in part,** and **DENIED in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is **DENIED,** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is **DISMISSED** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (7)

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Third Amended Complaint**<br>Walter RUSYNIAK and Anthony Rusyniak, Plaintiffs, v. Ena Paola GENSINI, Gunila De Montaigu, and Concha Futura, S.A., Defendants.<br>2009 WL 2250055 | PDF | N.D.N.Y. | May 19, 2009 | Pleading |
| **2.  Amended Complaint**<br>Walter RUSYNIAK and Anthony Rusyniak, Plaintiffs, v. Ena Paola GENSINI, Gunila De Montaigu, and Concha Futura, S.A., Defendants.<br>2007 WL 4653169 | PDF | N.D.N.Y. | July 12, 2007 | Pleading |
| **3.  Notice of Removal Under 28 U.S.C. | 1441**<br>Walter RUSYNIAK and Anthony Rusyniak, Plaintiffs, v. Ena Paola GENSINI, Gunila De Montaigu and Concha Futura, S.A., Defendants.<br>2007 WL 4653168 | PDF | N.D.N.Y. | Mar. 16, 2007 | Pleading |
| **4.  Defendants' Reply Memorandum of Law in Support of Motion to Reconsider**<br>Walter RUSYNIAK and Anthony Rusyniak, Plaintiffs, v. Ena Paola GENSINI, Gunila De Montaigu and Concha Futura, S.A., Defendants.<br>2009 WL 3093427 | PDF | N.D.N.Y. | Aug. 10, 2009 | Motion |
| **5.  Memorandum of Law in Opposition to Defendants' Motion to Reconsider**<br>Walter RUSYNIAK and Anthony Rusyniak, Plaintiffs, v. Ena Paola GENSINI, Gunila De Montaigu and Concha Futura, S.A., Defendants.<br>2009 WL 3093426 | PDF | N.D.N.Y. | July 24, 2009 | Motion |
| **6.  Defendants' Memorandum of Law in Support of Motion to Reconsider**<br>Walter RUSYNIAK and Anthony Rusyniak, Plaintiffs, v. Ena Paola GENSINI, Gunila De Montaigu and Concha Futura, S.A., Defendants.<br>2009 WL 2250056 | PDF | N.D.N.Y. | June 08, 2009 | Motion |
| **7.  Docket 5:07-CV-00279**<br>Rusyniak et al v. Gensini et al | — | N.D.N.Y. | Mar. 16, 2007 | Docket |

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**History (2)**

**Direct History (2)**

⚑ 1. Rusyniak v. Gensini
629 F.Supp.2d 203 , N.D.N.Y. , May 05, 2009

*Reconsideration Denied by*

2. Rusyniak v. Gensini 🔖
2009 WL 3672105 , N.D.N.Y. , Oct. 30, 2009

Este-Green v. Astrue, Not Reported in F.Supp.2d (2009)

2009 WL 2473509

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** ⬟ Exhaustion of other
remedies

Representative for a social security payee
failed to exhaust her administrative remedies
before filing her claim since there was no
final decision after a hearing. The Social
Security Administration (SSA) garnished the
representative's wages after attempting to work
out a repayment plan since the representative
was overpaid on behalf of the payee. The
representative contacted the SSA to complain
about the garnishment and shortly thereafter, the
representative filed the action with the Small
Claims Court, without having a hearing or final
order from the Commissioner of Social Security.
Social Security Act, § 205(g), 42 U.S.C.A. §
405(g).

29 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1**  Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 42 U.S.C. §§ 405(g)-(h) and
1383(c)(3), "because Plaintiff's claim appeared to relate to the
payment of Social Security benefits to her as representative
payee for the account of Albertina King." (Dkt. No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision
about her overpayment and to ask that the SSA not recover

2009 WL 2473509

the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of

Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

[1]   *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

[2]   *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J.,

2009 WL 2473509

adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3        *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S.

Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

**III. ANALYSIS**

 **\*3**  After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action.[4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

4        As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is ***DISMISSED.*** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1.  Docket 5:09cv00722**<br>ESTE-GREEN v. ASTRUE | — | N.D.N.Y. | June 24, 2009 | Docket |

**History**

There are no History results for this citation.